**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

WACKER DRIVE EXECUTIVE SUITES,
LLC, on behalf of itself, individually, and
on behalf of all others similarly situated,

                Plaintiff,

      v.

JONES LANG LASALLE AMERICAS
(ILLINOIS), LP,

          Defendant.

Case No. 18-CV-5492

Magistrate Judge Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

Wacker Drive Executive Suites, LLC ("WDES") leased office space at 125 S. Wacker Drive in the Chicago Loop between 2005 and 2017. When the building manager, Jones Lang LaSalle Americas (Illinois), LP ("JLL"), insisted that WDES hire union movers and contractors to make improvements to its leased space, WDES sued alleging that JLL illegally conspired with three unions to bar non-union labor from the building to induce tenants to purchase union labor at inflated prices. JLL now moves to dismiss the complaint in its entirety. The motion is denied.

## BACKGROUND[1]

WDES was a tenant on the third floor of a building located at 125 S. Wacker Drive in Chicago, Illinois from August 2005 through December 2017. Cmplt. ¶ 18. WDES's primary business was leasing shared-full-service-executive office space to people and businesses. *Id.* JLL has been the 125 S. Wacker Drive property manager since 2012. *Id.* Under WDES's lease with the landlord, WDES received a sum of money paid by the landlord to improve its space

---

[1] The Court accepts all well-pled facts as true and construes all inferences in favor of the plaintiff when considering a motion to dismiss. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012).

called a construction allowance. *Id.* at ¶ 19. WDES's landlord is not named as a defendant in this action.

The construction allowance was disbursed to WDES to pay for renovations in its leased space in two phases: one phase in 2014 and the other in 2017. Cmplt. ¶ 20. In 2014, WDES spent $325,000 of its $355,520 construction allowance on improving the ceiling, lighting, carpeting, tiling, kitchen, and cabling. *Id.* at ¶ 21. Although WDES wanted to use less expensive non-union contractors, JLL did not permit it to do so. *Id.* at ¶¶ 22, 23. JLL told WDES that if non-union contractors showed up at the building, they would not be allowed on the freight elevator. *Id.* In 2017, WDES spent $45,000 of its $266,000 construction allowance to modify its office, upgrade the electrical system, and replace carpeting. *Id.* at ¶ 25. In 2017, JLL forbade WDES from using the cheaper, non-union contractors it wanted to use. *Id.* at ¶¶ 26-27. Additionally, in January 2015, WDES purchased office furnishings and JLL forced it to use union movers to transport the furnishings into its space at a cost of $975. *Id.* at ¶ 28.

In this putative class action, WDES alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).[2] Specifically, WDES alleges that JLL repeatedly violated the Hobbs Act, 18 U.S.C. § 1951 (extortion), and the Labor Management Relations Act of 1947 ("Taft-Harley Act"), 29 U.S.C. § 186 (bribery), by preventing non-union contractors from accessing and working in buildings managed by JLL in the Chicago Loop. As result, WDES alleges that it and other similarly situated tenants were forced to pay union contractors and movers at least 20% more than they otherwise would have paid due to the higher cost of union labor.

---

[2]   WDES seeks to represent a class of individuals and entities who were tenants and subtenants in buildings JLL managed in Chicago's Loop area who incurred moving expenses or hired contractors to make improvements in their leased office space in the past four years. Cmplt. ¶ 42.

WDES's Complaint consists of two counts arising under RICO. The first count is for a violation of 18 U.S.C. § 1962(c), which prohibits participation through a pattern of racketeering activity in the affairs of enterprise engaged in interstate commerce The second count alleges a conspiracy to violate subsection (c), which is a violation of 18 U.S.C. § 1962(d). WDES alleges two types of activity that could be considered predicate acts of racketeering. First, WDES alleges that JLL entered into an illegal hot cargo agreement with three unions (the "Unions")[3] under Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e), and its actions in furtherance of the agreement yielded a pattern of repeated violations of the Hobbs Act, 18 U.S.C. § 1951 (extortion). *See* Cmplt. ¶¶ 13, 32.[4] Rather than oppose the Unions' demands for exclusivity, WDES claims JLL accedes and enforces a union-only policy through its tenant handbook/rules and by directing its employees to keep non-union contractors out of the buildings it manages. *Id*. at ¶¶ 16-17. Additionally, JLL allows union agents to monitor the buildings JLL manages to alert JLL whenever non-union contractors are present to demand their removal. *Id.* at ¶ 15. Accordingly, contractors unable to provide proof of union membership are denied entry into JLL managed buildings. *Id.* at ¶ 17.

As for the second type of racketeering activity, WDES alleges that the union-only rule effectively constitutes bribery in violation of Section 302 of the Labor Management Relations Act ("LMRA" or "Taft-Hartley Act"), 29 U.S.C. § 186(a). WDES supports this allegation by

---

[3] The three unions are the International Union of Operating Engineers Local 399, Service Employees International Union Local 1, and Teamsters Local 705. Cmplt. ¶ 11.

[4] "'Hot cargo' in labor law generally refers to goods or products made by nonunion employees or by employers who are considered 'unfair' to organized labor, but the appellation 'hot cargo clause' may also be attached to provisions . . . that prohibit an employer from dealing with other employers that hire nonunion workers." *Milwaukee and Southeast Wisconsin Dist. Council of Carpenters v. Rowley-Schlimgen, Inc.*, 2 F.3d 765, 766 (7th Cir. 1992). Section 8(e) generally prohibits "hot cargo" agreements, but also includes "the so-called 'construction industry proviso,' which places hot cargo agreements between union and employers 'in the construction industry' beyond the reach of the statute." *Id.*

characterizing the union-only policy as a "kickback" to unionized contractors as it forces the tenants into hiring union contractors for work that otherwise would have gone to non-union contractors. Cmplt. ¶¶ 32, 38-39.

## LEGAL STANDARD

JLL moves to dismiss the Complaint based on Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. JLL's Rule 12(b)(1) motion challenges WDES's constitutional standing to bring this lawsuit. Rule 12(b)(1) "provides for dismissal of a claim based on lack of subject matter jurisdiction, including lack of standing." *Stubenfield v. Chicago Housing Authority*, 6 F.Supp.3d 779, 782 (N.D. Ill. 2013) (*citing Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)). "In ruling on a motion to dismiss for want of standing [based on a facial challenge], the district court must accept as true all material allegations of the complaint and must draw all reasonable inferences therefrom in favor of the plaintiff." *Retired Chicago Police Ass'n*, 76 F.3d at 862.

The Rule 12(b)(6) portion of JLL's motion attacks the sufficiency of WDES's complaint. When deciding a Rule 12(b)(6) motion to dismiss, the court also accepts all the well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016). Under the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard does not require "detailed factual allegations," but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Id.* at 679. Resolving a fact intensive inquiry necessary

to decide a question of law is not appropriate at the motion to dismiss stage. *See, e.g.*, *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 482 (7th Cir. 2019); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F.Supp.3d 510, 538-39 (N.D. Ill. 2019). As further explained below, a number of JLL's arguments in its motion to dismiss involve fact-based inquiries that cannot be resolved in a Rule 12(b)(6) proceeding.

