# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

WACKER DRIVE EXECUTIVE SUITES,
LLC, on behalf of itself, individually, and on
behalf of all others similarly situated,

    **Plaintiff,**

  v.

JONES LANG LASALLE AMERICAS
(ILLINOIS), LP,

    **Defendant.**

**Case No. 1:18-cv-5492**

**Magistrate Judge Sunil R. Harjani**

## PLAINTIFF'S MOTION FOR RULE 23 CLASS CERTIFICATION

Plaintiff Wacker Drive Executive Suites, LLC ("WDES" or "Plaintiff"), by undersigned counsel, on behalf of all those similarly situated, hereby submits its brief in support of its Motion for Class Certification, pursuant to Fed. R. Civ. P. ("Rule") 23(b)(2) and (3) ("Motion for Class Certification"). For the reasons stated herein, Plaintiff's Motion for Class Certification should be granted.

**INTRODUCTION**

This is a Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968

("RICO"), class action brought by WDES, a former tenant at a building located at 125 S. Wacker

Drive in the Chicago Loop, to recover damages sustained by tenants of 20 office buildings in the

Chicago Loop managed by Defendant Jones Lang LaSalle American (Illinois), LP ("JLL" or

"Defendant") as the result of an illegal conspiracy/agreement between JLL and three labor unions[1]

to force tenants into hiring union-only movers and union-only building trades contractors

("contractors").

The cost difference between union and non-union labor in the Chicago Loop is substantial:

union contractors cost over 35% more and union movers cost over 20% more that non-union

laborers. *See* Expert Report of Robert Kaestner, attached as Exhibit A. Because of the illegal

agreement, WDES was forced to spend thousands of dollars more for union movers and union

building trade work to renovate its space. And as will be shown, every tenant in all 20 buildings

JLL managed during the class period who hired movers and contractors had no choice but to pay

the inflated premium. If the case is certified, the tenants will have the opportunity to recoup

millions of dollars in damages extracted as a result of JLL's illegal "hot cargo" agreement with the

unions.[2]

---

[1] The three unions are: International Union of Operating Engineers Local 399, AFL-CIO; Service
Employees International Union, Local 1; and Teamsters Local 705, collectively "the three unions."

[2] A "hot cargo agreement" is a violation of 29 U.S.C. §158(e) which prohibits "secondary
boycotts" between an employer and a union to refuse to deal with a different employer because of
a dispute with the primary employer. Here, the primary employer is JLL. It has collective
bargaining agreements with its engineer's union, Local 399 of the AFL-CIO, and its janitors union,
SEIU Local 1. The Complaint alleges that this agreement violates §8(e) and the Hobbs Act (18
U.S.C. §1951), the federal statute which prohibits extortion. The Complaint also alleges violations
of 29 U.S.C. §186. These are a RICO predicate acts. *See* 18 U.S.C. §§1961(1)(B) and (C).

The case was filed on August 13, 2018. D.E. 1.[3] Discovery has been ongoing since July 31, 2019 (and is continuing through the filing of this Motion). D.E. 61. WDES alleges that JLL's conspiracy with the three unions violates several statutes: 18 U.S.C. §1951 (based on violations of 29 U.S.C. §158(e) as an illegal "hot cargo agreement"); 29 U.S.C. §186; and 18 U.S.C. §§1962(c) and (d). WDES alleges that this conspiracy is ongoing through the present. *See* D.E. 76 at 10-13.

This case is ideally suited for certification under Rule 23(b)(2) and (3). The claims of each and every putative class member can be adjudicated in one proceeding that resolves four significant, overarching class-wide questions: 1) Was there a policy and practice which prevented tenants from using non-union movers/contractors at JLL managed buildings in the Chicago loop?; 2) Did JLL agree/conspire with the three unions to enforce this requirement?; 3) Did tenants incur increased labor costs as a result?; and (4) What is the proper measure of damages? Because the answers to these questions will adjudicate the claims of all Class Members in one stroke, the Court should certify Plaintiff's claims under Rule 23(b)(2) and (3). These four questions will yield common answers which will drive resolution of this litigation and thus overwhelmingly predominate over any individualized issues that JLL may attempt to raise.

Indeed, for purposes of class certification, this case is akin to antitrust cases in which courts in this circuit routinely find that a conspiracy to affect prices gives rise to common issues of law and fact. Such cases are well suited for class certification even when the legal and factual issues are complex. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012); *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prod. LLC*

---

[3] An Amended Complaint was filed on September 6, 2019, which is substantially the same as the original complaint. D.E. 76.

