# Exhibit A

*Wacker Drive Executive Suites v. Jones Lang LaSalle American (Illinois), LP*

# EXPERT OPINION REPORT OF ROBERT KAESTNER
**Pursuant to Fed. R. Civ. P., Rule 26**

Court: United States District Court – Northern District of Illinois
Case Number: 18-CV-05492
Case Name: *Wacker Drive Executive Suites v. Jones Lang LaSalle American (Illinois), LP*
Subject: Mandating the Use of Union Labor Raises Costs
Prepared By: Robert Kaestner
Date: January 17, 2020

1. **Qualifications, Publications, Cases, and Compensation of Witness.**

   I am a qualified expert witness in this matter. I have a Ph.D. in economics and an extensive record of scholarly publications in labor economics and other applied microeconomic fields. I have published 130 articles in academic journals. I have also been awarded numerous research grants from the federal government and from non-profit organizations that have been administered almost always through the universities where I have held appointments. I have held appointments as a tenured, Full Professor at Baruch College of the City University of New York, the University of Illinois (University of Illinois System), the University of Illinois at Chicago and the University of California at Riverside. Currently, I am a Research Professor at the University of Chicago. I am a Research Associate of the National Bureau of Economic Research, which is widely considered the most prestigious group of economists in the world. I serve or have served on the editorial boards of several, leading academic journals.

   A list of publications authored in the past ten years is attached as Appendix B. I have not served as an expert witness at a trial or deposition in the past four years.

   The compensation to be paid for my study and testimonial in this case amounts to $650 per hour for each hour of service provided.

2. **Mandating the Use of Union Labor Raises Costs**

   I reviewed the Amended Class Action Complaint of Wacker Drive Executive Suites, LLC and the Wacker Drive Executive Suites, LLC Response to Defendant's First Set of Interrogatories.

   In this report, I provide evidence related to whether mandating the use of union labor to move in and out of, and renovate commercial office space in downtown Chicago affects the costs of such activities. The evidence I present consists of a review of the academic literature on this issue, and from an original analysis of official government data. In that analysis, I estimate the difference in wages (and fringe benefits) between union and non-union workers in occupations typically used to move into and renovate commercial space in downtown Chicago.

### a. Review of Academic Literature

The union wage premium, which measures the difference between union and non-union wages and is expressed as a percent of non-union wage, has been widely documented in the academic literature. There is overwhelming evidence that unions raise wages. The evidence is extensive and spans many years and many contexts. The evidence is also uniform—every study finds that there is a large, positive wage premium for union workers. And most importantly, evidence shows that the union wage premium in construction is very high.

The results of the following published studies support this conclusion.

#### i. Studies Related to All Workers

- Lewis (1986): reported that between 1970 and 1979, unions raised wages by 14% among all workers.
- Card (1996): reported that in 1987-88, unions raised wages by 17% among all workers, but as much as 28% for lower-skilled workers.
- Hirsch (2004): reported that between 1973 and 2001, unions raised wages by between 18% and 28% among all workers.
- Farber et al. (2018); reported that between 1936 and 2015, unions raised wages by 15% to 20% among all workers.

As the results of the studies above show, the evidence documenting a union wage premium is quite uniform. Across all occupations, unions raise wages of their members by approximately 15% relative to non-union workers and this premium has been remarkably stable over a long period of time.

#### ii. Studies Related to Construction Workers

- Northrup (1984)[1]: reported union wage premiums for skilled (unskilled) workers in construction of 43% (50%) in 1936 and 46% (69%) in 1970.
- Allen (1988): reported union wage premiums for construction workers of between 37% and 56% for the period between 1967 and 1983.
- Linneman et al. (1990) [2]: reported union wage premiums for construction workers of between 34% and 52% for the period between 1973 and 1986.

---

[1] As reported in Thieblot, Armand J. 2001. "The Fall and Future of Unionism in Construction." *Journal of Labor Research* 22( 2): 287– 306.

[2] As reported in Allen Steve G. 1994. Developments in Collective Bargaining in Construction in the 1980s and 1990s, In Paula B. Voos, ed. Contemporary Collective Bargaining in the Private Sector Madison, WI: Industrial Relations Research Association, 1994, pp. 411-445.

2

- Hirsch (undated)[3]: reported union wage premiums for construction workers of between 34% and 41% for the period between 1983 and 1992.
- Bratsburg and Ragan (2002))[4]: reported union wage premiums for construction workers of between 24% and 54% for the period between 1967 and 1999.
- Blanchflower and Bryson (2004): reported union wage premiums for construction workers of 52% in 1983-1988 and 41% in 1996-2001.
- Bilginsoy (2013): reported union wage premiums for construction workers of 47% in 1983-1988 and 38% in 2002-2007.

