# Exhibit C

## DEPOSITION OF STEPHEN ZSIGRAY

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3    WACKER DRIVE EXECUTIVE          )
     SUITES, LLC, on behalf of       )
4    itself Individually, and on     )
     behalf of all others            )
5    similarly situated,             )
                                     )
6              Plaintiffs,           )
                                     )
7         vs.                        ) No. 1:18-cv-5492
                                     )
8    JONES LANG LASALLE AMERICAS     )
     (ILLINOIS), LP,                 )
9                                    )
               Defendant.            )
10

11            The discovery deposition of STEPHEN

12       ZSIGRAY, taken in the above-entitled cause,

13       pursuant to Fed.R.Civ.P. 30(b)(6), before

14       Andrew R. Pitts, Certified Shorthand Reporter

15       of the State of Illinois, on Friday,

16       December 20, 2019, at 77 West Wacker Drive,

17       Suite 500, Chicago, Illinois, pursuant to

18       Notice, commencing at 9:00 a.m.

19

20

21

22

23                   REPORTED BY:
                ANDREW R. PITTS, CSR, RPR
24                LICENSE NO.:  084-4575

## DEPOSITION OF STEPHEN ZSIGRAY

1    APPEARANCES:

2      FOSTER PC
       BY MR. HOWARD W. FOSTER, ESQUIRE and
3      MR. MATTHEW A. GALIN, ESQUIRE
       150 North Wacker Drive
4      Suite 2150
       Chicago, Illinois  60606
5      Phone:  (312) 726-1600
       E-Mail:  hfoster@fosterpc.com
6               mgalin@fosterpc.com

7           -and-

8      STEPHAN ZOURAS
       BY MR. JAMES B. ZOURAS, ESQUIRE
9      100 North Riverside Plaza
       Suite 2150
10     Chicago, Illinois  60606
       Phone:  (312) 233-1550
11     E-Mail:  jzouras@stephanzouras.com

12          Appeared on behalf of the Plaintiffs;

13     MORGAN, LEWIS & BOCKIUS LLP
       BY MR. SCOTT T. SCHUTTE, ESQUIRE and
14     MS. HEATHER NELSON, ESQUIRE
       77 West Wacker Drive
15     Suite 500
       Chicago, Illinois  60601-5094
16     Phone:  (312) 324-1773
       E-Mail:  scott.schutte@morganlewis.com
17               heather.nelson@morganlewis.com

18          Appeared on behalf of the Defendant.

19     ALSO PRESENT:

20          MS. LISA FONTOURA, Senior Counsel Jones Lang
            LaSalle.

21

22

23

24

**DEPOSITION OF STEPHEN ZSIGRAY**

I N D E X

WITNESS                                          EXAMINATION

  STEPHEN ZSIGRAY

      BY MR. FOSTER                                    4, 71

      BY MR. SCHUTTE                                     68


                    E X H I B I T S

  NUMBER                                             MARKED

  Exhibit 1    Defendant's supplemental               5
               objections and designations in
               response to 30(b)(6) Notice

  Exhibit 2    E-mail and attachments from            59
               Keelee Leyden to Richard De
               Vries, movers list

_DEPOSITION OF STEPHEN ZSIGRAY_

1                    (Whereupon, the witness was

2                      administered an oath.)

3                    STEPHEN ZSIGRAY,

4    called as a witness herein, having been first

5    administered an oath, was examined and testified as

6    follows:

7                         EXAMINATION

8    BY MR. FOSTER:

9         Q.   Good morning.  You are who, sir?

10        A.   I am Steve, Stephen Zsigray.

11        Q.   Okay.  And what is your position at Jones

12   Lang & LaSalle?

13        A.   I'm a managing director, and I run our

14   management program development business for the

15   midwest.

16        Q.   And are you aware that you are here today as

17   a corporate representative to answer questions on

18   various topics?

19        A.   I am.

20        Q.   So just to hopefully to make this go

21   smoothly, you undoubtedly know I'm Howard Foster,

22   I represent the Plaintiff Wacker Drive Executive

23   Suites.  I'll ask you questions, and when I'm done,

24   you answer.  And while you're talking, I am not going

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    to talk, and I hope the same will go when I'm

2    talking, you don't talk, and then the court reporter

3    can get it all down.

4            If you don't understand one of my questions,

5    just let me know.  And if you want to take a break,

6    let me know, and we will take a break except when a

7    question is pending.  When a question is pending, you

8    have to answer it.  And your lawyers probably told

9    you to please answer verbally.  Right?

10       A.   Yes.

11       Q.   Rather than assenting through a nod or

12   something.  Okay.

13           MR. FOSTER:  The first thing I want to do is

14   just label this Exhibit 1, if I could have a sticker.

15                   (Whereupon, Exhibit 1 was marked

16                    for identification.)

17   BY MR. FOSTER:

18       Q.   Exhibit 1, Mr. Zsigray, that is the

19   Defendant's supplemental objections and designations

20   in response to our Notice of 30(b)(6) deposition.

21   This is a document prepared by your lawyers, or the

22   lawyers for Jones Lang and LaSalle, listing all the

23   topics that we are going to go through.

24           Do you know if you are going to be the

__DEPOSITION OF STEPHEN ZSIGRAY__

1   representative for Jones Lang and LaSalle on all of

2   the topics that we are going to do here today?

3        A.   Yes.

4        Q.   So if you could please turn to Page 3, topic

5   number 1.  Before we get started, I would just like

6   to know a little bit about your background.

7             Could you tell me how long you have been

8   with Jones Lang and LaSalle.

9        A.   I've been with Jones Lang LaSalle 32 and a

10  half years since 1987.

11       Q.   So have you held various positions over the

12  32 years?

13       A.   Yes.

14       Q.   Okay.  And, again, your current position is

15  what?

16       A.   I am the regional manager for the midwest

17  region.  I oversee office and industrial properties

18  for the region.

19       Q.   And how long have you held that position?

20       A.   Since 2006.

21       Q.   So let's turn to topic number 1:  "How JLL,"

22  which is Jones Lang and LaSalle, "earns fees from its

23  landlord clients at the building from tenant

24  construction buildouts."

__DEPOSITION OF STEPHEN ZSIGRAY__

1          So why don't you just answer that question.

2     How does Jones Lang LaSalle earn fees from tenant

3     buildouts, if it does earn fees from tenant

4     buildouts?

5          A.   Yes, and it varies by property, varies by

6     client.   In cases where we do earn management fees, it

7     is typically a percentage of the construction cost,

8     a percentage of the construction cost.

9          We have buildings where we don't get

10    construction management fees for overseeing

11    construction management, and we get a management fee,

12    and if our onsite team performs the construction,

13    that's all part of a negotiation with an investor

14    client coming into the building.

15         Q.   All right.   So let's now talk about the

16    15 buildings that are at issue in this case.   Okay?

17         A.   Yes.

18         Q.   All right.   As to those 15 buildings that

19    are at issue in the case, how did Jones Lang and

20    LaSalle earn fees from its tenants through buildouts,

21    if it did?

22              MR. SCHUTTE:   Object to form.

23                   Go ahead.

24

_DEPOSITION OF STEPHEN ZSIGRAY_

1   BY THE WITNESS:

2        A.   As a percentage of construction costs,

3   I can't tell you of those 15 buildings off the top of

4   my head without reviewing them which ones did or

5   didn't, but if we did, it was based on a percentage of

6   construction costs.

7   BY MR. FOSTER:

8        Q.   You haven't looked at the agreements,

9   though, for the 15 buildings to determine if they

10  were a percentage of the construction costs?

11       A.   Whether we received a fee or not.  If we

12  received a fee, then it was based on a percentage of

13  construction costs.

14       Q.   Okay.  So I think I understand that.  Let me

15  just make sure that I do.

16            If Jones Lang and LaSalle received a fee

17  from those -- owners, right?

18       A.   Owners, yes.

19       Q.   Correct?

20       A.   Correct.

21       Q.   With regard to the 15 buildings at issue in

22  this case, part of the fee would have been a

23  percentage of the buildout costs by the tenants; is

24  that correct?

## DEPOSITION OF STEPHEN ZSIGRAY

1        A.   Yes.

2        Q.   Are you saying that you are not sure that

3   Jones Lang and LaSalle did receive a fee from the

4   owners of these 15 buildings?

5        A.   I'm saying that I have not reviewed every

6   single building back to the dates that you are talking

7   about as to whether we received in any year, every

8   year, no year, depending on whether we did

9   construction management under a management agreement

10  that had a fee under it.

11       Q.   What did you review in preparation for this

12  deposition as to this topic?

13       MR. SCHUTTE:   You can answer.

14  BY THE WITNESS:

15       A.   Okay.  I reviewed the 125 South -- the WDES

16  lease at 125 South Wacker.  I reviewed rules and -- to

17  this document, to this particular topic, I reviewed

18  the 125 South Wacker lease.  That's the WDES.

19  BY MR. FOSTER:

20       Q.   That's the only building that you reviewed

21  for this deposition to prepare?

22       A.   I reviewed management agreements for the

23  other buildings.  I don't recall the details of every

24  agreement as to whether or not we were getting a

_DEPOSITION OF STEPHEN ZSIGRAY_

1    percentage management fee on those 15 agreements.

2         Q.   Well, in discovery, the management

3    agreements for the 15 buildings were produced to us.

4    I have actually read all of them that were produced.

5    It looked to me that all of the buildings were paying

6    management fees that included a portion of the

7    buildout costs.

8              Do you have any reason to think that I was

9    wrong about that?

10             MR. SCHUTTE:  Object to form.

11                  Go ahead.

12    BY THE WITNESS:

13        A.   I know that if we were paid under those

14    agreements in accordance with those agreements and

15    there was a percentage management fee in those

16    agreements for construction, then we would have

17    received them, yes.

18    BY MR. FOSTER:

19        Q.   Well, weren't you supposed to prepare for

20    topic 1 as to all 15, you know, agreements here

21    today?

22             MR. SCHUTTE:  Hold on.  That's not a

23    question for the witness.  That's a legal question.

24    He's prepared to -- he already answered the question.

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1  The question is how they earned the fee, and he

2  described how they earned the fee.

3          MR. FOSTER:  He didn't.  He is saying he

4  doesn't know for the other 14 buildings.

5          MR. SCHUTTE:  That's not what he said.

6          MR. FOSTER:  You know, I don't want to argue

7  with you about what he said, Scott.  Don't tell me

8  what he said.  Let's have the witness testify.  The

9  witness is saying he could only remember reviewing the

10  agreement for only one building, 125 South Wacker.

11  BY MR. FOSTER:

12     Q.  Is that correct?  Is that your testimony?

13          MR. SCHUTTE:  That's --

14          MR. FOSTER:  No.

15          MR. SCHUTTE:  No.  I will object if my --

16          MR. FOSTER:  You can object to the form of

17  the question.

18          MR. SCHUTTE:  You know what?  Let me do it.

19  And if you need to take a break so we can get

20  ourselves calmed down, we can do that.  Do you need a

21  break, or are you okay?

22          MR. FOSTER:  I don't need a break.

23          MR. SCHUTTE:  Okay.  Good.

24          MR. FOSTER:  Do you?

11

_DEPOSITION OF STEPHEN ZSIGRAY_

1          MR. SCHUTTE:  I object to the form of the

2     question.

3          MR. FOSTER:  Okay.

4          MR. SCHUTTE:  Could you read the question

5     back, please.

6               (Whereupon, the record was read by

7                the reporter as requested.)

8          MR. SCHUTTE:  Object to form of the

9     question.

10         MR. FOSTER:  Answer the question, please,

11    sir.

12         THE WITNESS:  Read it again.

13              (Whereupon, the record was read by

14               the reporter as requested.)

15     BY THE WITNESS:

16      A.   I prepared for topic 1.  I read all the

17    agreements.  I don't recall every single detail about

18    the agreement as I'm sitting here.

19    BY MR. FOSTER:

20      Q.   But you are supposed to be able to answer

21    questions on this topic.  So are you saying that

22    you're not able to answer any questions about any of

23    the other buildings other than 125 South Wacker?

24         MR. SCHUTTE:  Object to form.  Misstates his

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1   testimony.

2           MR. FOSTER:  Okay.

3    BY THE WITNESS:

4       A.  There are other agreements that have

5    percentage project management fees in them.

6           MR. FOSTER:  Yes.

7    BY THE WITNESS:

8       A.  I don't have them memorized to tell you

9    which ones they are right now.

10  BY MR. FOSTER:

11      Q.  But you don't -- okay.  You may not have

12   them memorized, but we wanted to find out if there

13   were such agreements as to these 15 buildings.  Are

14   you able to tell us that?  You don't have to have

15   them memorized, but are you able to tell us that, if

16   they are or not?

17      A.  They are.

18           MR. FOSTER:  Do you want to go off the

19   record for a second?  Maybe we can clarify this with

20   you and me talking, Scott?  I mean, would you agree to

21   go off the record?

22           MR. SCHUTTE:  Yeah, let's go off the record.

23               (Whereupon, a break was taken from

24                9:21 to 10:19 a.m.)

__DEPOSITION OF STEPHEN ZSIGRAY__

1   BY MR. FOSTER:

2       Q.   Mr. Zsigray, I think I understand what

3   you're saying with regard to topic number 1, but

4   I just want to reread the answer that Jones Lang and

5   LaSalle gave to topic number 1.  We will go over it

6   again quickly, and we are going to move on.

7           It says, "JLL will produce a designee to

8   testify generally with respect to the buildings it

9   currently manages at issue in this case during the

10  class period as to how JLL may be compensated by

11  building owner for any construction management and/or

12  construction supervision services it may provide for

13  the buildings JLL currently manages."

14          I believe you said that you have read and do

15  recall the fee provisions with regard to the

16  125 South Wacker building; is that correct?

17      A.   That's correct.

18      Q.   So let me ask you this about that building.

19  Okay?  All right.

20          With regard to that building, does Jones

21  Lang LaSalle earn a fee for overseeing tenant

22  buildout projects?

23          MR. SCHUTTE:  Currently?

24          MR. FOSTER:  You can't interfere with the

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1  question.  If you want to object, you can say it.  You

2  can't do that, Scott.

3          MR. SCHUTTE:  Object.  The question is vague

4  as to time frame.

5          MR. FOSTER:  Okay.  Answer the question,

6  sir.

7   BY THE WITNESS:

8      A.   Under our current agreement for the property

9  management of 125 South Wacker, the owner of which is

10  Ivanhoé Cambridge, we do not receive a management fee

11  if our property personnel -- people who are assigned

12  to the building, managers of the building, we do not

13  get a fee.

14          We get a fee if we are requested by the

15  owner to bring in a project manager, specialist from

16  within JLL who is not an employee of the property, to

17  do the construction management.  In that case, we get

18  a management fee or a percentage -- we get a

19  percentage construction management fee.

20  BY MR. FOSTER:

21      Q.   If that does occur and there is a

22  construction management fee, would it be a portion of

23  the tenant buildout fee that the tenant incurs?

24          MR. SCHUTTE:  Object --

DEPOSITION OF STEPHEN ZSIGRAY

1    BY THE WITNESS:

2         A.   Yes, it would be a percentage.

3              MR. FOSTER:  You interrupted the witness

4    again, Scott.  It's habitual.

5              MR. SCHUTTE:  I was attempting to object to

6    form, and the witness started his answer.  Object to

7    form.  It is not habitual.  Object to form.

8              MR. FOSTER:  Every question.

9              MR. SCHUTTE:  It's not every question.

10             MR. FOSTER:  Okay.

11             MR. SCHUTTE:  I only object to bad

12   questions.

13             MR. FOSTER:  Okay.

14             MR. SCHUTTE:  Object to form.

15   BY MR. FOSTER:

16        Q.   He can object to form.  Mr. Zsigray, in the

17   future, could you just pause for a second before

18   answering to let your lawyer to object if he wants to

19   object.

20        A.   Sure.

21        Q.   That might help.

22        A.   Yes, I will.

23        Q.   Okay.  Before he rudely interrupted, my

24   understanding was the answer to your question was,

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

```
1    yes, it would be in that situation a percentage of

2    the charge that the tenant pays for the construction

3    project?

4            MR. SCHUTTE:  Object to the characterization

5    of my objection.

6                 Go ahead.

7     BY THE WITNESS:

8        A.   It would be a percentage of the construction

9    costs of that project.

10   BY MR. FOSTER:

11       Q.   Costs to whom?

12       A.   To the landlord.

13       Q.   I'm talking about tenant buildouts though.

14       A.   Landlord provides tenant buildouts.

15       Q.   When you say provides tenant buildouts, I'm

16   not sure I understand.  When you say provides, you

17   mean pays for?

18       A.   I'm saying pays for and manages the

19   construction.

20       Q.   In the typical case of a tenant in one of

21   the buildings, let's say -- not one; 125 South

22   Wacker.  Say a tenant like my client was a tenant in

23   125 South Wacker, Wacker Drive Executive Suites, and

24   Wacker Drive Execute Suites received a tenant
```

<u>__DEPOSITION OF STEPHEN ZSIGRAY</u>__

1    improvement allowance and did a couple of

2    buildouts -- I'm calling them buildouts -- over the

3    course of its tenancy.  Are you with me so far?

4         A.   I am with you so far.

5         Q.   Without regard to those particular

6    buildouts, did Jones Lang and LaSalle earn a fee of

7    any kind?

8              MR. SCHUTTE:  Object to form.

9                   Go ahead.

10    BY THE WITNESS:

11        A.   No.

12   BY MR. FOSTER:

13        Q.   Why not?

14        A.   Because the tenant negotiated in their lease

15   with the landlord to do their own construction, to do

16   their own construction management with their own

17   contractor.

18        Q.   I see.  So you're saying that neither the

19   landlord, nor Jones Lang and LaSalle was asked to

20   provide a project manager?  Is that the reason why it

21   isn't?

22        A.   Yes.

23        Q.   So the key here is whether the tenant uses

24   its own project manager or they are asking Jones

**DEPOSITION OF STEPHEN ZSIGRAY**

1    Lang and LaSalle or the owner to provide one?

2              MR. SCHUTTE:  Object to form.

3                   Go ahead.

4     BY THE WITNESS:

5         A.  Yes.

6    BY MR. FOSTER:

7         Q.  In the typical case of tenant -- is there a

8    typical case with regard to tenants then, whether

9    they provide their own project manager or they ask

10   for one?

11        A.  In my experience?

12        Q.  Yes.

13        A.  Generally, very uncommon for a tenant to do

14   their own construction.  Typically, and most often, it

15   is provided for by the landlord.  The landlord does

16   the construction.

17        Q.  When you say does the construction, you mean

18   would be the general contractor?

19        A.  The general contractor would do the

20   construction.

21        Q.  Right.

22        A.  It would be managed and overseen by the

23   landlord's representative.  In this case, if it was

24   JLL, it would be us.

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    Q.   So in those situations, wouldn't it be

2    typical then for Jones Lang and LaSalle to earn some

3    sort of a fee from those buildouts?

