**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself, individually, and on behalf of all others similarly situated,

      Plaintiff,

v.

JONES LANG LASALLE AMERICAS (ILLINOIS), LP,

      Defendant.

Case No. 1:18-cv-5492

Magistrate Judge Sunil R. Harjani

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR RULE 23 CLASS CERTIFICATION**

**JONES LANG LASALLE**
**AMERICAS (ILLINOIS), LP**

Philip A. Miscimarra
Scott T. Schutte
Stephanie L. Sweitzer
Kevin F. Gaffney
Heather J. Nelson
**MORGAN, LEWIS & BOCKIUS LLP**
77 West Wacker Drive, 5th Floor
Chicago, IL 60601
Tel: 312.324.1000
Fax: 312.324.1001
philip.miscimarra@morganlewis.com
scott.schutte@morganlewis.com
stephanie.sweitzer@morganlewis.com
kevin.gaffney@morganlewis.com
heather.nelson@morganlewis.com

*Attorneys for Defendant*

## TABLE OF CONTENTS

**Page**

FACTS RELEVANT TO CERTIFICATION ................................................................. 5

    1.    Building Owners, Not JLL, Dictate Whether Their Tenants Can Use Union Labor. ....................................................................................... 5

    2.    During Its Tenancy In A Class Building, Plaintiff Used Nonunion Labor Repeatedly, Sometimes With The Building Owner's Permission, And Sometimes Without It. ....................................................................... 8

        A.    Plaintiff's Lease Agreement With The Building Owner. ..................... 8

        B.    The 2014 Renovations. ............................................................... 9

        C.    The 2017 Renovations. ............................................................. 11

    3.    Plaintiff Filed Suit Under Its Self-Described "Complicated," Three-Tiered Theory Of Liability, Which Implicates A Number Of Affirmative Defenses. .................................................................................... 11

    4.    Plaintiff's Proposed Damages Model Admittedly Cannot Be Applied To Its Own Alleged Claims, Let Alone Those Of Absent Putative Class Members. ................................................................................... 13

ARGUMENT .......................................................................................... 16

I.    Plaintiff Cannot Satisfy Commonality, Typicality, Or Adequacy Under Rule 23(a). .......................................................................................... 16

    A.    Plaintiff Has Identified No Questions Common To The Class That Could Drive The Outcome Of The Litigation. ........................................... 16

    B.    Typicality Is Lacking Because The Union-Only Restrictions Do Not Arise From The Same Conduct And Fundamental Intra-Class Conflicts Exist. .......... 18

    C.    Beset By A Time-Bar And Lacking Candor, Plaintiff Would Inadequately Represent The Putative Class, Especially Current Tenants. ............................... 20

II.    Plaintiff Cannot Maintain A Class Action Under Rule 23(b)(3). ................... 22

    A.    Individual Questions Predominate And Would Overwhelm A Class Action. ........................................................................................ 22

    B.    The Large Amounts In Controversy Prove A Class Action Is Inferior Here. ...... 24

III.    A Class Action Under Rule 23(b)(2) Cannot Be Maintained Because Plaintiff Lacks Standing For Injunctive Relief And Could Only Benefit From Monetary Relief. .............................................................................................. 25

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................22

*Bldg. Owners Managers Ass'n of Chicago And Wackenhut Corp.*, 2007 WL
  4570695 (NLRB Div. of Judges Dec. 21, 2007) .......................................7

*Boelk v. AT & T Teleholdings, Inc.*,
  2013 WL 261265 (W.D. Wis. Jan. 10, 2013) ..........................................17

*Brown v. Cty. of Cook*,
  549 F. Supp. 2d 1026 (N.D. Ill. 2008) ....................................................25

*CE Design, Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) .............................................................16, 21

*Chi. Tchrs. Union, Local No. 1 v. Bd. of Educ. of Cty. of Chi.*,
  797 F.3d 426 (7th Cir. 2015) ...................................................................25

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................24

*Cty. of L.A. v. Lyons*,
  461 U.S. 95 (1983)...................................................................................25

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982).................................................................................20

*Kaplan v. Pomerantz*,
  132 F.R.D. 504 (N.D. Ill. 1990)...............................................................21

*Mace v. Van Ru Credit Corp.*,
  109 F.3d 338 (7th Cir. 1997) ...................................................................24

*Mendoza v. Home Depot, U.S.A. Inc.*,
  2010 WL 424679 (C.D. Cal. Jan. 21, 2010) ............................................24

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .............................................................16, 22

*Muro v. Target Corp.*,
  580 F.3d 485 (7th Cir. 2009) .............................................................18, 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Oetinger v. First Residential Mortg. Network, Inc.*,
2009 WL 2162963 (W.D. Ky. 2009) ........................................................................20

*Ret. Chi. Police Ass'n v. Cty. of Chi.*,
7 F.3d 584 (7th Cir. 1993) ........................................................................................20

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
782 F.3d 922 (7th Cir. 2015) ....................................................................................21

*Simic v. Cty. of Chi.*,
851 F.3d 734 (7th Cir. 2017) ....................................................................................25

*Szabo v. Bridgeport Mach., Inc.*,
249 F.3d 672 (7th Cir. 2001) ......................................................................................1

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..............................................................................2, 16, 17, 18

**STATUTES**

18 U.S.C.
§ 1951(a) ..................................................................................................................12
§ 1951(b)(2) .............................................................................................................12
§ 1962(c) ............................................................................................................ passim
§ 1962(d) ..................................................................................................................12

29 U.S.C.
§ 158(e) ..............................................................................................................12, 17
§ 186(a)(2) ...............................................................................................................12
§ 186(c)(3) .....................................................................................................12, 13, 23

**RULES**

Fed. R. Civ. P.
23.............................................................................................................................17
23(a) ................................................................................................................. passim
23(b) ................................................................................................................. passim

In its Motion for Class Certification (the "Motion"), Plaintiff Wacker Drive Executive Suites, LLC ("Plaintiff") seeks certification of a class of "**[a]ll tenants** in the class buildings who were subjected to [Defendant] **JLL's requirement** to hire union contractors **exclusively** and who incurred moving expenses and/or hired contractors to make improvements/renovation in their tenant space since August 14, 2014." Dkt. 105 at 7 (emphasis added). As detailed in Sections I-III of the Argument below, this Court should deny the Motion because Plaintiff does not meet the requirements of Rules 23(a) or 23(b)(2) or (3) of the Federal Rules of Civil Procedure.

The Motion depends on two key factual allegations. First, when it renovated its leased office space, Plaintiff was allegedly "forced to use union contractors, **exclusively**" by JLL, the manager of the building. Dkt. 105 at 5 (emphasis added). Second, JLL allegedly imposed the same "union-only requirement" on all other tenants in the Chicago Loop buildings it manages, pursuant to an illegal "conspiracy" between JLL and three labor unions. *Id.* at 4. In Plaintiff's world, these allegations have been "confirm[ed]" and provide the foundation for certification. *Id.*

In reality, however, there is no factual basis for either contention. This becomes obvious when one actually reads the inapposite citations tacked onto these claims as the purported confirmation. More to the point, the facts in the record clearly disprove both allegations, and now is the time to deconstruct the false, unsupported narrative Plaintiff continues to peddle.[1]

For one thing, the union-only requirement in Plaintiff's building was a mandate directly from the building owner, not something JLL imposed as the building manager for some external reason. The same is true in every Chicago Loop building with a similar restriction managed by JLL. The record reaffirms this dispositive fact every which way, including admissions from

---

[1] Plaintiff must offer **facts** in support of certification, not regurgitated allegations. *See Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23").

