# Exhibit M

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4    WACKER DRIVE EXECUTIVE SUITES)

5    LLC, on behalf of itself      )

6    individually, and on behalf  )

7    of the others similarly      )

8    situated,                    )

9                  Plaintiff,     ) Case No.

10            vs.                 ) 1:18-cv-5492

11   JONES LANG LASALLE AMERICAS  )

12   (ILLINOIS), L.P.,            )

13                  Defendant.    )

14

15         The videotaped deposition of ROBERT

16   KAESTNER, Ph.D., called as a witness for

17   examination, taken pursuant to the Federal Rules

18   of Civil Procedure of the United States District

19   Courts pertaining to the taking of depositions,

20   taken before ANDREA L. KIM, a Certified Shorthand

21   Reporter of said state, CSR No. 84-3722, at Suite

22   2150, 100 North Riverside Plaza, Chicago,

23   Illinois, on the 21st day of February, A.D. 2020,

24   at 9:29 a.m.

Page 2

1 PRESENT:
2
3      FOSTER PC,
4      (150 North Wacker Drive, Suite 2150,
5      Chicago, Illinois 60606
6      312-726-1600), by:
7      MR. HOWARD W. FOSTER,
8      hfoster@fosterpc.com,
9      MR. MATTHEW A. GALIN,
10          -and-
11     STEPHAN ZOURAS, LLP,
12     (100 North Riverside Plaza, Suite 2150,
13     Chicago, Illinois 60601
14     312-233-1550), by:
15     MR. JAMES B. ZOURAS,
16     jzouras@stephanzouras.com,
17     MS. ANNA CERAGIOLI,
18     aceragioli@stephanzouras.com,
19          -and-
20
21
22
23
24

Page 3

1 PRESENT:  (Continued)
2      THE WALNER LAW FIRM, LLC,
3      (555 Skokie Boulevard, Suite 250,
4      Northbrook, Illinois 60062
5      312-371-2308), by:
6      MR. AARON R. WALNER,
7      awalner@walnerlawfirm.com,
8          appeared on behalf of the Plaintiff
9
10     MORGAN, LEWIS & BOCKIUS LLP,
11     (77 West Wacker Drive, 5th Floor,
12     Chicago, Illinois 60601
13     312-324-1000), by:
14     MR. SCOTT T. SCHUTTE,
15     scott.schutte@morganlewis.com,
16     MS. HEATHER J. NELSON,
17     heather.nelson@morganlewis.com,
18          appeared on behalf of the Defendant.
19
20 VIDEOTAPED BY:
21     MR. KEVIN DUNCAN.
22
23 REPORTED BY:  ANDREA L. KIM,
24          Illinois CSR No. 84-3722.

Page 4

1                I N D E X
2
3 WITNESS:                      PAGE:
4 ROBERT KAESTNER, Ph.D.
5      EXAM by MR. SCHUTTE................   7
6
7               *****
8               I N D E X
9 EXHIBIT NUMBER                    MARKED
10 Exhibit No. 17............................. 10
11 Exhibit No. 18............................. 26
12 Exhibit No. 19............................. 28
13 Exhibit No. 20............................. 68
14 Exhibit No. 21............................. 77
15 Exhibit No. 22............................103
16 Exhibit No. 23............................113
17 Exhibit No. 24............................136
18 Exhibit No. 25............................142
19 Exhibit No. 26............................161
20 Exhibit No. 27............................162
21
22
23
24

Page 5

1      THE VIDEOGRAPHER:  Good morning.  We are
2 going on the video record at 9:29 a.m.  Today's
3 date is February 21, 2020.  Please note that the
4 microphones are sensitive and may pick up
5 whispering, private conversations, and cellular
6 interference.  Please turn off all cell phones or
7 place them away from the microphones as they can
8 interfere with the deposition audio.  Audio and
9 video recording will continue to take place
10 unless all parties agree to go off the record.
11          Here begins media unit one in the
12 video recorded deposition of Mr. Robert Kaestner
13 taken on behalf of the defendants in the case
14 matter of Wacker Drive Executive Suites, LLC,
15 versus Jones Lang LaSalle Americas filed in the
16 United States District Court for the Northern
17 District of Illinois, bearing Case No.
18 1:18-cv-5492.
19          This deposition is being held at 100
20 North Riverside Plaza in Chicago, Illinois.  My
21 name is Kevin Duncan, and I am a certified legal
22 video specialist from the firm of Veritext Legal
23 Solutions.  The court reporter today is
24 Ms. Andrea Kim from the firm of Veritext Legal

2 (Pages 2 - 5)

Page 6

1  Solutions.
2      I am not authorized to administer
3  oaths. I am not related to any party in this
4  action, nor am I financially interested in the
5  outcome.
6      Counsel, please identify yourselves
7  starting with the noticing party.
8      MR. SCHUTTE: Scott Schutte on behalf of the
9  defendant Jones Lang LaSalle Americas Illinois,
10 LP.
11     MS. NELSON: Heather Nelson on behalf of the
12 defendant Jones Lang LaSalle.
13     MR. FOSTER: Howard Foster for the plaintiff
14 Wacker Drive Executive Suites.
15     MR. ZOURAS: Jim Zouras for the plaintiff.
16     MR. GALIN: Matthew Galin for the plaintiff.
17     MS. CERAGIOLI: Anna Ceragioli for the
18 plaintiff.
19     THE VIDEOGRAPHER: Thank you, counsel. Will
20 the court reporter please administer the oath.
21     (WHEREUPON, the witness was duly
22     sworn.)
23     THE VIDEOGRAPHER: You may proceed.
24

Page 7

1      ROBERT KAESTNER, Ph.D.,
2  called as a witness herein, having been first
3  duly sworn, was examined and testified as
4  follows:
5          EXAMINATION
6  BY MR. SCHUTTE:
7      Q. Could you please state and spell your
8  name for the record.
9      A. Robert Kaestner, K-A-E-S-T-N-E-R.
10     Q. Okay. Dr. Kaestner, do you understand
11 that your deposition is being videotaped and
12 could be show to the judge or jury in this case?
13     A. Yes.
14     Q. Okay. Have you ever given a
15 deposition before?
16     A. No.
17     Q. Let me go over the ground rules for
18 today then. I am going to ask you a series of
19 questions. Andrea, the court reporter, is going
20 to make a written transcript. We will also have
21 a video transcript that you will have an
22 opportunity to review the written transcript and
23 make any corrections after we are finished.
24     There's a couple things we both need

Page 8

1  to do to make Andrea's life easier. The first
2  one is that sometimes you are going to anticipate
3  what my question is and want to start giving the
4  answer. There will be other instances where I am
5  excited to ask my next question and may cut you
6  off, but to the extent we can, we both need to
7  let the other one finish before we start the next
8  question or answer. Okay?
9      A. Good.
10     Q. Also for Andrea's benefit even though
11 we have a videographer, it's important that you
12 give your answers orally because the court
13 reporter has a difficult time taking down nods of
14 the head or uh-huh or uh-uh.
15     Is that fair?
16     A. Yes.
17     Q. Sometimes I speak quickly. Sometimes
18 especially given that you are a -- you have an
19 area of specialization that I am not familiar
20 with. My questions may not make sense to you.
21 If at any point you need me to repeat or rephrase
22 a question that you don't understand or didn't
23 hear, please ask me to do that, and I will be
24 happy to repeat it or rephrase. Okay?

Page 9

1      A. Yes.
2      Q. If you answer the question though, I
3  am going to assume that you understood the
4  question. Is that fair?
5      A. Yes.
6      Q. We will take a break every hour or so,
7  but if at any point you need to take a break more
8  than frequently, just let me know. The only
9  thing that I would ask is that you not take a
10 break in between the time when a question is
11 pending and when you give the answer. Please
12 take a break after the answer. Okay?
13     A. Yes.
14     Q. Is there any reason, Dr. Kaestner,
15 that you could not testify fully and accurately
16 today?
17     A. No.
18     Q. I am going to hand you what we have
19 marked as Exhibit 17 which is a -- I am going to
20 ask you to review that and tell me if that's a
21 copy of the report that you drafted in this
22 matter.
23
24

3 (Pages 6 - 9)

Page 10

1       (WHEREUPON, a certain document
2       was marked Deposition Exhibit No.
3       17, for identification, as of
4       2/21/20.)
5   BY THE WITNESS:
6       A.   It seems to be in order.  Thank you.
7   BY MR. SCHUTTE:
8       Q.   You understand, Dr. Kaestner, that you
9   are being offered as an expert on behalf of the
10  plaintiff Wacker Drive Executive Suites in this
11  lawsuit?
12      A.   Yes.
13      Q.   Okay.  If I refer to Wacker Drive
14  Executive Suites as WDES today, will you -- is
15  that okay with you?
16      A.   Yes.
17      Q.   You understand what I mean?
18      A.   Yes.
19      Q.   Okay.  You understand that your expert
20  opinion has been offered to the Court as a basis
21  for doing a class-wide damages calculation?
22      A.   Yes.
23      Q.   Did you have an opportunity to review
24  your report Exhibit 17 in preparation for your

Page 11

1   deposition today?
2       A.   Yes.
3       Q.   Did you see -- as you reviewed it, did
4   you see any errors that need to be corrected?
5       A.   No.
6       Q.   Did you actually physically prepare
7   the report?
8       A.   Yes.
9       Q.   Okay.  Did anyone assist you, not
10  counsel, but anyone on your behalf?
11      A.   No.
12      Q.   When you drafted your report, did you
13  choose your words carefully?
14      A.   Yes.
15      Q.   Okay.  And when you prepared for your
16  deposition today by among over things reviewing
17  your report, did you see any words in your report
18  that you would like to change?
19      A.   No.
20      Q.   And is it your signature that appears
21  electronically on page 9 of the report?
22      A.   Yes.
23      Q.   And even though that's an electronic
24  signature, is it your testimony that that's a

Page 12

1   signature that's just as good as if you had
2   signed it with a pen?
3       A.   Yes.
4       Q.   When were you retained, Dr. Kaestner,
5   by counsel in this matter?
6       A.   I don't know exactly the date but
7   November 2019.
8       Q.   Had you -- did you have any
9   familiarity with this lawsuit prior to the time
10  you were retained in November of 2019?
11      A.   No.
12      Q.   Do you have a written agreement with
13  plaintiff's counsel that governs the terms of
14  your expert engagement?
15      A.   No.
16      Q.   Counsel has -- or I guess your report
17  states that you are being paid $650 an hour for
18  your work on the matter?
19      A.   That's correct.
20      Q.   Is the -- is there a different amount
21  you are charging for your testimony as opposed to
22  work drafting the report?
23      A.   No.
24      Q.   Approximately how many hours have you

Page 13

1   worked on this matter?
2       A.   15.
3       Q.   15?
4       A.   Yes.
5       Q.   Have you submitted a bill for the 15
6   hours that you worked on this matter?
7       A.   I have.
8       Q.   Have you been paid?
9       A.   Yes.
10      Q.   Was the payment made to you personally
11  or was it made to one of your employers?
12      A.   Personally.
13      Q.   Okay.  The report on page 1 has a date
14  of January 17th of 2020.  Do you see that in the
15  upper left?
16      A.   Yes.
17      Q.   Okay.  And then on page 9 next to your
18  signature, it has a date of January 31st of 2020?
19      A.   Yes.
20      Q.   Which of those dates or maybe neither
21  of them reflects the time when you finalized your
22  report?
23      A.   I will say January 31st, but that's to
24  the best of my recollection.

4 (Pages 10 - 13)

Page 14

1    Q.   Do you know what the significance of
2   January 17th on page 1 of the report is?
3    A.   I do not.
4    Q.   Okay.  Is that something you typed?
5    A.   I don't remember.
6    Q.   Okay.  I should have asked this when I
7   was asking about your retention, but who was it
8   that retained you?  Was it one of the law firms
9   that's involved on behalf of the plaintiff?
10   A.   Yes.
11   Q.   Which law firm?
12   A.   Foster PC.
13   Q.   You wrote on page 1 of your report at
14  the bottom, and I'll read it for the record:  "In
15  this report, I provide evidence related to
16  whether mandating the use of union labor to move
17  in and out of, and renovate commercial office
18  space in downtown Chicago affects the cost of
19  such activities."
20       Did I read that correctly?
21   A.   Yes.
22   Q.   And those were words that you typed?
23   A.   Yes.
24   Q.   Is that an accurate statement of what

Page 15

1   you are intending to do in your report with
2   respect to this litigation?
3    A.   I think what I intend to do is exactly
4   what I say.  What I do is I -- I can read it.  I
5   estimate the difference in wages between union
6   and non-union workers in occupations typically
7   used to move into and out of renovated commercial
8   space in downtown Chicago.  That's what I intend
9   to do.
10   Q.   Okay.  But I am asking specifically
11  about that sentence where you told the Court that
12  you are in this report providing evidence
13  relating to whether mandating the use of union
14  labor affects the cost of activities.
15       That is not actually what -- you are
16  not opining about the effect of a so-called
17  union-only rule on the difference between union
18  and non-union labor, are you?
19   MR. FOSTER:  I object to the form of the
20  question.  You can answer.
21   THE WITNESS:  I can answer?
22   MR. FOSTER:  You can answer.
23  BY THE WITNESS:
24   A.   I am estimating the differences in the

Page 16

1   cost of labor between union and non-union labor
2   in occupations used to move into and renovate
3   office space in downtown Chicago.
4    Q.   But that opinion you are offering
5   about the differences between union and non-union
6   is not in the context of the union-only rule that
7   plaintiffs have alleged exists in downtown
8   Chicago?
9    MR. FOSTER:  I object to the form of the
10  question.  You can answer.
11  BY THE WITNESS:
12   A.   The context is that there is different
13  costs of labor between -- for union and non-union
14  services, and that I think is relevant to.
15  BY MR. SCHUTTE:
16   Q.   Right, and I understand that.  I am
17  asking about this specific question where you
18  wrote and told the judge that you are offering an
19  opinion as to whether mandating the use of union
20  labor affects the cost of activities of
21  renovating commercial office space in downtown
22  Chicago, and my question to you is you are not
23  actually offering an opinion between the
24  connection of a union-only rule and the

Page 17

1   differences you say exist between the cost of
2   union and non-union labor, are you?
3    MR. FOSTER:  Objection, that's been asked
4   and answered.  This is your fourth attempt.
5    MR. SCHUTTE:  It hasn't begun answered.
6    MR. FOSTER:  Okay.  Okay.  He answered it,
7   but if he wants to answer it -- he can answer it
8   again.
9   BY THE WITNESS:
10   A.   Again, I estimate the difference
11  between the cost of union and non-union labor,
12  and that's relevant in a context where union
13  labor is required to be used because it --
14  BY MR. SCHUTTE:
15   Q.   Okay.  Can you show me in your report
16  where you have a discussion of a connection
17  between the differences between union and
18  non-union wages and the allegation by plaintiffs
19  that unions are mandated in downtown Chicago?
20   A.   I don't have it in my report.
21   Q.   And, again, because -- and I am not
22  trying to fight with you.  I just want to
23  understand the scope of your opinion.  We will
24  talk at great length today about the opinion you

5 (Pages 14 - 17)

1 have offered that there's a difference in
2 downtown Chicago between the cost of union and
3 non-union labor.
4      My only question and specifically
5 pointing to what you wrote in the first page is
6 none of your opinions are about whether that
7 difference is caused by the union-only rule;
8 isn't that correct?
9     MR. FOSTER: Objection, asked and answered.
10 The fourth time you are asking it. It seems like
11 the same question. You can answer.
12 BY THE WITNESS:
13   A. That's correct.
14 BY MR. SCHUTTE:
15   Q. You also do not opinion, do you,
16 Dr. Kaestner, on the difference in union versus
17 non-union wages specific to the Chicago Loop?
18   A. That's correct. What I estimate is
19 the difference between union and non-union wages
20 in the Chicago metropolitan area defined in the
21 report as the -- as the Chicago-Naperville-Joliet
22 area that's defined by the U.S. Government. This
23 is the smallest area that can be used to
24 represent Chicago.

1   Q. Is there any work that you have done
2 in connection with your retention by counsel in
3 this case that is not covered in your report?
4     In other words, did you form any
5 opinions about the case that you do not include
6 in your report?
7   A. No.
8   Q. Do you anticipate that there is
9 additional work that you will be doing on this
10 matter?
11   A. I can't anticipate.
12   Q. Okay. What did you do to prepare for
13 your deposition today?
14   A. Reviewed my report.
15   Q. Anything else?
16   A. No.
17   Q. Did you meet with counsel?
18   A. I did.
19   Q. For how long?
20   A. One hour.
21   Q. And when was that?
22   A. Beginning of this week so Tuesday.
23   Q. Who was with -- again, I don't want to
24 talk about what you talked about, at least not

1 right now, but I do want to know who was at that
2 meeting.
3   A. The counsel present here today.
4   Q. All four attorneys?
5   A. Yes.
6   Q. Where did that meeting occur?
7   A. In these premises.
8   Q. Other than your report, did you review
9 any other documents to prepare for your
10 deposition today?
11   A. No.
12   Q. If we -- I think you testified that
13 you don't recall -- well, let me just ask you
14 again because I don't remember what you said.
15     Is it your testimony that you think
16 you completed your report on January 31st which
17 is the date on the signature page?
18   MR. FOSTER: Objection. Asked and answered.
19 BY MR. SCHUTTE:
20   Q. Go ahead and answer.
21   A. Yes.
22   Q. Okay. Did you -- other than the one
23 hour you spent with counsel and the time you
24 spent reviewing your report to prepare for your

1 deposition, have you done any other work on this
2 matter between January 31st of 2020 and today?
3   A. No.
4   Q. Is the hour that you spent -- strike
5 that.
6     How much time did you spend reviewing
7 your report in preparation for your deposition
8 today?
9   A. An hour and a half.
10   Q. Okay. So of the 2.5 hours, one hour
11 meeting with counsel --
12   A. No, that was -- excuse me.
13   Q. That's okay.
14   A. That's the time I reviewed my report.
15   Q. When you were with counsel?
16   A. Yes.
17   Q. Okay. So is the hour and a half that
18 you testified that you spent reviewing your
19 report and meeting with counsel part of the 15
20 hours that you've spent on this case?
21   A. No.
22   Q. Is the 15 hours what you spent
23 actually preparing your report?
24   A. Yes.

1    Q.    And then you have 1.5 hours since
2  then?
3    A.    Yes.
4    Q.    Okay.  Have we talked about everything
5  you did to prepare for your deposition today, met
6  with counsel and reviewed your report?
7    A.    Yes.
8    Q.    Okay.  Have you ever served as an
9  expert in a lawsuit before?
10    A.    No.
11    Q.    And by lawsuit, I mean that broadly
12  which would include an arbitration or a
13  mediation.
14    A.    The answer is still no.
15    Q.    Okay.  Have you ever testified at
16  trial for any reason whether it's a personal
17  lawsuit or any other capacity?
18    A.    No.
19    Q.    I take it then you have never
20  submitted an expert report in any case in federal
21  court?
22    A.    Correct.
23    Q.    Prior to this case, were you familiar
24  with WDES?

1    A.    No.
2    Q.    Prior to this case, were you familiar
3  with Larry Grossman?
4    A.    No.
5    Q.    Have you ever met Mr. Grossman?
6    A.    No.
7    Q.    Prior to this case, were you familiar
8  with Amy Grossman?
9    A.    No.
10    Q.    Have you ever met Ms. Grossman?
11    A.    No.
12    Q.    You currently, according to your CV
13  materials that we have seen and your report, are
14  a research professor at the University of
15  Chicago.
16    A.    Correct.
17    Q.    Can you tell the ladies and gentlemen
18  of the jury and the judge what a research
19  professor at the University of Chicago does?
20    A.    In my position there I conduct
21  research, teach, and advise students.
22    Q.    And that's in the Harris School of
23  Public Policy?
24    A.    Correct.

1    Q.    What classes do you currently teach?
2    A.    I teach a course in cost benefit
3  analysis and --
4    Q.    How very appropriate for the
5  University of Chicago.
6    A.    And micro-economics.
7    Q.    Do you teach any classes on labor
8  economics?
9    A.    I do not.
10    Q.    Okay.  Is the position you have at the
11  University of Chicago a tenure track position?
12    A.    It is not.
13    Q.    Okay.  You are also according to the
14  documents you've provided to us and some other
15  things we have looked at a research associate at
16  the National Bureau of Economic Research?
17    A.    Correct.
18    Q.    What is the nature of your work at the
19  National Bureau of Economic Research?
20    A.    That's a non-profit and non-partisan
21  organization, professional organization of
22  economists.  It's very prominent, internationally
23  known, and I am an affiliate there where I
24  conduct research along with other people.

1    Q.    I'm sorry?
2    A.    Along with other economists.  It's an
3  unpaid position.
4    Q.    Okay.  You anticipated my next
5  question.
6        So your -- your -- you earn your
7  living with your work as a research professor at
8  the University of Chicago, but you also do work
9  as a research associate uncompensated at the
10  National Bureau of Economic Research?
11    A.    That's incorrect.  I do research.  I
12  conduct research that is for my professional
13  activities paid for by the University of Chicago,
14  and that research -- it is just an affiliation of
15  a group of economists the National Bureau of
16  Economic Research.  So they don't pay me.  They
17  don't direct my research.
18    Q.    I see.  I am going to go ahead and ask
19  this question, but maybe given what you just
20  said, it doesn't make any sense.
21        Is there a way to estimate the amount
22  of time you spend in your role as a research
23  professor at the University of Chicago versus at
24  the National Bureau of Economic Research or do

7 (Pages 22 - 25)

Page 26

1 they overlap?
2     A.   As part of my contract with the
3 university that my time is accounted for by my
4 compensation at the university, and so there's no
5 conflict or overlap.
6     Q.   Okay.
7     A.   It's a -- the NBER is an honorific
8 appointment that provides some benefits in terms
9 of dissemination of my research.
10    Q.   I see.  Okay.  Thank you.  That's very
11 helpful.
12    MR. SCHUTTE:  Could we mark this, Andrea, as
13 18, please.
14         (WHEREUPON, a certain document
15         was marked Deposition Exhibit No.
16         18, for identification, as of
17         2/21/20.)
18 BY MR. SCHUTTE:
19    Q.   Dr. Kaestner, we have marked as
20 Exhibit 18 a page that we printed off of the
21 Harris School of Public Policy website at the
22 University of Chicago.
23         As you can see in the lower right
24 corner, we pulled it down and printed it this

Page 27

1 week on Tuesday I think.
2         First of all, have you ever seen this
3 document or this web page before?
4     A.   I have seen the web page.
5     Q.   Is this something that you were
6 involved in drafting?
7     A.   Yes.
8     Q.   Okay.  The third paragraph states, and
9 I'll read it into the record:  "Dr. Kaestner's
10 areas of research interests are the economic and
11 social determinants of health, health demography,
12 and health, labor and social policy evaluation."
13         Is that an accurate statement of your
14 area of research interest as you sit here today?
15    A.   It's not a complete assessment.
16    Q.   What are the other areas that you have
17 of research interest?
18    A.   Labor economics.
19    Q.   Is there a reason why you did not
20 include labor economics in the bio or information
21 posted about you on the Harris School of Public
22 Policy website?
23    A.   In my opinion it's contained under
24 labor, the word labor and policy evaluation.

