# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>JONES LANG LASALLE AMERICAS (ILLINOIS), LP,<br><br>    Defendant. | Case No. 1:18-cv-5492<br><br>Magistrate Judge Sunil R. Harjani |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
TO EXCLUDE PROPOSED EXPERT TESTIMONY OF DR. ROBERT KAESTNER**

**JONES LANG LASALLE
AMERICAS (ILLINOIS), LP**

Philip A. Miscimarra
Scott T. Schutte
Stephanie L. Sweitzer
Kevin F. Gaffney
Heather J. Nelson
**MORGAN, LEWIS & BOCKIUS LLP**
77 West Wacker Drive, 5th Floor
Chicago, IL 60601
Tel: 312.324.1000
Fax: 312.324.1001
philip.miscimarra@morganlewis.com
scott.schutte@morganlewis.com
stephanie.sweitzer@morganlewis.com
kevin.gaffney@morganlewis.com
heather.nelson@morganlewis.com

*Attorneys for Defendant*

Plaintiff Wacker Drive Executive Suites, LLC ("Plaintiff") alleges that it was illegally forced by Defendant Jones Lang LaSalle Americas (Illinois), LP ("JLL") to use union workers for construction and moving projects within the office space it leased in a Chicago Loop high-rise building. Plaintiff asserts that using nonunion workers would have cost less, and it seeks damages in the amount of the difference between the costs for the union labor it actually used and the costs of the nonunion labor it purportedly wanted to use.[1]

However, Plaintiff has no real-world evidence to support this damages theory, because Plaintiff never actually solicited cost proposals from the allegedly "cheaper, non-union contractors" for its projects. Dkt. 76 (Am. Compl.) ¶ 26. Needing some way to estimate what its nonunion labor costs would have been, Plaintiff has always fallen back on laborer hourly wage data, claiming it can demonstrate the "difference in cost between union and non-union labor" incurred by Plaintiff. *Id.* ¶¶ 29-30.

That assumption is not borne out by the factual record. Plaintiff did not pay wages to anyone; it hired contractors. The contractors paid wages to their workers, and then sent Plaintiff a single invoice for their fee for the contractor's work on the project, which included a labor component but also materials, related costs (*e.g.* insurance), and profit.[2] Thus, when laborers worked on Plaintiff's projects, there were two different "labor costs": union wages (paid by the

---

[1] As set out in JLL's Opposition to Plaintiff's Motion for Class Certification, *see* Dkt. 125 at 9-11, 15-16, Plaintiff actually used a combination of union and nonunion labor on the projects at issue, and does not know the costs of the union labor on these projects.

[2] None of Plaintiff's contracting invoices are itemized, meaning the charges to Plaintiff for union labor are indistinguishable from all other costs baked into the invoices. *See* Dkt. 125 at 15; *see also id.* at 16 (admitting putative class members have similar, non-itemized records). For all practical purposes, this renders Dr. Robert Kaestner's damages formula unusable: Because the labor costs are not isolated, there is no way to apply Dr. Kaestner's formula, even if it passed *Daubert* muster (which it does not). *Id.*; *see also* Dkt. 125-5 ("Hosfield Op.") at 16-19 (illustrating the impracticalities of Dr. Kaestner's formula). Here, the focus is on the inadmissibility of Dr. Kaestner's opinion—assuming, as he does, that isolated union labor charges "will be available," even though they are not. Dkt. 105-1 ("Kaestner Rpt.") at 9.

contractors to their workers) and labor charges (invoiced to Plaintiff as part of the overall project cost). Although Plaintiff conflates the two, this distinction is critical because there is no record evidence that the union wages paid by the contractor to its workers was passed on directly to Plaintiff.

