## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **Case No. 1:18-cv-5492** |
| **v.** | **Magistrate Judge Sunil R. Harjani** |
| **JONES LANG LASALLE AMERICAS (ILLINOIS), LP,** | |
| **Defendant.** | |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RULE 23 CLASS CERTIFICATION

i

## **TABLE OF CONTENTS**

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RULE 23 CLASS CERTIFICATION i

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION AND SUMMARY .................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.    JLL Offers No Real Opposition To Certification Of The Moving Subclass .................. 2

    II.    JLL Cannot Avoid Liability Or Certification By Blaming Its Landlord Clients For The Union-Only Rule. ............................................................................................................ 3

    III.    JLL Does Not Dispute That Plaintiff's Questions Will Generate Common Answers, Thereby Establishing Commonality; Instead It Makes Merits-Based Attacks Which Are Irrelevant At This Stage. ................................................................................................. 6

    IV.    Typicality Is Satisfied Because The Claims Of WDES And The Class Arise From The Same Course Of Conduct, They Will Make The Same Arguments, And Will Use The Same Evidence To Establish JLL's Liability. ................................................................... 8

    V.    JLL's Arguments Against Adequacy Are Without Merit. ........................................... 11

    VI.    Predominance Is Easily Satisfied. .............................................................................. 13

      A.    Common Questions Of Fact And Law Clearly Predominate Over Any Individual Issues. ....................................................................................................................... 13

      B.    Common Issues Predominate As To Damages, As Shown By Plaintiff's Methodology For Calculating Class Wide Damages. ....................................................................... 15

      C.    The Fact That Contractor Invoices Do Not Itemize Labor Costs Is An Issue Common To All Contracting Subclass Members And Can Be Resolved On A Class-Wide Basis; A 49% Discount On Damages Can Be Applied To Account For All Conceivable Non-Itemized Costs. ............................................................................................................ 17

    VII.    A Class Action Is Superior To Other Available Methods For Fairly And Efficiently Adjudicating This Controversy. ................................................................................... 22

    VIII.    The Requirements Of Rule 23(b)(2) Are Also Met. .................................................. 22

CONCLUSION ................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455 (2013) ............................. 5

*Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659 (N.D. Ill. 1996) .. 20

*BCS Serv., Inc. v. BG Investments, Inc.*, 728 F.3d 633 (7th Cir. 2013) ........................................ 18

*BCS Services, Inc. v. Heartwood 88, LLC,* 637 F.3d 750 (7th Cir. 2011) .................................... 18

*Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018) ........................................................ 8

*Bell v. PNC Bank Nat'l Assn,* 800 F.3d 360 (7th Cir. 2015) ......................................................... 13

*Bennett v. Dart*, 2020 WL 1812376 (N.D.Ill. April 9, 2020) ....................................................... 22

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251 (1946) ................................................................. 18

*Boyle v. United States*, 556 U.S. 938 (2009) ................................................................................... 7

*Building Owners Management Association and Wackenhut Corp.,* No. 13-CE-127, 2007 WL

    4570695 (N.L.R.B. Div. of Judges Dec. 21, 2007)............................................................ 7, 11

*Butler v. Sears, Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013) ................................................. 21

*Carnegie v. Household Int'l, Inc.,* 376 F.3d 656 (7th Cir. 2004) ................................................. 21

*Carter v. Berger,* 777 F.2d 1173 (7th Cir. 1985) ........................................................................... 3

*Championsworld LLC v. U.S. Soccer Federation, Inc.,* 726 F. Supp. 2d 961 (N.D. Ill. 2010) ...... 4

*Connell Construction Co, Inc. v. Plumbers and Steamfitters Local Union 100,*

    421 U.S. 616(1975)................................................................................................................ 15

*Dietrich v. C.H. Robinson Worldwide, Inc.*, 2020 WL 635972 (N.D. Ill. Feb. 11, 2020) ........... 22

*Fond du Lac Bumper Exchange v. Jui Li Enterprise Co., Ltd.,*

    2016 WL 3579953 (E.D. Wis. 2016)..................................................................................... 10

*George v. Kraft Foods Global, Inc.,* 251 F.R.D. 338 (N.D. Ill. 2008) .......................................... 6

iii

*Healy v. Intl. Brotherhood of Elec. Workers,* 296 F.R.D. 587 (N.D. Ill. 2013) ........................... 15

*In re Steel Antitrust Lit.,* 2015 WL 5304629 (N.D. Ill. 2015) ..................................................... 10

*In re Sulfuric Acid Antitrust Lit.,* 2007 WL 898600 (N.D. Ill. 2007) ........................................... 11

*In re Uranium Antitrust Lit.,* 473 F. Supp. 382 (N.D. Ill. 1979) .................................................. 3

*Kleen Products LLC v. International Paper Co.,* 831 F.3d 919 (7th Cir. 2016) ........................ 19

*Kleen v. International Paper,* 306 F.R.D. 585 (N.D. Ill. 2015) .................................................... 20

*Lacy v. Cook Cty.*, 897 F.3d 847 (7th Cir. 2018) ......................................................................... 8

*Laurens v. Volvo Cars of N. Am., LLC,* 868 F.3d 622 (7th Cir. 2017) ........................................ 23

*Local 282, Teamsters,* 197 N.L.R.B. 673 (N.L.R.B. 1972) ........................................................ 15

*Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469 (7th Cir. 2002) ................................... 18

*Magpayo v. Advocate Health and Hospitals Corp.*, 2018 WL 950093 (N.D. Ill. Feb. 20, 2018) 13

*MCM Partners, Inc. v. Andrews-Bartless & Assc., Inc.,* 62 F.3d 967 (7th Cir. 1995) .................. 4

*Messner v. Northshore Univ. Health Sys.,* 669 F.3d 802 (7th Cir. 2012) .................................... 10

*Mullen v. GLV, Inc.,* 2020 WL 1237189 (N.D.Ill. March 13, 2020) ........................................... 23

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) ............................................................. 8

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629 (7th Cir. 2020) ................................ 3

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ............................................................... 6

*Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330 (N.D. Ill. 1997) ................................................. 20

