THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WACKER DRIVE EXECUTIVE SUITES, LLC**, on behalf of itself, individually, and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>    v.<br><br>**JONES LANG LASALLE AMERICAS (ILLINOIS), LP,**<br><br>      Defendant. | Case No. 1:18-cv-5492<br><br>Magistrate Judge Sunil R. Harjani |

**PLAINTIFF'S RESPONSE TO DEFENDANT JONES LANG LASALLE'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF DR. ROBERT KAESTNER**

Plaintiff, Wacker Drive Executive Suites, LLC ("WDES") responds to Defendant Jones Lang LaSalle Americas (Illinois) LP ("JLL")'s Motion to Exclude ("the Motion") its damages expert, Dr. Robert Kaestner ("Dr. Kaestner"). As will be shown, the Motion does not challenge Dr. Kaestner's qualifications to opine on the damages incurred by WDES. And as to his methodology—the use of a standard, demonstrably reliable regression analysis to estimate the difference between the cost of union and non-union labor—the Motion says nothing. Accordingly, there is no basis to strike Dr. Kaestner from testifying as an expert on damages. The Motion should be denied.

## I. INTRODUCTION

The issue in this class action is whether the class has been damaged by the "union–only rule" JLL imposed on all its tenants at the 20 Loop buildings it manages or has managed during the class period. JLL does not dispute that it enforces this rule on tenants at all these buildings. The result is that every tenant in all 20 buildings, likely in the thousands, had to pay for union labor to move in and out of their space, and to build-out their offices. Plaintiff retained Dr. Kaestner, a labor economist teaching at the University of Chicago, to estimate the damages to WDES and demonstrate how damages can be calculated on a class-wide basis.

Dr. Kaestner did exactly that. *See* D.E. 105-1 ("Kaestner Report"). To summarize: Dr. Kaestner estimated the difference in wage rates paid by union versus non-union contractors for the major building trade labor at issue in Metropolitan Chicago (the smallest applicable geographic area for which government data were available), while controlling for differences in productivity using a regression analysis, all of which is set forth at Table 1 (fourth column) of his Report. *Id*. at 7. The difference in wages paid to union versus non-union carpenters, for example, is 41%. *Id*. The differences for the other types of trade labor used in the typical office build-out follow in the same column. *Id*. Thus, the exact union versus non-union price differences for carpentry, drywall, plumbing and electrical work, for example, are all established.[1] *Id*. Dr. Kaestner would simply apply his union wage premium overcharge percentage to each invoice and estimate that portion of the total union overcharge. He would do that for each class member.

---

[1] James Raisher, WDES' other retained expert (who JLL does not challenge), also testified that landlord representatives in the Loop are well-aware that union contractors cost more than non-union contractors. *See* Raisher Dep., March 18, 2020 (D.E. 125-6) at 113-17. Except for transcripts, all page citations to ECF filed documents will be to the ECF pagination at the top of the page.

1

## II. THE RULE 702/DAUBERT REQUIREMENTS

The starting point for Kaestner, as with any expert witness, is his qualifications and assessment of his reliability. These criteria come from Fed. R. Evid. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *See Manpower, Inc. v. Insurance Co. of Pa.,* 732 F.3d 796, 806 (7th Cir. 2013) (Daubert "remains the gold standard for evaluating the reliability of expert testimony … establishes a standard of evidentiary reliability … a valid connection to the to the pertinent inquiry … and mandates that the testimony have a reliable basis in the knowledge and experience of the relevant discipline.") (quotations, citations omitted). It is well-established that "the rejection of expert testimony is the exception rather than the rule." *E.g., Bianco v. Hultsteg*, 2009 WL 347002, at *2 (N.D. Ill. Feb. 5, 2009).

The Motion does not take issue with Dr. Kaestner's qualifications to opine on damages the class members allegedly suffered, which are set forth in Section 1 of his Report. It is generally accepted that an economist is qualified to perform a valid regression analysis. *See, e.g., Universal Coin & Bullion, Ltd. v. Federal Express Corp.,* 2015 WL 12001264, at *4 (W.D. Tenn. June 30, 2015) ("As a noted economist, Dr. Marshall is qualified to engage in a regression analysis methodology . . . ."); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression,* at 328, published as part of the *Reference Manual on Scientific Evidence,* Federal Judicial Center (3d ed.) ("[A]ny individual with substantial training in and experience with multiple regression and other statistical methods may be qualified as an expert. A doctoral degree in a discipline that teaches theoretical or applied statistics, such as economics, history, and psychology, usually signifies to other scientists that the proposed expert meets this preliminary test of the qualification process").[2] Dr. Kaestner is hardly an exception.

