# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   WACKER DRIVE EXECUTIVE          )
     SUITES, LLC, on behalf of      )
 4   itself, individually, and on   )
     behalf of all others           )
 5   similarly situated,            )
                                    )
 6            Plaintiffs,           )
                                    )
 7       vs.                        )   No. 1:18-cv-5492
                                    )
 8   JONES LANG LASALLE AMERICAS    )
     (ILLINOIS), LP,                )
 9                                  )
              Defendant.            )
10

11            THE REMOTE DEPOSITION OF MARK HOSFIELD,

12   called for examination pursuant to the Rules of

13   Civil Procedure for the United States District

14   Courts pertaining to the taking of depositions,

15   taken remotely before Nohemi Salazar Pitts,

16   Certified Shorthand Reporter within and for the

17   State of Illinois, on July 28, 2020, pursuant to

18   Notice, commencing at 10:06 a.m. CST.

19

20

21

22

23

24
```

1

## Page 2

```
 1   REMOTE APPEARANCES:

 2   FOSTER PC
     BY:  MR. HOWARD FOSTER, Esquire
 3   BY:  MR. MATTHEW GALIN, Esquire
     150 North Wacker Drive
 4   Suite 2150
     Chicago, Illinois  60606
 5   Phone: 312.726.1600
     E-mail: Hfoster@fosterpc.com
 6   E-mail: Mgalin@fosterpc.com

 7                 -and-

 8   STEPHAN ZOURAS, LLP
     BY:  MR. JAMES B. ZOURAS, Esquire
 9   100 North Riverside Plaza
     Suite 2150
10   Chicago, Illinois  60606
     Phone: 312.233.1550
11   E-mail: Jzouras@stephanzouras.com

12              Appeared on behalf of the
                Plaintiffs;
13
14   MORGAN, LEWIS & BOCKIUS LLP
     BY:  MR. SCOTT T. SCHUTTE, Esquire
15   BY:  MS. HEATHER J. NELSON, Esquire
     77 West Wacker Drive, 5th Floor
16   Chicago, Illinois  60601
     Phone: 312.324.1000
17   E-mail: Scott.schutte@morganlewis.com
     E-mail: Heather.nelson@morganlewis.com
18
              Appeared on behalf of the Defendant.
19
20
21
22
23
24
```

## Page 3

```
 1                  I N D E X

 2   MARK HOSFIELD                  EXAMINATION

 3      BY MR. FOSTER                     5

 4

 5

 6

 7

 8              E X H I B I T S

 9                                        INTRODUCED
     HOSFIELD        DESCRIPTION          PAGE

10   Exhibit 1    Mark Hosfield Report        12

11   Exhibit 2    Lab Construction Costs, Bates 000650 67

12   Exhibit 3    Kaestner Report             31

13   Group        Sworn Statement For Contractor and
     Exhibit 4    Subcontractor to Owner      77
14

15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1        THE REPORTER:  The parties in this

 2   deposition acknowledge that I am not physically

 3   present in the deposition room and that I will be

 4   reporting this deposition remotely pursuant to

 5   Federal Rule of Civil Procedure 29.

 6             They further acknowledge that in

 7   lieu of an oath administered in person, the witness

 8   will verbally declare his testimony under penalty

 9   of perjury.  The parties and their counsel consent

10   to this arrangement and waive any objections to

11   this manner of reporting.

12             Please indicate your agreement by

13   stating your name and your agreement on the record.

14        MR. FOSTER:  Howard Foster, I agree.

15   I represent the Plaintiff.

16        MR. SCHUTTE:  Scott Schutte on behalf of

17   Jones Lang LaSalle, and we also agree on behalf of

18   the Defendant.

19        THE REPORTER:  Mr. Hosfield, please

20   raise your right hand.

21        (Whereupon, the witness was

22             administered an oath.)

23        MR. FOSTER:  Before we begin, I just

24   want to make it clear for the record Matthew Galin
```

## Page 5

```
 1   and James Zouras are also on this deposition call

 2   in attendance for the Plaintiff.

 3             Is there anything you would like to

 4   note on the record?

 5        MR. SCHUTTE:  Let me add that Heather

 6   Nelson of Morgan Lewis is also only the line for

 7   Jones Lang LaSalle.

 8        (WHEREUPON, technological

 9             issues were resolved

10             off the record.)

11        MARK HOSFIELD,

12   called as a witness herein, having been first

13   administered an oath, was examined and testified

14   remotely via videoconference as follows:

15        EXAMINATION

16   BY MR. FOSTER:

17        Q.    Dr. Hosfield, this is Howard Foster.

18   I'm sure you know who I am.  I'll be taking your

19   deposition in this matter.

