THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself, individually, and on behalf of all others similarly situated,** | **Case No. 1:18-cv-5492** |
| **Plaintiff,** | **Magistrate Judge Sunil R. Harjani** |
| v. | |
| **JONES LANG LASALLE AMERICAS (ILLINOIS), LP,** | |
| **Defendant.** | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF
ITS MOTION FOR CLASS CERTIFICATION**

Plaintiff Wacker Drive Executive Suites, LLC ("WDES" or "Plaintiff"), by its counsel, on behalf of all those similarly situated, submits its Supplemental Brief in Support of its Motion for Class Certification under Fed. R. Civ. P. ("Rule") 23(b)(2) and (3) ("Motion"). For the reasons set forth below and in its original Motion, WDES' Motion for Class Certification should be granted.[1]

## I. BACKGROUND.

WDES previously moved for class certification on behalf of two subclasses: (1) Class members who were subjected to JLL's union-only mover rule and incurred union moving expenses ("the Moving Subclass"); and, (2) Class members who were subjected to JLL's union-only contractor rule and incurred union contracting expenses ("the Contracting Subclass"). (Dkt. No. 105 at 7-8). The Court denied WDES' Motion without prejudice, finding it "more prudent to allow the plaintiff to further develop its factual record before conclusively deciding a class certification motion." (Dkt. No. 135 at 14). The Court noted that Plaintiff must identify evidence which could answer, on a class basis, "the central question" of "whether JLL imposed the union-only requirement pursuant to an agreement or conspiracy between JLL and the Unions," not whether the union-only rule was instituted and enforced by JLL alone. (Dkt. No. 135, at 3, 6). Accordingly, the Court directed WDES to engage in discovery on the commonality prong of Rule 23(a)(2) to determine whether evidence on the alleged conspiracy/RICO enterprise between JLL and the three unions sufficiently raises a question common to the class. (Dkt. No. 135).

There is no dispute that JLL promulgated the union-labor restrictions at the buildings at issue. (*See, e.g.*, Dkt. No. 125 at 9; Dkt. No. 125-3, Deposition of Stephen Zsigray at 27:10-23) (agreeing non-union contractors are not permitted in JLL buildings because "there are rules and

---

[1] The parties have agreed (Dkt. No. 181) that this supplemental brief should be considered along with Plaintiff's previously-filed briefs on the motion for class certification (Dkt. Nos. 105, 131) and its response to the motion to exclude the expert testimony of Dr. Robert Kaestner (Dkt. No. 132).

1

regulations in each building" regarding union labor). The only question is whether common evidence exists to answer the question of *why* the union-only rule exists. JLL contends that the rule was instituted entirely by its landlord-owner clients[2], while WDES maintains that it was the result of a conspiracy between JLL and the unions. (Dkt. Nos. 105, 125).

## II. LEGAL STANDARDS FOR RICO CONSPIRACY AND RICO ENTERPRISE[3]

### A. RICO Conspiracy

The elements of a RICO conspiracy under 18 U.S.C. §1962(d) are "that (1) the defendants agreed to . . . participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendants further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino Joliet v. Johnston,* 763 F.3d 723, 734-35 (7th Cir. 2014). A RICO conspiracy can and typically is proven based on reasonable inferences from circumstantial, rather than direct evidence. "[I]f membership to the conspiracy may reasonably be inferred from circumstantial evidence of the relationship among parties, their actions, and the totality of their conduct," then a RICO case may proceed before a jury. *United States v. Ashman*, 979 F.2d 469, 491 (7th Cir. 1992) (internal quotations omitted); *see also United States. v. Volpendesto,* 746 F.3d 273, 284 (7th Cir. 2014) (One "does not need to put forth direct evidence of the defendant's agreement to participate in an ongoing criminal enterprise.").

### B. Association-in-Fact RICO Enterprises

Association-in-fact enterprises require three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purposes." *Bible v. United Student Aid Funds, Inc.,* 799 F. 3d 633, 655 (7th Cir. 2015)

---

[2] "[JLL's] clients are office-building owners (*i.e.*, landlords)." (Dkt. No. 125 at 9).

