## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**WACKER DRIVE EXECUTIVE SUITES, LLC, on behalf of itself, individually, and on behalf of all others similarly situated,**

**Case No. 1:18-cv-5492**

        **Plaintiff,**

**Magistrate Judge Sunil R. Harjani**

    **v.**

**JONES LANG LASALLE AMERICAS (ILLINOIS), LP,**

        **Defendant.**

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## ITS SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

**I.** **There Is Direct and Circumstantial Evidence That The Union-Only Rule Is JLL's; JLL Can't Escape Its Own Words.**

In its Supplemental Brief, WDES detailed the evidence undermining JLL's chief defense that every building owner (dozens of them) each independently and consistently, over countless years, "directed" JLL to impose the union-only rule. (*See* Dkt. 183 at 5-6, 10-11). In response, JLL doubles down on this, but offers no direct evidence to back it up. To be sure, JLL points to various building rules that generally state that building owners reserve the right to impose rules and regulations. (*See, e.g.,* Dkt. 190 at 7-8). But none mention the union-only rule, much less that the building owners directed JLL to impose it.

As shown by the 19,000 pages of emails generated in this case (Dkt. 165 at 2), JLL is in constant communication with the building owners, yet cannot identify a single email/document by an owner directing it to exclude non-union workers from the buildings. And despite 10 months of additional discovery, JLL has not procured a single declaration from a building owner (its own clients) attesting that it was they, not JLL, that promulgated the union-only rule. JLL does mention the rule in one email, but it was so JLL could *advise the owner of JLL's ban* on non-union labor. (Dkt. 183-7). JLL points out that this email involved a building outside the class definition, but the discussion is between JLL's General Manager for 333 S. Wabash and Assistant Manager for 71 S. Wacker and other JLL Loop buildings (Gens) and JLL's General Manager for Loop building 111 S. Wacker (Hopwood). And the import of the email is self-evident – two JLL Managers (who have "corresponded on the union vs. non-union matter in the past") understand that "the use of union labor is not based on intent . . . but rather based on trade jurisdiction." (Dkt. 183-7). Gens unequivocally states that he has "<u>never allowed a non-union trade to conduct work in a union building before</u>" and did not want to "carelessly succumb to [the building owner's] request." (Dkt. 183-7). No one on this email chain ever suggested that the prohibition of non-union labor was an

owner's directive, not even the owner itself who was oblivious to it. It was JLL's management – the common thread at all buildings – that promulgated and enforced the union-only rule.

JLL claims that WDES's arguments around this email "speak[] volumes about the weakness of WDES's evidentiary support." (Dkt. 190 at 8). But what actually "speaks volumes" is the absence of a single shred of paper showing any building owner "directive" on the union-only rule. JLL points to Building Owner Management Agreements, detailed legal documents setting forth JLL's responsibilities as established by the building owners, and in these documents, a single provision that describes JLL's responsibility as follows: "[to] implement or cause to be implemented the decisions of the Owner." (Dkt. 190 at 8-9). But how any of this is evidence that JLL couldn't have independently implemented its own rule, especially an unwritten one, is a mystery to WDES. Like every other document JLL relies on, these materials are silent on non-union labor. More importantly, the agreements specifically provide that "[JLL] shall have total responsibility for and shall fully comply with all applicable laws and regulations having to do with . . . wages, working conditions and other employer-employee related subjects." (Dkt. 190-10 at JLL_4303). If the building owners really were imposing a rule on union labor, it would have been explicitly recited there and JLL would not be given "total responsibility" over the area. Simply put, JLL lacks an evidentiary foundation to claim building owners dictate the rule.