## DISCUSSION

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Subsections 1962(a) through (c) prohibit certain "pattern[s] of racketeering activity" in relation to an "enterprise." Subsection 1962(d) makes it unlawful to conspire to violate subsections (a), (b), or (c) of section 1962. To survive a motion to dismiss, WDES must allege a violation of 18 U.S.C. § 1962(c), and specifically: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sabrina Roppo v. Travelers Commercial Ins. Co*., 869 F.3d 568, 587–88 (7th Cir. 2017). The pattern of racketeering activity must consist of at least two violations of certain crimes. 18 U.S.C. § 1961(1)(A) ("racketeering activity means . . . any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . .") (quotations omitted). To bring a claim under § 1962(d), WDES must allege that JLL: (1) agreed to participate or maintain an interest in the operation of an enterprise through a pattern of racketeering activity; and (2) that JLL agreed that a person would commit at least two predicate acts. *See DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (citing *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)).

According to JLL, its conduct, as alleged in the Complaint, did not violate either the Hobbs Act or the LMRA. In its Motion, JLL contends that WDES's complaint should be

dismissed in its entirety on the following grounds: (A) lack of Article III standing; (B) failure to plead a predicate act of extortion under the Hobbs Act because (1) mere acquiescence to union pressure does not amount to an agreement under Section 8(e) of the NLRA, (2) any agreement to ban non-union labor would be permissible under the construction industry proviso exception to Section 8(e), (3) JLL did not obtain extorted property, (4) JLL's conduct was not wrongful; (C) failure to plead a predicate act of bribery under the Taft-Hartley Act because of its statutory exception under subsection (c)(3); and (D) failure to allege that JLL conducted the enterprise's affairs under RICO. The Court analyzes each of these issues in turn.

## I.      Constitutional Standing

Because Article III standing is jurisdictional, standing issues must be addressed before reaching the merits. *See Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (2017). Constitutional standing requires a plaintiff show: (1) that it has suffered a concrete injury, (2) that the injury is fairly traceable to actions of the defendant and not the result of the independent action of a third party not before the court, and (3) that it is likely that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Craftwood II, Inc. v. Generac Power Sys., Inc*., 920 F.3d at 481. JLL contends that WDES cannot allege a fairly traceable injury or an injury that can be redressed by a favorable decision.

### A.      Traceability

With respect to the second requirement of standing, WDES must show that there is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). JLL argues that WDES's "purported injury is not fairly traceable to the actions of JLL; rather it is the direct result of [WDES's] own actions when [WDES] entered into a lease

with the *Landlord*, thereby agreeing to abide by the Building's Rules." (Doc. 34, at 14) (emphasis in original). The Building's Rules contain the union-only requirement. (Doc. 32-2, at 5).

A "self-inflicted" injury may defeat standing when a plaintiff's conduct alone caused his injury. *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 518 (7th Cir. 2010) (holding plaintiff's injury was "entirely self-inflicted, resulting solely from" its litigation decisions); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.5 (3d ed. 2008) ("Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is so completely due to plaintiff's own fault as to break the casual chain.").

WDES's injury is not entirely self-inflicted so as to break the causal chain linking JLL's conduct to the alleged injury. Although WDES made the decision to enter into the lease, it nonetheless alleges that JLL's agreement to an illegal hot cargo agreement with the Unions and its enforcement of this union-only requirement with respect to tenants caused WDES's increased labor and moving costs. Cmplt. ¶¶ 1, 2. These allegations demonstrate that JLL played a role in bringing about the increased labor and moving costs by separately agreeing to the union-only rule and enforcing it with tenants. Because JLL's imposition of its union-only policy with tenants contributed to WDES's increased costs, WDES's action in entering into the lease does not render its payment of above-market price unionized labor "self-inflicted" so as to defeat standing. At this stage of the proceedings, WDES has met its modest burden of alleging that its injury is fairly traceable to JLL's conduct. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (noting that for standing purposes, a plaintiff's burden of alleging that an injury is "fairly traceable" to a defendant's conduct is "relatively modest.").

**B.       Redressability**

As to the third standing requirement, JLL argues that WDES fails to allege an injury likely to be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561. JLL argues that the monetary damages sought (the increased labor and moving costs) stem from the construction allowance[5] in the lease with the landlord, and therefore, those damages are only recoverable from the landlord to whom the allowance was repaid in the form of rent payments. (Doc. 34 at 14-15).

"[A]n individual plaintiff bears the burden of showing that he has standing for each type of relief sought," including "a stake in injunctive relief in particular." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017) (internal citation and quotations omitted). WDES seeks money damages and injunctive relief prohibiting JLL from continuing to enforce the union-only policy. The requested money damages would redress the alleged economic injury—increased price for union labor—of which WDES complains. JLL has not demonstrated that WDES cannot recover the increased contractor labor costs attributable to JLL's actions from JLL. And in any event, the increased costs for union movers do not appear to stem from the construction allowance.

Next, JLL contends that "[WDES] does not have standing to seek injunctive relief because it is no longer a tenant of the Building." (Doc. 34, at 15). WDES does not dispute that an injunction could not redress any potential injury for it. However, it is premature at the motion to dismiss stage to make a final determination on WDES's standing to pursue injunctive relief

---

[5]       The Complaint alleges that a construction allowance is "a sum of money paid by the landlord to improve its space. . . . The money is an advance on the rent the tenant will pay in rent. Thus, the allowance is simply the return of some of the money the tenant will be paying. The larger the allowance, the higher the rent." Cmplt. ¶ 19.

because its "desire to serve as [a] class representative[] complicates matters." *Laurens*, 868 F.3d at 625. In *United States Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980), the Supreme Court held that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied." *Id.* at 404. For example, "[w]hen the claim on the merits is 'capable of repetition, yet evading review,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation." *Id.* at 398.

Here, the current briefing does not address the possibility of injunctive relief for the putative class, which may include current tenants. Because WDES has a damages claim that otherwise supports an injury-in-fact and class treatment remains a possibility, the issue of standing with respect to injunctive relief will be deferred past the pleading stage. *See Laurens*, 868 F.3d at 625 ("[i]f either named plaintiff has a live damages claim that will support injury-in-fact, further proceedings will be necessary, and that would be the best time to explore whether either one also has standing to pursue any type of injunctive relief."); *see also Block v. Lifeway Foods, Inc.*, 2017 WL 3895565, at *7 (N.D. Ill. Sept. 6, 2017) (on a motion to dismiss, declining to rule on whether the plaintiff had standing to pursue injunctive relief until the parties had briefed the issue of class certification).