*v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001); *Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999).

Accordingly, this Court should find that Plaintiff has more than met its burden of proving by a preponderance of the evidence that this case is suited for class certification.

## FACTS

### JLL Requires Tenants To Hire Union Movers And Contractors Exclusively At All Chicago Loop Locations

Since the start of the class period on August 14, 2014 through the present, JLL manages or has managed the following 20 buildings in the Chicago loop: 1) 1 North Franklin Street; 2) 101 North Wacker Drive; 3) 111 South Wacker Drive; 4) 111 West Jackson Boulevard; 5) 123 North Wacker Drive; 6) 125 South Wacker Drive; 7) 175 West Jackson Boulevard; 8) 180 North LaSalle Street; 9) 20 North Wacker Drive; 10) 200 West Adams Street; 11) 200 West Jackson Boulevard; 12) 224 South Michigan Avenue; 13) 231 South LaSalle Street; 14) 36 South Wabash Avenue; 15) 71 South Wacker Drive; 16) 175 North Franklin Street; 17) 201 North Clark Street; 18) 300 South Wacker Drive; 19) 330 South Wells; 20) 77 West Wacker Drive[4] (hereafter "class buildings"). *See* JLL's Response to Plaintiff's First Set of Interrogatories, attached as Exhibit B.

Discovery in this case confirms what the National Labor Relations Board has already found: a long-standing conspiracy exists between management companies of Chicago Loop buildings and labor unions to force tenants to use union labor exclusively:

> Marcus testified there is a widespread practice in the city of Chicago in office buildings, and I have personally been involved in this where, regardless of the contractor, whether it's security, plumbing, electrical, anything, that before they enter into the contract they insist that they will have union personnel. And the reason they do that, is so…there won't be any threats of any work stoppage from

---

[4] To the extent that JLL managed any class building for only a portion of the class period, the class members will only include those tenants who moved and/or renovated during the time JLL managed that building.

anybody. And those are buildings that don't even have contracts of any kind with the plumbers, with the pipe fitters, with whoever, it's just their practice that they want union people working in the buildings.

*Building Owners Management Association and Wackenhut Corp.,* No. 13-CE-127, 2007 WL 4570695 (N.L.R.B. Div. of Judges Dec. 21, 2007) (quotations omitted).

Plaintiff has confirmed that JLL requires all tenants to hire union movers and contractors at the 20 class buildings at issue (hereafter "union requirement"). *See, e.g.,* Dep. Tr. Stephen Zsigray, December 20, 2019, attached as Exhibit C, at 25:24-27:02, 28:10-29:23, 41:08-47:24, 59:12-20.[5] Though the manner in which the union requirement is conveyed to tenants varies slightly from building to building, there is little dispute that the requirement exists in all of the class buildings. *Id.* All tenants must obtain prior approval from the building manager at their respective class building to use contractors, otherwise the buildings' engineers and security guards will prevent the contractors from entering the building. *Id.* To the extent any non-union contractors are somehow able to make it into one of the class buildings, notwithstanding JLL's efforts, building engineers and other tradesman who patrol the floors will immediately eject any non-approved contractors from the building. *Id.*

WDES was a tenant in the 125. S. Wacker Drive building, which was managed by JLL beginning in 2012. D.E. 76, at ¶18. In both 2014 and 2017, WDES received a tenant improvement allowance ("TIA"), as part of its lease renewal, to renovate and update its space. It received a TIA of over $350,000 (first installment) and over $260,000 (second installment), with the amount of the TIA being amortized into WDES' monthly rent payments. *See, e.g.,* Expert Report of James Raisher, attached as Exhibit D; Dep. Tr. Larry Grossman, January 6, 2020, attached as Exhibit E,

---

[5] Stephen Zsigray is JLL's Managing Director, and was produced under Rule 30(b)(6) to speak for the company on this and other topics.

at 52:01-08, 83:06-84:16; Wacker Drive Tenant Allowance Agreement (Wacker Drive_000036), attached as Exhibit F. Per the union-only requirement, WDES was forced to use union contractors, exclusively. *See* Ex. E at 40:11-16; Dep. Tr. Amy Grossman, January 27, 2020, attached as Exhibit G, at 65:1-7; 70:8-10; 73:16-74:18; *see also* Exhibit H, Rules and Regulations for Contractors (Wacker Drive_000200) (Requiring union trade workers). WDES was also required to use a union mover in 2015 to move furniture. Ex. E at 87:16-88:1; Ex. G at 113:24-115:3.