In these studies of construction occupations, the evidence documenting a union wage premium is quite uniform and relatively stable over time. In the construction industry, unions raise wages of their members by approximately 40% relative to non-union workers (using the most recent estimates reported by Blanchflower and Bryson and Bilginsoy).

### b. Original Analysis of the Union Wage Premium in Moving and Construction Occupations in Chicago

To provide evidence of the difference in the cost of union and non-union labor in construction and moving occupations in Chicago, I conducted an empirical analysis that compared the wages of union to non-union workers in occupations commonly used to move into and renovate office space in downtown Chicago. These occupations were selected based on experience of the plaintiff and come from occupations classified by the U.S. Bureau of the Census. The occupations are listed in Appendix A.

Data for the analysis came from the Current Population Survey (CPS) from 2011 to 2019. The Current Population Survey is the main source of labor force statistics in the United States and is conducted jointly by the U.S. Census Bureau and U.S. Bureau of Labor Statistics. It is a monthly survey of approximately 60,000 households that collects information on labor force characteristics including wages, occupation and union membership of individuals in the household. In each month, approximately 25% of the sample who are working is asked about the wage they earn on their job, their occupation and whether they belong to a union. This sample is referred to as the Outgoing Rotation Group (ORG). The ORG of the CPS is the most widely used data to examine the difference in union and non-union wages. The sample for the analysis is restricted to workers ages 18 to 64 who are employed in the private sector. I combined years of data (2011-2019) to insure sufficiently large sample sizes to obtain reliable estimates.

---

[3] As reported in Allen Steve G. 1994. Developments in Collective Bargaining in Construction in the 1980s and 1990s, In Paula B. Voos, ed. Contemporary Collective Bargaining in the Private Sector Madison, WI: Industrial Relations Research Association, 1994, pp. 411-445.

[4] As reported in Belman, Dale, and Paula B. Voos. 2006. "Union Wages and Union Decline: Evidence from the Construction Industry." *Industrial and Labor Relations Review* 60(1): 67– 87.

3

### i. Union Wage Premium for Combined Occupations

The first step in my analysis was to estimate the union wage premium for the combined occupations listed in Appendix A. I calculate this estimate separately for workers in the U.S. who reside outside the metropolitan area of Chicago (Chicago-Naperville-Joliet) and for workers living in the Chicago metropolitan area. The Chicago-Naperville-Joliet metropolitan area is the closest geographical area to Chicago that can be identified in the public-use CPS data. To obtain these estimates, I adjust statistically for the fact that I am using data from several years (2011-2019), that earnings information is reported as an hourly or weekly wage and accounting for the fact that some people enter the sample twice (in different years).[5] I also calculate estimates using the sample survey weight provided by the CPS.

The results of my analysis are as follows:

- The union wage premium in the combined occupations listed in Appendix A is 39% in areas outside the Chicago metropolitan area. It is highly significant from a statistical perspective (p-value <0.001).

- The union wage premium in the combined occupations listed in Appendix A is 47% in the Chicago metropolitan area. The 8% difference in the union wage premium between the metropolitan Chicago area and the rest of the U.S. is statistically significant (p-value=0.06). The higher union wage premium in Chicago than the U.S. is consistent with the greater union density in Chicago than in the rest of the U.S.; the share of workers in unions in the occupations in Appendix A in Chicago is twice that of the U.S.

- I also found that there was no statistically significant or economically important difference in non-union wages in the Chicago metropolitan area and the rest of the U.S.

It is important to recognize that these estimates of the union wage premium are similar to estimates reported in the academic literature and described earlier. This provides evidence that these estimates are valid and reasonable.

Because there are demographic differences between union and non-union workers that may be related to productivity differences, although the evidence to substantiate this claim is not extensive or uniform, I obtained alternative estimates of the union wage premium adjusting for age, education, gender and race. I do so in steps: first adjusting for age and education, and then adjusting for age, education, gender and race. Estimates from this analysis are as follows:

- After adjusting for age and education, the union wage premium in the combined occupations in Appendix A is 30% in areas outside the Chicago metropolitan area.

---

[5] Ordinary Least Squares regression methods are used to obtain estimates of the union wage premium.

4

> Further adjustment for gender and race yields an estimate of 28%. All estimates are highly significant from a statistical perspective (p-value <0.001).

- After adjusting for age and education, the union wage premium in the combined occupations in Appendix A is 40% in the Chicago metropolitan area. The 10% difference in the union wage premium between the metropolitan Chicago area and the rest of the U.S. is statistically significant (p-value=0.01). Further adjustment for gender and race yields an estimate of 36%. The 8% difference in the union wage premium between the metropolitan Chicago area and the rest of the U.S. is statistically significant (p-value=0.04).

Overall, the union wage premium in Chicago in the relevant occupations remains very high (30% to 36%) even after adjusting for demographic factors and consistent with results from the academic literature. However, these adjustments are only valid if they represent true productivity differences between union and non-union workers. This is a claim that is not well founded by direct evidence.