4    A.   As I just reviewed all these documents, it

5    varies building by building.  If it is negotiated with

6    the landlord that if building personnel perform that

7    work, there is no additional construction management

8    fee.  When I say building personnel, people that are

9    reimbursed by the property and paid for as an

10   operating expense of the property.  There is no fee.

11        If an outside project manager is brought in

12   because it's a complicated project and the building

13   personnel aren't skilled enough or they don't have

14   capacity to handle it, then there, generally speaking,

15   will be a fee attached to that.

16   Q.   Okay.  Well, let me just try and understand

17   this a little better.

18        Is there a typical situation with tenant

19   buildouts whether they have an insider being the

20   project manager or use an outsider?

21        MR. SCHUTTE:  Object to form.

22        Go ahead.

23   BY THE WITNESS:

24   A.   Truly varies by building and the experience

1    level of the management team that is running the

2    property and officed on site at the property, and it

3    is determined by the negotiation with the client.

4    Many times they are repeat clients and we have similar

5    arrangements across multiple markets, and we have

6    utilized the same type of a fee structure.

7    BY MR. FOSTER:

8          Q.   The client is then who, the tenant?

9          A.   The client is the owner.

10         Q.   All right.  So let me ask a little more.

11   I think I'm learning some stuff here.

12              If the tenant wants to do a project, am I

13   correct that somebody needs to be a project manager

14   for every project?

15         A.   You are correct.

16         Q.   If the tenant wants to provide for its own

17   project manager, in that situation, Jones Lang and

18   LaSalle probably would not earn a fee for that

19   particular project; is that correct?

20         A.   That's correct.

21         Q.   But for the tenant to do that and have its

22   own project manager then, it would generally mean

23   that it is going out and essentially hiring its own

24   general contractor to be project manager?  Is that

21

DEPOSITION OF STEPHEN ZSIGRAY

1    what that would mean?

2        A.   The tenant would sign a contract with a

3    general contractor to do the work.

4        Q.   Right.

5        A.   Yes.

6        Q.   And in that situation, what would Jones Lang

7    and LaSalle's role be in that with regard to that

8    project?

9            MR. SCHUTTE:   Object to form.

10               Go ahead.

11   BY THE WITNESS:

12       A.   Oversight of the project.

13   BY MR. FOSTER:

14       Q.   But it wouldn't earn any fee for the

15   oversight?

16       A.   In rare instances, but typically not.

17       Q.   In some cases, some tenants might be

18   smaller, I guess, and they don't want to hire their

19   own general contractor; is that correct?

20           MR. SCHUTTE:   Object to form.

21               Go ahead.

22    BY THE WITNESS:

23       A.   I stated earlier that there are very few

24   situations where tenants -- whether they're large,

1    medium, or small, there just aren't that many

2    situations where the tenant wants to do their own

3    construction.

4    BY MR. FOSTER:

5        Q.   So in most cases, you're saying the tenant

6    needs to use -- I don't understand.  When you say do

7    their own, you mean hire their own GC?

8        A.   Yes.

9        Q.   So in most cases, who did they use?

10       A.   They used the landlord, they used the

11   landlord's agent to be the construction coordinator

12   who hires a general contractor.

13       Q.   The landlord's agent is Jones Lang and

14   LaSalle with regard to these buildings, right?

15       A.   Yes.

16       Q.   You are the agent?

17       A.   Yes.

18       Q.   So you are saying in most cases then, the

19   tenants are using you, Jones Lang and LaSalle, to be

20   their project managers?

21       A.   Yes.

22       Q.   Then in those cases, are you saying there is

23   no uniform rule as to whether Jones Lang and LaSalle

24   earns a fee on those particular projects?

**DEPOSITION OF STEPHEN ZSIGRAY**

1          A.   That's what I'm saying.

2          Q.   It varies, you're saying, from building to

3    building?

4          A.   It varies from building to building and

5    sometimes project to project.

6          Q.   Who decides?

7          A.   Well, it's decided when the management

8    agreement is awarded by the owner, whether it's

9    through competitive bid or not, when they acquire the

10   building.  It's generally they hire a leasing company

11   and a management company.

12         Q.   Now, I know that.

13              MR. SCHUTTE:  Hold on.  He's not finished

14   with his answer.

15              Go ahead and finish your answer.

16    BY THE WITNESS:

17         A.   All right.  And in those cases, there may

18   not be a fee.  I looked at five agreements, and they

19   were all five very different.  As I stated earlier, in

20   some cases, building personnel do this construction

21   management oversight construction coordination.  There

22   is no fee.  Other cases, there are fees.  It depends.

23   It's really a building-by-building basis.

24

**DEPOSITION OF STEPHEN ZSIGRAY**

1  BY MR. FOSTER:

2      Q.  What was the situation at 125 South Wacker

3  under the current agreement, what does that provide?

4      A.  I stated this earlier.

5      Q.  Well, state it again.

6      A.  Under the current agreement if --

7      Q.  Right.

8      A.  This is owned by Ivanhoé Cambridge.

9      Q.  Yeah.

10     A.  If Jones Lang LaSalle building personnel,

11  manager, general, assistant general manager does the

12  oversight of the construction and the coordination of

13  the construction, hiring the general contractor,

14  hiring the architects, et cetera, et cetera, there is

15  no fee, no additional fee if building personnel do it.

16          There would be a fee provided in the

17  management agreement if the owner said or the

18  management team said we don't have capacity.  We have

19  three buildouts going already or whatever.  And a

20  separate project manager is pulled in who is not a

21  member of the property team, an onsite member of the

22  property team.  Then there would be a fee -- then the

23  contracts provide that a fee would be earned.

24     Q.  Okay.  I am going to move on to the next

**DEPOSITION OF STEPHEN ZSIGRAY**

1    topic.  Okay?  "The process by which Jones Lang and

2    LaSalle checks the union cards/membership of

3    contractors working for tenants and what happens if a

4    contractor does not have such cards/evidence of the

5    membership."

6              Are you prepared to answer questions about

7    that topic, Mr. Zsigray?

8         A.   Yes, I am.

9         Q.   All right.  So does somebody at each of

10   these 15 buildings check for union cards for

11   contractors who wanted to come in and do work in the

12   buildings?

13        A.   It varies by property.

14        Q.   Go ahead.  I think you were going to say

15   something.

16        A.    It varies by property, and more often than

17   not, the majority of the times the union cards are

18   checked by other trades, meaning a carpenter trade

19   will check on another plumber, et cetera.  There are

20   always multiple trades working in a building.

21   Typically, we get notification, if there was a

22   nonunion contractor in that building, it's coming from

23   a trade who is working in that building and observes

24   it.

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1      Q.   And then what happens?

2      A.   Then they are not permitted to stay in the

3  building.

4      Q.   Okay.  Why not?

5           MR. SCHUTTE:  Object to form.

6                Go ahead.

7  BY THE WITNESS:

8      A.   Because they are nonunion.

9  BY MR. FOSTER:

10     Q.   Well, why aren't nonunion contractors

11 permitted to stay in the buildings?

12     A.   There are multiple reasons.

13     Q.   What are they?

14     A.   One -- well, as a starting point, there are

15 rules and regulations in each building that are that

16 our clients have in place that we follow.  There are

17 situations where clients are pension funds who are

18 representing unions, and they require union contracts.

19 And most often, there is a -- all of the leases

20 provide for labor harmony, a harmony clause, to be in

21 the rules and regulations in many of the leases that

22 require work to be done that doesn't disrupt the

23 building.

24     Q.   Okay.  So in virtually all 15 buildings,

27

**DEPOSITION OF STEPHEN ZSIGRAY**

1    though, it is the procedure to check for union cards

2    for all the tradesmen, just summing up; is that

3    correct?

4              MR. SCHUTTE:  Object to form.

5                   Go ahead.

6     BY THE WITNESS:

7         A.   It's not a requirement of our team to do

8    that.

9    BY MR. FOSTER:

10        Q.   It is a requirement of the building owners

11   to do that.  That's what I'm hearing from you; is

12   that correct?

13        A.   If rules and regulations are in place that

14   suggest that when we take over a property, we follow

15   the procedures that have been in place.

16        Q.   Okay.  I've looked at the rules for all the

17   15 buildings involved in this case, and every one of

18   them has a building rule somewhere in there saying

19   only union contractors are allowed in this building,

20   something to that effect.  Are you familiar with

21   those rules for these 15 buildings?

22              MR. SCHUTTE:  Object to form.

23                   Go ahead.

24

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    BY THE WITNESS:

2        A.   I'm familiar with perhaps not every detail

3    of every building, but I am familiar with many of

4    them, yes.

5    BY MR. FOSTER:

6        Q.   With regard to the union rule that I've just

7    mentioned; is that correct?

8        A.   Yes.

9        Q.   Okay.  Is there any situation that you are

10   aware of where Jones Lang and LaSalle has refused to

11   carry out those rules?

12           MR. SCHUTTE:  Object to form.

13               Go ahead.

14    BY THE WITNESS:

15        A.   Not that I'm aware of.

16   BY MR. FOSTER:

17        Q.   Is there any building owner with regard to

18   these 15 buildings that has not promulgated a rule of

19   this nature with regard to union contractors?

20           MR. SCHUTTE:  Object to form.

21               Go ahead.

22    BY THE WITNESS:

23        A.   No.

24

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1   BY MR. FOSTER:

2       Q.   All right.  I am going to move on to the

3   next topic, which is number 3.

4           MR. SCHUTTE:  Do you want water or coffee?

5           THE WITNESS:  No.

6           MR. FOSTER:  Anyone need a break?

7           MR. SCHUTTE:  No, I just asked him if he

8   needed to refill his water.

9           MR. FOSTER:  I hope you will ask me that at

10  some point during the day for me too, Scott.

11          MR. SCHUTTE:  Of course.  If I see your

12  water running low, I'd be happy to bring you some

13  water.

14          MR. FOSTER:  All right.

15  BY MR. FOSTER:

16      Q.   Number 3:  "The basis for JLL's claim as

17  asserted in its motion to dismiss that its landlord

18  clients have required the union-only rule as to

19  continued improvements."

20          Okay.  So are you aware that your company's

21  position in this litigation is that the owner

22  required the union-only rule at least as to the

23  125 South Wacker building where my client was a

24  tenant?

**DEPOSITION OF STEPHEN ZSIGRAY**

1      A.   Yes.

2      Q.   I have looked at the management agreement

3   for that building, and I did not see anything in that

4   agreement that required Jones Lang and LaSalle to

5   exclude nonunion contractors from the building.

6           Are you aware of any particular rule issued

7   by the landlord that requires that for that building?

8           MR. SCHUTTE:   Object to form.

9               Go ahead.

10   BY THE WITNESS:

11      A.   That building had rules and regulations that

12   were developed by the previous owner who was Tishman

13   Speyer.  When MetLife bought that building and we took

14   over that building, those rules and regulations came

15   with the building, and our job was to enforce the

16   rules and regulations.

17   BY MR. FOSTER:

18      Q.   Okay.  You've answered my question.

19           When a building is sold and a new owner

20   takes over, do they have a discussion with Jones Lang

21   and LaSalle about the prior rules, whether they are

22   going to continue them or not?

23      A.   No, not typically.

24      Q.   What happens?

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1      A.   The rules and regulations that are in place

2  which are typically attached to every single lease

3  that's in that building are accepted.

4      Q.   Is that like a formal --

5      A.   And continued.

6      Q.   I'm sorry.

7      A.   And continued, yes.

8      Q.   How does Jones Lang and LaSalle know that

9  they have been accepted and continued?

10      A.   In the sale of a building, there is an

11  assignment of leases, there is an assignment of

12  contracts, there is an assignment of property

13  documents that would be -- rules and regulations would

14  be included in that.  There's an acceptance that

15  occurs during the transition in a sale where the lease

16  are accepted, where the contracts are accepted, and

17  any of the existing procedures and policies in the

18  building are brought over.

19      Q.   So as I understand your testimony then, as

20  to the 125 South Wacker building, there was a rule

21  that required union-only contractors in place by the

22  prior owner, right, MetLife?

23      A.   The prior owner was Tishman Speyer.

24      Q.   Tishman Speyer; is that correct?

**DEPOSITION OF STEPHEN ZSIGRAY**

1       A.   Yes.

2       Q.   Jones Lang and LaSalle managed the building

3   for Tishman Speyer?

4       A.   No.  Tishman Speyer managed their own

5   building.

6       Q.   All right.  So then when Tishman Speyer sold

7   the building to its current owner, which was -- the

8   name escapes me.

9       A.   An entity named MetLife.

10       Q.   Right.

11       A.   It was Tishman Speyer selling it to MetLife.

12       Q.   And MetLife then hired Jones Lang and

13   LaSalle to manage the building for it?

14       A.   To manage and lease the building, yes.

15       Q.   Right.  Okay.  And so Jones Lang and LaSalle

16   would have been made aware of the building rules that

17   were carried over, correct?

18       A.   Correct.

19       Q.   And Jones Lang and LaSalle didn't -- well,

20   it's part of Jones Lang and LaSalle's job as building

21   manager to enforce those rules, correct?

22       A.   Yes.

23       Q.   And so that was the basis for the claim

24   asserted in the motion to dismiss, that the landlord

__DEPOSITION OF STEPHEN ZSIGRAY__

1  required the building union-only rule at 125 South

2  Wacker?

3      A.   Yes.

4      Q.   Does Jones Lang and LaSalle promulgate its

5  own building rules?

6      A.   I would say in a new development where a

7  building is coming out of the ground and rules and

8  regs are to be put in place for a new building,

9  possibly; otherwise, we are inheriting.  Most every

10  building that we have downtown, we were hired into an

11  existing building that had been developed, and rules

12  and regs were in place in virtually every case.

13      Q.   With regard to these 15 buildings involved

14  in this lawsuit, right?

15      A.   Yes.  Yes.

16      Q.   Yes?  Okay.  All right.

17          So now we are on to -- okay.  Let's move on

18  to the next topic.

19          MR. FOSTER:  Can I -- I'm sorry.  Which is

20  number 4?

21          MR. SCHUTTE:  4 was withdrawn.

22          MR. FOSTER:  All right.  5.  Okay.  "The

23  total amount of fees earned" -- all right.  Okay.  All

24  right.  So then as I understand it, 5 was withdrawn

**DEPOSITION OF STEPHEN ZSIGRAY**

1    also, right?

2         MR. SCHUTTE:  5 was not withdrawn.  We

3    objected to 5 and said we would not produce a witness

4    on the topic.

5         MR. FOSTER:  All right.  Outside of the

6    building one.

7         MR. SCHUTTE:  Yes.

8         MR. FOSTER:  All right.  So let's move on to

9    number 6.

10   BY MR. FOSTER:

11        Q.   "The nature of JLL's communications with

12   Building Owners Management Association, also known as

13   BOMA, with regard to the union-only rule."

14             Are you familiar with any communications

15   between JLL and BOMA with regard to the union-only

16   rule in any of your buildings?

17        A.   No.

18        Q.   Are you familiar with the labor negotiations

19   that have occurred by BOMA with the labor unions?

20        A.   Yes.

21        Q.   Have you participated in any of those

22   collective bargaining negotiations?

23        A.   No.

24        Q.   So as you sit here today, you are not aware

**DEPOSITION OF STEPHEN ZSIGRAY**

1    of this topic having come up in any discussions

2    between Jones Lang and LaSalle and BOMA?

3              MR. SCHUTTE:  Objection.  Asked and

4    answered.

5                   Go ahead.

6     BY THE WITNESS:

7         A.   Which topic are you referring to?

8    BY MR. FOSTER:

9         Q.   The topic the union-only rule.

10        A.   No.

11             MR. FOSTER:  Okay.  How about a break here?

12             MR. SCHUTTE:  Sure.

13                   (Whereupon, a break was taken from

14                    10:47 to 10:59 a.m.)

15             MR. SCHUTTE:  So we are back on the record.

16   There is one thing that the witness would like to

17   clarify.  He understood, Mr. Foster, your question,

18   "Have you participated in negotiations involving

19   BOMA," and he answered that as himself, and he would

20   like to clarify on behalf of JLL so that the record is

21   clear.

22             MR. FOSTER:  Well, yes.

23   BY MR. FOSTER:

24        Q.   "You" really is Jones Lang LaSalle?

**DEPOSITION OF STEPHEN ZSIGRAY**

1      A.   Yes.

2      Q.   Is that what you meant?

3      A.   No.  No, sir.  I want to correct that.

4      Q.   Okay.

5      A.   So as a corporate representative, JLL did

6  participate in the negotiations that BOMA conducts,

7  the labor committee that BOMA conducts, with three

8  entities:  SEIU janitors, SEIU security, and Local 399

9  laborers -- or engineers.  So those, each year, every

10 three years, there's contracts one year.  They're on

11 three-year cycles, and every year one of them expires.

12         We are a participant, JLL is a participant,

13 on the labor committee.  One of my managers, one of my

14 senior managers participates on that.  I don't

15 personally; JLL does corporately, participates on the

16 BOMA labor committee.

17     Q.   Who is that manager?

18     A.   David Hopwood.

19     Q.   All right.  Are you done with that

20 clarification?

21         MR. SCHUTTE:  Do you want to ask him whether

22 that changes the issue about whether there were

23 conversations about the union-only rule?  In other

24 words, fill in the circle.

37

DEPOSITION OF STEPHEN ZSIGRAY

1              MR. FOSTER:  Okay.

2       BY MR. FOSTER:

3            Q.  I mean, did Jones Lang and LaSalle have

4       conversations with BOMA about the union-only rule?

5       That would presumably include Mr. Hopwood?

6            A.   That would.  And so speaking as a corporate

7       representative, no.

8            Q.   All right.  I, sir, would like to go back to

9       topic number 2 briefly, and that was the process by

10      which Jones Lang and LaSalle checks the union cards

11      and membership of contractors working for tenants.

12              You may be aware that the chief engineer at

13      180 North LaSalle, France Falzone, testified about a

14      week ago here that he personally would walk around

15      and do the carding of contractors in his building.

16              Are you aware of that testimony?

17              MR. SCHUTTE:  I am going to object to that

18      characterization of the testimony.

19                  Go ahead.

20       BY THE WITNESS:

21           A.   I'm aware of that testimony.

22      BY MR. FOSTER:

23           Q.   And he also said that he would personally

24      eject anyone who didn't have credentials.

**DEPOSITION OF STEPHEN ZSIGRAY**

1          Do the chief engineers at the other JLL

2     buildings do that also?

3          MR. SCHUTTE:  Object to form.

4               Go ahead.

5      BY THE WITNESS:

6          A.   There is no consistent policy for them to do

7     that.  And to my knowledge, all of them do not do

8     that.