Plaintiff and its own expert. That is why, despite months of discovery from JLL and the three labor unions, Plaintiff cannot point to a shred of evidence supporting the fiction that the various union-only restrictions at issue derive from a JLL-union "conspiracy." In fact, during the class period, JLL enforced a completely opposite **nonunion**-only rule in a downtown Chicago high-rise office building at the behest of that building's owner – something JLL could not plausibly do if conspiring with unions as Plaintiff imagines.

Plaintiff's claim of being "forced to use union contractors, exclusively" is an even more audacious bluff considering that Plaintiff has freely admitted to repeated use of nonunion contractors for the renovation projects at issue. Sometimes Plaintiff did so covertly to bypass the building owner's union-only requirement; other times Plaintiff did so with the express approval of the building owner and JLL. Either way, this key allegation is undeniably false.

Once the playing field is set straight on these facts, it becomes even more apparent why Plaintiff comes nowhere close to meeting the requirements of Rules 23(a) and (b).

**Rule 23(a) Commonality.** The nagging truth is that Plaintiff has not presented **any evidence whatsoever** of the glue it thinks can bind a diffuse class of thousands of tenants across 20 different buildings with different owners and different union restrictions regarding tens of thousands of construction projects and moves: the alleged JLL-union conspiracy. Without this necessary predicate, Plaintiff's entire three-tiered RICO theory collapses. Five (of the six) "common questions" Plaintiff raises ask whether JLL violated the laws comprising its RICO theory or whether damages result. But without any evidence of the alleged conspiracy on which those violations depend, all Plaintiff has done is restate its allegations in the form of common questions. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard"). The remaining common question asks whether JLL simply enforced union-

only restrictions. But this alleged conduct is not illegal, nor could it sustain Plaintiff's RICO theory, and thus cannot drive the outcome of the litigation in any way.

**Rule 23(a) Typicality.** Plaintiff's repeated use of nonunion labor—both permissibly and impermissibly—makes whatever claims it may have atypical of the alleged class claims. So does Plaintiff's unusual right to have **any** say in which contractors worked within its leased space; most tenants did not negotiate for the same right in their own leases, meaning their building owners retained all authority to select the contractors. There is also significant conflict within the class. Tenants in Class Buildings acknowledge that even in the absence of a "union only" rule, they would nonetheless still choose union labor for varied reasons: some tenants financially benefit from the union patronage it generates; some tenants believe in the principle of union solidarity; and some tenants hold the unremarkable belief that stopping unaccredited nonunion laborers from working on projects affecting common elements in high-rise office buildings is a good way to protect their valuable leasehold investments. In short, not all tenants share Plaintiff's core belief that union and nonunion labor are fungible and differ only in price.

**Rule 23(a) Adequacy.** Plaintiff cannot adequately represent the class members who disagree with its view of the union-only restrictions. Nor can Plaintiff adequately represent current tenants: it has no stake in how Class Buildings operate going forward since it no longer has any leases in them. Moreover, 91% of Plaintiff's claimed damages are barred by RICO's four-year statute of limitations. Plaintiff will be too preoccupied with this individualized defense to adequately represent others. Finally, Plaintiff's lack of candor before this Court regarding its own claims suggests it is not up to the task of fairly representing the putative claims of absent parties.

**Rule 23(b)(3) Predominance.** Individualized issues predominate for both liability and damages determinations. As to liability, Plaintiff's undeveloped argument that class members

3

share "identical questions of liability" demonstrates a misunderstanding of the proof necessary to sustain its three-tiered RICO theory. The Court has already flagged this theory as requiring numerous context-specific inquires, which necessarily vary by building, project, and transaction.

As to damages, the threshold question is whether each class member could even have them—*i.e.*, whether it could and would have selected nonunion labor in the absence of a union-only restriction, and whether it even paid for its projects (rather than its building owner). The only way to know is to ask each class member, as both parties agree the answers vary by tenant and by project. Then, for the class members who could have damages, Plaintiff proposes a hopelessly unworkable damages methodology. It requires isolating the union labor costs (i) from nonunion labor costs, and (ii) from all other contracting costs charged to a tenant (*e.g.*, insurance, materials, profit) that are not subject to a so-called union surcharge. But Plaintiff admits it does not have this information about its own claims, and that absent class members likely do not, either. So, in reality, this process requires innumerable wild goose chases: subpoenaing **each contractor** used by **each tenant** for **each project** and hoping the contractor maintained unusually detailed labor records.

**Rule 23(b)(3) Superiority.** Plaintiff does not present a paradigmatic class action in which class members have small potential recoveries and little incentive to pursue individual litigation. To the contrary, Plaintiff claims individual damages well in excess of $135,000. This, combined with Plaintiff's inadequate representation, suggests that whichever few class members share Plaintiff's peculiar view of union labor and attendant conspiracy theory would have an interest in controlling their own individual actions. *See* Fed. R. Civ. P. 23(b)(3)(A).

**Rule 23(b)(2) Injunctive Relief.** Plaintiff no longer has any active business or leaseholds in the Chicago Loop or otherwise. It therefore does not have standing to pursue injunctive relief, and its overwhelming interest is monetary relief. This bars certification under Rule 23(b)(2).

## FACTS RELEVANT TO CERTIFICATION

**1.    Building Owners, Not JLL, Dictate Whether Their Tenants Can Use Union Labor.**

JLL is an office building manager.  Its clients are office-building owners (*i.e.*, landlords).
The whole point of JLL's business is to ensure office buildings operate in the manner their owners
see fit.  The building owner sets its rules for the building, and JLL then handles enforcement of
those rules on a day-to-day basis; that is the business model.

For each of the JLL-managed "Class Buildings" in the Chicago Loop, *see* Dkt. 105 at 4,
JLL played no role in creating the Building's rules.  Dkt. 105-3 ("Zsigray Dep.") at 33:19-34:15.[2]
That includes the various union-labor restrictions at the heart of this case: each of the Class
Building owners—not JLL—promulgated their version of that restriction.  *Id.* at 28:16-29:23.

After taking substantial discovery on this issue,[3] Plaintiff cannot seriously contend that the
union-labor rules are a requirement JLL foists on tenants for its own reasons, rather than a directive
straight from the building owners.  JLL's verified response to Plaintiff's interrogatory was
unequivocal.  *See* Dkt. 105-2 at 4 ("JLL does not maintain any rules regarding the use of union
and non-union contractors/movers," but rather "enforces any rules implemented by the building
landlords/owners").  JLL's deposed witnesses also left no ambiguity.  *See* Ex. C ("Falzone Dep.")
18:18-19:10 ("Q: And was that [union-labor] rule imposed by Jones Lang and LaSalle? A: No."),
22:23-23:11 ("These were owner rules, rules by ownership.  These were not mandated or anything
by Jones Lang LaSalle."), 25:19-26:15, 60:11-61:15 (same);[4] Zsigray Dep. 27:10-23 (nonunion
contractors are not permitted in Class Buildings because "there are rules and regulations in each

---

[2] Stephen Zsigray was JLL's Rule 30(b)(6) deponent.  *See also* Ex. A ("Zsigray Decl.") at ¶¶ 4-6 (JLL
managed 20 Class Buildings during the class period, but only 15 of them at the time of his deposition).
[3] Plaintiff served requests for production and interrogatories on JLL, deposed two JLL witnesses, and served
document subpoenas on three unions and three building owners.  *See* Ex. B ("Schutte Decl.") at ¶¶ 3-8.
[4] Frank Falzone is the chief engineer for one of the Class Buildings, 180 N. LaSalle.  *Id.* at 4:16-24.

building that are [sic] that our clients have in place that we follow" and each building's owner lease agreement contains some variation of a "labor harmony" clause).