Page 28

1     Q.   Okay.  In your report at page 1, you
2 refer to that you have an extensive record of
3 scholarly publications in labor economics?
4     A.   That's correct.
5     Q.   Can you tell the judge and the jury
6 what you mean by labor economics?
7     A.   Labor economics is a study of labor
8 markets, the supply of labor to various markets,
9 the demand for labor, the determination of wages
10 in labor markets.  That would be a thumbnail
11 sketch.
12    MR. SCHUTTE:  Okay.  Let's mark this as No.
13 19, please, Andrea.
14         (WHEREUPON, a certain document
15         was marked Deposition Exhibit No.
16         19, for identification, as of
17         2/21/20.)
18 BY MR. SCHUTTE:
19    Q.   We have handed you, Dr. Kaestner, and
20 marked as Exhibit 19 a document that I will
21 represent to you that I also pulled off of the
22 Harris School of Public Policy website, and I am
23 going to ask you to the best of your knowledge,
24 is this a current copy of your CV?

Page 29

1     A.   It seems current.
2     Q.   Okay.  One thing -- it's a little bit
3 like This is Your Life.
4         One thing I noticed looking at a prior
5 copy of your CV that was available on the
6 internet is that you had a stint as a consultant
7 at the Federal Reserve Bank of Chicago; is that
8 correct?
9     A.   Correct.
10    Q.   Is there a reason why that is not --
11 perhaps I am just missing it.  I don't see that
12 listed on Exhibit 19?
13    A.   I am no longer a consultant there.
14    Q.   Okay.  Is there a reason why you did
15 not leave that on your CV as a prior position
16 that you held in the professional -- in your
17 professional experience?
18    A.   No, I didn't think it was important.
19    Q.   Okay.  Can you tell us why it was that
20 you decided to leave your work as a professor at
21 the University of Illinois in the Institute of
22 Government and Public Affairs and join the
23 University of Chicago?
24    A.   I thought it was a better opportunity.

8 (Pages 26 - 29)

1  Q.  Okay.  Were you a tenured professor at
2  the University of Illinois?
3  A.  Yes, I was a tenured full professor.
4  Q.  Let's do it this way.  Your report
5  lists at the back page 13 in Appendix B the
6  articles you published from 2010 to present?
7  A.  Yes.
8  Q.  Okay.  Would you be able to look
9  through that, and among the 47 articles that
10 are -- excuse me -- 50 articles that are listed,
11 identify which articles you believe are covered
12 by -- within the field of labor economics?
13 A.  Would you like me to go through each
14 one and --
15 Q.  Yeah, I would just like you to go
16 through the list and tell me by number which of
17 these you think are articles that are in the area
18 of labor economics as opposed to, for example,
19 economic and social determinants of health,
20 health demography, et cetera.
21      So specifically I am looking for
22 articles that you think are articles that you
23 have written within the field of labor economics
24 as you have used that term in your report and as

1  you have defined it for us today.
2  A.  Number 3, number 15, number 18, number
3  19, number 22, number 25, number 29, number 33,
4  number 38, number 39, number 43.  So of the -- of
5  those 50, those would be the ones.
6  Q.  Are there any of the 50 that you can
7  identify that are articles that specifically
8  focus on labor unions?
9  A.  Can you clarify with specifically
10 focus?
11 Q.  That's a fair -- that's a fair
12 question.
13      Can you identify among the 50 articles
14 any that have to do with labor unions?
15 A.  Number 25.
16 Q.  Any others?
17 A.  Not on this list.  That's a -- can
18 I -- that's a partial list of my publication
19 record.  That's the last ten years.
20 Q.  Okay.
21 A.  I have 80 more publications.
22 Q.  Of those 80, do you recall any are --
23 that concern the topic of labor unions?
24      And if you want to refer to Exhibit 19

1  which is your full CV which I think includes all
2  of your articles, not limited to the last ten
3  years, that would be fine with me.
4  A.  Well, let's start -- number 120,
5  number 116, number 86, number 75.  That would be
6  it.
7  Q.  Have you ever written any articles or
8  been published in any forum on the topic of union
9  versus non-union wages?
10 A.  Not directly.
11 Q.  How about indirectly?
12 A.  In some of those articles I have
13 referred to that would.
14 Q.  Okay.  Prior to the -- your engagement
15 in November or so of 2019 in this matter, have
16 you done research into differences between union
17 and non-union wages?
18 A.  No.
19 Q.  Have you ever written any articles
20 that are negative about unions?
21 A.  No.
22 Q.  Have you written any articles that are
23 positive about unions?
24 A.  I don't write articles that are

1  negative or positive.  I write articles that
2  reflect the science and differences between
3  unions.  I don't put a positive or negative
4  assessment.  That's not what I do.
5  Q.  Okay.  Fair enough.  That's a fair
6  enough answer.
7      Do you have -- have you ever written
8  any articles about the process for submitting and
9  analyzing bids for renovation projects in the
10 Chicago Loop?
11 A.  No.
12 Q.  Other than the articles you have
13 already identified, are there any articles in
14 your -- the CV list of 130 articles you have
15 written along with books that relate to the
16 subject matter that you are testifying about in
17 this litigation?
18 A.  Yeah, any article that's written about
19 wages, that would be relevant because the
20 methodology and the approach I use is a very
21 standard approach applied to any analysis of
22 wages.
23 Q.  In your opinion is the arena of
24 union -- unions and the effect of unions on wages

Page 34

1 something that makes that issue unique from wages
2 generally?
3    A.   I don't understand the question.
4    Q.   I will withdraw it and move on.  I
5 will come back to that.
6        You wrote in your report at page 1
7 quote: "I am a qualified expert witness in this
8 matter."
9        What is the basis of that statement?
10    A.   I have a Ph.D. in Economics.  My area
11 of specialization was labor economics and applied
12 econometrics.  I have published articles in the
13 top journals in the field of labor economics
14 including the Journal of Labor Economics,
15 Industrial and Labor Relations Review, Journal of
16 Human Resources, Journal of Human Capital, and
17 that would be.
18    Q.   Is it fair to say that labor economics
19 is a secondary interest of yours with the area of
20 the economic and social determinants of health
21 and health demography being the primary area of
22 your research focus?
23    A.   No.
24    Q.   Have you ever worked in construction?

Page 35

1    A.   Yes.
2    Q.   When?
3    A.   When I was a young gentleman.
4    Q.   And where was that?  Was that in
5 Chicago?
6    A.   No.
7    Q.   Have you ever been a member of a
8 union?
9    A.   Yes.
10    Q.   What union?
11    A.   Professors Union when I was a faculty
12 member.
13    Q.   The work that you did in the
14 construction industry, could you describe that
15 generally?
16    A.   I was a laborer.
17    Q.   Okay.  The report identifies that the
18 only two documents that you reviewed in
19 connection with forming your opinions in this
20 matter are the First Amended Complaint and WDES's
21 Response to the First Set of Interrogatories
22 that's on page 1.
23        Is that an accurate statement that
24 those are the only two documents that you

Page 36

1 reviewed specific to this case?
2    A.   Yes.
3    Q.   And I apologize if I have already
4 asked you this, but have you reviewed any
5 documents related to this case since you
6 submitted your report on January 31st of 2020?
7    A.   No.
8    Q.   How did you choose those two documents
9 as the documents that you would review?
10    A.   I was provided them by counsel.
11    Q.   All right.  Were there other documents
12 that you wanted to review but were not given
13 access to?
14    A.   No.
15    Q.   Do you have an understanding as to why
16 those were the documents that were provided to
17 you?
18    A.   No.
19    Q.   I am going to hand you what we have
20 marked previously in this case, Dr. Kaestner, as
21 Exhibit 10 which is the First Amended Class
22 Action Complaint in this lawsuit, and is that the
23 document that you referred to in your complaint
24 as the Amended Class Action Complaint?

Page 37

1    A.   Unless the counsel objects, I would
2 say, yes.  I mean, as far as I know, yes.
3    Q.   Okay.  When did you review the First
4 Amended Complaint?
5    A.   Prior to writing the report or...
6    Q.   When did you start writing the report?
7    A.   Sometime after November or -- 2019.
8    Q.   How --
9    A.   Can I correct that?
10    Q.   Of course.
11    A.   I started working on the analysis that
12 was part of the report.
13    Q.   Okay.  The actual physical act of
14 drafting, could you estimate for us when you
15 started that?
16    A.   Late December.
17    Q.   Okay.  Of the 15 hours that you said
18 you spent on drafting the report, how much of
19 that time did you spend reviewing the First
20 Amended Complaint?
21    A.   An hour.
22    Q.   Okay.  Did you review the entire
23 document?
24    A.   Quickly, not in detail.

10 (Pages 34 - 37)

Page 38

1  Q.  Okay.  What was the purpose for you
2  reviewing the First Amended Complaint?
3  A.  I don't know what you mean the
4  purpose.  Why I read the document?
5  Q.  Yes.
6  A.  To become familiar with the case.
7  Q.  Did you rely on the allegations in the
8  First Amended Complaint in forming your opinion?
9  A.  No.
10  Q.  Did you see anything when you reviewed
11  the First Amended Complaint that you disagreed
12  with?
13  A.  I didn't take an agree or disagree
14  with anything in the complaint.  It wasn't -- I
15  didn't see that was my purview to agree or
16  disagree.
17  Q.  You were reviewing the complaint to
18  get background on the case?
19  A.  That would be a reasonable way to
20  frame it, yes.
21  Q.  If I ask you to take a look at -- in
22  the complaint at paragraphs 8 and 9, you
23  understand, Dr. Kaestner, do you not, that the
24  allegations that are being made in the complaint

Page 39

1  have to do with a so-called union-only rule that
2  the plaintiff has alleged exists in the Chicago
3  Loop?
4  A.  From reading the complaint, that's
5  what I read.
6  Q.  Okay.  And you understand that when
7  the plaintiffs use the term "Chicago Loop," it is
8  limited to geographically as it says in paragraph
9  9, the area bounded on the east by Michigan
10  Avenue, on the north and west by the Chicago
11  River, and on the south by Congress Parkway?
12  A.  I will accept the definition provided
13  in the complaint.
14  Q.  Okay.  And if we use -- if I use the
15  term Chicago Loop today during your deposition to
16  mean the definition of Chicago Loop that the
17  plaintiff has asserted in this case, is that okay
18  with you?
19  A.  I don't -- when you refer to it, I
20  will understand what you mean.
21  Q.  That's perfectly good, thank you, and
22  I also asked you to take a look at paragraph 42
23  of the complaint.  It actually uses the term
24  Chicago Loop in the definition of the class that

Page 40

1  the plaintiffs are seeking to certify.
2  Do you see that?
3  A.  I do see it.
4  Q.  And do you understand that the area
5  that the plaintiffs alleged in which this
6  union-only rule existed is in the Chicago Loop?
7  A.  Again, I understand when you refer to
8  the Chicago Loop what is the definition.
9  Q.  And what I am specifically asking,
10  sir, is if you understand that the allegations in
11  this case about there being a union-only rule and
12  that union-only rule harming WDES and similarly
13  situated tenants is limited to the Chicago Loop?
14  A.  I have read the complaint, and if
15  that's what the complaint says, then...
16  Q.  Well, we're going to -- I don't want
17  to hide the ball from you.  We are going to talk
18  about this extensively later, but your analysis
19  is limited -- we will talk about what it means
20  but the Chicago, Joliet, and Naperville
21  metropolitan area, correct?
22  A.  That's -- not the entire analysis, but
23  that is the -- an important part of it.
24  Q.  Well, the other part of your analysis

Page 41

1  is to Cook County, correct?
2  A.  Correct.
3  Q.  And both of those are different than
4  the term Chicago Loop as the plaintiff has
5  defined it, correct?
6  A.  By those definitions, yes.
7  Q.  Did you have any role, Dr. Kaestner,
8  in drafting paragraphs 29 through 31 of the
9  complaint?
10  A.  No.
11  Q.  Do you have any reason to think that
12  the allegations in paragraph 30 is -- are correct
13  or incorrect?
14  A.  I am not sure what you want me to
15  comment on or the question exactly.
16  Q.  Okay.  I will rephrase it.  That's
17  fair.
18  Paragraph 30, as I read it, is an
19  allegation about the differences in wages for
20  union versus non-union workers in the Chicago
21  metropolitan area.
22  Would you agree with that?
23  A.  I am going to read what it says so I
24  will interpret it as it's written.  So it says:

11 (Pages 38 - 41)

Page 42

1 The differences for carpenters -- and I think the
2 differences are referring to the differences in
3 union and non-union workers for carpenters for
4 non-union is 32.61 versus 46.35, and it's
5 referring to one number from the Bureau of Labor
6 Statistics, another from the Cook County
7 prevailing wages.
8      I have no reason to expect that those
9 aren't the numbers that the Bureau of Labor
10 Statistics publishes or that the Cook County
11 prevailing wage publishes by the Illinois
12 Department of Labor, and so that's how I would
13 interpret those numbers as those numbers come
14 from those sources and, as far as I know, are --
15 were accurate numbers.
16      Q.   Is the Bureau of Labor Statistics
17 documents or information that's referenced in
18 paragraph 30 the same as the Current Population
19 Survey information that you used as part of your
20 analysis?
21      A.   I do not know where that number came
22 from.  So I can't answer that.
23      Q.   Where the number referred to in --
24      A.   32.61, yes.  I didn't write this.

Page 43

1      Q.   Okay.  But in my initial question --
2 let me make sure I understand your testimony.
3      Your testimony is you have no opinion
4 one way or the other whether the allegations in
5 paragraph 30 are true or false.  You didn't look
6 into that?
7      A.   I didn't assess whether paragraph 30
8 was correct.
9      Q.   Did the allegations in paragraph 30
10 inform the way that you decided to do your
11 analysis?
12      A.   No.
13      Q.   Have you discussed the analysis that
14 someone did -- strike that.
15      Do you know who did the analysis in
16 paragraph 30 to be able to make these
17 allegations?
18      A.   No.
19      Q.   Did you rely on the allegations in
20 paragraph 30 in forming your opinion?
21      A.   No.
22      Q.   Paragraph 31 I want to focus your
23 attention to the sentence at the top of page 7
24 that says -- I will read it into the record:

Page 44

1 "Those tenants preferring to use union labor have
2 also been overcharged because the labor market
3 for contracting services has been closed to
4 effective competition, meaning union labor is
5 supercompetitively priced; that is, above the
6 price it would be if the union-only rule were not
7 in place."
8      Are you offering any opinions in this
9 case about that allegation that I just read into
10 the record?
11      A.   Can you explain the allegations one by
12 one for me that you are making?
13      Q.   I am not making the allegations --
14      A.   Well, I mean there's more than one
15 statements and conclusions here.
16      Q.   Okay.  Let me try it this way.  The
17 opinion you are offering -- and we will talk
18 about that extensively -- is the differences in
19 wages in the Chicago metropolitan area between
20 union and non-union workers either in moving or
21 in renovation of commercial properties, correct?
22      A.   That is correct.
23      Q.   Okay.  You are not offering an
24 opinion -- any opinion in your report anyway

Page 45

1 about whether the labor market for contracting
2 services has been closed to effective competition
3 meaning that union labor is super competitively
4 priced.  That's not something that you offer an
5 opinion about in your report, right?
6      A.   My report addresses the question of
7 whether there are differences in the cost of
8 union versus non-union labor.
9      Q.   And so the answer to my question is,
10 no, that's not an issue that you have addressed
11 in your report?
12      A.   I gave my answer.
13      Q.   I will see if the Judge thinks that
14 you answered the question or not.
15      Did you have any role in drafting
16 paragraph 59 of the complaint?
17      A.   I had no role in drafting paragraph 59
18 or any other paragraph in the complaint.
19      Q.   Do you know how the allegations and
20 the calculations in particular in paragraph 59A
21 were arrived at?
22      A.   No, I do not.
23      Q.   What about the allegations in 59B?
24      A.   As I stated, I have no idea of who

12 (Pages 42 - 45)

Page 46

1 wrote or did the analysis or what the analysis
2 concluded in the complaint besides what I have
3 read.
4    Q.   You are not offering any opinion today
5 are you, Dr. Kaestner, on the specific damages
6 that WDES suffered as a result of the alleged
7 union-only rule, right?
8    A.   Correct.
9    Q.   And you are not offering any opinion
10 today as to what any particular absent class
11 member what damages that each entity suffered as
12 a result of this alleged union-only rule,
13 correct?
14    A.   That's correct.
15    Q.   I am going to hand you what we have
16 previously -- do you mind if -- I am not going to
17 remark this.  This was Exhibit 1 that we have
18 used previously.  We can substitute in the one
19 with the sticker.
20    MR. FOSTER:  Okay.  Sure, that's fine.
21 BY MR. SCHUTTE:
22    Q.   Okay.  I am going to hand you what we
23 have previously marked as -- it was marked as
24 Grossman Exhibit 1 which is the Plaintiff Wacker

Page 47

1 Drive Executive Suites Response to Defendant's
2 First Set of Interrogatories.
3        My first question for you,
4 Dr. Kaestner, is that the other document that you
5 reviewed that is mentioned in page 1 of your
6 report?
7    A.   Yes.
8    Q.   Okay.  How much time did you spend
9 reviewing this Exhibit 1?
10    A.   Very short amount of time, cursory
11 review.
12    Q.   Why did you review it?
13    A.   To get background information.
14    Q.   Okay.  Did anything in Exhibit 1 --
15 strike that.
16        Did you rely on anything in Exhibit 1
17 in forming your opinion?
18    A.   No.
19    Q.   Did you review Exhibit 1 around the
20 same time that you reviewed the First Amended
21 Complaint which is Exhibit 8 I think or 10 -- let
22 me rephrase that question.  Let me rephrase that
23 question.
24        Did you review Exhibit 1 WDES's

Page 48

1 interrogatory responses around the same time that
2 you reviewed Exhibit 10 the First Amended
3 Complaint?
4    A.   That seems a reasonable assumption,
5 yes.
6    Q.   Have you reviewed the -- strike that.
7        Are you aware that WDES has submitted
8 a supplemental response to Interrogatory 4 that
9 supplements the response previously given that
10 you looked at in Exhibit 1?
11    A.   I am not aware of that.
12    Q.   Okay.  Is that something you feel like
13 you need to see in order to ensure that your
14 opinion is accurate?
15    A.   No.
16    Q.   Did you review any deposition
17 transcripts?
18    A.   No.
19    Q.   Did you review any documents relating
20 to work that was performed at 125 South Wacker at
21 the WDES location in 2014 or 2017?
22    A.   No.
23    Q.   Have you reviewed the plaintiff's
24 motion for class certification?

Page 49

1    A.   Is it one of these documents, no.
2    Q.   Okay.  And I think I asked you this
3 before, but let's just close it out.
4        Have you had any contacts at all with
5 Larry Grossman or Amy Grossman?
6    A.   No.
7    MR. FOSTER:  Objection, asked and answered.
8 You can answer.
9 BY MR. SCHUTTE:
10    Q.   On page 3 of your report --
11    A.   Can I clarify which report?
12    Q.   Oh, sorry.  Exhibit No. 17, your
13 report.
14    A.   Okay.  Thank you.
15    Q.   On page 3, again, I want to cover this
16 sort of at a high level now but come back to it
17 in more detail, you write -- at the paragraph
18 just under the heading B you write in discussing
19 the occupations that were selected for your
20 analysis, and you say -- and I will read it into
21 the record:  "These occupations were selected
22 based on experience of the plaintiff and come
23 from occupations classified by the U.S. Bureau of
24 the Census."

13 (Pages 46 - 49)

Page 50

1 How did you obtain the information
2 that you -- well, strike that.
3 What did you mean when you wrote "were
4 selected based on experience of the plaintiff"?
5 A. Counsel gave me a list of occupations,
6 and I used that as a starting point, and then I
7 went to the Bureau of Labor Statistics or the
8 census and found occupations that I thought were
9 appropriate for the tasks of moving and
10 renovating office space in Chicago, and that's
11 how I chose them.
12 Q. What list of occupations does
13 plaintiff counsel provide to you?
14 A. I don't know exactly what the list
15 was. It was things like carpenter, painter.
16 Q. Do you have a copy of that what was
17 provided to you?
18 A. I do not.
19 Q. Do you have a copy in your records
20 somewhere?
21 A. I do not.
22 Q. So there was a document that they
23 provided to you -- did you rely on that document
24 to form your opinion?