Given that this factual record was established by the time Plaintiff's damages expert, Dr. Robert Kaestner, tendered his report, one would expect that Dr. Kaestner would support both parts of Plaintiff's damages theory: (i) that union laborers earn higher wages than their nonunion counterparts, and (ii) that there is a methodology by which this Court could ascertain how the union wages paid to workers translated to the labor charges actually billed to Plaintiff and absent class members. But Dr. Kaestner only goes halfway: He dedicates his Expert Report to detailing his analysis of "union wage premiums," or the higher wage rates (and fringe benefits) he thinks union laborers earn over nonunion laborers in the same trade. Kaestner Rpt. at 1-2.

But when it comes time to explain how those wage premiums relate to Plaintiff's damages, Dr. Kaestner's analysis stops cold. He just asserts, without any explanation, that dividing Plaintiff's actual union labor *charges* by his *wage* premiums yields Plaintiff's estimated nonunion labor *charges*. This damages formula mixes up the two types of labor costs, without any adjustments. Dr. Kaestner blindly assumes a perfect correlation between the different variables: the more wages a contractor paid its laborers, the more labor charges Plaintiff incurred from the contractor in exactly equal dollars. He provides no support whatsoever for this critical 1:1 wage-to-cost ratio—no data to verify, no methodology to test, no logic to analyze, nothing. It is pure *ipse dixit*. This alone makes Dr. Kaestner's damages opinion unreliable and inadmissible.

But there is more. During his deposition, Dr. Kaestner dug a deeper hole by conceding there are no "empirical studies" or "credible research" supporting another key premise underlying

his damages formula: that "union and nonunion laborers are equally productive." Dkt. 125-13 ("Kaestner Dep.") 126:8-127:24.  In other words, Dr. Kaestner blindly assumes, again, that nonunion laborers would have spent the exact same number of hours completing the work for Plaintiff's projects as accredited union laborers did—just at lower wage rates (and that each penny of those wage savings would have been passed on to Plaintiff, instead of pocketed by the contractor).

For these reasons, as further set out below, Dr. Kaestner's damage-calculation opinion is fatally flawed and cannot be admitted.  His union-wage-premium opinion is irrelevant on its own, absent a reliable methodology connecting it to Plaintiff's alleged damages.  Therefore, the Court should exclude Dr. Kaestner from providing any expert testimony in this case.

### RELEVANT BACKGROUND

**1.     Plaintiff's Claims.**

Plaintiff was a tenant in a building managed by Defendant (JLL), but owned by a third party.  Am. Compl. ¶ 18.  Plaintiff alleges that JLL conspires with certain labor unions to force tenants in JLL-managed buildings "to hire union only contractors" for tenants' construction and moving projects.  *Id.* ¶ 1.  Plaintiff thinks this alleged conspiracy caused it to "suffer[ ] damages" by "pay[ing] for above-market price unionized labor" for three projects.  *Id.* ¶¶ 2, 21-28.

Plaintiff does not allege it hired union members directly and paid them wages for the projects.  *See generally id*.  Instead, Plaintiff alleges it hired union-affiliated contractors; the contractors, in turn, hired union members to perform the labor.  *See, e.g., id.* ¶¶ 1, 22-23.  Plaintiff then paid the contractors the amounts the contractors charged Plaintiff for the labor.[3]

---

[3] *See* Dkt. 125-8 (Plf. Supp. Resp. to Def. Interrogatory No. 4) at 5 (identifying labor charges from seven union contractors for carpentry, demolition, flooring, ceiling, painting, HVAC, electrical, and general contracting, and the supporting invoices to Plaintiff); Dkt. 125-9 ("A. Grossman Dep. Vol. 2") 163:4-164:1 (confirming this is the basis for Plaintiff's damages claim).