*Rotella v. Wood,* 528 U.S. 549 (2000) ......................................................................................... 19

*Salinas v. United States*, 522 U.S. 52 (1997) ................................................................................ 3

*Schmidt v. Smith & Wollensky*, LLC, 268 F.R.D. 323 (N.D.Ill. 2010) ....................................... 12

*Simic v. Cty. of Chi.*, 851 F.3d 734 (7th Cir. 2017) .................................................................... 23

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ............................................. 3

iv

*U.S. v. General Motors Corp.*, 384 U.S. 127 (1966) .................................................................. 5

*Wacker Drive Executive Suites, LLC v. Jones Lang LaSalle Americas (Illinois), LP*, 2019 WL 2270000 (N.D.Ill. May 28, 2019) ........................................................................................ 4, 7

*Walker Distrib. Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1 (9th Cir. 1963) .............................. 5

*Zollicofer v. Gold Standard Baking, Inc.,* 2020 WL 1527903 (N.D. Ill. Mar. 31, 2020) ............. 13

## Other Authorities

Herbert Hovemkamp, *Federal Antitrust Policy: The Law of Competition And Its Practice,* §1.1a. (3d ed. 1994) ........................................................................................................................ 11

Philip Areeda, *Antitrust Law*, Vol. IIA at147 (4th ed. 2014) ....................................................... 20

William B. Rubenstein, 4 *Newberg On Class Actions,* §12:4 (5th ed. 2020). ........................ 17, 21

## Rules

Fed. R. Civ. P. 23 ................................................................................................................... passim

Plaintiff Wacker Drive Executive Suites, LLC ("WDES" or "Plaintiff"), by its counsel, on behalf of all those similarly situated, submits its Reply in Support of its Motion for Class Certification under Fed. R. Civ. P. ("Rule") 23(b)(2) and (3) ("Motion"). For the reasons stated in the Motion, and here, the Court should grant Plaintiff's Motion for Class Certification for the two Proposed Subclasses.[1]

## INTRODUCTION AND SUMMARY

Plaintiff's evidence establishes that certification of both Subclasses is warranted. JLL's opposition primarily consists of contesting liability,[2] a protracted discussion of disputed and irrelevant facts (along with an invitation to decide which facts are true), and a variety of misplaced arguments which are either irrelevant to certification or underscore why certification is proper.

Two important points, however, emerge from JLL's response that weigh in favor of certification. First and foremost, JLL effectively offers no opposition to the Moving Subclass. Second, JLL admits it enforces a mandatory "union-only rule" for *both* Subclasses at the 20 class buildings at issue, thereby forcing thousands of tenants to pay a 20-35% premium for union movers and trade labor. These admissions alone demonstrate the propriety of class certification. JLL highlights some irrelevant details – like the fact that WDES snuck in non-union labor (the costs of which WDES does not seek as damages). But at its core, WDES, like every absent class member, has a legitimate claim for damages from union overcharges directly caused by JLL's union-only

---

[1] Exhibits cited in Plaintiff's Motion or JLL's Response, will use the citations in those briefs. New exhibits cited for the first time in this reply brief will begin with Exhibit 1. Except for transcripts, all page citations to ECF filed documents will be to the ECF pagination at the top of the page.

[2] Throughout its brief, JLL repeatedly and wrongly insists, as if on summary judgment or closing argument, that it is not liable as a matter of law because "the facts in the record clearly disprove [its liability]", that Plaintiff's liability theory and its evidence is "false", a "fiction", and an "audacious bluff", and that class certification is the proper vehicle by which to resolve the merits. (*See* D.E. 125 at 2, 5-6) (asking the Court "to deconstruct the false, unsupported narrative Plaintiff continues to peddle.")

rule at its buildings. Moreover, the class members have suffered the same damages from the same rule, enforced in all 20 buildings. As Plaintiff's expert, Dr. Kaestner, makes clear, there is evidence of common impact of damages to all class members alike – the percent increase each tenant incurred for forced union labor. Finally, JLL asserts defenses to the claims, such as the statute of limitations (and others), but none are individual issues. They apply to all class members, the resolution of which will impact every class member in the same way.

Unquestionably, a class action is the most superior and efficient means by which to resolve this dispute, not just because of Plaintiff's unwavering commitment, but because it will ensure uniform legal decisions on central questions, and otherwise serve the "economies of time, effort and expense." Because resolution of the overarching legal and factual questions will generate common answers and will drive its outcome for the entire class, this litigation can and should be resolved in a single proceeding.

## **ARGUMENT**

### I.     **JLL Offers No Real Opposition To Certification Of The Moving Subclass**

JLL barely acknowledges the Moving Subclass, and when it does, it merely references the same arguments it makes in opposing certification of the Contracting Subclass. The problem for JLL is that those arguments do not apply to the Moving Subclass. This is why there is little to no application of such arguments pertaining to the Moving Subclass. As JLL must tacitly recognize, even if any of the arguments it raises against certification of the Contracting Subclass were viable (they are not), they would not apply to the Moving Subclass. Unlike trade labor, movers do not implicate general contractor/sub-general contractor relationships; there are no material or other

non-labor costs;[3] moving is generally completed in one day (vitiating any dispute over when the statute of limitations accrues); moving costs are paid directly by the tenant (not from tenant improvement allowances); and there is no evidence that any non-union movers ever contracted with any tenant in the class. Because JLL has not put forth any serious challenge here, the Court should grant Plaintiff's Motion for the Moving Subclass.

**II.** **JLL Cannot Avoid Liability Or Certification By Blaming Its Landlord Clients For The Union-Only Rule.**

JLL contends the class certification should be denied because the building owners (its clients) are solely to blame for the union-only rule. (D.E. 125-1 at 5) ("the union-only requirement in Plaintiff's building was a mandate directly from the building owner, not something JLL imposed . . . ."). But even if this turns out to be true, it is irrelevant as to the merits of the case and for class certification. The Complaint alleges JLL is part of a conspiracy to enforce the union-only rule at its Loop buildings. As a co-conspirator, JLL is jointly and severally liable for all damages caused by the conspiracy, regardless of its role in the conspiracy. *See, e.g., Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 645–46 (1981) (acknowledging joint and several liability under the Clayton Antitrust Act for all members of a conspiracy); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2020) (same proposition); *In re Uranium Antitrust Lit.,* 473 F. Supp. 382, 387 (N.D. Ill. 1979) ("It is generally recognized that a private antitrust action is a tort action, that antitrust coconspirators are joint tortfeasors, and that they are jointly and severally liable for the entire amount of damages caused by their acts").