---

[2] *See* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf (last accessed on August 11, 2020).

2

### III. DR. KAESTNER'S REGRESSION ANALYSIS IN DETERMINING THE NON-UNION WAGE RATES IS UNCHALLENGED

Dr. Kaestner determined the difference in union versus non-union wage rates for construction workers in the relevant building trades. He has studied this issue extensively in his work as a labor economist and cited the many economists who have published peer-reviewed works supporting his conclusions. Kaestner Report at 3-4. He then performed his own analysis to determine the difference in wages paid to union and non-union building trades workers in the Chicago area. *Id*. at 4-10. The device he uses is a standard regression analysis, which is universally accepted by the federal courts as a reliable statistical tool.[3] *See, e.g., Manpower,* 732 F.3d at 808 ("Regression analysis permits the comparison between an outcome (called a dependent variable) and one or more factors (called independent variables) that may be related to that outcome"); *see generally,* David H. Kaye and David A. Freedman, *Reference Guide on Statistics,* at 260, also published by the Federal Judicial Center as part of the *Reference Manual on Scientific Evidence* ("Regression models are used by many social scientists to infer causation from association. Such models have been offered in court to prove disparate impact, in discrimination cases, to estimate damages in antitrust actions, and for many other purposes").

Numerous class actions are certified with the assistance of an economist employing a regression analysis to estimate class damages, *i.e.*, to show they can be estimated for all class members and thus satisfy the predominance requirement of Fed. R. Civ. P. 23(b)(3). *See, e.g., Kleen Products LLC v. International Paper Co.,* 306 F.R.D. 585, 605 (N.D. Ill. 2015) (granting certification in monopoly overcharge case based on economist's report showing damages could be estimated for the class predicated on his ability to establish the "but for" price for containerboard products which employed a regression analysis, despite criticisms which "go to the merits" of

---

[3] *See, e.g.,* D.E. 125-13, Kaestner Dep., February 21, 2020 ("Kaestner Dep."), at 122-23.

whether damages were caused by "the cost of inputs" rather than the conspiracy), *aff'd,* 831 F.3d 919 (7th Cir. 2016); *Ploss as Trustee for Harry Trust v. Kraft Foods Group, Inc.,* 431 F. Supp. 3d 1003, 1015 (N.D. Ill. 2020) (granting certification based upon expert's opinion that prices for the class were "artificially inflated" using "an event study regression analysis" because such studies "are routinely relied on to prove causation"); *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise, Co.,* 2016 WL 3579953, at *9 (E.D. Wis. June 24, 2016) (certifying class action based upon economist's damage analysis predicated on a "regression analysis indicat[ing] a common overcharge"). Thus, there is no legal bar to certifying this class predicated upon Dr. Kaestner's regression analysis, especially given that the regression analysis itself is not challenged.

In plain English, this is what Dr. Kaestner did: First, he selected the dependent variable, *i.e.*, what he is trying to determine, the "but-for" non-union price for the labor used by class members for moving and building-out their office space in the area. The dependent variable is the weekly wage paid to a worker (transformed into a natural logarithm to ease interpretation). He selected independent variables that have been extensively documented in the literature to affect the dependent variable (weekly wage).[4] These independent variables (used in analysis underlying Table 1, fourth column) are: gender, race, ethnicity, level of education, and whether the worker was paid hourly or weekly. Kaestner Report at 7. The dependent variable and independent variables just described form the regression model that was used to derive the union wage premium—the difference between union and non-union wage.