20             And I can see from your CV that you have

21   been deposed many times, so I'm assuming you know

22   the format.  If you don't understand a question

23   that I have asked, just please let me know, and I

24   will try and, well, rephrase if necessary.
```

1    MR. FOSTER:  Did we lose our audio?
2    MR. SCHUTTE:  No.  You're on the phone.
3    THE WITNESS:  No.
4         (Whereupon, a discussion was
5         had off the record.)
6  BY THE WITNESS:
7    A.    Let me just state that I am not a
8  doctor, so you don't have to call me Dr. Hosfield.
9  BY MR. FOSTER:
10   Q.    I'm sorry.  I didn't --
11   A.    That's okay.
12   Q.    I thought by academic, you -- okay.
13 Mr. Hosfield.  All right.
14        And if you'd like to take a break, let
15 us know, but you cannot take a break while a
16 question is pending.
17        All right.  Let me start by asking you
18 if you have ever examined the question of the
19 difference between the price of union and non-union
20 labor before in any of your professional work?
21   A.    You're talking about the price of union
22 and non-union, like the wage rates?
23   Q.    Yes.
24   A.    Well, it varies all over the country,

6

1  but I have dealt with it before on construction
2  projects, yes.
3    Q.    Okay.  Have you dealt with it for
4  particular clients in your consulting business?
5    A.    I have had clients who have had, for
6  example, open shop subsidiaries and things that had
7  non-union labor and also had union labor.  So --
8  but I have dealt with those kind of wage rates
9  before, sure.
10   Q.    Have you represented both union clients
11 and management clients?
12   A.    What do you mean by management clients?
13   Q.    Management side as opposed to the union
14 side of labor disputes.
15   A.    Okay.  I don't -- I think you segued
16 into labor disputes without any way to get there.
17 I haven't been involved in labor disputes except as
18 a manager of a business.  And I had two union
19 plants and one non-union plant that I operated,
20 then I had some labor disputes here and there, but
21 as a consultant, I've dealt more with the costs of
22 projects and in some cases the management of
23 projects.
24   Q.    Okay.  When you are hired as a

7

1  consultant to work on projects, is it to determine
2  the cost of them?
3    A.    It depends on the situation.
4    Q.    Have you analyzed the cost of union and
5  compared it to non-union labor in any particular
6  project?
7    A.    Well, usually on a project, you have one
8  or the other.  So you wouldn't do that on a
9  particular project.
10   Q.    Have you ever recommended to a client
11 that they use either union or non-union labor for
12 a project?
13   A.    I have not been in a position to
14 recommend -- I have not been asked to recommend a
15 certain contractor to a client one way or the
16 other.
17   Q.    What about generally, union versus
18 non-union labor --
19   A.    I don't think that's --
20   Q.    -- for a particular contractor?
21   A.    I don't think that's a question, or
22 I don't understand it if it is one.
23   Q.    Have you ever recommended that a
24 particular client use union labor or non-union

8

1  labor generally as opposed to a particular
2  contractor?
3    A.    I don't think I have been asked to make
4  such a recommendation, no.
5    Q.    So is it correct to say, then, that for
6  some clients, you have recommended the use of
7  non-union contractors?
8         MR. SCHUTTE:  Object to form.
9         Go ahead.
10 BY THE WITNESS:
11   A.    I think that's exactly the opposite of
12 my answer that I just gave you.  So no, it would
13 not be correct that I recommended that a client use
14 either union or non-union.  I don't recommend which
15 type of labor my clients choose to use.
16 BY MR. FOSTER:
17   Q.    But I thought -- I didn't ask it that
18 way.  I thought I was now talking about particular
19 contractors.
20        You said that -- I believe you said that
21 you have recommended the use of particular
22 contractors to clients; is that correct?
23   A.    No, I have not.
24   Q.    So am I correct that you have not

9

1 recommended to a client that they use any
2 particular contractor or union generally or
3 non-union contractors?
4 **A.     I have not recommended that a client**
5 **pick a particular contractor.  The customers that**
6 **are hiring contractors, if they are my clients --**
7 **sometimes the contractors are my clients, but if**
8 **the owner is a client, I have not recommended that**
9 **they -- I have not been asked to recommend one**
10 **particular contractor over another.**
11 Q.     Is it typically the case when you're
12 involved in a construction project that you know
13 that a particular construction project is going to
14 be a union project or a non-union project?
15 **A.     I don't know the answer to that**
16 **question.  Not necessarily, no.**
17 Q.     Have you ever offered an opinion in the
18 past as to the productivity of union laborers as
19 non-union labor?
20 **A.     I don't recall.  I have experienced the**
21 **difference between union and non-union labor as an**
22 **employer, but I don't recall whether I have --**
23 **I mean, I probably have somewhere along the road,**
24 **but I haven't -- I can't recall a specific**

10

1 **circumstance where that --**
2 Q.     Okay.
3 **A.     -- (unintelligible) were done.**
4 Q.     Am I correct that you do not have a
5 degree in economics?
6 **A.     I have economic coursework, but I do not**
7 **have a degree in economics.  It's an accounting**
8 **finance and operations management is my Master's.**
9 Q.     I'd like to enter, make as an exhibit
10 your report at this time.
11 MR. FOSTER:  So I'm asking the court
12 reporter to label it.  Should we call that Hosfield
13 Exhibit No. 1?
14 BY MR. FOSTER:
15 Q.     So let's move on, please.  All right.
16 Mr. Hosfield, let me take you to your exhibit, sort
17 of in the middle of the page.  "I have also --
18 **A.     What page?**
19 MR. SCHUTTE:  Howard?
20 BY MR. FOSTER:
21 Q.     -- analyzed dozens of construction
22 claims involving the analysis of numerous factors,
23 including schedules, delays and disruptions,
24 acceleration, bids, estimates, costs, means and

11

1 methods, and labor productivity and its impact on
2 labor costs."
3 Okay.  Do you see that?
4 MR. SCHUTTE:  Howard, what's being
5 displayed as Exhibit 1 is not his report.
6 MR. FOSTER:  What is being displayed as
7 Exhibit 1?  I asked that it be Mr. Hosfield's
8 report.
9 MR. SCHUTTE:  It's a document that's
10 titled "Hosfield Dep - Group Ex 1" --
11 MR. FOSTER:  Okay.  I'm sorry.  That's
12 the wrong exhibit.  Nohemi, I think you've made the
13 wrong thing as Exhibit 1.
14 THE REPORTER:  The exhibit I was given
15 was marked Exhibit 1.
16 (Whereupon, a discussion was
17 had off the record.)
18 (Whereupon, Hosfield Exhibit 1
19 was introduced.)
20 BY MR. FOSTER:
21 Q.     Do you have a copy of your report,
22 Mr. Hosfield?
23 **A.     Yes, I do.**
24 MR. FOSTER:  Okay.  Scott, do you have a

12

1 copy of his report?
2 MR. SCHUTTE:  I do.  Yeah, that's what I
3 was going to suggest, the same thing.
4 MR. FOSTER:  Why don't we just proceed
5 with the report.  We all know what it is, and we
6 all have a copy of it.  So we'll take care of
7 getting it to the court reporter later.  Okay?
8 BY MR. FOSTER:
9 Q.     On Page 2, in the middle of the page,
10 you say, "I have also analyzed dozens of
11 construction claims involving the analysis of
12 numerous factors, including schedules, delays and
13 disruptions, acceleration, bids, estimates, costs,
14 means and methods, and labor productivity and its
15 impact on labor costs."
16 Do you see that, sir?
17 **A.     Yes, I see it.**
18 Q.     Okay.  How do you define labor
19 productivity?
20 **A.     The amount of progress that's made**
21 **per -- on a particular project because, you know,**
22 **your cost structure would be the amount of progress**
23 **that's made per hour, and the progress would be**
24 **measured based on whatever line item measurement.**

13

1  If it was a lump sum, it might be a percentage of
2  completion if the line item had to do with the
3  quantity, feet of miles driven, concrete poured you
4  want measured based on the quantity, but you would
5  look at these changes of productivity, hours and
6  costs per unit installed, essentially, and impacts
7  of outside events on that labor productivity.
8      Q.   Can you reduce that to a formula?
9      A.   Do I reduce what to a formula?
10     Q.   Can you define productivity as a
11 formula, productivity equals and then -- like an
12 economist would do?
13     A.   Well, I think everybody does it,
14 economists -- I mean, everybody looks -- measures
15 productivity in some way.
16     Q.   I'm asking you your --
17     A.   I think economists probably do it pretty
18 similarly too.
19     Q.   -- (unintelligible) express it as a
20 formula.
21     A.   You generally would calculate it based
22 on a -- depending on the particular situation and
23 the particular area of the project or line item
24 you're measuring, you'd measure it based on cost

14

1  per unit installed or cost per amount of completion
2  that's taken place.
3          You have to -- you'd actually tailor it
4  to that line item or pay item, if you will, that
5  you're measuring the productivity for.
6      Q.   Now, so that's not really a formula that
7  I have in mind such as an economist would provide.
8  It's more like your -- an informal way of thinking
9  about it.  Would you agree with that?
10         MR. SCHUTTE:  Object to form.
11             Go ahead.
12 BY THE WITNESS:
13     A.   I have no idea what you just said.
14 I didn't under- -- you said what I said wasn't a
15 formula like an economist would provide.
16             What do you think is a formula that an
17 economist provides, so I understand what you're
18 talking about.
19 BY MR. FOSTER:
20     Q.   Okay.  So an economist would use a
21 series of variables to express different factors
22 that go into productivity.
23     A.   Okay.  So what you're not -- that's not
24 an economist measuring productivity.  That's an

15

1  economist attempting to estimate the impact of
2  certain variables on productivity.  So that's a
3  different issue.
4      Q.   Right.  Okay.  Can you --
5      A.   What I'm measuring is actual labor
6  productivity on these projects.  Economists are
7  trying to estimate what kind of things may impact
8  productivity, but they don't really measure the
9  productivity itself based on the way you've
10 described the formula.
11     Q.   But I'm having a hard time understanding
12 how you define productivity.  So I'm wondering if
13 you can give me a hard and fast rule or definition
14 or how you express it, in your mind.
15     A.   I think it's the way they do it in the
16 construction industry too.  This is standard stuff.
17             You would look at -- we're not
18 estimating productivity on a project; we're
19 measuring actual productivity.  Economists are
20 attempting to estimate.
21             What you're describing, would be an
22 economist or me or a financial person or a
23 construction manager trying to estimate what types
24 of things might impact, what variables might impact

16

1  labor productivity and to what extent those
2  variables impact it.  And that's what I'm hearing
3  you describe, and that's kind of an imprecise
4  measure of what might happen in a hypothetical
5  situation.
6              What I'm measuring on these projects is
7  how much time and cost were spent for 1,000 cubic
8  feet of concrete for a highway project or to drive
9  80 feet of piles or to accomplish some other amount
10 of dirt moved.
11             I'm observing how much cost and labor
12 hours were spent to do that at various points in
13 time in the project.  And therefore, then you can
14 look at how the labor productivity on that project
15 changed and look at what types of things actually
16 cost to change.  I'm not doing hypotheticals; I'm
17 doing actual things.
18     Q.   So if you're looking at how much cost
19 and labor were spent per hour to do a project,
20 would that be a fair categorization of what you're
21 thinking?
22     A.   That wouldn't even be close to what
23 I just said.  It's not per hour; it's the amount of
24 hours.  And if cost -- if the labor rate is

17

1  different for different groups, it would be the
2  amount of hours and the labor cost that was spent
3  to accomplish a level of production on a project.
4          That's what productivity measures, is
5  how much production is performed, how much
6  completion is accomplished, how much progress is
7  made based upon -- and how many hours it took to do
8  that, and what the ultimate cost was to do that.
9      Q.   So I'm trying again to summarize this to
10 make sure I understand your definition for
11 productivity.
12         Am I correct that the amount of hours
13 and labor costs on a project is how you look at it?
14     A.   That would be a piece of what you would
15 put into it, but I think the answer I just gave is
16 what I would refer you to. That answer stands on
17 its on and describes labor productivity, which is
18 measuring the hours and costs used to accomplish a
19 certain amount of progress on a project. That's
20 the easiest way I can generalize for you. The
21 specific --
22     Q.   You mean hours and products?
23     A.   Each specific project has its own
24 situation you have to consider. Each type of work

18

1  has considerations you have to think about, but
2  it's measuring the actual hours and ultimately the
3  labor cost incurred by the contractor to accomplish
4  progress on a project. That's what productivity is
5  in the construction industry.
6      Q.   Okay. So point me, please, to a place
7  in your report where you have said that. As I'm
8  looking through your report, I'm struggling to find
9  your definition of productivity.
10     A.   I don't know if there was a point where
11 I defined it. It's a standard in the construction
12 industry, I'm not sure I described that in my
13 report if I --
14     Q.   I don't think you did. And since you're
15 referring to your opinion about productivity,
16 I thought that you would do that, but I couldn't
17 find it. Okay?
18     A.   I'm trying to figure out --
19     Q.   You have told me now in this deposition,
20 and so let's move on.
21     A.   Let me just make one comment, is that
22 when I'm answering a question and you jump in as
23 I'm just finishing, it's impossible for me to hear
24 and for the court reporter to take it down, so

19

1  maybe --
2      Q.   I'm -- I'm sorry.
3      A.   May be best to do a little pause after
4  your question and after my answer, just to make
5  sure it's finished, and I think we'll get along
6  better if we do that.
7      Q.   And I totally agree. On the subject of
8  productivity -- But let me step back from that.
9          Would you generally agree that
10 contractors operating in competitive labor markets
11 have to price their services at or close to their
12 marginal cost?
13         MR. SCHUTTE:  Object to form.