[3] WDES incorporates the legal standard from its previously filed class certification briefs as if set forth herein.

2

(*citing Boyle v. United States,* 556 U.S. 938, 946 (2009) for this standard). Like a RICO conspiracy, an enterprise can be proven with circumstantial evidence. *See, e.g., Volpendesto,* 746 F.3d at 284 ("As with conspiracy in general, circumstantial evidence that the defendants agreed to participate in the enterprise is sufficient," affirming RICO conviction).

### III.  ARGUMENT

Class certification of both the Moving and Contracting Subclasses is warranted. As is reasonably inferred from the direct and circumstantial evidence detailed below, the union-only rule exists as a result of a conspiracy between JLL and the movers and engineering unions (Local 705 and Local 399, respectively) which affected tenants in all Loop buildings in the same way. The Moving Subclass was impacted by the conspiracy between Local 705 and JLL which ensured that only union movers could work in the Loop buildings. The Contracting Subclass was impacted by the conspiracy between Local 399 and JLL which ensured that only union trade workers could perform work in the Loop buildings.[4]

First, it is undisputed that for many years, JLL has maintained a rule excluding non-union laborers from performing work at the buildings it manages in the Chicago Loop and this rule is common proof that can be used on a class wide basis. (Dkt. No. 125 at 9) (JLL agrees that "each of the Class Building[s]" promulgated a union-labor restriction).

---

[4] WDES' Amended Complaint alleged a single conspiracy between JLL and International Union of Operating Engineers Local 399; Service Employees International Union, Local 1; and Teamsters Local 705. The Amended Complaint also alleged a single RICO enterprise between these entities. After conducting discovery, Plaintiff does not believe that Local 1 is a part of the conspiracy. Therefore, the alleged conspiracy here is between JLL and Local 705 and Local 399. Similarly, while the Amended Complaint alleged a single enterprise with these three unions, based on discovery, Plaintiff does not believe Local 1 is involved, leaving two enterprises: JLL and Local 705 (enterprise 1); and JLL and Local 399 (enterprise 2). RICO does not limit the number of enterprises. And by their nature, RICO enterprises are clandestine, the precise contours of which often, as here, only become clear during discovery. "Like a criminal conspiracy, a RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact between participants." *U.S. v. Elliott,* 571 F.2d 880, 898 (5th Cir. 1978). If the Court wishes WDES to amend any prior pleadings to reflect this matter, Plaintiff can easily do so.

Second, the union–only rule has been consistently enforced by JLL's authorized agents, specifically its Chief Engineers, who are all members of Local 399, while on duty and with JLL's knowledge at all its Loop buildings. Indeed, at the direction of Local 399, JLL Chief Engineers are required, while performing their job duties, to monitor/report the presence of any non-union trade workers to their union business agents. (Ex. A, Declaration of Patrick Kelly ("Kelly Decl.") at ¶ 3). Similarly, Local 705 regularly monitors JLL buildings to ensure that only unionized movers – specifically those signatories to its Collective Bargaining Agreement ("CBA") – perform work on the premises. (Ex. B, Dep. Tr. Richard DeVries ("DeVries Dep.") at 11:2-4; 30:21-31:3). As further evidence of an agreement, Local 705 provides and regularly updates JLL with a list of its union-member movers. (*Id*. at 17:17-18:6; 22:18-20). JLL, in turn, mandates that tenants use these movers and bars all other movers from its Loop buildings.

Finally, and perhaps most telling, is the absence of any credible evidence supporting JLL's defense—*i.e*., that the union-only rule, which has continuously been in effect for many years at all 20 JLL Loop buildings without exception—was entirely, independently (and coincidentally) created by numerous individual landlords (with no relationship to each other). In finding that WDES had not met its burden to show commonality, the Court believed JLL's assertion in this regard was significant (Dkt. No. 135 at 7, 12). But evidence uncovered since shows just the opposite. Thus, at this stage, a reasonable inference from all the evidence is that the union-only rule is a result of an agreement between JLL and Local 705 and Local 399. Because this evidence is significant proof on a common, outcome-determinative question of fact, the Court should grant WDES' Motion.