With no documents to substantiate its position, JLL obfuscates, stating its managers "testified that the union-only rule is a directive from the building owner, not JLL." (Dkt. 190 at 5). This is spurious. Not one JLL witness could point to any communication (direct or otherwise) with a building owner concerning any such "directive," identify any who purportedly gave the directive, or when/why this directive was made. All JLL's witnesses said is that because they believe all building rules come from building owners, they *assume* the union-only rule must as well. (*See,*

*e.g.*, Dkt. 125-10 at 18:18-19:23; 60:11-61:1 (Chief Engineer, in response to the question of *whether* ownership asked JLL to exclude non-union labor, "I believe that's what we are – how we are directed. I don't know for sure. So I don't know."); *see also* Dkt. 183-4 at 54:8-24-55:1-11 (JLL General Manager has no personal knowledge of its origins); Dkt. 190-3 at 50:3-18 (JLL Vice President testifying he can't "recall" if owners imposed the rule, how long it was in place, or why it was implemented). If these are building owner rules, why can't JLL point to a single piece of evidence to support it, other than its self-serving-we-say-so statements that lack evidentiary foundation?[1]

Even if the Court were to credit JLL's unsupported position that it merely enforces a passed-down rule, that is still not a defense. JLL asks: "How could JLL have been responsible for a rule it inherited?" (Dkt. 190 at 9). The answer is simple, and it relates to one very important dispositive issue that JLL has tellingly ignored throughout *all* of this briefing—to prevail on liability, there is no requirement that WDES prove JLL originated the rule. Even if JLL "enforced" the union-only rule at the building owners' direction, as it claims, it still agreed to carry it out, and conspirator liability (joint and several) attaches all the same because it was agreeing with the Unions to do so. (*See* Dkt. 131 at 3-4, citing authority; Dkt. 183 at n.10 (same)).[2] This is true whether the agreement was voluntary or required by the owners because under RICO, a party which enters into a conspiracy to violate the statute is liable even if its agreement was not entirely voluntary (or was even coerced). *See, e.g., MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.,*

---

[1] While the Court has the discretion to apply the evidentiary rules less strictly on class certification, it cannot turn a blind eye to the fact that JLL's core defense is supported entirely by the testimony of witnesses who lack personal knowledge and lack proper foundation for their assertions. *See, e.g., Mednick v. Precor, Inc.,* 320 F.R.D. 140, 146 (N.D.Ill. 2017) (noting that courts "have leaned both ways" on whether the court may consider only admissible evidence at class certification).

[2] WDES need not name every conspirator as a defendant, who are all jointly and severally liable for acts of their co-conspirators. *In Re. Cotton Yarn Antitrust Lit.,* 505 F. 3d 274, 284 (4th Cir. 2007); Dkt. 131 at 8-9.

62 F.3d 967, 980 (7th Cir. 1995) (reluctant RICO conspirator liable even if coerced). Accordingly, even if the building owners somehow required or expected JLL to impose the union-only rule (explicitly or as a carry-over legacy), that is not a defense for JLL's conduct.

## II. WDES' Evidence Of A Conspiracy Is Not Mere Speculation; The Facts Give Rise to A Reasonable Inference.

The Court tasked WDES to submit "direct or circumstantial proof of a promise between JLL and the Unions to impose the union-only rule or any evidence from which a reasonable inference could be made that such an agreement existed." (Dkt. 135 at 10). As detailed *supra*, there is direct evidence showing JLL promulgates and enforces the union-only rule. And WDES presented circumstantial evidence that JLL enforced the union-only rule per an agreement with Local 399 and 705. JLL responds by labeling WDES' evidence "speculative," repeating its mantra that building owners, not JLL, directed the rule. (Dkt. 190 at 15). But WDES's circumstantial evidence, viewed in concert with the direct evidence of JLL's enforcement of the union-only rule, is enough to reasonably infer that JLL agreed with Local 705 and 399 to enforce it.