## II.     RICO Predicate Acts

WDES's first predicate act of racketeering underlying its RICO claim is that JLL entered into an illegal hot cargo agreement under Section 8(e) of the NLRA and that its actions furthering that agreement yielded a pattern of repeated violations of the Hobbs Act, 18 U.S.C. § 1951 (extortion). Section 1951(a) of the Hobbs Act provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do . . . shall be fined under this title or

imprisoned not more than twenty years or both." 18 U.S.C. § 1951(a). Under § 1951(b), "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). JLL's challenges to WDES's RICO claim based on alleged Hobbs Act violations fall into two categories: (1) arguments that WDES has failed to allege a "hot cargo" agreement under Section 8(e) of the NLRA as necessary to establish "wrongful" conduct under the Hobbs Act, and (2) arguments that WDES has failed to allege "extortion" under the Hobbs Act. JLL also argues that WDES's RICO claim involving a predicate violation of the Taft-Hartley Act fails under the statutory exception of Section 186(c)(3). 29 U.S.C. § 186(c)(3). None of these arguments warrants dismissal of WDES's Complaint.

A.      Hot Cargo Agreement under Section 8(e) of the NLRA

WDES seeks to prove "wrongful use of actual or threatened . . . fear" under the Hobbs Act in this case by demonstrating that JLL's alleged conspiracy with the Unions is an illegal (and therefore "wrongful") "hot cargo" agreement under Section 8(e) of the NLRA. Section 8(e) of the NLRA prohibits "hot cargo" agreements by making it an unfair labor practice for a union and an employer "to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employers, or to cease doing business with any other person." 29 U.S.C. § 158(e).

1.      The Existence of an Illegal Hot Cargo Agreement

JLL argues that WDES fails to allege sufficient facts demonstrating that an illegal "hot cargo" agreement exists because its Complaint admits that JLL imposed the union-only rule "at the behest of the three unions" which "threaten[ed] a work stoppage (strike) [and] picketing outside the building," and JLL "accede[d] to their demands." Cmplt. ¶¶ 12-16. According to

10

JLL, under National Labor Relations Board precedent, "this alleged acquiescence to union pressure does *not* constitute a 'contract or agreement' under Section 8(e)" because it is not voluntary. (Doc. 34 at 7) (emphasis in original). JLL is correct that Section 8(e) prohibits voluntary agreements and employer acquiescence to union pressure or coercion may, under certain circumstances, vitiate the voluntariness needed to create a "contract or agreement" under Section 8(e). *General Longshore Workers, ILA*, 235 NLRB 161, 169 (1978) (noting that "Section 8(e) prohibits voluntary agreements."). Nevertheless, whether those circumstances exist is a question of fact that cannot be resolved at this early stage of the litigation and in the context of a motion to dismiss. *Am. Steel Erectros v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 56 (1st Cir. 2016) ("determining whether an arrangement comprises an illegal § 8(e) agreement though 'holistic' inquiry into all surrounding circumstances.").

Specifically, neither case cited by JLL supports a categorical rule that an agreement reached through or reaffirmed in response to union pressure cannot in any circumstance amount to a violation of Section 8(e). Rather, both cases confirm the factual nature of the existence of a voluntary agreement. For example, in *Dairy Employees' Union Local 754*, 210 NLRB 483 (1974), cited by JLL, the ALJ's Section 8(e) decision was made after a trial and upon review of "the entire record in the case," including his observation of witnesses. *Id*. The ALJ found that the employer had "acquiesced" or "succumbed" to the union's threats of what would happen if it dealt with other employers not signatory to the contracts with the union. The ALJ acknowledged that "acquiescence may constitute evidence from which one can infer an implied agreement, [but] such is not always the case." *Id*. at 490. "Considering all of the facts," the ALJ concluded that the employer did not enter into an agreement in violation of Section 8(e) because the

employer had filed an unfair labor practice charge against the union for threatening it into participating. *Id*. at 490 (finding the employer "by filing unfair labor charges in this case, revealed that it was not agreeing with the Respondent as to an 8(e) arrangement.").

This case is distinguishable from *Diary Employees' Union Local* in two important respects. First, the procedural posture is different. In *Diary Employees' Union Local*, the ALJ's decision was made after a trial. WDES has alleged the existence of a hot cargo agreement between JLL and the Union in its Complaint, and at this preliminary stage, the Court is bound to accept those allegations as true. Second, there is no allegation in this case that JLL, unlike the employer in *Diary Employees' Union Local*, objected to the union-only rule sought by the Unions but rather, the Complaint alleges JLL "zealously enforces" the union-only rule. Cmplt. ¶ 17. The other case relied on by JLL, *General Longshore Workers, ILA*, 235 NLRB 161 (1978), involved an agreed factual record consisting of pleadings, stipulated facts, and transcripts and exhibits from an injunction hearing before a district court. Based on this evidentiary record, the National Labor Relations Board found a violation of Section 8(e) but determined that there was no evidence of an independent violation of Section (b)(4)(ii)(A),[6] which requires "independent proof that the employer was restrained and coerced" to enter into a Section 8(e) agreement. *General Longshore Workers, ILA*, 235 NLRB at 169-70. The employer parties in *General Longshore Workers, ILA* "acted of their own free will in entering into" a collective bargaining agreement containing an "union signatory" provision. *Id*. at 169. The Board did not find, however, that union coercion automatically precludes a finding of voluntariness for purposes of Section 8(e).

---

[6]     Section 8(b)(4)(ii)(A) makes it "an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is forcing or requiring any employer . . . to enter into any agreement which is prohibited by section (e)." 29 U.S.C. § 158(b)(4)(ii)(A).

Moreover, the courts and the Board have recognized that an agreement procured through or reaffirmed in response to union economic pressure and threats of work stoppages may fall within the scope of Section 8(e). *See e.g.*, *Am. Steel Erectors*, 815 F.3d at 56; *Sheet Metal Workers, Local Union No. 91 v. NLRB.*, 905 F.2d 417, 421 (D.C. Cir. 1990) (affirming NLRB finding that union violated Section 8(e) where it attempted to secure a union-only clause as part of existing collective bargaining agreement by denying employers who refused discretionary wage and benefit concessions); *Hotel & Restaurant Employees, Local 531*, 237 NLRB 1204, 1206 (1978) (finding a violation of Section 8(e) where the union threatened it would strike in order to compel compliance with the agreement). In *American Steel Erectors*, in the context of a Section 8(b)(4)(ii)(A) claim, the First Circuit upheld a jury verdict finding of an illegal Section 8(e) agreement between a union and third party fabricators where the union pressured the fabricators to sever its relationship with nonunion contractors and to hire replacement union signatories by "stirr[ing] up trouble on the site" "when any potential work delays threatened to be a particularly expensive proposition." *American Steel Erectors*, 815 F.3d at 56. The First Circuit concluded that the "jury rationally could have seen these circumstances as signifying a tacit agreement, attributable to the coercion itself, between each fabricator and Local 7 for a specific course of action: oust the targeted nonunion erector *and* hire a union signatory replacement for the benefit of Local 7 in order to vitiate union obstacles that had been causing project interference." *Id*.