According to WDES' economist, Dr. Robert Kaestner, each class member has been damaged in the same manner by incurring increased costs for union labor. Ex. A, at 6, 8-9. Dr. Kaestner's Report breaks this down by the percent increase over non-union labor per trade/type of contractor used. *Id.* Accordingly, Dr. Kaestner's methodology can easily be applied to all class members who used movers or contractors, or both, in any of the class buildings during the class period, by applying the percent increase to the cost of labor paid by each class member for the type of labor used during the class period.[6] *Id.*

## STANDARD FOR CLASS CERTIFICATION

To obtain class certification, Plaintiff must initially satisfy Rule 23(a)'s requirements of: 1) numerosity (the class must be so large that individual joinder is "impracticable"); 2) commonality (questions of law or fact are common to the class); 3) typicality (named plaintiff claims are typical of the class' claims); and 4) adequacy of representation (the class representative must be able to fairly and adequately protect class interests). *See, e.g., Messner,* 669 F.3d at 811*;*

---

[6] As stated below, the class period is from August 14, 2014 (four years from the date the original complaint was filed) through the present. Civil RICO has a four year statute of limitations period. *See generally Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987). The tenants and/or JLL will have copies of the necessary invoices. JLL has not yet produced any specific tenant/absent class member information. *See* n.8, *infra.*

Rule 23(a)(1)-(4).  Plaintiff must also satisfy Rule 23(b)(2) or (3), in addition to the requirements

of Rule 23(a).  WDES is seeking certification under both Rule 23(b)(2) and (3).

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief…is appropriate respecting

the class as a whole."  For Rule 23(b)(3), proponents of the class must show that questions of law

or fact common to the members of the proposed class predominate over questions affecting only

individual class members and that a class action is superior to other available methods of resolving

the controversy. *See, e.g., Messner*, 669 F.3d at 811.

Plaintiff bears the burden of showing that class certification is appropriate.  *Id.*  "A party

seeking class certification must affirmatively demonstrate his compliance with the Rule…" *Kleen*

*Prod. LLC*, 831 F.3d at 922 (citations omitted).  But the showing need not be "to a degree of

absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance

of evidence." *Messner*, 669 F.3d at 811. The district court has broad discretion in determining

whether this burden is met.  *See, e.g., Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir. 1998).

## ARGUMENT

I.     **The Proposed Class Should Be Certified; The Requirements Of Rule 23(A) Are Easily Satisfied In This Case**

The proposed class definition is as follows: All tenants in the class buildings who were

subjected to JLL's requirement to hire union contractors exclusively and who incurred moving

expenses and/or hired contractors to make improvements/renovations in their tenant space since

August 14, 2014.  Plaintiff seeks certification of two subclasses:

> **First Subclass ("Contracting Subclass"):** All tenants in the class buildings, from August 14, 2014 through the present, who were subjected to JLL's requirement to hire union contractors exclusively and who hired union contractors to make improvements/renovations in their tenant space.

**Second Subclass ("Moving Subclass"):** All tenants in the class buildings, from August 14, 2014 through the present, who were subjected to JLL's requirement to hire union movers exclusively and who incurred moving expenses by hiring union movers.[7]

### A. The Parties Stipulated To Numerosity, Rule 23(a)(1)

As stipulated by the parties on November 12, 2019, the class is so numerous that joinder of all members is impracticable. D.E. 94. WDES is a member of the class (and is a member of both subclasses). JLL has the names and contact information of all its tenants and it can produce such information at the appropriate time. And if the class is certified, Plaintiff's counsel can use this list to send notice via first class mail to the last known address of the class members.[8]

### B. Plaintiff Satisfies Rule 23(a)(2): Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." In other words, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury and that their claims depend upon a common contention." *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 559 (N.D. Ill. 2015) (citations, quotations omitted). This is not a high burden and it does not require that each class member have identical claims. *Id.*; *Walmart v. Dukes*, 564 U.S. 338, 359 (2011) (*quoting* Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L.Rev. 149, 176, n. 110 (2003)) ("[E]ven a single common question will do.")

---

[7] Subclasses are permitted under Rule 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule"). Plaintiff proposes these two subclasses, *inter alia*, because the Moving Subclass did not utilize TIA with respect to moving costs. Accordingly, this subclass would not need to utilize some of the common evidence, such as the expert testimony of James Raisher. If the Court does not believe subclasses are necessary, however, one single class can proceed under the class definition above.