### ii. Union Wage Premium by Occupational Group

I also obtained estimates of the union wage premium by several occupational groups constructed from the individual occupations in Appendix A. I grouped occupations into categories because, despite being the largest and most appropriate source of data, the CPS does not have sufficient sample sizes to obtain estimates of the union wage premium in each individual occupation (see Appendix A for groupings). This is the case even when combining several years of data (2011-2019). Moreover, even when individual occupations are combined into larger groups, the CPS does not have sufficient sample sizes to obtain reliable estimates of the union wage premium in the metropolitan Chicago area. Therefore, I obtain the estimates of the union wage premium for each occupational group for the entire country using the same procedure as that used to obtain estimates of the union wage premium for the combined occupations. I then adjust for the fact that the union wage premium in Chicago is higher than in the country as a whole. How much is added depends on what adjustments were included in the analysis. For the baseline case, I add 8% to estimate the occupational group-specific union wage premium in metropolitan Chicago. If I include adjustments for age and education, then I add 10%, and if I include additional adjustments for gender and race then I add 8%. All of these estimates are noted above.

The results are shown in Table 1. All occupational group-specific estimates of the union wage premium for the U.S. in Table 1 are highly statistically significant (p-value<0.001). As noted, estimates for the Chicago metropolitan area are calculated by adding either 8% to the estimates for the U.S (columns 2 and 3) or 10% (column 2). As can be observed, estimates of the union wage premium by occupational group in Chicago vary modestly. In the baseline case, estimates range from 30% for moving-related occupations to 36% to 50% for construction occupational groupings. When additional adjustment is made for demographic factors, estimates range from 24% to 46%.

5

Table 1. Estimates of the Union Wage Premium by Occupation

| Occupational Group | Union Wage Premium in U.S. | Union Wage Premium in Metropolitan Chicago | Union Wage Premium in Metropolitan Chicago (Adjustment-1) | Union Wage Premium in Metropolitan Chicago (Adjustment-2) |
|---|---|---|---|---|
| Carpenter | 42% | 50% | 44% | 41% |
| Electrician | 28% | 36% | 32% | 29% |
| Drywaller | 42% | 50% | 46% | 42% |
| Plumber | 38% | 46% | 40% | 36% |
| Laborer | 38% | 46% | 41% | 38% |
| Installer | 35% | 43% | 37% | 34% |
| Operating Engineer | 34% | 42% | 39% | 36% |
| Mover | 22% | 30% | 27% | 24% |

Adjustment-:1 adjusts for differences in the age and education composition of union and non-union workers. Adjustment-2: adjusts for differences in the age, race, gender and education composition of union and non-union workers.

The simple average of the union wage premium across occupational groups in the Chicago metropolitan area is 43% in the baseline case. This estimate is remarkably close to estimates presented in the previous section. Specifically, the (weighted average) of the union wage premium in the combined occupations in the Chicago metropolitan area is 47%. Note this latter figure was calculated directly, and did not rely on the 8% adjustment used to calculate the occupational-group specific union wage differentials in Chicago metropolitan area. The similarity of the two estimates suggests that the occupational group-specific estimates obtained by adding 8% (or 10%) to the national estimates is relatively accurate and a valid approach.

### iii. An Alternative Approach Using Cook County Prevailing Wage Rates Set by State of Illinois

An alternative approach to estimating the union wage premium in construction occupations is to make use of published estimates of the prevailing wage for construction workers in Cook County published by the Illinois Department of Labor (IDOL). It is well known that the prevailing wage published by IDOL is the union wage and not the competitive (non-union) market wage, which is sometimes referred to as the prevailing wage. The IDOL prevailing wage is the wage plus fringe benefits paid to construction workers on public works jobs. Almost all such workers are unionized. Therefore, the IDOL prevailing wage is an accurate estimate of the wage and fringe benefit costs of union workers in construction occupations in Cook County. Another advantage of this alternative approach is that it incorporates the effect of unions on fringe benefits. It is well documented that unions raise fringe benefits above that paid to non-union workers (Freeman 1981; Budd 2005). Therefore, the analysis of the union wage premium that does not incorporate fringe benefit, as above, may understate the difference in total labor costs between union and non-union labor.

IDOL does not publish a prevailing wage for all of the occupations used to renovate commercial premises in Chicago. Therefore, I can only use this alternative approach to estimate

6

the union cost differential for those occupations for which the IDOL published a prevailing wage. As noted, the prevailing wage includes the hourly wage plus fringe benefits.

To calculate the union wage and fringe benefit premium for the occupations with a published prevailing wage, I use the non-union wage rate for the same occupations estimated using the CPS data described above. The CPS data report hourly wages (i.e., does not include fringe benefits). To calculate the non-union hourly wage plus fringe benefit rate, I multiply the non-union wage estimated from the CPS data by 1.32 because the U.S. Bureau of Labor Statistics states that fringe benefits average 32% of total compensation (https://www.bls.gov/news.release/pdf/ecec.pdf.