9     BY MR. FOSTER:

10         Q.   Do some of them do that?

11         A.   Frank does it.  Beyond Frank, I'm not sure.

12         Q.   Well, under whose authority does he do that?

13         MR. SCHUTTE:  Object to form.

14              Go ahead.

15     BY THE WITNESS:

16         A.   Well, the building rules and regulations for

17    180 North LaSalle, of which he is chief, specifically

18    state that both movers and contractors on site are

19    required to be union.  That building has those in

20    their contractor rules and regulations, in their

21    building rules and regulations, and in their moving

22    rules and regulations.  He is enforcing that

23    building's rules and regulations.

24

DEPOSITION OF STEPHEN ZSIGRAY

1    BY MR. FOSTER:

2         Q.   Under whose authority, the building manager?

3         A.   Under the owner -- under the client's.

4    We're an agent for the client.

5         Q.   Right.

6         A.   So --

7         Q.   Okay.  I understand that.  So Jones Lang and

8    LaSalle has undertaken then to enforce those rules at

9    that building, correct?

10        A.   Yes.

11        Q.   So is he doing to under the authority of his

12   building manager?

13        A.   He reports to a building manager.

14        Q.   Right.  A Jones Lang and LaSalle person is

15   the building manager, right?

16        A.   That is correct.

17        Q.   Okay.  So that the Jones Lang and LaSalle

18   person is aware of what he is doing, is that correct,

19   in that regard?

20        A.   It --

21             MR. SCHUTTE:  Object to form.

22                Go ahead.

23    BY THE WITNESS:

24        A.   I would have to ask that manager if she was

**DEPOSITION OF STEPHEN ZSIGRAY**

1  aware of that.

2  BY MR. FOSTER:

3       Q.  He said she was aware of it.

4       A.  Okay.

5       Q.  So that would be part of her job then is to

6  enforce those rules, correct?

7       A.  As a general manager of the building, yes.

8       Q.  Just to be absolutely clear about this,

9  every other of the 15 buildings has similar rules and

10  regulations about union movers.  We have already

11  established that; is that correct?

12       A.  Yes.

13       Q.  Do we have any reason to believe that the

14  procedure is any different at the other 14 buildings

15  with regard to carding?

16         MR. SCHUTTE:  Object to form.

17           Go ahead.

18   BY THE WITNESS:

19       A.  I would like to explain that to you.  Can I?

20  BY MR. FOSTER:

21       Q.  Go right ahead, sir.

22       A.  Okay.  And I'll preface it by saying every

23  building setup is unique.  In some buildings, the

24  larger buildings, there are security officers at the

1  loading dock.  They are not JLL employees; they're

2  Securitas employees.  That's who does all of our

3  security for the region, Securitas.  That's who would

4  be doing security at those 15 building.

5          There are loading dock guards, loading dock

6  security officers that check contractors in our

7  buildings through loading docks, not through main

8  entries, and the security individuals are the first

9  ones who come into contact with anyone coming into the

10  security dock, typically early morning if there is

11  construction going, or any other movement into the

12  building.

13          So Securitas, the Securitas personnel, are

14  SEIU, and part of their responsibility is to check and

15  make sure that the people coming into the property are

16  authorized to be at the property, authorized by the

17  management office after a tenant would make a request

18  to have a contractor come into the building, and we

19  would receive certificates of insurance, and we would

20  get all the qualifications of the contractor, and we

21  would give permission for them to come into the

22  building.  That was how they would get into the

23  building.

24          Would they check?  We would be looking to

**DEPOSITION OF STEPHEN ZSIGRAY**

1     approve union contractors to come into the building.

2     Does Securitas check every person that comes in?  They

3     check that that contractor is authorized to be there.

4     I can't say that they would check every individual to

5     see if they were union or not.  The company coming in

6     has been cleared by the management office, and we

7     would let them come in.

8          Q.   Okay.

9          A.   Okay?

10         Q.   So as I understand it then, the management

11    office, run by Jones Lang and LaSalle, has to have

12    advanced knowledge of any contractor before they will

13    be let into the building; isn't that correct?

14         A.   That's correct.

15         Q.   And the rules in every building require that

16    the contractors be union; is that correct?

17              MR. SCHUTTE:  Object --

18    BY MR. FOSTER:

19         Q.   Of the 15 buildings?

20              MR. SCHUTTE:  Object to form.

21                  Go ahead.

22     BY THE WITNESS:

23         A.   They all have a -- at a minimum, they have a

24    harmony in labor provision in their rules and

43

**DEPOSITION OF STEPHEN ZSIGRAY**

1    regulations, but -- so yes, the answer is yes.

2    BY MR. FOSTER:

3         Q.   Yes.  So that would be part of Jones Lang

4    and LaSalle's job as manager of each of these

5    buildings to determine if every contractor who comes

6    is union, correct?

7         A.   Correct.

8         Q.   And that's what they do; isn't that correct?

9         A.   Yes.

10        Q.   And if they're nonunion, you won't even put

11   them on the approved list so that they can come

12   through security; isn't that correct?

13        A.   That's right.

14        Q.   Okay.  Moving on.  Well, one more point.

15             Securitas, the security firm?

16        A.   Yes.

17        Q.   Okay.  Do they report to Jones Lang LaSalle

18   building managers?

19        A.   Each property has a security contract, yes,

20   with --

21        Q.   Do they --

22        A.   With Securitas.

23        Q.   Every?

24        A.   They are a contract service provider, yes.

**DEPOSITION OF STEPHEN ZSIGRAY**

1      Q.   Do they report to JLL building managers?

2      A.   Yes.

3      Q.   So now we are on to topic number 7.  The

4  topic number 7 is whether the union-only rule has

5  been in effect at 180 North LaSalle Street and

6  111 South Wacker for tenant contractors and movers in

7  the applicable time periods.

8           Okay.  So let's talk about that.  And

9  I think we already have sort of talked about it.  We

10  have definitely talked about 180 North LaSalle.

11           THE WITNESS:  Could I get some more water?

12           MR. FOSTER:  Absolutely.  Let's take a

13  little break.

14           MR. SCHUTTE:  We don't have to break.

15  I could just get it.

16           THE WITNESS:  No, just a glass of water is

17  fine.

18           MR. FOSTER:  The waiter will refill your

19  glass for you.

20           THE WITNESS:  Thank you.

21           MR. ZOURAS:  Do you need water, Howard?

22           MR. SCHUTTE:  Oh, yeah.  Howard, would you

23  like some?

24           MR. FOSTER:  No, I'm -- all right.

1    BY MR. FOSTER:

2        Q.   Okay.  180 North LaSalle, we've been talking

3    about that.  Mr. Falzone is currently the chief

4    engineer there, and I know from memory he's been

5    chief engineer for several years at that building.

6        A.   Yes.

7        Q.   Right.  So I think the answer is, if I

8    understand everything correctly, that that has been

9    the rule for the last four years at 180 North

10   LaSalle, right?

11       A.   Yes.

12       Q.   What about 111 South Wacker?  Is that --

13   I mean --

14       A.   What was your question?  You said -- what is

15   your question?

16       Q.   Well, I think we have already covered there

17   this, but you have said that I think that there is

18   there has been a union-only rule at 111 South Wacker?

19       A.   Yes.

20       Q.   Has that been in effect for the last four

21   years?

22       A.   Yes.

23       Q.   We are done with that topic.

24            Topic number 8 is whether Jones Lang and

**DEPOSITION OF STEPHEN ZSIGRAY**

1   LaSalle's competitive building for construction work

2   at the buildings, which is a service Jones Lang and

3   LaSalle offers its landlord clients, includes

4   receiving bids from nonunion contractors.  "If not,

5   then how has failure to receive competitive bids from

6   nonunion contractors been communicated to landlord

7   clients?

8         Let me just ask, Are you familiar with this

9   concept of competitive bidding in the management

10  agreements?

11        A.   Yes, I am.

12        Q.   What is competitive bidding as referred to

13  in the management agreements?

14        A.   It is seeking multiple qualified service

15  providers for every service and receiving or issuing

16  scope requirements, issuing RFP requirements, and

17  receiving bids.

18        Q.   Does Jones Lang and LaSalle receive bids or

19  RFPs from firms that do not have collective

20  bargaining agreements with labor unions?

21        MR. SCHUTTE:  Object to form.

22            Go ahead.

23   BY THE WITNESS:

24        A.   No.

DEPOSITION OF STEPHEN ZSIGRAY

1     BY MR. FOSTER:

2          Q.   Why not?

3          A.   Multiple reasons, first being the work

4     harmony within the properties.  It's the same as the

5     non- -- it would be in keeping with the nonunion rule

6     for contractors in the building.

7          Q.   For the same reasons?

8          A.   Yes.

9          Q.   All right.  Fair enough.

10              What about -- okay.  Topic number 9, whether

11    the union-only rule was in effect at the five

12    buildings Jones Lang and LaSalle no longer manages

13    but managed during the class period.

14         A.   Yes.

15         Q.   That's your answer to that question?

16         A.   Yes.

17         Q.   Okay.  That's easy.

18              Topic number 10, whether Jones Lang and

19    LaSalle has discussed the union-only rule with its

20    landlord clients, and if so, the reasons for the rule

21    and implications of not having the possibility of

22    unions picketing the buildings.

23              I think that you have pretty much answered

24    that from your prior testimony up to now.

**DEPOSITION OF STEPHEN ZSIGRAY**

1      A.   Yes, I have.

2      Q.   I think you have.  You have explained why.

3 And am I correct that the owners of all of these 15

4 buildings want the union-only rule?

5      A.   Yes.

6      Q.   Okay.  I get it.  All right.

7           And you are not aware of any situation where

8 Jones Lang and LaSalle has tried to push back on

9 those rules?

10      A.   I am not.

11      Q.   Topic number 11:  "The basis for any claim

12 by Jones Lang and LaSalle that the use of union

13 contractors is an individual choice made by each

14 tenant."

15           Are you aware that that is a claim or

16 contention that is being made by Jones Lang and

17 LaSalle in this litigation?

18      A.   I am.

19      Q.   Could you explain then to me, please, why

20 Jones Lang and LaSalle believes that whether to use

21 union contractors is an individual choice made by

22 each tenant.

23           MR. SCHUTTE:  Object to form.

24                Go ahead.

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    BY THE WITNESS:

2        A.   Because not every building, not every single

3    building has the same clearly defined nonunion

4    language that 180 North LaSalle has.  111 South Wacker

5    would be an example of that where the work harmony

6    clause that's in everyone's leases and that's in the

7    rules and regulations of the building would -- given

8    at that particular property where it's not

9    specifically stated that all contractors have to be

10   union in writing in the leases, then the tenant could,

11   if they chose to, avoid that and say, "We don't care

12   if we cause disruption to the building; we are going

13   to do that anyway."

14           In the building where it is clearly defined

15   where there is no black and white about it where it

16   has to be union contract, which the majority of the

17   buildings are, that would be -- they would not have

18   that latitude.  So it would be pending which building.

19       Q.   As I understand it from your answer then,

20   you haven't actually spoken to any tenants about

21   this; is that correct?

22       A.   We have -- there --

23       Q.   You, Jones Lang and LaSalle, have you

24   reached out to your tenants and asked them if they

1  want --

2      A.   I believe there is a tenant identified in

3  the document that we have spoken to.

4      Q.   There was one.  It was a firm that does

5  work, financial planning for union members, and

6  that's the only one you identified.

7          So Jones Lang and LaSalle doesn't know, has

8  no indication that any other tenants feel the way

9  that one firm feels; isn't that true?

10         MR. SCHUTTE:  Object to form.  Object to

11  form.  Sorry, Howard.

12         MR. FOSTER:  Go ahead.

13   BY THE WITNESS:

14      A.   Please repeat the question.

15  BY MR. FOSTER:

16      Q.   Jones Lang and LaSalle has no indication

17  that any other tenants in any of its buildings prefer

18  to use union labor; isn't that correct?

19      A.   Union labor?

20      Q.   Yeah.

21      A.   Prefer to use union labor?

22      Q.   Prefer to use union labor, right, that they

23  support -- I take that back.  I take this back.

24         My question was, Is it an individual issue?

**DEPOSITION OF STEPHEN ZSIGRAY**

1    And you're saying in some buildings, it's

2    theoretically possible that tenants could use

3    nonunion contractors at some of these 15 buildings.

4    Am I correct that that's your answer?

5        A.   I said one of the buildings that I know of.

6        Q.   Which one?

7        A.   111 South Wacker.

8        Q.   Pardon me?

9        A.   111 South Wacker.

10        Q.   In that one building, it would be possible?

11   Why would it be possible in that building?

12        MR. SCHUTTE:  Object to form.  Asked and

13  answered.

14        MR. FOSTER:  Go ahead.

15  BY THE WITNESS:

16        A.   Because the moving regulations say that all

17  movers have to be nonunion.  The building harmony

18  clause is in the building rules and regulations and

19  it's in the tenant leases.  There is not a specific

20  statement in the building rules and regulations in

21  that building that is clearly defined as other

22  buildings that says only nonunion contractors -- only

23  union contractors.

24

VerbalTech Inc. - 312.869.4039
Chicago, Illinois

## DEPOSITION OF STEPHEN ZSIGRAY

1  BY MR. FOSTER:

2       Q.   Let me go over your answer because I think

3  you may have misspoken.  You said the building rules

4  require all of the movers to be nonunion?

5       A.   No, I meant that is -- let me clarify that.

6  The building rules require the movers to be union.

7       Q.   Okay.

8       A.   I'm sorry.

9       Q.   So that a tenant cannot use a nonunion mover

10  in that building?

11       A.   No.

12       Q.   You are saying that there is no rule

13  requiring union contractors at 111 South Wacker?

14       A.   There's a policy that we follow that

15  requires that.  It's not in writing in the rules and

16  regulations specifically that I reviewed.

17       Q.   It's an unwritten rule, would you agree with

18  that statement, at that building?

19          MR. SCHUTTE:  Object to form.

20             Go ahead.

21   BY THE WITNESS:

22       A.   It's a rule that is defined by the labor

23  harmony clause of the rules and regulations, which

24  talks about disruption and picketing.

**DEPOSITION OF STEPHEN ZSIGRAY**

1  BY MR. FOSTER:

2      Q.   Right.  But as we discussed earlier, it

3  would be your practice, Jones Lang and LaSalle's

4  practice, at that building to instruct security to

5  card all the contractors who come in, correct?

6      A.   Yes.

7      Q.   It's not possible for a tenant to get a

8  nonunion contractor into that building; is it?

9      A.   It's not recommended.

10     Q.   How would it be possible to go through

11  security?

12     A.   If -- as I spoke to you earlier about who

13  gives clearance to this and who gives position to who

14  comes in and when they come in and it's worked through

15  the management office of the building, security is

16  only responding to the direction that they are given

17  by the building management office.

18     Q.   Which is Jones Lang and LaSalle?

19     A.   Yes.  And if Jones Lang and LaSalle in a

20  particular case where a tenant said, "I want to use a

21  nonunion contractor at 111 South LaSalle" --

22     Q.   South Wacker?

23     A.   Or 111 South Wacker, and pointed

24  specifically to the rules and regulations saying, "It

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    doesn't say that there," but it does, we would just

2    talk to them about the harmony in labor.  And in that

3    particular case, if they said that they chose to, it

4    has not happened, but we would do that.

5         Q.   It has never happened, to your knowledge,

6    right?

7         A.   To my knowledge, correct.

8         Q.   So I'm not sure then why it is that Jones

9    Lang and LaSalle believes that the choice of whether

10   to use union or nonunion labor is an, quote,

11   "individual" issue.

12            Why does Jones Lang and LaSalle believe that

13   is an individual issue when your rules prevent them

14   from making that choice?

15            MR. SCHUTTE:  I am going to object to the

16   form of the question.  I would be happy to explain,

17   but for now, I'll just leave it at that.

18            MR. FOSTER:  Okay.

19               You can answer.

20    BY THE WITNESS:

21       A.   I don't know.

22   BY MR. FOSTER:

23       Q.   I am moving on to the next topic, which is

24   number 12, whether Jones Lang and LaSalle or its

1    landlord clients pays for tenant improvement

2    allowances at the buildings, and whether the

3    allowances are amortized over the course of the

4    tenants' leases plus interest.

5         Okay.  What is a tenant improvement

6    allowance, sir?

7         A.   It is a dollar amount that is provided in a

8    lease negotiation to a tenant to perform construction

9    management in the building for their space, the

10   construction of their space specifically.

11        Q.   With regard to these 15 buildings that Jones

12   Lang and LaSalle manages, who pays the tenant

13   improvement allowances, Jones Lang and LaSalle or the

14   owners?

15        A.   The owners.

16        Q.   Okay.  Does Jones Lang and LaSalle negotiate

17   the amount of those tenant improvement allowances in

18   lease negotiations?

19        MR. SCHUTTE:  Object to form.  Outside the

20   scope.

21             You can answer in an individual

22   capacity.

23   BY THE WITNESS:

24        A.   Every one of those 15 buildings that we

**DEPOSITION OF STEPHEN ZSIGRAY**

 1  manage has a separate -- in most cases, a separate

 2  leasing agreement with a leasing agent that may or may

 3  not be Jones Lang LaSalle.  In most of the cases of

 4  those 15 buildings, it is not Jones Lang LaSalle

 5  leasing, but the answer is the leasing company that is

 6  representing the owner and is the agent for them on

 7  the leasing service negotiates that on behalf of the

 8  owner and in concert with the owner's rep.

 9  BY MR. FOSTER:

10      Q.   Okay.  So what does Jones Lang and LaSalle

11  have to do with the tenant improvement allowances

12  then at the buildings where it manages?

13      A.   Explain what you mean by what do they have

14  to do with it.

15      Q.   They don't determine the amount of the TIAs

16  for each tenant, right?

17      A.   Correct.

18      Q.   You're saying that they generally don't

19  negotiate the leases of the tenants, right?

20      A.   Correct.

21      Q.   Well, let me ask you this.

22           Do those tenant improvement allowances get

23  amortized back to the tenants as rent?

24           MR. SCHUTTE:  Object to form of the

**DEPOSITION OF STEPHEN ZSIGRAY**

1    question.

2                Go ahead.

3    BY THE WITNESS:

4        A.   I've pondered that question as to what that

5    means.  An owner looks at every lease transaction and

6    analyzes it based upon the rent stream, based upon the

7    cost of the capital to build the tenant space and

8    based upon the free rent, if there is any that is

9    provided, or any other allowance, and they use their

10   own discount rate to look at how they valued that

11   lease.

12               And if you say is it amortized into the

13   rent, a lease has a rental income stream and it has an

14   expense extreme, and at the end of the day, the owner

15   has to be satisfied with the return that they get over

16   a five- or a seven- or a ten-year life of the lease

17   discounted back to today.

18               So every owner looks at it differently,

19   would look at it with their own set of criteria for

20   what type of return they require or want.  It could be

21   a core asset, it could be a value-add asset, it could

22   be an opportunistic aspect, all of those different

23   return expectations.