Even Plaintiff's own expert conceded this dispositive point. See Dkt. 105-4 (Op. of J. Raisher) at 2 ("In the Chicago Central Business District submarket, it is commonplace for **landlords** to require tenants to use union contractors and vendors.") (emphasis added). Plaintiff, too, effectively conceded the point through admissions foreclosing any conclusion to the contrary. *See* Ex. D (Plf. Resp. to Def. Req. for Admission) at 5 (the union-only rule in Plaintiff's building predated JLL's management of the building); Dkt. 105-7 ("A. Grossman Dep.") at 142:22-143:14 (the union-only rule derives from Plaintiff's lease with its building's owner, entered into before JLL managed he building).[5] So did Amy and Larry Grossman, the two individual owners of Plaintiff. *See id.* at 17:10-19, 39:15-41:5, 66:5-17; Dkt. 105-5 ("L. Grossman Dep.") at 39:11-40:16, 46:24-47:21.

Moreover, not every building JLL managed in downtown Chicago had a union-only rule. The owner of the Tribune Tower, which is located a mere half-block outside of Plaintiff's "Chicago Loop" definition, imposed a **nonunion**-only rule, which JLL enforced as the building manager during the class period. *See* Zsigray Decl. at ¶ 7. Plaintiff cannot explain why the alleged conspiracy would extend only to high-rises south of the Chicago River, *see* Dkt. 76 (Am. Compl.) ¶¶ 8-9, 14, and not to high-rises immediately north of it. Nor would that make sense.

Despite all of this, Plaintiff continues to insist the various union-only restrictions stem from a "conspiracy . . . between **management companies** of Chicago Loop buildings and labor unions." Dkt. 105 at 4-5 (emphasis added). Plaintiff argues "the National Labor Relations Board has already found" this in one case and "[d]iscovery in this case confirms" it. *Id.*

---

[5] Plaintiff designated Amy Grossman as its Rule 30(b)(6) deponent.

Not so. Indeed, it is difficult to understand why Plaintiff thinks *Bldg. Owners Managers Ass'n of Chicago And Wackenhut Corp.*, 2007 WL 4570695 (NLRB Div. of Judges Dec. 21, 2007) helps its cause. That opinion offers no finding of a conspiracy between management companies and labor unions in the Chicago Loop. It does not even contain the word "conspiracy." *See id.* Rather, the limited issue was whether a clause in one collective bargaining agreement requiring non-signatory subcontractors to meet certain compensation standards was, in effect, a hot cargo agreement. *Id.* at *1. Moreover, what Plaintiff mischaracterizes as the NLRB's "finding" about union labor requirements in the Chicago Loop is really just the Court's restatement of one witness's testimony on the subject. *Id.* at *6. Even worse, Plaintiff bowdlerized the witness's confirmation that the union labor requirement in that case came from the building's **owner**, not the building **manager**. *See id.* at *1, n.6 (immediately after the testimony Plaintiff block quotes, the witness, Richard Marcus, continues: "'I know [about the union requirement] because when I moved into a building, I tried to have some carpeting installed, and they would not let them in the building because they were non-union.' Marcus testified this incident had nothing to do with [Respondent], rather **the building owner as a matter of policy** would only allow people who were union contractors to work in the building.") (emphasis added).

The discovery Plaintiff thinks confirms its conspiracy theory is deposition testimony from Mr. Zsigray describing the various ways the union-only rules in Class Buildings are enforced. *See* Dkt. 105 at 5.[6] Nothing in this testimony suggests that the union-only restrictions arise from a

---

[6] Through imprecise "*id.*" citations of 13 transcript pages, Plaintiff misleadingly suggests Mr. Zsigray testified JLL enforces the union-only rules the same way everywhere. *Id.* Instead, he testified "every building setup is unique" and enforcement "varies by property." Zsigray Dep. 26:9-13, 41:13-23; *see also id.* 38:8-39:11 (there is "no consistent policy" for removing nonunion contractors, and not all buildings do so); *compare also* Falzone Dep. 15:9-18 ("Q. Does that mean that the building engineers [at one Class Building] try and prevent nonunion contractors from coming into their buildings? A. No.") (objection omitted) *with* Dkt. 105 at 5 (Plaintiff arguing "engineers and security guards will prevent [nonunion] contractors from entering the building" in all Class Buildings).

conspiracy between JLL and unions. Instead, it is entirely consistent with the fact that JLL enforced the building owners' union-only restrictions—something Mr. Zsigray repeatedly confirmed.[7] *See supra* at 5-6.

In sum, Plaintiff offers no evidence whatsoever that the union-only rules stem from some JLL-union conspiracy. Rather, the factual record before the Court disproves that core allegation.

2. **During Its Tenancy In A Class Building, Plaintiff Used Nonunion Labor Repeatedly, Sometimes With The Building Owner's Permission, And Sometimes Without It.**

A. **Plaintiff's Lease Agreement With The Building Owner.**

On April 30, 2005, Plaintiff executed an agreement with the owner of 125 S. Wacker Drive to lease the third floor of that Class Building. *See* Dkt. 34-1. At the time, Plaintiff was aware that that owner of the building imposed a union-only restriction, but still signed the lease without attempting to negotiate around that restriction. A. Grossman Dep. 44:11-17; L. Grossman Dep. 43:5-21, 44:22-45:24. JLL did not serve as the building manager for 125 S. Wacker until seven years later, in December 2012. Dkt. 80 (Answer) ¶ 18.

On September 19, 2013, Plaintiff executed an amendment to its lease. *See* Dkt. 34-2. At this time, Plaintiff and the building owner negotiated an exception to the building owner's union-only restriction: Plaintiff, a nonunion entity, could act as its own general contractor for any renovation project for the leased space. *See* Dkt. 34-2 at 3 (¶ 6); A. Grossman Dep. 44:23-45:19, 46:18-47:20,142:22-143:19; *see also* Zsigray Dep. 17:20-19:20 (this was "very uncommon"). As the general contractor, Plaintiff could solicit and select the subcontractors to perform its renovation work (subject to the building owner's rules), something a majority of tenants in JLL-managed Chicago Loop buildings had no ability to do under the terms of their leases. *See* Zsigray Decl. ¶ 8.

---

[7] Ms. Grossman testified the union-only rule was enforced in the same manner throughout Plaintiff's tenancy at 125 S. Wacker, which started before JLL managed the building. A. Grossman Dep. 56:6-16.