Page 51

1 A. No.
2 Q. Well, your opinion says that you
3 selected the occupation based on experience of
4 the plaintiff.
5 What did you mean by that?
6 A. Again, the counsel provided me with a
7 list of occupations that I -- that they
8 thought -- for whatever reason they provided a
9 list of occupations to me. I don't know if I
10 have that list. I may have it. I don't think I
11 have it because then I just went to the -- I took
12 those occupations and I went to the Bureau of
13 Labor Statistics or the Census Department codes,
14 and I said what are -- you know, in my opinion, I
15 chose occupations that were relevant in
16 construction building trades, and I selected
17 those occupations that I thought relevant, and
18 those are in Appendix A.
19 MR. SCHUTTE: We will put this in writing,
20 Howard, but we will want to request a copy of
21 whatever was provided to the expert. We will put
22 it in writing.
23 BY MR. SCHUTTE:
24 Q. So do I understand correctly your

Page 52

1 testimony that when you wrote that these
2 occupations were selected based on experience of
3 the plaintiff, what you are referring to is a
4 list of occupations provided to you by
5 plaintiff's counsel?
6 A. Yes.
7 Q. Okay. You don't know anything about
8 the experience of WDES with respect to these
9 occupations, correct?
10 A. That's correct.
11 Q. Can I ask you about the references
12 section of your report which is at page 10?
13 A. Sure.
14 Q. Actually -- well, let's go ahead and
15 finish this, and then we will take a break.
16 What did you include in the reference
17 section on page 10?
18 A. I included references that support
19 any -- the statements at the appropriate places
20 in my report. I provide references to citations
21 where -- that provide evidence to support the
22 point I was making.
23 Q. Okay. Are there any articles or other
24 information that you relied on or cited in your

Page 53

1 report that you did not cite in the references
2 section?
3 A. Can you rephrase the question?
4 Q. I would be happy to, yeah. It was a
5 bad question.
6 Are there any references that you
7 relied on in your report that you did not include
8 in the reference section at page 10?
9 A. For example, I referred to some
10 websites that are not listed --
11 Q. Right?
12 A. -- but other than that, as far as I am
13 concerned, the citations reflect the reports, the
14 literature that I reviewed that I used to support
15 the statements in my report.
16 Q. Okay. Is there a reason why --
17 there's a -- on page -- in page 2 of your report,
18 there's a reference to an article or a finding by
19 Northrup?
20 A. Yes.
21 Q. And it's footnoted down to as reported
22 in I guess Thieblot or however you say that name.
23 A. Yeah.
24 Q. Am I missing it or is that article

14 (Pages 50 - 53)

Page 54

1 listed in the references?
2    A.   The Northrup article?
3    Q.   Yes.
4    A.   No, I think the -- is the Thieblot
5 article listed?
6    Q.   It's not, and that's why I was
7 wondering whether --
8    A.   That's an oversight.
9    Q.   Okay.  You intended to put into the
10 reference section anything -- any articles that
11 you relied on in forming your opinion?
12    A.   I intended to put into the reference
13 section any article that I use as evidence to
14 support my statements in the report.
15    Q.   Okay.  This might just be
16 happenstance.
17       Is it possible that there's a page
18 missing in that the list here which is
19 alphabetical ends at L or is it just a
20 coincidence that there aren't any articles that
21 you relied that anybody had last names after L?
22    A.   My quick review suggests that the only
23 omitted one was the Thieblot.
24    MR. SCHUTTE:  Okay.  Could we take a five to

Page 55

1 ten minute break.
2    THE VIDEOGRAPHER:  Going off the video
3 record at 10:29 a.m.
4    (WHEREUPON, a recess was had at
5       10:29 a.m. until 10:44 a.m.)
6    THE VIDEOGRAPHER:  We are back on the video
7 record at 10:44 a.m.  You may proceed.
8 BY MR. SCHUTTE:
9    Q.   Dr. Kaestner, we talked about at the
10 very start of the deposition that what you are
11 offering an opinion about is the difference
12 between union and non-union wages in the
13 occupations that you have defined as relevant to
14 the litigation, correct?
15    A.   Correct.
16    Q.   I want to make sure so it's clear for
17 the record and for the judge some things you are
18 not offering an opinion on.
19       One of them is you are not offering an
20 opinion, are you, as to whether Jones Lang
21 LaSalle is liable to WDES, correct?
22    A.   Correct.
23    Q.   And you are not offering an opinion
24 about whether WDES suffered damages or the amount

Page 56

1 of those damages, correct?
2    A.   Correct.
3    Q.   You are not offering any opinion about
4 whether a union-only rule exists in the Chicago
5 Loop, correct?
6    A.   Correct.
7    Q.   Okay.  Now, let's get into the meat of
8 your opinion.
9       So, as I read it and tell me if this
10 is a fair overall description of your approach,
11 you have looked at the question of the difference
12 between union and non-union wages from three
13 angles.  You have done a review of academic
14 literature.  You have done an original analysis
15 based on the Current Population Survey data, and
16 then you have done an analysis done based on
17 Illinois Department of Labor data, and then you
18 have ultimately formulated an approach that could
19 used you say on a class-wide basis to identify
20 the damages that have been suffered.
21       Is that a fair overall summary?
22    A.   Yes.
23    Q.   On page 1 of the report at the very
24 last sentence on page 1 that begins in that

Page 57

1 analysis, you say:  "I estimate the difference in
2 wages (and fringe benefits) between union and
3 non-union workers."
4       The only part of the analysis where
5 you look specifically at fringe benefits is in
6 the section on the Department of Labor -- based
7 on the Department of Labor statistics, correct?
8    A.   Yes, correct.
9    Q.   You don't look at fringe benefits in
10 the Current Population Survey analysis, correct?
11    A.   That's correct.
12    Q.   Okay.  And then you go on to write:
13 "In occupations typically used to move into and
14 renovate commercial space."
15       How -- can you tell us how you
16 identified the occupations that are typically
17 used to move into and renovate commercial space?
18    A.   As I said, I started from a list of
19 occupations and then went to the Bureau of Labor
20 Statistics or the Census Bureau, they overlap,
21 where they have occupational titles and groups
22 and tasks by areas.  So for construction,
23 building trades, then I chose the occupations
24 that I thought would be used in those activities.

15 (Pages 54 - 57)

Page 58

1  Q.  Okay.  Did you consult any materials
2  or rely on anything other than your -- the
3  document you received from plaintiff's counsel
4  and your own work at looking at the available
5  categories in order to identify the occupations
6  typically used to move into and renovate
7  commercial space in downtown Chicago?
8  A.  No.
9  Q.  Thank you.
10        Finally, at the end of that same
11 sentence, you say -- let me read the whole
12 sentence so it's not out of context:  "In that
13 analysis, I estimate the difference in wages and
14 (fringe benefits) between union and non-union
15 workers in occupations typically used to move
16 into and renovate commercial space in downtown
17 Chicago."
18        When you wrote downtown Chicago, what
19 do you mean?
20     A.  I meant that the estimate that I --
21 the estimates that I have obtained and report in
22 the expert testimony and the expert report in my
23 opinion they apply to the -- they would be
24 reasonable and applicable to the downtown Chicago

Page 59

1  Loop as we have defined earlier.
2     Q.  So when you wrote downtown Chicago,
3  you mean the same thing as the definition of
4  Chicago Loop that plaintiff uses in their
5  complaint at page 9?
6     A.  Yes.  That's how I intended it to be
7  used.  I was somewhat imprecise in my language.
8     Q.  Okay.  But just to be clear for the
9  record, there is no part of your analysis where
10 you look at data specific to the Chicago Loop,
11 correct?
12    A.  That's correct.
13    Q.  Okay.  Let's talk about the review of
14 the academic literature.
15        First of all -- which is on pages 2
16 and 3 of your report Exhibit No. 17.  It's
17 accurate, is it not, that none of the studies
18 that you looked at that had been done previously
19 are specific to the Chicago Loop?
20    A.  That's correct.
21    Q.  Okay.  Now, you used throughout these
22 two pages on a number of occasions, you used the
23 phraseology unions raised wages.  For example, in
24 your description in the bullet about the Lewis

Page 60

1  study, you say that between 1970 and 1979, unions
2  raised wages by 14 percent among all workers.
3        I could give you other examples, but
4  what do you mean by unions raised wages?
5     A.  I mean that union wages are above the
6  non-union wage.
7     Q.  So you don't mean actually that the
8  unions caused the wages to go up.
9        What you are referring to -- it's
10 another way of referring to the difference
11 between union and non-union wages?
12    MR. FOSTER:  Object to the form of the
13 question.  Misstates his testimony.
14 BY THE WITNESS:
15    A.  Do you want to ask another question or
16 should I answer?
17    MR. FOSTER:  You can answer the question.
18 BY THE WITNESS:
19    A.  So it's -- economic theory widely
20 viewed economists accepted opinion that
21 unions through restraint of supply of labor raise
22 wages above the market wage, the non-union wage.
23 So that's why that statement raise wages is
24 consistent and is used because that's the

Page 61

1  mechanism that creates the union, non-union
2  differential in wages.
3  BY MR. SCHUTTE:
4     Q.  Okay.  In the section little two,
5  which is Studies Related to Construction -- well,
6  let me strike that and start over.
7        Section little i on page 2 Studies
8  Related to All Workers, those are studies that
9  deal with all union versus non-union workers, not
10 specific to the construction industry, correct?
11    A.  That's correct.
12    Q.  And in section little ii Studies
13 Related to Construction Workers, those are
14 studies related to the construction industry,
15 correct?
16    A.  Correct.
17    Q.  Do any of those construction -- the
18 studies related to construction workers use the
19 same occupations that you chose to use in your
20 analysis -- your original analysis of the Chicago
21 metropolitan area or the Cook County data?
22    A.  Yes, there would be significant
23 overlap.  I don't know exactly how much overlap,
24 but there's significant overlap because the

16 (Pages 58 - 61)

1 occupations in Appendix A are under the broader
2 heading construction.
3    Q.   Okay.
4    A.   So there would be, as I say, a great
5 deal of overlap.  I can't say exactly the overlap
6 between these -- the occupations in these studies
7 and -- these studies mostly use the same data
8 source and the same general approach.
9    Q.   They use the same current population
10 survey data?
11   A.   Yes.
12   Q.   Okay.  Did you actually look at these
13 studies to determine whether they overlapped
14 exactly or substantially with the occupations
15 that you included in your original analysis?
16   A.   I did review all these studies.  These
17 studies don't list exactly all the occupations.
18 They included -- to the best of my knowledge,
19 they would include all occupations under the
20 broader category of construction as listed in the
21 occupational classification on Appendix A which
22 is not exactly that, but these are the
23 occupations -- these are the majority of
24 occupations listed under the broader group -- the

1 vast majority of occupations that were used in
2 these studies.  So I would -- it's my opinion
3 that these studies are very relevant to the exact
4 question that I am answering.
5    Q.   Okay.  None of the studies in -- the
6 studies related to construction workers are
7 specific to the Chicago Loop, correct?
8    A.   That's correct.
9    Q.   And none are specific to the Chicago
10 metropolitan area, correct?
11   A.   That is correct.
12   Q.   And --
13   A.   Can I --
14   Q.   Of course, yes.
15   A.   I would like to note that all of these
16 studies have -- there's a very consistent finding
17 across all of these studies by time, by year.  So
18 that's an important fact to recognize.
19   Q.   None of the studies in the section
20 called Studies Related to Construction Workers
21 have -- rely on data that's more current than
22 2007, correct?
23   A.   That's correct.
24   Q.   And only one of the studies that's the

1 Bilginsoy, if I am pronouncing that correctly,
2 only one of the studies, the Bilginsoy study uses
3 data more recent than 2002; isn't that correct?
4    A.   That's correct, but I would add that
5 the -- one of the main findings of this review of
6 the literature was that the estimates of the
7 difference between union and non-union wages was
8 remarkably stable through a very long period of
9 time as indicated by these various studies.
10   Q.   But, again, to answer my question,
11 only the Bilginsoy study uses data more recent
12 than 2002?
13       MR. FOSTER:  Objection, asked and answered.
14 You can answer.
15 BY THE WITNESS:
16   A.   That's correct.
17 BY MR. SCHUTTE:
18   Q.   You testified to this generally, but
19 when you looked at these studies related to
20 construction workers, did you confirm that they
21 rely on the Current Population Survey, or did you
22 look at whether any of them relied on different
23 data sets?
24   A.   The older studies relied on different

1 data sets.  The more recent studies -- and
2 everybody but Northrop relied on the Current
3 Population Surveys to the best of my
4 recollection.
5    Q.   Okay.  How did you chose the studies
6 related to construction workers that you included
7 in your report?
8    A.   I did a review of the academic
9 literature, and these were all the studies that I
10 uncovered.  I don't leave any out.
11   Q.   Thank you.  That was what I was going
12 to ask.
13       Now, you testified a moment ago, and I
14 will paraphrase what you said, that you -- your
15 reading of the studies related to construction
16 workers is that they -- your analysis of them
17 concluded that the difference between union and
18 non-union wages was I think you said remarkably
19 stable over time.
20       Is that your testimony?
21       MR. FOSTER:  Well, objection.  Could you
22 just refer him to where you are quoting?
23       MR. SCHUTTE:  I am quoting from what he
24 said --

17 (Pages 62 - 65)

1     MR. FOSTER: Okay. Wait, you mean -- okay.
2  You mean in a prior answer here?
3     MR. SCHUTTE: Yes.
4     MR. FOSTER: Okay. Okay. Go ahead, sorry.
5  BY THE WITNESS:
6     A.  Let me be more precise. You can see
7  that the estimates in Section A little ii are --
8  range from the smallest estimate -- it's here but
9  we can review was I think 24, and the largest was
10  54, but there's a preponderance of estimates in
11  the -- around 40 -- 40 to 45 percent. So that's
12  what I meant by remarkably stable because it
13  spans a period of time stretching from 1936
14  through basically 2007.
15  BY MR. SCHUTTE:
16     Q.  The gap between union and non-union
17  wages though changed over time?
18     A.  Not -- not from my reading of the
19  evidence. That there was different estimates,
20  for example, 50 percent in 1936 or 43 percent as
21  reported in Northrup, and then the 41 percent
22  reported in Blanchflower Bryson in the 1996 to
23  2000 range. So over time those two estimates are
24  43 percent and 41 percent and span a period of 70

1  years.
2        So that is why, and then I would also
3  comment that in studies related to all workers,
4  you see again the remarkable stability of the
5  estimate across studies and over time.
6     Q.  Okay. Would you agree with me based
7  on your experience in labor economics, that the
8  power of unions ebbs and flows over time?
9     A.  I don't know what you mean by the
10  power of the unions.
11     Q.  Did you read the Bilginsoy article?
12     A.  Yes, I have read every article that I
13  have got here.
14     Q.  Isn't it correct that the entire point
15  of the Bilginsoy article was to try to understand
16  the reason for the declining union power and the
17  quote shrinking union wage premium in the U.S.
18  construction industry between the 1980s and
19  2000s?
20     A.  The point of the Bilginsoy article --
21  I don't know what the intention of the author
22  was, but the results reported were that they look
23  at the union, non-union wage differential in
24  construction trades between 1983 and 2002. They

1  come up with a different number 47 percent in
2  '83, '88, 38 percent in 2002, 2007. Then they
3  speculate on what reason that might be, but in
4  terms of what they actually report and the
5  evidence, that's the evidence.
6     MR. SCHUTTE: Let's mark this Exhibit 21
7  please -- 20, please.
8        (WHEREUPON, a certain document
9        was marked Exhibit No. 20, for
10        identification, as of 2/21/20.)
11  BY MR. SCHUTTE:
12     Q.  Exhibit 20, Dr. Kaestner, is the
13  article titled Union Wage Gap in the U.S.
14  Construction Sector: 1983 to 2007 by Cihan,
15  C-I-H-A-N, Bilginsoy, B-I-L-G-I-N-S-O-Y, from the
16  journal called Industrial Relations dated July of
17  2013.
18        This is the article that you refer to
19  in your report at page 3, correct?
20     A.  Correct.
21     Q.  Okay. And the very first thing that
22  Mr. Bilginsoy -- assume that -- do you know
23  Mr. Bilginsoy?
24     A.  I do not know him.

1     Q.  Do you know if it's a man or a woman?
2     A.  I do not.
3     Q.  I assume it's a man, but I could be
4  accused of being sexist if I am shown to be
5  wrong.
6        Mr. Bilginsoy writes at the start --
7  sort of the synopsis of his article: "Wage gap
8  decomposition shows that declining union power
9  was the principal force behind the shrinking
10  union wage premium in the U.S. construction
11  industry between the 1980s and the 2000s."
12        Did I read that correctly?
13     A.  Yes, I didn't -- I wasn't --
14     Q.  Do you agree with Mr. Bilginsoy that
15  there was a shrinking union wage premium in the
16  U.S. construction industry between the 1980s and
17  the 2000s?
18     A.  I agree that they -- in their
19  estimates they produced two estimates, one for
20  the 1983 to '88 period and one for the 2000 and
21  2007 period, and that those are different. They
22  do not -- I don't think they actually provide
23  whether they are in a statistical sense
24  different.

18 (Pages 66 - 69)

Page 70

1    Q.   Let's take a look at that.  There's a
2  Table 1 in the Bilginsoy article at page 685.
3  It's titled Unionization Rates and Real Wages in
4  Construction Trades.
5        Do you see that?
6    A.   Yes, I do.
7    Q.   So in a 1983 to '88 sample, the union
8  premium for all trades is 86.8 percent and the
9  union premium in the 2002 to 2007 sample is 78.2
10 percent, correct?
11   A.   That's what this reported, yes.
12   Q.   Yes.  And the union premium for basic
13 trades in the '83 to '88 sample is 88.3 percent,
14 and then in the 2000 to -- excuse me -- the 2002
15 to 2007 sample, the union premium for basic
16 trades is 81.3 percent, correct?
17   A.   That's what's reported in the table as
18 the means of wages for people in their sample.
19   Q.   And for mechanical trades, the '83 to
20 '88 sample has the union premium 80.6 percent,
21 and in the 2002 to 2007 sample, it is at 61.3
22 percent for the mechanical trades, correct,
23 that's what they report?
24   A.   That's what they report.

Page 71

1    Q.   And would you agree that if those
2  numbers are accurate, that there is a shrinking
3  union wage premium in the U.S. construction
4  industry between the 1980s and 2000s as
5  Mr. Bilginsoy writes on page 1 of his article?
6    A.   I would not agree with that statement
7  as consistent with the evidence that's presented
8  because -- I wouldn't agree with that as being
9  consistent with the evidence in Table 1 or other
10 places in the document.
11   Q.   But you rely on Mr. Bilginsoy, do you
12 not, in your report as being a good data point
13 for the union wage difference in the construction
14 industry -- I guess that's the end of my
15 question.  Let me rephrase the question.
16       You rely on Bilginsoy as one of seven
17 studies related to construction workers that you
18 later in the report say verifies or validates the
19 conclusions you reach in your original analysis?
20   A.   That's correct, except my evidence
21 that I am using is not the same as Table 1.  I am
22 using evidence in other tables that are more --
23 that are different than Table 1, and those are
24 the evidence that I refer to.

Page 72

1    Q.   Which table of Bilginsoy are you
2  using?
3    A.   Well, I have written 47 and 38.  So
4  those are the numbers that I am relying on now.
5    Q.   Perhaps you could point us to where
6  those came from.
7    A.   Yeah.  And the reason I am -- say
8  there's several different analyses, different
9  levels of -- that are used in the analysis.  So I
10 want to find -- there's preferred analyses and
11 non-preferred analyses by the authors'
12 description.
13       Here we go Table 5.
14   Q.   Okay.  What page is that on?
15   A.   Page 691.  Sorry for taking so long.
16   Q.   First, can you just point to us where
17 you got the 47 percent and the 38 percent that's
18 referenced in page 3 of your report?
19   A.   Yes, that's -- it's under the row.
20 It's called Union Effect Adjusted Wage Gap .467.
21 That's in log points in logarithm.  So that's not
22 exactly, but 47 percent is -- would be the
23 interpretation, and then there would be 38
24 percent -- .378 would be 38 percent for the 2000,

Page 73

1  2007.
2        There's very similar evidence reported
3  in a different type of analysis called the IV,
4  Instrumental Variables corrected, and it's almost
5  identical .47 and .38.  So those are the numbers
6  I use.  Those are the numbers that are preferred
7  and stated by the authors or the author in this
8  case that are preferred and what they
9  believe is most correct.
10   Q.   Where does the author say that?
11   A.   In the description of the analysis.
12 That's why they did this -- these two different
13 approaches, but they are remarkably consistent.
14   Q.   But the fact that the union effect
15 adjusted wage gap of 47 percent in 1983 to 1988
16 had shrunk to 30 -- you used 38 percent which is
17 rounding up in 2002 to 2007.  That does
18 demonstrate what Bilginsoy says at the very start
19 of his article that there is a shrinking union
20 wage premium in the U.S. construction industry,
21 correct?
22       It's gone from 47 in '83 to '88 down
23 to 38 percent in 2002, 2007?
24   A.   Yes, except that if you look at the

Page 74

1  Blanchflower Bryson article which uses the exact
2  same period '83 to '88, they report the union
3  wage premium of 52 percent.  So these estimates
4  are just one of many that's why I put as the
5  academic literature.  None should be preferred --
6  preferred or advantaged over other ones.  Again,
7  the point of my review is to show the stability
8  and similarity of the academic literature, and
9  then I provided my own analysis with current data
10 along the same lines as them to answer the
11 question.
12     Q.    So your testimony is that Bilginsoy's
13 data is just one of many approaches that could be
14 taken, none is more right than any other; is that
15 correct?
16     A.    My report reviews academic studies and
17 reports on what the several academic studies have
18 reported in analyses of the union wage premium in
19 construction.  Every analysis has slight
20 differences.  For example, in Bilginsoy they talk
21 about -- or is this the one with mechanical
22 trades.  It's not clear what mechanical trades
23 are, all trades, basic trades.
24        So every report might be somewhat

Page 75

1  different for that reason, but a preponderance of
2  evidence and assessment of the evidence that's
3  why these studies were there to provide
4  background for my own analysis and some
5  comparison to my own analysis.
6      Q.    So is it fair to say that you rely on
7  Bilginsoy's numbers, the 47 percent in 1983 to
8  '88 and 38 percent in 2002 to 2007, but you
9  disagree with his statement that there is a
10 shrinking union wage premium in the U.S.
11 construction industry between the '80s and the
12 2000s?
13     A.    Can you clarify what you mean by rely
14 on?
15     Q.    You cited seven studies in -- related
16 to construction workers in your review of
17 academic literature, correct?
18     A.    Correct.
19     Q.    And later you come to the conclusion
20 that your original analysis based on the current
21 population survey and Illinois Department of
22 Labor data -- I will paraphrase here and we will
23 talk about it later, but you say one reason why I
24 think my numbers are right is because they line

Page 76

1  up with the seven studies that are discussed in
2  the academic literature section of my report.
3  Isn't that what you do?
4      A.    I think that I compare my estimate to
5  the academic literature to establish that my
6  estimates aren't particularly unusual.
7      Q.    Okay.  Do you agree with Bilginsoy his
8  analysis that the difference between union and
9  non-union wages for construction workers was 47
10 percent in 1983 to 1988?
11     A.    That's the estimate he reported.  I
12 don't have to agree or disagree with it.  This is
13 the estimate that they reported based on their
14 analysis.  I accept that estimate.
15     Q.    Okay.  And you also accept the
16 estimate of 38 percent in 2002 to 2007, correct?
17     A.    When I say accept the estimates, those
18 are the estimates I reported.  They have drawn
19 their own conclusions.  I didn't draw conclusions
20 from those estimates.  I just reported the
21 estimates.
22     Q.    Based on all of the articles you
23 looked at, will you agree with me that the union
24 wage gap between union workers in the

Page 77

1  construction industries and non-union workers in
2  the construction industry changes over time?
3      A.    Again, based on my reading of the
4  evidence and my conclusion is that the union
5  premium in construction has generally been
6  relatively stable, and that it's not -- there's
7  no consistent evidence of a mark change
8  substantially over time.
9      MR. SCHUTTE:  Let's mark this as 21, please.
10 This is the Blanchflower and Bryson article that
11 you cite.
12        (WHEREUPON, a certain document
13        was marked Deposition Exhibit No.
14        21, for identification, as of
15        2/21/20.)
16 BY MR. SCHUTTE:
17     Q.    I'll start over with apologies to
18 Andrea.
19        What we have marked as Exhibit 21 is
20 the Blanchflower Bryson article titled What
21 Effect Do Unions Have on Wages Now and Would
22 Freeman and Medoff Be Surprised from the Journal
23 of Labor Research summer of 2004.
24        Are you familiar with the Journal of