Despite alleging it had "cheaper, non-union contractors it wanted to use," Am. Compl. ¶ 26, Plaintiff does not know if those nonunion contractors were, in fact, cheaper than the union contractors it did use. *See* Dkt. 105-7 ("A. Grossman Dep.") 70:3-19, 100:6-23, 113:24-114:13 (Plaintiff never actually solicited cost proposals from nonunion contractors). Still, Plaintiff averred in the complaint "[t]he difference in cost between union and non-union labor is significant," and cited some statistics purporting to show that certain union tradesmen earn higher wages than their nonunion counterparts. Am. Compl. ¶¶ 29, 30. Plaintiff then assumed its contractors passed on some of these higher union wage costs to Plaintiff, resulting in an estimated 20% "overcharge[ ]" for union labor. *Id.* ¶ 31. Plaintiff recognized "the actual amount [of the alleged overcharge] will have to be determined by an economist." *Id.*

**2.    Dr. Kaestner's Proposed Expert Testimony.**

Plaintiff disclosed the Expert Report of Dr. Kaestner in support of its Motion for Class Certification. *See* Dkt. 105 (Class Cert. Mot.) at 6. As Plaintiff tells it, the Report concludes that "each class member has been damaged in the same manner" by the alleged union-only conspiracy and can "determine the increased amount [each class member] was forced to pay as a result." Dkt. 105 at 6, 13. Likewise, Dr. Kaestner says the Report "provide[s] evidence related to whether mandating the use of union labor to move in and out of, and renovate commercial office space in downtown Chicago affects the costs of such activities." Kaestner Rpt. at 1.

This is all window dressing. Dr. Kaestner's substantive opinion says none of these things. *See generally* Kaestner Rpt. 2-9; *see also* Kaestner Dep. 56:3-6, 55:16-22 (confirming he actually offers no opinion on the existence of the union-only conspiracy Plaintiff alleges); *id.* 55:23-56:2 (no opinion on whether Plaintiff could have suffered any damages because of the alleged conspiracy); *id.* 17:15-18:13, 44:23-45:12 (no opinion on whether the alleged conspiracy could have affected the price of labor, union or nonunion). Dr. Kaestner did not even rely on the

particular allegations in this case when drafting his Report. *See id.* 38:7-20.

In reality, Dr. Kaestner's opinion has a very narrow and generic mandate: "estimate the difference in wages (and fringe benefits) between union and non-union workers in occupations typically used to move into and renovate commercial space in downtown Chicago." Kaestner Rpt. at 1; *see also* Kaestner Dep. 14:13-15:9 (confirming this is precisely "what [he] intend[ed] to do."); *id.* 49:15-51:18, 58:1-8 (clarifying that he does not even offer an opinion on which "occupations [are] typically used to move into and renovate commercial space in downtown Chicago," as he just relied on a list of occupations supplied to him by Plaintiff's counsel).

### (a)   Calculation of "Union Wage Premiums."

The first eight (of nine total) pages of Dr. Kaestner's substantive opinion describes his calculation of "[t]he union wage premium, which measures the difference between union and non-union wages and is expressed as a percent of non-union wage[s.]" Kaestner Rpt. at 2; *see also id.* at 2-8.[4] Specifically, Dr. Kaestner calculates the union wage premium using this formula:

$$\frac{\textbf{Cost of Union Wages}}{\textbf{Cost of Nonunion Wages}} = \textbf{Union Wage Premium}$$

*Id.* at 9, n.9. Although Dr. Kaestner had never researched this issue prior to Plaintiff engaging him for this case, Kaestner Dep. 32:14-18, he appears to have drawn on his general experience researching other labor economics issues and crunching publicly available data, *id.* 23:12-16, 34:6-17.[5]

---

[4] Thus, if Dr. Kaestner believes a union wage rate is 1.5 times greater than a nonunion wage rate, he expresses the corresponding union wage premium as 50%. *See* Kaestner Dep. 151:8-22.

[5] The particulars of Dr. Kaestner's "union wage premium" analysis are not relevant to, and therefore not detailed in, this Motion. *See* Kaestner Dep. 56:9-22 (summarizing his approach). JLL does not concede the merit of Dr. Kaestner's union wage premium opinion. *See also* Hosfield Op. at 6-7 (identifying the flaws in Dr. Kaestner's union wage premium estimates).