The same principles apply to RICO's conspiracy provision. *See Salinas v. United States*, 522 U.S. 52, 65–66 (1997); *Carter v. Berger,* 777 F.2d 1173, 1175-76 (7th Cir. 1985) ("the

---

[3] Any conceivable additional costs for movers, if any (*e.g.,* gasoline), are unquestionably *de minimis.*

damages provision in §1964(c) is practically verbatim the damages in the antitrust laws"). Thus, as long as JLL is a member of a RICO conspiracy, it is liable for all damages the conspiracy has caused to the class. How JLL came to be part of this conspiracy to violate RICO is not at issue at this time.

Moreover, being compelled or induced into a conspiracy by a co-conspirator is not a defense to a charge of conspiring to violate RICO. *See, e.g., MCM Partners, Inc. v. Andrews-Bartless & Assc., Inc.,* 62 F.3d 967, 979 (7th Cir. 1995) (reversing dismissal of RICO conspiracy complaint arising from a dispute over union labor, and holding that, "even if A-B and FDC may have been reluctant participants in a scheme devised by 'upper management,' they still knowingly implemented management's decisions, thereby enabling the enterprise to achieve its goals.");[4] *see also, Championsworld LLC v. U.S. Soccer Federation, Inc.,* 726 F. Supp. 2d 961, 974 (N.D. Ill. 2010) (rejecting affirmative defense of duress in RICO case and holding, "it is difficult for a party to claim that its will was overborne by economic duress when it has had time for 'inquiry, examination, and reflection.'"). And JLL failed to even raise any affirmative defense of coercion or duress imposed by the landlords in its Answer, undoubtedly because it recognizes that any such defense is both legally and factually unavailable. Indeed, the facts show just the opposite – JLL readily agreed to the union-only rule for many years at every class building without the slightest push-back. (*See, e.g.,* D.E. 105-3, Zsigray Dep., at 25:24-27:02, 28:10-29:23, 41:08-47:24, 59:12-

---

[4] This Court's ruling in which it denied JLL's motion to dismiss makes this point, too. *See Wacker Drive Executive Suites, LLC v. Jones Lang LaSalle Americas (Illinois), LP,* 2019 WL 2270000, at *6 (N.D.Ill. May 28, 2019) (quotations and citations omitted) ("Specifically, WDES alleges that the Unions successfully exerted pressure on JLL to use union contractors by threatening to strike, picket, and publicly shame JLL. In response to the Union's pressure, JLL 'accedes' to the Unions' demands and in turn, 'forces' WDES and other tenants to use union contractors and movers through its own economic pressure. WDES's alleged accession signifies the existence of an agreement, as 'accede' means 'to consent or agree; specif., to agree to (a demand, proposal, etc.), esp. after first disagreeing.'").

4

20). This conduct completely undercuts JLL's suggestion that it had no motive or intent to enter into the illegal hot cargo agreement alleged by Plaintiff. JLL's "we were just following orders" defense is wrong and repugnant to the idea of conspiracy.[5]

Plaintiff's burden under Rule 23 is not to prove that "questions will be answered, on the merits, in favor of the class" – it is to demonstrate that common questions, capable of generating common answers, exist. *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455, 459 (2013). The core liability question identified by *both* Parties – whether JLL entered into an illegal "hot cargo" agreement with the unions – is a common one, will be resolved through evidence that is common to the class, and will generate *exactly the same answer* for every class member. (*See generally* D.E. 105; D.E. 1 and 76 at ¶¶11-17). To the extent JLL challenges Plaintiff's allegations that the union-only rule is enforced by a conspiracy between JLL and labor unions (D.E. 125 at 8, 11-12), this is a *merit*s argument JLL could make at a later stage, but not in opposing class certification now. *See Amgen*, 568 U.S. at 459.

The evidence uncovered so far plainly indicates that JLL zealously checks every contractor entering its buildings for union credentials. If a contractor does not have them, they are not allowed in through the docks. (*See, e.g.,* D.E. 105-3, Zsigray Dep., at 25:24-27:02, 28:10-29:23, 41:08-47:24, 59:12-20). And in the off chance a non-union contractor does make it through, JLL building engineers, union members with double loyalties, personally eject them from the buildings. (*See, e.g.,* D.E. 125-3, Falzone Dep., at 44-48).

---

[5] Additionally, WDES is not required to name all members of the conspiracy. *See U.S. v. General Motors Corp.,* 384 U.S. 127, 129 n. 2 (1966); *Walker Distrib. Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 8 (9th Cir. 1963) ("A plaintiff need not sue all conspirators; he may choose to sue but one."); *Burlington Industries v. Milliken & Co.,* 690 F.2d 380, 391 n.8 (4th Cir. 1982) (same).

### III. JLL Does Not Dispute That Plaintiff's Questions Will Generate Common Answers, Thereby Establishing Commonality; Instead It Makes Merits-Based Attacks Which Are Irrelevant At This Stage.

To meet the "low" burden of satisfying commonality, it is well-established that a plaintiff need not *prove* an unlawful practice at class certification. *See, e.g., George v. Kraft Foods Global, Inc.,* 251 F.R.D. 338, 348 (N.D. Ill. 2008) (holding that "plaintiffs' burden to show commonality is low."). This requires the Court to consider whether "the central questions in the litigation are the same for all class members." *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010). Faced with Plaintiff's six common questions to the class, JLL makes unpersuasive assertions in a futile effort to show they are somehow individualized. But as demonstrated below, all present common issues which will generate common answers for the entire class.

Plaintiff's first common question is detailed above: whether JLL enforced the union-only requirement at the class buildings. JLL's response is merely to deny liability, claiming it is not liable for the conspiracy to enforce the union-only rule. This is clearly wrong.