Dr. Kaestner then used a software program, STATA/MP Version 16.0 to conduct the statistical (regression) analysis. His work product, including the electronic files from the program,

---

[4] "In statistics, a variable is a characteristic of units in a study . . . Typical variables include income . . . and educational levels . . . When investigating a cause-and-effect relationship, the variable that represents the effect is called the dependent variable, because it depends on the causes. The variables that represent the causes are called independent variables." *Reference Guide on Statistics* at 219.

were produced to JLL so that his work could be scrutinized. *See* Kaestner Dep. at 99. The Motion does not take issue with any aspect of Dr. Kaestner's choice of variables for the regression analysis or its results, what he concludes is a substantial "union wage premium" which impacts every class member. All JLL has to say about Dr. Kaestner's methodology is: "[t]he particulars of Dr. Kaestner's Union Wage Premium analysis are not relevant to, and therefore not detailed in the Motion [to Exclude] . . . JLL does not concede the merit of Dr. Kaestner's union wage opinion." D.E. 127 at 6, n.5. That certainly makes the Court's task in deciding this Motion much easier.[5]

## IV. NEITHER OF JLL's TWO CRITICISMS OF THE REPORT ARE A BASIS TO STRIKE DR. KAESTNER'S TESTIMONY

As noted, the Motion does not take issue with Dr. Kaestner's regression analysis. Rather, JLL makes two other arguments which, at most, go the weight of his testimony, not its reliability: (1) that Dr. Kaestner failed to account for hypothetical "productivity differences" between union and non-union workers, as posited by JLL (*see* D.E. 127 at 7, 10, 15-16); and, (2) that wage differences between union and non-union labor do not account for WDES' damages (because other factors purportedly also account for the cost of such contracting services). *See* D.E. 127 at 8-9. Neither of these arguments has merit and tellingly, JLL does not seriously contend that their criticisms have any real bearing on calculating damages for the Moving Subclass.

### A. JLL's First Criticism: So-Called "Productivity Differences"

The Motion contends that Dr. Kaestner's testimony should be stricken because he does not account for an assumption; namely, JLL's unsupported belief that union labor is more productive

---

[5] JLL retained Mark Hosfield, a Certified Public Account (C.P.A.), as a rebuttal expert on a few, varied topics and filed his report as an Exhibit in Opposition to the Motion for Class Certification. D.E. 125-5. Yet JLL's Motion does not rely upon any opinions, data, or other information offered by Hosfield. JLL does not even rely on every rebuttal topic set forth in Hosfield's Report. In fact, JLL's Motion, in four footnotes, references Hosfield's Report only in the most general/passing terms. D.E. 127 at n. 2, 5, 12, 13. Accordingly, WDES does not respond to any criticisms of Kaestner's Report asserted in Hosfield's Report that are not a basis for the Motion. Any other disagreements between Kaestner and Hosfield are properly resolved at summary judgment or trial.

than non-union labor, and therefore, it should cost more. As put by JLL, "Dr. Kaestner decided not to control for any productivity differences attributable to the variable at the heart of his analysis: whether a laborer is union affiliated . . . ." D.E.127 at 7. Even if JLL can ultimately substantiate its belief (it can't), challenges based on an expert's purported failure to control for variables are properly made on cross-examination, not a motion to strike. It is well-settled that "objections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility." *E.g., Jordan v. Dominick's Finer Foods*, 115 F.Supp.3d 950, 963 (N.D. Ill. 2015) (citations omitted).

And in any event, JLL's assertion that Dr. Kaestner did not account for productivity variables is simply untrue. Dr. Kaestner did make two separate "adjustments" to control for factors economists generally recognize as affecting productivity (age and education), reflected in Table 1 (column 3).[6] Kaestner Report at 7. And in the final column, he also accounts for an additional two factors that some economists believe affect worker productivity: race and gender. *Id*. Thus, the last column of Table 1 represents Dr. Kaestner's estimate of the "union wage premium" controlling for every factor recognized in the field as having any measurable effect on productivity, and the unmistakable conclusion is that significant wage differences exist between union and non-union workers. *See, e.g.,* Kaestner Report at 4-7; Kaestner Dep. at 128-29.

JLL's rebuttal expert Mark Hosfield (who is not an economist) opines that Dr. Kaestner should also have "controlled" for one additional factor: that unionized workers are somehow more "productive" than their non-union counterparts. D.E. 125-5 at 12 ("Dr. Kaestner makes no attempt

---

[6] Dr. Kaestner acknowledged that there is no available data on productivity such as output per hour for any given job. So, he used "proxy variables." *See* Kaestner Dep.at 186-87. The use of proxy data when the best available data is unavailable is commonly done by experts. *See, e.g., National Resources Defense Council v. Illinois Power Resources Generating LLC.,* 2018 WL 5777476, at *5 (C.D. Ill. Nov. 2, 2018) (challenges to the use of national rather than local data does not disqualify the expert or his methodology).

to account for differences in productivity attributable to whether laborers are union-affiliated or not."). Dr. Kaestner indeed did not account for this "factor," but that's because ***there's no credible evidence that union workers are more productive***. *See* Kaestner Report at 5-6; Kaestner Dep. at 126, 147-49, 187-89.