14             Go ahead.
15 BY THE WITNESS:
16     A.   I'm not sure what you mean when you ask
17 that question. It doesn't make sense in the
18 context you have asked it. What are you saying?
19 BY MR. FOSTER:
20     Q.   I mean, generally in economics, the
21 price of anything is going to be the marginal cost
22 of production. Would you agree with that?
23     A.   Well, what do you mean by the marginal
24 cost of production in the price? In other words,

20

1  are you saying that a person would price a certain
2  project based on the cost or equal to the cost it
3  causes them to do that project?
4      Q.   Right. Generally, that's correct in
5  ECON 101. A person in a competitive labor market
6  selling anything, widgets, labor, steel, is going
7  to be able to -- would have to price it at its
8  marginal cost, also known as the market price?
9      A.   Yeah, I don't understand. And I have
10 done a lot of work in economics, and I have been
11 considered an expert by the courts in economics,
12 and I don't understand the question you're stating
13 when you say it that way. It doesn't make sense to
14 me. When you say marginal cost --
15     Q.   This is --
16     A.   Marginal cost --
17     Q.   -- marginal cost --
18     A.   Marginal cost in economics and in
19 business and accounting means the additional cost
20 incurred to do an additional amount of work. So
21 what you're asking me doesn't make any sense to me,
22 I'm sorry.
23     Q.   Okay. So what you're saying is you
24 don't understand how marginal cost affects the

21

1 price of anything?
2     **A.**    **No. I'm saying I don't understand your**
3 **question and your use of marginal cost in the way**
4 **you're using it.**
5     **Q.**    Do you believe that marginal cost is
6 related to price?
7     **A.**    **Well, let's go back for just a minute.**
8 **I don't believe marginal cost is related to price.**
9 **It's possible price is related to marginal cost,**
10 **but I need to know what you mean by marginal cost**
11 **because the way you're using it isn't the standard**
12 **way an economist or an accountant would use the**
13 **term "marginal cost," or at least I don't**
14 **understand it to be the same.**
15     **So what do you mean by marginal cost.**
16     **Q.**    What you just said, which is what
17 economists call marginal cost is the cost to
18 produce one additional unit.
19     **A.**    **All right. So your question is, Is the**
20 **cost to produce one additional unit related to**
21 **price?**
22     **Q.**    Yes.
23     **A.**    **And what --**
24     **Q.**    In a competitive labor -- in a

22

1 competitive market.
2     **A.**    **Well, in the construction market, that**
3 **doesn't make sense, that question. I'm sorry, but**
4 **it just doesn't.**
5     **Normally, in a business, if you were**
6 **going to price something, you would price it in a**
7 **way to cover all of your costs and not your**
8 **marginal cost. Theoretically that's true, but if**
9 **you run a business, that way, you will end up going**
10 **out of business.**
11     **I know some economists believe that.**
12 **Other economics understand that you have to cover**
13 **the non-marginal costs too when you're selling**
14 **something. So while there may be some**
15 **relationship, that's not generally the way it's**
16 **priced.**
17     **Q.**    That's not generally the way what is
18 priced?
19     **A.**    **The way -- well, we go back to your**
20 **original question. In a competitive bidding**
21 **situation, I assume you mean in the construction**
22 **environment, they price it based on the costs they**
23 **will incur to do the work, the estimated costs they**
24 **will incur to do the work, and they also may**

23

1 **consider the other contractors they're bidding**
2 **against, and if they know what their costs are,**
3 **they might be able to raise the price a little bit**
4 **or may have to lower the price a little bit.**
5     **But there's so many things that go into**
6 **selecting a contractor when you're creating a bid**
7 **that to simplify it saying that the bid is based on**
8 **marginal cost, besides not really making sense in**
9 **that statement, is oversimplifying it to the point**
10 **where it doesn't help anybody.**
11     **Q.**    Okay. Let me move on. You're critical
12 of Dr. Kaestner's use of union wage data. And if
13 you could please turn -- well, I'm sorry, strike
14 that. I'm going to stay on the subject here of
15 labor productivity.
16     You say in your report at the bottom of
17 Page 8, "The total labor cost to a tenant for
18 moving and renovation projects in commercial office
19 space in downtown Chicago is based on a number of
20 project-specific factors including the labor wage
21 rate, the productivity of the contractor's labor
22 force, the materials used, the competitive bidding
23 environment, and the means and methods employed,"
24 period.

24

1     You do not cite anything to support that
2 statement. Why not?
3     **A.**    **Well, it's based on my experience and**
4 **knowledge. And, frankly, it's common sense.**
5 **I mean, it's just the things you need to consider.**
6 **That's what goes into a bid. That's what goes into**
7 **how fast and how -- and what the cost and hours**
8 **spent are to do a particular project. That's**
9 **common knowledge in the construction industry.**
10     **Q.**    Can you cite me anything that agrees
11 with you that that's common knowledge in the
12 construction industry, a specific --
13     **A.**    **My experience.**
14     **Q.**    Let me finish, sir.
15     **A.**    **Sure. I'm sorry.**
16     **Q.**    An article, a publication, anything that
17 shows it's common knowledge?
18     **A.**    **It's based on -- I suppose I could.**
19 **It's so rudimentary that I didn't bother to look up**
20 **an article on bidding and so forth.**
21     **But it's my experience, it's based on my**
22 **30 or 40 years of working around contractors and**
23 **working with contractors and managing my own**
24 **construction projects. And that's -- it's just**

25

1 very common knowledge. It's basic about what goes
2 into the costs incurred in doing a construction
3 project.
4      Q.     Okay. You said in that sentence that
5 there are a number of factors included, and then
6 you cite several of them.
7           Are there any factors that you didn't
8 cite that are also included in there?
9      A.     Yeah, I mean, there may be others. If
10 you're talking about a tenant moving and renovation
11 project, it may be parking, access to the loading
12 dock, but those are kind of -- they're
13 building-specific kind of issues and area-specific.
14           I gave you the things that are the most
15 common and probably the most impactful there that
16 cross broadly across all projects of this type.
17      Q.     What are the other factors that could be
18 included in certain particular jobs other than
19 parking?
20           MR. SCHUTTE: Object to form.
21           Go ahead.
22 BY THE WITNESS:
23      A.     You know, you would have to look. There
24 may be building hours restrictions for loading

26

1 docks, as an example. It would be more building-
2 specific kind of things.
3 BY MR. FOSTER:
4      Q.     Okay. You then went on to say,
5 Dr. Kaestner's damages methodology is therefore
6 flawed because it is limited to an estimate of a
7 wage differential and ignores several important
8 factors that impact total labor costs, and it's
9 incomplete.
10           You cited nothing to support that view.
11 Why not, at the end of that paragraph?
12      A.     That is my opinion, and it's based on
13 all of the pages that follow. That's a summary of
14 the opinion, and the support for that is on the
15 pages that follow. So it is supported, but it's
16 supported in more detail on the next ten or
17 12 pages.
18      Q.     You didn't cite anything specific to
19 support your conclusion there. Why not?
20           MR. SCHUTTE: Object to form.
21           Go ahead.
22 BY THE WITNESS:
23      A.     It's an opinion. I'm not sure what one
24 would cite except all of the things that I cite

27

1 specifically to support that opinion in the next
2 ten pages or so. There's ten pages of support.
3 BY MR. FOSTER:
4      Q.     Well, experts are required to -- are you
5 done, sir?
6      A.     That's -- I was going to say that's an
7 example where you have to let me finish.
8           I cite specific documents as a basis and
9 reasoning and support for that opinion in the next
10 ten pages. That's kind of a summary statement of
11 my opinion as to that particular aspect of
12 Dr. Kaestner's report.
13      Q.     Are you done now, sir?
14      A.     I am.
15      Q.     Okay. Experts are required to show the
16 court the facts or data that go into their opinion.
17           So I'm asking you, specifically what
18 facts or data went into that opinion?
19      A.     I just answered that question. Can
20 I have my answer read back?
21      Q.     Well, you said that's the ten pages.
22 That's not specific enough for me. So could you
23 please be more specific.
24           MR. SCHUTTE: I'm going to object to

28

1 form. Asked and answered.
2           Ms. Hosfield, you can try to do
3 your best with answering the question again.
4 BY THE WITNESS:
5      A.     Look, I can go through the next
6 ten pages, if you want specifics. You can either
7 ask questions about it, or I'll just narrate for
8 you, but it sounds like you're asking for a
9 narration, so I will do that.
10           The first comment in there is
11 productivity of contractor's labor force. So if
12 you go to Page 91, I say, "Dr. Kaestner has not
13 properly accounted for any of the potential
14 differences in productivity between union and
15 non-union labor that would impact the total cost of
16 labor to Plaintiff and the putative class."
17 BY MR. FOSTER:
18      Q.     Okay. Could you stop there, sir. Let
19 me just find where you are. You're on Page 9?
20      A.     Right. I'm in the very next sentence
21 after you ended where I make a statement and then
22 I give you --
23      Q.     Are you looking at topic heading
24 number 1 on Page 9?

29

1    **A.    Right.  This is the beginning of the**
2  **ten pages of specifics that you wanted that support**
3  **that particular conclusion.  So --**
4    **Q.**    I'm looking -- where were you reading
5  from, just which sentence?  "Dr. Kaestner has not
6  properly accounted for," is that the topic heading
7  No. 1?
8    **A.    It is.**
9    **Q.**    In bold?
10   **A.    Yes.**
11   **Q.**    Okay.  That's fine.
12   **A.    Do you want me to go on, or do you want**
13 **to ask questions?**
14   **Q.**    Let me ask you this, Mr. Hosfield.  You
15 say he has not properly accounted for any of the
16 potential differences in productivity between union
17 and non-union labor that would impact the total
18 cost.
19        He did, however, examine what he
20 considered to be differences in productivity.
21   **A.    No, he did not.**
22   **Q.**    He did, as I understand it, but the only
23 thing he didn't look at is whether the workers are
24 union versus non-union.  Would you agree that he --

30

1    **A.    And he -- go ahead.**
2    **Q.**    On Page 6, he cites in his chart the six
3  factors that he considered in which he believes
4  affect productivity:  Age, education, et cetera.
5        MR. SCHUTTE:  Are you asking him to look
6  at the Kaestner report?
7            And, Mark, take your time.
8        MR. FOSTER:  Let me finish, Scott.
9            (Whereupon, Hosfield Exhibit 3
10           was introduced.)
11 BY MR. FOSTER:
12   **Q.**    My question to you is, Isn't it true
13 that he did consider the relevant factors affecting
14 productivity, as he saw them?
15   **A.    Are you asking me to look at the**
16 **Kaestner report?**
17   **Q.**    Yes.
18   **A.    Okay.  I do have a copy of it here.  And**
19 **you're looking at Page 6?**
20   **Q.**    Correct.
21   **A.    And I don't see anywhere on this Page 6**
22 **where he talks about anything having to do with**
23 **productivity.**
24   **Q.**    Adjustment No. 1, if you look on Page 6,

31

1  "adjusts for differences in the age and education
2  composition of union and non-union workers."
3        Do you see that?
4    **A.    I'm on Page 6.  Page 6 starts with a**
5  **table called Estimates of the Union Wage Premium by**
6  **Occupation.**
7    **Q.**    All right.  And if you go down to the
8  bottom of that table there, he explains the
9  adjustments?
10   **A.    Yeah, he is not adjusting for the**
11 **productivity between union and non-union workers.**
12 **He is attempting to adjust for various demographics**
13 **that have nothing to do with productivity.**
14   **Q.**    Do you think those factors affect
15 productivity --
16   **A.    I read the -- I see his report.  I read**
17 **the sentence you referred to, those demographics,**
18 **and there's no demonstration that they have**
19 **anything to do with productivity, nor did the study**
20 **you referred to make such a suggestion.  So --**
21   **Q.**    What --
22   **A.    No, he has not adjusted for the**
23 **difference between union and non-union, and you**
24 **have something --**

32

1    **Q.**    Mr. Hosfield, I think you're
2  interrupting me now.  I thought you were done, I
3  tried to get in a question, and you cut me off.
4    **A.    Okay.**
5        MR. SCHUTTE:  Well, Howard, hold on.
6  You said you thought he was done, and you were
7  wrong.  He was finishing his answer.  And now he's
8  finished.  You can ask your next question.  I know
9  this is difficult for everybody, but just let him
10 finish his answer.
11       MR. FOSTER:  Yeah, I'm trying.
12 BY MR. FOSTER:
13   **Q.**    Are you done, Mr. Hosfield, with your
14 answer?
15   **A.    I suppose I am at this point, yes.**
16   **Q.**    You suppose.  If you're not sure, you
17 can keep going.
18   **A.    I would say that he has not done an**
19 **adjustment for productivity between union**
20 **productivity and non-union productivity, and he's**
21 **done some kind of strange demographic comparison**
22 **which has nothing to do with productivity.  So --**
23   **Q.**    Are you done?
24   **A.    I am done with that answer.**

33

**Page 34**

1    Q.    Okay.  So I take it then you are of the
2 opinion that union labor is more productive than
3 non-union labor in every case; is that correct?
4    A.    What do you mean by in every case?
5    Q.    In every case.  Is a union contractor
6 going to be more productive in completing the same
7 job as a non-union firm?
8    A.    I don't know what you mean by in every
9 case, so I'll answer it without the "in every
10 case."  I don't know what you mean by that.
11        I do know that the studies, some of
12 which Dr. Kaestner cited, contain information in
13 them that would -- and studies that demonstrate
14 that union construction labor is generally more
15 productive and more efficient than non-union, and
16 while that productivity gap narrowed between the
17 '70s and the early '80s, there is still a
18 significant productivity advantage to using union