### A. A Reasonable Inference From The Evidence Is That JLL Entered Into A Conspiracy With Local 705 And Local 399.

Pursuant to the Court's September 23, 2020 order, Class certification is warranted because a reasonable inference can be drawn from the evidence that there is a conspiracy between JLL and Local 705 and Local 399. (*See* Dkt. No. 135 at 10) (noting WDES' burden to submit "direct or circumstantial proof of a promise between JLL and the Unions to impose the union-only rule" or "evidence from which a reasonable inference could be made that such an agreement existed."). Moreover, "it is settled that no formal agreement is necessary to constitute an unlawful conspiracy, and that business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." *Norfolk Monument Co. v. Woodlawn Memorial Gardens,* 394 U.S. 700, 704 (1969); *see also Ashman*, 979 F.2d at 491 (noting relationship among parties and "the totality of their conduct" as circumstantial evidence from which a RICO conspiracy can be inferred).

#### 1. Conspiracy between JLL and Local 705.

The business behavior of JLL and Local 705 in carrying out and enforcing the union-only rule with respect to movers presents significant circumstantial evidence of an agreement to force all Chicago Loop tenants to use only union (and Local 705-signatory) movers. Richard DeVries, Local 705's Business Representative, testified that the union "monitors" whether non-union movers are being used in Loop buildings, including JLL buildings. (DeVries Dep. at 11:2-4; 30:21-31:3). As recently as 2020, DeVries confronted Frank Falzone, the JLL Chief Engineer on duty at 180 N. LaSalle St., because while monitoring the premises (on a Saturday), he discovered non-union movers working at the building. (Ex. C, JLL00024970). This resulted in a 10–15-minute conversation with Falzone in which DeVries said: "I see you're using a non-union mover in the building" and Falzone responded that he was instructed not to have any conversations on the subject of non-union movers because of this lawsuit. (DeVries Dep. at 16:10-18, 47:12-15, 51:10-

5

22). Following this interaction, Falzone, however, admitted to General Manager Julie Welter that DeVries "was questioning the union affiliation of the gym equipment" movers and "said union movers should be used…" (Ex. C). Falzone further reported that DeVries threatened JLL with labor disruptions: "I was able to nicely negotiate him out of inflating a blow-up critter in front of the building." (Ex. C).

    Threats like these are not an isolated occurrence. DeVries testified that 705 frequently looks for non-union movers and when found, considers "taking some type of [retaliatory] action" including picketing, and deployment of the inflatable rat outside the offending buildings. (DeVries Dep. Tr. at 60:14 – 63:22). Unquestionably, the specter of Local 705's veiled and/or explicit threats regarding the presence of non-union movers at JLL buildings poses a constant threat to JLL, which reasonably explains why it would agree to capitulate to a demand to impose a union-only rule. And to be sure, Local 705's agreement with JLL extends beyond 180 N. LaSalle. DeVries regularly sends a list of Local 705 signatory movers to JLL managers for distribution to tenants. (*See, e.g.,* DeVries Dep. at 38:18-24, 41:20-24, 17:17-18:6, 18:2-6 (stating he regularly sends list, hoping building managers send it to tenants); Ex. D, Deposition of Julie Welter, General Manager at 180 N. LaSalle ("Welter Dep.") at 63:22-64:3, 64:23-24) (stating the list existed as long as she has been was at 180 N. LaSalle); Ex. E, JLL0025337 (General Manager for 1 N. Franklin and 175 W. Jackson requests updated list from DeVries); *see also* Ex. F, WDES' Answer to JLL's Interrogatories at No. 16 (Tishman Speyer confirmed that DeVries sends a list of "approved movers" to Chicago Loop buildings and threatens picketing should tenants attempt to use other movers, leading to "a lot of pressure on building managers" to follow the union-only rule.)).