"Circumstantial evidence involves drawing an inference from the circumstances." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017). "[It] can be more probative than direct evidence." *U.S. v. Grier,* 866 F.2d 908, 923 (7th Cir.1989). Because "conspiracies are carried out in secret, direct proof of agreement is rare," and as such, "[n]ot only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support." *U.S. v. Stephens*, 46 F.3d 587, 593 (7th Cir. 1995). The Seventh Circuit has observed that "[t]he difference between speculation and inference lies in the substantiality of the evidence constituting the premise." *Wisconsin Mem'l Park Co. v. Comm'r*, 255 F.2d 751, 752 (7th Cir. 1958). The *only* reasonable explanation for JLL's interactions with Local 705 and Local 399 with respect to the union-only rule is the existence of an agreement regarding that rule.

4

Here, with respect to Local 705, emails, documents, and testimony show JLL carrying out the union-only rule at the behest and under the threatening watch of Local 705: Local 705 regularly sends, and JLL accepts, lists of member movers the union wants JLL's tenants to use (Dkt. 183 at 7-8); and Local 705 ensures compliance by monitoring JLL's buildings. (Dkt. 183 at 6-8). This is made clear because the one time JLL slipped up (on a Saturday), Local 705 sprang into action and JLL's Chief Engineer had to "negotiate" Local 705 out of ratting the building. (Dkt. 183 at 6; Dkt. 183-3[3]). This is not merely "parallel behavior" as JLL suggests (Dkt. 190 at 15-16) because as the evidence makes clear, JLL and 705 regularly <u>interact</u> to carry out the agreement.

Likewise, Local 399's sworn statements, along with the testimony from JLL's witnesses, show that these parties also regularly need to interact to carry out the agreement (the union-only rule): Local 399 engineers at JLL buildings monitor for non-union labor while being paid and supervised by JLL. (Dkt. 183 at 9); and if the union-only rule is broken, they are instructed to contact Local 399. (Dkt. 183 at 9). JLL concedes all this but contends there is no evidence that <u>JLL</u> expects its engineers to report non-union workers to JLL management. (Dkt. 190 at 18-19, 23). Not so. Engineers constantly patrol buildings to "strictly enforce" the rule on JLL's behalf, as JLL well-knows. (*See, e.g.,* Ex. 1, JLL_29744-45 ("I just want to be sure there are no occurrences with a contractor in the building that we did not approve or is non-union. Plus our amazing engineers are union . . . and they strictly enforce that"); Ex. 2, JLL_19631-19633 (JLL approved tenant request to use a non-union installer after receiving permission from its Chief Engineer confirming there are no union installers); Ex. 3, JLL_41426-28 (JLL aware engineers enter tenant space without tenant authorization to check union status); Dkt. 190-5, at 24-25, 27 (JLL General

---

[3] Contrary to JLL' insinuation, WDES did not ask Falzone about the email because the email (and Devries' inspection) occurred months *after* Falzone's deposition. (Dkt. 190 at 17). Moreover, JLL's characterization that Falzone was kidding about the rat is a credibility issue to be decided by a jury.

Manager did not instruct engineers to stop reporting presence of non-union workers); Dkt. 190-6, at 33, 35-36 (JLL General Manager did not consider engineer reporting improper). This is circumstantial (if not direct) evidence that JLL acquiesces, approves, and encourages its engineers to enforce the union-only rule. As such, it is more than a reasonable inference that JLL's engineers are not merely acting on their own, but carrying out – as authorized agents of JLL – an agreement between JLL and Local 399. Engineers are the linchpin in this relationship: Local 399 and JLL regularly interact through the Chief Engineers as their common conduit, meaning they are not merely acting in "parallel", but are instead acting together in agreement.

As is often the case, direct proof of a conspiracy is rare, and evidence is difficult to obtain given its clandestine nature. But circumstantial evidence can be just as probative as direct evidence, and can serve as the only evidence by which a conspiracy is proven. By directing WDES to present circumstantial evidence of a conspiracy, the Court signaled awareness of this standard. WDES has presented this evidence, and JLL cannot conclusively label all this evidence as "speculation" simply because it disagrees with the reasonable inferences drawn from it.