Under this precedent, WDES sufficiently alleges the existence of an illegal "hot cargo" agreement between JLL and the Unions within the contemplation of Section 8(e). WDES alleges that JLL's conspiracy with the Unions is an unwritten "agreement" to require tenants of the buildings it manages to use only union labor. Cmplt. ¶¶ 1, 3, 13. Specifically, WDES alleges

that the Unions successfully exerted pressure on JLL to use union contractors by threatening to strike, picket, and publicly shame JLL. *Id*. ¶ 15. In response to the Union's pressure, JLL "accedes" to the Unions' demands and in turn, "forces" WDES and other tenants to use union contractors and movers through its own economic pressure. *Id*. ¶¶ 16, 28, 34, 53. WDES's alleged accession signifies the existence of an agreement, as "accede" means "to consent or agree; specif., to agree to (a demand, proposal, etc.), esp. after first disagreeing." Black's Law Dictionary (10th ed. 2014). Accordingly, the Court declines, at this stage, to find that WDES cannot establish a voluntary agreement that violates Section 8(e).

### 2. Construction Industry Proviso Exception to Section 8(e)

Next, JLL argues that even if a Section 8(e) agreement exists between JLL and the Unions, Section 8(e)'s exception for the construction industry expressly permits the alleged union-only rule alleged here. This exception, referred to as the construction industry proviso to Section 8(e), allows "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work." 29 U.S.C. § 158(e). WDES disputes that the construction industry proviso applies in this case because: (1) the Supreme Court has limited the exception to agreements in the context of collective bargaining; (2) JLL is not an "employer in the construction industry;" and (3) the work in question was not "construction" work. Although the Complaint appears to allege that the union-only agreement arose in the context of a collective-bargaining relationship, whether JLL can demonstrate that the alleged agreement is exempted by the construction industry proviso of Section 8(e) cannot be resolved on a motion to dismiss because the allegations of the Complaint do not clearly establish that the proviso applies in this case.

WDES first contends that the alleged union-only agreement does not fall within the construction industry proviso because the agreement was not obtained in the context of a collective bargaining relationship, citing the Supreme Court's decision in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616 (1975). In *Connell*, the Supreme Court interpreted the construction industry provision in the context of "a novel and apparently fool-proof organizational tactic: "stranger" picketing aimed at pressuring employers with whom the union had no collective bargaining relationship, and whose employees it had no interest in representing, into signing union signatory subcontracting agreements." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 653 n.8 (1982). After considering the legislative history, the *Connell* Court concluded that the proviso "extends only to agreements in the context of collective-bargaining relationships and . . . possibly to common-situs relationships on particular jobsites as well." *Id*. at 633; *see also Woelke & Romero*, 456 U.S. at 666 (holding that construction industry provision to Section 8(e) protects "subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship.").

WDES points out that it had no collective bargaining relationship with the union contractors it hired to renovate its space and the movers it used to transport office furnishings. WDES thus argues that its own contracting with the union contractors does not establish that the exception for agreements in the context of collective bargaining relationship applies. However, the Complaint does not demonstrate that the necessary collective bargaining relationship under the construction industry proviso exception to Section 8(e) is absent in this case. WDES alleges that JLL has a collective bargaining agreement with two of the three Unions, the International Union of Operating Engineers Local 399 and Service Employees International Union, Local 1. Cmplt. ¶¶ 11, 12. Thus, the alleged union-only requirement agreed to by JLL seems to arise in

the context of a collective-bargaining relationship.  In this respect, this case is distinguishable from *Connell* where there was no collective bargaining agreement and the union demanding the union-only subcontracting clause was a "stranger" to the general contractor in question.  *See also Connell*, 421 U.S. at 619 (holding that construction industry proviso did not apply because general contractor was a "stranger" to the union and the union disclaimed any interest in representing the general contractor's employees).[7]  Accordingly, the Court concludes that the construction industry proviso is not necessarily inapplicable to this case from the face of the Complaint on the ground that the alleged union-only agreement did not arise in the context of a collective bargaining relationship.[8]

Even if the alleged agreement between JLL and the Unions arose within a collective bargaining context, JLL must also demonstrate that it is an "employer in the construction industry" to take advantage of the proviso's exemption from Section 8(e).  In this regard, WDES argues that protection of the Section 8(e) proviso is not available to JLL because: (1) JLL is a

---

[7]     Citing *Spectacor Management Group v. NLRB.*, 320 F.3d 385, 391 (3d Cir. 2003), WDES suggests that to meet the collective bargaining relationship requirement in this case, JLL would have to give "the employees the work in question."  WDES's citation to *Spectacor* in this context is misplaced. The Third Circuit did not address the issue of whether the union-only clause arose in the "context of a collective bargaining relationship."  Specifically, the *Spectacor* court did not find that for an agreement to arise "in the context of a collective bargaining relationship," the contracting employer, as oppose to the neutral, secondary employer, had to be the direct employer of the union workers.  Rather, the portion WDES quotes from *Spectacor* involved the "right of control" test, the second test of whether an alleged hot cargo agreement between a union and an employer amounts to a lawful work preservation agreement. *Id.*  Section 8(e) invalidates "only those contract clauses with secondary objectives, while those with a primary purpose, such as a work preservation, remain[] lawful." *Spectacor*, 320 F.3d at 391.  Here, at least at this stage, JLL has not invoked the work preservation doctrine by arguing that the alleged union-only agreement had the primary objective of influencing the labor relations of its own employees because it had the right to control the work of the contractors and movers.

[8]     Without any analysis or citation to authority, WDES also suggests in a footnote that the construction industry proviso may not apply in this case because the JLL-WDES relationship was not one of general contractor-subcontractor. (Doc. 40, at 4 n.2).  WDES's argument is forfeited for purposes of the motion to dismiss. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (noting "[p]erfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

management company and not engaged in the construction industry and (2) the work that was performed by the union contractors was not construction-industry work as 125 S. Wacker Drive is an existing building.