[8] Due to potentially sensitive tenant information, the parties agreed to defer the production of such information/list until after the resolution of the motion for class certification.

Here, numerous common questions of law and fact exist among putative class members. All class members (in both subclasses) share the common questions of fact about whether they were subjected to the union-only requirement and a common question of law about whether this violated RICO (and the predicate acts alleged). Specifically, all class members share the following common questions which will generate common answers and drive the outcome of this litigation:

- Whether JLL enforced the union-only requirement at the class buildings?;

- Whether JLL had an agreement with the three unions to enforce the union requirement at the class buildings?;

- Whether JLL's agreement with the three unions was an illegal hot cargo agreement violating 29 U.S.C. §158(e)?;

- Whether JLL violated 18 U.S.C. §1951 and 29 U.S.C. §186?;

- Whether JLL violated 18 U.S.C. §§1962(c) and (d) in enforcing this requirement, including common legal questions of whether there is a pattern of racketeering and a RICO enterprise?; and,

- Whether the class members were damaged by this requirement/policy in the form of higher labor and moving costs, pursuant to 18 U.S.C. §1964(c)?

These material facts and issues of law are the same, or substantially similar, for all class members and therefore, these common issues could be tried such that proof as to one member would be proof as to all class members. This satisfies the commonality requirement. *See, e.g., Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (commonality shown where an "issue 'central to the validity of each one of the claims' in a class action . . . can be resolved 'in one stroke'"); *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015) ("class-wide resolution means that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim . . . What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

proceeding to generate common *answers* apt to drive the resolution of the litigation.") (*citing Wal-Mart,* 564 U.S. at 350).

### C.     Plaintiff Also Satisfies Rule 23(a)(3): Typicality

Rule 23(a)(3) ("typicality") requires that the claims of the representative parties are typical of the claims of the class.  Typicality is established if the claims of the class representative and class members arise from the same practice or course of conduct and are based on the same legal theory. *See, e.g., Keele,* 149 F.3d at 595.  Typicality and commonality are closely related.  "Typical does not mean identical, and the typicality requirement is liberally construed." *Kurgan v. Chiro One Wellness Centers LLC,* No. 10-CV-1899, 2014 WL 642092, at *7 (N.D. Ill. Feb. 19, 2014).

Here, WDES' claims are typical of the class' because the claims arise from the same course of conduct by JLL—enforcing the union requirement at all of the class buildings.  As described above, WDES was forced to use and did use union movers in 2015.  WDES was also forced to use and did use union labor to renovate its space in 2014 and 2017.  Consequently, WDES was damaged in the same, or substantially similar manner, as every other putative class member by paying an increased amount for this work. *See* Ex. A at 5-6, 8-9.  Those damages are all sought under 18 U.S.C. §1964(c) for violations of §§1962(c) and (d), §1951 and §186.  D.E. 76 at ¶¶52-69.  As such, all class members also share the same legal theory as WDES in this case.

And as noted above, with respect to the subclasses, WDES is a member of both and has no interests that conflict with any potential class members.  For these reasons, typicality is met here. *See, e.g., Snyder v. Ocwen Loan Servicing, LLC,* 258 F. Supp. 3d 893, 904 (N.D. Ill. 2017) (Finding typicality satisfied where "Plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of the proposed class members" and "Plaintiffs do not have interests that conflict with those of the other class members, as both named plaintiffs and the class seek to end [Defendant's] practice[.]").

**D. Plaintiff And Proposed Class Counsel Satisfy Rules 23(a)(4), 23(g): Adequacy Of Representation**

Finally, Rule 23(a)(4) requires that the class representative "will fairly and adequately protect the interests of the class." Adequate class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 21 U.S. 591, 625-26 (1997) (citations, quotations omitted). Courts consider whether the named plaintiff: "[(1)] has antagonistic or conflicting claims with other members of the class or (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) has counsel that is competent, qualified, experienced and able to vigorously conduct the litigation." *Pawelczak v. Fin. Recovery Servs., Inc.*, 286 F.R.D. 381, 386 (N.D. Ill. 2012) (quotations omitted). Satisfying this standard is "not too difficult." *Id.* at 387; *see also Robles v. Corp. Receivables, Inc.*, 220 F.R.D. 306, 314 (N.D. Ill. 2004).