As noted, the CPS does not have sufficient sample sizes to estimate the non-union wage rate in a specific occupation in the Chicago metropolitan area. Therefore, I use the non-union wage rate in a specific occupation in the U.S, as an estimate for Chicago. This is a valid approach to estimate the non-union wage rate in Chicago metropolitan area because, as reported above, the non-union wage in combined occupations in Appendix A does not differ statistically or economically between the Chicago metropolitan area and the rest of the U.S. Accordingly, it is reasonable to use the national, non-union wage rate in an occupation as an estimate of the non-union wage rate in Chicago metropolitan area.

Table 2 presents estimates of the union wage and fringe benefit premium for the occupations with published IDOL prevailing wages.[6]

Table 2. Alternative Estimates of the Union Wage Premium by Occupation

| Occupations | IDOL Cook County Prevailing Wage | Non-Union Hourly Wage | Non-Union Wage Plus Fringe | Union Wage Plus Fringe Premium% |
|---|---|---|---|---|
| Brickmasons, blockmasons, and stonemasons | 46.88 | 20.21 | 26.68 | 76% |
| Carpenters | 48.55 | 20.31 | 26.81 | 81% |
| Cement masons, concrete finishers, and terrazzo workers | 46.25 | 22.27 | 29.40 | 57% |
| Construction laborers | 43.72 | 18.39 | 24.27 | 80% |
| Electricians | 49.35 | 23.09 | 30.48 | 62% |
| Glaziers | 44.85 | 20.38 | 26.90 | 67% |
| Painters, construction and maintenance | 47.30 | 18.91 | 24.96 | 89% |
| Pipelayers, plumbers, pipefitters, and Steamfitters | 51.00 | 21.19 | 27.97 | 82% |
| Plasterers and stucco masons | 44.50 | 19.47 | 25.70 | 73% |
| Millwrights | 48.55 | 22.87 | 30.19 | 61% |

The first column of Table 2 lists the published IDOL prevailing wage by occupation (for July 2019). The second column shows the estimated non-union, hourly wage in the specific occupations (in 2019) obtained from CPS data. The third column contains the wage plus fringe benefit cost of non-union labor. This figure is calculated by multiplying the wage in column 2 by 1.32 to obtain

---

[6] https://www2.illinois.gov/idol/Laws-Rules/CONMED/Pages/2019-Rates.aspx

7

the wage plus fringe benefit hourly cost. Finally, the last column shows the union wage plus fringe benefit premium as a percent of non-union compensation.

The first point of note about the estimates of the union wage plus fringe benefit premium in Table 2 is that they are larger than estimates in Table 1. For example, for carpenters, the estimate of the union wage premium from the CPS is 50%; the analogous estimate derived from the prevailing wage and inclusive of fringe benefits is 81%. This suggests that unions increase wages and fringe benefits, but the union impact is relatively larger on fringe benefits than on wages. Accounting for both of these effects, as in Table 2, leads to larger estimates of the difference in the total cost of union labor vis-à-vis non-union labor. The second point of note about estimates in Table 2 is their magnitudes; the total cost of union labor in Cook County relative to non-union labor ranges from 57% to 89%--a very large cost differential.

It is worth reiterating that the use of the IDOL prevailing wage to calculate the total difference in union and non-union labor costs, as in Table 2, has the important advantage of measuring in an highly accurate way the total (wage plus fringe benefit) costs of union labor in Cook County in the occupations listed in Table 2. This information is largely reported by unions.[7] The disadvantage is that IDOL does not publish a prevailing wage for all the occupations typically used to move into and renovate commercial premises in Chicago.

### iv. Conclusion

The evidence documenting that union labor in moving and construction occupations is substantially more costly than similar non-union labor is overwhelming. Published estimates of the union wage premium in construction from academic studies are large with a typical estimate indicating that union wages are 40% higher than non-union wages. Estimates from my analysis are consistent with the published estimates and suggest that for Chicago, the union wage premium in construction and building occupations is 47%. Estimates from analyses that adjust for demographic factors are similar (36% to 40%). When adding in the effect of unions on fringe benefits, as well as wages, the difference in union v. non-union costs in a sample of construction occupations in Cook County increases to approximately 73% (simple average of estimates in Table 2).

To summarize, the evidence is overwhelming that the cost of union labor is significantly greater than the cost of non-union labor in Chicago. Also evident is that estimates of the union wage premium in Table 1 are conservative.[8] Therefore, the use of estimates in Table 1 to calculate damages will produce a conservative estimate.

---

[7] https://www2.illinois.gov/idol/Laws-Rules/CONMED/Pages/2018-Prevailing-Wage-Methodology.aspx

[8] Similarly, other evidence from the Bureau of Labor Statistics Modeled Wage Estimates program indicates that estimates in Table 1 are conservative (https://www.bls.gov/mwe/).