24               So that analysis of that lease is typically

1    done by the leasing agent, it's shared with the owner,

2    and the owner decides whether they want to do that

3    deal or not.

4           MR. FOSTER:  Okay.  I understand.  All

5    right.  Can we go off the record for a few minutes?

6           MR. SCHUTTE:  Of course.

7                    (Whereupon, a break was taken from

8                     11:25 to 11:35 a.m.)

9                    (Whereupon, Exhibit 2 was marked

10                    for identification.)

11   BY MR. FOSTER:

12       Q.   I want to go back, sir, just to clarify.

13   The rules at all the buildings, we have clarified,

14   with regard to nonunion contractors, I just want to

15   make sure that is the same for nonunion movers.

16       A.   So you're asking me if it's the same rules

17   for nonunion movers?

18       Q.   Right.  Are nonunion movers not allowed in

19   the 15 buildings?

20       A.   That's correct.

21       Q.   And then I would like to show you what is

22   marked as Exhibit 2.  If you take a look at this.

23   It's a multi-page exhibit.  Those documents, to

24   clarify, were produced pursuant to subpoenas on the

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    Local 705 union.

2              MR. SCHUTTE:  Have you produced them to us?

3              MR. FOSTER:  Yes, we did.

4              MS. NELSON:  Yeah, it's just not our

5    document.

6              MR. SCHUTTE:  No, I'm sorry.  I just

7    didn't -- did you make a copy of the subpoenaed

8    documents to us?

9              MR. FOSTER:  We did.

10             MR. SCHUTTE:  I'm just asking.  I wasn't

11   positive.

12             MR. FOSTER:  Okay.

13             MR. SCHUTTE:  Got you.

14   BY MR. FOSTER:

15        Q.   All right.  So if you will look, sir, the

16   first one, which is Bates ending in 001, is an e-mail

17   from Kelly Leyden?

18        A.   Keelee.

19        Q.   Keelee Leyden at Jones Lang and LaSalle to

20   Richard De Vries.  He is an official with Local 705

21   movers union.  And it says, "Hi, Richard, do you have

22   an updated movers list for Office and Industrial

23   moves?  The last notice I have on file is from

24   4/1/15."

**DEPOSITION OF STEPHEN ZSIGRAY**

```
 1              Have you seen this before?

 2              MR. SCHUTTE:  Take your time to read through

 3    it if you need to.  Yeah, certain pages are difficult

 4    to read.

 5    BY MR. FOSTER:

 6         Q.   I see it.  It's just a list of union group

 7    movers produced by the union.  But on the last page,

 8    there is an e-mail from Walker Vauters at JLL back to

 9    Richard De Vries, and it says, "Stay in touch."

10              Okay.  So let me just ask you, Have you seen

11    this e-mail before?

12         A.   No.

13         Q.   It seems to reflect that Jones Lang and

14    LaSalle wants to receive an up-to-date list of

15    union-approved movers.  Would you agree with that?

16              MR. SCHUTTE:  Object to form.

17                   Go ahead.

18    BY THE WITNESS:

19         A.   I can't answer that without some

20    clarification as to the dates here.

21    BY MR. FOSTER:

22         Q.   I'm not sure I could clarify.  The dates of

23    what?

24         A.   All right.  Keelee Leyden's e-mail is from
```

1    October 18, 2018, when she was assistant general

2    manager at 175 West Jackson.

3         Q.   Right.  Okay.

4         A.   Walker Vauters, who was a security director

5    at 111 South Wacker at the time, is dated November 2,

6    2016.  And he's thanking Rich for what I'm -- I'm not

7    sure the connection between these two.

8         Q.   Okay.  Well, I'm not sure either.  This is

9    how they were produced to us.

10        A.   Okay.

11        Q.   So there is some connection -- let me ask

12   you this question.

13             Why are Jones Lang and LaSalle people

14   communicating to the movers union to get a list of

15   approved union movers?

16             MR. SCHUTTE:  Object to form.  Outside the

17   scope.

18                  Go ahead.

19    BY THE WITNESS:

20        A.   Because we require union-only movers.

21   BY MR. FOSTER:

22        Q.   Right.  So does Jones Lang and LaSalle

23   maintain a list of union movers?

24        A.   I think we -- the requests, one in 2016 and

**DEPOSITION OF STEPHEN ZSIGRAY**

1    one in 2018, would suggest that our list was updated

2    based upon moving companies that were union and

3    working that the Teamsters were a part of.

4         Q.   Right.  It seems to me that Jones Lang and

5    LaSalle is regularly in touch with the movers union

6    so it can maintain a list of approved union movers;

7    is that correct?

8              MR. SCHUTTE:  Object to form.

9                   Go ahead.

10    BY THE WITNESS:

11         A.   In two instances in the past three years,

12    that question was asked.  There's two of them.

13    BY MR. FOSTER:

14         Q.   You're only aware of those two instances

15    where Jones Lang and LaSalle employees have reached

16    out to the movers union to get a list of approved

17    union movers?

18              MR. SCHUTTE:  Outside the scope.

19                   Go ahead.

20    BY THE WITNESS:

21         A.   I'm only aware of these two that I'm looking

22    at, yes.

23    BY MR. FOSTER:

24         Q.   Does Jones Lang and LaSalle maintain a list

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1    of approved union movers with regard to these

2    15 buildings?

3         A.   Not to my knowledge.  These are individual

4    buildings:  One was 175; one was 111 South Wacker.

5    I do not consolidate and keep at the regional level

6    any type of list of approved movers requiring them to

7    be used at the properties, these 15 or any other ones.

8         Q.   Okay.  Where is your office?

9         A.   AON Center.

10        Q.   Do you know why these people would be

11   reaching out to the movers union to ask him for a

12   list of approved union movers?

13            MR. SCHUTTE:  Objection.  Outside the scope.

14               Go ahead.

15    BY THE WITNESS:

16        A.   I would speculate on why.

17   BY MR. FOSTER:

18        Q.   Why?

19        A.   Because they want to have as many options as

20   possible for their tenants to look at and receive bids

21   from.

22        Q.   Did they circulate this list to their

23   tenants?

24        A.   I'm assuming so.  I don't know for a fact,

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1  but I believe that's the reason that they

2  absolutely -- I firmly believe this is why they would

3  ask for that, so they can provide it to their tenants,

4  yes.

5      Q.  So it would seem like they would need to

6  have regular contact with the movers union to get

7  update listings of approved union movers?

8      A.  Well, if you look at Keelee's e-mail on

9  Thursday, December 18th, it looks like they weren't in

10  contact with them regarding a list or had any list

11  from April 1st of '15.  So that was three and a half

12  years later.

13      Q.  Right.

14      A.  So, you know, she -- apparently that

15  building wasn't in contact with the union for that

16  period of time.

17         I would like to make a clarification, if

18  I could.  Can I do that to this particular one?

19      Q.  Okay.  Go ahead.

20      A.  Okay.  We took over this building.  This is

21  dated October 18th.  Brookfield purchased this

22  building in April of 2018.  The previous managing

23  agent was a self-managing owner out of New York.

24         We took over.  We were assigned the

**DEPOSITION OF STEPHEN ZSIGRAY**

1    management contract in April of '18.  Keelee was

2    assigned as assistant general manager of this

3    property.  She would have been looking at a property

4    list that had been in the management office under the

5    old management company and was reaching out for an

6    update stating that the one that they had was from

7    4 of '15.

8         Q.   Okay.  Okay.

9         A.   Okay?

10        Q.   All right.  I understand that.  On the other

11   hand, if you look at the last page, Walker Vauters

12   said to Richard De Vries, "Stay in touch."  That's

13   what his e-mail says, the one dated November 2016.

14   Sounds like he wants to be kept apprised of union

15   movers from the union, right?

16             MR. SCHUTTE:  Objection.  Outside the scope.

17   Foundation.

18                  Go ahead.

19   BY THE WITNESS:

20        A.   I don't know what the nature of Mr. Vauters'

21   relationship is with Richard De Vries.  It could be a

22   personal relationship.  I have no idea of knowing

23   that.  Walker no longer works for us.

24

**DEPOSITION OF STEPHEN ZSIGRAY**

1    BY MR. FOSTER:

2           Q.   He no longer works for you?

3           A.   He retired.

4           Q.   Okay.  But isn't it accurate to say, and

5    I think you have indicated this, but I want to make

6    it absolutely certain, that Jones Lang and LaSalle

7    wants to have a current list of approved union movers

8    to circulate to its tenants?

9           A.   I would say yes.  And the reason I would say

10   that is because when we provide names -- tenants have

11   the same expectation of their purchasing people that

12   we have of our bidding process, and that would be to

13   go get multiple bids.

14           And so if we can give them multiple sources

15   to get bids from so that they can go out and

16   competitively bid against the union -- all union

17   contractors aren't going to bid the exact same number;

18   they are going to bid based on profit, overhead, and

19   other things.  And so giving them a list of approved

20   movers that they can go out to bid on their own and

21   get their best pricing is how I see that, and I think

22   that's --

23           Q.   Well, okay.

24           A.   And I consider that a good practice.

**DEPOSITION OF STEPHEN ZSIGRAY**

1      Q.   Okay.  But they would never circulate a list

2   of nonunion movers to the tenants, right?

3      A.   That's right.

4           MR. FOSTER:  Okay.  I'm done.  I don't have

5   any more questions for you, sir.  Thank you.

6           THE WITNESS:  Thank you.

7           MR. SCHUTTE:  I have one follow-up.

8                     EXAMINATION

9   BY MR. SCHUTTE:

10      Q.   Sir, can you look at topic 9, I believe it

11   is.  Sorry, it's topic 11.

12           Are you aware that JLL has taken a position

13   in this litigation that even if there were no

14   union-only rule, that some tenants might still choose

15   to use union contractors?

16      A.   Yes, I'm aware of that.

17      Q.   Okay.  Why, even in the absence of a

18   union-only rule, might a tenant still choose to

19   exercise their choice and use a union contractor?

20      A.   I would say a couple of reasons.  The first

21   I would say is that tenants, individual tenants in a

22   building, have their own views of union contractors

23   based upon their organization.

24           For example, if I'm the City -- I'm going to

**DEPOSITION OF STEPHEN ZSIGRAY**

1    give you an example.  The City of Chicago is a tenant

2    in the building or if, say, State Teachers Retirement

3    System is a tenant in the building, they represent

4    unions.  If Teamsters is a tenant in the building,

5    they represent unions, and they would want and -- they

6    would want to, because they are union advocates and

7    supporters and part of their business, I would say

8    that would be one.

9            I'd say number two, I would say there is a

10   level of training, there is a level of development,

11   there is a level of certification, updates, and

12   requirements, there's continuing education that union

13   organizations provide for their members.  It's the

14   case in 399.  It's case in SEIU.  There's training and

15   development.

16           And as a result, I think tenants in

17   buildings would want to have the most qualified,

18   capable people working, particularly in an electrical

19   closet or some very difficult environment that would

20   require current knowledge and the most capable skill.

21           And then lastly, I would say that if I'm

22   asked to provide a list of general contractors, the

23   best general contractor in the City of Chicago, the

24   best painter in the City of Chicago, the best

## DEPOSITION OF STEPHEN ZSIGRAY

1   electrician in the City of Chicago, they are going to

2   most likely be union.

3            And so if you take someone like a

4   JC Anderson or a Clune Construction, they have decades

5   of experience in providing buildouts in downtown

6   Chicago in the buildings of downtown Chicago.  They're

7   highly respected, they're highly valued by the market,

8   and I think in absence of a union-only rule, people

9   would still want their buildouts done in a way that

10  gives them the finished product that they would

11  expect.

12       Q.   In your view, in the absence of a union-only

13  rule, in order to determine whether a particular

14  tenant would choose to use a union contractor or

15  nonunion contractor, would you say that the only way

16  to do that would be to ask that on a tenant-by-tenant

17  basis?

18       A.   Yes, absolutely.

19            MR. SCHUTTE:  All right.  I have nothing

20  further.

21            MR. FOSTER:  Okay.  I would like to ask a

22  couple questions about that.

23

24

<u>DEPOSITION OF STEPHEN ZSIGRAY</u>

1                     FURTHER EXAMINATION

2     BY MR. FOSTER:

3          Q.   You are of the opinion, sir, that unions

4     have higher quality workmanship than nonunion firms.

5     That's what it sounds like to me.  Is that your

6     opinion?

7          A.   Are you asking my personal opinion or my --

8          Q.   Yes.

9          A.   -- corporate opinion?

10         Q.   Okay.  Does Jones Lang and LaSalle have an

11    opinion about that?

12         A.   I can't speak to whether Jones Lang LaSalle

13    does; I can speak to my personal opinion.

14         Q.   Right now, I am just asking about Jones Lang

15    and LaSalle corporate rep.

16              Has there ever been a Jones Lang and LaSalle

17    statement or publication which indicates that union

18    contractors do better quality work than nonunion

19    contractors?

20         A.   Not to my knowledge.

21         Q.   And you say that is your personal opinion,

22    right, that the best contractors in the City of

23    Chicago are all union contractors?

24         A.   That's my personal opinion, yes.

**DEPOSITION OF STEPHEN ZSIGRAY**

1      Q.   Is that personal opinion?  Can you site any

2   study that would agree with you?

3      A.   I could cite the experience that my firm has

4   had and that I have had as a regional manager running

5   the business.

6      Q.   I understand.  Other than -- that's not my

7   question.

8      A.   Okay.

9      Q.   Is there any study --

10         MR. SCHUTTE:  Well, he can give you -- let

11  him finish his answer.

12         MR. FOSTER:  Okay.

13  BY MR. FOSTER:

14      Q.   I know you have personal --

15         MR. SCHUTTE:  No, but let him finish.  He

16  started to answer.  You can move to strike the answer,

17  you can disregard the answer, but you can't interrupt

18  and stop the witness.

19         MR. FOSTER:  Okay.

20         MR. SCHUTTE:  Please finish your answer.

21         MR. FOSTER:  Study was my question.

22         MR. SCHUTTE:  He knows what the question

23  was.

24              Please go ahead and answer, give the

**DEPOSITION OF STEPHEN ZSIGRAY**

1    rest of your answer to the question, please.

2     BY THE WITNESS:

3         A.   I am basing it on my experience in running

4    the management of a 35 million square foot portfolio

5    in downtown Chicago of the quality of the contractors

6    who work in our buildings.  And they are union, and

7    they are -- the ones I mentioned, the two

8    specifically, JC Anderson and Clune, there are many of

9    them who are just very, very high quality, and

10   I would -- so a study?  No.

11   BY MR. FOSTER:

12        Q.   Okay.  I understand it.

13             And you have spent your entire career at

14   Jones Lang and LaSalle essentially, right?

15        A.   My first seven years in my career were in

16   corporate finance, but my real estate career is Jones

17   Lang and LaSalle, yes, sir.

18        Q.   Right.  In your experience at Jones Lang and

19   LaSalle, have you ever dealt with any nonunion

20   contractors?

21        A.   Yes, sir, I have.

22        Q.   Which ones?

23        A.   I managed the Texas region of Jones Lang

24   LaSalle for eight years, and I managed the Tennessee

DEPOSITION OF STEPHEN ZSIGRAY

1    region of Jones Lang LaSalle for three years.

2        Q.   Do those regions allow nonunion contractors

3    into their properties?

4        A.   Yes, they did.

5        Q.   Okay.  Why is that?

6        A.   Because they were nonunion towns.  They

7    were --

8        Q.   Okay.  Did --

9        A.   Dallas is a right-to-work.  Texas is a

10   right-to-work state.  And there were union contractors

11   and there were nonunion contractors.

12       Q.   Did the nonunion contractors do good work in

13   those areas?

14       A.   Some of them.

15       Q.   Okay.

16       A.   Yes.

17            MR. FOSTER:  All right.  I have no further

18   questions.

19            MR. SCHUTTE:  We have nothing further.  We

20   will reserve signature.  Thank you.

21            MR. FOSTER:  Okay.  Thank you.

22                 FURTHER DEPONENT SAITH NOT

23

24

**DEPOSITION OF STEPHEN ZSIGRAY**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF ILLINOIS

 3   WACKER DRIVE EXECUTIVE          )
     SUITES, LLC, et al.,           )
 4                                  )
               Plaintiffs,          )
 5                                  )
         vs.                        ) No. 1:18-cv-5492
 6                                  )
     JONES LANG LASALLE AMERICAS    )
 7   (ILLINOIS), LP,                )
                                    )
 8             Defendant.           )

 9

10              I, STEPHEN ZSIGRAY, being first

11        administered an oath, say that I am the

12        deponent in the aforesaid deposition taken on

13        12/20/2019; that I have read the foregoing

14        transcript of my deposition, and affix my

15        signature to same.