Plaintiff also negotiated for "tenant improvement allowances," or TIAs. A. Grossman Dep. 47:21-48:2; Dkt. 34-2 ¶ 7 (a $355,520 "First Installment" TIA after 2013 and a $266,640 "Second Installment" TIA after 2017). TIAs are funds a building owner gives to a tenant for renovation to leased space in the owner's building. *Id.* 48:3-22. Plaintiff speculates its TIAs were effectively its own funds, recouped by the building owner through rent paid over time. Dkt. 105 at 5-6. But Plaintiff offers no direct evidence showing its own TIAs were repaid in this way. *Id.*[8] Indeed, both parties' experts agree that not all TIAs are recouped by building owners; some TIAs, or some percentage of them, are just a building owner's lost spend. *See* Hosfield Op. at 21-22 (JLL's expert collecting sources showing TIA costs exceeding rents); Ex. F ("Dep. of J. Raisher") at 94:3-16 (Plaintiff's expert agreeing that not all rents reabsorb TIA dollars and conceding he offers no methodology for determining how much of a TIA may be reabsorbed). And both experts agree this varies according to each individual tenant's lease negotiation. Dep. of J. Raisher 93:13-94:1 (TIA "transactions are negotiated on a deal-by-deal basis"); Hosfield Op. at 21-22 (same).

**B.    The 2014 Renovations.**

In early 2014, Plaintiff undertook a "very large renovation" project, encompassing ceiling demolition and replacement, lighting fixture installation, tile and carpet installation, kitchen remodeling, and cabling installation. A. Grossman Dep. 59:6-13; *see also id.* 99:6-14 (a "facelift" to the leased space). Rather than act as its own nonunion general contractor (as its lease amendment permitted), Plaintiff hired Schaumburg Executive Suites, LLC ("SES"), a nonunion entity, as the general contractor. *Id.* 60:8-12, 26:13-19. SES is 100% owned by Larry Grossman, who also owns 75% of Plaintiff. *Id.* 17:10-19, 57:6-58:17, 62:23-63:14.

---

[8] Plaintiff and its expert James Raisher call this "amortizing" the TIAs. Dkt. 105 at 5; Dkt. 105-4. They appear to have misunderstood the accounting concept of amortization. *See* Ex. E ("Hosfield Op.") at 22.

Notwithstanding SES's nonunion status, JLL approved SES as Plaintiff's general contractor. *Id*. 60:13-17, 61:17-62:1. In that role, SES allocated the 2014 renovation work among three groups of contractors. First, SES performed some of the work itself.[9] *See id*. 57:6-12 (oversight, material selection, architecture work); L. Grossman Dep. 64:24-65:2 (cleanup); *see also* A. Grossman Dep. 79:5-10; Ex. G (Sept. 5, 2014 invoice from SES, with charges for "Cleanup," "Supervision," "Fee," among others). Second, SES hired Ostrander Construction to be its union "sub-general contractor." A. Grossman Dep. 124:11-15.[10] Ostrander performed some of the renovation work itself, but also hired other union subcontractors to handle some of the work. *See* Ex. H (Plf. Supp. Resp. to Def. Rog. No. 4) at 5 (identifying seven union contractors for carpentry, demolition, flooring, ceiling, painting, HVAC, electrical, and general contracting). Third, SES hired **nonunion** subcontractors to perform some of the work. A. Grossman Dep. 80:1-81:1 (painting), 84:4-85:12, 95:10-15 (furniture moving necessary for construction to occur).

Plaintiff "snuck in" the nonunion subcontractors to get around the building owner's union-only restriction. *Id*. 82:7-15, 86:4-14. Plaintiff coordinated this scheme with the union contractors SES hired. Ex. I ("A. Grossman Dep. Vol. 2") 214:23-215:9; Ex. J (Dec. 9, 2013 email from Ms. Grossman to a nonunion contractor, recognizing that Plaintiff had to use Ostrander for "building reasons," but offering that Ostrander "will find a way to get you in the building").[11]

By no later than August 12, 2014, all of the work performed by the union contractors was complete. *See* Ex. H at 5 (identifying $232,104 in union contracting costs); Ex. K (Aug. 12, 2014

---

[9] Plaintiff initially argued JLL approved SES as the general contractor "in an oversight capacity" only, and did not approve SES to perform any actual work. A. Grossman Dep. 64:1-19. Plaintiff later backtracked, recognizing JLL paid SES for the work SES invoiced as its own—both in 2014 and 2017—something JLL would not have done once, let alone twice, had it not approved SES to perform that work. *Id*. 134:10-15.
[10] Plaintiff testified JLL "presented" Ostrander to SES for hire. *Id*. 135:10-24. Plaintiff further testified JLL "oversaw construction" and "interacted with [Plaintiff's] subcontractors." *Id*. 92:12-21.
[11] *Compare id. with* Dkt. 76 ¶ 15, 56 (alleging union workers try to "remove[]" nonunion workers).

Ostrander invoice for "100%" of the "Work Completed," totaling $232,104 and Final Waivers of Lien for Ostrander and the subcontractors it hired). To pay the contractors, JLL authorized the payment of the First Installment TIA funds. L. Grossman Dep. 83:16-84:7.[12]

### C. The 2017 Renovations.

Plaintiff undertook another renovation project in 2017, involving "the same types of things" as the 2014 renovations. A. Grossman Dep. 99:6-14 (wall demolition, wall construction, office reconfiguration). Just as with the 2014 renovation, (i) Plaintiff hired SES as its general contractor; (ii) SES performed some work itself; (iii) SES hired **union** contractors for some work; (iv) SES hired **nonunion** contractors for some work; and (v) the expenses were ultimately paid from the TIA. *Id.* 101:10-18, 103:23-108:18; Ex. L (Aug. 4, 2017 letter enclosing invoices).[13]

Later that year, another company purchased Plaintiff's assets and assumed its lease. L. Grossman Dep. 54:15-24. Currently, Plaintiff does not have any active business or leases. *Id.* 18:4-20; A. Grossman Dep. 139:18-20 (not even "considering doing business in the Loop").

### 3. Plaintiff Filed Suit Under Its Self-Described "Complicated," Three-Tiered Theory Of Liability, Which Implicates A Number Of Affirmative Defenses.

On August 13, 2018—over four years after the union contractors completed and invoiced their work for Plaintiff's 2014 renovation—Plaintiff filed its Complaint against JLL. *See* Dkt. 1.[14] Plaintiff's two alleged causes of action arise under RICO, 18 U.S.C. § 1962(c) (prohibiting a pattern of racketeering) and (d) (prohibiting a conspiracy to violate § 1962(c)). *See* Dkt. 55 ("MTD

---

[12] The 2014 renovation costs exceeded the First TIA by $15,696.08, so Plaintiff "carried over" this excess amount to its Second TIA, paid in 2017. A. Grossman Dep. 101:10-102:9; Ex. L (Aug. 4, 2017 letter enclosing invoices and receipts) at JLL000003531-3533 (July 28, 2014 Rex Electric invoice for $5,704) and JLL00003537 (Connor Electrical invoice for "job complete[d] 7/21/14" for $1,895); *see also* Ex. H at 5-6 (identifying both of these 2014 invoices as part of the 2017 TIA damages claim).

[13] As with the 2014 renovation, JLL "introduced" to SES certain union contractors SES ultimately hired. A. Grossman Dep. 111:12-22; *see also id.* 111:5-11 (JLL's role in 2017 was "basically the same as the 2014 renovation. They approved the job, filled out forms, managed the vendors coming in and out of the building. The building engineers came to our floor to supervise various probably other things.").

[14] *See also* Dkt. 76 (Am. Compl.), Dkt. 102 (dismissing new claims asserted in Am. Compl.).