20 (Pages 74 - 77)

1 Labor Research, Dr. Kaestner?
2    A.   I am, yes.
3    Q.   Is that a widely accepted journal in
4 the field of labor economics?
5    A.   I think it's a journal that's in -- a
6 labor economics journal, a professional journal
7 of labor economics.  That's my opinion.
8    Q.   Is that a prestigious journal?
9    A.   It's a professional journal with peer
10 review.  Whether what journals are prestigious or
11 not are in the eye of the beholder.
12   Q.   Is it widely considered to be
13 prestigious like you say the Chicago -- you say
14 the National Bureau of Economic Research is
15 widely considered to be prestigious.
16       Would you consider the Journal of
17 Labor Research to be widely considered to be
18 prestigious?
19   A.   Again, I am going to tell you that
20 this is a professional journal that
21 publishes articles in the Journal of Labor
22 Economics.  I would assess the credibility of
23 every article that is presented and to draw my
24 conclusions of it.  In terms of do I believe that

1 there's -- that this reflects a professional
2 peer-reviewed journal that imbues it with the
3 qualities that that comes with, yes.
4    Q.   Okay.  Did you read the Blanchflower
5 and Bryson article in connection with your work
6 on this?
7    A.   I did.
8    Q.   Okay.  Did you read all the articles
9 that you cited in your report?
10   A.   I read -- the only article that I
11 didn't read is because of where I say reported in
12 another article because those were results of
13 analysis reported in those articles.
14   Q.   Okay.  At the very start of their
15 article Blanchflower and Bryson write that the
16 book published in January 1985 -- excuse me --
17 the book from 1984 called What Do Unions Do is
18 according to Blanchflower and Bryson the most
19 famous book in labor economics and industrial
20 relations.
21       Do you agree with that?
22   A.   I agree it was one of the most
23 comprehensive analyses of what -- of unions at
24 the time, and that's what I -- how I would

1 characterize it.
2    Q.   Have you read the book?
3    A.   I have.
4    Q.   Okay.  But why did you qualify your
5 statement unions at the time?
6    A.   Because it was written in 1984.  So I
7 think it was a very important work and
8 comprehensive analysis that had not been
9 previously done.
10   Q.   Okay.  Where in the Blanchflower and
11 Bryson article did you get the numbers that you
12 cite on page 3 of your report?
13   A.   Well, Table 8 is one of the numbers.
14 You can see that the -- in construction -- the
15 line labeled Construction says the change in
16 premiums is minus 10.7 rounding to 11, and that's
17 consistent with the 52 and 41 that I cite in the
18 report.  I am having trouble identifying the 52
19 and 41 exactly where that comes from in the
20 report, but that's consistent with what I wrote,
21 and I am sure the 52 and 41 are in there.  I just
22 can't put my finger on it right now.
23       I think it's on page 3 -- on page 397.
24 We used our data to estimate separate results by

1 two digit industry.  We chose these years using
2 these data.  We also found considerable
3 variation.  There is less variation in the wage
4 gap by industry in the later period --
5    Q.   Sorry.  You have to slow down.
6    A.   I'm sorry.  Anyway it's on page 397,
7 and it's at the bottom of page 397, and you see
8 41 percent and 52 percent in construction as
9 reported by the authors, and then those two
10 numbers again feed into Table 8 where they report
11 a minus 10.7 percent.
12   Q.   Okay.  So to sum up what I have been
13 asking you about, Blanchflower and Bryson find
14 that the union wage premium in 1983 to 1988
15 period is 52 percent, and Bilginsoy finds that
16 during that same period it's 47 percent, correct?
17   A.   That's as reported, yes.
18   Q.   And then Blanchflower and Bryson find
19 that by the 1996 to 2001 time period, the union
20 premium has dropped to 41 percent, correct?
21   A.   That's correct.
22   Q.   And Bilginsoy looks at a different
23 time period 2002 to 2007, but he sees that the
24 wage gap has dropped to 38 percent, correct?

21 (Pages 78 - 81)

1   A.   Yes.
2   Q.   So isn't it fair to say that both
3   Blanchflower and Bryson and Bilginsoy find a
4   shrinking union wage premium in the U.S.
5   construction industry between the 1980s and the
6   2000s?
7   A.   Throughout the United States.  So I
8   would just qualify your -- that in the United
9   States as a whole these estimates suggest that
10  there's been -- not suggest.  They just report as
11  a mean estimate with confidence intervals around
12  them a lower estimate in the later period than in
13  the early period.  They do not report whether
14  they are statistically different from each other.
15  Q.   Do you have an issue with them using
16  data from across the United States in their
17  analysis?
18  A.   What do you mean an issue?
19  Q.   Do you think it was appropriate for
20  them to use data from construction industry
21  wages -- strike that.
22       Do you think it was appropriate for
23  them to use data about construction industry
24  wages from throughout the United States to do

1   their analysis that's summarized in their
2   articles?
3   A.   Their intent was to describe the
4   situation in the United States.  So that is
5   appropriate.
6   Q.   I want to change gears now and start
7   asking you about your analysis of the
8   government -- the data.
9       At page 1 of your report you refer to
10  this as an original analysis of official
11  government data.  What did you mean by that?
12  A.   That I conducted these -- the
13  statistical analysis using data made -- collected
14  and made available by the federal government.
15  Q.   But why did you say it was original?
16  A.   Because I did it.
17  Q.   Did you mean to state that it is
18  original because no one to your knowledge had
19  ever done an analysis before of the union versus
20  non-union wage gap in the Chicago metropolitan
21  area?
22  A.   No, I used the word original to --
23  perhaps incorrectly to refer to that I did this.
24  Q.   Okay.  As opposed to the section where

1   you are reviewing previously written academic
2   studies?
3   A.   That's correct.
4   Q.   Okay.  Thank you.
5       Okay.  So your analysis based on the
6   current population survey starts on page 3 of
7   your report, correct?
8   A.   Yes.
9   Q.   Why did you choose the current
10  population survey data?
11  A.   This is the most widely used data to
12  estimate the union, non-union wage differential.
13  It's one of the few data sets that report whether
14  a worker is covered by a union or not, and it has
15  the largest sample size that are available to
16  conduct the analysis, and as I say, it's been
17  widely used in many analysis, not just of the
18  union, non-union wage differential but of
19  analysis of wage differentials in general.
20  Q.   Did you consider other data --
21  consider but reject using other data sets?  And
22  I'll set to the side the Department of Labor
23  statistic that you use later in your report.
24  A.   Just let me just correct you.  That's

1   the Illinois Department of Labor prevailing wage.
2       I searched for other available data
3   sets, and I didn't find any that were acceptable
4   or that I felt were better than the Current
5   Population Survey.
6   Q.   Dr. Kaestner, prior to your work on
7   this matter, had you ever done any work with the
8   Current Population Survey data?
9   A.   Yes.
10  Q.   The Current Population Survey is
11  self-reporting, correct?
12  A.   Yes, it's information that's reported
13  by individuals to surveyors.  Let me add it's
14  generally considered very high quality in
15  reporting of the data.
16  Q.   So over on page 4 -- maybe I can try
17  to summarize to see if I understand what it is
18  you did is that you took all of the occupations
19  that are listed in Appendix A which is a list we
20  have talked about that you came up with based on
21  what was provided to by plaintiff's counsel and
22  your own review of the data.
23       You -- for purposes of page 4, you
24  melded all of that into a single data set, and

Page 86

1  you looked at the union wage premium inside the
2  Chicago, Naperville, Joliet metropolitan area and
3  outside that area, and the summary as reflected
4  in the bullets on page 4; is that correct?
5      A.  Yes.
6      Q.  And what you concluded was that the
7  union wage premium in the combined occupations
8  listed in Appendix A is 39 percent in areas
9  outside the Chicago metropolitan area and 47
10  percent inside the Chicago metropolitan area,
11  correct?
12      A.  That's correct.
13      Q.  Do you have an understanding that you
14  could explain to the judge and jury of what is
15  encompassed by what you referred to as the
16  Chicago-Naperville-Joliet metropolitan area?
17      A.  Well, it's an official designation of
18  the U.S. Census, an official government
19  designation.  I don't know exactly the
20  geographical boundaries, but it includes
21  Naperville and Joliet --
22      Q.  Do you know if it includes --
23      A.  -- and Chicago and the Loop.
24      Q.  Right.  And here is what I am getting

Page 87

1  at.  I am not fighting with you.  I just don't
2  understand it myself is does it include, for
3  example, all of Cook County plus DuPage and Lake
4  and whatever county Joliet is in -- what I am
5  not remembering right now -- Will?
6      A.  It includes all of Cook County.  As I
7  say, I don't know the exact geographical
8  boundaries.  The reason I use this is because
9  it's the smallest geographical area that's
10  available to do the analysis.
11      Q.  And where is this information
12  available?
13      A.  What information specifically?
14      Q.  The information that you used to make
15  your -- to do your analysis that's summarized in
16  the first two bullets on page 4.  Is it a
17  publicly available website?
18      A.  Yes.
19      Q.  Did you retain the data that you
20  pulled in and analyzed for union wage premiums
21  inside and outside the Chicago metropolitan area?
22      A.  I did.
23      Q.  Is it in a spreadsheet?
24      A.  It is not.

Page 88

1      Q.  In what form is it kept?
2      A.  It's in an electronic data set and in
3  a -- in a software, statistical software program
4  format.
5      Q.  Okay.  How did you adjust
6  statistically for the fact that you are using
7  data from several years?  What do you mean by
8  that?
9      A.  Yeah, so I allow the effect of the
10  wages to differ by year to account for variation
11  in inflation and changes in wages over time.
12      Q.  Is that calculation reflected in the
13  electronic data set that you referred to that's
14  kept in the statistical software program?
15      A.  That calculation -- first of all, let
16  me say this is a standard approach that you can
17  find in thousands of analyses -- similar
18  analyses.  Second, that calculation is reflected
19  in the figures in Section I here, the 39 percent
20  and the 47 percent.
21      Q.  What I am asking is is, for example,
22  if we wanted to have an expert replicate what you
23  did, is the data set that you used and the
24  analysis that you did to statistically adjust for

Page 89

1  the fact that you are using data from several
2  years available currently in the software program
3  that you discussed earlier?
4      A.  Yes, the analysis could be replicated.
5      Q.  Okay.  What did you mean when you say:
6  Also calculate estimates using the sample survey
7  weight provided by the CPS or Current Population
8  Survey?
9      A.  That means there's a different -- that
10  each person in the survey has a probability of
11  being sampled relative to their population, and
12  so this again is a very standard approach to
13  adjust the estimates for that they might sample a
14  little bit more of one group, a little bit less,
15  and these weights adjust for that.  I don't think
16  that they make almost any difference to what I
17  have reported here whether you do or do not make
18  that adjustment.
19      Q.  Okay.  I am not a statistician so bear
20  with me on this question.
21          When you say sample -- I want to make
22  sure I understand we are on the same page by what
23  you mean by sample.  So in the CPS there is a
24  pool of data available about union and non-union

23 (Pages 86 - 89)

1 workers in the industries in Appendix A. Did you
2 use all of that data to do your analysis or did
3 you take a sample from that data?
4     A.   No.  So the Current Population Survey
5 is -- we refer to it as a sample because it's a
6 sample of the broader population.
7     Q.   Right.
8     A.   So that sampling reflects that not
9 everybody is drawn perfectly randomly from the
10 population.  They might overrepresent a
11 particular geography or a particular type of
12 person.  They calculate weights to account for
13 that.  The survey is very standard.  It's an
14 excellent survey.  So year after year it's a very
15 comparable survey.
16         That's what I mean by sample.  Given
17 the sample -- and I think I am pretty explicit in
18 what I say is the analysis is restricted to
19 workers ages 18 to 64 who are employed in the
20 private sector in the years 2011 to 2019, and
21 then among that group, I use everybody that I can
22 observe.
23     Q.   Okay.  Thank you.  That last one the
24 use of sample I wanted to make sure I understood.

1         Sampling, as you use it in your
2 report, refers to what is done in the current
3 population survey to get their data, but once you
4 had their data, you did not pick a sample or
5 subset of that data to run your analysis?
6     A.   No, as a -- so there's a little bit of
7 imprecision.  I said the sample for the analysis.
8 So I selected.  I didn't take everybody in the
9 Current Population Survey.  I restricted to those
10 who are 18 to 64 employed in private sector, not
11 government jobs, state, or federal, local
12 government jobs in these years.
13     Q.   But within those parameters, you use
14 all the data available without sampling?
15     A.   Yes.
16     Q.   Okay.  Thank you.  That clarifies one
17 issue I had reading this.
18         Why did you confine the work you did
19 to the public sector -- excuse me -- to the
20 private sector?
21     A.   Because I -- I was intending to
22 estimate the union, non-union wage differential
23 for employees who are employed in the private
24 sector, not by government.

1     Q.   Okay.  Do you know whether any of
2 the -- are you aware that during the class
3 period, the buildings managed by JLL at one point
4 or another there was 20 such buildings?
5     A.   I am not aware.
6     Q.   Okay.  Would your analysis -- we will
7 get to this later, but would your analysis apply
8 it a tenant in one of those 20 buildings managed
9 by JLL who was a public sector tenant?  For
10 example, if the Illinois Department of Labor or
11 the Illinois secretary of space (sic) is a tenant
12 in one of the 20 class buildings, would your
13 analysis apply to that tenant?
14     A.   My analysis would apply to people who
15 have used private sector workers.
16     Q.   Even if it's a public sector --
17     A.   If they use private sector workers, my
18 analysis would -- to do the renovation and move
19 in, then I would say my results apply.
20     Q.   Thank you.  I'm sorry if I am being
21 obtuse, but just so I can restate it.
22         The analysis is not on who the tenant
23 is or who the person having the work performed
24 for them is.  It's whether the workers are

1 private or public workers?
2     A.   The analysis is privately employed
3 workers.
4     Q.   Okay.
5     A.   I don't want to be difficult.
6     Q.   No, you are not being difficult.  I
7 appreciate your helping me understand the
8 analysis.
9         Can you explain for the judge and the
10 jury what you mean at the end of bullet 1 where
11 you say:  It was highly significant from a
12 statistical perspective (p-value of less than
13 .001)?
14     A.   That means that if you -- that with
15 great certainty the estimate of 39 percent is
16 very different from zero, and, in fact, it's very
17 a small confidence interval around it.  So the
18 idea that it's a very precise estimate.  It
19 doesn't go from minus 10 to minus 80.  That 39
20 percent is a very reliable, credible estimate
21 that if you did this analysis with a thousand
22 different samples, you would get 39 percent a lot
23 of times.
24     Q.   Okay.  And in the second bullet you

24 (Pages 90 - 93)

Page 94

1 have a p-value of .06, but that's referring to
2 the difference between 39 percent and 47 percent,
3 correct?
4    A.   Correct, but can I clarify?
5    Q.   Of course.
6    A.   That the 47 percent is still very
7 reliable in and of itself as being very different
8 with great certainty from zero and, in fact, with
9 94 percent certainty, it's different from 39.
10    Q.   Did you calculate the p-value of 47
11 percent?
12    A.   I did not.  I did not report it so,
13 but given that 47 percent is bigger than the 39
14 percent, the p-value will be probably very
15 equivalent to the .0001.
16    Q.   Okay.  The sentence at the end of the
17 second bullet point:  "The higher union wage
18 premium in the Chicago than the U.S. is
19 consistent with the greater union density in
20 Chicago than in the rest of the U.S.; the share
21 of workers in unions in the occupations in
22 Appendix A in Chicago is twice that of the U.S."
23          What is the source of that sentence?
24    A.   That's the current population survey

Page 95

1 and the -- directly from the sample and the
2 analysis that I -- the same data that I have used
3 to calculate these estimates.
4    Q.   What is the relationship between
5 greater union density and a higher union wage
6 premium?  Why do you draw that conclusion?
7    A.   As I think I have cited the evidence,
8 but in general there's evidence to show that
9 because unions constrain labor supply, they are
10 more effective at doing that when they have a
11 larger share of the workforce.  Given that
12 greater -- this is what people refer to as their
13 greater union power, that they have been able
14 to -- so you would expect a higher union non-wage
15 union premium in Chicago versus the rest of the
16 United States because of that higher density,
17 greater ability to restrict entry of labor.
18    Q.   Okay.  And I should have asked this
19 early on, but I want to make sure that it's clear
20 for the record.
21          When you are talking about the
22 difference between union and non-union workers,
23 you're talking -- the analysis that's being done
24 on a dollar per hour basis, correct?

Page 96

1    A.   It's not always reported as an hourly
2 wage.  It's sometimes reported as a weekly wage,
3 and so I use both of those, and I think, as I say
4 in the report, I adjust for the fact that
5 sometimes it's reported as an hourly wage and
6 sometimes reported as a weekly wage.
7    Q.   But in either instance it is a wage
8 over a particular period of time, either per hour
9 or per week?
10    A.   Yes, and it applies to the last
11 year --
12    Q.   Okay.
13    A.   -- or I'm sorry -- at the time of the
14 interview.
15    Q.   And just so that I -- I think I have
16 already asked you this.  So, Howard, I will save
17 you the asked and answered, but I want to make
18 sure I am clear.
19          When you use the term metropolitan
20 Chicago throughout your report, you are talking
21 about the Chicago-Naperville-Joliet metropolitan
22 area?
23    A.   Correct.
24    Q.   Okay.  Dr. Kaestner, why did you chose

Page 97

1 to use the time period 2011 to 2019?
2    A.   There was two reasons.  One is because
3 any individual year does --
4    Q.   Go ahead.  I'm sorry.
5    A.   Any individual year does not have --
6 would have less sample size, and the size of the
7 number of observations and sample used in the
8 analysis is important to how you measure the
9 precision of the estimate, again, how much
10 certainty --
11    Q.   Yes.
12    A.   -- you can put behind the estimates.
13 So and then I did not go back before 2011.  One,
14 I wanted to keep the data as recent as possible
15 and, two, that the occupational classifications
16 changed between 2010 and 2011.
17    Q.   Okay.  Are you aware that the class
18 that the plaintiffs are seeking to certify in
19 this case begins in 2014?
20    A.   Not explicitly.
21    Q.   Would you have been able to do the
22 same analysis you did using data only from 2014
23 to 2019?
24    A.   Not the same because it would not have

25 (Pages 94 - 97)

1 the same level of certainty and precision --
2     Q.   Yes.
3     A.   -- but let me also state that these
4 estimates reflect the average over the entire
5 period controlling for the variation in wages and
6 are expressed as a percentage.
7     Q.   Let me ask a more precise question.
8         Would there have been enough data
9 available for you to do the same analysis that
10 you did for the time period 2014 to 2019, and I
11 recognize that the results may have come out
12 differently.  I am asking is there enough data in
13 a smaller time period to do the same analysis?
14     A.   I am going to answer a little bit
15 differently, but hopefully if I don't answer you,
16 you will correct me.
17     Q.   You can be assured of that.
18     A.   Okay.  So the -- as I mentioned,
19 there's a very strong relationship between the
20 size of the sample and the precision of the
21 estimate meaning the credibility and certainness
22 that you can provide in terms of what the
23 estimate implies.  So it's never a question of
24 can you.  It's a trade-off between precision and

1 estimate.  So I thought in my expert opinion, the
2 more data provided the better trade-off, and
3 that's why I chose it, but it is possible.
4     Q.   It is possible -- it is possible that
5 the result of the analysis would have been
6 different had you used the data set from 2014 to
7 2019 rather than 2011 to 2019?
8     A.   I am going to answer that it's in my
9 opinion unlikely because I can -- in the analysis
10 when we adjust for year, you see the effects of
11 years.  So there hasn't been great changes in any
12 dimension of the market or even in inflation that
13 would suggest that this would change noticeably
14 if I had done the analysis from -- at a different
15 period within that time period.
16     Q.   But, again, all of the data that you
17 used and all of the analysis that you did is
18 available -- what is the name of the software
19 program?
20     A.   Stata, S-T-A-T-A.
21     Q.   S-T-A-T-A.  All of the information
22 that you used and all the analysis that you did
23 is retained in your Stata software, correct?
24     A.   Correct.