His relevant union wage premiums are set forth in Table 1,[6] which provides four different premiums for each of eight trades (*e.g.*, plumber). *Id.* at 6 (premiums for U.S., Metropolitan Chicago, Metropolitan Chicago (Adjustment-1), and Metropolitan Chicago (Adjustment-2)). The two "Adjustments" refer to Dr. Kaestner's attempts to account for four "demographic differences" he thinks "may be related to productivity differences": age, education, gender, and race. *Id.* at 4.

Dr. Kaestner recognizes the lack of "evidence that these factors are directly related to output per hour," or productivity. Kaestner Dep. 123:7-124:21 (there is "no direct evidence or there's none that I am aware of that would be applicable"). Still, he controlled for these variables anyway because of an unspecified "hypothesis" that certain laborers of one race, gender, or age may be less productive than the same laborers of a different race, gender, or age. *Id.* 124:22-125:6.

By contrast, Dr. Kaestner decided ***not*** to control for any productivity differences attributable to the variable at the heart of his analysis: whether a laborer is union-affiliated. Dr. Kaestner admits, as with the demographic factors above, a "hypothesis" exists that union laborers may be more productive than nonunion laborers. *See, e.g.,* Kaestner Dep. 126:8-19. More than that: several studies, including two articles Dr. Kaestner cited in his Report, usher data demonstrating superior productivity of union laborers. *Id.* 136:19-139:6, 145:7-147:11. Yet, Dr. Kaestner discarded all such studies (even though he cited them in his Expert Report) because he believes they are not "credible or reliable," *id.* 146:23-147:11, even if they were published in a "credible" and "peer-reviewed journal," *id.* 138:16-140:23. With those studies discounted, Dr. Kaestner believes no studies have "directly measured the productivity of union versus non-union workers," *id.* 135:24-136:12, and therefore did not control for union affiliation. *But see supra* at 6 (acknowledging the exact same lack of "direct evidence" regarding the race, gender, and age

---

[6] Dr. Kaestner also provides separate union wage premiums in Table 2. Kaestner Rpt. at 7. But his proposed damage calculation formula (*see infra*) only considers the premiums in Table 1. *Id.* at 9.

factors, but still controlling for them).

**(b)     Proposed Damages Formula.**

Just half of the last page of Dr. Kaestner's opinion explains his "approach to calculating damages" in this case. Kaestner Rpt. at 9. His approach has four steps. First, identify "the costs incurred for union services" actually used by Plaintiff, and match those services with the appropriate "occupational category[y]" in Dr. Kaestner's Table 1 of union wage premiums. *Id.* (first bullet). Second, use this formula to determine what "the non-union cost of that labor" for the occupational category would have been:

$$\frac{\textbf{Cost of Union Labor}}{\textbf{Union Wage Premium}} = \textbf{Cost of Nonunion Labor}$$

*Id.* (second bullet), n. 9. Third, find the "difference[ ] in the costs of services between union and non-union labor" for the occupational category. *Id.* (third bullet). Fourth, repeat steps 1-3 for each occupational category of union labor used by Plaintiff, and sum up the totals "to obtain the total excess costs of using union labor." *Id.* (third bullet).

There are two critical, albeit unspoken assumptions underlying this damages formula.

**(i)     Damages Assumption #1: Plaintiff's Costs Of Labor Are Equal To The Wages Paid To The Laborers.**

The algebra of this formula assumes the costs of union or nonunion labor to Plaintiff varies **only by** and **in perfect accordance with** difference in the wage rates earned by certain union and nonunion laborers.[7] Why Dr. Kaestner draws this direct line between what Plaintiff paid and what the laborers earned is left unsaid in the few lines of his Report concerning damages. *See* Kaestner Rpt. at 9. But there are only two possible explanations.