Plaintiff's second and third questions again pertain to the conspiracy to impose the union-only rule: whether the unions are part of it. JLL inaccurately claims there is "**no evidence whatsoever**" that this contention could be common to the class. (D.E. 125 at 21) (emphasis in original). But whether the unions are part of the conspiracy is a factual, merits question which is not at issue now. What is at issue for class certification is that the union-only rule is imposed at all the Loop buildings. Contrary to JLL's claim that practices differ in some material way between the 20 class buildings it manages, it maintains/disseminates rules and regulations to all tenants which explicitly mandate union membership for all movers and trade workers. (*See, e.g.,* D.E. 105-3, Zsigray Dep. (cited *supra*)). Whether there are slight or minor variations in how the rule is

enforced at each building, this does not defeat commonality—the rule is substantially the same at all JLL Loop buildings.

With respect to the remaining questions, the evidence reveals that JLL aggressively enforces the rule, prohibiting non-union movers or trade workers from entering the buildings. (*Id.*; *see also* D.E. 105 at 6, citing evidence regarding WDES' experience). It is under constant pressure from the unions not to allow any non-union trades into the buildings. Any slip-up could mean a picket or a giant inflatable rat outside the building. (*See* Exhibit 1, attached hereto, Plaintiff's Answers to Defendant's Interrogatory Number 16). And all it takes for the unions to learn if a non-union contractor has made it into a Loop building is a single call or email from a JLL engineer to a union steward or business agent. (*See* D.E. 125-3, Falzone Dep., at 46-47.) This is the pressure-cooker environment in the Loop. *See Building Owners Management Association and Wackenhut Corp.,* No. 13-CE-127, 2007 WL 4570695 (N.L.R.B. Div. of Judges Dec. 21, 2007). To reiterate, if JLL is a party to an illegal hot cargo agreement with the unions, then the RICO violation follows as a matter of law.

To be sure, WDES points to no evidence – and none exists – supporting any claim that the ban on non-union labor does not exist at all 20 Loop buildings. On the contrary, JLL zealously enforced the rule throughout the class period, and these policies are alleged to have damaged the class in the same way. So, there are several liability questions common to the class.[6] To resolve

---

[6] JLL inaccurately contends that proving the RICO enterprise is a building by building analysis, and thus not a common question. (D.E. 125 at 27). This is wrong. The RICO enterprise is an association-in-fact enterprise between JLL and the three unions. *See, e.g., Wacker Drive,* 2019 WL 2270000, at *14. The individual buildings are not the RICO enterprise and are not part of the RICO enterprise. All tenants from all loop buildings will rely on exactly the same evidence to prove that this association-in-fact enterprise meets the *Boyle* requirements of purpose, longevity, and relationship. *See generally Boyle v. United States*, 556 U.S. 938, 945–46 (2009).

these central liability questions, the Parties will rely on common evidence to generate common answers which will drive the litigation for the entire class. Commonality is plainly satisfied.

IV. **Typicality Is Satisfied Because The Claims Of WDES And The Class Arise From The Same Course Of Conduct, They Will Make The Same Arguments, And Will Use The Same Evidence To Establish JLL's Liability.**

JLL suggests that every aspect of WDES' interaction with JLL must be common for it to have a typical RICO claim. In this way, it seeks to apply an "identically-situated standard" in place of the *actual* standard requiring only that Named Plaintiff's claim "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Lacy v. Cook Cty.*, 897 F.3d 847, 866 (7th Cir. 2018). It is well-established, however, that typicality is determined by whether "claims arrive from the same events or course of conduct that gives rise to the putative class members' claims. But the individual claims may feature some factual variations as long as they 'have the same essential characteristics.'" *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1465 (2019), quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). If JLL's "identically-situated standard" argument held any water, it would essentially be an outright ban on the class action device itself.

According to JLL, WDES is atypical of absent class members and had less "economic fear" because it negotiated the right to use a related entity, Schaumburg Executive Suites (SES), a non-union general contractor, to "oversee" some construction work, although admittedly not to perform *any* of the actual labor or moving. (D.E. 125 at 7, 14-15, 22-23). JLL also points out that, despite JLL's zealous effort to search-out and eject non-union contractors from the building, WDES managed to "sneak in" a non-union painter to perform some limited work. (D.E. 125 at 14); (*see also* Exhibit 1, attached hereto, at Response Number 5 (a non-union worker painted small area of

8

the office discretely during evening hours, resulting in painting costs of $75 rather than the union-labor price of $300)).

But what JLL ignores is that WDES' use of some non-union contractors is not part of the claims at issue. WDES, like all other putative class members, was forced to subcontract exclusively with union trade workers and as a result, it was forced to pay higher prices – at least 20% higher – just like every other class member. (*See* D.E. 125-8 at 5-6); (*see also* Exhibit 1, attached hereto, at 16 (WDES could not operate its business unless it agreed to the union-only rule, but the union-only labor came at a significantly higher cost)). To be sure, WDES excluded any costs associated with SES (and/or any non-union labor cost) from its claims. WDES' damages are strictly limited to the higher costs for union trade labor and movers it was compelled to use. (D.E. 125-8). There is absolutely no recovery sought for any costs associated with the handful of non-union workers WDES or any other tenant managed to "sneak in." The fact that WDES may have incurred other costs that are not part of this lawsuit does not defeat typicality.