JLL's assumption that union labor is more "efficient" or "productive" than non-union labor is exactly that – an assumption backed up only by the subjective views of its expert C.P.A.; hardly a basis to strike an expert who disagrees. To be sure, many economists believe any increased productivity of union workers is *not* enough to offset their higher wages. *See, e.g.,* John Litwinski, *Regulation of Labor Market Monopsony,* 22 Berkley J. Emp. & Lab. L. 49 at 93-94 (2001) ("Although unions may have better morale and have negotiated more efficient work rules than those used by non-union workers, union employees generally are not sufficiently productive to offset their higher wages. In fact, many unions do not even come close . . . Indeed, if union workers were sufficiently more productive to offset their higher wage demands, one would not see higher prices for union goods.").

And Hosfield tacitly acknowledges this. He is unable to generally opine that any purported increased productivity is always enough to offset higher union wages. D.E. 125-5 at 14 ("In certain instances the productivity difference is demonstrably large enough to overcome the wage differential."). He is unable to so state in this case as well. When asked, Hosfield could not testify with any confidence the degree to which union workers are purportedly more productive. *See generally* Ex. A, Hosfield Dep., July 28, 2020, at 42-53.[7] He merely offered an unremarkable and irrelevant truism applicable to both union and non-union workers alike: "[t]raining can make a

---

[7] Hosfield did not even determine how much more productive he believed union labor to be. Ex. A at 43. And he could not say if any purported productivity increase would be enough to offset the higher union wage. *Id*. at 44.

7

labor force more productive." D.E. 125-5 at 13.[8] At most, Mr. Hosfield's opinion is nothing more than a disagreement over the significance of an independent variable; that is, union membership supposedly resulting in increased productivity, which Dr. Kaestner did not include in his regression analysis because he does not (and is not required) to accept it. Disagreement over whether to account for an independent variable will not preclude expert testimony. *See Manpower, Inc.,* 732 F.3d at 808 (citing *Bazemore v. Friday,* 478 U.S. 385, 400 (1986)). Again, it is properly addressed on cross-examination.

In sum, Dr. Kaestner was not asked to opine on whether union workers are more productive than non-union workers because he does not believe there is any credible evidence to support it. But he does recognize that productivity can affect price, and accordingly, he controlled for possible productivity differences by using recognized measures of productivity in the field of economics (detailed above). The result is that his damage estimates are more conservative, *i.e.*, less than they would otherwise be had he not controlled for these productivity variables. And after controlling for productivity, Dr. Kaestner still found the existence of a significant union wage premium. There is no basis to exclude his opinion.[9]

### B. JLL's Second Criticism: Wage Differences Purportedly Do Not Account for WDES' Damages

JLL's second criticism of Dr. Kaestner's Report is that the difference between union and non-union wage rates do not fully account for the difference in cost for such work performed/charged to the tenants. D.E. 127 at 9 ("Dr. Kaestner wrongly thinks Plaintiff's damages **are** wages, instead of labor charges") (emphasis in original). According to JLL, this method of

---

[8] "Training", at least when it comes to movers and trade workers, is virtually synonymous with "education", a factor Dr. Kaestner *did* control for. Kaestner Report at 7.
[9] Moreover, the Motion puts forth no explanation as to how this could apply to the Moving Subclass.

8

estimating damages is unreliable and unsupported. *Id.* at 12-13. JLL believes the difference in labor costs must account for significant factors other than wage rates. No so.