19 labor that has not changed, according to the couple
20 of studies I saw in there, in terms of their
21 ability to get work done in less time and more
22 efficiently than non-union labor.
23        That's also consistent with my
24 experience in the industry that I used to manage.

**Page 35**

1 And so that's the information that you would look
2 at to determine if there's a reason for a wage gap,
3 because as an economist, you would know that if
4 there was no reason to hire higher-paid laborers,
5 you would then hire the lower-paid laborers.
6    Q.    Are you done with your answer, sir?
7    A.    Yes.
8    Q.    So what I didn't hear from you is any
9 definitive statement to the effect that union labor
10 is more productive than non-union labor.  Do you
11 believe that?
12        MR. SCHUTTE:  Object to form.
13 BY THE WITNESS:
14    A.    I believe that the studies -- I believe
15 it's true because there have been studies that have
16 shown that it's true, and the studies and my own
17 experience tells me that it's true.
18 BY MR. FOSTER:
19    Q.    Are you done?
20    A.    Yes.
21    Q.    What studies are you referring to in
22 your answer?
23    A.    Well, there's a couple of studies that
24 are referenced in articles by a guy named Allen

**Page 36**

1 that Dr. Kaestner took certain parts out of that
2 but did not discuss the differences in
3 productivity, that analyze where there is a wage gap
4 between union and non-union labor and whether it
5 could be explained by differences in productivity,
6 among other things.  Those are two of them.
7        And one was a study, and I think one was
8 kind of a follow-up, and then there was another
9 article that was cited by Dr. Kaestner that had
10 some similar information demonstrating that union
11 labor is more productive than non-union labor in
12 the construction industry.
13    Q.    You read those two studies in
14 conjunction with preparing your report for this
15 case; is that correct?
16    A.    I read the articles, right.
17    Q.    You read them for the first time after
18 you read Dr. Kaestner's report; is that correct?
19    A.    Those particular papers, yes.
20    Q.    So you had never in your entire career
21 read any study about the productivity of union
22 labor until you read those two articles; is that
23 correct.
24    A.    No, that would not be correct.  No.

**Page 37**

1 I mean, it's an issue that you -- that's been
2 studied quite a bit.  So no, it's for purposes of
3 this report, I looked at the studies Dr. Kaestner
4 looked at and selected a few others, but I read
5 studies and information coming to these same
6 conclusions on productivity over the years.
7    Q.    Can you cite one that you've read over
8 the years other than just describing one?
9    A.    I haven't kept track of them.  There was
10 one by Belman that was also in Dr. Kaestner's
11 report that has a similar conclusion, but no,
12 I haven't kept track of all the papers I've read
13 that summarized studies showing that union labor is
14 more productive than non-union labor.
15    Q.    Belman was also study that was cited by
16 Dr. Kaestner in his report, right?
17    A.    I think I just said that, yes.
18    Q.    So it sounds like you read three
19 articles after reading Dr. Kaestner's report to
20 prepare your report in this case, all of which
21 addressed this topic; is that correct?
22    A.    I did a lot -- I did some of my own
23 research too, but I did read the studies that
24 Dr. Kaestner read.  One of the things I did was

1  read the studies that Dr. Kaestner cited to see
2  what they said and what the basis for the
3  conclusions were in the studies.
4      Q.    Okay.  So let me take that apart piece
5  by piece, if I could.
6          You said you did your own work other
7  than reading these studies in preparing your report
8  on the question of the productivity of union labor.
9          What work did you do on that issue for
10  your report?
11     A.    I know with respect to looking for
12  studies on my own, I think there are a couple that
13  he didn't look at that I've cited.  But the first
14  place I started were to see if the studies he cited
15  and he considered authoritative address the issue
16  of union versus non-union productivity differences.
17     Q.    So I see you looked at the ones that he
18  cited.  I understand that.
19          What else did you look at?
20     A.    Well, I looked at -- I did some of my
21  own research looking for articles that addressed
22  the topic as well.
23     Q.    And what articles did you look at in
24  your own research?

38

1      A.    I would have to go through my list and
2  compare it to what Dr. Kaestner's list had, to see
3  what he didn't look at.
4      Q.    Your report doesn't cite any of those
5  articles; does it?
6      A.    Well --
7          MR. SCHUTTE:  Object to form.
8          Go ahead.
9  BY THE WITNESS:
10     A.    I don't know that that's true, but
11  I would have to go back and look, I mean, to the
12  extent I found anything on productivity.  There was
13  enough in the article that Dr. Kaestner found that
14  would demonstrate that there's a productivity
15  difference, but I would have to go look through my
16  Exhibit 2 and through his list of documents
17  considered and see what the differences are.
18  BY MR. FOSTER:
19     Q.    Why don't you take a minute and do that,
20  because I would like you to tell me definitively
21  what you looked at, what you considered in coming
22  to this opinion that union labor is more productive
23  than non-union labor.
24     A.    Okay.

39

1      Q.    Okay?  So let's just go ahead and look
2  at your exhibits, sir.
3          MR. SCHUTTE:  Howard, while Mark is
4  doing this, can we confirm something?  So I see Jim
5  is participating and I see Matt is participating.
6  There's somebody listed as Howard User 5.
7          (Whereupon, a discussion was
8              had off the record.)
9  BY THE WITNESS:
10     A.    I think the only one that -- this is to
11  answer your question.  The only one that I found
12  that I considered, or at least used -- I may have
13  found others, but the only one I used was the first
14  academic publication called The Fall and Future of
15  Unionism in Construction.  That's one that he did
16  not cite.
17          I think the rest of those -- I had
18  enough in the article that he cited to talk about
19  unionism and wage differences and so forth.  There
20  were a couple of other articles that I found, but
21  they didn't necessarily have to do with
22  productivity directly; they had to do with other
23  things.
24

40

1  BY MR. FOSTER:
2      Q.    What page are you on, Mr. Hosfield, in
3  your report?
4      A.    Exhibit 2.
5      Q.    Right.  What page is that?  The pages
6  are numbered.
7      A.    It should be the last page, the last
8  exhibit in the document.  It's Page 1 of 2 for
9  Exhibit 2.
10     Q.    Okay.  And does that report that you
11  just cited come to a conclusion as to how much more
12  productive union labor is as to non-union labor?
13     A.    I don't know if it does or not.
14  I haven't looked at it since I issued my report,
15  I don't think, so I don't recall whether it comes
16  to such a conclusion.
17     Q.    And I know your report does not come to
18  a conclusion as to how much more productive union
19  labor is as to non-union labor, and I want to ask
20  you why not.
21     A.    Well, my job was to discuss the report
22  and work that was done by Dr. Kaestner as to
23  whether it was reliable.  My job was not to make up
24  for the deficiencies in his report by doing the

41

1 analysis and research that is required to support
2 his opinions.
3     Q.    But he didn't opine that union was more
4 productive than non-union labor; you do, as I
5 understand it.  So I'm asking you, How much more
6 productive is it?
7         MR. SCHUTTE:  Object to form.
8         Go ahead.
9 BY THE WITNESS:
10     A.    He opines as to the difference in wage
11 rates, and my opinion is that he needed to consider
12 the difference in productivity to determine the
13 difference in costs that are damages in this case.
14     He hasn't measured the damages; he's
15 measured something quite simple, which is the
16 difference in wage rates between union and
17 non-union.  The way he went about doing that I
18 disagree with and I think is unreliable, but he did
19 attempt to measure the difference in the wages for
20 union and non-union labor in the Chicago Loop.
21 BY MR. FOSTER:
22     Q.    Are you done with your answer, sir?
23     A.    Yes.
24     Q.    Okay.  You did not answer my question.

42

1 So I'm going to re-ask it.
2         Why did you not determine how much more
3 productive union labor is than non-union labor in
4 your report?
5         MR. SCHUTTE:  That's asked and answered.
6         Go ahead and answer it again.
7 BY THE WITNESS:
8     A.    That was not my job.  My task was to
9 look at Dr. Kaestner's report and determine whether
10 it was a reliable measure of the damages in this.
11 And one of the reasons it is not, I came to the
12 conclusion, is because he failed to consider the
13 difference in productivity between union and
14 non-union labor, among other things.  It wasn't my
15 job to go fill in the holes in his report, to do
16 the things he failed to do.
17 BY MR. FOSTER:
18     Q.    Could you please turn to Page 11 of your
19 report, sir, the second paragraph, the paragraph
20 that begins with "In fact, according to a study."
21         "In regards to the productivity
22 differential between union and non-union workers,
23 a 2004 article stated that 'union workers are more
24 productive than like workers in a non-union

43

1 environment.'
2         "In certain instances, the productivity
3 difference is demonstrably large enough to overcome
4 the wage differential."
5         I take it, then, you're not able to
6 determine whether productivity differences in
7 Chicago Loop buildings would be enough to overcome
8 the wage differences that exist; is that correct?
9         MR. SCHUTTE:  Objection to form.
10         Go ahead.
11 BY THE WITNESS:
12     A.    I have not done a study of the Chicago
13 Loop productivity for this type of worker or these
14 types of workers.  I think the Allen studies come
15 closest because I think they focused on internal
16 improvement, shopping centers, and things like
17 that, as I recall.  But no, I have not done a study
18 to determine that.
19         And the study that was -- I think it was
20 Belman, is it, where they say in certain instances
21 they focused on productivity and demonstrated that
22 it was one of the reasons for the wage
23 differential, but I don't know that they identified
24 any instances where there wasn't sufficient

44

1 productivity difference to overcome the wage
2 differential.
3 BY MR. FOSTER:
4     Q.    But you're not able to say that if class
5 members used union labor in this particular case,
6 it would cost less than non-union labor because of
7 increased productivity; are you?
8     A.    I don't know that it would cost less.
9 I think that the cost would be probably about the
10 same, would be my guess, given the way that the
11 non-union -- given what non-union contractors may
12 be bidding.  But no, I haven't done a study to show
13 that union labor costs less because of
14 productivity.
15     Q.    You said that you think it might be
16 about even in the Chicago Loop.  You didn't say
17 that anywhere in your report.  Why not?
18         MR. SCHUTTE:  Object to form.  Asked and
19 answered.
20         Go ahead.
21 BY THE WITNESS:
22     A.    I'm just answering your questions.
23 I think you can imply that through the studies and
24 so forth in the report.  But, again, I am analyzing

45

1 what Dr. Kaestner did or didn't do. I didn't use
2 my report to fill in the holes in his report and
3 make up for his failures.
4 BY MR. FOSTER:
5 **Q.** So you can't, sitting here today, say
6 that any class member would not have been damaged
7 if they used union labor because of productivity
8 differences; is that correct?
9 MR. SCHUTTE: Object to form.
10 Go ahead.
11 BY THE WITNESS:
12 **A. I don't think, based on Dr. Kaestner's**
13 **work and my review of his work that you can say**
14 **that any class member was or wasn't damaged. He**
15 **just hasn't done the work to determine whether**
16 **there were any damages or not.**
17 BY MR. FOSTER:
18 **Q.** Do you have an opinion then as to
19 whether non-union contractors could do the work in
20 these Chicago Loop buildings at a lower cost than
21 their union counterparts?
22 **A. I don't think I understood that**
23 **question.**
24 **Q.** Could non-union firms do the work for

46

1 these class members, in these Jones Lang and
2 LaSalle buildings, at the same cost as non-union
3 firms?
4 MR. SCHUTTE: Object to form.
5 Go ahead.
6 BY THE WITNESS:
7 **A. I think you asked me about non-union and**
8 **then at the same cost as non-union at the end of**
9 **that.**
10 BY MR. FOSTER:
11 **Q.** Do you understand my question, sir?
12 **A. No. Try it one more time. I don't.**
13 **Q.** Okay. Do you have an opinion as to
14 whether the class members -- and do you know who
15 the class members are in this case? What's --
16 **A. We know one of them, and we know how**
17 **they're described, yes.**
18 **Q.** Okay. So do you have an opinion as to
19 whether the class members would have saved money if
20 they had been able to use non-union firms to do
21 their build-outs in these buildings?
22 **A. Well, I have seen nothing to demonstrate**
23 **that that is true.**
24 **Q.** But you don't come to any opinion that

47

1 it wouldn't have saved money; is that correct?
2 **A. I've merely analyzed Dr. Kaestner's**
3 **report. There's no evidence that they would have**
4 **saved money -- that the class members, putative**
5 **class, would have saved money if they had been**
6 **allowed to use non-union labor in these buildings,**
7 **but I haven't -- and Dr. Kaestner's report**
8 **certainly doesn't support that theory.**
9 **Q.** But if there were any -- if productivity
10 didn't make up for the difference, wouldn't the
11 cost of non-union labor be less?
12 **A. Maybe or maybe not. It depends on what**
13 **the non-union contractors decided to bid. If they**
14 **knew that they had -- that the union contractors**
15 **had to bid higher to cover their labor costs, then**
16 **the non-union people would have bid closer to that**
17 **so that they could make a higher profit if they**
18 **really could. So there is no evidence that --**
19 **Q.** Non-union laborers just can't do -- it's
20 more competitive, and they don't have that much
21 discretion in what they're bidding?
22 **A. I don't know what you mean by that. Are**
23 **you trying to tell me that contractors don't have**
24 **any discretion on how much they bid for a project?**

48

1 **Q.** I'm asking you. If it's in a really
2 competitive market, wouldn't their discretion go
3 down?
4 **A. Well, that would be true across the**
5 **board. No, in a competitive market -- I mean, if**
6 **you think hypothetically in a market where somebody**