    This "business behavior" reasonably evidences a practice and understanding between JLL and Local 705 which constitutes an agreement: Local 705 will periodically remind JLL to use its

6

movers by sending lists; It monitors its buildings for compliance; and at the first sign of non-compliance, a Local 705 Business Agent will personally show up as a harbinger of consequences to come if that non-compliance is not promptly remedied. And JLL's "business behavior" likewise strongly suggests an agreement with Local 705 to carry out the parties' objective. JLL General Manager Noah Gens explained it best in response to a building owner's request to use a non-union mover to donate chairs to the Chicago Public School System: "I do not want to come across as an obstructionist, but I also do not want to carelessly succumb to this request either." (Ex. G, JLL0018592); (Ex. H, Dep. Tr. Noah Gens ("Gens Dep.") at 36:8 – 38:1). Gens confirmed during his deposition that his concern with permitting non-union workers was union repercussions – disruptions such as strikes, picketing, or the inflation of a giant rat outside of JLL buildings. (Gens Dep. at 52:5 – 53:3).

In other words, JLL agrees, appeases, and acquiesces to Local 705's demands, all of which provide substantial circumstantial evidence of a conspiracy. And the fact that JLL may have done so "reluctantly" is no defense. *See, e.g., MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (reluctant participants are still RICO conspirators, citing authority in RICO and antitrust context). In sum, for class certification, it is more than reasonable to infer from the evidence that JLL implements and carries out the same union-only rule for movers at the behest of Local 705 because it fears Local 705's retaliatory response.[5]

---

[5] JLL's fear that union disruptions will impact its ability to perform business is reflected in other communications, too. For example, Jim Drach and Sean Casey, JLL Chief Engineers at 125 S. Wacker and 71 S. Wacker, respectively, emailed each other in June 2016 to discuss their shared concern about how union contractors Bear Construction and JC Anderson and their subcontractors walked off due to another union's picket line. (Exhibit I, JLL0000912-13).

### 2. Conspiracy between JLL and Local 399.

WDES has also obtained evidence sufficient to establish, by reasonable inference, that Local 399 and JLL conspired to prohibit all non-union trade workers from performing any contracting and subcontracting work in all of JLL's Chicago Loop buildings. When non-union workers seek to perform work at JLL buildings, Local 399's long-standing practice, "reinforced periodically including at membership meetings," is for JLL's on-duty Chief Engineers to report any non-union presence to Local 399. (Ex. A at ¶ 3). Even if the non-union workers are not engineers (and thus not affiliated with Local 399), JLL's Chief Engineers *still* report non-union labor to Local 399. Local 399's President and Business Manager, Patrick Kelly, testified that this is because the union "has an interest in ensuring that contractors who perform work" in JLL's Chicago Loop buildings are union workers. (Ex. A at ¶¶ 2-3). All JLL Chief Engineers – and their supervising General Managers – likewise bar non-union trade workers from JLL buildings.

JLL Chief Engineers work with other JLL employees to ensure compliance with Local 399's union-only trade worker preference. For example, Falzone confirmed that all JLL Chief Engineers agreed "not to have non-union contractors in our building." (Ex. J, Deposition of Frank Falzone ("Falzone Dep.") at 13-14). A reasonable inference, particularly given JLL's unquestioned knowledge and consent to the conduct of their agents,[6] is that JLL's Chief Engineers are not merely acting in their own personal interests, but carrying out an agreement between JLL and Local 399 to institute the union-only rule. This evidence of business behavior—which is common to all putative members of the Contracting Subclass—constitutes significant circumstantial proof of an agreement between JLL and Local 399 to keep out non-union trade workers.

---

[6] Falzone's immediate supervisor, Welter, similarly testified that her building was a "union building," which she defined: "the building has a requirement that union labor perform work in the building." (Welter Dep. at 19:13-23). She further testified that part of her job was to prevent non-union workers from working in the building." (*Id.*).

8

### B. JLL's Defense That Every Landlord at Every Loop Building Independently And Continuously Directed JLL to Institute the Union-Only Rule Holds No Weight.