### III. There Is Sufficient Circumstantial Evidence Of The Enterprises To Satisfy *Boyle*.[4]

JLL puts forth three generalized criticisms of the enterprises (Dkt. 190 at 20-22), all of which are confusing, misstate the law and as explained, miss the mark.

First, JLL contends that it and the Unions have "divergent" interests (*Id.* at 20-21), but then in the same breath, *describes their common interest*:

> JLL's goal is to carry out its responsibilities as building manager/agent to the building owner, *including enforcing the building owner's union-only rule* . . . the Unions' goals are to promote the interests of their members, *including promoting use of union-only labor.*

---

[4] *Boyle* requires only that association-in-fact enterprises have three features: purpose, relationship among the members; and longevity. *Boyle v. U.S.*, 556 U.S. 938, 945-47 (2009). *See* Dkt. 183 at 3 (citing standard). WDES discussed each factor in its Supplemental Brief. (*Id.* at 11-12).

(*Id.* at 21, emphasis added). In any event, JLL is just wrong on the law because members of an enterprise *can* have "divergent" interests. *See, e.g., U.S. v. Volpendesto*, 746 F.3d 273, 296 (7th Cir. 2014)[5]; *see also Inteliquent, Inc. v. Free Conferencing Corp.,* 503 F. Supp. 3d 608, 628 (N.D. Ill. 2020) ("Given the flexibility of RICO's statutory language, a single 'association-in-fact' enterprise can exist even when its members and associates constitute opposing factions").

Second, JLL contends that the enterprises have no structure apart from the racketeering activity, citing *U.S. v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). *Boyle* rejects any such requirement, holding that while an association-in-fact enterprise is required to have a structure, it does not need to have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engaged. 556 U.S. at 945-47; *see also Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094 (N.D. Ill. 2016) ("No further features or other ascertainable structures beyond those inherent in the predicate activity are required.").

Further, as this Court recently held, the threshold for establishing an association-in-fact enterprise is low. *See Inteliquent*, 503 F. Supp. 3d at 627 ("[An association-in-fact enterprise] need not be 'much' more than a bare-bones conspiracy to commit the predicate acts themselves."); *Obiefuna v. Hypotec, Inc.*, 451 F. Supp. 3d 928, 950 (S.D. Ind. 2020) ("the Supreme Court and the Seventh Circuit . . . have instructed lower courts to remain 'liberal' when reviewing allegations of an enterprise and imputing to the term 'enterprise; a broad meaning . . . .'"). Nevertheless, there is

---

[5] "Nor is it contradictory to say that someone shares in a common purpose even though that person's ultimate interests diverge from his confederates. For example, a person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means. He cannot escape liability just because, at the end of the day, he prizes his own self-interest above the group's." *Volpendesto*, 746 F.3d at 296.

relationship/structure apart from the racketeering acts.[6] As WDES discussed (Dkt 183 at 11-12), there is a close working relationship between JLL and 399, *inter alia*, as result of the CBA governing JLL's engineers (signed by BOMA). And even though there is no governing CBA for Local 705, there is an admittedly close relationship.

Third, JLL contends there is no enterprise as the Unions are acting to advance their own self-interests, citing *Green v. Morningstar Inv. Mgmt. LLC*, 2019 WL 216538 (N.D. Ill. Jan. 16, 2019). As discussed *supra* (citing *Volpendesto/Inteliquent*), this is not a bar to establishing an association-in-fact enterprise. Putting that aside, *Green* is not applicable here because neither JLL nor the Unions are "simply performing services for an enterprise," which was the issue in *Green*.