As to WDES's first argument, JLL contends that it qualifies as an "employer in the construction industry" under the proviso because it is a "real estate management company involved in building construction, alterations, paintings and repairs." (Doc. 34 at 7). Whether an entity is an "employer in the construction industry" for purposes of the proviso is a factual inquiry "dependent upon the circumstances of each situation, rather than on the principal business of the employer" and "turns upon the 'degree of control over the construction-site labor relations it elects to retain.'" *Rowley-Schlimgen, Inc.*, 2 F.3d at 768 (*quoting United Bhd. of Carpenters and Joiners of Am. (Long Drug Stores, Inc.)*, 278 NLRB 440, 446 (1986)). Thus, under the test established by the Seventh Circuit in *Rowley-Schlimgen*, "whenever an employer is able to determine the nature of the workers who will be employed at a construction site through it selection of a subcontractor, the employer is, to that extent, an 'employer in the construction industry' within the meaning of § 158(e)'s construction industry proviso." *Rowley-Schlimgen,* 2 F.3d. at 769. Moreover, because the applicability of the construction industry proviso is an affirmative defense, JLL bears the burden of proof on the issue. *Connecticut Ironworkers Employers Association, Inc. v. New England Regional Council of Carpenters*, 869 F.2d 92, 96 (2d Cir. 2017). As such, WDES need not plead facts showing that the construction industry proviso does not apply. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) ("a complaint need not anticipate and overcome affirmative defenses."). The Seventh Circuit "has cautioned that the "'irregular' approach [of a Rule 12(b)(6) dismissal

based on an affirmative defense] is appropriate 'only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Id*.

Nothing in WDES's Complaint demonstrates that JLL possessed the relevant control over labor relations at the job site on the third floor of 125 S. Wacker Drive. To show that it exercises control over the jobsite and labor relations of the union contractors, JLL points to its Guidebook for New Tenants, which states in part that "[t]enant contractors will be required to comply with all building rules and regulations." (Doc. 32-4, at 17; doc. 32-5, at 17). JLL also cites it Rules and Regulations for Contractors & Vendors and Service Providers, which reads in relevant part that contractors "will be held responsible for any and all of the rules and regulations included herein that are applicable to your work" and "[m]anagement reserves the right to halt or delay any work in the building if we determine that the work interferes with our tenant's ability to reasonably conduct their business." (Doc. 32-3, at 2).[9] Even if these documents demonstrate that JLL could have controlled the labor relations of the union contractors as it suggests, issues surrounding JLL's actual degree of control over the jobsite labor relations are better resolved at summary judgment or ultimately trial based on a more complete factual record. *Rowley-Schlimgen*, 2 F.3d at 768 (after reviewing the summary judgment record, remanding for the district court to determine in the first instance whether defendant was an employer "in the

---

[9]     JLL argues that the Court should consider the 125 South Wacker Drive Rules and Regulations for Contractors & Vendors and Service Providers and Guidebook for New Tenants, attached as Exhibits C, D, and E to its motion to dismiss, in resolving its Motion to Dismiss. "A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Exhibits C, D, and E appear to meet these requirements. WDES references JLL's "tenant handbook/rules" in its Complaint. Cmplt. ¶ 17. The Tenant Handbook and Rules contain the union-only requirement. The Tenant Handbook states that "All contractors working in 125 South Wacker must be Union members." (Doc. 32-4, at 17; doc. 32-5, at 18). The Rules and Regulations state that "[a]ll trades persons are to have the proper trade union or other affiliations as required by the local jurisdictional entities." (Docs. 32-3, at 5). WDES alleges that JLL enforces the union-only agreement through its tenant handbook/rules, and the existence and enforcement of the union-only rule is central to WDES's RICO claims. Cmplt. ¶ 17. Consequently, the Court considers Exhibits C, D, and E attached to JLL's motion to dismiss in resolving the Motion to Dismiss.

construction industry"); *United Bhd. of Carpenters and Joiners of America*, 278 NLRB at 443 (*cited in Rowley-Schlimgen*, 2 F.3d at 768) (finding that although employer owned the building and could have elected to become its own general contractor and retain control of all phases of the construction project, "the actual construction work the "[e]mployer elected to reserve to itself was of such limited scope that the [e]mployer did not become engaged in the construction industry within the meaning of the proviso."). Because the Complaint and Exhibits C, D, and E attached as Exhibits to the Motion to Dismiss do not establish JLL's actual involvement with onsite labor relations, the construction industry proviso does not necessarily operate as a bar to WDES's allegation of an illegal hot cargo agreement at the pleadings stage.

The parties also dispute whether the work performed was at a construction site. *See United Rentals Highway Techs., Inc. v. Indiana Constructors, Inc.*, 518 F.3d 526, 530 (7th Cir. 2008) ("the statutory exception is not for construction workers as such; it is for workers at a construction site"). Whether the work performed by the union contractors and movers in WDES's space of 125 S. Wacker Drive "relate[s] to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work" is another factual question which is inappropriate to resolve on a motion to dismiss. 29 U.S.C. § 158(e). WDES argues that the proviso is inapplicable to work done at an already completed building and thus, 125 S. Wacker Drive does not fall into the definition of a construction site. WDES cites *Spectacor*, 320 F.3d at 395-96, for the proposition that "construction type work performed in a completed building is not 'construction' because no work is being 'built into or affixed to land.'" (Doc. 40, at 4). However, *Spectacor* involved a contract for skilled workers to set up and break down trade shows at a convention center. The *Spectacor* court merely deferred to the NLRB's "reasonable statutory interpretation" that

installing, assembling, and dismantling of trade show exhibits did not constitute "construction" under the proviso because such work was "temporary" and not "built into or affixed" to the land. *Spectacor*, 320 F.3d at 395-96. *Spectacor* did not hold that the proviso is inapplicable to work in an existing or completed building.

Additionally, the Third Circuit in *Spectacor* cited an NLRB decision in which the removal of asbestos from an existing building was considered "construction" where these activities "affect the structure of buildings and equipment, such as boilers and pipes, which, after installation, have become an integral part of the structure, itself." *Spectacor*, 320 F.3d at 394 n.4 (*quoting U.S. Abatement, Inc.*, 303 NLRB 451, 456 (1991)). The NLRB's decision in the *Spectacor* case confirmed that the definition of "construction" includes "new work, additions, alterations, reconstruction, installations, and repairs." *In re South Jersey Regional Council of Carpenters, Local 623*, 335 NLRB 586, 591-92 (2001); *see also In re Garab*, 333 NLRB 16, 22-23 (2001) (noting that the Board has interpreted "construction" in Sections 8(e) and (f) as "cover[ing] repairs to and replacement of 'integral parts' of any immobile structure" in "both new and existing structures.").

However, even if construction industry proviso can apply to work done within a completed building, it is premature to decide whether all the contracted work performed here was at a construction site at the motion to dismiss stage without the benefit of a fully developed record. Only certain work constitutes construction under the proviso, namely projects where the work provided involves "building or affixing to the land." *Spectacor*, 320 F.3d at 395. The Complaint shows that some of the work in question involved "improving the ceilings of the common area, new lighting, carpeting, tiling, reconfiguring the kitchen area, []installing cables" and "modifying the office configurations, upgrading the electrical system, and re-carpeting."

Cmplt. ¶¶ 21, 25.    While this work may constitute construction work, the Complaint lacks sufficient factual detail to form a complete picture concerning the disputed work.  Moreover, some of the additional work alleged in the Complaint involved "movers," and the extent of the movers' involvement in construction-type activity and whether it qualifies as work at a construction site is unknown.  There is no need to make a factual finding on this issue merely on the basis of WDES's allegations where no conclusion can currently be reached on the issue of whether JLL is "an employer" in the construction industry.  Because the Complaint does not allege facts that would definitely make the construction industry proviso applicable, JLL's motion to dismiss based on this exception to Section 8(e) of the NLRA is denied.