Here, WDES, the named plaintiff, is more than adequate. As stated above, it is a member of the class and its interests in prosecuting RICO claims against JLL are the same as those of other Class Members, because they bring the same claims, for the same remedies, under the same legal theories. There is no antagonism between Plaintiff and the Class members. Additionally, WDES has been cooperating fully with proposed Class Counsel during the factual and legal proceedings of this case; its two owners have already been deposed; and it has responded to robust discovery requests. Amy Grossman, the CEO of WDES, has also demonstrated that she more than understands the legal theory and facts of the case. *See, e.g., Robles*, 220 F.R.D. at 314 ("In order to be represented properly, a class must have a conscientious representative plaintiff . . . Moreover, the named class representative must understand the basic facts underlying his claims and [g]eneral knowledge and participation in discovery are sufficient to meet this standard.") (citations, quotations omitted); *see generally* Ex. G.

Additionally, Class Counsel is experienced and qualified under Rule 23(a)(4) and (g). Plaintiffs' Counsel is highly experienced and have successfully acted as representative counsel in numerous complex class and collective actions in federal and state courts in Illinois and throughout the United States.  Additionally, Plaintiff and its counsel have dutifully litigated this case and are well versed in class action and RICO matters.[9]

## II.    The Requirements Of Rule 23(b)(3) Are Also Satisfied; Common Issues Of Fact And Law Predominate

In addition to meeting the requirements of Rule 23(a), the proposed Class' claims also meet the standards of Rule 23(b)(3). Certification is appropriate under Rule 23(b)(3) where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3).[10]  WDES' claims plainly meet this standard.

### A.    Common Questions Of Fact And Law Predominate

The Seventh Circuit has emphasized that the "predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (quoting 7AA Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE §1778 (3d ed. 2011)). If a significant aspect of the case "*is capable of proof at trial* through evidence that is common to the class rather than individual to its members," predominance is met. *Id.* at 818 (emphasis in original);

---

[9] *See, e.g.,* Ex. I, Stephan Zouras LLP Firm Resume; *see generally* www.fosterpc.com; *See* Ex. J, Curriculum Vitae for The Walner Law Firm, LLC. WDES does not anticipate that JLL will challenge adequacy of counsel.

[10] Courts are not to consider the merits at this early stage. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen v. Connecticut Retirement Plans*, 568 U.S. 455, 459 (2013) (emphasis in original).

*see also Butler*, 727 F.3d at 801 ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification").

As discussed above, there are myriad of common questions regarding liability, conspiracy, violations of RICO and its predicate acts, each of which will generate common answers to drive this litigation. Moreover, as Dr. Kaestner's report shows, there is a common methodology (*i.e.*, application of the percent markup for union labor in the Chicago loop) that can be used to calculate damages for each class member. Ex. A at 5-6, 8-9. Each class member can rely on Dr. Kaestner's analysis to determine the increased amount it was forced to pay as a result of JLL's union requirement. *See Messner,* 669 F.3d at 802 ("In other words, [expert] Dranove claimed that he could use common evidence—the post-merger price increases Northshore negotiated with insurers—to show that all or most of the insurers and individuals who received coverage through those insurers suffered some antitrust injury as a result of the merger . . . That was all that was necessary to show predominance for purposes of Rule 23(b)(3)."). Thus, the "impact" of JLL's union requirement is the same for all class members. *Id.; see also Kleen Prod. LLC*, 306 F.R.D. at 600 ("This comports with the 'prevailing view' that 'price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.'").

Indeed, as noted above, this case is akin to price fixing conspiracies in the antitrust context, in which courts frequently conclude that common issues predominate and that such cases are well suited for certification. *See* 7AA Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, Civil §1778 (3ed. 2019) (antitrust cases typically involve "a common course of conduct" suitable for certification under Rule 23(b)(3)); 6 NEWBERG ON CLASS ACTIONS, at §20:23, n.8 (5th ed. 2019)

("As a rule, the allegations of a price-fixing conspiracy is sufficient to establish predominance of common questions . . . ") (quotations, citations omitted).

This does not, however, mean that all individual questions must be absent. "The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner*, 669 F.3d at 815; *Butler,* 727 F.3d at 801 (same general proposition). That the amount of damages to each class member is different—which it undoubtedly will be based on the amount of labor used to move/renovate—is not a bar to certification either. *See, e.g., Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) (citing authority); 2 NEWBERG ON CLASS ACTIONS, at §4:54 ("Therefore, courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations . . . "). These amounts can be easily determined based on the class member invoices. *See* Ex. A at 8-9. While amount of damages will vary, the percentage that was overpaid by tenants for each category of contractor (*i.e.*, the impact) is the same for every member of the class.