8

### 3. A General Approach to Estimating Damages to Potential Class Members

Damages for each potential class member can be estimated using the evidence on the differences in the cost of union and non-union labor presented in Table 1. The following steps describe the approach:

- For each class member, the costs incurred for unions services will be available and can be aggregated into the occupational categories shown in Table 1 and listed in Appendix A (e.g., carpenter, electrician, and plumber).

- For each of these categories of labor, the non-union cost of that labor can be calculated by dividing the union cost of that type of labor by the corresponding union wage premium in Table 1.[9]

- Then the differences in the costs of services between union and non-union labor can be calculated for each type of labor and summed to obtain the total excess costs of using union labor.

The approach to calculating damages is general and will yield different damages depending on the amount and cost of union labor employed in each service category. If a class member only used carpentry, then the excess costs of union labor will reflect the higher costs of carpentry and not the higher costs of other services. Many combinations of services can be accommodated by this approach and damages applicable to each potential class member can be calculated.

Dated: January 31, 2020            Respectfully submitted,

                                                 */s/ Robert Kaestner*

                                                 Robert Kaestner

---

[9] As noted, the union wage premium is equal to the union cost divided by the non-union cost (expressed as a percent). Thus, the non-union cost of labor is equal to the union cost of labor divided by the union wage premium.

9

**References:**

Allen, Steven G. 1988. "Declining Unionization in Construction: The Facts and the Reasons." *Industrial and Labor Relations Review*, Vol. 41, No. 3 (April), pp. 343-59. _. 1994.

Allen, Steven G. 1988. "Further Evidence on Union Efficiency in Construction." *Industrial Relations: A Journal of Economy and Society,* 27(2): 232– 40.

Allen Steve G. 1994. "Developments in Collective Bargaining in Construction in the 1980s and 1990s",

In Paula B. Voos, ed. *Contemporary Collective Bargaining in the Private Sector*, Madison, WI: Industrial Relations Research Association, 1994, pp. 411-445

Bilginsoy, C. 2013. "Union Wage Gap in the U.S. Construction Sector: 1983–2007." *Industrial Relations*, 52: 677-701

Blanchflower, David and Alex Bryson. "What effect do unions have on wages now and would Freeman and Medoff be surprised?" *Journal of Labor Research*, 25(3): 383-414.

Bratsberg, Bernt, and James F. Ragan. 2002. "Changes in the Union Wage Premium by Industry." *Industrial and Labor Relations Review*, 56(1): 65-83.

Budd, J.W. 2005. "The effect of unions on employee benefits: Updated employer expenditure results." *Journal of Labor Research*, 26:669-676.

Card, D. 1996. "The effect of unions on the structure of wages: A longitudinal analysis." *Econometrica*, 64(4):957–979.

Freeman, Richard B. 1981. "The Effect of Unionism on Fringe Benefits." *Industrial and Labor Relations Review*, 34: 489–509.

Hirsch, Barry T. 2004. "Reconsidering Union Wage Effects: Surveying New Evidence on an Old Topic." *Journal of Labor Research*, 25(2): 233-66.

Lewis, H. G. 1986. "Union relative wage effects." *Handbook of Labor Economics*, 2:1139–1181.

Farber, Henry, et al. "Unions and Inequality over the Twentieth Century: New Evidence from Survey Data".

Linneman, Peter D., Michael L. Wachter, and William H. Carter. 1990. "Evaluating the Evidence on Union Employment and Wages." *Industrial and Labor Relations Review*, 44(1):34-53.

# Appendix A

1. **Occupations Used in Analysis of Union Wage Premium**

| OCCUPATION TITLE | 2010 CENSUS CODE(S) | 2010 SOC CODE(S) |
|---|---|---|
| Brickmasons, blockmasons, and stonemasons | 6220 | 47-2020 |
| Carpenters | 6230 | 47-2031 |
| Carpet, floor, and tile installers and finishers | 6240 | 47-2040 |
| Cement masons, concrete finishers, and terrazzo workers | 6250 | 47-2050 |
| Construction laborers | 6260 | 47-2061 |
| Operating engineers and other construction equipment operators | 6320 | 47-2073 |
| Drywall installers, ceiling tile installers, and tapers | 6330 | 47-2080 |
| Electricians | 6355 | 47-2111 |
| Glaziers | 6360 | 47-2121 |
| Insulation workers | 6400 | 47-2130 |
| Painters, construction and maintenance | 6420 | 47-2141 |
| Paperhangers | 6430 | 47-2142 |
| Pipelayers, plumbers, pipefitters, and steamfitters | 6440 | 47-2150 |
| Plasterers and stucco masons | 6460 | 47-2161 |
| Helpers, construction trades | 6600 | 47-3010 |
| Miscellaneous construction and related workers | 6765 | 47-4090 |
| Electrical and electronics repairers, industrial and utility | 7100 | 49-2094, 49-2095 |
| Security and fire alarm systems installers | 7130 | 49-2098 |
| Control and valve installers and repairers | 7300 | 49-9010 |
| Heating, air conditioning, and refrigeration mechanics and installers | 7315 | 49-9021 |
| Millwrights | 7360 | 49-9044 |
| Electrical power-line installers and repairers | 7410 | 49-9051 |
| Telecommunications line installers and repairers | 7420 | 49-9052 |
| Helpers—installation, maintenance, and repair workers | 7610 | 49-9098 |
| Other installation, maintenance, and repair workers | 7630 | 49-9093, 49-9099 |
| Industrial truck and tractor operators | 9600 | 53-7051 |
| Laborers and freight, stock, and material movers, hand | 9620 | 53-7062 |
| Material moving workers, all other | 9750 | 53-7199 |