16

17                    _____
                      STEPHEN ZSIGRAY
18

19

20   Subscribed and sworn to
     before me this _____ day
21   of _____, 2020.

22

23   _____
          Notary Public
24
```

## DEPOSITION OF STEPHEN ZSIGRAY

1                          ERRATA SHEET

2   CASE NAME:  WACKER DRIVE EXECUTIVE SUITES, et al., vs.
    JONES LANG LASALLE, et al.
3   CASE NUMBER:  1:18-cv-5492
    WITNESS:  STEPHEN ZSIGRAY
4   REPORTER:  Andrew R. Pitts

5   I wish to make the following changes for the following
    reasons:

6
    **PAGE**      **LINE**
7
    _____   _____ **CHANGE:**_____
8
    **REASON:**_____
9
    _____   _____ **CHANGE:**_____
10
    **REASON:**_____
11
    _____   _____ **CHANGE:**_____
12
    **REASON:**_____
13
    _____   _____ **CHANGE:**_____
14
    **REASON:**_____
15
    _____   _____ **CHANGE:**_____
16
    **REASON:**_____
17
    _____   _____ **CHANGE:**_____
18
    **REASON:**_____
19
    _____   _____ **CHANGE:**_____
20
    **REASON:**_____
21
    _____   _____ **CHANGE:**_____
22
    **REASON:**_____
23
    _____   _____ **CHANGE:**_____
24
    **REASON:**_____

## DEPOSITION OF STEPHEN ZSIGRAY

1    **PAGE**    **LINE**

2    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

3    **REASON:**_____

4    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

5    **REASON:**_____

6    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

7    **REASON:**_____

8    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

9    **REASON:**_____

10    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

11    **REASON:**_____

12    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

13    **REASON:**_____

14    \_\_\_\_    \_\_\_\_  **CHANGE:**_____

15    **REASON:**_____

16

17    In accordance with Supreme Court Rule 207(a), the

18    above corrections are made to correct an error in the reporting or transcription of my answer(s).

19    Signed:_____

20    Date:_____

21

22

23

24

### DEPOSITION OF STEPHEN ZSIGRAY

STATE OF ILLINOIS )
                  )   SS:
COUNTY OF C O O K )


I, ANDREW R. PITTS, C.S.R., R.P.R., a certified shorthand reporter within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on December 20, 2019, personally appeared at 77 West Wacker Drive, Suite 500, Chicago, Illinois, STEPHEN ZSIGRAY, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois wherein WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself Individually, and on behalf of all others similarly situated are the Plaintiffs, and JONES LANG LASALLE AMERICAS (ILLINOIS), LP is the Defendant.

I further certify that the said STEPHEN ZSIGRAY was first administered an oath to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness

78

**DEPOSITION OF STEPHEN ZSIGRAY**

1    as aforesaid.

2            I further certify that the signature to the

3    foregoing deposition was reserved by counsel for the

4    Defendant and that there were present at the

5    deposition the attorneys hereinbefore mentioned.

6            I further certify that I am not counsel for

7    nor in any way related to the parties to this suit,

8    nor am I in any way interested in the outcome thereof.

9            IN TESTIMONY WHEREOF:  I certify to the

10        above facts this 11th day of January, 2020.

11

12

13    _____

14    ANDREW R. PITTS
      Certified Shorthand Reporter
15    County, Illinois
      My commission expires May 31, 2021

16

17    C.S.R. Certificate No. 084-4575.

18

19

20

21

22

23

24