Opinion") at 3. To prove liability under § 1962(c), Plaintiff must demonstrate (i) JLL conducted the affairs (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *Id.* at 5.[15]

Plaintiff alleges JLL committed two predicate racketeering activities. The first is extortion, prohibited by the Hobbs Act, 18 U.S.C. § 1951(a); *see also* 18 U.S.C. § 1951(b)(2) (requiring proof that JLL (i) obtained the property of another, (ii) induced by wrongful use (iii) of actual or threatened force, violence, or fear). The second is bribery, prohibited by the Labor Management Relations Act (Taft-Harley Act), 29 U.S.C. § 186(a)(2) (requiring proof that JLL (i) paid, lent, or delivered any money or other thing of value (ii) to any labor organization representing JLL employees). Both of these alleged predicate acts depend on Plaintiff proving in the first instance that JLL violated the "hot cargo" provision of the National Labor Relations Act, 29 U.S.C. § 158(e) (requiring proof JLL (i) entered into an agreement with a labor organization (ii) whereby JLL agreed to cease doing business with any other person); *see also* MTD Opinion at 10, 21-29.[16]

Although Plaintiff's Motion never mentions it, this Court's thorough, 33-page analysis of JLL's original motion to dismiss provides a roadmap for the numerous liability determinations here. *See* MTD Opinion. It further recognizes a number of pertinent affirmative defenses, which are also never mentioned in Plaintiff's Motion.[17] This Court also explained in great detail how these liability questions are context-specific "fact-based inquiries."[18]

---

[15] Plaintiff's derivative claim under 18 U.S.C. § 1962(d) requires a similar showing: (i) JLL agreed to participate or maintain an interest in the operation (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity, and (v) JLL agreed that a person would commit at least two predicate acts. *Id.*

[16] Plaintiff has argued the alleged bribery predicate act is "free-standing" and "does not depend on a finding" of an illegal hot cargo agreement. Dkt. 39 at 1, 11. Not so. *See* Dkt. 76 ¶¶ 1, 13, 38-40 (providing no separate basis for bribery beyond the purported hot cargo agreement); *see also* MTD Opinion at 29 (discussing the bribery claim: "the Complaint alleges that the wages from [Plaintiff] to the union contractors were not in the regular course because they were purportedly the result of an illegal hot cargo agreement").

[17] *See, e.g., id.* 14-21 (no hot cargo liability under the "construction industry proviso"), 16, n.7 (same for a "lawful work preservation agreement"), 29 (no bribery liability if the thing of value is sold "at the prevailing market price in the regular course of business" under 29 U.S.C. § 186(c)(3)).

[18] *Id.* at 5; *see also, e.g., id.* at 11 (whether an alleged hot cargo agreement was voluntary or the result of pressure or coercion depends on a "holistic inquiry into all surrounding circumstances") (citations omitted),

4.     **Plaintiff's Proposed Damages Model Admittedly Cannot Be Applied To Its Own Alleged Claims, Let Alone Those Of Absent Putative Class Members.**

Plaintiff believes its damages to be "the increased costs for union labor" it paid, as compared to the costs of nonunion labor it believes it would have paid if not for the building owner's union-only restriction. Dkt. 105 at 6; *see also* Dkt. 76 ¶¶ 29, 59. Plaintiff asserts its expert, Dr. Robert Kaestner, has a methodology for determining the difference between union and nonunion costs tenants could have paid.[19]

The first stage of his methodology purports to approximate what the cost of the nonunion labor could have been for one component of a tenant's construction or moving work. This first stage consists of (i) isolating the cost of the union labor actually incurred, (ii) identifying the "occupational category" under which the labor qualifies (*e.g.*, electrician), and (iii) dividing the cost of the union labor by Dr. Kaestner's estimated "union wage premium" for the occupational category. *See* Dkt. 105, Ex. A at 9; Ex. M ("Kaestner Dep.") at 160:1-7. The second stage of his methodology then purports to calculate the damages by subtracting the approximated cost of nonunion labor from the actual incurred cost of union labor. Dkt. 105, Ex. A at 9. This process needs to be repeated for each labor component (*e.g.*, plumber, mason) for each project. *Id.* Plaintiff claims this "methodology can be easily applied to all class members who used movers or contractors, or both." Dkt. 105 at 6. But there are at least two problems with this claim.

*First*, by claiming this methodology can be applied "to all class members," Plaintiff makes the critical, but unsupported assumptions that all putative class members (i) could and (ii) would have chosen nonunion labor in the absence of their building owners' union-only restrictions. But

---

18-19 (the construction industry proviso depends on the "actual degree of control" JLL exercised over each jobsite and whether each jobsite qualifies as a "construction site"), 29 (the § 186(c)(3) bribery exception turns on "factual questions" about the "market price" and "regular course of business" for each transaction).

[19] Concurrent with the filing of this brief, JLL is filing a motion to exclude Dr. Kaestner's proposed expert testimony for the reasons detailed therein.

unlike Plaintiff, most putative class members had no say at all in the contractors who performed renovation work in their leased spaces. *See* Zsigray Decl. ¶ 8. So regardless of any union-only rules, they **could not have** chosen nonunion contractors, even if that was their preference.

And Plaintiff admits assuming such a preference is speculative anyway. *See* A. Grossman Dep. 30:2-23 (no knowledge of class members expressing this); L. Grossman Dep. 27:8-22, 89:14-90:4 (same). Plaintiff believes that nonunion labor is always cheaper, but even if that is true,[20] that does not make it the dispositive factor. *See* A. Grossman Dep. 32:2-13 (admitting that some tenants might prefer union labor, even if more expensive). In fact, the Grossmans do not categorically hire nonunion workers when given the choice. *See* Ex. N (Plf. Resp. to Def. Interrogatories) at 6-7 (will hire union workers with whom they have a "positive relationship"); *see also* A. Grossman Dep. 34:13-21; L. Grossman Dep. 33:15-22 (price is just one factor they consider, among referrals, abilities, track record, availability, and communication); Hosfield Op. at 15-16 (explaining why contracting work does not necessarily go "to the lowest bidder").

Indeed, multiple putative class members have confirmed they would not have chosen nonunion labor even if given the opportunity. *See* Ex. O ("ABM Decl.") ¶¶ 5-6, 10-12; Ex. P ("Ullico Decl.") ¶¶ 5-6, 10-13; Ex. Q ("Cozen O'Connor Decl.") ¶¶ 5-6, 10-11. They prefer union labor for a variety of reasons. *See* ABM Decl. ¶¶ 9-10 (it employs union workers in a Class Building and elsewhere) ¶ 13 (union workers are better skilled, better trained, and more reliable); Ullico Decl. ¶ 14 (union labor yields superior work and is more cost-effective), ¶ 15 (union labor better protects its leasehold investment), ¶ 16 (it invests in construction loans for projects

---

[20] Plaintiff does not know if this is true. It claims it was not permitted to use the "less expensive" nonunion contractors "it wanted to use," *see* Dkt. 76 ¶¶ 22, 26, but never actually solicited cost proposals from them or presented them to JLL for approval. *See* A. Grossman Dep. 70:3-19, 100:6-23, 113:24-114:13; L. Grossman Dep. 73:1-24, 86:8-16, 87:16-88:1. Even worse, Mr. Grossman cannot say his nonunion contracting company, SES, charged labor rates cheaper than union labor rates. L. Grossman Dep. 69:14-71:2 ("Maybe at some times I billed in the past in my life more than what a union rate might be. So what?").

performed by union labor); Cozen O'Connor Decl. ¶ 10 (using union labor in Chicago is "customary"), ¶ 9 (it has a client relationship with a union contractor).