1     Q.   Okay.  Why is it that you think it is
2 appropriate to use data for the Chicago
3 metropolitan area defined in your report as
4 Chicago-Naperville-Joliet and apply that to the
5 Chicago Loop?
6     A.   I wouldn't use the word appropriate.
7 So I would say that I think it's a credible and a
8 reasonable way to provide an estimate which is
9 meaning credible and reasonable of the union,
10 non-union wage differential in the Chicago Loop
11 because that smaller geography is contained
12 within the larger geography.
13         There is not that much -- to the best
14 of my knowledge, there's not that much variation.
15 I wouldn't expect that much variation in the --
16 to be so different in the Chicago Loop than in
17 the larger broader area.  The wages are very
18 comparable.  That's, for example, when you see --
19 that's the prevailing wage analysis, the second
20 analysis.  This is very much evidence along the
21 lines that my original analysis using the Current
22 Population Survey data is with a large degree of
23 certainty applicable to the Loop.
24     Q.   Do you currently live in the Chicago

1 metropolitan area?
2     A.   I do.
3     Q.   How long have you lived in the Chicago
4 metropolitan area?
5     A.   17 years.
6     Q.   Okay.  Is it your testimony that there
7 are no differences that are significant to your
8 analysis between let's use as an example
9 Naperville which is in DuPage County, Joliet
10 which is in Will County, and the Chicago Loop in
11 terms of union versus non-union wages?
12     A.   Can you rephrase that?  I'm sorry.  I
13 wasn't paying attention, sorry.
14     Q.   And, again, I just -- you know, I am
15 not going to try to hide the ball.  In my opinion
16 as somebody who has lived -- in my view as
17 somebody who has lived in the Chicago
18 metropolitan area since 1992, Joliet is a whole
19 lot different than Naperville is a whole lot
20 different than the Chicago Loop, and what I am
21 trying to get at is do you feel comfortable based
22 on your knowledge of the area, 17 years of living
23 here, that it is appropriate to use data from
24 Joliet and Naperville and the Chicago Loop to

Page 102

1  come up with an analysis applicable to the
2  Chicago Loop for union versus non-union wages?
3     A.  It's not my job to be comfortable or
4  uncomfortable with my analysis.  As I stated, I
5  think my analysis applies that is a -- generally
6  would be applicable to the Loop because in my
7  expert opinion, my scientific opinion, and my
8  review of other data or knowledge, the
9  differences in wages are not extreme.  For
10 example, if you look at the bullet point, it
11 says:  I find that there are no statistically
12 significant or economically important differences
13 between the non-union wages in the Chicago
14 metropolitan area and the rest of the United
15 States.
16    Now to put that in context to repeat
17 your question, I don't know how your comfort
18 level is in saying that the wages in the
19 metropolitan area Chicago as defined would be --
20 non-union wages in construction would be similar
21 to the United States.  You might have thought
22 otherwise.  In fact, the estimate is that they
23 are the same statistically.
24    So that gives me -- that is a strong

Page 103

1  data point, some strong evidence to suggest that
2  the effects that I am finding would be applicable
3  more broadly, and, again, if you expand to
4  Illinois versus the United States, you would find
5  similar results in my opinion.
6     So I do think -- and, again, it's
7  my -- as my report says, I think that these
8  estimates of the union, non-union wage
9  differential that I report would be reasonable
10 and applicable to the smaller geography of the
11 Chicago Loop.
12    MR. SCHUTTE:  Okay.  Why don't we go off the
13 record for five minutes and take a break.
14    MR. FOSTER:  Okay.
15    THE VIDEOGRAPHER:  Going off the record at
16 11:52 a.m.
17       (WHEREUPON, a recess was had at
18       11:52 a.m. until 12:05 p.m.)
19       (WHEREUPON, a certain document
20       was marked Deposition Exhibit No.
21       22, for identification, as of
22       2/21/20.)
23    THE VIDEOGRAPHER:  Good afternoon.  We are
24 going back on the video record at 12:05 p.m.  You

Page 104

1  may proceed.
2  BY MR. SCHUTTE:
3     Q.  Dr. Kaestner, we have marked as
4  Exhibit 22 a document that has the Bates label
5  Wacker Drive 604 in the lower right corner.
6     Is this the document that were
7  referring to as the list of occupations that were
8  provided to you by plaintiff's counsel?
9     A.  Yes.
10    Q.  And then you took this list of
11 occupations and looked at the occupation set that
12 was available in the current population survey to
13 come up with the population -- excuse me -- with
14 the occupations that you use in Appendix A,
15 correct?
16    A.  Correct.
17    Q.  Okay.  So we can set that aside.
18    MR. SCHUTTE:  Thank you very much, Jim, for
19 pulling that together so quickly.
20    MR. ZOURAS:  You are welcome.
21 BY MR. SCHUTTE:
22    Q.  Okay.  So before we broke, we were
23 talking about this issue about differences in
24 different areas of the United States or different

Page 105

1  areas within the Chicago metropolitan area.
2     The analysis that you did that led you
3  to your conclusion in the third bullet in
4  paragraph 4 that there is no statistically
5  significant or economically important difference
6  in non-union wages in the Chicago metropolitan
7  area and the rest of the U.S., is the analysis
8  that you did to reach that conclusion available
9  in Stata?
10    A.  Yes.
11    Q.  Okay.  What do you mean by
12 economically important?
13    A.  Because statistical significance does
14 not necessarily mean a small or very small
15 difference.  So the economically important refers
16 to that there's -- not only is it not
17 statistically significant, but it's very -- any
18 difference is very small.
19    Q.  Okay.  Now, back to your original
20 analysis using the CPS data.
21    After you calculated the 47 percent
22 and 38 percent -- excuse me -- 47 and 39 percent
23 numbers for the Chicago metropolitan area and
24 outside the Chicago metropolitan area, you then

27 (Pages 102 - 105)

Page 106

1  did a further analysis where you looked at the
2  same two geographies but isolated out first age
3  and education, correct?
4     A.   Yes.
5     Q.   And then you also did a second
6  adjustment where you also took into account
7  gender and race?
8     A.   Yes.
9     Q.   Okay.  And ultimately you got there a
10  difference between Chicago -- the Chicago
11  metropolitan area and the U.S. of 10 percent
12  based on age and gender and 8 percent based on --
13  excuse me -- 10 percent based on age and
14  education, and 8 percent based on gender and
15  race?
16     A.   No.  So let me clarify that after
17  adjusting for age and education, the difference
18  between union and non-union wages in the Chicago
19  metropolitan area was 40 percent, and after
20  adjusting for age, education, gender, and race,
21  it was 36 percent.
22     Q.   Okay.  But you also did the same
23  analysis outside the Chicago metropolitan area
24  and found a 30 percent adjusted for age and

Page 107

1  education and 28 percent for gender and race?
2     A.   Correct.
3     Q.   And the difference between -- when you
4  adjust for age and education, the difference
5  between outside the U.S. and inside -- excuse
6  me -- outside the Chicago metropolitan area and
7  the Chicago metropolitan area, the difference is
8  10 percent?
9     A.   After adjustment for age and
10  education, yes.
11     Q.   And it's 8 percent for a further
12  adjustment for gender and race?
13     A.   Yes, as it was for the estimate with
14  no adjustment for any of these factors.
15     Q.   Okay.  When you do the second
16  adjustment, is it an adjustment where you take
17  into account age, education, gender, and race or
18  is it just gender and race?
19     A.   It is age, education, gender, and
20  race.
21     Q.   Okay.  So you add two more factors?
22     A.   Yes.
23     Q.   Okay.  Now, moving forward, everything
24  we have been talking to up until now is

Page 108

1  essentially taking all 28 of the occupations in
2  Appendix A and considering that data as a group,
3  correct?
4     A.   Correct.
5     Q.   The next thing you want to do or the
6  next thing you try to do is to take the -- you
7  take Appendix A, page 12 of your report and you
8  take those 28 occupations and put them into eight
9  different groups; is that right?
10     A.   Yes.
11     Q.   Who was involved in taking the 28
12  occupations and putting them into eight groups?
13     A.   Just myself.
14     Q.   Okay.  What was the basis for you to
15  do that?
16     A.   Again, looking at the -- this was
17  using the occupational classifications of the
18  U.S. Census Bureau.  These occupations were
19  grouped together because they were in similar
20  occupations -- considered as similar occupations
21  by the Bureau of Census.
22     Q.   And you did that -- but you did that
23  yourself.  That wasn't relying on any other
24  literature or any other analysis you had seen

Page 109

1  previously?
2     A.   Yes, I did that myself.
3     Q.   Okay.  And then as I understand the
4  analysis when you break it into the eight groups,
5  there's still sufficient data set at the --
6  outside the metropolitan Chicago area to do an
7  analysis of union versus non-union, and then to
8  do the Adjustment 1 for age and education, and
9  adjustment two for age, education, gender, and
10  race, correct?
11     A.   That's correct.
12     Q.   Okay.  But do I have it right that
13  there's not sufficient data inside the Chicago
14  metropolitan area to take it the analysis down to
15  the level of the eight groups?
16     A.   Again, there's data.  The word
17  sufficient goes back to the trade-off between
18  precision and -- and -- of the estimate.  So in
19  my opinion there was -- the sample sizes were
20  inadequate to do the analysis just in the Chicago
21  metropolitan area.  By inadequate, I mean it
22  would be lacking sufficient precision to be
23  informative.
24     Q.   So what you did as a proxy is that you

28 (Pages 106 - 109)

Page 110

1 took the -- you know that there is -- you know
2 based on your analysis that there's an 8 percent
3 difference between the Chicago metropolitan area
4 and the -- outside the Chicago metropolitan area
5 for all union -- these 828 groups and the all
6 non-union the 28 groups, and in order to -- when
7 you break it into the groups, you just make an 8
8 percent adjustment for what you find at the --
9 outside the Chicago metropolitan area; is that
10 right?
11      A.   For -- that's generally correct.  For
12 each of the groups, I used the data outside the
13 metropolitan area to identify the union,
14 non-union wage difference, and then I apply that
15 8 percent adjustment.  An important thing that
16 you see reported is that the premium across all
17 the occupations in the metropolitan area was 43
18 percent.  If I just take the average of the --
19 when I did adjusting by 8 percent was 43 percent.
20 That's remarkably similar to the 47 percent I got
21 when I didn't have to do the adjustment.
22      Q.   Right.
23      A.   So that implies that the 8 percent
24 adjustment factor applied individually to each of

Page 111

1 these occupations is very credible and really is
2 not an issue in terms of being applicable to each
3 individual occupation.
4      Q.   But you applied that 8 percent
5 adjustment at the occupational group level
6 because in your expert opinion, there was not
7 sufficient data to be precise if you looked at
8 actually doing the calculation at the group level
9 in the Chicago metropolitan area, correct?
10      A.   Yes.
11      Q.   Okay.  Then you used the same
12 approach, did you not, to get to a Chicago
13 metropolitan group level for Adjustment 1 for age
14 and education; that is, you were able to
15 calculate the difference between the Chicago
16 metropolitan area and outside the Chicago
17 metropolitan area based on all 28 of the
18 occupations, and that it was a -- what, that was
19 a 10 percent difference, and so you then apply
20 that -- you then run the same data at the group
21 level, and you apply that 10 percent adjustment,
22 correct?
23      A.   Yes, in that column called -- in
24 column in Table 1 under the column Adjustment 1.

Page 112

1      Q.   Okay.  And then to get to Adjustment
2 2, you do the same thing.  You take what you can
3 calculate based on the data available at the
4 outside the Chicago metropolitan area, and you
5 apply the difference that you have already
6 determined based on the Adjustment 2 without
7 breaking it into occupational groups; is that
8 right?
9      A.   Yes, that is correct.  I just want to
10 reiterate that the -- using that adjustment is
11 supported by the evidence that I mentioned prior
12 that when I can use a combined occupations, the
13 difference was 8 percent.
14      Q.   Okay.
15      A.   When I used the individual occupations
16 and applied the adjustment and then combined them
17 subsequently, I get 43 percent which is again
18 very close to the 47 percent.  Strongly suggests
19 that there is no -- that the use of this
20 adjustment factor is very credible and
21 appropriate.
22      MR. SCHUTTE:  Okay.  Could we mark this as
23 Exhibit 23.
24

Page 113

1           (WHEREUPON, a certain document
2           was marked Deposition Exhibit No.
3           23, for identification, as of
4           2/21/20.)
5 BY MR. SCHUTTE:
6      Q.   Dr. Kaestner, what we have marked as
7 Exhibit 23 is a full page blowup of Table 1 from
8 your report page 6, and the reason we did that is
9 so that I can -- without having to flip back and
10 forth, we can refer to the report and Table 1 at
11 the same time.  Do you understand what I am
12 saying?
13      A.   Thanks, yes.
14      Q.   Okay.  Sure.  Help me out please with
15 something which I was not able to do on my own.
16      Can you walk me -- the last paragraph
17 on page 5 where you say the results are shown in
18 Table 1, can you please show me and walk us
19 through how that paragraph correlates with Table
20 1 because I just can't follow?  And let me try to
21 guide you through.
22      MR. FOSTER:  I am sorry.  Which paragraph?
23 BY MR. SCHUTTE:
24      Q.   The last paragraph on page 5.  The

29 (Pages 110 - 113)

Page 114

1 results as shown in Table 1.
2        You say: "As noted, estimates for the
3 Chicago metropolitan area are calculated by
4 adding either 8 percent to the estimates for the
5 U.S. (columns 2 and 3) or 10 percent (column 2)."
6        I understand that in Exhibit 23 that
7 when you do the occupational group analysis, you
8 can take the carpenter number from the union wage
9 premium in the U.S., add 8 percent, and get to
10 50, and I can go down that column and get 28 add
11 8, 36, etc. My question is: What do you mean
12 when you say by adding 8 percent to the estimates
13 for the U.S. columns 2 and 3?
14    A.   Yeah, just give me a second. Thank
15 you.
16    Q.   Okay. Of course, take as much time as
17 you need.
18    A.   Yeah, so what is missing in these
19 calculations. So you can see that in Table 1,
20 Column 1.
21    Q.   May I interrupt you?
22    A.   Yes.
23    Q.   When you say Table 1, Column 1, is
24 that the column that says Occupational Group?

Page 115

1    A.   No, I'm sorry. In Table 1 in the
2 column labeled Union Wage Premium in U.S.
3    Q.   What are we going to call that Column
4 1 or 2?
5    A.   Let's call it Column 2. Thank you.
6 Okay. And then if you look at Column 3 labeled
7 Union Wage Premium in Metropolitan Chicago area,
8 you will see that the difference between Column 2
9 and Column 3 is always 8 percent.
10    Q.   Yes.
11    A.   Okay. And that refers to the 8
12 percent premium that is in Chicago relative to
13 the rest of the -- 8 percent difference in the
14 union, non-union wage (reporter clarification).
15 Sorry, so the 8 percent that is added to Column 3
16 from adding Column 2 plus 8 percent equals Column
17 3.
18    Q.   I am fully with you at that point.
19    A.   Okay. So I am just repeating for
20 recorder.
21    Q.   I appreciate that, but I understand --
22    A.   And then so that's the 8 percent
23 previously referred to.
24        So column -- what we are going to call

Page 116

1 Column 4 is the Union Wage Premium in
2 Metropolitan Chicago Adjustment 1 and then union
3 wage -- in Column 5 the Union Wage Premium
4 Chicago Adjustment 2. Those are calculated
5 similarly by adding 10 percent in Column 4 and 8
6 percent in Column 5 to numbers that aren't in the
7 table. Okay.
8        So I don't have a comparable Column 2
9 that's reported in the table. So I didn't report
10 the comparable Column 2 estimates that refer --
11 that would be analogous to Columns 4 and 5 as
12 Column 3 is analogous to Column 2. So that's an
13 oversight or -- but that's how they are --
14    Q.   Is there a reason why you did not
15 include the -- so let me make sure I understand
16 what you did.
17        So for Column 4 you took a calculation
18 at the occupational group level with Adjustment 1
19 at the U.S. level which is not presented in the
20 chart, you added the 10 percent that we derived
21 from the analysis on page 4 and 5 to get to the
22 numbers that are in Column 4, correct?
23    A.   That is correct.
24    Q.   And for Column 5 you added 8 percent

Page 117

1 to a calculated occupational group level U.S.
2 wide with the Adjustment 2, but that's not
3 reported in the chart?
4    A.   That's correct. They can be derived
5 if you just subtract 10 from Column 4 or 8 from
6 Column 2.
7    Q.   Is there a reason why you didn't put
8 the U.S. wide level for Adjustment 1 and
9 Adjustment 2 in the chart?
10    A.   No particular reason.
11    Q.   Okay. When you go back and look
12 though at the text of the last paragraph on
13 paragraph 5, what did you mean when you said: As
14 noted, estimates for the Chicago metropolitan
15 area are calculated by adding 8 percent to the
16 estimate for the U.S. (columns 2 or 3). I get
17 that, and then you say or 10 percent for Column
18 2?
19    A.   So I'm sorry the columns have been
20 referred to imprecisely, but we just went through
21 it. So column -- so there is only two numbers.
22 We either add 8 percent -- I either added 8
23 percent or 10 percent. I added 8 percent into
24 the Column 2 numbers to get Column 3, and that

30 (Pages 114 - 117)

Page 118

1  was based on estimates reported.
2      In Column 4 I add 10 percent to
3  numbers that are not reported, and then in Column
4  5 I add 8 percent again because that's the
5  differential between Chicago and the rest of the
6  United States that occurs in Adjustment 2 which
7  happens to be coincident with the difference
8  between Chicago and the rest of the United States
9  in Column 3.
10      Q.   Okay.  So in that last paragraph of
11  page 5 where you say:  As can be observed --
12  excuse me -- as noted, estimates for the Chicago
13  metropolitan area are calculated by adding either
14  8 percent to the estimates for the U.S., and when
15  you say Columns 2 and 3, you are referring to the
16  columns Union Wage Premium in the U.S. as Column
17  2, Union Wage Premium in Metropolitan Chicago as
18  three, and then you say or 10 percent.  What
19  should that say -- not Column 2, what should it
20  say?
21      A.   I want to know if you are -- I think
22  the point of this questioning is to make sure you
23  understand what's in the columns.
24      Q.   Oh, no, now I understand what's in the

Page 119

1  columns --
2      A.   Okay.  Now --
3      Q.   I am wondering how a mistake like that
4  got made --
5      A.   Can I -- I don't think it was a
6  mistake.  There's no mistake in the report in
7  terms of the estimates reported in Table 1.  So
8  these are all valid estimates that can be -- that
9  are in the Stata data set and can be retrieved
10  from that and replicated.
11      Q.   Okay.  So that was one of my
12  questions.  So everything that's reflected in
13  Table 1 is available in the Stata data set and
14  can be replicated?
15      A.   Correct.
16      Q.   Okay.  But you will agree with me,
17  will you not, that the reference to other 10
18  percent, Column 2 is a mistake.  It should be or
19  10 percent, Column 4?
20      A.   I am guilty of mislabeling columns.
21      Q.   Okay.  And then there's no reference
22  to how you got to Column 5?
23      A.   There is.  It is just poorly written,
24  and do you want me to explain how I got what we

Page 120

1  are now referring to Column 5?  Column 5 --
2      Q.   I understand how to you got to Column
3  5.
4      A.   Okay.
5      Q.   I just don't understand how --
6  candidly, I don't understand how in a report of
7  this importance you could make the error on page
8  5 that doesn't line up with the chart on page 6.
9      Did you notice that error when you
10  reviewed your report in preparation for your
11  deposition today?
12      A.   I did not.
13      Q.   Okay.  What do you mean when you used
14  the term at the bottom of the page 5 "vary
15  modestly"?
16      MR. SCHUTTE:  V-A-R-Y, Andrea, vary
17  modestly.
18  BY THE WITNESS:
19      A.   Well, we don't have to refer to the
20  word.  I tell you exactly what the numbers are.
21  So they are -- you know, the numbers are between
22  36 and 50 for the estimates listed in the table
23  or between 24 and 46.  So that's exactly what I
24  mean those ranges.

Page 121

1  BY MR. SCHUTTE:
2      Q.   Yeah, I understand the ranges, but I
3  am questioning the term you applied to them.
4      Is it your testimony as an expert in
5  labor economics that a variance between 36 to 50
6  percent is a modest variance?
7      A.   I don't have any expert opinion on
8  what the word modest means.
9      Q.   Well, I know.  I am asking what you --
10      A.   I used the word modest to refer to the
11  ranges that are in the table.  So I provided the
12  ranges, and that's what I -- they range from 24
13  to 40 -- to 42 from -- in Column 5, from 27 to 46
14  in Column 4, from 30 to 50 in Column 3.  So
15  that's what I...
16      Q.   I am going to stick my neck out and
17  ask a question that I may be completely showing
18  my ignorance of statistics.
19      Did you calculate a p-value of the
20  difference between 36 and 50 percent?
21      A.   I did not.
22      Q.   Could you?
23      A.   No, because these are -- these are
24  separate regression estimates.  So I could apply

31 (Pages 118 - 121)

Page 122

1 a statistical formula, but I didn't and it's not
2 standard to do so.
3    Q.   When you did the calculations that you
4 used to get to the data on Table 1, can you
5 describe the statistical approach you used?  Was
6 it a regression analysis?
7    A.   Yes, it was a regression analysis.
8    Q.   Okay.  And is there -- for purposes of
9 someone who is a statistical expert who will
10 review this transcript, can you describe in more
11 detail the statistical analysis that you did?
12    A.   The statistical analysis is a very
13 standard, one of the work horse types of analyses
14 that occur in labor economics.  It's called a
15 wage analysis.  The dependent variable is the
16 natural logarithm of the wage.  The independent
17 variables are an indicator for union, non-union
18 coverage of a worker.
19       Then you have a -- and that's the
20 first analysis and an indicator for Chicago or in
21 the national analysis or the rest of the United
22 States, indicators for what year the data come
23 from.  So that -- indicators for whether the wage
24 was reported as an hourly wage or a weekly wage,

Page 123

1 and then you estimate a regression analysis or
2 ordinary least squares regression analysis that
3 calculates the effect of being covered by a union
4 on wages, and that's an estimate of the
5 difference between the union and the non-union
6 wage.
7    Q.   Okay.  I want to talk for a bit
8 about -- you use the term in page 4 and elsewhere
9 of productivity differences.  I am specifically
10 referring to the last paragraph on page 4 you say
11 that: "Because there are demographic differences
12 between union and non-union workers that may be
13 related to productivity differences."
14       What do you mean by productivity
15 differences there?
16    A.   So let me read the full sentence.
17    Q.   Of course.
18    A.   "Because there are demographic
19 differences between union" -- (reporter
20 clarification).  "Because there are demographic
21 differences between union and non-union workers
22 that may be related to productivity differences,
23 although the evidence to substantiate this claim
24 is not extensive or uniform, I obtained

Page 124

1 alternative estimates of the union wage premium
2 adjusting for age, education, gender and race."
3       So that people -- so the word
4 productivity is used for a different amount of
5 output per hour.  That's how productivity is
6 measured, the output of labor per hour.
7    Q.   And how is the amount -- you said --
8 you defined productivity is the amount of output
9 per hour.
10       How is -- how is any of the following
11 related to amount of productivity per hour:  Age,
12 education, gender, or race?
13    A.   I don't think there's much direct
14 evidence that these factors are directly related
15 to output per hour.  There's not that many
16 studies that can measure output per hour of a
17 worker in terms of these demographics.  So it's
18 very there's -- no direct evidence or there's
19 none that I am aware of that would be applicable
20 in this case.  So that's the first part of the
21 answer.
22       The second part is there is, for
23 example, people who make more money, usually have
24 higher education as professors and attorneys

Page 125

1 compared to carpenters.  So some -- there is a
2 hypothesis, a view that because you have more
3 education, you are more productive, and that's
4 why you make more money, but that is -- the
5 assumption is that you are more productive.  The
6 evidence to actually measure that is not direct.
7    Q.   Okay.  But isn't the apt analysis when
8 you are using union versus non-union, not
9 attorneys and professors on one hand and the
10 carpenter on another.  It's a carpenter with a
11 college degree versus a carpenter with a high
12 school degree?
13    A.   I'm sorry.  Can you rephrase it or
14 have the --
15    Q.   I am happy to rephrase it.
16       You said that there is a hypothesis,
17 and I take it you don't -- you said you have seen
18 no direct evidence related to this but -- well,
19 strike that.
20       You used an example a moment ago that
21 there is an assumption that could be made that
22 attorney who is an attorney or a professor has a
23 higher level of education than a carpenter, and
24 my question is:  Isn't the more apt analysis the

32 (Pages 122 - 125)

Page 126

1 question of whether a carpenter with a higher
2 level of education is more productive in terms of
3 amount of output per hour than a carpenter with a
4 high school education?
5     A.   I think that's correct.  That's a
6 hypothesis, and that's why I made these
7 adjustments to address that possibility.
8     Q.   Okay.  Are you aware of any literature
9 or research that discusses whether union workers
10 because they are in a union are more productive
11 than non-union workers?
12     A.   Again, in terms of literature there
13 are people who have written on this issue, but in
14 terms of direct evidence that I would assert as
15 credible as the estimates in my report, I don't
16 think there's any credible direct evidence that
17 union workers are more productive in terms of
18 actual estimates.  There is hypothesis and
19 argument, but this is made on both sides.
20     Q.   When you say that the -- what do you
21 mean when you say that the analysis in your
22 report is -- do you mean the analysis where you
23 do not adjust for age, gender, education, or
24 race?