---

[7] Notice that this damages formula is the exact same formula Dr. Kaestner used to calculate his union wage premiums in the first place, just rearranged to solve for a different unknown variable. *Compare supra* at 5 *with supra* at 7; *see also* Kaestner Rpt. at 9, n. 9 (confirming these formulas are the same).

The first is that Dr. Kaestner wrongly thinks Plaintiff's damages **are** wages, instead of labor charges. *See supra* at 2, 7. His Report is laser-focused on wages, and he never acknowledges that Plaintiff's damages are something different. Instead, he uses the imprecise terms "cost of services" or "cost of union labor" to describe Plaintiff's damages, which could refer to either wages (costs to contractors) or labor charges (costs to Plaintiff). Kaestner Rpt. at 9;[8] *see also* Kaestner Dep. 48:7-49:1 (Dr. Kaestner did not read Plaintiff's Supplemental Interrogatory Response, any deposition transcripts, or any other documents relating to the damages for Plaintiff's projects, but does not think he needed to see them to ensure the accuracy of his opinion).

The other possible explanation is that Dr. Kaestner knows Plaintiff's damages are labor charges, but thinks those charges from contractors are equal to the underlying wages contractors paid to their laborers. In other words, if Contractor A pays its union laborers wage rates that are 15% greater than the wage rates Contractor B pays its nonunion laborers (*i.e.,* a 15% union wage premium), then Contractor A's labor charge to Plaintiff will be **exactly** 15% more than Contractor B's labor charge for the same project. But there is nothing whatsoever in Dr. Kaestner's opinion that explains this assumption, let alone provides reason to think it is well-founded. *See id*. at 9.

Indeed, Dr. Kaestner admits he has no basis to know how and to what extent contractors factor in their laborers' wage rates when determining how much to charge tenants for labor. Dr. Kaestner is not a contractor, nor has he ever researched how contractors put together their bids for projects. *See* Kaestner Dep. 33:7-11, 157:12-17. He has "no expertise or basis" to know the relationship between (i) the labor charges in a contractor's bid for a project and (ii) the wage rates or productivity of the laborers for that project. *Id*. 157:18-159:15 ("I have no idea what the

---

[8] Earlier in his Report, Dr. Kaestner equates this imprecise terminology with wages specifically. *See id*. at 6 ("the analysis of the union **wage** premium that does not incorporate fringe benefit, as above, may understate the difference in total **labor costs** between union and non-union labor.") (emphasis added).

contractors will assume") ("I don't know what contractors do in their bidding"); *see also* 180:21-181:6 ("I have no direct knowledge" of whether contractors factor in the cost of fringe benefits).

### (ii) Damages Assumption #2: Union and Nonunion Laborers Would Have Been Equally Productive In Completing The Work For Plaintiff's Projects.

As noted, Dr. Kaestner's damages formula presumes the total labor costs to Plaintiff for a project are equal to the total wages paid to the laborers for the project. *See supra* at 7-8. The total wages paid are a function of two factors: (i) the wage rate multiplied by (ii) the total amount of time it takes to complete the project. *Cf.* Kaestner Dep. 194:1:7 (acknowledging the total amount of time is "reflected in the cost of labor"). The damages formula also presumes the only one of these wage factors driving the cost difference to Plaintiff between union and nonunion labor is the allegedly higher wage rate paid to union laborers. *See supra* at 7 (the union wage premium is the only variable); Kaestner Dep. 130:1-13 (agreeing that the damages figure calculated "is attributable to the union wage gap"); Kaestner Rpt. at 4, 7 (the union wage premium is a rate-based measurement). Therefore, the damages formula necessarily assumes the other wage factor—the amount of time—would have been the same regardless of whether Plaintiff used union or nonunion laborers. In other words, Dr. Kaestner is assuming that union and nonunion laborers are equally productive. *See* Kaestner Dep. 190:16-23 (admitting his damages formula does not account for any productivity differences between the groups); 187:7-188:12 (same). However, even Dr. Kaestner concedes that there is no basis for this assumption:

> There is a lack of empirical studies that have the same amount of certainty and precision or even what we call a credible research design that can answer the question of whether union and non-union workers are equally productive. It may sound surprising and it's – but it is, in fact, the case.