Next, JLL warns that Plaintiff has a "significant conflict" with the class because it believes only a "few class members share Plaintiff's peculiar view of union labor … . " (D.E. 125 at 7-8). In support, JLL produces three recently-unveiled declarations from current tenants – most, if not all, with direct financial ties to unions – in which they, although stopping short of actually condoning the union-only rule, profess a "preference" for union labor. (*See, e.g.,* D.E. 125-15 at ¶¶8-10, 125-16 at ¶¶7-9, 125-17 at ¶¶9-10). At the outset, it is telling that while JLL has direct access to the thousands of putative class member tenants, it could find only *three* preferring union labor (and *none* actually supporting the contested union-only rule depriving tenants of a <u>choice</u> of

9

union or non-union contractors).[7] Notably, these three tenants do not deny that they were given no choice between union and non-union labor – they just offer after-the-fact that they prefer union labor. Even if they were given an opportunity to make a rational and informed choice, the tenant would have to know: (1) non-union labor would be allowed into the building by JLL; and (2) the difference in price between union and non-union labor. Basic economics tell us that the large difference in price Dr. Kaestner found, 24%-41%, would matter a great deal to any tenant.[8]

Many antitrust cases have been certified over lesser damages in price caused by price fixing or monopolization. *See, e.g., Messner v. Northshore Univ. Health Sys.,* 669 F.3d 802 (7th Cir. 2012) (vacating denial of class certification of antitrust claim for monopolization of hospital services where plaintiff's economist estimated a 20% overcharge for some services and other charges were affected to lesser degrees); *Fond du Lac Bumper Exchange v. Jui Li Enterprise Co., Ltd.,* 2016 WL 3579953, at *9 (E.D. Wis. 2016) (certifying antitrust class where the price difference was simply a "statistically significant estimate of an overcharge"); *In re Steel Antitrust Lit.,* 2015 WL 5304629, at *9 (N.D. Ill. 2015) (certifying antitrust class). Nevertheless, should notice go out, and these tenants not want to participate in this case, they are free to opt-out of the class.

But denying class certification on this basis is wrong. JLL's hope that many more tenants may support its position is pure speculation, and cannot serve as a basis to deny certification. *See, e.g., Messner,* 669 F.3d at 825-26 (rejecting the argument that many absent class members secretly

---

[7] The fact that JLL could only find three potential class members who possibly share its view of the case, underscores that certification is proper. As noted above, perfect uniformity is not required.

[8] "Most customers prefer to purchase things at the lowest possible price- even, if possible, at less than the cost of producing them." Herbert Hovemkamp, *Federal Antitrust Policy: The Law of Competition And Its Practice,* §1.1a. (3d ed. 1994).

prefer the status quo); *In re Sulfuric Acid Antitrust Lit.,* 2007 WL 898600, at *5 (N.D. Ill. 2007) (rejecting the argument that some class members "would actually benefit from the alleged price increase . . . However, mere speculation regarding the existence of such contracts will not force outright denial of certification at this stage."). So, WDES is not atypical for preferring less expensive non-union labor. And JLL's argument is not a basis for denying certification.

## V. JLL's Arguments Against Adequacy Are Without Merit.

Next, JLL argues that an issue it implies is unique to WDES – the event which triggers accrual of the statute of limitations – makes it inadequate. JLL contends the statute of limitations begins running on the contracting date for the services, rather than the date the services were paid for, which would exclude 91% of WDES' damages. (D.E. 125 at 7, 25). This is a merits issue likely to be decided on summary judgment, but even if JLL's view carries the day, it is not an issue unique to WDES, and its resolution will be easily administered on a class-wide basis (*i.e.,* the contracting date for all class members would need to be on or after August 13, 2014). Moreover, WDES would still have standing for its 2017 damages anyway, so nothing about this issue weighs in favor of denying certification. While the Parties obviously disagree over when the statute of limitations begins, the Court's resolution of this key question will necessarily apply to every class member in one stroke.

Finally, JLL decries Plaintiff for what it calls an "unmistakable lack of candor" on the facts and the law. (D.E. 125 at 25). Citing six pages from its brief under the heading "Facts Relevant to Certification" as its sole support (which JLL presents as unassailable truths), JLL claims WDES premised its motion for class certification entirely on fabrications. *Id.* It also claims WDES "misled" the Court about the law, citing its competing view of a National Labor Relations Board opinion referenced by Plaintiff as proof. *Id.* (referencing *Wackenhut Corp.,* 2007 WL 4570695).

11

That JLL disagrees with WDES' factual position is unsurprising—that disagreement is at the heart of the adversarial process, not a reason to deny certification.

WDES is an adequate class representative, more than meeting the low hurdle. It sincerely objects to having the union-only rule imposed on it and zealously sought relief from it. Thus, WDES will fairly and adequately protect the interests of the class – as it has already proven by its compliance with all discovery requests and deposition notices. *E.g., Schmidt v. Smith & Wollensky*, LLC, 268 F.R.D. 323, 328 (N.D.Ill. 2010). In fact, given that WDES' interests are perfectly aligned with those of the class, along with its demonstrated knowledge, sophistication, and commitment to the cause, WDES is the ideal candidate for the job. The fact that JLL disagrees with a case WDES cites in its brief is also not a bar to certification. That citation has been reiterated in this brief to show that the union-only rule is very much in force in the Loop and the participation of management companies and unions. The rule cannot exist without the active enforcement of property managers like JLL.

Accordingly, what JLL posits as reasons to question Plaintiff's honesty and integrity are nothing more than factual disputes and a disagreement over the interpretation of legal authority, issues which are present in all civil litigation. Needless to say, whether WDES can prove a conspiracy, or whether JLL can prove it was legally impossible for it to have entered into a conspiracy, go to the ultimate merits—these issues, cannot be resolved on a motion for class certification, and must await completion of substantive merits discovery the Parties deferred by stipulation. (*See* D.E. 128, joint status report identifying merits discovery JLL has yet to produce pending the Court's certification ruling).

VI.    **Predominance Is Easily Satisfied.**

A.    **Common Questions Of Fact And Law Clearly Predominate Over Any Individual Issues.**

JLL's claim that individualized questions will "overwhelm a class action" is odd, not only because it ignores the evidence submitted by Plaintiff, but because JLL itself recognizes in its brief that certain core legal and factual issues predominate. Inescapably, resolution of the fundamental and common liability question of whether JLL's agreement with the three unions is an illegal hot cargo agreement will cause the entire class to "prevail or fail in unison." *Magpayo v. Advocate Health and Hospitals Corp.*, 2018 WL 950093, at * 12 (N.D. Ill. Feb. 20, 2018) (citing *Bell v. PNC Bank Nat'l Assn*, 800 F.3d 360 (7th Cir. 2015)). The same is also true with respect to JLL's main defense, that it was not legally possible for it to enter into such an agreement as a mere self-described "enforcer" of the union-only rule. Clearly, each of these central questions, which will produce the same answer for every class member, dramatically eclipse any conceivable individualized issue.