As JLL notes, no one – not WDES, JLL, Dr. Kaestner or anyone else – is able to isolate the precise amount of WDES' total invoiced costs comprising labor costs. *See, e.g.,* D.E. 125, JLL Opposition to Class Certification at 19. And while JLL has not yet produced any absent class member files (D.E. 128, status report noting production that has not yet occurred), it is unlikely that JLL's records for any class members will show such itemization either.[10] But this is not the result of any recordkeeping shortcomings by any tenant or JLL. Rather, it is attributable to the way that contractors issue invoices: as a total amount without itemization of labor versus material.[11] As such, for reasons beyond anyone's control, neither WDES' damage model (nor any conceivable model) will ever estimate damages with perfect precision. But it is well-established that damages in class actions need not be exact. This reality is not a basis to exclude expert testimony that assists the trier of fact. *See* William B. Rubinstein, 4 *Newberg on Class Actions,* §12:5 (5th ed. 2020) ("Even in instances in which the defendant's records cannot lead to exact calculations, they often form a rubric or data point that a formula can use").

### 1. Labor Costs Account For The Vast Majority Of The Construction Sub-Class' Damages

WDES' principal, Amy Grossman, who has years of experience working with contractors to perform build-outs for entities she operates and negotiated all of the contracts with the union contractors at issue, testified, unsurprisingly, that labor charges account for the "vast majority" or "overwhelming majority" of the total invoiced costs. *See* Grossman Dep., January 27, 2020 (D.E.

---

[10] And in the unlikely event that JLL's records actually do show such itemization, this argument is, moot.
[11] This issue has no bearing on the Moving Subclass because material costs (and other miscellaneous costs) for movers, if any, are *de minimis*.

105-7), at 144-45; Cont'd Grossman Dep., February 24, 2020 (D.E. 125-9) at 167.[12] JLL does not suggest that labor accounts for less than a majority of the build-out costs.

Rather, with respect to WDES' two build-outs (2014 and 2017), the evidence establishes that the contractors quoted, billed and received a single, all-inclusive amount for their work. *See, e.g.,* Ex. B attached hereto; D.E. 125-11 (showing various contractors/subcontractors invoices/lien waivers with all-inclusive price).[13] They did not consider the cost of materials and related expenses significant enough to separate them from the labor.

To be sure, including the full amount of contractor/subcontractor invoices would result in damages which are somewhat overstated. But damages need only be estimated for class certification and trial. *See, e.g., Kleen Products,* 306 F.R.D. at 605 (citations omitted) (granting class certification and holding, "in a complicated antitrust case… where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, 'plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.'"). This relaxed burden in proving the amount of damages is essential for the continued viability of private, civil treble damage antitrust and RICO actions:

---

[12] The cost of furniture, fixture, and equipment ("FFE") are not included in the contractor/subcontractor invoices and were billed separately. D.E. 125-8. As such, JLL has no basis to take issue with FFE.

[13] Though not a basis for the Motion, Hosfield notes (D.E. 125-5 at 22) that Dr. Kaestner cannot break down the type of work performed by each subcontractor. Not so. The type of work performed by each subcontractor for WDES is detailed in various invoices and lien waivers submitted to the union general contractor, broken down by category, for both the 2014 and 2017 build-outs. *See* Ex. B. In the event that an invoice for carpentry work, for example, also included charges for other kinds of labor (*e.g.,* drywallers), what matters here is that the invoice would still include a union overcharge (for all the labor). The percentage difference among the various classes of labor in Prof. Kaestner's list is not large. Therefore, the difference between an invoice for 100% carpentry labor, for example, and one in which carpentry was only 80% of the labor, but also included 20% of some other type of labor, would be minimal – so minimal that it is a reasonable estimation to proceed on for a class action. In any event, even if there is a real dispute about which tradesmen performed the work, that is an issue to be resolved on summary judgment—it in no way undermines Dr. Kaestner's methodology for establishing the wage premium overcharge percentage.

10

> Any discussion of the accuracy required in measurement of antitrust damages must begin with one premise: the use of private damages actions to enforce the antitrust laws will be undermined by an unrealistic requirement of precision…Any system of antitrust enforcement that takes private damages actions seriously must permit plaintiffs to estimate damages by mechanisms that are reasonably within their reach… The Supreme Court has responded to these difficulties by setting a relatively high standard for proof of the *fact* of an antitrust violation and resulting injury, but a lower standard for proof of the amount of damages.

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice*, §17.4, at 668-69 (3d ed.). The decision in *Spray-Rite Service Corp. v. Monsanto Co.* illustrates how the principle is applied in the Seventh Circuit. 684 F.2d 1226, 1243 (7th Cir. 1982) ("if the plaintiff shows that disaggregation [of damages] is impracticable . . . the burden shifts to the defendant to demonstrate the contrary . . . Spray-Rite sustained its burden by proving that disaggregation is impracticable . . . ", affirming judgment for the plaintiff); *see also Kleen Products,* 306 F.R.D. at 605.