7 **has a huge cost advantage -- and there's no**
8 **demonstration that the non-union contractors have**
9 **such a cost advantage because of the reasons cited**
10 **in my report in part.**
11 **But if there were two entities that had**
12 **a huge cost advantage, and you know one entity had**
13 **to bid $100,000 for a project, there's no reason**
14 **for you to bid anything less than 95,000 or 98,000**
15 **to get the work, unless that other contractor is**
16 **better than you are or more productive.**
17 **Q.** I'm sorry, sir. Are you done?
18 **A. Yes.**
19 **Q.** You seem to assume that contractors can
20 bid up to the price of union labor --
21 MR. SCHUTTE: Object to form.
22 BY MR. FOSTER:
23 **Q.** -- just a few dollars less, but that may
24 not be the case. You have no data that show that,

49

**Page 50**

1  right?

2     A.     What may not be the case?

3     Q.     Well, if a non-union firm has the

4  discretion to bid close to the union price for a

5  job without losing the job to a competitor because

6  a competitor is bidding less?

7     A.     They have the discretion to bid what

8  they think they can get, and that's how contractors

9  typically bid.

10     Q.     Sure. Okay. Are bids ever secret and

11  sealed?

12     A.     They are in certain situations, yes, and

13  in certain situations they are open. But in

14  certain situations, they are secret and sealed.

15     Q.     So if a bid is secret and sealed,

16  wouldn't a contractor try and bid competitively?

17     A.     But in your hypothetical you gave me

18  where you have a non-union contractor who

19  hypothetically -- and I don't think this is a true

20  hypothetical -- had exactly the same productivity

21  as a union contractor and hypothetically had much

22  lower wages, they would know what the union wages

23  are. That's not a secret.

24     And they would know how many hours -- if

**Page 51**

1  they had the same productivity as the union

2  contractor, they would know how many hours it took.

3     So all they have to do is say, well, I'm

4  going to take the same amount of hours to do the

5  work that the union contractor is going to do, and

6  they're going to charge a certain amount, so I'll

7  charge a little less, or I'll factor in costs for a

8  little less, because I know what they have to bid

9  if our hours are the same.

10     The problem with that is they don't know

11  what the hours are that the union contractor has to

12  spend because they don't have same productivity.

13     Q.     Okay. But that's why --

14     A.     That's why your hypothetical is not

15  really --

16     Q.     I mean, how would you support your

17  theory that a non-union firm can bid up to close to

18  what the union bid is? How could that happen if

19  the non-union firm has imperfect information?

20     A.     Well, I'm saying it's not imperfect

21  information. It's that they -- unless they had the

22  same productivity or similar productivity, they

23  wouldn't -- I mean, you could either bid that high

24  if your productivity was half of what the union

**Page 52**

1  contractor's was. You would have to bid that high,

2  and so it would be a competitive bid.

3     But if your productivity was less, you

4  could still bid more than that wage differential

5  because you know that you're going to be less if

6  your productivity was exactly the same. So you

7  know you're going to be less by filling part of

8  that gap, and therefore the wage differential no

9  longer measures the cost difference to the

10  landlord.

11     Q.     Okay. My point is if you don't know

12  that the productivity is large enough to overcome

13  the wage gap, then you can't predict how a

14  non-union firm is going to price -- bid its labor;

15  isn't that correct?

16     A.     Well, basic economics says if they can

17  get a bigger piece of the pie than just -- you

18  know, they're not going to bid off the wage

19  differential, as Kaestner seems to suggest. That's

20  ridiculous, because if they had the same

21  productivity or similar, then they know what the

22  union contractor has to bid, and they're going to

23  bid -- they're going to close that gap.

24     So the wage differential can't possibly

**Page 53**

1  measure the difference of what a competitive bid

2  would be, even if their productivity were the same,

3  which it isn't.

4     Q.     I'm sorry. Go ahead and finish.

5     A.     I'm finished.

6     Q.     Do you know of any economists who are of

7  the opinion that the potential increase in

8  productivity in union labor is not enough to offset

9  their higher wages?

10     A.     I haven't asked a lot of economists that

11  question. That is -- and I don't know of any who

12  have an opinion one way or the other on that,

13  personally.

14     MR. FOSTER: Okay. Could we take a

15  short break?

16     MR. SCHUTTE: Sure. It's 11:12. Could

17  we come back at 11:20?

18     MR. FOSTER: Yeah, that's fine.

19     (Whereupon, a short break was

20     taken.)

21  BY MR. FOSTER:

22     Q.     All right. Mr. Hosfield, so to resume,

23  as we've discussed before, Dr. Kaestner identified

24  six factors in his report that he believed affected

1 productivity. Is it your opinion that none of
2 those affect productivity?
3 **A.      Point to me in his report where he**
4 **identified six factors that he thought affected**
5 **productivity.**
6 **Q.**      We've been there before. Let's look
7 again. Page 8. He adjusts for age, education --
8 age, race, gender, and education. It's on Table 1,
9 at the bottom of Table 1. He makes two
10 adjustments.
11          MR. SCHUTTE: I think you said six. Are
12 you just pointing to those four?
13          MR. FOSTER: Please don't interrupt.
14          MR. SCHUTTE: Well, you made such a big
15 deal on the fact that it was six adjustments, and
16 then he asked you to identify where, and you said
17 four of them.
18          MR. FOSTER: May I ask a question,
19 please.
20               Is the court reporter there?
21          THE REPORTER: I'm here.
22          MR. FOSTER: Can you hear me? I think
23 we have a problem. I'm sorry, Nohemi, can you hear
24 me?

54

1          THE REPORTER: I can hear you.
2          MR. FOSTER: Okay. Nohemi? Let me
3 re-ask the question. Okay?
4 BY MR. FOSTER:
5     **Q.**      Dr. Kaestner identified various factors
6 which he controlled for in accounting for
7 productivity. They are listed at the bottom of
8 Table 1. Adjustment 1 adjusts for the differences
9 in age and education. Adjustment 2 affects for
10 differences in the age, race, gender, and
11 education.
12          Is it your opinion, Mr. Hosfield, that
13 these factors do not have any effect on
14 productivity of workers?
15 **A.      I read the study, and I didn't see them**
16 **as having impact. This is actually differences in**
17 **composition. But I don't know that race has any**
18 **difference in productivity. I didn't read the**
19 **study and come to the conclusion that people, their**
20 **race or gender had any impact in productivity or**
21 **that age has it.**
22 **I think your question was that he**
23 **identified six factors here, and I don't see the**
24 **six factors, I never have. I have only seen four.**

55

1     **Q.**      Excuse me. I may have misstated the
2 number six. So that's why I have rephrased the
3 question.
4     **A.      Okay. Yeah, I don't -- first of all,**
5 **I don't think this has -- these aren't the types of**
6 **things that would have any big impact on**
7 **productivity, but I don't know that -- I'm not of**
8 **the opinion that age, race, gender has any impact**
9 **on productivity necessarily.**
10 **I know that when I re-read that article**
11 **the other day, that union workers by and large,**
12 **their educational -- they had higher levels of**
13 **education than the non-union workers do and than**
14 **they used to.**
15 **So I know there have been some changes**
16 **over time in these things, but I didn't -- this**
17 **isn't an adjustment for productivity that covers**
18 **training and skill levels and so forth; this is**
19 **demographic information, and I'm not of the opinion**
20 **that this is an adjustment for productivity, no.**
21     **Q.**      So let me just take it one by one to
22 make sure I'm right.
23          Are you saying that age does not have a
24 bearing on productivity?

56

1     **A.      I have to go look at the article again,**
2 **but I don't know that -- I can look at the article**
3 **if you have it here.**
4     **Q.**      What article are you referring to, sir?
5     **A.      The article that he got this information**
6 **out of.**
7     **Q.**      What article is that?
8     **A.      That's -- when I said I'm looking for**
9 **the article, I will tell you when I find it. Hang**
10 **on. Somewhere he came up with this --**
11     **Q.**      Is it correct to say you're just
12 mimicking what you're reading in the article, you
13 have no basis for agreeing or disagreeing with
14 this?
15          MR. SCHUTTE: Object to form.
16 BY THE WITNESS:
17     **A.      It's not correct to say that.**
18 BY MR. FOSTER:
19     **Q.**      What factors are you using --
20     **A.      I'm trying to recall where he got the**
21 **information he adjusted and what this came out of,**
22 **and I don't see it cited in his report, so I**
23 **probably have to go back to the table where he**
24 **created it, which I don't have in front of me.**

57

**Page 58**

1    Q.    Okay.

2    A.    My recollection is that the article

3  talked about demographic information, and it had to

4  do with union density or make-up but did not have

5  to do with productivity.

6    Q.    Okay.  But, sir, you didn't answer my

7  question.  So I'm going to come back and try and

8  get you to answer it.

9        Are you of the opinion that age has no

10  bearing on productivity?

11        MR. SCHUTTE:  Object to form.

12        Go ahead.

13  BY THE WITNESS:

14    A.    I don't think you can adjust for

15  productivity the way he's done it.  I don't know

16  whether age, because it's -- I don't know that

17  that's true one way or the other.

18  BY MR. FOSTER:

19    Q.    Okay.

20    A.    Because as a union worker gets older,

21  they get more experienced.  So probably as you get

22  older, you're more productive, I would say, as you

23  get out of apprentice.

24        I don't think the way he's adjusted this

**Page 59**

1  has anything to do with the productivity that needs

2  to be considered, which is the training and the

3  skill level that a person has in the particular

4  occupation and the experience.

5        Certainly, gender and race, I don't

6  believe, are things that would have any difference,

7  but again, I recall this article -- unless you have

8  the article, I recall this article having to do

9  with population density within the unions and not

10  having to do with productivity, but population

11  density and how it's changed.

12  BY MR. FOSTER:

13    Q.    Do you have an opinion as to whether age

14  has any bearing on productivity?

15    A.    It might, and I don't know what it is,

16  but I don't think the way he used the study

17  information was appropriate in trying to adjust for

18  it.  It wouldn't be the largest factor that I would

19  look at certainly.  I just -- the study did not --

20  as I recall, the study talked about population

21  densities.

22    Q.    Do you have any opinion at all as to

23  whether gender has a bearing on productivity?

24    A.    Again, I would have to look at the

**Page 60**

1  article.  I don't know that it does.  No,

2  I wouldn't expect it to have much of a productivity

3  factor.

4    Q.    Is that based just on the article, or is

5  this based on your experience?

6    A.    It's my expectation and my experience.

7    Q.    What experience do you have in measuring

8  gender on productivity?

9    A.    I have not -- I haven't tried to measure

10  productivity differences between genders.

11    Q.    Okay.  What about education?  Does

12  education --

13    A.    The education in the --

14    Q.    -- have a bearing on productivity?

15    A.    The education in the article had little

16  to do with productivity, well, maybe a slight

17  thing.  It would be -- nothing in here would have

18  the same impact that the apprenticeship and

19  training programs and the experience that you would

20  get that a union would have.

21        So these are all -- to the extent there

22  is any change, it's minor, but as I recall, there

23  were more people in unions in the population

24  density today that had a high school education or

**Page 61**

1  higher than there were 20 years ago, is what the

2  conclusion was.

3    Q.    Are you saying that education has no

4  bearing on productivity?

5    A.    I'm saying it may or may not, but the

6  study, as I recall, talked about population

7  density.

8    Q.    Okay.  All right.  Moving on.

9        You said on the bottom of Page 9 that

10  Dr. Kaestner makes no attempt to account for the

11  differences in productivity attributable to whether

12  laborers are union-affiliated or not.  And to that,

13  you cite to just your own opinion.

14    A.    Which page are you on?

15    Q.    I'm on Page 9 of your report?

16    A.    Okay.

17    Q.    The bottom of Page 9, last paragraph,

18  and Dr. Kaestner makes no attempt to account for

19  the differences in productivity attributable to

20  whether labors are union-affiliated or not.

21        My question to you is, what basis do you

22  have that union members are more productive than

23  non-union members?

24    A.    Well, we have already talked about this.

1  You've already asked me about the studies that were
2  recited in Dr. Kaestner's report and my own
3  experience.
4      Beyond the answer that I gave you the
5  last time you asked me that question, I can't
6  really add to that, I don't think.  It's my
7  experience, the studies I've looked at, my
8  experience with construction and my own labor force
9  at one point.
10     Q.    If you could turn the page, please, to
11 Page 10.  You say in the last paragraph, "The CPS
12 dataset incompletely captures the human capital of
13 workers because it does not include variables that
14 measure training, such as certification or
15 apprenticeship programs."  And you've mentioned
16 certification and apprenticeship here today a
17 number of times.
18     How do you measure the affect of
19 certification and apprenticeship on productivity?
20     A.    You would have to do a productivity
21 study to determine whether -- people who have been
22 through those programs and how much more productive
23 those people are than people who have not been
24 through those programs.

62

1      Q.    Have you done such a study?
2      A.    No.  I haven't been asked to.  Again, my
3  job here is not to make up for Dr. Kaestner's
4  failures but to determine whether his report forms
5  a reasonable basis for the measurement of the
6  claimed damages in this matter.