In its original opposition, JLL adamantly opposed certification on the grounds that it could not have participated in a conspiracy regarding the union-only rule because the "building owner sets its rules for the building[.]" (Dkt. No. 125 at 5). But a reasonable inference from the evidence is that the union-only rule did not originate from the building owners at all, but from JLL itself.

Other than its own self-serving testimony, JLL – notwithstanding unfettered access to numerous landlord clients – has not produced any reliable evidence that any landlord ever asked it to institute a "union-only" rule.[7] All JLL produced in support of this claim was the building rules for one building, which is silent on why the rule exists. (Ex. K, JLL00000671-693). Likewise, JLL's agreements with its landlord clients are silent on the issue. (*See*, *e.g.*, Ex. L, JLL00003973-4000). But tellingly, the evidence shows just the opposite, that *JLL resists* when landlords themselve*s* try to use non-union labor at their own buildings, which simply can't be squared at all with JLL's purported defense.

This fact deserves repeating: If a ***landlord*** wants to use non-union labor at a JLL building, *it must seek JLL's approval*. For example, in a 2015 email, two JLL General Managers, Noah Gens and David Hopwood,[8] addressed whether JLL should permit its own landlord-client to use non-union movers. (Gens Dep. at 11:10 – 13:17). Callahan Capital Partners, owner of both 180 N. LaSalle and 125 S. Wacker, asked JLL if it could use non-union movers to donate chairs to Chicago Public Schools. (Gens Dep. at 36:8 – 38:1). In response, Gens advised the landlord that "the use

---

[7] This is made clear by JLL's answer to WDES' interrogatory asking for the evidence that the landlords have imposed the rule. (Exhibit M, Defendant's Objections and Answers to Plaintiff's Second Set of Interrogatories at page 3-4) (Defendant simply points Plaintiff to building management agreements and rules.)

[8] Gens was the General Manager for 333 S. Wabash and an assistant manager 71 S. Wacker and various other JLL buildings downtown (Gens Dep. at 11:10 – 13:17) and Hopwood the General Manager for 111 S. Wacker. (*Id.* at 31:18 – 32:3, 44:22 – 45:3).

9

of union labor is not based on intent, no matter how good hearted it may be (*i.e.,* charity), but rather based on trade jurisdiction[9]", emphasizing that he "never allowed a non-union trade to conduct work in a union building before." (Ex. G). Given that the landlords themselves must seek JLL's permission to use non-union labor, JLL's suggestion that the union-only rule originated from them, individually, collectively or otherwise, is simply untenable and implausible.[10]

Accordingly, for purposes of class certification, there is ample common evidence that JLL does not simply enforce a union-only rule created by building owners as it claims – but rather *JLL promulgates and imposes* the rule upon tenants. And the evidence reveals this is generally how it works at all JLL loop buildings. (*See, e.g.*, Ex. G (email between Hopwood and Gens regarding Callahan Capital Partners)).

### C. The Evidence Of Each Association-In-Fact Enterprise Is Common To Each Subclass.

As detailed above, there is significant proof of an agreement between JLL and Local 705 to exclude non-union movers from JLL's Chicago Loop buildings. JLL has an admittedly close relationship with Local 705. (Ex. N, JLL0021047). Local 705 is constantly on the lookout for non-union movers, as DeVries testified, and threatens to picket and/or deploy the inflatable rat outside any offending building. JLL has cooperated by not allowing non-union movers in its buildings, even refusing requests by building landlords to use non-union movers. This establishes the "common purpose" and relationship parts of the RICO enterprise requirements. And the longevity of the relationship is also established by its existence throughout the class period (and likely was

---

[9] "Trade union jurisdiction" refers to union trades that are subject to a CBA. (Gens Dep. at 27:16-19).

[10] Importantly, even if the Court were to conclude that all of the landlords did impose the rule on JLL—which the evidence does not support—it would still not alter this conclusion. As explained above, and in Plaintiff's Reply in Support of Class Certification (Dkt. 131, Section II at 3-5, citing authority), being compelled or induced to enter into a conspiracy is no defense. Liability still attaches to such participants.