With respect to Local 705, there is certainly no "commercial relationship" as JLL contends (Dkt 190. at 21, also discussed in *Green*), as there is no CBA with the buildings at all. And the fact that JLL and Local 399, which represents *engineers*, work together to ensure that (third party) *tenants* hire union contractors for *non*-engineering work (*i.e.,* for carpenters, painters, electricians, etc.) actually underscores how their actions are not taken for their own self-interest, but on behalf of a larger enterprise. Neither JLL nor Local 399 should have any interest—on their own—in ensuring that carpenters, painters, etc. are hired by tenants. As such, JLL's relationship with these Unions are not "run-of-the-mill" commercial relationships, and JLL's argument holds no weight.

JLL then takes a few additional scattered shots at each enterprise separately that also fail. With respect Local 399, WDES describes the details of how this enterprise actually operates (Dkt. 183 at 12), which is supported by the testimony of *an adverse witness*, Patrick Kelly (Dkt. 183-1). JLL is largely silent about this testimony, except to say that it doesn't show that the engineers "took on this responsibility as a result of [their] role in a JLL/Unions enterprise[.]" (Dkt. 190 at

---

[6] JLL does not dispute that a structure between JLL and the Unions exists to carry out the hot cargo agreement, which is enough on its own under *Boyle*.

23). This is not true. For the reasons detailed above (Sec. II), JLL engineers, under JLL's direct knowledge and supervision, report non-union workers to JLL management.

With respect to Local 705, JLL's argument is that there is no common purpose because the Union patrols JLL's buildings less frequently than WDES portrays. (Dkt. 190 at 22).[7] This is pedantic – the clear upshot of Devries' testimony is that he approached JLL building management *on a Saturday* to send a message when he found non-compliance: Local 705 is watching and repercussions (picketing, rat) are possible. It was subtle/implicit, but that is how enterprises often operate. *See U.S. v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978). And DeVries' message was understood. (Dkt. 183-3.) All this is to say that at this stage of the case, WDES' view of this circumstantial evidence is, at the very least, more than fair and reasonable.[8] Thus, for purposes of class certification, there is enough proof of an enterprise under *Boyle*.

**IV.    The Court has Inherent Authority to Certify a Modified Class as Proposed.**

In its Motion, WDES sought certification of two subclasses: a contracting subclass; and a moving subclass. (Dkt. 105 at 7-8). WDES also noted in its Supplemental Brief that the Court could, in its discretion, grant certification for certain buildings. (Dkt. 183 at 12-13). If the Court finds that there is stronger evidence for certain subsets of tenants as compared to tenants at all 20 buildings, that should not be a basis for denying certification across the board. Accordingly, in this event, WDES reiterates its alternative request for certification for certain subclasses.

Dated: November 24, 2021                               Respectfully Submitted,

---

[7] JLL also takes issue with emails showing that it donates money to Local 705. According to JLL, "this email shows JLL and Local 705 had a relationship but is not direct or circumstantial proof that an enterprise existed." (Dkt. 190 at 22). Actually, *it is* evidence supporting an enterprise, because "relationship" is one of the three components of an association-in-fact enterprise under *Boyle,* 556 U.S. at 946.

[8] That JLL may have on occasion allowed non-union movers for certain charitable purposes doesn't alter the analysis. Any such deviation was met with obvious consternation about Union's repercussions.

<u>/s/ *James B. Zouras*</u>

James B. Zouras
Ryan F. Stephan
Anna Ceragioli
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza, Suite 2150
Chicago, IL 60606
jzouras@stephanzouras.com
rstephan@stephanzouras.com
aceragioli@stephanzouras.com

Howard W. Foster
Matthew A. Galin
**FOSTER PC**
10 S. Riverside Pl., Suite 875
Chicago, IL 60606
hfoster@fosterpc.com
mgalin@fosterpc.com

Aaron R. Walner
**THE WALNER LAW FIRM LLC**
555 Skokie Boulevard, Suite 250
Northbrook, IL 60062
awalner@walnerlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, the attorney, hereby certify that on November 24, 2021, I electronically filed the attached with the Clerk of the Court using the ECF system which will send such filing to all attorneys of record.

*/s/ James B. Zouras*