### B.    Extortion Under the Hobbs Act

JLL's second challenge to WDES's Hobbs Act claim focuses on whether WDES can prove extortion under the Hobbs Act, which is defined as "the obtaining of property from another, with his consent, inducted by wrongful actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). JLL contends that WDES's allegations fail to demonstrate that JLL obtained any property from WDES or that it did so through the use of any wrongful act or threatened force, violence, or fear.

### 1.    "Obtained" Extorted Property Under the Hobbs Act

JLL first argues that WDES's Hobbs Act claim fails "because JLL extorted no property from [WDES]" by imposing the union-only rule on the building's tenants through its alleged "hot cargo" agreement. (Doc. 34 at 11).  In response, WDES alleges that the "extorted property is the money that WDES was required to spend on more expensive union services." Cmplt. ¶ 34. JLL argues that WDES did not allege and cannot allege that JLL obtained this extorted property because WDES paid this money directly to the union contractors and JLL did not receive any

benefit as a result. Thus, according to JLL, it did not extort property from WDES because it did not personally obtain property from WDES.

The Supreme Court and several circuits have held that the "obtain" requirement can be met by directing the extorted property's transfer to a third-party. *See, e.g.*, *United States v. Green*, 350 U.S. 415, 418, 420 (1956) (rejecting the view that "the Hobbs Act covers only the taking of property from another for the extortioner's personal advantage" because "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property."); *United States v. Brissette*, 919 F.3d 670, 679 (1st Cir. 2019) (collecting cases). JLL argues that the Supreme Court's decision addressing the "obtaining of property" element in *Sekhar v. United States*, 570 U.S. 729 (2013) holds otherwise. *Sekhar* involved the appeal of an attempted extortion conviction under the Hobbs Act of New York State's Comptroller's Office's General Counsel. The Supreme Court ultimately reversed the conviction and held that attempting to compel a person to recommend that his employer approve an investment does not constitute "obtaining of property from another" under the Hobbs Act. *Id.* at 731 and 735-36. In its holding, *Sekhar* noted that the Hobbs Act's "obtaining of property" element requires proof of "the acquisition of property" – "[t]hat is," proof that "the victim part[ed] with his property, and that the extortionist gain[ed] possession of it." *Id.* at 735 (internal quotations and citations omitted). But the circuits to have squarely addressed this question post-*Sekhar* have held that a defendant meets the "obtain" element by directing its transfer to another entity, irrespective of whether he receives any personal benefit as a result. *See Brissette*, 919 F.3d at 679; *United States v. Carlson*, 787 F.3d 939, 944 (8th Cir. 2015) (holding the "obtaining of property" element met where the defendant "did demand items of value, she just did not seek to obtain them for herself" (emphasis omitted)). On this point, the First Circuit recently

commented: "we do not see how that part of *Sekhar* precludes the conclusion that a defendant may 'acqui[re]' property within the meaning of *Sekhar* by directing its transfer from the victim to a party of his choosing, notwithstanding that he does not otherwise personally benefit from the transfer." *Brissette*, 919 F.3d at 678.

The Court finds that a persuasive approach concerning the "obtaining of property" element was recently taken by the First Circuit in the factually analogous case of *Brissette*, 919 F.3d 670 (1st Cir. 2019). *Brissette* involved the criminal prosecution of two officials of the City of Boston for Hobbs Act extortion and conspiracy. *Id.* at 672. The two city officials allegedly threatened to withhold permits needed by a production company to put on a music festival unless the company agreed to hire additional workers from a specific union to work at the event. *Id.* The defendants in *Brissette* made a similar argument to JLL's argument here – that a person "obtain[s] . . . property" within the meaning of the extortion provision of the Hobbs Act by bringing about its transfer another, only if the person received a personal benefit from the transfer. *Id.* at 676-77. *Brissette* rejected that argument and aligned the First Circuit with the other circuits that have resolved the same question. *Id.* at 678-79, 690 (collecting cases) (*see, e.g.*, *United States v. Panaro*, 266 F.3d 939, 948 (9th Cir. 2001) ("Of course, 'it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom. The Hobbs Act does not require such proof.'") (internal citation omitted); *United States v. Hyde*, 448 F.2d 815, 843 (5th Cir. 1971) ("One need receive no personal benefit to be guilty of extortion; the gravamen of the offense is loss to the victim.") (internal citation omitted); *United States v. Provenzano*, 334 F.2d 678, 686 (3d. Cir. 1964) ("it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom")); *see also United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986) ("[t]o

secure a conviction under the Hobbs Act, the prosecution does not have to show that the defendant acted to receive, either directly or indirectly, the proceeds of his extortion or any benefit therefrom."). The *Brissette* court concluded that the "obtaining of property" element "may be satisfied by evidence showing that the defendants induced the victim's consent to transfer property to third parties the defendants identified, even where the defendants do not incur any personal benefit from the transfer and even where the transfer takes the form of wages paid for real rather than fictitious work." *Id*. at 687-68.

JLL attempts to distinguish *Brissette* on the ground that the underlying contract for use of the City's space in *Brissette* did not obligate the company to hire unionized workers while WDES's lease for use of the building owner's space did precisely that. It also points out that in *Brissette* the city officials directed wages to a specific union, but here JLL only prevented WDES from directing wages to non-union workers generally in accordance with the building owner's rule. The current record does not definitively demonstrate, however, that JLL, as building manager, was merely enforcing a pre-existing obligation between WDES and the building owner, as opposed to following its own union-only agreement with the Unions and enforcing this restriction on tenants in the buildings it manages. Cmplt. ¶¶ 1, 3, 13, 14. The lease provides that all tenants "shall observe and comply with the Rules and Regulations, as supplemented or amended from time to time." (Doc. 34-1, at 49). The Rules and Regulations state that they were "developed by building management of 125 S. Wacker Drive to provide information regarding procedures for the building." (Doc. 32-2, at 2). The Complaint's allegations and these documents allow a reasonable inference that although the lease requires WDES to follow building rules, JLL, not the landlord, may have "developed" or created the union-only rule. Regardless, even if JLL was merely enforcing the landlord's union only restriction as it contends

(which ignores the Complaint's allegations of an illegal hot cargo agreement), JLL has not explained how this distinction demonstrates that WDES fails to adequately allege the "obtaining" element under the Hobbs Act extortion provision even though it did not receive the extorted property or any personal benefit from it, which was the primary issue on appeal in *Brissette*. Put another way, JLL's reliance on the different factual scenarios presented in *Brissette* and this case is a distinction without a difference.