**B.     A Class Action Here Is Superior To Individual Lawsuits**

Rule 23(b)(3)'s superiority requirement is satisfied when "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 255 (N.D. Ill. 2014) (*citing Amchem*, 521 U.S. at 615); *see also Pella Corp v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (In determining superiority, courts should evaluate whether "the central questions in the litigation are the same for all class members" or whether "a decentralized process of multiple trials is necessary

for an accurate evaluation of the claims."). Judicial economy and efficiency, as well as consistency

of judgments, would be achieved through certification of the class in this case.

To be sure, the alternative (a decentralized process) means potentially hundreds (or

thousands) of individual lawsuits, piecemeal litigation, and inconsistent adjudications. Without a

class, the Court would have to hear hundreds (or more) of additional individual cases raising

*identical questions of liability*. Moreover, some of the putative class members' damages are likely

too small to justify the cost of litigating their individual claims.[11]

Because liability turns on JLL's acts, the question of liability will be determined by proof

that is identical as to each class member. A class determination of liability is therefore compelling

from a manageability perspective—at least hundreds (or more) tenants were harmed by JLL's

common policy and practice that violates §1951, §186, and §1962, and they were wrongfully

forced to overpay for moving/contracting labor. Under these circumstances, it would be

enormously *inefficient*—for both the Court and parties—to engage in multiple trials in individual

actions on the same liability issues. As the *Kleen Prod.* Court found: "The overarching liability

and impact issues are common to the class and can be resolved in one stroke. And given the

breadth and importance of the common issues, the superiority requirement...poses no serious

obstacle to class certification here." 306 F.R.D. at 605–06 (citations, quotations omitted). The

same is true here. For all of these reasons, certification under Rule 23(b)(3) is warranted and

proper.

---

[11] Such a financial and practical deterrent to class members' individual suits would incentivize JLL to continue its unlawful practices discussed herein. It is well established that the class action device is appropriate for adjudicating such claims while also providing the appropriate deterrent.

### III. The Requirements Of Rule 23(b)(2) Are Also Met

WDES is also seeking certification under Rule 23(b)(2) for injunctive relief. *See, e.g.,* D.E. 76, ¶60. In addition to the requirements of Rule 23(a), certification under Rule 23(b)(2) requires evidence that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2).

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted. A Rule 23(b)(2) class is thus appropriate when plaintiffs seek to require the defendant to do or not do something that would benefit the whole class. Here, plaintiffs seek to do just that. Plaintiffs request declaratory and injunctive relief that would require defendant to comply with the . . . [the federal law], which would benefit the whole class. It would be difficult to argue that this requested equitable relief did not fit within Rule 23(b)(2)'s gamut . . .

*Heritage Operations Grp., LLC v. Norwood*, 322 F.R.D. 321, 326 (N.D. Ill. 2017) (citations and quotations omitted).

Here, WDES is seeking an injunction preventing JLL from continuing to enforce the union-only requirement at any of its class buildings going forward. This effects all tenants/future tenants, alike, and would allow tenants to select nonunion contractors going forward. An injunction would also provide common relief to the whole class. As such, Rule 23(b)(2) is satisfied.

### CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court: i) certify this case for class treatment pursuant to Rule 23(b)(2) and (3); ii) appoint WDES as the Class representative; and iii) appoint Plaintiff's counsel as Class Counsel pursuant to Rule 23(g).

Date: January 31, 2020

Respectfully Submitted,

*/s/ James B. Zouras*

James B. Zouras
Ryan F. Stephan
Anna Ceragioli
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza, Suite 2150
Chicago, IL 60606
jzouras@stephanzouras.com
rstephan@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
**FOSTER PC**
150 N. Wacker Drive, Suite 2150
Chicago, IL 60606
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
**THE WALNER LAW FIRM LLC**
555 Skokie Boulevard, Suite 250
Northbrook, IL 60062
awalner@walnerlawfirm.com

## CERTIFICATE OF SERVICE

I, the attorney, hereby certify that on January 31, 2020, I filed the attached with the Clerk

of the Court using the ECF system, which will send such filing to all attorneys of record.

*/s/ James B. Zouras*