## Appendix A

**2. Occupational Groups Used in Table 1 (includes all occupations listed in part 1)**

**Carpenters**
**Electricians**
**Drywallers (including the individual occupations listed below)**
    Brickmasons, blockmasons, and stonemasons
    Drywall installers, ceiling tile installers, and tapers
    Glaziers
    Insulation workers
    Painters, construction and maintenance
    Paperhangers
    Plasterers and stucco masons
**Installers (including the individual occupations listed below)**
    Electrical and electronics repairers, industrial and utility
    Security and fire alarm systems installers
    Control and valve installers and repairers
    Heating, air conditioning, and refrigeration mechanics and installers
    Millwrights
    Electrical power-line installers and repairers
    Telecommunications line installers and repairers
    Helpers—installation, maintenance, and repair workers
    Other installation, maintenance, and repair workers
**Laborers (including the individual occupations listed below)**
    Construction laborers
    Helpers, construction trades
    Miscellaneous construction and related workers
**Operating engineers and other construction equipment operators**
**Plumber (Pipelayers, plumbers, pipefitters, and steamfitters)**
**Mover (including the individual occupations listed below)**
    Industrial truck and tractor operators
    Laborers and freight, stock, and material movers, hand
    Material moving workers, all other

12

# Appendix B

## Articles Published 2010 to present

1. Joyce, Theodore, Kaestner, Robert and Jason Ward. (forthcoming). "The Impact of Parental Involvement Laws on the Abortion Rate of Minors." Demography
2. Antonakos, Cathy, Claudia J. Coulton, Robert Kaestner, Mickey Lauria, Dwayne E. Porter, and Natalie Colabianchi (forthcoming). "Built Environment Exposures of Adults in the Moving to Opportunity Experiment." Housing Studies. DOI: 10.1080/02673037.2019.1630560
3. Wehby, George, Dave, Dhaval, and Robert Kaestner. (forthcoming). "Effects of the Minimum Wage on Infant Health". Journal of Policy Analysis & Management.
4. Jaeger, David, Joyce Theodore and Robert Kaestner. (Forthcoming). "A Cautionary Tale of Evaluating Identifying Assumptions: Did Reality TV Really Cause a Decline in Teenage Childbearing?" Journal of Business & Economic Statistics. https://doi.org/10.1080/07350015.2018.1497510
5. Schiman, Jeffrey, Kaestner, Robert, and Anthony Lo Sasso. 2019. "Infant Mortality and Adult Wellbeing: Evidence from Wartime Britain." Labour Economics, 60:12-29
6. Jaeger, David A., Theodore J. Joyce, and Robert Kaestner. 2019. Tweet Sixteen and Pregnant: Missing Links in the Causal Chain from Reality TV to Fertility. A replication study of Kearney & Levine (American Economic Review, 2015). International Journal for Re-Views in Empirical Economics, Vol 3(2019-1). DOI: 10.18718/81781.10
7. Margerison, Claire E., Colleen MacCallum, Jiajia Chen, Yasamean Zamani-Hank, and Robert Kaestner. 2020. "Impacts of Medicaid Expansion on Health Among Women of Reproductive Age," American Journal of Preventive Medicine, 58(1):1-11.
8. Gallagher, Ryan, Kaestner, Robert, and Joseph Persky. 2019. "The Geography of Family Differences and Intergenerational Mobility." Journal of Economic Geography, 19(3): 589-618, https://doi.org/10.1093/jeg/lby026https://doi.org/10.1093/jeg/lby026
9. Dave, Dhaval M., Kaestner, Robert, and George L. Wehby. 2018. "Does Public Insurance Coverage for Pregnant Women Affect Prenatal Health Behaviors?" Journal of Population Economics, 32(2):419-453.
10. Kaestner, Robert and Kevin Callison. 2018. "An Assessment of the Forward-Looking Hypothesis of the Demand for Cigarettes." Southern Economic Journal, 85(1): 48-70
11. Hu, Luojia, Kaestner, Robert, Miller, Sarah, Mazumdar, Bhaskar, and Ashley Wong. 2018. "The Effect of the Affordable Care Act Medicaid Expansions on Financial Wellbeing." Journal of Public Economics, 163:99-112.
12. Kaestner, Robert, Schiman, Cuiping and G. Caleb Alexander. 2019. "Effects of Prescription Drug Insurance on Hospitalization and Mortality: Evidence from Medicare Part D." Journal of Risk and Insurance, 86(3): 595-628. https://doi.org/10.1111/jori.12229
13. Roebuck, Christopher, Kaestner, Robert, and J. Samantha Dougherty. 2018. "Impact of Medication Adherence on Health Services Utilization in Medicaid." Medical Care, 56(3):266-273.
14. Wherry, Laura, Miller, Sarah, Kaestner, Robert and Meyer, Bruce. 2018. "Childhood Medicaid Coverage and Later Life Health Care Utilization. Review of Economics and Statistics, 100(2): 287-302. doi: 10.1162/REST_a_00677. *2017 HCUP Outstanding Article of the Year Award*.