```
                   VERBALTECH INC.
                 3013 WEST 54th STREET
                CHICAGO, ILLINOIS  60632
```

January 13, 2020

MORGAN, LEWIS & BOCKIUS LLP
Mr. Scott T. Schutte, Esquire
77 West Wacker Drive
Suite 500
Chicago, Illinois  60601-5094

Dear Mr. Schutte:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled cause.
Also enclosed are additional signature pages, if
applicable, and errata sheets.

Per your agreement to secure signature, please submit
the transcript to the deponent for review and
signature.  All changes or corrections must be made on
the errata sheets, not on the transcript itself. Errata
sheets should be signed and signature pages need to be
signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to
VerbalTech Inc. at the above address, and VerbalTech
Inc. will handle distribution to the respective
parties.

If you have any questions, please call me at the phone
number below.

_____   Procedure outlined in Rule 207 (a) of
          the Illinois Supreme Court Rules


Sincerely,


Andrew R. Pitts,
Court Reporter
(312) 752-6583

cc:  MR. HOWARD W. FOSTER

# DEPOSITION OF STEPHEN ZSIGRAY

**'**

**'15** [2] - 65:11, 66:7
**'18** [1] - 66:1

## 0

**001** [1] - 60:16

## 1

**1** [9] - 5:14, 5:15, 5:18, 6:5, 6:21, 10:20, 12:16, 14:3, 14:5
**10** [1] - 48:18
**10:19** [1] - 13:24
**10:47** [1] - 36:14
**10:59** [1] - 36:14
**11** [2] - 49:11, 68:11
**111** [11] - 45:6, 46:12, 46:18, 50:4, 52:7, 52:9, 53:13, 54:21, 54:23, 62:5, 64:4
**11:25** [1] - 59:8
**11:35** [1] - 59:8
**12** [1] - 55:24
**125** [13] - 9:15, 9:16, 9:18, 11:10, 12:23, 14:16, 15:9, 17:21, 17:23, 25:2, 30:23, 32:20, 34:1
**14** [2] - 11:4, 41:14
**15** [27] - 7:16, 7:18, 8:3, 8:9, 8:21, 9:4, 10:1, 10:3, 10:20, 13:13, 26:10, 27:24, 28:17, 28:21, 29:18, 34:13, 41:9, 42:4, 43:19, 49:3, 52:3, 56:11, 56:24, 57:4, 59:19, 64:2, 64:7
**175** [2] - 62:2, 64:4
**18** [1] - 62:1
**180** [7] - 38:13, 39:17, 45:5, 45:10, 46:2, 46:9, 50:4
**18th** [2] - 65:9, 65:21
**1987** [1] - 6:10
**1st** [1] - 65:11

## 2

**2** [4] - 38:9, 59:9, 59:22, 62:5
**2006** [1] - 6:20
**2016** [3] - 62:6, 62:24, 66:13
**2018** [3] - 62:1, 63:1, 65:22

## 3

**3** [3] - 6:4, 30:3, 30:16
**30(b)(6** [1] - 5:20
**32** [2] - 6:9, 6:12
**35** [1] - 73:4
**399** [2] - 37:8, 69:14

## 4

**4** [3] - 34:20, 34:21, 66:7
**4/1/15** [1] - 60:24

## 5

**5** [4] - 34:22, 34:24, 35:2, 35:3

## 6

**6** [1] - 35:9

## 7

**7** [2] - 45:3, 45:4
**705** [2] - 60:1, 60:20

## 8

**8** [1] - 46:24

## 9

**9** [2] - 48:10, 68:10
**9:21** [1] - 13:24

## A

**a.m** [3] - 13:24, 36:14, 59:8
**able** [4] - 12:20, 12:22, 13:14, 13:15
**absence** [3] - 68:17, 70:8, 70:12
**absolutely** [5] - 41:8, 45:12, 65:2, 67:6, 70:18
**acceptance** [1] - 32:14
**accepted** [4] - 32:3, 32:9, 32:16
**accordance** [1] - 10:14
**accurate** [1] - 67:4
**acquire** [1] - 24:9
**add** [1] - 58:21
**additional** [2] - 20:7, 25:15
**administered** [2] - 4:2, 4:5

**advanced** [1] - 43:12
**advocates** [1] - 69:6
**agent** [8] - 23:11, 23:13, 23:16, 40:4, 57:2, 57:6, 59:1, 65:23
**ago** [1] - 38:14
**agree** [4] - 13:20, 53:17, 61:15, 72:2
**agreement** [12] - 9:9, 9:24, 11:10, 12:18, 15:8, 24:8, 25:3, 25:6, 25:17, 31:2, 31:4, 57:2
**agreements** [15] - 8:8, 9:22, 10:1, 10:3, 10:14, 10:16, 10:20, 12:17, 13:4, 13:13, 24:18, 47:10, 47:13, 47:20
**ahead** [38] - 7:23, 10:11, 17:6, 18:9, 19:3, 20:22, 22:10, 22:21, 24:15, 26:14, 27:6, 28:5, 28:23, 29:13, 29:21, 31:9, 36:5, 38:19, 39:4, 39:14, 40:22, 41:17, 41:21, 43:21, 47:22, 49:24, 51:12, 52:14, 53:20, 58:2, 61:17, 62:18, 63:9, 63:19, 64:14, 65:19, 66:18, 72:24
**allow** [1] - 74:2
**allowance** [3] - 18:1, 56:6, 58:9
**allowances** [6] - 56:2, 56:3, 56:13, 56:17, 57:11, 57:22
**allowed** [2] - 28:19, 59:18
**amortized** [3] - 56:3, 57:23, 58:12
**amount** [4] - 34:23, 56:7, 56:17, 57:15
**analysis** [1] - 58:24
**analyzes** [1] - 58:6
**Anderson** [2] - 70:4, 73:8
**answer** [33] - 4:17, 4:24, 5:8, 5:9, 7:1, 9:13, 12:10, 12:20, 12:22, 14:4, 15:5, 16:6, 16:24, 24:14, 24:15, 26:6, 44:1, 46:7, 48:15, 50:19, 52:4, 53:2, 55:19, 56:21, 57:5, 61:19, 72:11, 72:16, 72:17,

72:20, 72:24, 73:1
**answered** [6] - 10:24, 31:18, 36:4, 36:19, 48:23, 52:13
**answering** [1] - 16:18
**anyway** [1] - 50:13
**AON** [1] - 64:9
**applicable** [1] - 45:7
**apprised** [1] - 66:14
**approve** [1] - 43:1
**approved** [11] - 44:11, 61:15, 62:15, 63:6, 63:16, 64:1, 64:6, 64:12, 65:7, 67:7, 67:19
**April** [2] - 65:11, 65:22, 66:1
**architects** [1] - 25:14
**areas** [1] - 74:3
**argue** [1] - 11:6
**arrangements** [1] - 21:5
**aspect** [1] - 58:22
**assenting** [1] - 5:11
**asserted** [2] - 30:17, 33:24
**asset** [1] - 58:21
**assigned** [3] - 15:11, 65:24, 66:2
**assignment** [3] - 32:11, 32:12
**assistant** [3] - 25:11, 62:1, 66:2
**Association** [1] - 35:12
**assuming** [1] - 64:24
**attached** [2] - 20:15, 32:2
**attempting** [1] - 16:5
**authority** [3] - 39:12, 40:2, 40:11
**authorized** [2] - 42:16, 43:3
**avoid** [1] - 50:11
**awarded** [1] - 24:8
**aware** [19] - 4:16, 29:10, 29:15, 30:20, 31:6, 33:16, 35:24, 38:12, 38:16, 38:21, 40:18, 41:1, 41:3, 49:7, 49:15, 63:14, 63:21, 68:12, 68:16

## B

**background** [1] - 6:6
**bad** [1] - 16:11
**bargaining** [2] - 35:22, 47:20
**based** [8] - 8:5, 8:12,

72:20, 72:24, 73:1
58:6, 58:8, 63:2, 67:18, 68:23
**basing** [1] - 73:3
**basis** [5] - 24:23, 30:16, 33:23, 49:11, 70:17
**Bates** [1] - 60:16
**behalf** [2] - 36:20, 57:7
**believes** [2] - 49:20, 55:9
**best** [5] - 67:21, 69:23, 69:24, 71:22
**better** [2] - 20:17, 71:18
**between** [3] - 35:15, 36:2, 62:7
**beyond** [1] - 39:11
**bid** [5] - 24:9, 67:16, 67:17, 67:18, 67:20
**bidding** [3] - 47:9, 47:12, 67:12
**bids** [7] - 47:4, 47:5, 47:17, 47:18, 64:20, 67:13, 67:15
**bit** [1] - 6:6
**black** [1] - 50:15
**BOMA** [9] - 35:13, 35:15, 35:19, 36:2, 36:19, 37:6, 37:7, 37:16, 38:4
**bought** [1] - 31:13
**break** [12] - 5:5, 5:6, 11:19, 11:21, 11:22, 12:23, 30:6, 36:11, 36:13, 45:13, 45:14, 59:7
**briefly** [1] - 38:9
**bring** [2] - 15:15, 30:12
**Brookfield** [1] - 65:21
**brought** [2] - 20:11, 32:18
**build** [1] - 58:7
**Building** [1] - 35:12
**building** [117] - 6:23, 7:14, 9:6, 9:20, 11:10, 14:11, 14:16, 14:18, 14:20, 15:12, 20:5, 20:6, 20:8, 20:12, 20:24, 24:2, 24:3, 24:4, 24:10, 24:20, 24:23, 25:10, 25:15, 26:20, 26:22, 26:23, 27:3, 27:15, 27:23, 28:10, 28:18, 28:19, 29:3, 29:17, 30:23, 31:3, 31:5, 31:7, 31:11, 31:13, 31:14, 31:15, 31:19,

## DEPOSITION OF STEPHEN ZSIGRAY

32:3, 32:10, 32:18, 32:20, 33:2, 33:5, 33:7, 33:13, 33:14, 33:16, 33:20, 34:1, 34:5, 34:7, 34:8, 34:10, 34:11, 35:6, 38:15, 39:16, 39:19, 39:21, 40:2, 40:9, 40:12, 40:13, 40:15, 41:7, 41:23, 42:4, 42:12, 42:18, 42:22, 42:23, 43:1, 43:13, 43:15, 44:18, 45:1, 46:5, 47:1, 48:6, 50:2, 50:3, 50:7, 50:12, 50:14, 50:18, 52:10, 52:11, 52:17, 52:18, 52:20, 52:21, 53:3, 53:6, 53:10, 53:18, 54:4, 54:8, 54:15, 54:17, 56:9, 65:15, 65:20, 65:22, 68:22, 69:2, 69:3, 69:4

**building's** [1] - 39:23
**building-by-building** [1] - 24:23
**buildings** [56] - 7:9, 7:16, 7:18, 8:3, 8:9, 8:21, 9:4, 9:23, 10:3, 10:5, 11:4, 12:23, 13:13, 14:8, 14:13, 17:21, 23:14, 26:10, 26:12, 27:11, 27:24, 28:17, 28:21, 29:18, 34:13, 35:16, 39:2, 41:9, 41:14, 41:23, 41:24, 42:7, 43:19, 44:5, 47:2, 48:12, 48:22, 49:4, 50:17, 51:17, 52:1, 52:3, 52:5, 52:22, 56:2, 56:11, 56:24, 57:4, 57:12, 59:13, 59:19, 64:2, 64:4, 69:17, 70:6, 73:6
**buildout** [4] - 8:23, 10:7, 14:22, 15:23
**buildouts** [15] - 6:24, 7:3, 7:4, 7:20, 17:13, 17:14, 17:15, 18:2, 18:6, 20:3, 20:19, 25:19, 70:5, 70:9
**business** [3] - 4:14, 69:7, 72:5
**BY** [99] - 4:8, 5:17, 8:1, 8:7, 9:14, 9:19, 10:12, 10:18, 11:11, 12:15, 12:19, 13:3, 13:7, 13:10, 14:1,

15:7, 15:20, 16:1, 16:15, 17:7, 17:10, 18:10, 18:12, 19:4, 19:6, 20:23, 21:7, 22:11, 22:13, 22:22, 23:4, 24:16, 25:1, 27:7, 27:9, 28:6, 28:9, 29:1, 29:5, 29:14, 29:16, 29:22, 30:1, 30:15, 31:10, 31:17, 35:10, 36:6, 36:8, 36:23, 38:2, 38:20, 38:22, 39:5, 39:9, 39:15, 40:1, 40:23, 41:2, 41:18, 41:20, 43:18, 43:22, 44:2, 46:1, 47:23, 48:1, 50:1, 51:13, 51:15, 52:15, 53:1, 53:21, 54:1, 55:20, 55:22, 56:23, 57:9, 58:3, 59:11, 60:14, 61:5, 61:18, 61:21, 62:19, 62:21, 63:10, 63:13, 63:20, 63:23, 64:15, 64:17, 66:19, 67:1, 68:9, 71:2, 72:13, 73:2, 73:11

## C

**calmed** [1] - 11:20
**Cambridge** [2] - 15:10, 25:8
**cannot** [1] - 53:9
**capable** [2] - 69:18, 69:20
**capacity** [3] - 20:14, 25:18, 56:22
**capital** [1] - 58:7
**card** [1] - 54:5
**carding** [2] - 38:15, 41:15
**cards** [4] - 26:10, 26:17, 28:1, 38:10
**cards/evidence** [1] - 26:4
**cards/membership** [1] - 26:2
**care** [1] - 50:11
**career** [3] - 73:13, 73:15, 73:16
**carpenter** [1] - 26:18
**carried** [1] - 33:17
**carry** [1] - 29:11
**case** [15] - 7:16, 7:19, 8:22, 14:9, 15:17, 17:20, 19:7, 19:8, 19:23, 28:17, 34:12, 54:20, 55:3, 69:14

**cases** [11] - 7:6, 22:17, 23:5, 23:9, 23:18, 23:22, 24:17, 24:20, 24:22, 57:1, 57:3
**Center** [1] - 64:9
**certain** [2] - 61:3, 67:6
**certificates** [1] - 42:19
**certification** [1] - 69:11
**cetera** [3] - 25:14, 26:19
**changes** [1] - 37:22
**characterization** [2] - 17:4, 38:18
**charge** [1] - 17:2
**check** [9] - 26:10, 26:19, 28:1, 42:6, 42:14, 42:24, 43:2, 43:3, 43:4
**checked** [1] - 26:18
**checks** [2] - 26:2, 38:10
**Chicago** [8] - 69:1, 69:23, 69:24, 70:1, 70:6, 71:23, 73:5
**chief** [5] - 38:12, 39:1, 39:17, 46:3, 46:5
**choice** [5] - 49:13, 49:21, 55:9, 55:14, 68:19
**choose** [3] - 68:14, 68:18, 70:14
**chose** [2] - 50:11, 55:3
**circle** [1] - 37:24
**circulate** [3] - 64:22, 67:8, 68:1
**cite** [1] - 72:3
**City** [6] - 68:24, 69:1, 69:23, 69:24, 70:1, 71:22
**claim** [4] - 30:16, 33:23, 49:11, 49:15
**clarification** [3] - 37:20, 61:20, 65:17
**clarified** [1] - 59:13
**clarify** [7] - 13:19, 36:17, 36:20, 53:5, 59:12, 59:24, 61:22
**class** [2] - 14:10, 48:13
**clause** [4] - 27:20, 50:6, 52:18, 53:23
**clear** [2] - 36:21, 41:8
**clearance** [1] - 54:13
**cleared** [1] - 43:6
**clearly** [3] - 50:3, 50:14, 52:21
**client** [8] - 7:6, 7:14, 17:22, 21:3, 21:8, 21:9, 30:23, 40:4

**client's** [1] - 40:3
**clients** [9] - 6:23, 21:4, 27:16, 27:17, 30:18, 47:3, 47:7, 48:20, 56:1
**closet** [1] - 69:19
**Clune** [2] - 70:4, 73:8
**coffee** [1] - 30:4
**collective** [2] - 35:22, 47:19
**coming** [6] - 7:14, 26:22, 34:7, 42:9, 42:15, 43:5
**committee** [3] - 37:7, 37:13, 37:16
**communicated** [1] - 47:6
**communicating** [1] - 62:14
**communications** [2] - 35:11, 35:14
**companies** [1] - 63:2
**company** [5] - 24:10, 24:11, 43:5, 57:5, 66:5
**company's** [1] - 30:20
**compensated** [1] - 14:10
**competitive** [5] - 24:9, 47:1, 47:5, 47:9, 47:12
**competitively** [1] - 67:16
**complicated** [1] - 20:12
**concept** [1] - 47:9
**concert** [1] - 57:8
**conducts** [2] - 37:6, 37:7
**connection** [2] - 62:7, 62:11
**consider** [1] - 67:24
**consistent** [1] - 39:6
**consolidate** [1] - 64:5
**Construction** [1] - 70:4
**construction** [37] - 6:24, 7:7, 7:8, 7:10, 7:11, 7:12, 8:2, 8:6, 8:10, 8:13, 9:9, 10:16, 14:11, 14:12, 15:17, 15:19, 15:22, 17:2, 17:8, 17:19, 18:15, 18:16, 19:14, 19:16, 19:17, 19:20, 20:7, 23:3, 23:11, 24:20, 24:21, 25:12, 25:13, 42:11, 47:1, 56:8, 56:10
**contact** [4] - 42:9,

65:6, 65:10, 65:15
**contention** [1] - 49:16
**continue** [1] - 31:22
**continued** [4] - 30:19, 32:5, 32:7, 32:9
**continuing** [1] - 69:12
**contract** [5] - 22:2, 44:19, 44:24, 50:16, 66:1
**contractor** [22] - 18:17, 19:18, 19:19, 21:24, 22:3, 22:19, 23:12, 25:13, 26:4, 26:22, 39:20, 42:18, 42:20, 43:3, 43:12, 44:5, 54:8, 54:21, 68:19, 69:23, 70:14, 70:15
**contractors** [40] - 26:3, 26:11, 27:10, 28:19, 29:19, 31:5, 32:21, 38:11, 38:15, 39:18, 42:6, 43:1, 43:16, 45:6, 47:4, 47:6, 48:6, 49:13, 49:21, 50:9, 52:3, 52:22, 52:23, 53:13, 54:5, 59:14, 67:17, 68:15, 68:22, 69:22, 71:18, 71:19, 71:22, 71:23, 73:5, 73:20, 74:2, 74:10, 74:11, 74:12
**contracts** [5] - 25:23, 27:18, 32:12, 32:16, 37:10
**conversations** [2] - 37:23, 38:4
**coordination** [2] - 24:21, 25:12
**coordinator** [1] - 23:11
**copy** [1] - 60:7
**core** [1] - 58:21
**corporate** [6] - 4:17, 37:5, 38:6, 71:9, 71:15, 73:16
**corporately** [1] - 37:15
**correct** [41] - 8:19, 8:20, 8:24, 11:12, 14:16, 14:17, 21:13, 21:15, 21:19, 21:20, 22:19, 28:3, 28:12, 29:7, 32:24, 33:17, 33:18, 33:21, 37:3, 40:9, 40:16, 40:18, 41:6, 41:11, 43:13, 43:14, 43:16, 44:6, 44:7, 44:8, 44:12, 49:3, 50:21, 51:18,

## DEPOSITION OF STEPHEN ZSIGRAY

52:4, 54:5, 55:7, 57:17, 57:20, 59:20, 63:7
**correctly** [1] - 46:8
**cost** [3] - 7:7, 7:8, 58:7
**costs** [8] - 8:2, 8:6, 8:10, 8:13, 8:23, 10:7, 17:9, 17:11
**couple** [3] - 18:1, 68:20, 70:22
**course** [4] - 18:3, 30:11, 56:3, 59:6
**court** [1] - 5:2
**covered** [1] - 46:16
**credentials** [1] - 38:24
**criteria** [1] - 58:19
**current** [7] - 6:14, 15:8, 25:3, 25:6, 33:7, 67:7, 69:20
**cycles** [1] - 37:11

## D

**Dallas** [1] - 74:9
**date** [1] - 61:14
**dated** [3] - 62:5, 65:21, 66:13
**dates** [3] - 9:6, 61:20, 61:22
**David** [1] - 37:18
**De** [4] - 60:20, 61:9, 66:12, 66:21
**deal** [1] - 59:3
**dealt** [1] - 73:19
**decades** [1] - 70:4
**December** [1] - 65:9
**decided** [1] - 24:7
**decides** [2] - 24:6, 59:2
**Defendant's** [1] - 5:19
**defined** [4] - 50:3, 50:14, 52:21, 53:22
**definitely** [1] - 45:10
**DEPONENT** [1] - 74:22
**deposition** [3] - 5:20, 9:12, 9:21
**described** [1] - 11:2
**designations** [1] - 5:19
**designee** [1] - 14:7
**detail** [2] - 12:17, 29:2
**details** [1] - 9:23
**determine** [4] - 8:9, 44:5, 57:15, 70:13
**determined** [1] - 21:3
**developed** [2] - 31:12, 34:11
**development** [4] - 4:14, 34:6, 69:10,

69:15
**different** [3] - 24:19, 41:14, 58:22
**differently** [1] - 58:18
**difficult** [2] - 61:3, 69:19
**direction** [1] - 54:16
**director** [2] - 4:13, 62:4
**discount** [1] - 58:10
**discounted** [1] - 58:17
**discovery** [1] - 10:2
**discussed** [2] - 48:19, 54:2
**discussion** [1] - 31:20
**discussions** [1] - 36:1
**dismiss** [2] - 30:17, 33:24
**disregard** [1] - 72:17
**disrupt** [1] - 27:22
**disruption** [2] - 50:12, 53:24
**dock** [4] - 42:1, 42:5, 42:10
**docks** [1] - 42:7
**document** [4] - 5:21, 9:17, 51:3, 60:5
**documents** [4] - 20:4, 32:13, 59:23, 60:8
**dollar** [1] - 56:7
**done** [7] - 4:23, 27:22, 37:19, 46:23, 59:1, 68:4, 70:9
**down** [2] - 5:3, 11:20
**downtown** [4] - 34:10, 70:5, 70:6, 73:5
**Drive** [3] - 4:22, 17:23, 17:24
**during** [4] - 14:9, 30:10, 32:15, 48:13

## E

**e-mail** [6] - 60:16, 61:8, 61:11, 61:24, 65:8, 66:13
**early** [1] - 42:10
**earn** [6] - 7:2, 7:3, 7:6, 7:20, 14:21, 18:6, 20:2, 21:18, 22:14
**earned** [4] - 11:1, 11:2, 25:23, 34:23
**earns** [2] - 6:22, 23:24
**easy** [1] - 48:17
**education** [1] - 69:12
**effect** [4] - 28:20, 45:5, 46:20, 48:11
**eight** [1] - 73:24
**either** [1] - 62:8
**eject** [1] - 38:24

**electrical** [1] - 69:18
**electrician** [1] - 70:1
**employee** [1] - 15:16
**employees** [3] - 42:1, 42:2, 63:15
**end** [1] - 58:14
**ending** [1] - 60:16
**enforce** [4] - 31:15, 33:21, 40:8, 41:6
**enforcing** [1] - 39:22
**engineer** [3] - 38:12, 46:4, 46:5
**engineers** [2] - 37:9, 39:1
**entire** [1] - 73:13
**entities** [1] - 37:8
**entity** [1] - 33:9
**entries** [1] - 42:8
**environment** [1] - 69:19
**escapes** [1] - 33:8
**essentially** [2] - 21:23, 73:14
**established** [1] - 41:11
**estate** [1] - 73:16
**et** [3] - 25:14, 26:19
**exact** [1] - 67:17
**EXAMINATION** [3] - 4:7, 68:8, 71:1
**examined** [1] - 4:5
**example** [3] - 50:5, 68:24, 69:1
**except** [1] - 5:6
**exclude** [1] - 31:5
**Execute** [1] - 17:24
**Executive** [4] - 4:22, 17:23
**exercise** [1] - 68:19
**exhibit** [1] - 59:23
**Exhibit** [5] - 5:14, 5:15, 5:18, 59:9, 59:22
**existing** [2] - 32:17, 34:11
**expect** [1] - 70:11
**expectation** [1] - 67:11
**expectations** [1] - 58:23
**expense** [2] - 20:10, 58:14
**experience** [6] - 19:11, 20:24, 70:5, 72:3, 73:3, 73:18
**expires** [1] - 37:11
**explain** [4] - 41:19, 49:19, 55:16, 57:13
**explained** [1] - 49:2

**extreme** [1] - 58:14

## F

**fact** [1] - 64:24
**failure** [1] - 47:5
**fair** [1] - 48:9
**Falzone** [2] - 38:13, 46:3
**familiar** [6] - 28:20, 29:2, 29:3, 35:14, 35:18, 47:8
**far** [2] - 18:3, 18:4
**fee** [36] - 7:11, 8:11, 8:12, 8:16, 8:22, 9:3, 9:10, 10:1, 10:15, 11:1, 11:2, 14:15, 14:21, 15:10, 15:13, 15:14, 15:18, 15:19, 15:22, 15:23, 18:6, 20:3, 20:8, 20:10, 20:15, 21:6, 21:18, 22:14, 23:24, 24:18, 24:22, 25:15, 25:16, 25:22, 25:23
**fees** [10] - 6:22, 7:2, 7:3, 7:6, 7:10, 7:20, 10:6, 13:5, 24:22, 34:23
**few** [2] - 22:23, 59:5
**file** [1] - 60:23
**fill** [1] - 37:24
**finance** [1] - 73:16
**financial** [1] - 51:5
**fine** [1] - 45:17
**finish** [4] - 24:15, 72:11, 72:15, 72:20
**finished** [2] - 24:13, 70:10
**firm** [4] - 44:15, 51:4, 51:9, 72:3
**firmly** [1] - 65:2
**firms** [2] - 47:19, 71:4
**first** [7] - 4:4, 5:13, 42:8, 48:3, 60:16, 68:20, 73:15
**five** [4] - 24:18, 24:19, 48:11, 58:16
**follow** [4] - 27:16, 28:14, 53:14, 68:7
**follow-up** [1] - 68:7
**follows** [1] - 4:6
**foot** [1] - 73:4
**form** [39] - 7:22, 10:10, 11:16, 12:1, 12:8, 12:24, 16:6, 16:7, 16:14, 16:16, 18:8, 19:2, 20:21, 22:9, 22:20, 27:5, 28:4, 28:22, 29:12, 29:20,

31:8, 39:3, 39:13, 40:21, 41:16, 43:20, 47:21, 49:23, 51:10, 51:11, 52:12, 53:19, 55:16, 56:19, 57:24, 61:16, 62:16, 63:8