**Second**, Dr. Kaestner's methodology cannot be "easily applied" to the entire putative class. His methodology requires isolation of the "labor component" of a tenant's union contracting costs. *See* Kaestner Dep. 159:19-160:7. In other words, it cannot be applied to the bottom-line amount a tenant pays to a union contractor because that figure includes non-labor costs such as materials, insurance, and the contractor's profit. *Id.* 158:18-160:16.[21] In theory, this sounds straightforward enough. But in practice, the methodology is unusable: tenants only have the bottom-line amounts they pay to contractors, not the isolated union labor costs Dr. Kaestner requires.

Plaintiff provides a perfect illustration. JLL has tried many times to get the basis for its damages claim—*i.e.*, the amounts it paid for (i) union (ii) labor, specifically. *See* Schutte Decl. ¶¶ 9-20 (detailing JLL's efforts). Each time, Plaintiff provided a different answer. *Id.* Ultimately, during a second deposition, Plaintiff conceded it cannot provide an accurate answer. For one thing, Plaintiff's records are not specific enough: they set forth only the bottom-line costs, which bundle together labor costs with **non-labor costs** like materials, insurance, and profit. *Compare* Ex. H at 4-6 (identifying the invoices allegedly setting forth Plaintiff's union labor costs and stating the corresponding damages "will be determined by applying the methodology provided by Dr. Robert Kaestner") *with* A. Grossman Dep. Vol. 2 164:23-165:110, 167:9-17, 169:18-23, 182:3-23, 186:7-17, 198:7-208:5, 238:2-241:11 (confirming these invoices and other supporting documents include undetermined amounts of materials, insurance, and profit). For another, Plaintiff's records may be over-inclusive, by combining union and **nonunion** labor costs together. A. Grossman Dep. 105:23-108:18; *see also* 99:23-100:5 (the union and nonunion work was "jumbled together").

---

[21] *Cf.* A. Grossman Dep. 146:5-14 (contractors "are not in the business to do things for free"), 146:15-147:7 (a 33% profit on the cost of labor represents only a "small markup" and is entirely appropriate).

This explains why Dr. Kaestner did not try to apply his methodology to Plaintiff's claims and estimate Plaintiff's alleged damages. *See* Kaestner Dep. 46:4-8.[22]  Nor could Dr. Kaestner do so for the rest of the class.  Plaintiff admits "it's not typical" for tenants to have contracting records more useful than the over-inclusive and unspecific bottom-line records Plaintiff has.  A. Grossman Dep. Vol. 2 167:21-169:16; 170:17-171:5 (they would not have "detailed breakdowns" distinguishing labor from materials and profit).  Plaintiff further recognizes that to distinguish whether union or nonunion workers performed the labor baked into any tenant's bottom-line records, one would have to ask each of the contractors involved to see if they even kept records that detailed.  A. Grossman Dep. 141:14-21, 82:16-83:8; *see also* Hosfield Op. at 16-19 (detailing the impracticalities of using Dr. Kaestner's methodology); A. Grossman Dep. 118:14-23 (after line-by-line review of the invoices for Plaintiff's projects, Plaintiff admitted "[i]t's probably hard to recreate [these projects] after the fact so many years later . . . .  It's not typical we do that.").

## ARGUMENT[23]

### I.    Plaintiff Cannot Satisfy Commonality, Typicality, Or Adequacy Under Rule 23(a).

#### A.    Plaintiff Has Identified No Questions Common To The Class That Could Drive The Outcome Of The Litigation.

The commonality prerequisite demands that Plaintiff provide sufficient evidence demonstrating "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

---

[22] Plaintiff may argue that union labor costs should be estimated since they cannot be directly known.  But neither Dr. Kaestner nor any other expert provides an opinion on how one could even go about such a speculative estimate, let alone reliably.  *See id.* 166:12-19, 173:1-6; *see also* A. Grossman Dep. 210:20-212:21 (Plaintiff is unable to provide such an estimate with any accuracy).

[23] "A class 'may only be certified if the trial court is satisfied, *after a rigorous analysis*,'" that the prerequisites of Rule 23(a) and one of the requirements of Rule 23(b) have been met. *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011).  Plaintiff bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  "Frequently, [the court's] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 564 U.S. at 351 (citations and punctuation omitted).

"That language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349. More precisely, the commonality analysis turns on whether the plaintiff identifies a "common contention" on which its "claims must depend," and whether that common contention "of such a nature that it is capable of classwide resolution—[meaning] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

The six "common questions" Plaintiff identifies fail this standard. The first asks whether JLL simply enforced the union-only restrictions at Class Buildings. Dkt. 105 at 9. But the answer to this question will not "drive the resolution of this litigation," *Wal-Mart*, 564 U.S. at 350, because that conduct, by itself, is not illegal. *See* 29 U.S.C. § 158(e) (prohibiting only **agreements between employers and unions** to cease doing business with other persons); *supra* at 11-12 (Plaintiff's entire RICO theory depends on a predicate violation of 29 U.S.C. § 158(e)).[24]

Under any clear-eyed reading of the complaint, the common contention on which the claims actually "depend" is that JLL imposed all of the separate union-only restrictions in Class Buildings pursuant to an illegal hot cargo agreement with the three unions. *Supra* at 11-12. This is the second common question Plaintiff identifies. Dkt. 105 at 9. But Plaintiff identifies **no evidence whatsoever** that this contention could be common to the class. *Supra* at 5-8. Absent some evidence, therefore, Plaintiff is asking this Court to find commonality based on its allegations alone. *Cf. Wal-Mart*, 564 U.S. at 350 (Rule 23 is not a "mere pleading standard"). And the remaining four common questions Plaintiff identifies are nothing more than a formulaic recitation of the causes of action or damages that Plaintiff believes constitute the RICO theory stemming

---

[24] *Cf. Boelk v. AT & T Teleholdings, Inc.*, 2013 WL 261265, at *8-9 (W.D. Wis. Jan. 10, 2013) (whether employer placed restrictions on employees' activities during a meal break is not a common question capable of driving the litigation because such restrictions, "by themselves," were not illegal).

17

from the wholly unsupported contention of a conspiracy. Dkt. 105 at 9. Thus, those questions fail the Rule 23(a)(2) standard for the same reason. In sum, Plaintiff offers **zero evidence** of "some glue holding the alleged reasons for all those [union-only] decisions together, [so] it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question." *Wal-Mart*, 564 U.S. at 352.

> **B.      Typicality Is Lacking Because The Union-Only Restrictions Do Not Arise From The Same Conduct And Fundamental Intra-Class Conflicts Exist.**

Under Rule 23(a)(3), Plaintiff must provide evidence that its individual claims are typical, meaning that they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [are] based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). Here, Plaintiff makes two conclusory arguments, with little in the way of development: (i) its claims "arise from the same course of conduct by JLL—enforcing the union requirement," and (2) "has no interests that conflict with any potential class members." Dkt. 105 at 10. Both arguments are wrong.

On the first point, as already established, Plaintiff's claims **do not** arise from mere enforcement of the building owners' union-only requirements. *Supra* at 17. They arise from and entirely depend on the allegation that the union-only requirements are a byproduct of an illegal hot cargo agreement between an employer and a union. *Id.* But because the indisputable reality is that those requirements come from each individual building owner, *supra* at 5-8, then at the very most, Plaintiff's claims **could be** typical of only those tenants residing in its same building (and even then, Plaintiff necessarily would have filed suit against the wrong party).