Page 127

1     A.   No, I say that the hypothesis or to
2 test -- the empirical analysis, the empirical
3 studies.  There is a lack of empirical studies
4 that have the same amount of certainty and
5 precision or even what we call a credible
6 research design that can answer the question of
7 whether union and non-union workers are equally
8 productive.  It may sound surprising and it's --
9 but it is, in fact, the case.
10     Q.   Did you do any survey of the
11 literature to try to determine whether there was
12 any academic literature out there about the
13 productivity of union versus non-union workers
14 that was not based on age, education, gender, or
15 race?
16     A.   I reviewed the literature looking for
17 direct evidence of the differences in
18 productivity between union and non-union workers
19 ideally in construction, but I didn't find any
20 studies that I felt were -- that meet the
21 criteria of professional journals, for example,
22 academic journals that I have referred to for
23 other pieces of evidence to provide that type of
24 evidence.

Page 128

1     Q.   Is there any literature that you saw
2 that used age or gender or education or race as a
3 proxy for productivity?
4     A.   As I say, the standard analysis in --
5 a standard analysis is to adjust for these
6 factors because of the potential for these
7 factors to effect productivity which is
8 indirectly established by observing that they get
9 paid more.
10         So if they get paid more, therefore,
11 they are more productive.  It's a little bit
12 tautological because the actual productivity of
13 the workers is rarely, if ever, measured
14 directly.  For example, I think there might be a
15 study of pear pickers in California that measure
16 productivity in terms of agricultural -- number
17 of bushels, but that would be the extent of the
18 type of study.
19     Q.   Right, but what I am not following,
20 Dr. Kaestner, is that in that study, you could
21 take a union pear picker and find out the union
22 pear picker picks 100 pears per hour and is paid
23 a higher wage and find a non-union pear picker
24 who picks 75 pears per hour and is paid a lower

Page 129

1 wage.
2         I don't understand how age, gender,
3 education, or race plays into that on either side
4 of the equation.  It seems to me that you don't
5 think it does either.
6     A.   I think there's a potential that --
7 there's a potential and belief among many
8 economists that these may be proxies for
9 productivity differences, and that's why I
10 included them as an adjustment and to present
11 that evidence, and I think the important point to
12 note is that they don't do much in terms of --
13 and, again, I don't want to argue about what much
14 is.  The estimates are there that in one case
15 it's 47 percent adjusting for education and age
16 is 40 percent adjusting for age, education and
17 education I think is 36 percent, and then I would
18 argue, as I did in the report, that it's not
19 clear that these adjustments are necessary or
20 particularly valid that where you would prefer
21 one over the other.  I think what's important is
22 the range of estimates is relatively close
23 meaning 36 to 47.
24     Q.   Let me cut to the chase.

33 (Pages 126 - 129)

Page 130

1      At the end of your report, you suggest
2  that the model that ought to be used by the judge
3  that can be used to determine damages on a
4  class-wide basis is you take the union wage
5  premium from Table 1, and then you apply it to
6  the work done by the people in the various
7  occupational groups on a project, and you will
8  come up with a number that is attributable to the
9  union wage gap; is that right?
10     A.  Generally that's correct.  You would
11  take each -- the cost -- the payments made to the
12  various categories of labor in Table 1 and then
13  apply these union wage --
14     Q.  And we will talk about the Illinois
15  Department of Labor analysis, but you are
16  recommending that the judge should use Table 1,
17  not Table 2, correct?
18         That's what you say on page 9 of the
19  complaint.  You say that for each of the
20  categories of labor, the non-union cost of that
21  labor can be calculated by dividing the union
22  cost of that type of labor by the corresponding
23  union wage premium in Table 1.
24     MR. FOSTER:  You said complaint.

Page 131

1      MR. SCHUTTE:  Oh, I'm sorry.  I misspoke
2  then.
3      MR. FOSTER:  It's not in the complaint.
4  BY MR. SCHUTTE:
5      Q.  Let me rephrase the question.
6         What you are recommending in an expert
7  opinion to the judge is that to get to a
8  class-wide damages model that for each category
9  of labor, each occupational group, you can take
10  Table 1, the union premium, and multiply that by
11  the work that was done by that occupational group
12  and you can get to the difference that the
13  person -- the entity would have paid had they not
14  used union workers.  That's at the end of the day
15  what you are suggesting.
16     A.  That's what I say is one approach, and
17  so I say one can do it this way, and also -- but
18  I think it's important to -- and so that's --
19  yes, but I also think it's important to note the
20  other parts of the expert report that say that
21  Table 1 based on the other evidence presented
22  appears to be a conservative estimate.
23     Q.  Right.  I'm actually not -- I am
24  actually just going mechanically to something

Page 132

1  right now which is you are recommending to the
2  judge on page 9 -- you don't say one way to do
3  it.  You say:  "The damages for each potential
4  class member can be estimated using the evidence
5  on the differences in the cost of union and
6  non-union labor presented in Table 1," and then
7  you go on to demonstrate exactly how mechanically
8  that approach would be applied, correct?
9      A.  Correct.
10     Q.  We will talk about Table 2, but you
11  don't recommend to use Table 2.  You recommend
12  Table 1, correct?
13     A.  In that segment, yes.
14     Q.  Yes.  And which column -- using
15  Exhibit 23, which column from Table 1 are you
16  recommending that the judge use for a class-wide
17  damages analysis:  Column 2, Column 3, Column 4,
18  or Column 5?
19     A.  I recommend using estimates in Table
20  1, and so if you -- what I would do first I would
21  use column -- what we are referring to as Column
22  3 but -- and that's because of the tentative link
23  between -- between productivity and these
24  factors.  That's more hypothesis that there's no

Page 133

1  concrete evidence, and so that would suggest that
2  column -- what we are referring to as Column 3
3  labeled Union Wage Premium in Metropolitan
4  Chicago would be appropriate and reasonable
5  estimates to use.
6      Q.  Okay.  My last question and we can
7  take lunch is I think you said something, and
8  correct me if I am wrong, please, that the
9  Adjustment 2 had very little effect.
10         Did you say something to that effect?
11     A.  We can just compare.  I don't -- so
12  unfortunately I am not an attorney, and my
13  language gets somewhat imprecise, and I apologize
14  for that, but we can just look at Columns 3, 4,
15  and 5 to observe the differences that are about
16  the estimates of the union wage differential.  So
17  in -- between union and non-union labor.  So if
18  you have a question about those differences, I am
19  happy to answer them.
20     Q.  But my question is simply this the
21  Adjustment 2 in several of the rows for several
22  of the occupational groups the amount of the
23  Union Wage Premium in Metropolitan Chicago with
24  Adjustment 2 is actually the same as or only

34 (Pages 130 - 133)

Page 134

1 slightly higher than the Union Wage Premium in
2 the U.S.
3          In other words, whereas Columns 3 and
4 Columns 4 -- actually, Column 3 in particular has
5 a significant -- an 8 percent difference.  Column
6 5 actually has some occupational groups where the
7 union wage different premium in metropolitan
8 Chicago with Adjustment 2 gets you to a place
9 where it's the same as the Union Wage Premium in
10 the U.S.?
11     A.   Except that's an incorrect calculation
12 because, as we have established before, the
13 analogous estimates to Column 2 for Adjustment 1
14 and 2 were not included in the table.  So that
15 they can be calculated by just subtracting 10
16 from the Column 4 estimates labeled Union Wage
17 Premium Metropolitan Chicago Adjustment 1.  For
18 example, carpenter 44 percent minus 10 would be
19 34 percent.  So the analogous estimate for that
20 to Column 2 would be 34 and not 42 so --
21     Q.   Okay.
22     A.   -- I apologize for the lack of
23 clarity.
24     MR. SCHUTTE:  Got you.  Why don't we take a

Page 135

1 lunch break.
2     THE VIDEOGRAPHER:  Going off the video
3 record at 12:45 p.m.
4          (WHEREUPON, a recess was had at
5          12:45 p.m. until 1:35 p.m.)
6     THE VIDEOGRAPHER:  We are back on the video
7 record at 1:35 p.m.  You may proceed.
8 BY MR. SCHUTTE:
9     Q.   Dr. Kaestner, before we broke, we were
10 talking about productivity.
11          Did you identify or could you identify
12 for us a single study that linked age, education,
13 race, or gender to productivity?
14     A.   I did not uncover one directly as it
15 applies to union labor but --
16     Q.   Because I read a great number of the
17 studies that you cited, and some of them talked
18 about those four demographics, but I read those
19 more as making sure that something wasn't going
20 on besides union versus non-union as opposed to
21 those being a proxy for productivity.
22          Is that how you read them?
23     A.   No.
24     Q.   Okay.  Did you identify any studies

Page 136

1 besides you mentioned the study about pear
2 picking.  Did you attempt to identify any studies
3 that looked at union versus non-union
4 productivity on using your definition amount of
5 output per hour?
6     MR. FOSTER:  Objection, asked and answered.
7 You can answer.
8 BY THE WITNESS:
9     A.   I did look, and I did not find any,
10 and I will just modify.  I didn't find any that
11 directly measured the productivity of union
12 versus non-union workers.
13     MR. SCHUTTE:  24.
14          (WHEREUPON, a certain document
15          was marked Deposition Exhibit No.
16          24, for identification, as of
17          2/21/20.)
18 BY MR. SCHUTTE:
19     Q.   Dr. Kaestner, we have marked as
20 Exhibit 24 a document that is -- it's an article
21 titled Further Evidence on Union Efficiency in
22 Construction, Steven G. Allen from the spring
23 1988 edition of Industrial Relations, and I
24 believe this is an article -- it's an article

Page 137

1 that was cited in your reference section.
2          Is this an article that you reviewed
3 in connection with your report?
4     A.   I don't think this is the same
5 article.  Let's be sure of that first of all.
6     Q.   If you take a look at page 10 of your
7 report, the References section, the second
8 article down Allen Steven G. --
9     A.   Yes, I see it now.
10     Q.   Yes.  So did you review this article?
11     A.   No, this is not an article I
12 reviewed.  There should be an A or a B.  So when
13 I use the Allen article and reference the Allen
14 article in the report, I was referring to the
15 first one, the Allen -- Steven G. Allen 1988.
16 You will note they both have 1988 on it.  So it's
17 really the first one that is the reference used
18 in the report to support my statements --
19     Q.   Right.
20     A.   -- and if we want to find the
21 statement I used to report that or -- that's in
22 the literature section.
23     Q.   How did Exhibit 24 get on the
24 reference list then if it's not an article that

35 (Pages 134 - 137)

Page 138

1 you reviewed in connection with your report?
2    A.   Because I was probably copying
3 citations, and it si an Allen '88 citation, and
4 it was a mistake.
5    Q.   Okay. Well, I take it then you
6 haven't read this Exhibit 24 article by
7 Mr. Allen?
8    A.   Not that I recall reading it
9 explicitly, no.
10   Q.   Is Industrial Relations a
11 peer-reviewed journal?
12   A.   Yes.
13   Q.   Do you find it to be -- recognize it
14 as a credible journal?
15   A.   Yes.
16   Q.   Okay. Mr. Allen writes in his report
17 that the very first sentence of the text is:
18 "Previous estimates of construction union
19 productivity on projects built in the early '70s
20 show 30 percent greater per activity per union
21 compared to non-union contractors in commercial
22 office building construction, but there was no
23 union-non-union difference in school
24 construction," and it is citing a prior Allen

Page 139

1 piece.
2        I take it that you didn't read -- you
3 didn't dig into these prior estimates of
4 construction union productivity?
5    A.   Actually I did consider this type of
6 evidence as presented in this paper, and this --
7 I rejected using this type of evidence because
8 it's not a direct estimate of the effect of union
9 workers. You will note it's based on highly
10 aggregate data not -- with what I would consider
11 not credible measurement estimates. So I did --
12 and so when I refer to direct evidence, I don't
13 think this is a credible kind of study to do so.
14 That's why I didn't pursue this --
15   Q.   But --
16   A.   This is a -- can I just finish? I'm
17 sorry.
18        This is a very different type of
19 analysis. This is not an analysis of
20 productivity per se. It uses aggregates at
21 the -- large aggregate numbers. We can find the
22 data source, but anyway that's my general
23 criticism of this, and that's why I didn't pursue
24 this type of study.

Page 140

1    Q.   How do you -- or how are you able to
2 criticize this article when you haven't read it?
3    A.   Because this is a common approach
4 that's been used. It's used in more
5 macroeconomic analysis, and so I don't want to be
6 critical of this article per se. I am saying
7 this of genre of article I don't think it
8 represents direct evidence of the impact because
9 it's -- again, it's -- we can -- I can support
10 that a little bit more if you would like, but I
11 see a very fundamental difference between this
12 article and what I would consider direct evidence
13 of the output per worker and the difference
14 between that for union and non-union -- non-union
15 workers.
16   Q.   This article is looking at a random
17 sample of 75 projects and specifically looking at
18 square footage of production per hour union
19 versus non-union. Isn't that pretty specific
20 data?
21   A.   No, because it's at the -- it's at a
22 very aggregate level. Anyway, I haven't read it.
23 So that's my comment that stands as that so.
24   Q.   What other articles -- what articles

Page 141

1 did you consider on whether productivity should
2 be taken into account in your model that you then
3 rejected?
4    A.   First of all, I'd rephrase your
5 question, if you don't mind, that productivity
6 should be considered. It's just that there
7 that's no evidence of productivity differences --
8 direct evidence between productivity differences
9 between -- direct evidence between union and
10 non-union labor. So notwithstanding the claim of
11 this article that it's applicable.
12   Q.   What direct evidence would you be
13 looking for?
14   A.   For example, I think the pear picker
15 evidence is a good -- would be a good example.
16   Q.   What is the approach that Mr. Allen
17 used in Exhibit 24?
18   A.   I --
19       MR. FOSTER: I object. If you want to ask
20 him questions about this article which he says he
21 hasn't read, you want to give him some time to
22 look at it because I don't think it's fair for
23 you to ask -- to quiz him about it if he says he
24 hasn't read it.

36 (Pages 138 - 141)

1    MR. SCHUTTE:  I would expect that any
2  document that he put on his reference list, and I
3  asked him earlier today if documents were on
4  there for a reason.  He said they were on there
5  because I considered them --
6    MR. FOSTER:  He said it was a mistake.  So
7  you want to take a break and let him read it?
8    MR. SCHUTTE:  It's a mistake that an article
9  that's on point about productivity in the
10  construction industry -- let's strike that --
11    MR. FOSTER:  If you want to ask questions,
12  why don't we give him a few minutes to read it.
13  It's short.
14    MR. SCHUTTE:  No, we are not going to do
15  that.  If he has any -- he put it on his
16  reference list but didn't bother to read it.  We
17  will just leave it at that.
18    I am going to mark this as Exhibit 25,
19  and I do not have a courtesy copy of this one,
20  but I am going to ask quick questions about it.
21    (WHEREUPON, a certain document
22    was marked Deposition Exhibit No.
23    25, for identification, as of
24    2/21/20.)

1    MR. FOSTER:  Before we start, do you want to
2  take a break to discuss this?
3    THE WITNESS:  I could take five minutes, but
4  I could offer something now.  So I am going to
5  offer something now.
6    MR. SCHUTTE:  I have no question pending.  I
7  will just point out for the record that it was a
8  document that was --
9    MR. FOSTER:  You don't have to keep pointing
10  out for the record.  It's on the record.
11    MR. SCHUTTE:  How about this, how about I
12  finish what I am going to before you start saying
13  what you are going to say.  It's on the reference
14  list.  I asked questions about it.  He says he
15  hasn't reviewed it.  I am done with it.  If you
16  want to ask him on redirect about it --
17    MR. FOSTER:  Okay.  You said if you wanted
18  that take a break, he could.  Do you want to take
19  a break?
20    MR. SCHUTTE:  I don't -- I am withdrawing
21  any further questions about this.
22    MR. FOSTER:  Do you want to take a break,
23  Professor?
24    THE WITNESS:  Yes, I would like a ten-minute

1  break.
2    MR. FOSTER:  He says he wants a break.
3    MR. SCHUTTE:  I am not agreeing to a break
4  right now.  I'm not asking any further questions
5  about Exhibit 24.  If you want to take a break
6  before you ask questions, that's fine.  I am
7  moving on --
8    MR. FOSTER:  You said at the beginning if he
9  wanted to take a break, he could.
10    MR. SCHUTTE:  Then you can ask him questions
11  about this after we get to your portion of the
12  exam.  I am done with Exhibit 24.
13  BY MR. SCHUTTE:
14    Q.  Before I go to Exhibit 25, just to get
15  this straight, Dr. Kaestner, you attempted in
16  your analysis to take productivity into account
17  by using age, education, race, and gender as a
18  proxy, didn't you?
19    A.  In my analysis I -- in one version of
20  it, I adjusted for age, education, race, and
21  gender to address the hypothesis, the claim that
22  these might be related to productivity
23  differences between union and non-union wages,
24  and I reported the estimates with and without

1  those adjustments.
2    And my further statement was that
3  there's no direct evidence, including the
4  evidence in Allen '88 that was inadvertently
5  listed on my -- in my report of the effect of
6  age, education, race, or gender on productivity.
7    Q.  Exhibit 25 is an article from a book
8  article or chapter is called Developments in
9  Collective Bargaining and Construction in the
10  1980s and 1990s from a book called Contemporary
11  Collective Bargaining in the Private Sector.
12    Did you review this article in
13  connection with your report?
14    A.  I reviewed -- yes, I reviewed some of
15  the tables or the reported -- yes, for example,
16  Table 3 I think was -- no -- yes, so I did review
17  this and Table 4 is the key estimates that I
18  relied on and reported these estimates.
19    Q.  Did you read the entire article?
20    A.  Yes.
21    Q.  Okay.  Did you read the section at
22  page 430 and 431 titled Productivity?
23    A.  As I said, I read the entire article.
24  So those are a part of it, yes.

37 (Pages 142 - 145)

Page 146

1    Q.    And those are articles by -- it is
2  describing articles about whether there is a
3  measure of productivity on -- by union workers as
4  opposed to non-union workers.  It's a survey of
5  all the prior literature on that issue, is it
6  not?
7    A.    It's a survey of the literature that
8  uses a particular approach that was in the study.
9  So I don't know if it was all of the literature,
10  but it reviews some studies, mostly his own.
11    Q.    Did you go back and read any of the
12  studies that are cited that look at productivity
13  of union workers versus non-union workers?
14    A.    Again, the question that you started
15  out as and I was answering is whether the
16  adjustment for age, education, race, and gender
17  are -- is there evidence that these are directly
18  linked to productivity.  So that's -- I answered
19  that.
20    Q.    I am off of that question now.
21    A.    Okay.  And then can you rephrase the
22  next question?  Thank you or just restate --
23    Q.    My question is is that when you read
24  this entire article that's included in your

Page 147

1  reference section and mentioned in footnote 2 of
2  your report and specifically the section on
3  productivity, did you go back and read any of the
4  articles on the topic of whether there were
5  productivity differences between union and
6  non-union workers?
7    A.    No, I did not because again I do not
8  believe that this approach to measuring
9  productivity differences between union and
10  non-union productivity is a credible or reliable
11  approach.
12    Q.    How do you know what the approach is?
13    A.    Because it's the use of a production
14  function that uses aggregate data with poorly
15  measured variables.  For example, in the '88
16  piece that's -- what number exhibit is this --
17  Exhibit 24.  You can see that the price, for
18  example, on page 234 Mr. -- Dr. Allen states the
19  prices of capital and materials used in the cost
20  function analysis are imputed -- (reporter
21  clarification) -- cost function analysis are
22  imputed from other sources.
23        So the word imputed means that he --
24  another way of phrasing that could be he made it

Page 148

1  up or did some manipulation that goes -- this
2  type of manipulation and lack of data on a
3  precise level makes these studies unreliable in
4  my opinion and I think in others, and this
5  general approach, you know, is not widely used
6  anymore.
7    Q.    And it would be inappropriate to
8  impute from a larger data set the portion of that
9  data that is labor as opposed to materials,
10  correct?  That's your criticism?
11    A.    No, I am just saying this is an
12  example of that -- these studies do not really
13  have very well measured data, have to draw from
14  poor sources or either the quality of the sources
15  is not even mentioned or it is mentioned in
16  footnote 3.  So in general say lack of quality,
17  reliable data and the general approach which is a
18  very restrictive approach, a very highly
19  restrictive empirical analysis is in my opinion
20  not credible and reliable evidence of
21  union-non-union wage differences, and that's why
22  I still say there's not credible direct -- I
23  shouldn't use the word credible -- reliable
24  direction evidence that unions are more or less

Page 149

1  productive than non-union labor.
2    Q.    What is it do you think that was being
3  imputed that was inappropriate?
4    A.    He imputed all of the main independent
5  variables.  The prices of capital material, but
6  this is just an example.  As you said, if you
7  want me to take ten minutes and be more precise
8  and read it a little more precisely.
9    Q.    With respect to Exhibit 25, you told
10  me you had read that and --
11    A.    Yes, but --
12    Q.    -- I don't think it's appropriate for
13  you to go do homework during the deposition so
14  you can answer my questions better, but I think I
15  am ready to move off that except for one question
16  which is you think it's inappropriate where
17  Dr. Allen had to impute the cost of capital labor
18  and materials from different data?
19    A.    I don't think it's inappropriate.  It
20  is -- it reduces the credibility and reliability
21  of those types of studies in that context for
22  that application --
23    Q.    Okay.
24    A.    -- which is fundamentally different

38 (Pages 146 - 149)

1 from the analysis in my report.
2     Q.   Let me ask you a hypothetical.  Under
3 the approach that you are recommending to the
4 court, if you have an electrician -- excuse me --
5 let's use carpenter.  If you have a carpenter who
6 did $10,000 -- strike that.
7         If you had a carpenter where the
8 amount of labor done by that carpenter cost
9 $10,000.  Okay.  And he was a union carpenter and
10 he did that -- was able to do the work that cost
11 $10,000 in 100 hours.  Actually, let's use 100
12 hours.  Okay.  So that is $100 per hour if I do
13 my math right.
14     A.   Correct.
15     Q.   Okay.  Under your approach in order to
16 ascertain damages, you would take that $10,000,
17 take the 50 percent number in Column 3 and say
18 that had that work been done by a non-union
19 worker, it would have been done for $5,000.
20 Therefore, that tenant's damages are $5,000.
21         Is that how your approach is to be
22 applied?
23     A.   Well, I am not quite sure why you use
24 10,000 and 100 hours so, but I would -- the