*Id.* 127:1-9; *see also* 127:10-24 (admitting he looked for, but did not find, sufficient academic literature supporting his assumption), 186:13-187:6 (when asked if it is possible that

union workers can be more efficient and productive than nonunion workers, admitting "I don't know if it's correct or not," but arguing it is not "pertinent").

## **LEGAL STANDARDS**

Under Rule 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court must ensure that any expert testimony admitted as evidence is both reliable and relevant. This "gatekeeping" function requires the Court to determine at the threshold whether: (i) the expert is properly qualified on the relevant topics; (ii) the reasoning or methodology underlying the proposed testimony is scientifically reliable; and (iii) the proposed testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a)-(d); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

To determine whether an expert is qualified, the Court must evaluate whether he is an expert on the relevant subject based his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Regardless of qualifications, expert testimony may not be admitted unless it is shown to be reliable—meaning that (i) the testimony is based upon sufficient facts or data, and (ii) is the product of the reliable application of reliable principles and methods. Fed. R. Evid. 702(b)-(d). Even so, the testimony must still be relevant—meaning "factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007); *Daubert*, 509 U.S. at 591 ("Th[is] consideration has been aptly described . . . as one of 'fit.'") (citation omitted). The proponent of expert testimony bears the burden of demonstrating that the testimony satisfies the mandatory requirements of Rule 702 and *Daubert*. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017).

Where, as here, "an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior

to ruling on a class certification motion." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010); *see also* Class Cert. Mot. at 6, 13 (identifying only Dr. Kaestner's methodology as the means by which damages could be determined across the putative class).

## ARGUMENT

The core contention of Dr. Kaestner's damages opinion is that Plaintiff's alleged "excess costs of [using] union labor," as compared to the costs of using nonunion labor, tracks perfectly with the higher wage rates union laborers earn, as compared to the wage rates nonunion laborers earn. Kaestner Rpt. at 9; *supra* at 7-8. For three reasons, this fails to meet the high bar of admissible expert testimony under Rule 702 and *Daubert*.

**I. Dr. Kaestner's Damages Opinion Is Not Relevant To The Extent It Presumes Plaintiff's Damages Are Wages Paid To Union Laborers, Which Is Incorrect.**

Plaintiff's "costs of using labor" (*i.e.,* its damages) were not wages, but labor charges. *Supra* at 7-8. Thus, if Dr. Kaestner draws the direct correlation between Plaintiff's costs and laborers' wages because he thinks Plaintiff's costs **were** wages, then his opinion is not "factually linked" to this case and fails the relevance standard of Rule 702(a), *Gallardo*, 497 F.3d at 733. *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–45 (1997) (expert studies based on data that was "dissimilar to the facts presented in this litigation" were irrelevant and inadmissible); *United States v. Kokenis*, 662 F.3d 919, 926–27 (7th Cir. 2011) (affirming exclusion of proposed expert testimony on a theory that was not "applicable to any transaction in this case," and therefore irrelevant under Rule 402); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support").[9]

---

[9] For similar reasons, after finding that Dr. Kaestner's damages opinion is inadmissible, the Court should exclude him from providing any expert testimony in this case. His surviving union wage premium opinion is not relevant on its own.

-11-

That wages and labor charges can both be deemed "labor costs" does not make Dr. Kaestner's opinion relevant, as that sort of grouping is "too broad for this context . . . [and] would not assist the trier of fact." *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420–21 (7th Cir. 2005); *see also supra* at 7-8 (explaining that these two "costs" are not interchangeable, and that only labor charges are the alleged damages in this case); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (affirming the exclusion of expert testimony because the expert failed to "connect the dots" between the studies relied upon and the alleged damages of the case).