As stated in its motion for class certification, the class satisfies the "predominance" requirement of Rule 23(b)(3). *See, e.g., Zollicofer v. Gold Standard Baking, Inc.,* 2020 WL 1527903, at *28 (N.D. Ill. Mar. 31, 2020) (citations, quotations omitted) (granting certification and holding, "[t]he [predominance] inquiry simply asks whether the common, aggregation-enabling, issues in the case are more prevalent or more important than the non-common, aggregation-defeating, individualized issues."). The only individual question is the amount of each class member's damages, which is permissible.

Faced with the overwhelming common issues to the class regarding JLL's union-only policy, JLL claims that the issues of whether the union-only rule was voluntary or coerced, part of

a lawful work preservation agreement or not, and whether JLL "conducted the affairs" of the RICO enterprise, are "building-by-building" issues. (D.E. 125 at 27). It is unsurprising that JLL offers no support for these arguments – especially as JLL can point to no real evidence that there is any notable difference in the effect of the union only rule at the class buildings. This case is about JLL's consistent and uniform conduct which has continued unabated at its Loop buildings for years. Contrary to JLL's suggestion, there is no evidence that its conduct with respect to the union-only rule or its agreement with the unions differs on a "building by building" or "project-by-project" basis, in any material way. Thus, neither the fact of the buildings' separate ownership, nor JLL's plan to blame owners for the union-only rule, "necessarily" create any individual issues, much less any that predominate.

Straying further afield, JLL rehashes the construction industry proviso argument from its motion to dismiss, despite this Court holding that:

> [E]ven if construction industry proviso can apply to work done within a completed building, it is premature to decide whether all the contracted work performed here was at a construction site at the motion to dismiss stage without the benefit of a fully developed record. Only certain work constitutes construction under the proviso, namely projects where the work provided involves "building or affixing to the land."

(D.E. 55 at 21) (citation omitted). Thus, JLL's argument clearly is premature.

In any event, the applicability of this defense is common to all class members. From a factual standpoint, when moving into a new space, the type of work done by each tenant is similar.[9] Moreover, there is also a common legal argument that can be asserted as to all class members as to why this affirmative defense is not available: In short, the exemption only applies to subcontracting of work previously done by union members. The exemption exists to protect

---

[9] As noted *infra*, this defense would seem not to even apply to the Moving Subclass.

members of the bargaining unit from losing work to non-union subcontractors. *Connell Construction Co, Inc. v. Plumbers and Steamfitters Local Union 100,* 421 U.S. 616, 630 (1975) ("Congress limited the construction-industry proviso to that single situation, allowing subcontracting agreements in relation to work done on a job site."). JLL has two collective bargaining agreements at the buildings: one with Local 399 (covering engineers), and one with S.E.I.U. Local 1 (janitors). Neither of these bargaining unit workers would be affected by the use of construction labor by tenants since that labor would not otherwise be done by the engineers or janitors.[10] The exemption does not apply where the work claimed would not be done by the members of the bargaining unit (*i.e.*, the bargaining units employed at the JLL buildings). In other words, the exemption does not apply when the goal is the "protection of work historically performed by employees in other work units." *Local 282, Teamsters,* 197 N.L.R.B. 673, 678 (N.L.R.B. 1972).

While the merits of this defense can be decided at summary judgment or trial, the upshot is that this determination will be applicable to all class members. As such, this a quintessential case for prosecution as a class action.

### B. Common Issues Predominate As To Damages, As Shown By Plaintiff's Methodology For Calculating Class Wide Damages.

The rule in the Seventh Circuit is that "the need for individual damages determinations does not, by itself, defeat class certification under Rule 23(b)(3)." *Healy v. Intl. Brotherhood of Elec. Workers,* 296 F.R.D. 587, 594 (N.D. Ill. 2013); *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010) (affirming liability class where class members "still must prove individual issues of causation and damages"). Here, although each class member's damages differ by the labor

---

[10] Construction labor is governed by different unions which JLL has no interest in.

performed and the union charge, those costs are easily obtainable. The list of class members is in JLL's possession. JLL's tenant files contain the contractor and subcontractor invoices for the build-outs, and either JLL or the tenants have them for movers. These invoices will be reviewed, and the total for each type of labor determined, and Dr. Kaestner will calculate the overcharge for each. All of these calculations will be performed upon certification and the case can then be tried for a total sum of damages as to all class members. "[T]he fact that there may be thousands or millions of such calculations does not defeat the conclusion that common issues predominate; it is black-letter class action law that such damage calculations do not render the common liability issue nonpredominant . . . the importance of liability determination will generally outweigh the application of a simple, common *methodology* class member by class member." William B. Rubenstein, 4 *Newberg On Class Actions,* §12:4 (5th ed. 2020).

As explained by Dr. Kaestner, all class members were impacted by JLL's conduct in the same way, *i.e.*, as a result of being forced to use union labor exclusively, and all had to pay the same percent increase for trade work and moving. (*See* Kaestner Report, D.E. 105-1 at 7, 9-10).[11] And damages for each potential class member can be measured using the same methodology for each tenant. *Id.*[12]

---

[11] James Raisher, WDES' other retained expert (who JLL does not challenge), also testified that landlord representatives in the Loop are well-aware that union contractors cost more than non-union contractors. *See* Raisher Dep., March 18, 2020 (D.E. 125-6) at 114-117. JLL also posits that there is an individual issue of whether the money for the build-out came from the landlord or the tenant. D.E. 125 at 27-28. But Raisher also testified that 99% of TIAs are amortized as part of the rent and paid back by the tenant. Raisher Dep. at 117-118, 129-130. Thus, in 99% of the loop build-outs, the money will be paid by the class member tenants.

[12] Indeed, this lines up with JLL's own estimate on the heightened costs for union labor. *See* Exhibit 2, attached hereto, article published by JLL (stating that union labor for "commercial office space construction" costs "up to 20%" more than non-union labor).