Accordingly, the general rule in an overcharge antitrust case is that the direct purchaser is entitled to recover the full amount of the overcharge. *See generally,* Phillip E. Areeda, *Antitrust Law,* Vol. IIA (4th ed. 2014) ("In an overcharge case, the defendant has illegally imposed noncompetitive prices through some sort of collusive scheme or through monopolizing activities. In either event, the usual measure of damages is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased."); *Apple Inc. v. Pepper,* 139 S. Ct. 1514, 1519-22 (2019) (finding that consumers could sue Apple Computer for the full overcharge price for apps even though it included a 30% commission Apple paid to the app developers, and holding that "the *Illinois Brick* bright line rule [allowing the direct purchaser to recover the full overcharge] is grounded on the belief that simplified administration improves antitrust enforcement.").

Thus, courts permit direct purchasers to recover the full amount of the overcharge for a product even when only one input was priced noncompetitively. *See In re Processed Egg Products Antitrust Lit.,* 881 F.3d 262, 276 (3d Cir. 2018) (allowing direct purchasers of egg products to sue for the full amount of the alleged overcharge even though he price fixing conspiracy was for the actual eggs, the "price fixed input" which was then used to make a different product which was sold to the plaintiff); *Kleen Products,* 306 F.R.D. at 589, 596 (granting certification in consumer antitrust case for the price of the finished containerboard products, such as boxes, which used an input which had been price fixed). In other words, class members in antitrust cases need not back out these hard-to-itemize components of the overall charge.

RICO follows this principle[14] and it is an important deterrent aspect of its treble damages provisions. *See BCS Services, Inc. v. BG Investments, Inc.,* 728 F.3d 633, 640 (7th Cir. 2013) ("Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification…Otherwise the more grievous the wrong done, the less likelihood there would be of a recovery.") (citations, quotations omitted); *BCS Services, Inc v. Heartwood 88, LLC,* 637 F.3d 750, 759 (7th Cir. 2011) (collecting cases) ("On that phase of the case [damages] the plaintiff has a more relaxed burden than on the issue of causation . . ."); *In re EpiPen Mktg., Sales Prac & Antitrust Litig.,* 2020 WL 1164869, at *17 (D. Kan. Mar. 10, 2020) (rejecting defendants' argument that plaintiff's expert methodology was unreliable because it could not account for customers who paid nothing for EpiPens, finding this issue was one of weight, not admissibility, denying defendants' *Daubert* motion). JLL is asking the Court to disregard these principles.

---

[14] RICO was modeled on the Clayton Antitrust Act. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151–52 (1987).

To the extent JLL believes it can seriously challenge the fact that non-labor costs comprise only a small part of the overall charges for union contracting for office buildouts, it can do so on cross-examination. "The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology…" *Manpower,* 732 F.3d at 808 (vacating exclusion of economist because of his selection of data).

### 2. To Obviate Any Issue Over "Overstated" Damages, A 49% Reduction Can Be Applied To The Contracting Subclass' Damages

To address any conceivable concerns regarding overstated damages caused by the absence of itemization on invoices for labor costs, the solution is not to bar expert testimony or deprive the class of a remedy. It is to discount charges incurred by the Contracting Subclass by 49% before subjecting them to Dr. Kaestner's damages methodology. As noted above, Amy Grossman testified that labor costs make up the overwhelming majority of the contractor/subcontractor invoice prices. This reduction, therefore, more than accounts for the material costs (and any other miscellaneous costs) that could possibly make up the total charges at issue. And its application is extremely straightforward: Dr. Kaestner would simply apply his methodology to 51% of the invoiced amounts incurred by each class member.[15] This addresses JLL's primary criticism of Dr. Kaestner that his damage model is overinclusive (and overstates damages) because it encompasses non-labor components. With this discount, any argument that the damages to WDES and the class cannot reasonably be estimated simply vanishes.