7      Q.    You said on Page 12, the last paragraph,
8  "Not only does the increase in productivity have a
9  direct impact on wage differential, but it can also
10 provide an indirect impact as well.  For example,
11 due to the increased productivity associated with
12 union workers, a union employer can in turn use
13 less workers to complete a job."
14     Do you have data to back that up?
15     A.    Well, that's a natural conclusion.  So
16 if you have more productive workers and it would
17 take somebody else ten people to complete a job,
18 and you're able to do it because your workers are
19 more productive, you can complete it with nine
20 people.  You would save not only the wages of the
21 tenth person, but you would save the FICA, the
22 payroll taxes, the unemployment, the health
23 insurance, all the other things, the union dues
24 that go into the cost of a worker.

63

1      So it just follows, if you have more
2  productive workers on a project that requires
3  workers, you then can sometimes use less and save
4  even more money.
5      Q.    Okay.  I understand what you're saying.
6      Are you familiar with the concept of
7  featherbedding?
8      A.    I generally know the idea, yeah.
9      Q.    The idea generally is that unions hire
10 very often too many workers.
11     How does featherbedding then come into
12 play vis-à-vis the productivity of union workers?
13     MR. SCHUTTE:  Object to form.
14     Go ahead.
15 BY THE WITNESS:
16     A.    I think you're talking about a theory,
17 and so you're asking how a theory impacts the
18 productivity of union workers?
19 BY MR. FOSTER:
20     Q.    Yeah.  That would be --
21     A.    Well, what the theory --
22     Q.    If unions tend to hire too many workers,
23 then what you just said about their productivity
24 gains would be lost or diminished because they've

64

1  got too many workers hired; isn't that true?
2      A.    Your question is a hypothetical that I
3  don't believe is true in most situations because
4  union contractors still have to compete with each
5  other.  And so if one did that, they would
6  experience higher costs than the other, and they
7  wouldn't get the work.  So it economically doesn't
8  make a lot of sense to work with that,
9  hypothetically --
10     Q.    Don't you think there is such a thing as
11 featherbedding?
12     A.    However --
13     Q.    Hold on.  Let me --
14     A.    You've got to -- you've got to let me
15 finish --
16     THE REPORTER:  I'm sorry.
17 BY MR. FOSTER:
18     Q.    I'm sorry, Mr. Hosfield --
19     A.    -- especially when I'm still talking.
20 If you're going to interrupt, do it when I'm
21 paused, not when I'm talking.
22     THE REPORTER:  I'm sorry.  I didn't get
23 most of that there.  I didn't get that.
24     THE WITNESS:  Yeah, you did get it?

65

**Page 66**

1        THE REPORTER:  No, I couldn't get it.

2        THE WITNESS:  Yeah, that's what I

3 thought.  Okay.

4 BY THE WITNESS:

5    **A.**    **If a union contractor is competing**

6 **another union contractor and one hires too many**

7 **employees -- which is a hypothetical.  I'm not**

8 **aware of any evidence or studies in the Chicago**

9 **Loop that anyone has put forth in this case that**

10 **that's true.  The company that was featherbedding**

11 **would not get there work because their costs would**

12 **be higher.**

13 BY MR. FOSTER:

14    **Q.**   Are you done with your answer?

15    **A.**   **Yes.**

16    **Q.**   Okay.  Are you saying you're not aware

17 of any studies addressing the phenomenon of

18 featherbedding, or you're not aware of any studies

19 that have looked at in the Chicago Loop?

20    **A.**   **I'm aware that one of the articles**

21 **mentioned that theory 30 years ago or 40 years ago**

22 **when the unions were larger and more powerful.**

23 **I have seen nothing that it would be true, nothing**

24 **that suggests that that is true, that that theory**

**Page 67**

1 **is still taking place today, and I have seen**

2 **certainly nothing to be able to -- nothing that**

3 **would suggest that it's taking place in the Chicago**

4 **Loop in these office renovation projects.**

5    MR. FOSTER:  Okay.  I would like to make

6 an exhibit now, to introduce an exhibit, please.

7 This is the exhibit, the Jones Lang and LaSalle

8 document.  It's a one-page document.  Could we

9 call this is Wacker Drive Executive Suite Exhibit

10 No. 2, please.

11        (Whereupon, a discussion was

12        had off the record.)

13        (Whereupon, Hosfield Exhibit 2

14        was introduced.)

15 BY MR. FOSTER:

16    **Q.**   Mr. Hosfield, do you see the exhibit, a

17 Jones Lang and LaSalle document?

18    **A.**   **Yes.**

19    **Q.**   With a photograph on top?

20    **A.**   **Yes.**

21    **Q.**   Okay.  So this is a document that we

22 introduced, and if you want to take a look at it,

23 just read it briefly.

24    MR. SCHUTTE:  Is this the document that

**Page 68**

1 you produced about 6:00 last night?

2    MR. FOSTER:  Yes, it is, and it's got a

3 third bullet point on it.

4 BY MR. FOSTER:

5    **Q.**   It says, "Union or non-union:  This can

6 result in a variance of up to 20 percent on cost

7 numbers."

8    The article is about the construction of

9 laboratories.  And I'll let you read it if you

10 want, and I would just like you to comment on it.

11    MR. SCHUTTE:  Just for the record, I

12 will lodge an objection.  One, that this is not a

13 document that he referred to in forming his

14 opinion.  Second, it's also a document that, for

15 whatever reason, you didn't produce until last

16 evening.

17    But subject to that, if you can go

18 ahead and answer the question.

19    MR. FOSTER:  Yeah, I would like to put

20 on the record that you, Jones Lang LaSalle, never

21 produced this to us.  It was requested.  We only

22 found it a couple days ago.  So we have that on the

23 record.

24    MR. SCHUTTE:  You found it a couple of

**Page 69**

1 days ago, but you produced it last night at, like,

2 6:00; is that right?

3    MR. FOSTER:  Yeah, I think that's right.

4 And you never produced it to us in discovery.

5    MR. SCHUTTE:  Well, I'm not sure it's

6 responsive to anything, but we can take it up --

7    MR. FOSTER:  I asked if Jones Lang and

8 LaSalle had any estimates as to the difference

9 between the costs of union and non-union labor.

10    MR. SCHUTTE:  Within the construction of

11 laboratories?

12    MR. FOSTER:  Yeah.

13    MR. SCHUTTE:  Okay.

14    MR. FOSTER:  I think this falls within

15 the request.  If you can tell me why you didn't

16 produce it, I'd like to know, but we don't have to

17 have this dialogue now.

18    MR. SCHUTTE:  But you can also, if you

19 would, let's -- while Mark is looking at the

20 article that he's looking at for the first time.

21    MR. FOSTER:  Why don't we just be quiet

22 and let him look at the article?

23    MR. SCHUTTE:  I'm not going to be quiet

24 because you asked me to, Howard.  I'm going to ask

1  you, I'll put it on the record, you guys, please,
2  if you're making an issue of whether this should
3  have been produced, please send over the document
4  request that you think it was responsive to,
5  please.
6      MR. FOSTER: Okay. We will. I can do
7  that.
8  BY MR. FOSTER:
9      Q.   Mr. Hosfield, just let me know when
10  you're ready to answer questions about this.
11      **A.   First time I've seen it, and while you**
12  **guys were arguing, it was a little hard to read, so**
13  **give me a minute.**
14      Q.   Of course.
15      **A.   Are you -- were there other pages to**
16  **this and you're showing me one page, or is this the**
17  **only page?**
18      Q.   It's the only page.
19      **A.   Okay. All right. I have read it.**
20      Q.   So my only question is, it says, "Union
21  or non-union: This can result in a variance of up
22  to 20 percent on cost numbers." That's what Jones
23  Lang and LaSalle has said in this document.
24      Do you have any opinion about that?
70

1      **A.   I'm not sure where they got this. It**
2  **has to do with laboratory construction, but they**
3  **say this can result, so it may not, and it's up to**
4  **20 percent. So it may be at 1 percent if it does**
5  **result. So that's a general statement saying**
6  **something may or may not happen. So that's what**
7  **I see here.**
8      Q.   Okay.
9      **A.   This is not based on any kind of a study**
10  **or anything that would allow you to determine if**
11  **it's commercial office building renovations and**
12  **moving, that the cost of union labor is higher than**
13  **the cost of non-union labor. It doesn't seem to**
14  **factor into any productivity factors or anything**
15  **like that in here as well.**
16      **It's just a -- we don't know whether it**
17  **just relates to the wage rate or whether it relates**
18  **to the actual productivity of the labor or the cost**
19  **of the project.**
20      Q.   Okay. Do you think that economists can
21  differ as to how to measure productivity?
22      **A.   I have seen economists differ on how to**
23  **measure almost anything.**
24      **Do people differ in how to measure**
71

1  **actual productivity on a construction project? Not**
2  **that I have seen, no.**
3      **If you're an economist trying to**
4  **theoretically measure changes or differences in**
5  **productivity, yeah, I'm sure they all have their**
6  **own ideas and their own models and their own**
7  **variables, and so forth, but there's a standard way**
8  **to measure in the construction industry actual**
9  **productivity, actual progress for labor cost.**
10      Q.   Right. And I asked you about that, and
11  you couldn't come up with a single source for where
12  you got that standard from, a book, a manual,
13  right?
14      **A.   I don't recall what the answer was, but**
15  **I remember you trying to get me to say -- your**
16  **theory was that in order for something to be true,**
17  **somebody must have written it in the book or an**
18  **article or some economist must have written about**
19  **it in a book or an article.**
20      **That's just the way you measure**
21  **productivity. That's the standard way it's done in**
22  **the industry. It's the way it's always been done.**
23      Q.   Okay.
24      **A.   I mean, it's just -- I'm sure there's an**
72

1  **article. In fact, it's possible I wrote a book a**
2  **number of years ago where I think I probably**
3  **suggested or talked about measuring productivity in**
4  **that way, and I know other people in the**
5  **construction industry have written about it.**
6      **It just didn't seem like -- it was so**
7  **obvious to me and such standard industry practice,**
8  **it didn't seem like anyone would be so worried**
9  **about it that they'd want to see it written in a**
10  **book.**
11      Q.   All right. Give me the title of the
12  book that you are referring to that you wrote?
13      **A.   I'm contributing author to Proving and**
14  **Pricing Construction Claims. There was two**
15  **editions of it. I don't remember which -- one of**
16  **them, I believe, had to do with productivity, and**
17  **the other one had to do with something else. I**
18  **just don't remember.**
19      Q.   Can you turn to Page 13, please, of your
20  report. The last paragraph, the second sentence
21  says, "Instead, a bid on a project will reflect a
22  blended mix of anticipated labor costs, materials
23  costs, overhead, and a profit margin that will vary
24  depending upon project-specific considerations."
73

**Page 74**

1 The citation for that is the deposition
2 of Stephen Zsigray, Jones Lang and LaSalle's man.
3 **A.** He -- I believe he's a -- he's a --
4 **Q.** Do you have an authority for that
5 statement in your report?
6 **A.** He's an employee of Jones Lang LaSalle.
7 **Q.** Yeah, I deposed him, and --
8 **A.** I think you asked him the question for
9 which he gave that answer. It was important enough
10 to ask him the question, and that's the answer he
11 gave.
12 **Q.** And that's your answer too, right, word
13 for word? You just took it from him. I'm asking
14 why.
15 **A.** It's not word for word, and I think the
16 entire paragraph -- you have taken one sentence out
17 of a paragraph. That paragraph is a discussion of
18 a contractor's bidding, the bidding process that
19 takes place when a contractor is bidding, either
20 union or non-union.
21 I did cite something from a question you
22 asked him and his answer to a question you asked
23 him in terms of what he understands, because
24 I think it's consistent with what I understand, the

**Page 75**

1 considerations of a contractor during bidding, but
2 the entire paragraph speaks for itself.
3 **Q.** You don't cite anything else to support
4 that. So I'm asking what facts or data other than
5 Mr. Zsigray's deposition did you use in writing
6 that?
7 **A.** My skills, knowledge, education,
8 training, and experience.
9 **Q.** Okay. But then, well, it's kind of
10 vague to me. You say it's a blended mix of
11 anticipated -- you've got several factors, but you
12 don't tell us how much each factor comes into play
13 here in this. There's no formula.
14 **A.** It varies --
15 **Q.** Why not?
16 **A.** That's true, I don't, and it's because
17 it varies on various -- each project is different.
18 It varies on spot project-specific considerations.
19 You can't really generalize a number and say here
20 is how it's done every time; it's done differently
21 on every project, depending on the project
22 considerations and needs. It's an individualized
23 thing.
24 **Q.** Okay. So you're saying each project is

**Page 76**

1 different, right?
2 **A.** There are differences between each
3 project, that's correct.
4 **Q.** Okay. Does that mean the cost of
5 materials will vary from project to project in the
6 overall costs?
7 **A.** The cost of materials may vary, and the
8 type of material used, for example, will affect the
9 labor costs depending on the amount of labor hours
10 that's required.
11 **Q.** Okay. Are you able to say overall that
12 the materials typically account for a certain
13 percentage of the cost of a construction project?
14 **A.** That would be impossible to do.
15 It depends on what they're doing. It could be a
16 very large percentage, and it could be a very small
17 percentage. It just depends on what's being done.
18 MR. FOSTER: I'd like to turn now, if we
19 could, to another exhibit. So this is a group
20 exhibit, Wacker Drive number 41.
21 Court Reporter, do you have the
22 other -- I think there's only one remaining
23 exhibit.
24 THE REPORTER: That's the first one that

**Page 77**

1 was shared, if everybody can click on that.
2 (Whereupon, Hosfield Exhibit 4
3 was presented to the witness.)
4 BY MR. FOSTER:
5 **Q.** Mr. Hosfield, could you just let me know
6 when you've got this exhibit in front of you.
7 **A.** Yeah, let me --
8 **Q.** There are a number of pages here.
9 **A.** Yeah, let me take a look at it. I've
10 got it in front of me.
11 **Q.** You can take a look at it. Let me know