10

existence well before the class period, too). Thus, there is common evidence of this enterprise for the proposed Moving Subclass.

With respect to the enterprise comprised of JLL and Local 399, as detailed above, the evidence presents significant proof of an unwritten agreement between them to bar non-union trade workers from JLL's Chicago Loop buildings. There is a close working relationship between JLL and Local 399, both as a result of their CBA, and more importantly, the JLL Chief Engineers who wear two hats: as union-members trained to report non-union workers to Local 399; and as JLL employees trained to report non-union workers to JLL. A reasonable inference from this evidence is that the Chief Engineers are enforcing an unwritten agreement on behalf of both JLL and Local 399. This establishes the "common purpose" and the relationship parts of the RICO association-in-fact enterprise requirements. And as with the Local 705 enterprise, the longevity is established by the duration of this agreement for the entire class period (and undoubtedly much longer). This is all common evidence that can be shared by all Contracting Subclass members.

And this evidence is more than sufficient under the low threshold of *Boyle* to establish the existence of these enterprises at this stage of the litigation. *See* 556 U.S. 946.

**D. At the Very Least, The Court Should Certify A Class For The Five Buildings For Which Plaintiff Secured Direct Evidence Giving Rise To A Reasonable Inference Of A Conspiracy.**

As explained above, class certification of the Moving and Contracting Subclasses is warranted because common evidence exists tending to establish, by reasonable inference, that JLL formed an agreement and was part of an enterprise with Local 705 and 399, respectively, to prevent non-union trade workers and movers from performing work at all Loop buildings managed by JLL. Plaintiff sought to bolster this evidence with an additional corporate designee (*see* D.E. 174, Motion for Leave) to show that these uniform practices at 125 S. Wacker, 180 N LaSalle, 333 S.

11

Wabash, 71 S. Wacker, and 111 S. Wacker (described above) were not unique to these locations, but <u>standardized</u> at all JLL Loop buildings. It is Plaintiff's position that the Court's decision to deny its request (*see* D.E. 180) limited its ability to bridge the evidence of common practices at these five buildings to the rest of the Loop, but WDES understands and respects the Court's ruling.

In any event, WDES plainly secured common (and detailed) evidence directly from JLL General Managers, other employees and union representatives, concerning their activities at these five buildings, which provides solid support at the class certification stage that the alleged conspiracy/enterprise exists and is perpetuated at these five locations. Accordingly, should the Court find that there is insufficient common evidence to certify the class for the 20 buildings at issue, Plaintiff requests certification with respect to 125 S. Wacker, 180 N LaSalle, 333 S. Wabash, 71 S. Wacker, and 111 S. Wacker.

## **CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that this Court: i) certify this case for class treatment pursuant to Rule 23(b)(2) and (3) as to the Moving Subclass (if not for all 20 buildings, then for the five listed buildings); ii) certify this case for class treatment pursuant to Rule 23(b)(2) and (3) as to the Contracting Subclass (if not for all 20 buildings, then for the five listed buildings); iii) appoint WDES as the Class representative; and iv) appoint Plaintiff's counsel as Class Counsel under Rule 23(g).

Dated: October 1, 2021                                              Respectfully Submitted,

                                                                                   /s/ *James B. Zouras*

                                                                                   James B. Zouras
                                                                                   Ryan F. Stephan
                                                                                   Anna Ceragioli
                                                                                   **STEPHAN ZOURAS, LLP**
                                                                                   100 N. Riverside Plaza, Suite 2150

Chicago, IL 60606
jzouras@stephanzouras.com
rstephan@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
**FOSTER PC**
10 S. Riverside Pl., Suite 875
Chicago, IL 60606
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
**THE WALNER LAW FIRM LLC**
555 Skokie Boulevard, Suite 250
Northbrook, IL 60062
awalner@walnerlawfirm.com

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on October 1, 2021, I electronically filed the attached with the Clerk of the Court using the ECF system which will send such filing to all attorneys of record.

*/s/ James B. Zouras*