Turning to the Complaint in this case, WDES alleges that JLL directed third-party unions laborers to receive extorted property by requiring WDES to hire exclusively union labor. *See, e.g.*, Cmplt. ¶ 34. This allegation is sufficient to satisfy the "obtaining of property" element of WDES's claim that JLL violated the Hobbs Act. Accordingly, dismissal on this ground is not warranted.

### 2.    "Wrongful" Conduct Under the Hobbs Act

JLL next contends that the Complaint's alleged conduct does not rise to the level of "extortion" under the Hobbs Act. The Complaint alleges that "unless WDES (and the other tenants) accede to JLL's demands, they will not be able to start or complete their renovations and open for business." Cmplt. ¶ 34; *see also* Cmplt ¶ 35 (alleging JLL's refusal "to allow tenants to conduct business unless they use union labor . . . effectively holds hostage the tenants' ability to run their own business."). JLL suggests this alleged conduct merely constitutes coercion, by way of fear of economic loss, which does not amount to extortion under the Hobbs Act.

JLL is correct that "coercion, as the Supreme Court observed in *Scheidler*, is not extortion, and it is not a violation of the Hobbs Act." *Wackenhut Corp. v. Service Employees Intern. Union*, 593 F.Supp.2d 1289, 1296 (S.D. Fla. 2009). The requirement that property must be obtained to constitute extortion distinguishes it from coercion, which involves the use of force

or threat of force to restrict another's freedom. *See Scheidler v. National Organization for Women*, 537 U.S. 393, 405 (2003) ("[e]liminating the requirement that property must be obtained to constitute extortion would not only conflict with the express requirement of the Hobbs Act, it would also eliminate the recognized distinction between extortion and the separate crime of coercion."). "[C]oercion and extortion overlap to the extent that extortion necessarily involves use of coercive conduct to obtain property." *Id*. at 407-08. Because WDES's allegations satisfy the "obtaining of property" element of the extortion statute, as explained above, the Complaint states more than a claim for coercion.

JLL also argues that its alleged use of economic fear is not "wrongful" under the Hobbs Act. *See* 18 U.S.C. § 1951(b)(2) ("'extortion' means the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or *fear*, or under color of official right.") (emphasis added). The Complaint alleges that JLL induced WDES to use union-only labor through "fear of lost income" and "economic fear." Cmplt. ¶¶ 34, 36. Although "fear" under the Hobbs Act can include fear of economic loss, "there is nothing inherently wrongful about the use of economic fear to obtain property." *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 838 (9th Cir. 2014) (collecting cases); *U.S. v. Granados*, 142 F.3d 1016, 1020 (7th Cir. 1998) ("[e]xtortion is the wrongful use of force or fear, including fear of economic harm, in order to obtain money or property from another person."). The "fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *United Bhd. of Carpenters & Joiners of Am.*, 770 F.3d at 838. Therefore, courts must differentiate between legitimate use of economic fear and wrongful use of such fear. *Id*.

The Supreme Court held in *United States v. Enmons*, that a defendant violates the Hobbs Act only "where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. 396, 400 (1973). *Enmons* involved union employees who destroyed their employer's equipment to obtain a new collective bargaining agreement. *Id.* at 397-98. *Enmons* held, however, that this violent conduct did not violate the Hobbs Act because in the labor context, the Act "does not apply to the use of force to achieve legitimate labor ends," such as "higher wages in return for genuine services." *Id.* at 400-01. Instances of wrongful conduct by a union or its members include "where union officials threatened force or violence against an employer in order to obtain personal payoffs" and "where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." *Id*. at 400 (internal citation omitted). Thus, "the use of force, violence, or fear to obtain property is—'wrongful'—for purposes of the statute only when the alleged extortionist has no claim of right to that property." *Rennell v. Rowe*, 635 F.3d 1008, 1011 (7th Cir. 2010). The Seventh Circuit has explained: "If a defendant has no claim of right to property, the use of fear to obtain the property—including the fear of economic loss—may . . . amount to extortion." *Id*. at 1012. On the other hand, "where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred." *Id*.

JLL offers two reasons why its alleged use of economic fear is not wrongful under the Hobbs Act. First, it asserts that the landlord is legally permitted to require union-only contractors for work at a construction site under the construction industry proviso and JLL merely enforces this rule as the building manager. Second, it claims that the Unions have a

lawful claim to the money that WDES paid for the legitimate work they provided. Neither argument demonstrates that WDES's extortion claim fails at this stage.

Under *Enmons*, the relevant issue is whether JLL, the alleged extortionist, has a lawful claim to the extorted property, the wages that WDES was required to spend on union contractors. Resolution of this issue depends on the applicability of construction industry proviso defense which, as discussed above, is not properly resolved at the pleading phase. Moreover, the Complaint alleges that WDES acceded to JLL's demands for union-only contractors because it feared lost income if it was unable to start or complete renovations and open for business. *Id.* ¶¶ 34-35. By alleging that JLL used fear of economic harm or loss to impose the union-only rule on WDES and obtain property to which JLL has no lawful claim because it is based on an illegal hot cargo agreement, WDES's Complaint plausibly pleads wrongful conduct by JLL. These allegations are sufficient at this stage to satisfy the wrongfulness element of the Hobbs Act.

### C. Bribery Under the Labor Management Relations Act (Taft-Harley Act)

As a second type of racketeering activity underlying its RICO claim, WDES contends that JLL's alleged conduct of forcing tenants into hiring exclusively union laborers violates the Labor Management Relations Act ("LMRA"). *See* Cmplt. ¶¶ 38-40. 29 U.S.C. § 186(a)(2) makes it "unlawful for any employer . . . to pay, lend, or deliver . . . any money or other thing of value . . . to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(2). WDES reasons that JLL violates this provision by requiring tenants to use union-only contractors and this "is effectively a kickback by JLL to the unionized contractors who would otherwise not get hired by the tenants." Cmplt. ¶ 39.

JLL contends that the wage payments WDES made to union contractors qualify as an exception under 29 U.S.C. § 186(c)(3). Subsection (c)(3) permits "the sale or purchase of an article or commodity at the prevailing market price in the regular course of business." 29 U.S.C. § 186(c)(3). JLL asserts that "there is no claim here that the union contractors' services were sold to or purchased by [WDES] at anything other than the prevailing market rate for union construction in the regular course of business." (Doc. 34 at 11). JLL's argument, however, ignores allegations to the contrary in WDES's Complaint that JLL's actions drove up the price of union labor above "the prevailing market rate." Cmplt. ¶ 2; *see also* Cmplt. ¶¶ 29, 31 (alleging "[t]hose tenants preferring to use union labor have also been overcharged because the labor for contracting services has been closed to effective competition, meaning union labor is supracompetitively priced, i.e., above the price it would be if the union-only rule were not in place."). Moreover, for a transaction to fall under the Section 186(c)(3) exception, it must not only be at the "prevailing market price" but also be done "in the regular course of business." The Complaint's allegations do not establish that the transactions here occurred in the regular course of business. Rather, the Complaint alleges that the wages from WDES to the union contractors were not in the regular course because they were purportedly the result of an illegal hot cargo agreement and extortion. In the end, the applicability of the statutory exception of Section 186(c)(3) presents factual questions regarding whether the transactions here were "at the prevailing market price" and "in the regular course of business" which preclude dismissal claim of WDES's claims based on Section 302 of the LMRA at the pleading stage.