15. Kaestner Robert, Garrett, Bowen, Jiajia Chen, Anuj Gangopadhyaya, and Caitlyn Fleming. 2017. "Effects of ACA Medicaid Expansions on Health Insurance Coverage and Labor Supply." Journal of Policy Analysis and Management, 36(3):608-42.
16. Plurphanswat, Nanataporn, Kaestner, Robert, and Brad Rodu. 2017. "The Effect of Smoking on Mental Health." American Journal of Health Behavior, 41(4):471-83.
17. Alexander, G. Caleb, Schiman, Cuiping and Robert Kaestner. (forthcoming). "Association Between Prescription Drug Insurance and Health Care Utilization among Medicare Beneficiaries." Medical Care Research and Review, 75(2):153–174.
18. Kaestner, Robert and Darren Lubotsky. 2016. "Do 'Skills Beget Skills'? Evidence on the Effect of Kindergarten Entrance Age on the Evolution of Cognitive and Non-cognitive Skill Gaps in Childhood." Economics of Education Review, 53:194-206.
19. Kaestner, Robert and Darren Lubotsky. 2016. "Health Insurance and Income Inequality. Journal of Economic Perspectives, 30(2):1-29.
20. Kaestner, Robert. 2016. "Did Massachusetts Health Care Reform Lower Mortality? No According to Randomization Inference." Statistics and Public Policy, 3(1):1-6.
21. Roebuck, M.C., J.S. Dougherty, R. Kaestner, and L.M. Miller. 2015. "Increased Use of Prescription Drugs Reduces Medical Costs In Medicaid Populations." Health Affairs, 34(9):1586-1593.
22. Dave, Dhaval, Sandra Decker, Robert Kaestner and Kosali Simpon. 2015. "The Effect of Medicaid Expansions in the Late 1980s and Early 1990s on the Labor Supply of Pregnant Women. American Journal of Health Economics, 1(2):165-193.
23. Gordon, Rachel A., Hofer, Kerry G., Fujimoto, Ken A., Colwell, Nicole, Kaestner, Robert and Korenman, Sanders. 2015. "Identifying High Quality Preschool Programs: New Evidence on the Validity of the ECERS-R in Relation to School Readiness Goals." Early Education and Development, 26(8):1086-1110.
24. Callison, Kevin and Robert Kaestner. 2015. "Cigarette Taxes and Smoking: Will Higher Taxes Yield a Public Benefit?" Regulation 37(4):42-46.
25. Kaushal, Neeraj and Robert Kaestner. 2015. "Are Foreign-trained Nurses Perfect Substitutes for US-trained Nurses?" Industrial and Labor Relations Review. doi: 10.1177/0019793915592624
26. Kaestner, Robert and Anthony Lo Sasso. 2015. "Does Seeing the Doctor More Often Keep You Out of the Hospital?" Journal of Health Economics. 39: 259-272.
27. Kaestner, Robert, Michael Darden and Darius Lakdawalla. 2014. "Are Investments in Disease Prevention Complements? The Case of Statins and Health Behaviors." Journal of Health Economics, 36:151-163.
28. Zhenxiang Zhao, Robert Kaestner, Xin Xu. 2014."Spatial Mobility and Environmental Effects on Obesity." Economics & Human Biology, 14:128-140.
29. Kaestner, Robert and Ofer Malamud. 2014. "Self-selection and International Migration: New Evidence from Mexico." Review of Economics and Statistics, 96(1): 78-91.
30. Callison, Kevin and Robert Kaestner. 2014. "Do Higher Tobacco Taxes Reduce Adult Smoking? New Evidence of the Effect of Recent Cigarette Tax Increases on Adult Smoking." Economic Inquiry, 52(1):155-172.
31. Eiríksdóttir, Védís, Asgeirsdottir, Tinna, Bjarnadóttirr, Ragnheiður, Kaestner, Robert, Cnattingius, Sven et al. (2013). "Low Birth Weight, Small for Gestational Age and Preterm Births Before and After the Economic Collapse in Iceland: A Population Based Cohort Study." PloS ONE 8(12): e80499. doi:10.137/journal.p.one.00.80.499.