**formal** [1] - 32:4
**FOSTER** [100] - 4:8, 5:13, 5:17, 8:7, 9:19, 10:18, 11:3, 11:6, 11:11, 11:14, 11:16, 11:22, 11:24, 12:3, 12:10, 12:19, 13:2, 13:6, 13:10, 13:18, 14:1, 14:24, 15:5, 15:20, 16:3, 16:8, 16:10, 16:13, 16:15, 17:10, 18:12, 19:6, 21:7, 22:13, 23:4, 25:1, 27:9, 28:9, 29:5, 29:16, 30:1, 30:6, 30:9, 30:14, 30:15, 31:17, 34:19, 34:22, 35:5, 35:8, 35:10, 36:8, 36:11, 36:22, 36:23, 38:1, 38:2, 38:22, 39:9, 40:1, 41:2, 41:20, 43:18, 44:2, 45:12, 45:18, 45:24, 46:1, 48:1, 51:12, 51:15, 52:14, 53:1, 54:1, 55:18, 55:22, 57:9, 59:4, 59:11, 60:3, 60:9, 60:12, 60:14, 61:5, 61:21, 62:21, 63:13, 63:23, 64:17, 67:1, 68:4, 70:21, 71:2, 72:12, 72:13, 72:19, 72:21, 73:11, 74:17, 74:21
**Foster** [2] - 4:21, 36:17
**foundation** [1] - 66:17
**four** [2] - 46:9, 46:20
**frame** [1] - 15:4
**France** [1] - 38:13
**Frank** [2] - 39:11
**free** [1] - 58:8
**funds** [1] - 27:17
**FURTHER** [2] - 71:1, 74:22
**future** [1] - 16:17

## G

**GC** [1] - 23:7
**general** [14] - 19:18, 19:19, 21:24, 22:3, 22:19, 23:12, 25:11,

## DEPOSITION OF STEPHEN ZSIGRAY

25:13, 41:7, 62:1, 66:2, 69:22, 69:23
**generally** [6] - 14:8, 19:13, 20:14, 21:22, 24:10, 57:18
**given** [2] - 50:7, 54:16
**glass** [2] - 45:16, 45:19
**ground** [1] - 34:7
**group** [1] - 61:6
**guards** [1] - 42:5
**guess** [1] - 22:18

**H**

**habitual** [2] - 16:4, 16:7
**half** [2] - 6:10, 65:11
**hand** [1] - 66:11
**handle** [1] - 20:14
**happy** [2] - 30:12, 55:16
**harmony** [8] - 27:20, 43:24, 48:4, 50:5, 52:17, 53:23, 55:2
**head** [1] - 8:4
**hearing** [1] - 28:11
**held** [2] - 6:11, 6:19
**help** [1] - 16:21
**herein** [1] - 4:4
**Hi** [1] - 60:21
**high** [1] - 73:9
**higher** [1] - 71:4
**highly** [1] - 70:7
**himself** [1] - 36:19
**hire** [3] - 22:18, 23:7, 24:10
**hired** [2] - 33:12, 34:10
**hires** [1] - 23:12
**hiring** [3] - 21:23, 25:13, 25:14
**hold** [2] - 10:22, 24:13
**hope** [2] - 5:1, 30:9
**hopefully** [1] - 4:20
**Hopwood** [2] - 37:18, 38:5
**Howard** [4] - 4:21, 45:21, 45:22, 51:11

**I**

**idea** [1] - 66:22
**identification** [2] - 5:16, 59:10
**identified** [2] - 51:2, 51:6
**implications** [1] - 48:21
**improvement** [7] -

18:1, 56:1, 56:5, 56:13, 56:17, 57:11, 57:22
**improvements** [1] - 30:19
**include** [1] - 38:5
**included** [2] - 10:6, 32:14
**includes** [1] - 47:3
**income** [1] - 58:13
**incurs** [1] - 15:23
**indicated** [1] - 67:5
**indicates** [1] - 71:17
**indication** [2] - 51:8, 51:16
**individual** [9] - 43:4, 49:13, 49:21, 51:24, 55:11, 55:13, 56:21, 64:3, 68:21
**individuals** [1] - 42:8
**Industrial** [1] - 60:22
**industrial** [1] - 6:17
**inheriting** [1] - 34:9
**insider** [1] - 20:19
**instances** [3] - 22:16, 63:11, 63:14
**instruct** [1] - 54:4
**insurance** [1] - 42:19
**interest** [1] - 56:4
**interfere** [1] - 14:24
**interrupt** [1] - 72:17
**interrupted** [2] - 16:3, 16:23
**investor** [1] - 7:13
**involved** [2] - 28:17, 34:13
**involving** [1] - 36:18
**issue** [8] - 7:16, 7:19, 8:21, 14:9, 37:22, 51:24, 55:11, 55:13
**issued** [1] - 31:6
**issuing** [2] - 47:15, 47:16
**Ivanhoé** [2] - 15:10, 25:8

**J**

**Jackson** [1] - 62:2
**janitors** [1] - 37:8
**JC** [2] - 70:4, 73:8
**JLL** [16] - 6:21, 14:7, 14:10, 14:13, 15:16, 19:24, 35:15, 36:20, 37:5, 37:12, 37:15, 39:1, 42:1, 45:1, 61:8, 68:12
**JLL's** [2] - 30:16, 35:11
**job** [4] - 31:15, 33:20,

41:5, 44:4
**Jones** [84] - 4:11, 5:22, 6:1, 6:8, 6:9, 6:22, 7:2, 7:19, 8:16, 9:3, 14:4, 14:20, 18:6, 18:19, 18:24, 20:2, 21:17, 22:6, 23:13, 23:19, 23:23, 25:10, 26:1, 29:10, 31:4, 31:20, 32:8, 33:2, 33:12, 33:15, 33:19, 33:20, 34:4, 36:2, 36:24, 38:3, 38:10, 40:7, 40:14, 40:17, 43:11, 44:3, 44:17, 46:24, 47:2, 47:18, 48:12, 48:18, 49:8, 49:12, 49:16, 49:20, 50:23, 51:7, 51:16, 54:3, 54:18, 54:19, 55:8, 55:12, 55:24, 56:11, 56:13, 56:16, 57:3, 57:4, 57:10, 60:19, 61:13, 62:13, 62:22, 63:4, 63:15, 63:24, 67:6, 71:10, 71:12, 71:14, 71:16, 73:14, 73:16, 73:18, 73:23, 74:1

**K**

**Keelee** [4] - 60:18, 60:19, 61:24, 66:1
**Keelee's** [1] - 65:8
**keep** [1] - 64:5
**keeping** [1] - 48:5
**Kelly** [1] - 60:17
**kept** [1] - 66:14
**key** [1] - 18:23
**kind** [1] - 18:7
**knowing** [1] - 66:22
**knowledge** [7] - 39:7, 43:12, 55:5, 55:7, 64:3, 69:20, 71:20
**known** [1] - 35:12
**knows** [1] - 72:22

**L**

**label** [1] - 5:14
**labor** [15] - 27:20, 35:18, 35:19, 37:7, 37:13, 37:16, 43:24, 47:20, 51:18, 51:19, 51:21, 51:22, 53:22, 55:2, 55:10
**laborers** [1] - 37:9
**landlord** [16] - 6:23, 17:12, 17:14, 18:15,

18:19, 19:15, 20:6, 23:10, 30:17, 31:7, 33:24, 47:3, 47:6, 48:20, 56:1
**landlord's** [3] - 19:23, 23:11, 23:13
**Lang** [84] - 4:12, 5:22, 6:1, 6:8, 6:9, 6:22, 7:2, 7:19, 8:16, 9:3, 14:4, 14:21, 18:6, 18:19, 19:1, 20:2, 21:17, 22:6, 23:13, 23:19, 23:23, 25:10, 26:1, 29:10, 31:4, 31:20, 32:8, 33:2, 33:12, 33:15, 33:19, 33:20, 34:4, 36:2, 36:24, 38:3, 38:10, 40:7, 40:14, 40:17, 43:11, 44:3, 44:17, 46:24, 47:2, 47:18, 48:12, 48:18, 49:8, 49:12, 49:16, 49:20, 50:23, 51:7, 51:16, 54:3, 54:18, 54:19, 55:9, 55:12, 55:24, 56:12, 56:13, 56:16, 57:3, 57:4, 57:10, 60:19, 61:13, 62:13, 62:22, 63:4, 63:15, 63:24, 67:6, 71:10, 71:12, 71:14, 71:16, 73:14, 73:17, 73:18, 73:23, 74:1
**language** [1] - 50:4
**large** [1] - 22:24
**larger** [1] - 41:24
**LaSalle** [87] - 4:12, 5:22, 6:1, 6:8, 6:9, 6:22, 7:2, 7:20, 8:16, 9:3, 14:5, 14:21, 18:6, 18:19, 19:1, 20:2, 21:18, 23:14, 23:19, 23:23, 25:10, 26:2, 29:10, 31:4, 31:21, 32:8, 33:2, 33:13, 33:15, 33:19, 34:4, 36:2, 36:24, 38:3, 38:10, 39:17, 40:8, 40:14, 40:17, 43:11, 44:17, 45:5, 45:10, 46:2, 46:10, 47:3, 47:18, 48:12, 48:19, 49:8, 49:12, 49:17, 49:20, 50:4, 50:23, 51:7, 51:16, 54:18, 54:19, 54:21, 55:9, 55:12, 55:24, 56:12, 56:13, 56:16, 57:3, 57:4,

57:10, 60:19, 61:14, 62:13, 62:22, 63:5, 63:15, 63:24, 67:6, 71:10, 71:12, 71:15, 71:16, 73:14, 73:17, 73:19, 73:24, 74:1
**LaSalle's** [5] - 22:7, 33:20, 44:4, 47:1, 54:3
**last** [5] - 46:9, 46:20, 60:23, 61:7, 66:11
**lastly** [1] - 69:21
**latitude** [1] - 50:18
**lawsuit** [1] - 34:14
**lawyer** [1] - 16:18
**lawyers** [3] - 5:8, 5:21, 5:22
**learning** [1] - 21:11
**lease** [13] - 9:16, 9:18, 18:14, 32:2, 32:15, 33:14, 56:8, 56:18, 58:5, 58:11, 58:13, 58:16, 58:24
**leases** [8] - 27:19, 27:21, 32:11, 50:6, 50:10, 52:19, 56:4, 57:19
**leasing** [7] - 24:10, 57:2, 57:5, 57:7, 59:1
**least** [1] - 30:22
**leave** [1] - 55:17
**legal** [1] - 10:23
**level** [5] - 21:1, 64:5, 69:10, 69:11
**Leyden** [2] - 60:17, 60:19
**Leyden's** [1] - 61:24
**life** [1] - 58:16
**likely** [1] - 70:2
**list** [20] - 44:11, 60:22, 61:6, 61:14, 62:14, 62:23, 63:1, 63:6, 63:16, 63:24, 64:6, 64:12, 64:22, 65:10, 66:4, 67:7, 67:19, 68:1, 69:22
**listing** [1] - 5:22
**listings** [1] - 65:7
**litigation** [3] - 30:21, 49:17, 68:13
**loading** [4] - 42:1, 42:5, 42:7
**Local** [3] - 37:8, 60:1, 60:20
**look** [8] - 58:10, 58:19, 59:22, 60:15, 64:20, 65:8, 66:11, 68:10
**looked** [5] - 8:8, 10:5, 24:18, 28:16, 31:2

4

## DEPOSITION OF STEPHEN ZSIGRAY

**looking** [3] - 42:24, 63:21, 66:3
**looks** [3] - 58:5, 58:18, 65:9
**low** [1] - 30:12

## M

**mail** [6] - 60:16, 61:8, 61:11, 61:24, 65:8, 66:13
**main** [1] - 42:7
**maintain** [3] - 62:23, 63:6, 63:24
**majority** [2] - 26:17, 50:16
**manage** [3] - 33:13, 33:14, 57:1
**managed** [6] - 19:22, 33:2, 33:4, 48:13, 73:23, 73:24
**management** [41] - 4:14, 7:6, 7:10, 7:11, 9:9, 9:22, 10:1, 10:2, 10:6, 10:15, 13:5, 14:11, 15:9, 15:10, 15:17, 15:18, 15:19, 15:22, 18:16, 20:7, 21:1, 24:7, 24:11, 24:21, 25:17, 25:18, 31:2, 42:17, 43:6, 43:10, 47:9, 47:13, 54:15, 54:17, 56:9, 66:1, 66:4, 66:5, 73:4
**Management** [1] - 35:12
**manager** [26] - 6:16, 15:15, 18:20, 18:24, 19:9, 20:11, 20:20, 21:13, 21:17, 21:22, 21:24, 25:11, 25:20, 33:21, 37:17, 40:2, 40:12, 40:13, 40:15, 40:24, 41:7, 44:4, 62:2, 66:2, 72:4
**managers** [6] - 15:12, 23:20, 37:13, 37:14, 44:18, 45:1
**manages** [6] - 14:9, 14:13, 17:18, 48:12, 56:12, 57:12
**managing** [3] - 4:13, 65:22, 65:23
**marked** [3] - 5:15, 59:9, 59:22
**market** [1] - 70:7
**markets** [1] - 21:5
**mean** [9] - 13:20, 17:17, 19:17, 21:22,

22:1, 23:7, 38:3, 46:13, 57:13
**meaning** [1] - 26:18
**means** [1] - 58:5
**meant** [2] - 37:2, 53:5
**medium** [1] - 23:1
**member** [2] - 25:21
**members** [2] - 51:5, 69:13
**membership** [2] - 26:5, 38:11
**memorized** [3] - 13:8, 13:12, 13:15
**memory** [1] - 46:4
**mentioned** [2] - 29:7, 73:7
**MetLife** [5] - 31:13, 32:22, 33:9, 33:11, 33:12
**midwest** [2] - 4:15, 6:16
**might** [4] - 16:21, 22:17, 68:14, 68:18
**million** [1] - 73:4
**minimum** [1] - 43:23
**minutes** [1] - 59:5
**misspoken** [1] - 53:3
**misstates** [1] - 12:24
**morning** [2] - 4:9, 42:10
**most** [11] - 19:14, 23:5, 23:9, 23:18, 27:19, 34:9, 57:1, 57:3, 69:17, 69:20, 70:2
**motion** [2] - 30:17, 33:24
**move** [6] - 14:6, 25:24, 30:2, 34:17, 35:8, 72:16
**movement** [1] - 42:11
**mover** [1] - 53:9
**movers** [31] - 39:18, 41:10, 45:6, 52:17, 53:4, 53:6, 59:15, 59:17, 59:18, 60:21, 60:22, 61:7, 61:15, 62:14, 62:15, 62:20, 62:23, 63:5, 63:6, 63:16, 63:17, 64:1, 64:6, 64:11, 64:12, 65:6, 65:7, 66:15, 67:7, 67:20, 68:2
**moves** [1] - 60:23
**moving** [5] - 39:21, 44:14, 52:16, 55:23, 63:2
**MR** [182] - 4:8, 5:13, 5:17, 7:22, 8:7, 9:13, 9:19, 10:10, 10:18,

10:22, 11:3, 11:5, 11:6, 11:11, 11:13, 11:14, 11:15, 11:16, 11:18, 11:22, 11:23, 11:24, 12:1, 12:3, 12:4, 12:8, 12:10, 12:19, 12:24, 13:2, 13:6, 13:10, 13:18, 13:22, 14:1, 14:23, 14:24, 15:3, 15:5, 15:20, 15:24, 16:3, 16:5, 16:8, 16:9, 16:10, 16:11, 16:13, 16:14, 16:15, 17:4, 17:10, 18:8, 18:12, 19:2, 19:6, 20:21, 21:7, 22:9, 22:13, 22:20, 23:4, 24:13, 25:1, 27:5, 27:9, 28:4, 28:9, 28:22, 29:5, 29:12, 29:16, 29:20, 30:1, 30:4, 30:6, 30:7, 30:9, 30:11, 30:14, 30:15, 31:8, 31:17, 34:19, 34:21, 34:22, 35:2, 35:5, 35:7, 35:8, 35:10, 36:3, 36:8, 36:11, 36:12, 36:15, 36:22, 36:23, 37:21, 38:1, 38:2, 38:17, 38:22, 39:3, 39:9, 39:13, 40:1, 40:21, 41:2, 41:16, 41:20, 43:17, 43:18, 43:20, 44:2, 45:12, 45:14, 45:18, 45:21, 45:22, 45:24, 46:1, 47:21, 48:1, 49:23, 51:10, 51:12, 51:15, 52:12, 52:14, 53:1, 53:19, 54:1, 55:15, 55:18, 55:22, 56:19, 57:9, 57:24, 59:4, 59:6, 59:11, 60:2, 60:3, 60:6, 60:9, 60:10, 60:12, 60:13, 60:14, 61:2, 61:5, 61:16, 61:21, 62:16, 62:21, 63:8, 63:13, 63:18, 63:23, 64:13, 64:17, 66:16, 67:1, 68:4, 68:7, 68:9, 70:19, 70:21, 71:2, 72:10, 72:12, 72:13, 72:15, 72:19, 72:20, 72:21, 72:22, 73:11, 74:17, 74:19, 74:21
**MS** [1] - 60:4
**multi** [1] - 59:23
**multi-page** [1] - 59:23

**multiple** [7] - 21:5, 26:20, 27:12, 47:14, 48:3, 67:13, 67:14

## N

**name** [1] - 33:8
**named** [1] - 33:9
**names** [1] - 67:10
**nature** [3] - 29:19, 35:11, 66:20
**need** [7] - 11:19, 11:20, 11:22, 30:6, 45:21, 61:3, 65:5
**needed** [1] - 30:8
**needs** [2] - 21:13, 23:6
**negotiate** [2] - 56:16, 57:19
**negotiated** [2] - 18:14, 20:5
**negotiates** [1] - 57:7
**negotiation** [3] - 7:13, 21:3, 56:8
**negotiations** [5] - 35:18, 35:22, 36:18, 37:6, 56:18
**NELSON** [1] - 60:4
**never** [2] - 55:5, 68:1
**New** [1] - 65:23
**new** [3] - 31:19, 34:6, 34:8
**next** [4] - 25:24, 30:3, 34:18, 55:23
**non** [1] - 48:5
**nonunion** [30] - 26:22, 27:8, 27:10, 31:5, 44:10, 47:4, 47:6, 48:5, 50:3, 52:3, 52:17, 52:22, 53:4, 53:9, 54:8, 54:21, 55:10, 59:14, 59:15, 59:17, 59:18, 68:2, 70:15, 71:4, 71:18, 73:19, 74:2, 74:6, 74:11, 74:12
**North** [7] - 38:13, 39:17, 45:5, 45:10, 46:2, 46:9, 50:4
**NOT** [1] - 74:22
**nothing** [2] - 70:19, 74:19
**notice** [1] - 60:23
**Notice** [1] - 5:20
**notification** [1] - 26:21
**November** [2] - 62:5, 66:13
**number** [17] - 6:5, 6:21, 14:3, 14:5, 30:3, 34:20, 35:9, 38:9, 45:3, 45:4,

46:24, 48:10, 48:18, 49:11, 55:24, 67:17, 69:9
**Number** [1] - 30:16

## O

**oath** [2] - 4:2, 4:5
**object** [49] - 7:22, 10:10, 11:15, 11:16, 12:1, 12:8, 12:24, 15:1, 15:3, 15:24, 16:5, 16:6, 16:7, 16:11, 16:14, 16:16, 16:18, 16:19, 17:4, 18:8, 19:2, 20:21, 22:9, 22:20, 27:5, 28:4, 28:22, 29:12, 29:20, 31:8, 38:17, 39:3, 39:13, 40:21, 41:16, 43:17, 43:20, 47:21, 49:23, 51:10, 52:12, 53:19, 55:15, 56:19, 57:24, 61:16, 62:16, 63:8
**objected** [1] - 35:3
**objection** [4] - 17:5, 36:3, 64:13, 66:16
**objections** [1] - 5:19
**observes** [1] - 26:23
**occur** [1] - 15:21
**occurred** [1] - 35:19
**occurs** [1] - 32:15
**October** [2] - 62:1, 65:21
**offers** [1] - 47:3
**office** [8] - 6:17, 42:17, 43:6, 43:11, 54:15, 54:17, 64:8, 66:4
**Office** [1] - 60:22
**officed** [1] - 21:2
**officers** [2] - 41:24, 42:6
**official** [1] - 60:20
**often** [3] - 19:14, 26:16, 27:19
**old** [1] - 66:5
**one** [32] - 5:4, 11:10, 17:20, 17:21, 19:1, 19:10, 27:14, 28:17, 35:6, 36:16, 37:10, 37:11, 37:13, 44:14, 51:4, 51:6, 51:9, 52:5, 52:6, 52:10, 56:24, 60:16, 62:24, 63:1, 64:4, 65:18, 66:6, 66:13, 68:7, 69:8
**ones** [6] - 8:4, 13:9,

# DEPOSITION OF STEPHEN ZSIGRAY

42:9, 64:7, 73:7, 73:22