Moreover, Plaintiff does not satisfy this prong by identifying "the broadest way" in which its claims are typical. *Muro*, 580 F.3d at 492. Where, as here, the representative plaintiff's claim "involve facts that distinguish [its] claim from the claims of [its] fellow class members," the court

cannot draw the necessary conclusion that the individual and class claims share "the same essential characteristics." *Id.* This is where Plaintiff's repeated exceptions to the union-only restriction in its building come into play and distinguish its own claims from the claims it thinks putative class members have. *Supra* at 8-11. For example, the "economic fear" Plaintiff thinks satisfies the third element of its extortion predicate act, *see supra* at 12, is the "fear of lost income that will result if [tenants] cannot get their office spaces worked on by tradesmen," unless they use union laborers. Dkt. ¶ 34. But if Plaintiff negotiated an individualized exception to this requirement and further "snuck in" nonunion laborers whenever it wanted, how could its "economic fear" be anything like the rest of the class members who negotiated no such exception and played by the rules? And how could there even be a conspiracy between **JLL and unions** to impose the union-only restrictions classwide if all Plaintiff had to do to get around it was ask its **building owner** for an exception?

On the second point, Plaintiff does not explain its "no conflict" argument, which is reason enough to reject it. Still, it must stem from Plaintiff's belief that all class members have been injured like Plaintiff thinks it was injured: denial of access to allegedly cheaper nonunion labor that would have been selected in the absence of the union-only restriction. *Supra* at 13-14; *see also* Dkt. 105 at 10 (arguing Plaintiff "and the class seek to end [this] practice"). This is not true.

Some tenants employ or provide service to union laborers or entities, and therefore directly or indirectly benefit from the union-only rules. *Supra* at 14-15. Some tenants prefer union labor as a matter of principle and are happy to pay higher rates for what they consider to be superior tradesmanship.[25] *Id*. Some tenants believe that maintaining the union-only rules in their building protects them from injury, not causes them injury. *Id*. The restrictions stop certain tenants who

---

[25] This is one reason why Plaintiff's repeated citations to antitrust caselaw fall flat. Union labor and nonunion labor are not fungible—or at least parties can reasonably hold different views on that. The antitrust cases Plaintiff cites concern alleged market manipulations causing inflation of the price of **the same good or service.** *See* Dkt. 105 at 3-4, and cases cited therein. This is not an antitrust case.

are motivated only by short-term savings to use unaccredited (and potentially uninsured or underinsured) nonunion workers to work on the building's shared elements.[26] Such work threatens other tenants' long-term investments in their leaseholds, which dwarf the value of whatever marginal savings might be achieved through cheaper labor.[27]  *Id.*  Finally, some tenants never negotiated for any power to select contractors for work in their leased space, *see supra* at 13-14, and thus could not have selected nonunion labor even if the union-only rules did not exist.[28]

The Supreme Court has "repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotations and citations omitted).  Plaintiff neither possesses the same interest nor suffered the same alleged injury as the rest of the class, and thus cannot satisfy typicality.

### C. Beset By A Time-Bar And Lacking Candor, Plaintiff Would Inadequately Represent The Putative Class, Especially Current Tenants.

The adequacy prerequisite under Rule 23(a)(4), in part, turns on whether Plaintiff can "protect[] the different, separate, and distinct interest of the class members."  *Ret. Chi. Police Ass'n v. Cty. of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993) ("a class is not fairly and adequately represented if class members have antagonistic or conflicting claims") (citations omitted).  As explained above, *supra* at 19-20, Plaintiff cannot do so.  Additionally, Plaintiff, no longer a tenant anywhere, cannot adequately represent current tenants who are far more invested in the maintenance of Class Buildings than Plaintiff could be.  *Cf. Oetinger v. First Residential Mortg. Network, Inc.*, 2009

---

[26] *E.g.*, the third-floor ceilings demolished during Plaintiff's renovations connect to the floors above.  *Supra* at 9-11.

[27] *Compare* Dkt. 76 ¶ 59 (alleging that using union labor cost Plaintiff roughly $46,000) *with* Dkts. 34-1 at 2, 34-2 at 2 (showing that Plaintiff agreed to pay well over $7 million in rent over the course of its lease).

[28] It makes sense that the building owner would retain authority over selection of contractors in most cases. After all, the building will remain the owner's asset long after any one tenant's lease expires.

WL 2162963, at *5 (W.D. Ky. 2009) ("The Plaintiffs, who have no stake in the ongoing practices of [the defendant], do not adequately represent current employees").

Besides these intra-class conflicts, Plaintiff has another adequacy problem: it is barred from recovering anything for the 2014 renovations. *Supra* at 10-11 (Plaintiff was invoiced for "100%" of that "completed" work more than four years prior to the date it filed the original complaint); *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 930 (7th Cir. 2015) (four-year limitations period for civil RICO claims begin to run when a plaintiff discovers its injury). 91% of Plaintiff's claimed damages stem from the 2014 renovations. *See* Ex. H at 4-6. Plaintiff will be preoccupied by this time-bar to the vast majority of its potential individual recovery. *See CE Design*, 637 F.3d at 726 ("The presence of even an arguable defense peculiar to the named plaintiff . . . may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.").

Finally, these adequacy issues are compounded by Plaintiff's unmistakable lack of candor before this Court on issues central to its claims. *See Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) ("A plaintiff's honesty and integrity are important considerations in allowing him to represent a class. In this case, plaintiff's statements go beyond minor inconsistencies.") (citations omitted). It was bad enough that Plaintiff filed this lawsuit—and staved off dismissal— using allegations that discovery quickly proved to be greatly exaggerated, if not outright false. *See, e.g., supra* at 15-16, fn. 6, 11, 20. But Plaintiff further moved for certification on the basis of two key allegations **it knew** to be untrue. *See supra* at 1-2, 5-11. Plaintiff also attempted to mislead this Court by truncating an NLRB opinion to hide that it contradicts, rather than supports, its conspiracy theory. *Supra* at 7. These are not the actions of a plaintiff who can adequately represent "thousands" of class members. Dkt. 76 ¶ 44.

## II. **Plaintiff Cannot Maintain A Class Action Under Rule 23(b)(3).**

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Neither requirement is met here.

### A. **Individual Questions Predominate And Would Overwhelm A Class Action.**

"While similar to Rule 23(a)'s requirements for typicality and commonality, 'the predominance criterion is far more demanding.'" *Messner*, 669 F.3d at 814 (citing *Amchen*, 521 U.S. at 623-24). Under *Amchen*, this Court has a duty to take a "close look" at whether the far more demanding predominance prong it met. 521 U.S. at 615. Ignoring these standards, Plaintiff's perfunctory predominance argument amounts to little more than (i) a reference to its common questions (which are themselves flawed, *see supra* at 16-18), (ii) pointing out that Dr. Kaestner proposes a methodology for damages (which is also flawed, *see infra*), and (iii) analogizing this case to "antitrust cases where predominance can be found" (even though this is not an antitrust case and lacks the hallmarks of one, *see supra* at fn. 25). *See* Dkt. 105 at 13-14.

Remarkably, Plaintiff goes so far as to declare the alleged claims of putative class members raise "*identical questions of liability*." *Id.* at 15 (emphasis in original). Plaintiff does not bother to explain how this could be so—and indeed, one could only reach that conclusion by ignoring both the fact record and the Court's prior roadmap of the highly individualized liability issues that must be determined under the framework of Plaintiff's RICO theory. *See supra* at 12. Some of those individualized liability inquiries include the following:

- Whether an agreement with unions to impose the union-only restrictions was voluntary or the result of pressure or coercion. *See* MTD Opinion at 11. This "holistic" inquiry must be

conducted on a **building-by-building** basis since each building owner for the 20 Class Buildings imposed their own union-only restriction. *See supra* at 5.