1 approach that I described and applied would be I
2 would take the cost of union labor and then
3 divide it by the 1.5 which is 50 percent in the
4 column Table 1 labeled Union Wage Premium
5 Metropolitan Chicago for carpenters, and then
6 that's how I would get the difference between the
7 cost of union and non-union labor.
8     Q.   Okay.  But so if the cost of the
9 carpenter's labor in my hypothetical was $10,000
10 and if the 50 percent is the union wage premium
11 in Column 3, if the judge was to apply your
12 damages model to the hypothetical, the damages
13 would be $5,000?
14     A.   10,000 divided by 1.5.
15     Q.   Which is what?  Why is it divided by
16 1.5?
17     A.   I think I explain that in footnote 9.
18 As noted, the union wage premium is equal to the
19 union cost divided by the non-union cost
20 expressed as a percent, but for the purposes of
21 footnote 9 explains exactly why it should be
22 divided by 1.5.
23     Q.   I am going to have to come back to
24 that because I am not following, but let's apply

1 it.
2         If the carpenter's labor -- the
3 charges for the carpenter's labor in my
4 hypothetical was $10,000.  Under your damages
5 model, what is the damage to the tenant?  And if
6 you want to use a calculator, I am sure somebody
7 can give you one.
8     A.   It would be $4,000 I think.
9     MR. FOSTER:  Here is a calculator.  Use it.
10 BY THE WITNESS:
11     A.   Right.  So it would be 3,333.7.
12 BY MR. SCHUTTE:
13     Q.   And how did you do that calculation
14 based on Table 1?  What's the formula?
15     A.   It's in footnote 9, and it tells you
16 the formula.  So it would be 10,000 divided by
17 1.5 is equal to 6,666.67, and the cost was
18 10,000 -- that's the cost of non-union labor, and
19 the cost of union labor was $10,000.  So it would
20 be that.
21     Q.   I am going to have to ask you because
22 for my purposes and for the judge and the jury
23 they need to understand what you are saying.
24         The chart itself does not have that

1 1.5 number, does it?
2     A.   It has the .5, the 50 percent.  So I
3 think -- so this is exactly -- using the exact
4 numbers that I just calculated, the non-union
5 labor costs would be 6,666 and 67 cents, and that
6 would be the non-union, and then the union costs
7 would be 10,000.  The difference is 3,333.33.
8 That is 50 percent of the 6,666.67 non-union cost
9 of labor.  That's exactly the 50 percent number.
10     Q.   Right, but I am actually asking about
11 the -- can you tell me what the formula is?  What
12 are the numbers plugged into the formula to get
13 to the 6667.67?
14     A.   It would be 10,000 --
15     Q.   Yes.
16     A.   -- divided -- I just gave you the
17 formula.  It's the difference in union wages.  So
18 if you go back to the beginning of the document
19 or -- and again in footnote 9 it repeats it.  It
20 says that the union wage premium is the percent
21 of the non-union wage -- it's the difference in
22 the cost of union versus non-union labor
23 expressed as a percent of the non-union wage.
24         So in this case the difference in cost

39 (Pages 150 - 153)

Page 154

1 was -- it works out to be 3,333.34, and that's
2 divided by the 6,667.67 cost of non-union labor.
3 Okay. So that -- because that's the hypothesis
4 you gave me that the cost of non-union labor was
5 10,000. Then the cost of non-union labor given
6 the 50 percent difference that's printed in that
7 table would have to be 3,337 which is 50 percent
8 of the non-union wage of 6,667.
9     Q.   But, again, I am asking you for the
10 formula.
11     MR. FOSTER: Objection, asked and answered.
12 BY THE WITNESS:
13     A.   So the formula is the wage union minus
14 the wage non-union, okay, divided by the wage
15 non-union.
16 BY MR. SCHUTTE:
17     Q.   Okay. And how can you fill in those
18 numbers using Table 1?
19     A.   How did I get these numbers?
20     Q.   No, no, no, no. I am assuming for a
21 moment that -- all I am asking --
22     A.   Yes.
23     Q.   -- and this is for Judge Harjani. I
24 want the record to be clear as to exactly how in

Page 155

1 a hypothetical situation where we would know for
2 invoices or some evidence that a particular
3 carpentry project cost $10,000 in carpentry
4 labor. If the judge or the jury was presented
5 with that piece of evidence, walk us through the
6 formula using Table 1 which is where you refer
7 them to on how you get to what the damages are.
8 So 10,000 is the carpentry cost at union. What
9 do we do next?
10     A.   Right. So then you -- so the
11 10,000 -- so you have one unknown variable.
12 That's the cost of non-union labor.
13     Q.   Yes.
14     A.   So if you plug in the formula, it's
15 the 10,000 minus the unknown, we will just call
16 it X, divided by X equals .5. So then you can
17 use that formula to solve for the X which is the
18 non-union labor, and I just gave you the example
19 using exactly your hypothesis.
20         If we had 10,000 and we were using the
21 50 percent figure in Table 1, that would --
22 solving for the X would lead to $6,666.67 and
23 that would be -- and if you notice, that is --
24 that the difference between union and non-union

Page 156

1 cost of labor is 3,333.33 which is exactly 50
2 percent of the 6,666.67. So algebra works, and
3 that's the algebra, and I should have put maybe
4 the explicit formula in there. I thought
5 footnote 9 was -- covered the base.
6     Q.   Okay. I think it's more clear now.
7 It's not that you should say that if the
8 carpentry costs were $10,000 by a union worker,
9 the cost for a non-union worker -- (reporter
10 clarification) -- $10,000 for a union carpenter
11 that using the 50 percent, it would be $5,000 for
12 a non-union carpenter. I am reading the table
13 wrong if I say that?
14     MR. FOSTER: Is that a question?
15     MR. SCHUTTE: Yes.
16     MR. FOSTER: It wasn't phrased as a form of
17 a question.
18 BY THE WITNESS:
19     A.   Can you rephrase the question for me?
20 Thank you.
21 BY MR. SCHUTTE:
22     Q.   Yes. You are not suggesting to the
23 judge, are you, that if we know that the cost of
24 a union carpenter to do work was -- in labor

Page 157

1 alone was $10,000, that you can't then just apply
2 the Table 1 Column 3 50 percent and say that
3 means that the non-union carpenter would have
4 cost $5,000?
5     A.   That's correct.
6     Q.   Okay. And that the formula that you
7 expect us to discern from your report is you
8 think set out in footnote 9?
9     A.   I think it's set out in Section 3
10 generally that approach is the general approach,
11 yes.
12     Q.   Okay. Have you considered or looked
13 into at all the process by which either a general
14 contractor or a subcontractor puts together a bid
15 for work for a renovation project in the Chicago
16 Loop?
17     A.   No.
18     Q.   Would you agree with me that it is
19 possible that a contractor who is bidding out a
20 project in the Chicago Loop will make assumptions
21 about his worker or her worker, whether union or
22 non-union, and how many the hours the worker will
23 have to put in to do the work that's necessary?
24     A.   I have no expertise or basis to

40 (Pages 154 - 157)

Page 158

1  respond to that question.
2      Q.  Okay.  So if a general contractor who
3  is calculating a bid would say that I have a
4  union carpenter who I think can do the work that
5  needs to be done for $10,000 and it will take
6  him -- let me make an easier example.
7          If I am a contractor and I say that I
8  have a union carpenter and based on my experience
9  it will take him 10 hours at $100 per hour to do
10 the project, okay.  So it's $1,000 total.  Would
11 you agree with me that it's possible that the
12 non-union contractor would say to himself that my
13 carpenter is going to take 20 hours to do the
14 project at $50 an hour for $1,000 for the entire
15 project?
16     A.  I have no idea what the contractors
17 will assume.
18     Q.  Okay.  If all we have to measure
19 damages on behalf of tenants who have done
20 projects -- renovation projects in the Chicago
21 Loop are what they were charged without any
22 breakdown of how many hours it took at what rate,
23 it's not possible to actually identify what is
24 union versus non-union as opposed to efficiency

Page 159

1  and productivity.  Agree with that?
2      A.  No, I really don't understand exactly
3  what question you would like me to answer.  So
4  please try to -- if you can help me.
5      Q.  Yeah.  How much a contractor will bid
6  out a piece of work depends on what the
7  contractor has to put it in materials, what --
8  how much time at a certain wage the worker will
9  take, and what level of profit he or she wants to
10 obtain.
11         Would you agree with that?
12     A.  I don't know why -- I have no basis of
13 opinion to agree or disagree.  I don't know what
14 contractors do in their bidding.  I really don't
15 so --
16     Q.  Okay.  That's fair.
17     A.  -- I apologize.
18     Q.  No, that's fair.
19         Your formula on page 9 of your report
20 should only be applied, correct, to the labor
21 component of projects that are done in
22 renovation.  For example, it should not apply to
23 material?
24     A.  I think that is correct.  It says

Page 160

1  that -- as it says differences in the cost of
2  union and non-union labor.
3      Q.  Okay.  And so in order for us to use
4  your approach, we need to be able to identify the
5  labor component of work done in a renovation
6  project in the Chicago Loop?
7      A.  Correct.
8      Q.  Okay.  It would be inappropriate to
9  apply your formula to a profit that a contractor
10 builds into a bid for a renovation project in the
11 Chicago Loop, correct?
12     A.  I am going to stick with what I wrote
13 and what I believe is it would be ideal to have
14 the labor costs, purely the labor costs.  In the
15 absence of that, there would have to be some
16 estimate.
17     Q.  Okay.  But your report doesn't say in
18 the absence of that, there will be some estimate.
19 You have written for each class member, the cost
20 incurred for union services will be available.
21         What's the basis of that statement?
22     A.  Again, it's that the costs are
23 available.  Whether they are directly available
24 as a pure labor cost is the question that I think

Page 161

1  you are asking, and so this approach ideally
2  applies to pure labor costs but can be applied
3  generally just like in any context where you have
4  to estimate some -- another part of the problem,
5  but ideally it would be to pure labor costs.
6      Q.  But your formula does not -- your
7  framework doesn't have any reference, does it, to
8  estimating.  Your analysis says that the cost
9  incurred for union services will be available.
10         So you are assuming that that data
11 point is available for every single project for
12 every single tenant in the Chicago Loop during
13 the class period, right?
14     MR. FOSTER:  Excuse me.  Where are you
15 quoting from?
16     MR. SCHUTTE:  Bullet one on page 9.
17 BY THE WITNESS:
18     A.  I mean that's certainly a literal
19 reading of the bullet point.
20     MR. SCHUTTE:  Okay.  This will be 26.
21         (WHEREUPON, a certain document
22         was marked Deposition Exhibit No.
23         26, for identification, as of
24         2/21/20.)

41 (Pages 158 - 161)

1      MR. SCHUTTE:  Andrea, this will be 27,
2  please.
3            (WHEREUPON, a certain document
4            was marked Deposition Exhibit No.
5            27, for identification, as of
6            2/21/20.)
7  BY MR. SCHUTTE:
8      Q.   We have marked as Exhibit 26 WDES's
9  Supplemental Response to Interrogatory No. 4, and
10  we have marked as Exhibit No. 27 a document Bates
11  labels WDES 41 which is a document referred to in
12  Supplemental Response to Interrogatory No. 4, and
13  you have never seen either of those documents
14  before, have you?
15      A.   I may have seen the response to the
16  interrogatory or -- they weren't used in my
17  report.
18      Q.   Okay.  All right.  But let's take a
19  look at page 5 of Exhibit 26, and the 2014
20  renovation project the answer in the supplemental
21  response was:  The subject of Plaintiff -- that's
22  WDES's claim with respect to its 2014 Tenant
23  Improvement Allowance contracting costs is
24  $232,104 which includes, and then there are

1  several bullets broken down.
2            And then it goes on to say at the very
3  bottom of the paragraph under those bullets that
4  the amount of damages will be determined by
5  applying the methodology provided by Dr. Robert
6  Kaestner in his previously-produced report to
7  each of these categories listed in the
8  supplemental response.
9            Do you see that?
10      A.   I do.
11      Q.   Okay.  And then the document we have
12  marked as Exhibit 27 WDES 41 is a document that
13  is referenced in the response that has the
14  numbers that correspond to the bullets.
15            Do you see that?
16      A.   Yes.
17      Q.   Okay.  So this is a real world issue
18  for the judge and the jury.  If we are going to
19  apply your analysis as the plaintiff says we
20  should to calculate the damages that WDES
21  allegedly suffered because of the union premium,
22  for each of those bullets we would have to know
23  the portion of the costs or perhaps it's all, but
24  we would need to know what the labor costs are

1  for the work done by each of those vendors,
2  correct?
3      A.   You'd have to have a -- to know the
4  labor costs --
5      Q.   Yes.
6      A.   -- or to be able to estimate them?
7  Yes.
8      Q.   Your analysis does not talk about
9  estimating?
10      A.   My analysis says that the costs will
11  be available.  It doesn't say how they will be
12  available.  Whether they were estimated or a line
13  item directly.
14      Q.   Or imputed?  Would it be appropriate
15  to impute them?  Is that credible?
16      A.   I do not understand what you mean by
17  impute.
18      Q.   Impute I used it in the same way that
19  you used earlier that it wasn't appropriate for
20  Dr. Allen to impute information from information
21  that wasn't available.
22      A.   I didn't say it wasn't appropriate.  I
23  said it is unknown the reliability and
24  credibility and precision and the adequacy of

1  that -- the comment, the footnote, the imputation
2  which is very common in general in those studies.
3  It's usually known that it's very imprecise, and
4  so, for example, all the estimates that are
5  presented by Dr. Allen, he doesn't -- I don't
6  think he puts very much confidence intervals, but
7  whether those confidence intervals are even valid
8  given all the constructed and imputed data would
9  be a serious question, and, again, this is why
10  that -- those types of studies are not that
11  reliable.
12            So my report says that they will be
13  available, and how they will be available I don't
14  know.  They could be available directly or
15  through an estimate.
16      Q.   So is it your testimony under oath to
17  the judge that when you wrote in your report at
18  page 9 that the cost incurred for union services
19  will be available, that we are supposed to read
20  that as either available or that can be
21  estimated?
22      A.   I think that they would be available
23  or can be estimated would be more in line with my
24  intention.

42 (Pages 162 - 165)

1    Q.   Okay.  But you didn't write or can be
2  estimated.  You stopped at will be available,
3  correct?
4    A.   Correct.
5    Q.   Okay.  Do you have in your expert
6  opinion a formula that on a class-wide basis that
7  the amount -- the cost incurred for union
8  services can be estimated based on an overall
9  invoice from a vendor?
10    A.   What would you like me to answer?  I'm
11  sorry.  Again, can you just restate it?
12    Q.   Yeah.  I am asking whether you have
13  offered any opinion about how -- when the cost
14  incurred for union services is not directly
15  available, are you offering an opinion as to how
16  the cost of union services could be estimated
17  based on an invoice that would include labor
18  cost, material, and profit?
19    A.   I have not done so in my report.
20    Q.   The entry for -- in the interrogatory
21  response Exhibit No. 26, the last -- second to
22  last bullet is $24,877 for general contracting
23  fees by Ostrander Construction.
24        Do you see that?

1    A.   I do.
2    Q.   If that was all -- well, first of all,
3  if that's the -- again, I am testing here the
4  ability of your analysis to be applied on a
5  class-wide basis.
6        What occupational group would you
7  apply from Table 1 for general contracting fees?
8    A.   First, I would like to say that I
9  stand by my report that the general approach is
10  valid and that it can be moved forward.  So
11  that's --
12    Q.   By the way, I am not --
13    A.   No, no, I know, but I am just saying.
14  So that's what I made my basis on.  So I am not
15  sure why I am answering the question, and please
16  just clarify for me why I am answering the
17  question --
18    Q.   I am happy to do that.  I will read to
19  you that first sentence on page 9:  "Damages for
20  each potential class member can be estimated
21  using the evidence on the differences in the cost
22  of union and non-union labor presented in Table
23  1."
24        So are you not telling the judge there

1  that if we apply your formula, that we can
2  calculate -- we can estimate the damages for each
3  potential class member?
4    A.   I am saying that.
5    Q.   Okay.  So what I am doing is giving
6  you as an exemplar the class representative WDES
7  and what they have told us about their damages
8  case.
9        So your formula -- if the 24,877 for
10  general contracting fees, my first question is if
11  that's the evidence presented to the court, which
12  occupational group in Table 1 would we use?
13    A.   Is that a hypothetical or is this
14  actual?  So I don't want to answer on a
15  hypothetical question.  I don't know how it
16  relates to my inability to -- how it overturns or
17  disturbs the general approach that I would use.
18  There's nothing in that document that is -- that
19  overturns the general nature of my approach.  Now
20  so that's one answer.
21    Q.   Do you understand that the reason your
22  general approach is being offered is that
23  plaintiff's counsel has told the judge that you
24  can take your general approach and apply it to

1  every class member without regard to individual
2  issues and reach damages calculations, as you
3  say, damages for each potential class member can
4  be estimated using the evidence on the
5  differences in the cost of union and non-union
6  labor presented in Table 1.  This is not a
7  hypothetical.
8        MR. FOSTER:  Wait, I object to the form of
9  your question.  You are putting in stuff about
10  individual issues which he didn't say in his
11  report.  He doesn't use that phrase.  So okay.
12  If you want to ask him about what he said in his
13  report, that's fine, but I don't think you should
14  misstate what he said in his report.
15  BY MR. SCHUTTE:
16    Q.   That's fair enough.  My question is
17  this:  Your general report on page 9 I want you
18  to apply it to the real world damages line item
19  for WDES of $24,000 -- $24,877 for general
20  contracting fees by Ostrander Construction.
21  First, on Table 1 what occupational group would
22  we look to for the union premium?
23        MR. FOSTER:  I object to the form of the
24  question.  You can answer if you understand.

43 (Pages 166 - 169)

1 BY THE WITNESS:

2   A.  The short answer is it doesn't map

3 over to the occupations in Table 1.

4 BY MR. SCHUTTE:

5   Q.  So some judgment would have to be

6 applied by whoever is applying the formula?

7   A.  Yes.

8   Q.  Okay. If that $24,877 included the

9 cost of renting dumpsters, the amount of the

10 dumpsters would have to be backed out of that

11 $24,877 before you apply your union wage premium,

12 correct?

13   MR. FOSTER: I object to the form of the

14 question. You can answer.

15 BY THE WITNESS:

16   A.  So we can go down this line several

17 times if you would like. So my report says the

18 information will be available. I have testified

19 that when I said that, I believe it's either

20 directly available or would be estimated. Given

21 that, I would apply the general approach and the

22 estimates in Table 1, and so that's how I would

23 answer the question.

24

1 BY MR. SCHUTTE:

2   Q.  But I have a very specific question

3 which is if that $24,877 includes the cost of

4 renting dumpsters before you apply your formula,

5 we would have to back out the cost of renting the

6 dumpsters because those are not labor costs,

7 right?

8   If it's a known number, we would have

9 to back that out before we can apply your formula

10 because your formula only applies to labor costs?

11   MR. FOSTER: I object to the form of the

12 question. You can answer.

13 BY THE WITNESS:

14   A.  I have already stated that if it's not

15 directly available, it would have to be

16 estimated.

17 BY MR. SCHUTTE:

18   Q.  I'm not asking about estimating. I am

19 telling you that I am telling you specifically

20 that if the evidence was that that $24,877

21 included $800 in dumpster rental to apply your

22 formula, he would have to take the $800 out

23 because the union wage premium does not

24 contemplate a union premium for renting

1 dumpsters?

2   MR. FOSTER: Object to the form of the

3 question, asked and answered. You can answer.

4 BY THE WITNESS:

5   A.  In this case you would have a very

6 reliable estimate of $800. So that would be a

7 very good estimate that would make it available.

8 BY MR. SCHUTTE:

9   Q.  And you agree with me we would have to

10 back that out?

11   A.  That's what we mean -- that's what I

12 mean by estimate.

13   Q.  Okay. If that 24,877 included $13,048

14 in insurance premiums, you would agree with me if

15 that evidence was available, that $13,048 would

16 you to have backed out of the 24,877, correct?

17   A.  I am just going to answer in general,

18 and it applies specifically to your question that

19 the general approach applies to labor costs.

20 Labor costs would have to be available either

21 directly or estimated. You are using the word

22 back out as a -- in my language it would be

23 estimate. So that would apply to the last two

24 examples.

1   Q.  But you have not provided the court

2 with any way to on a class-wide basis estimate

3 labor costs when the information available

4 aggregates -- aggregates labor cost, material,

5 and profit, correct?

6   A.  That's correct.

7   Q.  Okay. Let's turn to the section in

8 your report on use of the Illinois Department of

9 Labor data. Now, at the end of the day, you do

10 this analysis and it's summarized in Table 2. I

11 think I covered this earlier just to make sure

12 the record is clear. You are not recommending to

13 the judge that Table 2 be used in the class-wide

14 damages calculation?

15   A.  That's correct.

16   Q.  Okay. Why did you include the

17 Illinois Department of Labor analysis if it's not

18 going to be something that you are recommending

19 to the judge to be applied?

20   A.  I included it to show the

21 reasonableness and the credibility of what I have

22 referred to and you have referred to as my

23 original analysis.

24   Q.  Okay.

44 (Pages 170 - 173)

1    A.   And these data have some advantages or
2 some usefulness is a better word relative to
3 the -- for that purpose.
4    Q.   So if I understand what you did here,
5 is you took information available from the
6 Illinois Department of Labor in the form of
7 prevailing wages for various occupations in Cook
8 County?
9    A.   I took all the occupations that are
10 published by the Illinois Department of Labor as
11 prevailing wages in Cook County that map into the
12 occupations in Appendix A.
13    Q.   Okay.  You write at page 6 that:  "The
14 IDOL prevailing wage is the wage plus fringe
15 benefit paid to construction workers on public
16 works jobs."
17        What's the citation or the factual
18 backup for that statement?
19    A.   The Illinois statute, the prevailing
20 wage statute of Illinois.
21    Q.   So here you are only looking at public
22 works jobs.  You are not looking at work done on
23 private construction projects, correct?
24    A.   So the prevailing wage is applied to

1 public works jobs.  The prevailing wage itself
2 probably includes information from non-public
3 works jobs as -- right.  So the statute says that
4 for public works jobs, you have to pay this
5 prevailing wage.  The prevailing wage is obtained
6 from surveys of unions, for example, of what they
7 paid their workers on jobs.  I presume they are
8 public work jobs.
9    Q.   You presume?
10    A.   As best I can tell from the Illinois
11 Department of Labor methodology that is cited in
12 the report.
13    Q.   Are there non-union wages that are
14 reported and used in calculating the Cook County
15 prevailing wage?
16    A.   There may be, but I think again
17 reading the methodology provided by the Illinois
18 Department of Labor, that they're mainly union
19 reported.  That the unions report the wages
20 directly to the -- to the state.
21    Q.   Okay.  So where would I go to validate
22 that statement?
23    A.   Again, it's -- the footnote 7 gives
24 you the citation.