## II. Dr. Kaestner's Damages Opinion Is Not Reliable To The Extent It Equates Labor Charges And Wages Paid To Laborers, Without Any Supporting Methodology.

The more charitable interpretation of Dr. Kaestner's under-explained damages opinion is that he equates the labor charges Plaintiff incurred with the underlying wages laborers earned while working on Plaintiff's projects. To be sure, Dr. Kaestner does not say this. But if one assumes Dr. Kaestner is trying to measure the actual damages in this case (labor charges), then this is the only way to make sense of his wage-focused damages formula. *See supra* at 7-9.

But even granting Dr. Kaestner this much does not push his damages opinion into the realm of admissibility. Critically, Dr. Kaestner offers **no methodology whatsoever** supporting the contention that a nonunion contractor would have charged Plaintiff less for labor than a union contractor did by an amount that tracks perfectly with Dr. Kaestner's union wage premiums.[10] *See supra* at 7-9. He did not analyze any data showing what Plaintiff was charged for labor or what wages the underlying laborers earned. He did not analyze any labor charge pricing data. He did not consult with any contractors who could explain how they price their labor. He did not reference any academic studies on this issue. He did not even bother to offer some logic explaining why this

---

[10] Indeed, his damages opinion stands in stark contrast to his union wage premium opinion, which is at least supported by some methodology (albeit a flawed one). *Compare* Kaestner Rpt. 2-8 *with id.* at 9.

assumption might be reasonable in the absence of any real research.

This is unreliable. "Rule 702's reliability elements require . . . that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Gopalratnam*, 877 F.3d at 780 (internal citations and quotations omitted); *see also Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("an expert must 'substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless'") (internal citation omitted).[11] Here, the complete absence of **any** methodology and **any** supporting data for a quantitative opinion like Dr. Kaestner's 1:1 labor cost-to-wage ratio is dispositive. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 (7th Cir. 2019) (affirming exclusion of expert who "failed to demonstrate that his conclusions were anything more than guesses. To satisfy *Daubert*, [he] needed to provide an explanation of how the evidence led to his conclusions").

At bottom, Dr. Kaestner's damages opinion is nothing more than *ipse dixit*: the Court is supposed to accept that Plaintiff always realized 100% of contractors' allegedly excess union wage costs (and would have always realized 100% of contractors' allegedly excess ***non***union wage ***savings***) simply because Dr. Kaestner's formula says so. *See Varlen Corp.*, 924 F.3d at 460 (the excluded expert "had to articulate a justification for his inference . . . beyond a simple say-so. If [he] made an argument based on a reliable methodology, then [plaintiff] has not pointed it out . . . And courts do not have to scour the record or make a party's argument for it."). Even if Dr.

---

[11] More specifically, courts are to evaluate reliability "by considering, amongst other factors: '(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community.'" *Gopalratnam*, 877 F.3d at 799 (citations omitted). There is no need to belabor these factors, as neither Dr. Kaestner nor Plaintiff even acknowledges Dr. Kaestner's implicit theory that labor charges track perfectly with wages, let alone demonstrates that it has any validity or acceptance.

Kaestner was qualified to opine on this issue (and he is not, *see supra* at 8-9), that would not be enough to validate this data-free, fact-free opinion. *See Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("even a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'") (citations omitted).[12]

### III. Dr. Kaestner's Damages Opinion Is Not Reliable Because It Depends On An Assumption He Admits Is Baseless: Equal Union and Nonunion Productivity.