16

JLL does not dispute that individual damages determinations do not preclude class certification,[13] instead it raises a concern over isolating the cost of labor for Dr. Kaestner to apply in his methodology: Invoices from contractors and subcontractors do not itemize labor costs.[14] (D.E. 125 at 19-20, 28). This was the case with WDES, as the contractors/subcontractors billed for one total amount that included both labor and material (and other miscellaneous costs). (*See, e.g.,* Exhibit 3, attached hereto). Thus, JLL contends Dr. Kaestner's methods, if applied to the invoices from each contractor/subcontractor (of each putative contracting subclass member), will produce somewhat overinclusive damages. (D.E. 125 at 19). While this may be true, as discussed below, it is not a basis to deny certification and it can easily be addressed by applying a 49% discount, as detailed below.

C. **The Fact That Contractor Invoices Do Not Itemize Labor Costs Is An Issue Common To All Contracting Subclass Members And Can Be Resolved On A Class-Wide Basis; A 49% Discount On Damages Can Be Applied To Account For All Conceivable Non-Itemized Costs.**

As JLL notes, neither WDES, Dr. Kaestner, nor anyone else (including JLL) is able to isolate the precise amount of the labor costs as a component of the invoices for build-outs. WDES believes it is extremely unlikely that contractor/subcontractor records in JLL's possession for class members will show any such itemization either. This "issue" that JLL raises, however, is therefore actually a class-wide issue that affects all subclass members. The question then becomes, what to do?

---

[13] *Messner,* 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3).")

[14] This issue has no bearing on the Moving Subclass because material costs (and other miscellaneous costs) for movers, if any, are *de minimis.*

First and foremost, the law does not deny recovery merely because damages cannot be calculated exactly. It is both permissible and necessary to estimate damages because, "[o]nce the plaintiff proves injury broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *BCS Serv., Inc. v. BG Investments, Inc.*, 728 F.3d 633, 640 (7th Cir. 2013). As the Supreme Court held:

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is not restricted to proof of damage in antitrust suits… The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done.

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265 (1946) (overturning judgment for defendant in antitrust case because the lower court improperly demanded that lost profit damages be free of estimation).

This principle has been applied in the Seventh Circuit in antitrust and RICO as both statutes have treble damages provisions which serve public purposes, to supplement the limited resources of the Justice Department. *See, e.g., Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469, 490-91 (7th Cir. 2002) ("It is certainly acceptable through expert testimony to make a reasonable estimation of actual damages through probability and inferences…); *BCS Services, Inc. v. Heartwood 88, LLC,* 637 F.3d 750, 759 (7th Cir. 2011) (surveying Supreme Court decisions on the relaxed burden of proving damages and reversing dismissal of RICO claim, noting "[e]ven 'speculation has its place in estimating damages and doubts should be resolved against the wrongdoer'"); *BCS Services, Inc.,* 728 3d at 640 (same). This is particularly true where the plaintiffs are acting as private prosecutors. *See* Philip Areeda, *Antitrust Law*, Vol. IIA at 147 (4th ed. 2014) ("If this public function [deterrence through treble damages] of private damage actions

18

is not to be frustrated, courts must not insist upon unduly rigorous proof of the quantum of the

plaintiff's injury, for the marketplace denies us sure knowledge of what the plaintiff's situation

would have been in the absence of the defendant's antitrust violations.").[15]

Indeed, Rule 23 requires no more need for exactness in certifying class actions seeking

money damages.

> [C]ourts have consistently held that such estimative techniques need not be exact
> at the class certification stage. Rather, models that "reasonably" account for the
> defendant's liability are acceptable even if there are "measure[s] of uncertainty
> due to the difficulty of ascertaining damages and the fact that what plaintiff's
> position would have been … is never known with certainty."

4 *Newberg on Class Actions,* at § 12:4.

Likewise, "formulae for aggregate class damages may also be based on records, typically

the defendant's records" and these formulae:

> [T]end to be simple and mechanical such that if properly designed, courts
> will rarely deny certification, as individual questions of damage will not
> overwhelm class damages . . . Even in instances in which the defendant's
> records cannot lead to exact calculations, they often form a rubric or data
> point that a formula can use.

*Id.* at § 12:5.

Accordingly, many RICO and antitrust class actions are certified in the Seventh Circuit in

which the damages need to be estimated and assumptions made by economists. *See, e.g., Kleen*

*Products LLC v. International Paper Co.,* 831 F.3d 919, 929 (7th Cir. 2016) (affirming class

certification based on the plaintiff's expert analysis which estimated a "but for" non-conspiratorial

price free of manipulation by "accounti[ing] for many other variables, such as downstream

---

[15] *See also, Rotella v. Wood,* 528 U.S. 549, 557-58 (2000) ("there is a clear legislative record of
congressional reliance on the Clayton [Antitrust] Act when RICO was under consideration… Both statutes
share a common congressional objective of encouraging civil litigation to supplement Government efforts
to deter and penalize…").

demand, production, and delivery inflation, and seasonal factors in order to control for other influences on price and to isolate the impact of the conspiracy"); *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 337 (N.D. Ill. 1997) (certifying RICO and antitrust class action for price fixing where the damages to competitor's products through "statistical sampling"); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 666 (N.D. Ill. 1996) (certifying RICO class action based on overcharges to each class member for pharmaceuticals from defendant's pricelist which varied by year and as to each class member).

Indeed, the trial court's certification order in *Kleen* delved into more detail about these assumptions and estimates by the damages expert and recognized they are a necessary part of the analysis. *Kleen v. International Paper,* 306 F.R.D. 585, 605 (N.D. Ill. 2015) ( "in a complicated antitrust case, where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages."). Moreover, the fact that each class member "individually negotiated" its own prices did not pose a bar to estimating damages. *Id.* at 600. JLL, however, has cited no authority in support of the proposition that damages cannot be established in this case. It will be done with as much specificity as the evidence permits, and the law does not demand more. JLL's argument is not a reason to deny certification.