---

[15] *See* U.S. Bureau of Labor Statistics, Monthly Labor Review (February 2017), at Table 1 (Employee-only labor share, nonfarm business subsectors, 1997 to 2014). According to this report, the employee-only labor share (costs) for the construction industry exceeds 59% since 1997, and was 64% in 2014. *See* https://www.bls.gov/opub/mlr/2017/article/estimating-the-us-labor-share.htm (last accessed on August 10, 2020). Thus, a reduction of 49% is a conservative estimate of labor costs.

And as discussed above, applying the estimated discount is a perfectly acceptable model through which to calculate damages in a complex class action such as this. Any issue JLL may have with the premise that labor accounts for a minimum of 51% of the invoiced amount, should be raised on summary judgment or trial (as a question of fact)—it has no bearing on Dr. Kaestner's methodology, which is a proper way, indeed the *only* way to calculate the increase in costs for union labor. Dr. Kaestner is simply applying his methodology to the cost of labor provided to him.

## V. JLL's CITED CASES DO NOT ALTER THE ANALYSIS

JLL does not cite much authority in its Motion and as discussed above, the relevant caselaw supports allowing Dr. Kaestner to testify. The authority that JLL does cite creates no bar to Dr. Kaestner. For example, JLL cites *United States v. Gallardo*, 497 F.3d 727 (7th Cir. 2007) for the proposition that Kaestner's Report is not "factually linked to the case." D.E. 127 at 11. JLL's assertion is perplexing. Everyone agrees that the heart of WDES' theory is that union contractors are more expensive. Dr. Kaestner's testimony addresses the differential between union and non-union wage rates. To say his Report is "not linked" to the facts of this case is absurd.

Then, JLL cites *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459–60 (7th Cir. 2019) to support its characterization of Dr. Kaestner's Report as *ipse dixit.* D.E. 127 at 14. That makes no sense. Dr. Kaestner concludes that union labor costs more than non-union labor. Certainly, this jibes with common sense, but Dr. Kaestner provides an empirical analysis, supported by extensive and unchallenged peer-reviewed academic literature specifically analyzing construction workers, to explain exactly why his conclusions align so well with the understanding of most laypeople. His conclusions are not *ipse dixit. See, e.g., Manpower,* 732 F.3d at 809 (vacating district court's rejection of economist's choice of data to use in an established methodology as "ipse dixit" because

his choice of data was "reasoned" and not based solely on "intuition"). There is nothing that is a "guess" in Dr. Kaestner's Report, which was the issue in *Varlen Corp.*

JLL also cites *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005) for the proposition that wages and labor are not interchangeable. D.E. 127 at 13. *Durkin* says absolutely nothing about the relationship between wages and labor—it's a case involving whether a bad check collection letter was too confusing to the reader. Moreover, the expert in *Durkin* was struck, in part, because he was offering an opinion about "readability" of a letter when the plaintiff's claim was based on whether the letter was "confusing." *Durkin*, 406 F.3d at 420. These are different subject matters, so the Court found the testimony to be irrelevant. *Id.* That is not the issue here, which is simply that Dr. Kaestner's model may overstate the amount damages, which as noted above, is not a basis to strike testimony in civil treble damage cases (and which can easily be remedied with a reduction).

In conclusion, as JLL readily notes, "Dr. Kaestner's opinion has a very narrow and generic mandate." D.E. 127 at 6. That much is true: there is *nothing* controversial, novel, or outside-the-box with respect to his Report—it is, indeed, very straightforward. All he does is estimate the wage differential between union and non-union laborers in downtown Chicago. This is standard, generic labor economic analysis using a standard, reliable, and widely-accepted regression analysis. JLL's criticisms of him can be explored on cross-examination, but are not a basis to exclude.

## **CONCLUSION**

For these reasons, JLL's Motion should be denied. The Court should allow Dr. Kaestner to testify.

Dated: August 14, 2020                              Respectfully Submitted,

/s/ *James B. Zouras*
James B. Zouras
Ryan F. Stephan
Anna Ceragioli
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza, Suite 2150
Chicago, IL 60606
jzouras@stephanzouras.com
rstephan@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
**FOSTER PC**
150 N. Wacker Drive, Suite 2150
Chicago, IL 60606
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
**THE WALNER LAW FIRM LLC**
555 Skokie Boulevard, Suite 250
Northbrook, IL 60062
awalner@walnerlawfirm.com

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on August 14, 2020, I filed the attached with the Clerk of the Court using the ECF system, which will send such filing to all attorneys of record.

*/s/ James B. Zouras*