12 when you're more familiar with it.
13 MR. SCHUTTE: I would just object that
14 the exhibit is not complete.
15 MR. FOSTER: Okay.
16 BY THE WITNESS:
17 **A.** All right. I have looked at it.
18 BY MR. FOSTER:
19 **Q.** Okay. So I'd like to start you first to
20 turn to Page 18 of your report, please.
21 **A.** Yes.
22 **Q.** And what you say in Page 18 is that
23 you're not able to itemize -- sorry. Hold on. The
24 last three words on Page 17 and continuing the

1 words to Page 18, I'm going to read that sentence
2 to you.
3         It says, "Based on the limited data
4 contained in the invoices for moving and
5 construction produced by WDES, it is not
6 practicable to identify and exclude on a classwide
7 basis any non-union labor potential class members
8 used for their projects during the alleged damages
9 period."
10        So essentially what you're saying is
11 that you can't figure out what type of labor was
12 used. So you couldn't do what Dr. Kaestner wanted
13 to do. Are you with me so far?
14    **A.    Well, first of all, that paragraph is a**
15 **secondary paragraph. The paragraph on Page 17**
16 **before that is what talks about really the other**
17 **important part of that bill.**
18        **But I don't know what Kaestner wanted to**
19 **do. So when you ask me a question about**
20 **Dr. Kaestner couldn't do what he wanted to do, I**
21 **have no idea what he wanted to do and didn't do it.**
22    Q.    Okay.
23    **A.    I know what he didn't do. I don't know**
24 **whether he wanted to do it or not.**

78

1    Q.    Are you done? Are you done with your
2 speaking?
3    **A.    I am now.**
4    Q.    Okay. I think that the point that
5 you're making, it's also made a little more clearly
6 on Page 19, and it says -- if you want to look at
7 Page 19 of your report, second paragraph:
8        "Each type of labor performed would need
9 to fit into one of his specified categories of
10 labor listed in Table 1 of his report (i.e.,
11 carpenter, electrician, drywaller, plumber,
12 laborer, installer, operating engineer, or mover).
13        "This is not a straightforward process,
14 and even Dr. Kaestner could not determine which
15 category of Table 1 corresponded to the cost for
16 general contracting fees."
17        Now, I would like you to please turn to
18 our group exhibit. The first document in that
19 group exhibit is Wacker Drive number 41. Do you
20 see that?
21    **A.    Where am I looking at?**
22    Q.    You were handed a group exhibit.
23    **A.    Oh, I'm sorry. You're talking about the**
24 **Bates number?**

79

1    Q.    Yeah, at the bottom right-hand corner --
2    **A.    I see it. Okay.**
3    Q.    -- of the first document in the pile,
4 it's Bates numbered Wacker Drive 000041.
5    **A.    Right.**
6    Q.    Okay. Now, if you could look at this
7 document. This is entitled Sworn Statement For
8 Contractor and Subcontractor to Owner?
9    **A.    Yes.**
10    Q.    This was prepared on September 14, 2014
11 by Ostrander Construction with regard to Wacker
12 Drive Executive Suites' work in building out its
13 space in 2014. And the significance of this is
14 that Ostrander listed the subcontractors and the
15 type of work that each one did on this document,
16 and that's what I want you to look at.
17    **A.    Where are you looking where they did**
18 **that?**
19    Q.    Okay. So, for example, we have
20 Ostrander, and then it says Carpentry.
21    **A.    Right.**
22    Q.    Then we have Break Thru Enterprises,
23 Demo, which I guess just means demolition.
24        Then the third one is Epic Building

80

1 Group, and it's a contractor for flooring. And
2 there's a specific amount for each one of these
3 types of labor.
4        So my question to you is would that make
5 it easier for Dr. Kaestner to figure out the type
6 of labor that was used in this particular project?
7    **A.    I don't understand your question, but**
8 **you also have an incorrect premise. What's listed**
9 **there is not labor; that's the total contract cost.**
10 **That would be a cost of everything that went into**
11 **this.**
12    Q.    Okay.
13    **A.    That would be labor, that would be**
14 **materials, that would be equipment rentals, that**
15 **would be overhead, that would be everything else.**
16 **So that isn't the cost of labor for any of these**
17 **people.**
18    Q.    Assuming you're right about that for the
19 moment, though, it is the cost charge for a
20 subcontractor who performed a particular type of
21 labor; isn't that correct?
22        MR. SCHUTTE: Objection --
23 BY THE WITNESS:
24    **A.    Well, it's Ostrander who is the general**

81

1 or if they had subcontractors in there or equipment
2 suppliers, it would be the cost charged for
3 certain -- to accomplish something.
4          And it's not -- no, it's not for the
5 labor; it's for everything that went into doing
6 what was needed to be done:  The materials, the
7 equipment rentals, the overhead that they charged,
8 the profit they charged, everything would be in
9 there.  So that isn't what --
10 BY MR. FOSTER:
11     Q.    Okay.  If you look at the first line, it
12 says Ostrander Carpentry, and there's a number?
13     A.    Right.
14     Q.    Isn't that number related to the work it
15 did for carpentry?
16     A.    Well, carpentry is the designation of
17 the category of work that was being done.  That
18 would include materials, if the materials were
19 needed; if you're using steel studs, it would be
20 the steel; if you're using wooden, which they don't
21 use a lot in the buildings anymore.  It would be
22 wood.  It would be sheeting, it would be the
23 equipment rental, it would be all those things that
24 they charged for in that $18,372 cost amount for

82

1 that contract.
2     Q.    Yeah, I understand what you're saying.
3 Okay.  Assuming you're right about that, it's still
4 related to the work for carpentry, correct?
5     A.    It's the contract to accomplish the
6 carpentry work and all the costs that go into that,
7 yes.
8     Q.    Okay.  So why didn't you consider
9 that --
10     A.    Including the profit.
11     Q.    -- when you were writing your report and
12 you were saying it was not possible to determine
13 the type of labor that was being used here?
14          MR. SCHUTTE:  Object to form.
15          Go ahead.
16 BY THE WITNESS:
17     A.    How could you determine the type of
18 labor that was being used for each one of these
19 people?  They could have used different classes of
20 labor.  I think even Dr. Kaestner would have --
21 BY MR. FOSTER:
22     Q.    Now, if you move on to the next one, the
23 next one is demolition, the next one is flooring,
24 the next one is ceilings, and so on down the list?

83

1     A.    Right.
2     Q.    Doesn't that help?
3     A.    Not really.  I mean --
4     Q.    Why not?
5     A.    Who did the carpentry?  Which classes of
6 people were involved in that?  Which classes of
7 people were involved in the ceilings?  Was it --
8     Q.    Well, wasn't flooring --
9     A.    How many laborers, how many installers?
10     Q.    Okay.
11     A.    Drywallers, carpenters, who was in
12 Ostrander Construction's group there?  You can't
13 tell me that, and neither could he.  He admitted
14 that in his deposition.  He had no idea.
15     Q.    But we know what type of labor was
16 generally used.
17     A.    No, you don't.  You're guessing.
18     Q.    You don't?
19     A.    No.  You're guessing.  You would have to
20 know who they used on that project.
21     Q.    Why are you guessing, I'm saying, if it
22 says carpentry?  Why can't we assume that they used
23 carpenters?
24     A.    Why would you -- you would have to look

84

1 at the carpentry contract and see what was in that.
2 Did the carpentry contract also include cabinet
3 installers, did it include laborers, did it include
4 the installers, did it include carpenters, did it
5 include drywallers?  What was in there?
6     Q.    Okay.  Suppose you did that, would that
7 help?
8     A.    Suppose you did what?
9     Q.    You looked at the contract.  Would that
10 help?
11     A.    No.  You would actually have to look
12 at -- yeah, that would tell you what the scope of
13 the work was.  You would have to look at the cost
14 records to determine who spent what time on it and
15 how many hours if you wanted to try and shoehorn
16 the people into Dr. Kaestner's categories.
17     Q.    Well, why don't we look at the next one
18 here, Wacker Drive 50 in the group exhibit.
19     A.    Well, I don't know what the next --
20     Q.    Okay.  If you could look down on the
21 Contractor's Affidavit part.
22     A.    Okay.
23     Q.    It says Connor Electric Services for
24 electrical, $1,895.  Do you see that?

85

1    A.    Yes.

2    Q.    Doesn't that indicate to us that Connor

3    Electric Services used electricians?

4    A.    Probably, for part of that work. They

5    might have also used laborers. I mean, if you look

6    at the electrical, you don't know whether that's

7    $1,000 for materials and 895 for labor, or whether

8    it's $50 for labor and $1840 for materials. You

9    just have no idea. This is a contract price,

10   including change orders and everything else that

11   took place.

12   Q.    Okay. I hear you. I --

13   A.    By the way, this isn't even a contract;

14   this is one bill for one period of time associated

15   with the full contract for Connor Electrical

16   Services.

17          So if you look at Connor Electrical,

18   they had a bill for $15,000. This is just one bill

19   for part of the material and overhead and labor and

20   everything else. It is a progress billing.

21          This isn't necessarily related to

22   billing. It's just related to how much was done on

23   progress during that time period and so how much

24   they were allowed to bill.

86

1    Q.    Are you done with your answer?

2    A.    Yes, for now.

3    Q.    Okay. Doesn't this help us identify the

4    type of labor that was used, electricians? That's

5    all I'm asking you. And I understand your point

6    about materials, but in terms of the type of

7    labor --

8    A.    You wouldn't know that they were all

9    electricians doing this work, because this

10   particular work at the end of a project could have

11   been Connor Electrical's cost to carry out

12   equipment. They could have -- I mean, it's

13   depending on whether the contract was billed on a

14   percentage of completion or a progress billing or

15   on a milestone basis.

16          You have no idea what's in that 1895.

17   It could be all equipment rental, or it could be

18   cleanup, it could be laborers taking things out at

19   the end a project. You have no idea what that is.

20   Q.    So you don't think that there were any

21   electricians involved?

22   A.    I think that Connor Electric Services

23   had electricians involved in their $15,000

24   contract. We don't know how much. We don't know

87

1    who else they had involved. And we don't know how

2    much of this was actually labor, period.

3    Q.    That $15,000 contract that you're

4    referring to, are you looking at another document

5    right now, Mr. Hosfield?

6    A.    I'm looking at the document that you

7    just showed me earlier. If you would recall, you

8    were reading down the list of what people did, and

9    you get to Connor Electric and their bill -- their

10   contract was $15,200.

11   Q.    Okay.

12   A.    And what you're showing me here on a

13   contractor's affidavit is a final waiver of a lien

14   for -- and this would be likely the final bill for

15   Connor Electrical Services for the work that done

16   in the $15,200 contract.

17   Q.    I see. I see. Okay.

18          So you're saying this doesn't change

19   your opinion at all about the ability to determine

20   the type of labor used on this particular job?

21   A.    Of course not. I mean, you're showing

22   me something -- I've seen thousands of these in my

23   career. I know exactly what's in these. I know

24   what kind of bills get submitted, you know, a

88

1    general contractor submits when they are submitting

2    a bill for work, and I know what backup is. And

3    none of it would allow you to tell what type of

4    labor was working on it, how much the labor worked

5    on it, how much was material, what the mix of hours

6    between the two. There's nothing here that will

7    help you with that. It's pure --

8    Q.    Are you done -- are you done talking?

9    I'm sorry. Are you done with your answer?

10   A.    It's pure guesswork. The only thing you

11   could look at would be the actual cost records of

12   the contractors that would demonstrate what costs

13   went into the cost, their billing.

14          You have to remember these bills aren't

15   the costs. They are certainly not the cost of

16   labor, and they're not the cost to Connor Electric.

17   That's how much they're billing for work that gets

18   done. Their cost may be $12,000, and it would be a

19   mix of equipment and labor and rental of equipment,

20   labor, materials, overhead, all of those things

21   would be in there, but these aren't cost numbers;

22   these are billing numbers.

23   Q.    I didn't ask you if they were cost

24   numbers.

89

1    I said, Are these billing numbers for,
2 among others, the labor that was used?
3    A.    Well, I could have sworn you said are
4 these cost numbers for labor that it was used.  If
5 you meant to say billing, that's fine.
6    No, the billing numbers would include
7 labor that was used if there was labor used; you
8 just don't know how much or which type of labor it
9 was.
10    Q.    Okay.  Doesn't this tell you which type
11 of labor it was?
12    A.    You've asked me that question.  We have
13 gone through this about three times now.  No, it
14 does not tell you what type of labor it was.
15    It tells you what type of work that
16 contractor was doing, but it doesn't say what type
17 of labor they were using to do the contract.
18    Q.    What's the difference?
19    A.    I don't even know how to answer that.
20 It's obvious, I think.  I mean, well, what's the
21 difference between what?
22    Q.    Okay.  If you look at the last one, 68.
23    A.    The last page?
24    Q.    Yeah, of this group exhibit, records on

90

1 68.
2    A.    Right.
3    Q.    Contractor's Affidavit?
4    A.    Right.
5    Q.    And, for example, Bear Construction
6 listed, what for?  Demolition, carpentry, and
7 drywall.  Those are the types of work that they
8 did.
9    A.    Right.
10    Q.    Doesn't that tell us what type of labor
11 their construction did on that job?
12    A.    It tells you the scope of their work.
13 It does not tell you which type of laborers they
14 used to accomplish that work.
15    Q.    What is the difference -- I'm just not
16 understanding it between the scope of labor as you
17 just said it and the type of labor as I'm saying
18 it.
19    A.    Well, the type of labor as you're saying
20 it, I assume, is what Dr. Kaestner's categories he