## III.    "Conducted" the Affairs of a RICO Enterprise

Lastly, JLL argues that WDES has failed to adequately allege that JLL "conduct[ed]" the affairs of an "enterprise" within the meaning of 18 U.S.C. § 1962(c). Section 1962(c) requires, among other things, that a "'person' must have 'conducted or participated in the conduct of the

'enterprise's affairs,' not just [its] own affairs.'" *United Food & Commercial Workers Union & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) (*quoting Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)); *Reves*, 507 U.S. at 179 ("conduct" requires "some degree of direction.").  To state a claim under Section 1962(d), WDES must allege that JLL agreed to act on behalf of the enterprise. *Walgreen*, 719 F.3d at 856 ("the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.") (internal citation omitted).

JLL contends that the Seventh Circuit's *Walgreen Co.* decision establishes that WDES's allegations are insufficient to state a claim that JLL "conducted or participated in the conduct of the enterprise's affairs."  In *Walgreen Co.*, an employee benefit fund filed a class action against Walgreen Company and two pharmaceutical companies (collectively "Par") under RICO for fraudulently overcharging the fund and other insurance providers for drug prescriptions by allegedly "filling prescriptions for several generic drugs with a dosage form that differed from, and was more expensive than, the dosage form prescribed to the customer." *Walgreen Co*. 719 F.3d at 850.  The fund claimed that Walgreens and Par conducted an association-in-fact RICO enterprise for the purpose of overcharging insurers by switching dosage forms of certain prescriptions drugs. *Id*. at 853.  The fund argued that it had sufficiently pled that Walgreens and Par were conducting the affairs of the enterprise rather than their own affairs.  In particular, the fund alleged that representatives from the companies regularly communicated. *Id*. at 854.  The fund further "described actions taken by each company—namely, that Par manufactured the expensive dosage forms and that Walgreens rigged its internal computer systems automatically to switch all ranitidine and fluoxetine prescriptions to the expensive dosage forms." *Id*.

The Seventh Circuit held that the fund failed to adequately allege that Walgreens and Par were conducting the affairs of the enterprise, as opposed to their own affairs. *Walgreen Co.* 719 F.3d at 854. Although the fund alleged regular communications between Walgreens and Par, "nothing in the complaint reveale[d] how one might infer that these communications were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests." *Id.* (emphasis in original); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (RICO "liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs."). Specifically, the complaint did not allege that "officials from either company involved themselves in the affairs of the other." *Walgreen Co.*, 719 F.3d at 854. "Nor [did] the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the . . . enterprise or to individual enterprise members." *Id.* at 855. Rather, "the activities the complaint describe[d] [were] entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filing prescriptions." *Id.*

In contrast to *Walgreen Co.*, the allegations here satisfy the conducting the enterprise's affairs pleading requirement. WDES defines the enterprise an association-in-fact consisting of JLL and the Unions which has a common purpose of forcing union-only labor on commercial tenants in buildings managed by JLL. Cmplt. ¶¶ 54, 55. WDES alleges several facts permitting a reasonable inference that JLL and the Unions involved themselves in the affairs of the other and worked as a distinct enterprise rather than as completely separate entities in implementing the union only rule at JLL managed buildings. For example, WDES alleges regular communication and coordinated action between JLL and the Unions to carry out the enterprise's union-only goal.

WDES claims that JLL "zealously enforces" the union-only policy by directing its building managers to keep non-union contractors out of the buildings it manages. *Id*. at 17. Building managers require proof of union membership before permitting a contractor into the building and deny building access to non-union contractors. *Id*. JLL allows union agents to "constantly patrol all of JLL buildings and report any non-union contractors to JLL building managers." *Id*. ¶ 56.

As further cooperation, the Complaint alleges that union "business agents, who operate outside the buildings, and union stewards, who are employees inside, closely monitor all contracting in JLL buildings. If they see a truck near the loading docks without the familiar union decals they spring into action and immediately notify the property manager and demand that non-union contractor/firm be removed." Cmplt. ¶ 15. If the non-union contractor is not removed, "the agents and/or stewards notify their union officials at its local office [who] will then call the property manager [and] demand expulsion." *Id*. Additionally, JLL building managers allegedly instruct "their subordinates in each of its Loop buildings to report any instance of a [non-union] violation to JLL's building managers." *Id*. at 56.

Unlike in *Walgreen Co.*, these concerted actions designed to prevent third-party tenants from using non-union labor amount to more than "parallel uncoordinated" illegal activity which exceeds the typical employer and union relationship. *Walgreen*, 719 F.3d at 855, 856 (noting without any indication "how the cooperation in this case exceeded that inherent in every commercial relationship between a drug manufacturer and a pharmacy," both the substantive RICO claim and the conspiracy claim failed). Moreover, there is an allegation here that JLL shared the proceeds from the illegal union-only scheme with agents of an enterprise member as the alleged extorted wages went to union members. *Id*. at 855 (noting no allegation that "profits

from the illegal drug-switching were siphoned off to the [] enterprise or to individual enterprise members.").

Finally, JLL asserts that its enforcement of the non-party landlord's union-only rule establishes nothing more than JLL "advance[ing] *its own* interests as the building manager by performing the contractual obligations of the position." (Doc. 45 at 3). Again, the Complaint and the exhibits attached to the Motion to Dismiss do not establish that the union-only rule was the landlord's rule which JLL was merely enforcing. Instead, the Complaint alleges that JLL and the Unions reached an illegal hot cargo agreement and have each contributed to the implementation of the agreement for the purpose of forcing union-only labor on commercial tenants in buildings managed by JLL.

The Court concludes that WDES's allegations, considered as a whole and construed in its favor as required at this stage of the proceedings, suffice to show that JLL conducted or participated in the enterprise's affairs. For the same reasons, the allegations are sufficient to state an agreement by JLL to participate in the scheme and that predicate acts would occur to enforce the union-only rule to support its Section 1962(d) claim. *Nesbitt v. Regas*, 2015 WL 1331291, at *17 (N.D. Ill. March 20, 2015).

## CONCLUSION

For the above reasons, this Court denies JLL's Motion to Dismiss [31]. JLL shall answer the Complaint by June 11, 2019. MIDP responses are due by July 11, 2019. Joint initial status report with a proposed fact discovery schedule is due by July 19, 2019. Status hearing is set for July 25, 2019 at 9:15 a.m. in Courtroom 1858.

**SO ORDERED.**

Dated: May 28, 2019

_____
Sunil R. Harjani
United States Magistrate Judge