32. Abner, Kristin, Robert Kaestner; Sanders Korenman; and Rachel A Gordon. 2013. "Does Child Care Quality Mediate Associations between Type of Care and Development?" Journal of Marriage and the Family, 75(5):1203-1217.
33. Kaestner, Robert and Neeraj Kaushal. 2013. "Acculturation and Health Insurance of Mexicans in the US." Review of International Economics, 21(2):233-48.
34. Gordon, Rachel A., Fujimoto, Ken, Kaestner, Robert and Sanders Korenman. 2013. "An Assessment of the Validity of the ECERS-R with Implications for Measures of Child Care Quality and Relations to Child Development." Developmental Psychology, 49(1), 146-160.
35. Kaestner, Robert. 2013. "The Grossman model after 40 years: a reply to Peter Zweifel." The European Journal of Health Economics, 14(2):357-360.
36. Colwell, Nicole, Gordon, Rachel A., Fujimoto, Ken,Kaestner, Robert, and Sanders Korenman. 2013. "New Evidence on the Validity of the Arnett Caregiver Interaction Scale: Results from the Early Childhood Longitudinal Study-Birth Cohort." Early Childhood Research Quarterly,28:218-233.
37. Sanders Korenman; Kristin S Abner; Robert Kaestner; Rachel A Gordon. 2013. "The Child and Adult Care Food Program and the Nutrition of Preschoolers." Early Childhood Research Quarterly, 28: 325– 336
38. Kaestner, Robert, Anthony Lo Sasso, Kevin Callison and Benjamin Yarnoff. 2013. "Youth Employment and Substance Use." Social Science Research, 42(1):169-85.
39. Kaestner, Robert and Neeraj Kaushal. 2012. "Effect of Immigrant Nurses on Labor Market Outcomes of US Nurses." Journal of Urban Economics 71:219-229
40. Kaestner, Robert and Nasreen Khan. 2012. Medicare Part D and its Effect on the Use of Prescription Drugs and Use of Other Health Care Services of the Elderly." Journal of Policy Analysis and Management 31(2):253-279.
41. Gordon, Rachel A., Robert Kaestner, Sanders Korenman, and Kristin Abner. 2011. "The Child and Adult Care Food Program: Who is Served and Why?" Social Service Review 85 (3): 359-400. **Frank R. Breul** *Memorial Prize for the best publication in Social Services Review 2011*
42. Kaestner, Robert and Benjamin Yarnoff. 2011. The Long Term Effects of Minimum Legal Drinking Age Laws on Adult Alcohol Use and Traffic Fatalities. Journal of Law and Economics 54:365-388.
43. Kaestner, Robert and Kevin Callison. 2011. "Adolescent Cognitive and Non-cognitive Correlates of Adult Health" Journal of Human Capital Vol. 5, No. 1, pp. 29-69.
44. Dhaval M Dave, Sandra L Decker, Robert Kaestner and Kosali Ilayperuma Simon. 2010. "The Effect of Medicaid Expansions on the Health Insurance Coverage of Pregnant Women: An Analysis Using Deliveries." Inquiry: Winter 2010/2011, Vol. 47, No. 4, pp. 315-330.
45. Zhao, Zhenxiang and Robert Kaestner. 2010. "Effects of Urban Sprawl on Obesity." Journal of Health Economics. 29(6):779-787.
46. Silber, Jeffrey H., Kaestner, Robert, Even-Shoshan, Orit, Wang, Yanghli, and Laura Bressler. 2010. "Aggressive Treatment Style and Surgical Outcomes." Health Services Research. 45(6):1872-1892. *AcademyHealth Article of the Year 2011.*
47. Kaestner, Robert and Jeffrey Silber. 2010. "Evidence on the Efficacy of Inpatient Spending on Medicare Patients." Milbank Quarterly 88(4): 560-594. **Article of the Year 2011, AcademyHealth**

48. LoSasso, Anthony, Lorens Helmchen and Robert Kaestner. 2010. "The Effects of Consumer-Directed Health Plans on Health Care Spending." Journal of Risk and Insurance 77(1); 85-103.
49. Kaestner, Robert and Xin Xu. 2010. "Title IX, Girls' Sports Participation, and Adult Female Physical Activity and Weight." Evaluation Review 34: 52-78.
50. Khan, Nasreen, Robert Kaestner, JW Salmon and B Gutierrez. 2010. "Does Supply Influence Mammography Screening?" American Journal of Health Behavior 34(4):465-75.