**onsite** [2] - 7:12, 25:21
**operating** [1] - 20:10
**opinion** [9] - 71:3, 71:6, 71:7, 71:9, 71:11, 71:13, 71:21, 71:24, 72:1
**opportunistic** [1] - 58:22
**options** [1] - 64:19
**order** [1] - 70:13
**organization** [1] - 68:23
**organizations** [1] - 69:13
**otherwise** [1] - 34:9
**ourselves** [1] - 11:20
**outside** [7] - 20:11, 35:5, 56:19, 62:16, 63:18, 64:13, 66:16
**outsider** [1] - 20:20
**overhead** [1] - 67:18
**oversee** [1] - 6:17
**overseeing** [2] - 7:10, 14:21
**overseen** [1] - 19:22
**oversight** [4] - 22:12, 22:15, 24:21, 25:12
**own** [19] - 18:15, 18:16, 18:24, 19:9, 19:14, 21:16, 21:22, 21:23, 22:19, 23:2, 23:7, 33:4, 34:5, 58:10, 58:19, 67:20, 68:22
**owned** [1] - 25:8
**owner** [23] - 14:11, 15:9, 15:15, 19:1, 21:9, 24:8, 25:17, 29:17, 30:21, 31:12, 31:19, 32:22, 32:23, 33:7, 40:3, 57:6, 57:8, 58:5, 58:14, 58:18, 59:1, 59:2, 65:23
**owner's** [1] - 57:8
**owners** [7] - 8:17, 8:18, 9:4, 28:10, 49:3, 56:14, 56:15
**Owners** [1] - 35:12

## P

**page** [3] - 59:23, 61:7, 66:11
**Page** [1] - 6:4
**pages** [1] - 61:3
**paid** [2] - 10:13, 20:9

**painter** [1] - 69:24
**pardon** [1] - 52:8
**part** [8] - 7:13, 8:22, 33:20, 41:5, 42:14, 44:3, 63:3, 69:7
**participant** [1] - 37:12
**participate** [1] - 37:6
**participated** [2] - 35:21, 36:18
**participates** [2] - 37:14, 37:15
**particular** [10] - 9:17, 18:5, 21:19, 23:24, 31:6, 50:8, 54:20, 55:3, 65:18, 70:13
**particularly** [1] - 69:18
**past** [1] - 63:11
**pause** [1] - 16:17
**paying** [1] - 10:5
**pays** [5] - 17:2, 17:17, 17:18, 56:1, 56:12
**pending** [3] - 5:7, 50:18
**pension** [1] - 27:17
**people** [8] - 15:11, 30:4, 42:15, 62:13, 64:10, 67:11, 69:18, 70:8
**percentage** [15] - 7:7, 7:8, 8:2, 8:5, 8:10, 8:12, 8:23, 10:1, 10:15, 13:5, 15:18, 15:19, 16:2, 17:1, 17:8
**perform** [2] - 20:6, 56:8
**performs** [1] - 7:12
**perhaps** [1] - 29:2
**period** [3] - 14:10, 48:13, 65:16
**periods** [1] - 45:7
**permission** [1] - 42:21
**permitted** [2] - 27:2, 27:11
**person** [3] - 40:14, 40:18, 43:2
**personal** [7] - 66:22, 71:7, 71:13, 71:21, 71:24, 72:1, 72:14
**personally** [3] - 37:15, 38:14, 38:23
**personnel** [8] - 15:11, 20:6, 20:8, 20:13, 24:20, 25:10, 25:15, 42:13
**picketing** [2] - 48:22, 53:24
**place** [7] - 27:16, 28:13, 28:15, 32:1, 32:21, 34:8, 34:12

**Plaintiff** [1] - 4:22
**planning** [1] - 51:5
**plumber** [1] - 26:19
**plus** [1] - 56:4
**point** [3] - 27:14, 30:10, 44:14
**pointed** [1] - 54:23
**policies** [1] - 32:17
**policy** [2] - 39:6, 53:14
**pondered** [1] - 58:4
**portfolio** [1] - 73:4
**portion** [2] - 10:6, 15:22
**position** [6] - 4:11, 6:14, 6:19, 30:21, 54:13, 68:12
**positions** [1] - 6:11
**positive** [1] - 60:11
**possibility** [1] - 48:21
**possible** [6] - 52:2, 52:10, 52:11, 54:7, 54:10, 64:20
**possibly** [1] - 34:9
**practice** [3] - 54:3, 54:4, 67:24
**preface** [1] - 41:22
**prefer** [3] - 51:17, 51:21, 51:22
**preparation** [1] - 9:11
**prepare** [2] - 9:21, 10:19
**prepared** [4] - 5:21, 10:24, 12:16, 26:6
**presumably** [1] - 38:5
**pretty** [1] - 48:23
**prevent** [1] - 55:13
**previous** [2] - 31:12, 65:22
**pricing** [1] - 67:21
**procedure** [2] - 28:1, 41:14
**procedures** [2] - 28:15, 32:17
**process** [3] - 26:1, 38:9, 67:12
**produce** [2] - 14:7, 35:3
**produced** [6] - 10:3, 10:4, 59:24, 60:2, 61:7, 62:9
**product** [1] - 70:10
**profit** [1] - 67:18
**program** [1] - 4:14
**project** [23] - 13:5, 15:15, 17:3, 17:9, 18:20, 18:24, 19:9, 20:11, 20:12, 20:20, 21:12, 21:13, 21:14, 21:17, 21:19, 21:22, 21:24, 22:8, 22:12,

23:20, 24:5, 25:20
**projects** [2] - 14:22, 23:24
**promulgate** [1] - 34:4
**promulgated** [1] - 29:18
**properties** [4] - 6:17, 48:4, 64:7, 74:3
**property** [20] - 7:5, 15:8, 15:11, 15:16, 20:9, 20:10, 21:2, 25:21, 25:22, 26:13, 26:16, 28:14, 32:12, 42:15, 42:16, 44:19, 50:8, 66:3
**provide** [12] - 4:12, 18:20, 19:1, 19:9, 21:16, 25:3, 25:23, 27:20, 65:3, 67:10, 69:13, 69:22
**provided** [4] - 19:15, 25:16, 56:7, 58:9
**provider** [1] - 44:24
**providers** [1] - 47:15
**provides** [3] - 17:14, 17:15, 17:16
**providing** [1] - 70:5
**provision** [1] - 43:24
**provisions** [1] - 14:15
**publication** [1] - 71:17
**pulled** [1] - 25:20
**purchased** [1] - 65:21
**purchasing** [1] - 67:11
**pursuant** [1] - 59:24
**push** [1] - 49:8
**put** [2] - 34:8, 44:10

## Q

**qualifications** [1] - 42:20
**qualified** [2] - 47:14, 69:17
**quality** [4] - 71:4, 71:18, 73:5, 73:9
**questions** [10] - 4:17, 4:23, 5:4, 12:21, 12:22, 16:12, 26:6, 68:5, 70:22, 74:18
**quickly** [1] - 14:6
**quote** [1] - 55:10

## R

**rare** [1] - 22:16
**rate** [1] - 58:10
**rather** [1] - 5:11
**reached** [2] - 50:24, 63:15
**reaching** [2] - 64:11,

66:5
**read** [9] - 10:4, 12:4, 12:6, 12:12, 12:13, 12:16, 14:14, 61:2, 61:4
**real** [1] - 73:16
**really** [2] - 24:23, 36:24
**reason** [5] - 10:8, 18:20, 41:13, 65:1, 68:20
**reasons** [5] - 27:12, 48:3, 48:7, 48:20, 68:20
**receive** [7] - 9:3, 15:10, 42:19, 47:5, 47:18, 61:14, 64:20
**received** [6] - 8:11, 8:12, 8:16, 9:7, 10:17, 17:24
**receiving** [3] - 47:4, 47:15, 47:17
**recommended** [1] - 54:9
**record** [8] - 12:6, 12:13, 13:19, 13:21, 13:22, 36:15, 36:20, 59:5
**referred** [1] - 47:12
**referring** [1] - 36:7
**refill** [2] - 30:8, 45:18
**reflect** [1] - 61:13
**refused** [1] - 29:10
**regard** [19] - 8:21, 14:3, 14:15, 14:20, 18:5, 19:8, 22:7, 23:14, 29:6, 29:17, 29:19, 34:13, 35:13, 35:15, 40:19, 41:15, 56:11, 59:14, 64:1
**regarding** [1] - 65:10
**region** [5] - 6:17, 6:18, 42:3, 73:23, 74:1
**regional** [3] - 6:16, 64:5, 72:4
**regions** [1] - 74:2
**regs** [2] - 34:8, 34:12
**regular** [1] - 65:6
**regularly** [1] - 63:5
**regulations** [22] - 27:15, 27:21, 28:13, 31:11, 31:14, 31:16, 32:1, 32:13, 39:16, 39:20, 39:21, 39:22, 39:23, 41:10, 44:1, 50:7, 52:16, 52:18, 52:20, 53:16, 53:23, 54:24
**reimbursed** [1] - 20:9
**relationship** [2] -

6

# DEPOSITION OF STEPHEN ZSIGRAY

66:21, 66:22
**remember** [1] - 11:9
**rent** [4] - 57:23, 58:6, 58:8, 58:13
**rental** [1] - 58:13
**rep** [2] - 57:8, 71:15
**repeat** [2] - 21:4, 51:14
**report** [2] - 44:17, 45:1
**reporter** [3] - 5:2, 12:7, 12:14
**reports** [1] - 40:13
**represent** [3] - 4:22, 69:3, 69:5
**representative** [5] - 4:17, 6:1, 19:23, 37:5, 38:7
**representing** [2] - 27:18, 57:6
**request** [1] - 42:17
**requested** [3] - 12:7, 12:14, 15:14
**requests** [1] - 62:24
**require** [8] - 27:18, 27:22, 43:15, 53:4, 53:6, 58:20, 62:20, 69:20
**required** [6] - 30:18, 30:22, 31:4, 32:21, 34:1, 39:19
**requirement** [2] - 28:7, 28:10
**requirements** [3] - 47:16, 69:12
**requires** [2] - 31:7, 53:15
**requiring** [2] - 53:13, 64:6
**reread** [1] - 14:4
**reserve** [1] - 74:20
**respect** [1] - 14:8
**respected** [1] - 70:7
**responding** [1] - 54:16
**response** [1] - 5:20
**responsibility** [1] - 42:14
**rest** [1] - 73:1
**result** [1] - 69:16
**retired** [1] - 67:3
**Retirement** [1] - 69:2
**return** [3] - 58:15, 58:20, 58:23
**review** [1] - 9:11
**reviewed** [8] - 9:5, 9:15, 9:16, 9:17, 9:20, 9:22, 20:4, 53:16
**reviewing** [2] - 8:4, 11:9

**RFP** [1] - 47:16
**RFPs** [1] - 47:19
**Rich** [1] - 62:6
**Richard** [5] - 60:20, 60:21, 61:9, 66:12, 66:21
**right-to-work** [2] - 74:9, 74:10
**role** [1] - 22:7
**rudely** [1] - 16:23
**rule** [29] - 23:23, 28:18, 29:6, 29:18, 30:18, 30:22, 31:6, 32:20, 34:1, 35:13, 35:16, 36:9, 37:23, 38:4, 45:4, 46:9, 46:18, 48:5, 48:11, 48:19, 48:20, 49:4, 53:12, 53:17, 53:22, 68:14, 68:18, 70:8, 70:13
**rules** [40] - 9:16, 27:15, 27:21, 28:13, 28:16, 28:21, 29:11, 31:11, 31:14, 31:16, 31:21, 32:1, 32:13, 33:16, 33:21, 34:5, 34:7, 34:11, 39:16, 39:20, 39:21, 39:22, 39:23, 40:8, 41:6, 41:9, 43:15, 43:24, 49:9, 50:7, 52:18, 52:20, 53:3, 53:6, 53:15, 53:23, 54:24, 55:13, 59:13, 59:16
**run** [2] - 4:13, 43:11
**running** [4] - 21:1, 30:12, 72:4, 73:3

## S

**SAITH** [1] - 74:22
**sale** [2] - 32:10, 32:15
**satisfied** [1] - 58:15
**SCHUTTE** [81] - 7:22, 9:13, 10:10, 10:22, 11:5, 11:13, 11:15, 11:18, 11:23, 12:1, 12:4, 12:8, 12:24, 13:22, 14:23, 15:3, 15:24, 16:5, 16:9, 16:11, 16:14, 17:4, 18:8, 19:2, 20:21, 22:9, 22:20, 24:13, 27:5, 28:4, 28:22, 29:12, 29:20, 30:4, 30:7, 30:11, 31:8, 34:21, 35:2, 35:7, 36:3, 36:12, 36:15, 37:21, 38:17, 39:3,

39:13, 40:21, 41:16, 43:17, 43:20, 45:14, 45:22, 47:21, 49:23, 51:10, 52:12, 53:19, 55:15, 56:19, 57:24, 59:6, 60:2, 60:6, 60:10, 60:13, 61:2, 61:16, 62:16, 63:8, 63:18, 64:13, 66:16, 68:7, 68:9, 70:19, 72:10, 72:15, 72:20, 72:22, 74:19
**scope** [6] - 47:16, 56:20, 62:17, 63:18, 64:13, 66:16
**Scott** [5] - 11:7, 13:20, 15:2, 16:4, 30:10
**second** [2] - 13:19, 16:17
**Securitas** [7] - 42:2, 42:3, 42:13, 43:2, 44:15, 44:22
**security** [14] - 37:8, 41:24, 42:3, 42:4, 42:6, 42:8, 42:10, 44:12, 44:15, 44:19, 54:4, 54:11, 54:15, 62:4
**see** [6] - 18:18, 30:11, 31:3, 43:5, 61:6, 67:21
**seeking** [1] - 47:14
**seem** [1] - 65:5
**SEIU** [4] - 37:8, 42:14, 69:14
**self** [1] - 65:23
**self-managing** [1] - 65:23
**selling** [1] - 33:11
**senior** [1] - 37:14
**separate** [3] - 25:20, 57:1
**service** [5] - 44:24, 47:2, 47:14, 47:15, 57:7
**services** [1] - 14:12
**set** [1] - 58:19
**setup** [1] - 41:23
**seven** [2] - 58:16, 73:15
**several** [1] - 46:5
**shared** [1] - 59:1
**show** [1] - 59:21
**sign** [1] - 22:2
**signature** [1] - 74:20
**similar** [2] - 21:4, 41:9
**single** [4] - 9:6, 12:17, 32:2, 50:2
**sit** [1] - 35:24
**site** [3] - 21:2, 39:18,

72:1
**sitting** [1] - 12:18
**situation** [7] - 17:1, 20:18, 21:17, 22:6, 25:2, 29:9, 49:7
**situations** [4] - 20:1, 22:24, 23:2, 27:17
**skill** [1] - 69:20
**skilled** [1] - 20:13
**small** [1] - 23:1
**smaller** [1] - 22:18
**smoothly** [1] - 4:21
**sold** [2] - 31:19, 33:6
**someone** [1] - 70:3
**sometimes** [1] - 24:5
**somewhere** [1] - 28:18
**sorry** [6] - 32:6, 34:19, 51:11, 53:8, 60:6, 68:11
**sort** [2] - 20:3, 45:9
**sounds** [2] - 66:14, 71:5
**sources** [1] - 67:14
**South** [25] - 9:15, 9:16, 9:18, 11:10, 12:23, 14:16, 15:9, 17:21, 17:23, 25:2, 30:23, 32:20, 34:1, 45:6, 46:12, 46:18, 50:4, 52:7, 52:9, 53:13, 54:21, 54:22, 54:23, 62:5, 64:4
**space** [1] - 56:9, 56:10, 58:7
**speaking** [2] - 20:14, 38:6
**specialist** [1] - 15:15
**specific** [1] - 52:19
**specifically** [6] - 39:17, 50:9, 53:16, 54:24, 56:10, 73:8
**speculate** [1] - 64:16
**spent** [1] - 73:13
**Speyer** [7] - 31:13, 32:23, 32:24, 33:3, 33:4, 33:6, 33:11
**spoken** [2] - 50:20, 51:3
**square** [1] - 73:4
**started** [3] - 6:5, 16:6, 72:16
**starting** [1] - 27:14
**State** [1] - 69:2
**state** [3] - 25:5, 39:18, 74:10
**statement** [3] - 52:20, 53:18, 71:17
**stating** [1] - 66:6
**stay** [2] - 27:2, 27:11

**Stay** [2] - 61:9, 66:12
**STEPHEN** [1] - 4:3
**Stephen** [1] - 4:10
**Steve** [1] - 4:10
**sticker** [1] - 5:14
**still** [3] - 68:14, 68:18, 70:9
**stop** [1] - 72:18
**stream** [2] - 58:6, 58:13
**Street** [1] - 45:5
**strike** [1] - 72:16
**structure** [1] - 21:6
**study** [4] - 72:2, 72:9, 72:21, 73:10
**stuff** [1] - 21:11
**subpoenaed** [1] - 60:7
**subpoenas** [1] - 59:24
**suggest** [2] - 28:14, 63:1
**Suites** [3] - 4:23, 17:23, 17:24
**summing** [1] - 28:2
**supervision** [1] - 14:12
**supplemental** [1] - 5:19
**support** [1] - 51:23
**supporters** [1] - 69:7
**supposed** [2] - 10:19, 12:20
**System** [1] - 69:3

## T

**talks** [1] - 53:24
**Teachers** [1] - 69:2
**team** [6] - 7:12, 21:1, 25:18, 25:21, 25:22, 28:7
**Teamsters** [2] - 63:3, 69:4
**ten** [1] - 58:16
**ten-year** [1] - 58:16
**tenancy** [1] - 18:3
**tenant** [53] - 6:23, 7:2, 7:3, 14:21, 15:23, 17:2, 17:13, 17:14, 17:15, 17:20, 17:22, 17:24, 18:14, 18:23, 19:7, 19:13, 20:18, 21:8, 21:12, 21:16, 21:21, 22:2, 23:2, 23:5, 30:24, 42:17, 45:6, 49:14, 49:22, 50:10, 51:2, 52:19, 53:9, 54:7, 54:20, 56:1, 56:5, 56:8, 56:12, 56:17, 57:11, 57:16, 57:22, 58:7,

## DEPOSITION OF STEPHEN ZSIGRAY

68:18, 69:1, 69:3, 69:4, 70:14, 70:16
**tenant-by-tenant** [1] - 70:16
**tenants** [25] - 7:20, 8:23, 19:8, 22:17, 22:24, 23:19, 26:3, 38:11, 50:20, 50:24, 51:8, 51:17, 52:2, 57:19, 57:23, 64:20, 64:23, 65:3, 67:8, 67:10, 68:2, 68:14, 68:21, 69:16
**tenants'** [1] - 56:4
**Tennessee** [1] - 73:24
**testified** [2] - 4:5, 38:13
**testify** [2] - 11:8, 14:8
**testimony** [7] - 11:12, 13:1, 32:19, 38:16, 38:18, 38:21, 48:24
**Texas** [2] - 73:23, 74:9
**thanking** [1] - 62:6
**THE** [49] - 8:1, 9:14, 10:12, 12:12, 12:15, 13:3, 13:7, 15:7, 16:1, 17:7, 18:10, 19:4, 20:23, 22:11, 22:22, 24:16, 27:7, 28:6, 29:1, 29:14, 29:22, 30:5, 31:10, 36:6, 38:20, 39:5, 39:15, 40:23, 41:18, 43:22, 45:11, 45:16, 45:20, 47:23, 50:1, 51:13, 52:15, 53:21, 55:20, 56:23, 58:3, 61:18, 62:19, 63:10, 63:20, 64:15, 66:19, 68:6, 73:2
**theoretically** [1] - 52:2
**three** [7] - 25:19, 37:7, 37:10, 37:11, 63:11, 65:11, 74:1
**three-year** [1] - 37:11
**Thursday** [1] - 65:9
**TIAs** [1] - 57:15
**Tishman** [7] - 31:12, 32:23, 32:24, 33:3, 33:4, 33:6, 33:11
**today** [5] - 4:16, 6:2, 10:21, 35:24, 58:17
**took** [3] - 31:13, 65:20, 65:24
**top** [1] - 8:3
**topic** [28] - 6:4, 6:21, 9:12, 9:17, 10:20, 12:16, 12:21, 14:3, 14:5, 26:1, 26:7, 30:3, 34:18, 35:4,

36:1, 36:7, 36:9, 38:9, 45:3, 45:4, 46:23, 46:24, 48:10, 48:18, 49:11, 55:23, 68:10, 68:11
**topics** [3] - 4:18, 5:23, 6:2
**total** [1] - 34:23
**touch** [3] - 61:9, 63:5, 66:12
**towns** [1] - 74:6
**trade** [2] - 26:18, 26:23
**trades** [2] - 26:18, 26:20
**tradesmen** [1] - 28:2
**training** [2] - 69:10, 69:14
**transaction** [1] - 58:5
**transition** [1] - 32:15
**tried** [1] - 49:8
**true** [1] - 51:9
**truly** [1] - 20:24
**try** [1] - 20:16
**turn** [2] - 6:4, 6:21
**two** [7] - 62:7, 63:11, 63:12, 63:14, 63:21, 69:9, 73:7
**type** [3] - 21:6, 58:20, 64:6
**typical** [5] - 17:20, 19:7, 19:8, 20:2, 20:18
**typically** [8] - 7:7, 19:14, 22:16, 26:21, 31:23, 32:2, 42:10, 58:24

### U

**uncommon** [1] - 19:13
**under** [12] - 9:9, 9:10, 10:13, 15:8, 25:3, 25:6, 39:12, 40:2, 40:3, 40:11, 66:4
**understood** [1] - 36:17
**undertaken** [1] - 40:8
**undoubtedly** [1] - 4:21
**uniform** [1] - 23:23
**union** [82] - 26:2, 26:10, 26:17, 27:18, 28:1, 28:19, 29:6, 29:19, 30:18, 30:22, 32:21, 34:1, 35:13, 35:15, 36:9, 37:23, 38:4, 38:10, 39:19, 41:10, 43:1, 43:5, 43:16, 44:6, 45:4,

46:18, 48:11, 48:19, 49:4, 49:12, 49:21, 50:10, 50:16, 51:5, 51:18, 51:19, 51:21, 51:22, 52:23, 53:6, 53:13, 55:10, 60:1, 60:21, 61:6, 61:7, 61:15, 62:14, 62:15, 62:20, 62:23, 63:2, 63:5, 63:6, 63:16, 63:17, 64:1, 64:11, 64:12, 65:6, 65:7, 65:15, 66:14, 66:15, 67:7, 67:16, 68:14, 68:15, 68:18, 68:19, 68:22, 69:6, 69:12, 70:2, 70:8, 70:12, 70:14, 71:17, 71:23, 73:6, 74:10
**union-approved** [1] - 61:15
**union-only** [19] - 30:18, 30:22, 32:21, 34:1, 35:13, 35:15, 36:9, 37:23, 38:4, 45:4, 46:18, 48:11, 48:19, 49:4, 62:20, 68:14, 68:18, 70:8, 70:12
**unions** [7] - 27:18, 35:19, 47:20, 48:22, 69:4, 69:5, 71:3
**unique** [1] - 41:23
**unwritten** [1] - 53:17
**up** [5] - 28:2, 36:1, 48:24, 61:14, 68:7
**up-to-date** [1] - 61:14
**update** [2] - 65:7, 66:6
**updated** [2] - 60:22, 63:1
**updates** [1] - 69:11
**uses** [1] - 18:23
**utilized** [1] - 21:6

### V

**vague** [1] - 15:3
**value** [1] - 58:21
**value-add** [1] - 58:21
**valued** [2] - 58:10, 70:7
**varies** [8] - 7:5, 20:5, 20:24, 24:2, 24:4, 26:13, 26:16
**various** [2] - 4:18, 6:11
**Vauters** [3] - 61:8, 62:4, 66:11
**Vauters'** [1] - 66:20
**verbally** [1] - 5:9

**view** [1] - 70:12
**views** [1] - 68:22
**virtually** [2] - 27:24, 34:12
**Vries** [4] - 60:20, 61:9, 66:12, 66:21

### W

**Wacker** [26] - 4:22, 9:16, 9:18, 11:10, 12:23, 14:16, 15:9, 17:22, 17:23, 17:24, 25:2, 30:23, 32:20, 34:2, 45:6, 46:12, 46:18, 50:4, 52:7, 52:9, 53:13, 54:22, 54:23, 62:5, 64:4
**waiter** [1] - 45:18
**walk** [1] - 38:14
**Walker** [3] - 61:8, 66:11, 66:23
**walker** [1] - 62:4
**wants** [7] - 16:18, 21:12, 21:16, 23:2, 61:14, 66:14, 67:7
**water** [7] - 30:4, 30:8, 30:12, 30:13, 45:11, 45:16, 45:21
**WDES** [2] - 9:15, 9:18
**week** [1] - 38:14
**West** [1] - 62:2
**white** [1] - 50:15
**withdrawn** [3] - 34:21, 34:24, 35:2
**witness** [10] - 4:1, 4:4, 10:23, 11:8, 11:9, 16:3, 16:6, 35:3, 36:16, 72:18
**WITNESS** [49] - 8:1, 9:14, 10:12, 12:12, 12:15, 13:3, 13:7, 15:7, 16:1, 17:7, 18:10, 19:4, 20:23, 22:11, 22:22, 24:16, 27:7, 28:6, 29:1, 29:14, 29:22, 30:5, 31:10, 36:6, 38:20, 39:5, 39:15, 40:23, 41:18, 43:22, 45:11, 45:16, 45:20, 47:23, 50:1, 51:13, 52:15, 53:21, 55:20, 56:23, 58:3, 61:18, 62:19, 63:10, 63:20, 64:15, 66:19, 68:6, 73:2
**words** [1] - 37:24
**workmanship** [1] - 71:4
**works** [2] - 66:23, 67:2

**writing** [2] - 50:10, 53:15

### Y

**year** [8] - 9:7, 9:8, 37:9, 37:10, 37:11, 58:16
**years** [11] - 6:10, 6:12, 37:10, 46:5, 46:9, 46:21, 63:11, 65:12, 73:15, 73:24, 74:1
**York** [1] - 65:23

### Z

**ZOURAS** [1] - 45:21
**ZSIGRAY** [1] - 4:3
**Zsigray** [5] - 4:10, 5:18, 14:2, 16:16, 26:7