- Whether an agreement with unions to impose the union-only restrictions was a lawful work preservation agreement. *See* MTD Opinion at 16, n.7. This, too, is necessarily a **building-by-building** inquiry.

- Whether the construction industry proviso exempts the renovation or moving work at issue,[29] which turns on **project-by-project** inquiries into:
  o The "actual degree of control" JLL exercised over the labor relations at each jobsite;[30] and
  o Whether each jobsite constituted a "construction site" because the work involved "building or affixing to the land." *Id.* at 16-21; *see also supra* at 9-11 (detailing evidence supporting application of the proviso to Plaintiff's claims).

- Whether the § 186(c)(3) exception to bribery applies, which turns on **transaction-by-transaction** inquiries into whether each transaction:
  o Reflected the "prevailing market price";
  o Occurred in the "regular course of business." MTD Opinion at 29.

- Whether JLL "conducted the affairs" of the RICO enterprise, which is a **building-by-building** inquiry since each building has its own union-only restriction and JLL did not enforce those restrictions or interact with union personnel uniformly. *See supra* at 7 and fn. 6.

Individualized damages inquiries also predominate—but not because "the amount of damages will vary" for each class member (although that is true). Dkt. 105 at 14. Even assuming liability could be proven on a classwide basis (and it cannot), the Court would next need to know whether **every single one of the allegedly "thousands" of tenant class members**, Dkt. 76 ¶ 44, would have—or even could have—selected nonunion contractors for their renovation or moving projects in the absence of their building owners' union-only restrictions. *See supra* at 13-15. Only those tenants that answer those questions affirmatively would theoretically qualify for damages. And if those tenants, like Plaintiff, used TIAs for their projects, the Court would need to know whether and to what extent those funds represent the tenant's or the building owner's money (*i.e.*,

---

[29] Depending on the circumstances, moving work may fall under the construction industry proviso. *See supra* at 10 (Plaintiff testified that certain moving work was directly related to construction work).
[30] The Court already concluded that this issue cannot be answered by reference to building-wide rules providing JLL formal control over jobsite relations. *See* MTD Opinion at 18.

not recoverable by the tenant).  *See supra* at 9.  That cannot be answered on a classwide basis, something even Plaintiff's expert admits.  *Id.* (a "deal-by-deal" inquiry).

Assuming each of those individualized threshold damage questions could be answered, one would then need embark on the intractable process of asking **every single one of the contractors each tenant used for each renovation or moving project** if it has records demonstrating (i) whether union labor was actually used by that contractor, and (ii) whether the specific cost for that union labor was recorded and broken out from other non-labor items charged to the tenant, like materials, insurance, and the contractor's profit.  *See supra* at 16 (Plaintiff confirming that neither it nor any class member has such records); *see also* Ex. H at 5-6 (Plaintiff alone used 10 different contractors for its projects).  Without this critical information, Dr. Kaestner's damages methodology cannot be used.  *See supra* at 15-16; *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (class action improperly certified where plaintiffs' "model falls far short of establishing that damages are capable of measurement on a classwide basis").  And without a usable methodology, Plaintiff "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.* at 35.

### B.   The Large Amounts In Controversy Prove A Class Action Is Inferior Here.

Although these unworkability problems precluded Dr. Kaestner from applying his methodology to Plaintiff's damages claim, *see supra* at 16, Plaintiff has conservatively estimated damages in excess of $135,000, plus interest.  *See* Dkt. ¶¶ 59 (itemizing over $45,000 in alleged damages), 60, 69 (alleging entitlement to treble damages).  Potentially significant recoveries such as this make a class action an inferior method under Rule 23(b)(2)(A), since putative class members would likely have interest in individually controlling their own actions.[31]

---

[31] *Cf. Mendoza v. Home Depot, U.S.A. Inc.*, 2010 WL 424679, at *10 (C.D. Cal. Jan. 21, 2010) ("potentially significant" individual recoveries of $25,000 proves the inferiority of class action); *Mace v. Van Ru Credit*

**III.**     **A Class Action Under Rule 23(b)(2) Cannot Be Maintained Because Plaintiff Lacks Standing For Injunctive Relief And Could Only Benefit From Monetary Relief.**

Plaintiff's tenancy in a JLL-managed building ended before Plaintiff filed this action. *Supra* at 11; *see also id.* (Plaintiff is no longer an active business and has no leases).  Therefore, Plaintiff does not have standing to seek "an injunction preventing JLL from continuing to enforce the union-only requirement at any of [the] class buildings going forward."  Dkt. 105 at 16; *see also Simic v. Cty. of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017) ("To have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'") (*citing Cty. of L.A. v. Lyons*, 461 U.S. 95, 102 (1983)).  As Plaintiff is the only purported representative of the class, this lack of standing forecloses certification under Rule 23(b)(2).[32]

Moreover, Rule 23(b)(2) "is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief."  *Chi. Tchrs. Union, Local No. 1 v. Bd. of Educ. of Cty. of Chi.*, 797 F.3d 426, 441 (7th Cir. 2015).  As a non-tenant, Plaintiff's primary goal is unquestionably monetary relief, further confirming certification under Rule 23(b)(2) is inappropriate.

<h2 style="text-align:center">CONCLUSION</h2>

For these reasons, Plaintiff's Motion for Class Certification should be denied with prejudice.

---

*Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

[32] *See, e.g., Brown v. Cty. of Cook*, 549 F. Supp. 2d 1026, 1032 (N.D. Ill. 2008) ("Rule 23(b)(2) is knocked out of contention as well by plaintiff's lack of standing to assert a claim for injunctive relief").

Dated:  June 12, 2020                                Respectfully submitted,


                                                     JONES LANG LASALLE
                                                     AMERICAS (ILLINOIS), LP

                                                     */s/ Scott T. Schutte*                    
                                                             One of Its Attorneys

                                                     Philip A. Miscimarra
                                                     Scott T. Schutte
                                                     Stephanie L. Sweitzer
                                                     Kevin F. Gaffney
                                                     Heather J. Nelson
                                                     MORGAN, LEWIS & BOCKIUS LLP
                                                     77 West Wacker Drive, 5th Floor
                                                     Chicago, IL 60601
                                                     Tel: 312.324.1000
                                                     Fax: 312.324.1001
                                                     philip.miscimarra@morganlewis.com
                                                     scott.schutte@morganlewis.com
                                                     stephanie.sweitzer@morganlewis.com
                                                     kevin.gaffney@morganlewis.com
                                                     heather.nelson@morganlewis.com

                                                     *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on the 12th day of June 2020, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification to the following attorneys of record for Plaintiff:

Ryan F. Stephan
James B. Zouras
Anna Ceragioli
STEPHAN ZOURAS, LLP
100 N. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel: +1.312.233.1550
rstephan@stephanzouras.com
jzouras@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
FOSTER PC
150 N. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: +1.312.726.1600
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
THE WALNER LAW FIRM LLC
555 Skokie Boulevard, Suite 250
Northbrook, Illinois 60062
Tel: +1.312.371.2308
awalner@walnerlawfirm.com
walner@walnerlawfirm.com

*Attorneys for Plaintiff*

*/s/ Scott T. Schutte*
Scott T. Schutte