1    Q.   The -- you write in page 6:  "Almost
2 all such workers are unionized."
3        What percentage are not unitized?
4    A.   I don't know the exact percentage, but
5 again from my reading of the methodology and from
6 other sources that have discussed prevailing
7 wages, it's widely accepted I think and
8 documented that the prevailing wage is -- is
9 very -- is a measure of the union wage.
10    Q.   What other sources are you referring
11 to?
12    A.   Other documents that I read, you know,
13 briefly but aren't cited, no.
14    Q.   They are not cited in the report --
15    A.   No, so let's rely on just -- rely on
16 the Illinois -- I relied mostly on the Illinois
17 Department of Labor methodology and the
18 description of their survey.
19    Q.   Okay.  And you come to the conclusion
20 that the Illinois Department of Labor prevailing
21 wage is an accurate estimate of the wage and
22 fringe benefit cost of union workers in
23 construction occupations in Cook County, correct?
24    A.   Correct.

1    Q.   Okay.  Then you compare that, do you
2 not, against non-union wages outside of the
3 Chicago metropolitan area as adjusted by
4 calculating a fringe benefit cost?
5    A.   I do and the reason I do that is
6 because of the previously cited evidence that the
7 non-union wages in the metropolitan Chicago area
8 do not differ significantly or meaningfully in an
9 economic sense as we discussed from the non-union
10 wages in these occupations from the country as a
11 whole.  So that's a reasonable and credible
12 estimate of the non-union wage.
13    Q.   But on the analysis you did using the
14 current population survey, you were comparing
15 data from that data set on the union side and the
16 non-union side.  In Section 3 you are using the
17 Illinois Department of Labor prevailing wage plus
18 fringe benefits on one side, and you are using
19 CPS nationwide data adjusted for fringe benefits
20 on the other for the comparison, correct?
21    A.   That's correct, and the reason I did
22 that is, again, because of the evidence that the
23 non-union wage in the Chicago metropolitan area
24 does not differ significantly or meaningfully

1 from the non-union wage in the U.S. as a whole in
2 these occupations.
3     Q.   All right.  And the results of your
4 analysis are set out in Table 2 on page 7,
5 correct?
6     A.   Correct.
7     Q.   And that's shown as a prevailing
8 wage -- all the numbers shown there other than
9 the percentages are dollars per hour?
10     A.   Yes.
11     Q.   Okay.  This morning you told me that
12 there's a portion of your analysis that relies on
13 not per hour but per week.
14         Where -- what part of your analysis or
15 the data you looked at was data based on wage per
16 week?
17     A.   So Table 1 of the sample used in Table
18 1 contains self-reported wages by workers covered
19 and not covered by unions.  Some report the wages
20 in hourly wage.  Some report it as a weekly wage.
21 In my analysis I actually adjusted for that
22 because there may have been differences between
23 reporting by union and non-union workers.  So I
24 wanted to take out any of those differences, and

1 I did so and so.
2     Q.   Okay.  When the data is reported as
3 hours -- or excuse me -- wages per week, what is
4 the assumption made about how many hours were
5 worked per week?
6     A.   So I didn't make any assumption, and
7 that's very much importantly why I adjusted for
8 whether the reporting was done by the hour or the
9 week and because if there was significant
10 differences, then that might have been reflected
11 in differences in hours worked.  In fact, there
12 were no -- that's been adjusted.  So that's not
13 an issue in that these numbers.
14     Q.   And all of that analysis is reflected
15 in your Stata data?
16     A.   In the Stata data code, yes.
17     Q.   Yes.  Is all of the data manipulation
18 analysis that you did -- I will take away the
19 manipulation.  I didn't mean it to be a negative
20 term, but is all the statistical work you did
21 with respect to the Department of Labor
22 prevailing wage also reflected in your Stata
23 data?
24     A.   Not all of it, but it's a -- the

1 column labeled Non-Union Hourly Wage, that's the
2 estimates that I have obtained.
3     Q.   I see.  The idea of the Department of
4 Labor Cook County prevailing wage is really just
5 a reference to numbers on the website that's
6 cited?
7     A.   Correct.
8     Q.   Thank you.
9         Why did you include fringe benefits in
10 the Department of Labor prevailing wage analysis
11 but not in the CPS data analysis?
12     A.   Because in the prevailing -- in this
13 section -- what section -- we are just going to
14 refer to it as the Illinois Department of Labor
15 section.  The prevailing wage includes wages and
16 fringe benefits.  So I wanted to compare apples
17 to apples, and the Current Population Survey only
18 reports the -- what's referred to as straight
19 time wages or just the wage component of
20 compensation, not fringe benefits.
21     Q.   Do you have any understanding as to
22 whether when a contractor is doing a renovation
23 project in the Chicago Loop it's the type of work
24 that would be covered by the class here, whether

1 that contractor passes along to the tenant the
2 fringe benefit costs of employees?
3     A.   I have no direct knowledge, but that
4 would be certainly part of labor costs.  So my
5 full expectation would be that that would be part
6 of the wage bill.
7     Q.   You told me that you included Table 2
8 in the entire Illinois Department of Labor
9 analysis because -- you know, the record will say
10 what it says -- but I understood you to say that
11 it sort of provides perspective or justifies the
12 Table 1 analysis?
13     A.   It provides evidence supportive of
14 Table 1 same as the academic -- review of
15 academic literature.  It's showing a
16 preponderance of evidence, a constellation of
17 evidence that's all consolidating and coming to
18 a -- you know, showing more or less the same
19 thing.  So it's in my mind a very powerful way to
20 demonstrate the difference between union and
21 non-union wages.
22     Q.   Okay.  Is there any -- do you think
23 that Table 1 is more accurate than Table 2 in
24 measuring non-union versus union wages?

46 (Pages 178 - 181)

Page 182

1  A.  I think they measure different things.
2 So Table 1 measures just the -- let's just refer
3 to it as the union wage premium, the difference
4 in union and non-union wages based on wages.
5 It's a large sample of persons.  So it's quite
6 accurate in terms of the precision, the certainty
7 of the estimates.
8  So and that's why -- and it covers
9 more of the occupations.  So that would be why I
10 would prefer it to -- in terms of if we had to
11 use -- if I had to use one number to report,
12 those estimates would be probably -- because they
13 are more comprehensive and larger samples.
14  Q.  Okay.  On page 6 you write: It is
15 well known -- this is in the first paragraph
16 under little (indicating).  "It is well known
17 that the prevailing wage published by the
18 Illinois Department of Labor is the union wage
19 and not the competitive (non-union) market wage
20 which is sometimes referred to as the prevailing
21 wage."
22  What is the source of your statement
23 that that is well known?
24  MR. FOSTER:  Well, wait.  Objection, that

Page 183

1 was asked and answered.  Okay.  You can answer.
2 BY THE WITNESS:
3  A.  The prevailing wage -- sometimes the
4 market wage is referred to as the prevailing wage
5 in -- even in academic literature, but in the
6 context of what the Illinois Department of Labor
7 and the Illinois statute, it's called the
8 prevailing wage statute.  It follows from the
9 federal statute.  That's a very specific meaning
10 of the term, and that refers to wages plus fringe
11 benefits.
12  So there's and important distinction
13 that I didn't want to have confused and conflated
14 that the prevailing wage as reported by the
15 Illinois Department of Labor is part of the
16 Illinois prevailing wage statute is -- it
17 mandates to include wages and fringe benefits
18 where if I was talking to colleagues and we would
19 say the prevailing wage in the Chicago market, we
20 would be probably referring to the market wage,
21 the competitive market wage without restraint of
22 supply for example by unions.
23  Q.  But the sentence I read to you is not
24 about fringe benefits.  It says: "It is well

Page 184

1 known that the prevailing wage published by the
2 Illinois Department of Labor is the union wage
3 and not the competitive (non-union) market wage."
4  What is the source of that statement
5 that it's well known.  That it's the union wage
6 and not the market wage?
7  A.  Again, it's my -- it's with reference
8 to the methodology that's published by the
9 Illinois Department of Labor and my expert
10 opinion on this.
11  Q.  It's actually a combination of even
12 under your own report mostly union but some
13 non-union wages?
14  A.  I don't know what mostly.  It has --
15 it has some -- it can some non-union wages in
16 there.
17  Q.  Okay.  I used my word.  I will use
18 your word.  Almost all of the wages that are in
19 the calculation of the Department of Labor
20 prevailing wage are union but some are not,
21 correct?
22  A.  That's what I have written, and that's
23 based on the methodology of the Illinois
24 Department of Labor.

Page 185

1  MR. FOSTER:  Would you mind taking a short
2 break?
3  MR. SCHUTTE:  No, not at all.  Actually --
4  MR. FOSTER:  Are we getting towards the end?
5  MR. SCHUTTE:  I wouldn't say getting towards
6 the end.  If you give me ten minutes, I can
7 probably organize things and based on how things
8 have just gone probably short-circuit.  So give
9 me ten --
10  MR. FOSTER:  Ten minutes.
11  MR. SCHUTTE:  -- actually, why don't we do
12 this.  If it's quicker than ten minutes --
13  MR. FOSTER:  Just come let us know, okay,
14 but you got it.  All right.
15  THE VIDEOGRAPHER:  Going off the video
16 record at 2:41 p.m.
17  (WHEREUPON, a recess was had at
18  2:41 p.m. until 2:54 p.m.)
19  THE VIDEOGRAPHER:  We are back on the video
20 record at 2:54 p.m.  You may proceed.
21 BY MR. SCHUTTE:
22  Q.  Dr. Kaestner, the analysis you did
23 looking at the Illinois Department of Labor
24 numbers, that is not specific to the Chicago

47 (Pages 182 - 185)

Page 186

1 Loop, correct? It's specific to Cook County?
2    A.   Correct.
3    Q.   Okay. I want to go back and close the
4 Loop on the hypothetical that I started when we
5 got derailed from, and I want you to make the
6 following assumption that you have a carpenter
7 who takes 100 hours to do a project at $100 per
8 hour such that the total project cost is $10,000.
9 That's a union carpenter. I want you to assume
10 that a non-union carpenter to do the same project
11 will take 200 hours at $50 an hour. So also a
12 $10,000 project.
13        There's nothing in the analysis you
14 are proposing that would account for the
15 possibility that a difference between union and
16 non-union work is reflective of the fact that
17 union workers can be more efficient and
18 productive than non-union workers, correct, in
19 that scenario?
20    A.   No, that's -- I don't know if it's
21 correct or not, but I am going to explain what's
22 pertinent in my report, and that's the point
23 about adjusting for age and education. They are
24 sometimes viewed as proxy variables without

Page 187

1 direct measurement but as proxy variables for
2 productivity differences. So I adjust for them
3 and present estimates even after adjusting for
4 them. So in some sense my analysis does account
5 for that possibility and the estimates are
6 presented.
7    Q.   But in my hypothetical I want you to
8 assume that each carpenter is the same race, the
9 same age, the same sex, and has the same
10 education level. Your formula would not be able
11 to account for the fact that it's possible that
12 the union worker can do more in a shorter period
13 of time, albeit at a higher per hour wage, than a
14 non-union worker?
15    MR. FOSTER: Okay. One second. I just want
16 to object to the form of the question,
17 speculation. You can answer.
18 BY THE WITNESS:
19    A.   Again, I would quibble with the
20 scenario that there is in -- some possibility or
21 some evidence, some scientific plausibility that
22 we would have that type of disparity in
23 productivity between union and non-union wages.
24 So when I -- when we go and take -- undertake a

Page 188

1 scientific inquiry, we talk about scientific
2 plausibility. Should we even be looking at
3 this -- for this research question.
4        So you have presented a hypothetical
5 question that I would suggest might not have any
6 scientific plausibility because it's not much
7 evidence of these stark differences in
8 productivity that you have laid out. Conditional
9 on that, anything is possible. So that would be
10 your hypothetical -- the math in your
11 hypothetical example is correct under the
12 conditions you stated.
13 BY MR. SCHUTTE:
14    Q.   How many years have you been teaching?
15    A.   Too long, too many. About 30.
16    Q.   Okay. Do you think that you can
17 prepare for class more efficiently and
18 productively than a professor who is just in his
19 or her first year of teaching?
20        Both of you have Ph.D.s, both of you
21 are -- you're probably going to be older, both of
22 you are white men, both of you Ph.D.s, would you
23 agree with me that as somebody who has been
24 teaching for 30 years you can prepare for class

Page 189

1 more efficiently than a person who is teaching
2 their first class?
3    A.   Again, you know, I don't know that
4 this is true. That like, for example, I don't
5 think my teaching evaluations would be an
6 assessment of my productivity are better than the
7 teaching evaluations of a new assistant
8 professor, and so similarly in terms of research,
9 new assistant professors publish research, and I
10 publish research so but --
11    Q.   I understand that you disagree with
12 the premise that union workers can be more
13 productive than non-union workers, but whether
14 that's true or not, your analysis, your formula
15 does not take that into account, correct?
16    A.   Again, I don't disagree or agree. I
17 think there's no evidence that I think is
18 credible that identifies that there are
19 significant productivity differences between
20 union and non-union workers in construction or
21 more broadly, but I don't think the evidence is
22 there. So based on that, then I don't think that
23 I would expect there to be large productivity
24 differences that explain the differences in

48 (Pages 186 - 189)

Page 190

1 wages --
2    Q.   Okay.
3    A.   -- and then finally the adjustment for
4 age, education, race, and gender are less
5 important, but age and education are intended to
6 address this issue, and they don't make much of a
7 difference consistent with the lack of evidence.
8    Q.   But you told me you couldn't point me
9 to a single article that tied age, education,
10 race, or gender to productivity in the
11 construction industry?
12    MR. FOSTER:  Objection, asked and answered.
13 BY THE WITNESS:
14    A.   But directly, yes.
15 BY MR. SCHUTTE:
16    Q.   Okay.  Again, I think we -- I
17 recognize you disagree with the premise, but if
18 there were differences in productivity between
19 union and non-union workers, that would not be
20 picked up for in your framework?
21    A.   Again, I think your math is correct,
22 and to the extent that that would be different
23 than my framework, yes.
24    Q.   Okay.  You -- in your report on that

Page 191

1 summary page where you laid out how it would
2 apply to all the class members, you told me that
3 you said will be available, what you meant was
4 will be available or can be estimated.
5       As you sit here today, do you have an
6 expert opinion on the percentage of time where
7 the labor cost will be available versus when the
8 labor cost will have to be estimated?
9    MR. FOSTER:  Objection.  Okay.  Are you
10 referring to a specific line in the report?
11    MR. SCHUTTE:  We talked about this for
12 hours.  I am talking about the line in the report
13 where he wrote:  For each class member, the cost
14 incurred for unions services will be available.
15 He then said what I meant was it will be
16 available or can be estimated.
17 BY MR. SCHUTTE:
18    Q.   My question is do you have an opinion
19 as to how often the cost incurred for union
20 services is available versus when it will have to
21 be estimated?
22    A.   I have no opinion.
23    Q.   Okay.  As you sit here, do you have
24 any opinion or knowledge of whether for many jobs

Page 192

1 done -- many renovation jobs done in the Chicago
2 Loop that the only thing available to a tenant
3 would be the overall cost of all work by all
4 occupational groups and materials and profit as a
5 single number?
6    A.   I have no knowledge of this.
7    Q.   Okay.  You told me that you put in a
8 total of 15 hours, obviously more since that
9 after going through today.
10       Of that 15 hours, what percentage of
11 time did you spend actually writing the report
12 versus reviewing the articles, manipulating the
13 data, or looking at the First Amended Complaint
14 and the interrogatory responses?
15    A.   You know, five.
16    Q.   Five hours writing the report?
17    A.   Of, you know, those are billed hours
18 by the way.  I didn't bill for every minute of my
19 time.
20    Q.   How much time did you spend that you
21 did not bill to counsel working on your report?
22    A.   I don't know because I didn't keep
23 track of it.  I wanted to be thorough in what I
24 wrote on the report so, and I billed for what I

Page 193

1 thought was fair and reasonable, and if I can
2 understand the question differently, maybe I can
3 be more helpful to you.
4    Q.   Again, I am not about hiding the ball
5 so I'll be straight up on this.  You said 15
6 hours, okay.  You cited a lot of articles you
7 said you read.  You wrote a report that is nine
8 pages long.  You did significant amounts of data
9 manipulation and research, and I am trying to
10 figure out how that breaks into 15 hours.  And if
11 it's more than 15 hours and you are just not
12 billing some of that, I would like you to
13 estimate that for the judge as well.
14    MR. FOSTER:  Objection, relevance.
15 BY MR. SCHUTTE:
16    Q.   You can answer.
17    A.   I didn't keep track.
18    Q.   Okay.  My last question is how did
19 you -- well, actually I may have others.
20       Do you have any knowledge as to
21 whether union workers in the construction
22 industry received more training than non-union
23 workers?
24    A.   I don't have explicit knowledge.

49 (Pages 190 - 193)

Page 194

1    Q.   Okay.  Do you agree that the number of
2  hours that were used or that were put in on a
3  particular project or renovation project matter
4  in your analysis or your framework for the class
5  damages?
6    A.   I think they would be reflected in the
7  cost of labor.
8    Q.   Okay.  If they can be either directly
9  ascertained or estimated?
10    A.   As we have discussed, yes.
11    Q.   Yes.  How did you come to be -- if you
12  know, how did you come to be retained as an
13  expert in this case?  Have you worked with any
14  counsel before?
15      Just tell us about that.
16    A.   I have worked with Foster PC before.
17    Q.   Okay.  And what kind of case did you
18  work with Foster PC on?
19    A.   On a RICO case.
20    Q.   And I want to be careful because I
21  don't want to invade this --
22    A.   Yes, thank you.
23    Q.   -- was it a consulting expert?
24  Because you said you have never been an expert

Page 195

1  witness before.
2    A.   I haven't been deposed as an expert
3  witness.
4    Q.   You have been retained as an expert
5  witness?
6    A.   I have been retained to provide
7  research that -- for my expertise.
8    MR. FOSTER:  Can I just -- he was a
9  consulting expert.
10  BY MR. SCHUTTE:
11    Q.   I don't want to touch that.
12    A.   Okay.  Thank you.
13    Q.   You said -- and I left open a loophole
14  then which is:  On how many occasions have you
15  been retained as a consulting expert as opposed
16  to a testifying expert?
17    A.   Three or four.
18    Q.   Okay.  Is that a significant portion
19  of your income currently?
20    A.   Unfortunately, no.
21    MR. SCHUTTE:  I think I have nothing
22  further.  Do you have any questions?
23    MR. FOSTER:  Can we take a little break and
24  we will chat, and we will let you know promptly.

Page 196

1    THE VIDEOGRAPHER:  Going off the video
2  record at 3:06 p.m.
3      (WHEREUPON, a recess was had at
4      3:06 p.m. until 3:11 p.m.)
5    THE VIDEOGRAPHER:  We are back on the video
6  record at 3:11 p.m.
7    MR. FOSTER:  And we have no questions for
8  Dr. Kaestner.
9    MR. SCHUTTE:  Dr. Kaestner, thank you for
10  your time and your patience.
11    THE VIDEOGRAPHER:  We are going off the
12  video record at 3:11 p.m.  This concludes today's
13  testimony.  The master video will be retained by
14  Veritext Legal Solutions.  Thank you and good
15  night.
16      (WHEREUPON, the deposition was
17      concluded at 3:11 p.m.)
18
19
20
21
22
23
24

Page 197

1      CERTIFICATE
2      OF
3    CERTIFIED SHORTHAND REPORTER
4
5    I, ANDREA L. KIM, a State of Illinois
6  Licensed Certified Shorthand Reporter, License
7  number 84-3722, do hereby certify:
8    That previous to the commencement of
9  the examination of the aforesaid witness, the
10  witness was duly sworn or affirmed to testify the
11  whole truth concerning the matters herein;
12    That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true and
16  accurate record of the testimony given and the
17  proceedings had at the aforesaid deposition;
18    That the said deposition was taken
19  before me at the time and place specified;
20    That I am not a relative or employee
21  or attorney or counsel for any of the parties
22  herein, nor a relative or employee of such
23  attorney or counsel for any of the parties
24

50 (Pages 194 - 197)

Page 198

1  hereto, nor am I interested directly or
2  indirectly in the outcome of this action.
3
4        IN WITNESS WHEREOF, I do hereunto set
5  my hand and affix my seal of office at Chicago,
6  Illinois, this 25th day of February, 2020.
7
8
9
10
11
12
13
14         *Andrea L. Kim*
15         ANDREA L. KIM, CSR
16         License No. 84-3722.
17
18
19
20
21
22
23
24

Page 199

1              Veritext Legal Solutions
                  1100 Superior Ave
2                    Suite 1820
                 Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
   February 27, 2020
5
   To: Mr. Zouras
6
   Case Name: Wacker Drive Executive Suites, LLC v. Jones Lang Lasalle
7  Americas (Illinois), LP
   Veritext Reference Number: 4001030
9  Witness:  Robert Kaestner , Ph.D.     Deposition Date:  2/21/2020
10
   Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
    shown
17
    above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
    Sincerely,
22
    Production Department
23
24  NO NOTARY REQUIRED IN CA

Page 200

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4001030
3      CASE NAME: Wacker Drive Executive Suites, LLC v. Jones Lang
     Lasalle Americas (Illinois), LP
       DATE OF DEPOSITION: 2/21/2020
4      WITNESS' NAME: Robert Kaestner , Ph.D.
5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
     as transcribed by the court reporter.
8

9  Date        Robert Kaestner , Ph.D.
10     Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11  the referenced witness did personally appear
     and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
     Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
18     Notary Public
19
     Commission Expiration Date
20
21
22
23
24
25

Page 201

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4001030
3      CASE NAME: Wacker Drive Executive Suites, LLC v. Jones Lang
     Lasalle Americas (Illinois), LP
       DATE OF DEPOSITION: 2/21/2020
4      WITNESS' NAME: Robert Kaestner , Ph.D.
5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
     as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
     that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
   Date        Robert Kaestner , Ph.D.
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
     the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
     Notary Public
24
     Commission Expiration Date
25

51 (Pages 198 - 201)

Page 202

1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 2/21/2020
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____   _____
20  Date            Robert Kaestner , Ph.D.
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                              888-391-3376