Regardless of why Dr. Kaestner draws a direct line between Plaintiff's costs and laborers wages, his damages opinion is also inadmissible because it assumes equal productivity between union and nonunion labor. *See supra* at 9-10. The point here is not that Dr. Kaestner took an ostrich approach to the academic studies demonstrating the superior productivity of union workers, including those cited in his Report (although this casts considerable doubt on his credibility). *See supra* at 6.[13] Rather, Dr. Kaestner adopted a contrary position while knowing full well that it lacks "credible" or "empirical" support. *Supra* at 6, 9. This, too, makes his damages opinion unreliable. *See Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994) ("expert testimony may be excluded if… based upon speculation [or] unsupported assumptions"); *Timm*, 932 F.3d at 994 (affirming exclusion of expert, like Dr. Kaestner, who "conceded that he could point to no empirical data or controlled experiments to support his opinions"); *Gen. Elec. Co.*, 522 U.S. at 143–47 (1997) (affirming exclusion of expert who did not provide basis for claim that studies of cancer incidence in mice supported testimony as to cancer incidence in humans).

---

[12] Although this Motion turns on Dr. Kaestner's failure to support his 1:1 labor cost-to-wage ratio assumption (*i.e.,* Plaintiff's failure to meet its burden of meeting the requirements of Rule 702), it is also worth noting that this assumption does not reflect the realities of the construction/moving industries or the competitive bidding environments in which the labor costs are determined. *See* Hosfield Op. at 7-8, 13-15.

[13] *See also* Hosfield Op. at 9-13 (collecting further sources demonstrating the superior productivity of union workers, explaining the underlying reasons, and identifying other factors causing variance in laborer productivity).

Like the baseless "costs equal wages" assumption, this baseless "equal productivity" assumption has the effect of eliminating any consideration that could undermine Plaintiff's belief that using union labor always cost it at least 20% more than nonunion labor. *See supra* at 7-10. In effect, Dr. Kaestner is trying to tilt the damages inquiry in Plaintiff's favor by reducing the analysis to the one variable he spent all his time analyzing: wage rates. He wants the Court to accept the proposition that if union laborers earn higher wage rates than nonunion laborers, then it **must be** true that Plaintiff will always pay more for union labor by the exact same measure, and that no other factors offset those allegedly higher wage costs. But he did not (and cannot) provide any reliable basis on which the Court can conclude labor cost dynamics really are so simple, or that hiring union laborers is always the more costly option for a tenant like Plaintiff. Thus, his proposed testimony cannot be admitted or leveraged to support Plaintiff's motion for class certification.

## **CONCLUSION**

For these reasons, Defendant respectfully requests the Court exclude the proposed expert testimony of Dr. Kaestner under Federal Rule of Evidence 702 and *Daubert*.

Dated: June 12, 2020                    Respectfully submitted,

                                        JONES LANG LASALLE
                                        AMERICAS (ILLINOIS), LP

                                        */s/ Scott T. Schutte*
                                            One of Its Attorneys

                                        Philip A. Miscimarra
                                        Scott T. Schutte
                                        Stephanie L. Sweitzer
                                        Kevin F. Gaffney
                                        Heather J. Nelson
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        77 West Wacker Drive, 5th Floor
                                        Chicago, IL 60601
                                        Tel: 312.324.1000
                                        Fax: 312.324.1001
                                        philip.miscimarra@morganlewis.com
                                        scott.schutte@morganlewis.com
                                        stephanie.sweitzer@morganlewis.com
                                        kevin.gaffney@morganlewis.com
                                        heather.nelson@morganlewis.com

                                        *Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I certify that on the 12th day of June 2020, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification to the following attorneys of record for Plaintiff:

Ryan F. Stephan
James B. Zouras
Anna Ceragioli
STEPHAN ZOURAS, LLP
100 N. Riverside Plaza, Suite 2150
Chicago, Illinois 60606
Tel: +1.312.233.1550
rstephan@stephanzouras.com
jzouras@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
FOSTER PC
150 N. Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: +1.312.726.1600
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
THE WALNER LAW FIRM LLC
555 Skokie Boulevard, Suite 250
Northbrook, Illinois 60062
Tel: +1.312.371.2308
awalner@walnerlawfirm.com
walner@walnerlawfirm.com

*Attorneys for Plaintiff*

*/s/ Scott T. Schutte*
Scott T. Schutte