In any event, to address any conceivable concerns regarding overstated damages caused by the absence of itemization on invoices for labor costs, Plaintiff can discount charges incurred by the Contracting Subclass by 49% before subjecting them to Dr. Kaestner's damages methodology. WDES' principal testified that labor costs account for the "vast majority" or "overwhelming majority" of the total contractor/subcontractor invoiced costs. *See* Grossman Dep., January 27, 2020 (D.E. 105-7), at 144-45; Continued Grossman Dep., February 24, 2020 (D.E. 125-9) at 167.

20

This discount would therefore eliminate any compensation in this case for non-labor costs. Accordingly, Dr. Kaestner's methodology would be applied to 51% of the contractor/subcontractor billed amount (*i.e.,* discounting the Contracting Subclass' damages by 49%.).[16] JLL has produced no contrary evidence, nor does JLL suggest that labor costs account for less than a majority of the costs.[17] And this is unquestionably a conservative estimate.[18]

The alternative would be to preclude certification—in a case in which there is substantial common impact of damages to hundreds (or thousands) of tenants—because the estimate of labor costs may be too low for some subclass members. Such a result would not further the interests of justice or efficiency when clearly there is evidence of common questions of both liability and impact of damages. *See, e.g., Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) ("[W]hile the amounts may be too low they are indicative of the modest stakes of the individual class members. The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits . . . But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all."); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of

---

[16] Dr. Kaestner testified that he could apply his methodology to an estimate. *See* D.E. 125-13, Kaestner Dep., February 21, 2020, at 159-161.

[17] The cost of furniture, fixture, and equipment ("FFE") is not included in the contractor/subcontractor invoices at issue and were billed totally separately. *See* D.E. 125-8 (Plaintiff's First Supplemental Response to Defendant's Interrogatory Number 4). As such, JLL has no basis to take issue with FFE.

[18] *See* U.S. Bureau of Labor Statistics, Monthly Labor Review (February 2017), at Table 1 (Employee-only labor share, nonfarm business subsectors, 1997 to 2014). According to this report, the employee-only labor share (costs) for the construction industry exceeds 59% since 1997, and was 64% in 2014. *See* https://www.bls.gov/opub/mlr/2017/article/estimating-the-us-labor-share.htm (last accessed on August 10, 2020). To the extent that putative contracting subclass members do have invoices that itemize labor (which is not expected), the itemized amount can be used instead of 51% of the total invoiced amount.

21

individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

Accordingly, this approach is both reasonable and practical. To be sure, pursuing these claims individually would not solve these problems anyway if such information is not itemized on any invoice. Again, while JLL raises a "problem" that is common to all class members, it's also one easily addressed on a class wide basis, further underscoring the basis for certification.

### VII. A Class Action Is Superior To Other Available Methods For Fairly And Efficiently Adjudicating This Controversy.

JLL devotes just two sentences in opposition to superiority, emphasizing that WDES' damages could exceed $135,000, and class members with similar damages may have an interest in controlling their own action. (D.E. 125 at 28-29). Like JLL's other arguments, this one is also inconsistent with the case law. As this Court has held, the superiority question focuses on the "economies of time, effort and expense", along with the uniformity of decision, served through use of the class action device. *E.g., Bennett v. Dart*, 2020 WL 1812376, at *3 (N.D.Ill. April 9, 2020). Thus, "relatively larger damages awards … does not automatically bar the use of a class action or demonstrate that class members have an interest in controlling the prosecution of a separate action. Indeed, if the class is successful, the damages would presumably be the same as those recovered under individual actions." *Dietrich v. C.H. Robinson Worldwide, Inc.*, 2020 WL 635972, at *5 (N.D. Ill. Feb. 11, 2020).

### VIII. The Requirements Of Rule 23(b)(2) Are Also Met.

Rule 23(b)(2) requires evidence that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief *or corresponding*

*declaratory relief* is appropriate respecting the class as a whole." Fed. R. Civ. P. 23 (b)(2) (emphasis added). JLL claims that Plaintiff lacks standing because it is no longer a tenant of a JLL-managed building and thus is entitled to no injunctive relief. (D.E. 125 at 29). Its only support for the argument is a case challenging the constitutionality of an ordinance regarding cell phone usage while driving, and where the Court found future injury conjectural because it would require the plaintiff to violate state and local laws again. *Id.* (*citing Simic v. Cty. of Chi.*, 851 F.3d 734 (7th Cir. 2017)) ("For purposes of standing to seek injunctive relief against future harm, courts generally assume that litigants 'will conduct their activities within the law and so avoid prosecution and conviction.'").

Just as the Court found in its order denying JLL's motion to dismiss, in light of WDES desire to serve as a class representative, it is premature to make a "final determination on WDES' standing to pursue injunctive relief." (D.E. 55 at 8-9) (citing *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017)). That's because where, as here, the alleged illegal conduct is capable of repetition with respect to other members of the class, the class representative "may pursue [its] claim for injunctive relief despite loss of [its] personal stake." *Mullen v. GLV, Inc.*, 2020 WL 1237189, at *5 (N.D. Ill. March 13, 2020) (citations omitted). Thus, there is no reason to deny a Rule 23(b)(2) class, and a class should be certified under this Rule as well.

## CONCLUSION

For the reasons stated above and in their initial Memorandum in Support, Plaintiff respectfully requests that this Court: i) certify this case for class treatment pursuant to Rule 23(b)(2) and (3); ii) appoint WDES as the Class representative; and iii) appoint Plaintiff's counsel as Class Counsel under Rule 23(g).

Dated: August 14, 2020

Respectfully Submitted,

/s/ *James B. Zouras*

James B. Zouras
Ryan F. Stephan
Anna Ceragioli
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza, Suite 2150
Chicago, IL 60606
jzouras@stephanzouras.com
rstephan@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
**FOSTER PC**
150 N. Wacker Drive, Suite 2150
Chicago, IL 60606
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
**THE WALNER LAW FIRM LLC**
555 Skokie Boulevard, Suite 250
Northbrook, IL 60062
awalner@walnerlawfirm.com

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on August 14, 2020, I filed the attached with the Clerk of the Court using the ECF system, which will send such filing to all attorneys of record.

*/s/ James B. Zouras*