21 created.  Is that correct?
22    Q.    Well, I'm just saying that, yeah, the
23 type of labor, right, would be something like along
24 the lines of the type of particular union trade

91

1 labor such that if it appeared in the CPS survey so
2 we know what the typical wage for that type of
3 labor is.  That's what I mean by type of labor.
4    So I'd like you to explain to me what
5 you mean by scope of labor?
6    A.    I never said scope of labor.
7    Q.    I think you did.
8    A.    I said scope of --
9    MR. SCHUTTE:  He said scope of work or
10 scope of project.
11    THE WITNESS:  Yeah, I did.  I never said
12 scope of labor.
13 BY MR. FOSTER:
14    Q.    Okay.  Well, let's be clear about this.
15 You're saying that this document reflects scope of
16 project?  Am I saying it correctly?  If I'm not,
17 please state it correctly.
18    A.    This says names and addresses of the
19 contractor, and it tells you what for, what was
20 that contractor contracted to do, what was the
21 scope of their project.
22    The scope of their construction's
23 project was demolition, carpentry, and drywall.
24 Demolition could include operating engineers, it

92

1 can include laborers.
2    Drywall, can include laborers, it can
3 include carpenters, it can include drywallers.
4    Carpentry can include laborers and
5 carpenters and anybody else they may need to do
6 some of the work on there.
7    So the type of labor, the labor
8 categories Dr. Kaestner is using, some of those
9 labor categories maybe included in there, some may
10 not, we don't know, because if you're doing
11 demolition, for example, you could be using any
12 number of people.  It could be carpenters.  It
13 could be laborers.  You could be using installers
14 to essentially uninstall cabinetry and so forth.
15 It depends on how you want to do it.
16    Carpentry, you certainly don't use
17 carpenters to do all of the work that needs to get
18 done that's carpentry related because the laborers
19 are less expensive.  So you would use laborers to
20 do the hauling and moving and so forth.  So no, you
21 cannot tell on these categories what types of work
22 they used.
23    Q.    And what authority do you have that
24 supports what you're saying, that the scope of the

93

1 project involved different types of labor?
2     **A.**     **My experience -- , skills, knowledge,**
3 **experience, education, and training, as well as**
4 **Dr. Kaestner's categories that you would have to**
5 **admit include certain areas that may have been used**
6 **on this project, I think, but it's --**
7     MR. FOSTER: Okay. Could we take
8 another break for a few minutes?
9     MR. SCHUTTE: Sure.
10     THE WITNESS: It's 12:14. Do you want
11 to take a half an hour, and I can get a little
12 lunch, or do you want to take a shorter one and
13 have a lunch break at 1:00?
14     MR. FOSTER: Let's take a shorter one,
15 okay, because I can come back and tell you in a
16 short amount of time, like, how much time we need.
17     THE WITNESS: That's fine.
18     MR. SCHUTTE: What time do you want to
19 break to?
20     MR. FOSTER: Ten minutes, is that all
21 right, Scott?
22     MR. SCHUTTE: Sure. 12:25.
23     (Whereupon, a short luncheon
24     break was taken.)

94

1 BY MR. FOSTER:
2     **Q.**     So I'm going to turn to your opinions,
3 Mr. Hosfield, about James Raisher. It's Page 21 of
4 your report and your conclusion that "Landlords are
5 not able to recover TIA costs through increase
6 rent."
7     As I understand it, you're saying that
8 they are not always able to recover their TIA costs
9 in increased rent. Is that the case?
10     **A.**     **Let me get to Page 21. Hang on. You're**
11 **talking about the subcategory C where I say**
12 **"Landlords are not able to recover all TIA costs**
13 **through increased rent"?**
14     **Q.**     Right. That's right.
15     **A.**     **And what was your question about that**
16 **sentence?**
17     **Q.**     So my question is, You say this is not
18 always the case. So my question would be,
19 Sometimes, in your opinion, landlords are able to
20 recover all of their TIA costs through rent; is
21 that correct?
22     **A.**     **There may be times they can recover all**
23 **of them through increased rent, but the difficulty**
24 **is that it's a negotiation where the rent is**

95

1 **established and they're negotiating pre-rent and**
2 **they're negotiating TIA costs, some which improve**
3 **the building and some of which are really tenant**
4 **space. And so there's no way of knowing whether**
5 **they actually increased the rent to cover the TIA**
6 **costs or whether that was just something that --**
7 **the cost they have incurred to keep a tenant in the**
8 **building or to get a tenant in the building.**
9     **So there may be times --**
10     **Q.**     Okay. But that doesn't mean that they
11 are not recovering it all through rent, right?
12     **A.**     **There may be times when a landlord says**
13 **we'll do this for you for $45 a square foot, and**
14 **someone says, "But I want a tenant improvement**
15 **allowance," and they say fine, now it's $50 a**
16 **square foot to recover it. There may be times when**
17 **that happens, but I'm not aware of that happening,**
18 **in my experience.**
19     **Generally, it's kind of a negotiation**
20 **where the landlord is determining how much money**
21 **they have to spend to get a tenant in there or to**
22 **keep the tenant, and they know what they want their**
23 **rents to be because they want to have it on their**
24 **ledger as being rented at a certain amount per**

96

1 **square foot. So they'll negotiate with tenant**
2 **improvement allowances and free rent to keep the**
3 **rent at a level that they would like it to be at.**
4     **Q.**     Are you aware of any particular instance
5 in which a landlord in the Chicago Loop agreed to a
6 TIA that was not recovered as rent?
7     MR. SCHUTTE: Just object to form.
8 BY THE WITNESS:
9     **A.**     **And how would you know that it was**
10 **recovered in rent? If they increased the rent**
11 **based on the TIA?**
12 BY MR. FOSTER:
13     **Q.**     No, it doesn't mean they had to increase
14 the rent. They're making a profit on their rent.
15     So I'm asking you if you can cite to a
16 specific example of any particular transaction in
17 the Chicago Loop where a landlord did not recover
18 the TIA it agreed to through rent?
19     MR. SCHUTTE: Object to form.
20 BY THE WITNESS:
21     **A.**     **In other words, you're saying the rent**
22 **wasn't high enough, a situation where the rent**
23 **wasn't high such that the landlord lost money in**
24 **the amount of the TIA allowance?**

97

**Page 98**

1  BY MR. FOSTER:
2      Q.    That's what I'm asking.  Are you aware
3  of any such case?
4      A.    No, I'm not aware of any of cases one
5  way or the other, but what I'm saying here is there
6  isn't a one-to-one correspondence where rent is
7  increased by the amount of the TIA allowance.
8      Q.    On Page 22, at the end of the page you
9  say:  Mr. Raisher's opinion that a TIA is
10  essentially a loan from the landlord for additional
11  allowance that the tenant is required to pay back
12  over the life of their lease term, and that a TIA
13  is 'added to the total rent due at an interest rate
14  the landlord charges and divided by the number of
15  months in the lease term is, quote "unreliable."
16      Why is it unreliable?
17      A.    Well, it's true -- it's not necessarily
18  true, for one thing, as we just discussed.  There's
19  no correspondence -- there's no one-to-one
20  correspondence I have ever seen between the amount
21  of the tenant improvement allowance and some
22  additional rent that's charged.  That's not the --
23      Q.    Well, let's just say you couldn't come
24  up with a single instance of where a landlord

**Page 99**

1  didn't amortize the TIA; is that correct?
2      A.    No.  You never asked me that question.
3      Q.    Are you aware of any transaction in the
4  Chicago Loop where a landlord did not amortize a
5  TIA into the rent?
6      MR. SCHUTTE:  Object to form.
7  BY THE WITNESS:
8      A.    I am not aware of a single situation
9  where a landlord amortized the TIA into the rent.
10  I've never heard of that happening.  And that's not
11  how amortization works.  You don't amortize
12  anything into the rent.
13  BY MR. FOSTER:
14      Q.    Have you had occasion to look at any
15  particular lease transaction in the Chicago Loop?
16      A.    I don't know what you mean by look at
17  any particular lease transactions.
18      Q.    Have you been part of them where this
19  has come up?
20      A.    Where what has come up?  I don't know
21  what you're asking me.  It's kind of -- you're
22  asking me some general questions without any real
23  subject.
24      Q.    Are you aware of any particular tenant

**Page 100**

1  allowance that has been agreed to by a landlord in
2  the Chicago Loop that was not amortized as rent?
3      A.    Amortized as rent?
4      Q.    Yes.
5      A.    You couldn't even do that from an
6  accounting standpoint.  There's no such thing as
7  amortizing a tenant improvement allowance as rent.
8  That's not how -- amortization is an accounting
9  concept that has nothing to do with the rent.
10      Q.    Passed on to the tenant as rent, let's
11  put it that way.
12      A.    I am not aware of any tenant improvement
13  allowances where the rent was increased based on a
14  negotiated tenant improvement allowance or
15  decreased based on a decreased tenant improvement
16  allowance.  I have never heard of that happening in
17  my experience, never seen an example of that
18  happening.
19      MR. FOSTER:  Okay.  All right.  I have
20  no further questions.
21      MR. SCHUTTE:  We have no questions.  And
22  we'll reserve signature.
23      THE REPORTER:  How soon do you need the
24  transcript?

**Page 101**

1      MR. FOSTER:  We need it.
2      THE REPORTER:  How about you, Scott?
3      MR. SCHUTTE:  I'll take it in the
4  ordinary delivery time.
5      FURTHER DEPONENT SAITH NAUGHT.
6      (WHEREUPON, the deposition was
7      concluded at 1:15 p.m. CST.)

1        IN THE UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF ILLINOIS

2           EASTERN DIVISION

3  WACKER DRIVE EXECUTIVE      )

    SUITES, LLC, on behalf of     )

4  itself, individually, and on  )

    behalf of all others         )

5  similarly situated,         )

                           )

6        Plaintiffs,        )

                           )

7      vs.               )   No. 1:18-cv-5492

                           )

8  JONES LANG LASALLE AMERICAS )

    (ILLINOIS), LP,          )

9                         )

        Defendant.         )

10

11       I, MARK HOSFIELD, being first

    administered an oath, certify that I am the

12  deponent in the aforesaid deposition taken remotely

    on July 28, 2020; that I have read the foregoing

13  transcript of my deposition, and affix my signature

    to same.

14

15

16       _____

        MARK HOSFIELD

17

18

19  Subscribed and sworn to

    before me this _____ day

20  of _____, 2020.

21

22  _____

    Notary Public

23

24

102

103

E R R A T A   S H E E T

CASE NAME: WACKER DRIVE vs. JONES LANG LASALLE

CASE NUMBER: 1:18-cv-5492

WITNESS: MARK HOSFIELD

REPORTER: Nohemi Salazar Pitts

I wish to make the following changes for the following reasons:

**PAGE**     **LINE**

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _     _ _ _   **CHANGE:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**REASON:**_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**P A G E    L I N E**

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _     _ _ _ _ **C H A N G E :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**R E A S O N :** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

In accordance with Supreme Court Rule 207(a), the above corrections are made to correct an error in the reporting or transcription of my answer(s).

S ig n e d : _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

D a t e : _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

1  STATE OF ILLINOIS     )

                )  SS:

2  COUNTY OF C O O K     )

3

4          I, NOHEMI SALAZAR PITTS, a Certified

5  Shorthand Reporter within and for the County of Cook

6  County and State of Illinois, do hereby certify that

7  heretofore, to-wit, on July 28, 2020, appeared before

8  me <u>remotely</u>, MARK HOSFIELD, in a cause now pending and

9  undetermined IN THE UNITED STATES DISTRICT COURT,

10  NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION,

11  wherein WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf

12  of itself, individually, and on behalf of all others

13  similarly situated are the Plaintiffs, and JONES LANG

14  LASALLE AMERICAS (ILLINOIS), LP is the Defendant.

15          I further certify that the said MARK

16  HOSFIELD was first administered an oath to testify the

17  truth, the whole truth and nothing but the truth in

18  the cause aforesaid; that the testimony then given by

19  said witness was reported stenographically by me in

20  the presence of the said witness, and afterwards

21  reduced to typewriting by Computer-Aided

22  Transcription, and the foregoing is a true and correct

23  transcript of the testimony so given by said witness

24  as aforesaid.

1        I further certify that the signature to

2 the foregoing deposition was reserved by counsel for

3 the respective parties and that there were present at

4 the deposition the attorneys hereinbefore mentioned.

5        I further certify that I am not counsel

6 for nor in any way related to the parties to this

7 suit, nor am I in any way interested in the outcome

8 thereof.

9        IN TESTIMONY WHEREOF: I certify to the

10 above facts this day of July 31, 2020.

11

12

13        NOHEMI SALAZAR PITTS, CSR

        LICENSE NO.: 084-4648

14

15

16

17

18

19

20

21

22

23

24

106

VERBALTECH INC.
3013 WEST 54th STREET
CHICAGO, ILLINOIS  60632


July 31, 2020


MR. SCOTT T. SCHUTTE
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, Illinois  60601

CASE NAME:  WACKER DRIVE vs. JONES LANG LASALLE
CASE NUMBER:  1:18-cv-5492
WITNESS:  MARK HOSFIELD
REPORTER:  Nohemi Salazar Pitts

Dear Mr. Schutte:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled cause.
Also enclosed are additional signature pages, if
applicable, and errata sheets.

Per your agreement to secure signature, please submit
the transcript to the deponent for review and
signature.  All changes or corrections must be made on
the errata sheets, not on the transcript itself. Errata
sheets should be signed and signature pages need to be
signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to
VerbalTech Inc. at the above address, and VerbalTech
Inc. will handle distribution to the respective
parties.

If you have any questions, please call me at the phone
number below.

_____  Procedure outlined in Rule 207 (a) of
          the Illinois Supreme Court Rules


Sincerely,

Nohemi Salazar Pitts,
Court Reporter
(312) 869-4039

cc:  ALL COUNSEL OF RECORD