# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WACKER DRIVE EXECUTIVE SUITES,
LLC, on behalf of itself, individually, and
on behalf of all others similarly situated,

        Plaintiff,

        v.

JONES LANG LASALLE AMERICAS
(ILLINOIS), LP,

        Defendant.

Case No. 18 C 5492

Magistrate Judge Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a civil RICO action which arises from an alleged conspiracy between a building

manager and two labor unions to force tenants to hire union-only movers and contractors at 20

commercial office buildings in the Chicago Loop. Plaintiff Wacker Drive Executive Suites, LLC

("WDES") is a former tenant of a building located at 125 S. Wacker Drive in Chicago, Illinois,

and Defendant Jones Lang LaSalle Americas (Illinois), LP ("JLL") manages 125 S. Wacker Drive

as well as other buildings in the Chicago Loop. WDES seeks to certify a class of tenants to sue

for alleged civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")

based on an alleged extortion and bribery scheme. This is WDES's second attempt to support

class certification. The first certification motion was denied without prejudice because WDES had

not established that "there are questions of law or fact common" to the class. *See Wacker Drive*

*Executive Suites, LLC v. Jones Lange LaSalle Americas (Illinois), LP*, 337 F.R.D. 149 (Sept. 23,

2020). The Court then allowed WDES ten months to conduct additional discovery and file

supplemental briefing in support of its request for class certification. Having carefully considered

the parties' original and supplemental briefing and oral arguments, the Court now denies WDES's supplemental motion for class certification [183]. WDES has not provided significant proof of the central common issues in this case, namely those relating to the existence of the required agreements/conspiracies between the building manager and the labor unions and the existence of an enterprise under RICO as to all 20 JLL-managed buildings in the Chicago Loop (the "Class Buildings").[1] In addition, since no common issue is present, WDES's claims cannot be typical of the claims of the class and common issues do not predominate. The Court also finds that certification is inappropriate on the ground that even if liability could be proven on a classwide basis, WDES did not meet its burden to demonstrate that it can prove damages for tenants who incurred contractor expenses on a classwide basis; that determination would require individualized damage assessments for thousands of tenant class members that would overwhelm classwide issues, making class certification inappropriate for class members who incurred contracting expenses.

## BACKGROUND

Between August 2005 and December 2017, WDES leased the third floor of the building located at 125 S. Wacker Drive in Chicago. WDES's primary business was leasing shared-full-service-executive office space to individuals and businesses. JLL manages numerous office buildings in the Chicago Loop, and it has been the 125 S. Wacker Drive property manager since 2012. In this lawsuit, WDES claims that it was required to use union contractors and movers at allegedly inflated costs when it performed renovations to its leased space in 2014 and 2017 and

---

[1]     The Class Buildings are located at: 1) 1 North Franklin Street; 2) 101 North Wacker Drive; 3) 111 South Wacker Drive; 4) 111 West Jackson Boulevard; 5) 123 North Wacker Drive; 6) 125 South Wacker Drive; 7) 175 West Jackson Boulevard; 8) 180 North LaSalle Street; 9) 20 North Wacker Drive; 10) 200 West Adams Street; 11) 200 West Jackson Boulevard; 12) 224 South Michigan Avenue; 13) 231 South LaSalle Street; 14) 36 South Wabash Avenue; 15) 71 South Wacker Drive; 16) 175 North Franklin Street; 17) 201 North Clark Street; 18) 300 South Wacker Drive; 19) 330 South Wells; 20) 77 West Wacker Drive.

moved office furnishings into its space in 2015 "as the result of an illegal conspiracy/agreement between JLL and [] labor unions to force tenants into hiring union-only movers and union-only building trades contractors" in violation of RICO. Doc. 105 at 2. WDES originally alleged that JLL and three unions, Teamsters Local 705, International Union of Operating Engineers Local 399, and the Service Employees International Union, Local 1, conspired to form a single RICO enterprise. Doc. 76 at ¶¶ 13-14, 54-55, 64; doc. 183 at 4 n.4. After ten months of additional discovery, WDES "does not believe that Local 1 is part of the conspiracy" and now frames its theory of the case as two separate alleged conspiracies—one between JLL and Local 705, and another between JLL and Local 399—but not a single overarching conspiracy. Doc. 183 at 4 n.4; *see also* Transcript of Oral Argument held on 2/4/2022 at 4.

WDES's basic theory is that JLL entered into an illegal hot cargo agreement with each union to force tenants at 20 office buildings to use union only contractors or movers and that its conduct related to enforcing those agreements violates RICO.[2] WDES's amended complaint consists of two counts arising under RICO. Count I is for a violation of 18 U.S.C. § 1962(c), which prohibits participation in the conduct of an enterprise through a pattern of racketeering activity engaged in interstate commerce. Count II alleges a conspiracy to violate subsection (c), which is a violation of 18 U.S.C. § 1962(d). WDES alleges two types of activity that could be considered predicate acts of racketeering: (1) extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 and (2) bribery in violation of Section 302 of the Labor Management Relations Act ("LMRA" or "Taft-Hartley Act"), 29 U.S.C. § 186(a). Doc. 76 at ¶¶ 32-40.

---

[2]    "A hot cargo agreement is an agreement by a business not to deal with nonunionized labor." *Goddess and Baker Wacker L.L.C. v. Sterling Bay Companies, L.L.C.*, 2022 WL 847480, at *2 n.3 (N.D. Ill. March 22, 2022). Section 8(e) of the National Labor Relations Act ("NLRA") generally bans hot cargo agreements. *Milwaukee and Southeast Wisconsin Dist. Council of Carpenters v. Rowley-Schlimgen, Inc.*, 2 F.3d 765, 766 (7th Cir. 1992); 29 U.S.C. § 158(e).

Regarding extortion, WDES alleges that JLL "preys on the tenants' fear of lost income that will result if they cannot get their office spaces worked on by tradesmen" to force tenants to use union-only labor and the "extorted property is the money that [tenants are] required to spend on more expensive union services." Doc. 76 at ¶ 34. Put another way, WDES says that unless tenants "accede to JLL's demands [to use union-only labor], they will not be able to start or complete their renovations and open for business." *Id*. According to WDES, the hot cargo agreement in violation of § 8(e) proves the wrongfulness element of its predicate extortion claim. *See* 18 U.S.C. § 1951(b)(2) (extortion requires "obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear"). WDES says that the union-only policy also violates 29 U.S.C. § 186(a) by causing tenants to pay increased labor costs that are effectively kickbacks to the union contractors or movers who would otherwise not be hired by the tenants. Doc. 76 at ¶ 39. WDES seeks monetary damages consisting of the increased price for union labor and moving costs and an injunction prohibiting JLL from continuing to enforce the union-only rule.

WDES now moves again for certification of a class of "[a]ll tenants in the class buildings who were subjected to JLL's requirement to hire union contractors exclusively and who incurred moving expenses and/or hired contractors to make improvements/renovations in their tenant space since August 14, 2014." Doc. 105 at 7. Specifically, WDES seeks certification of two subclasses under Rule 23(b)(2) and 23(b)(3): (1) class members who were subjected to JLL's union-only mover rule and incurred moving expenses ("the Moving Subclass") and (2) class members who were subjected to JLL's union-only contractor rule and incurred contracting expenses ("the Contracting Subclass."). *Id*. at 7-8; doc. 183 at 2.

WDES has had the opportunity to conduct substantial discovery to obtain evidence to support class certification. Prior to its first class certification motion, WDES served document production requests and interrogatories on JLL, deposed two JLL witnesses, and served document subpoenas on the three unions and three of the building owners. Doc. 125 at 9 n.3. Based on this evidence, the Court denied certification of the class, finding that the commonality requirement was not satisfied because WDES had not shown a common question that is subject to classwide proof. In particular, the Court found WDES's commonality theory factually inadequate because it had provided no proof of its critical contentions "that the union-only restriction is imposed as a result of an agreement between JLL and the Unions" and "that JLL and the Unions operated together as a single unit implementing the union-only rule" to potentially tie all its tenant claims together. *Wacker Drive*, 337 F.R.D. at 155. To address that concern, WDES was allowed to conduct ten months of additional discovery which included eight depositions and the production of more than 35,000 pages of documents, including 19,000 pages of emails. Doc. 190 at 4; doc. 193 at 2. The Court determined that it was more appropriate to make the final determination on class certification after discovery had been completed, rather than in the midst of it. *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (noting that "as a practical matter the time when a potential class action is ripe for a certification decision has been pushed back, and the burden on the party seeking to proceed with a class has increased" since the Supreme Court's decision in *Wal-Mart, Inc. v. Dukes*, 564 U.S. 338 (2011) and related cases). Despite being afforded the opportunity to conduct this additional discovery, WDES still has not met its burden of offering significant proof that the tenants in question meet the requirements under Rule 23 for the certification of either proposed subclass.

## DISCUSSION

Federal Rule of Civil Procedure 23 governs motions for class certification. "To achieve certification, a proposed class under Rule 23(b) must meet the requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—and one of the alternatives listed in Rule 23(b)." *Howard v. Cook County Sheriff's Office*, 989 F.3d 587, 597 (7th Cir. 2021). "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). The Supreme Court has made clear that Rule 23 "does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Instead, [a] party seeking class certification must *affirmatively* demonstrate [] compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id*. (emphasis added); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ."). "The party must also satisfy through *evidentiary proof* at least one of the provisions of Rules 23(b)." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). To do this, a plaintiff bears the burden of proving by a preponderance of the evidence that each of Rule 23's requirements are met. *Howard*, 989 F.3d at 597.

Moreover, a court's analysis of a class certification motion must be "rigorous" and will "frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 569 U.S. 33-34 (citations and quotations omitted); *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982) (to engage in a "rigorous analysis" as to whether the prerequisites of Rule 23(a) have been satisfied, courts must "probe behind the pleadings"). Rule 23 does not, however, permit

courts "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. Thus, the Court remains mindful that the merits themselves are "not on the table" at this class certification stage of the litigation. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018).

WDES argues that its class certification motion should be granted because it has satisfied all of the requirements under Rule 23(a) of the Federal Rules of Civil Procedure, as well as the requirements of Rule 23(b)(2) and 23(b)(3). JLL opposes class certification, arguing that WDES cannot show by a preponderance of the evidence that the commonality, typicality, or adequacy requirements of Rule 23(a), or the requirements of Rule 23(b)(2) and 23(b)(3), have been met.[3] JLL also argues that the opinion of WDES's expert, Dr. Robert Kaestner, should be excluded because his proffered testimony is not relevant or reliable on the issue of classwide damages and therefore, inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). WDES opposes JLL's motion to exclude Dr. Kaestner's proposed expert testimony. Because the Court finds that WDES has failed to satisfy Rule 23(a)'s commonality and typicality requirements and Rule 23(b)(3)'s predominance requirement, WDES's motion for class certification fails on these grounds alone. The Court need not address whether WDES has satisfied the adequacy requirement of Rule 23(a) or Rule 23(b)(2)'s requirements, or resolve JLL's motion to exclude Dr. Kaestner's proposed expert testimony.

---

[3] JLL has stipulated that the numerosity requirement is met in this case. Doc. 94.

A.      **Rule 23(a) Factors**

1.  **Commonality**

The Court's analysis begins with Rule 23(a)'s commonality requirement, which requires that WDES provide sufficient evidence demonstrating "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *Wal-Mart*, 564 U.S. at 353-60 (requiring "significant proof" of companywide policy of discrimination).   "Determining whether common questions are likely to generate common answers apt to drive the resolution of the litigation 'requires a precise understanding of the nature of the plaintiffs' claims'" and may overlap with the merits of the plaintiff's underlying claims. *McFields v. Dart*, 982 F.3d 511, 515-16 (7th Cir. 2020); *Molinari v. Financial Asset Management Systems, Inc.*, 2020 WL 4345418, at *6 (N.D. Ill. July 29, 2020) ("The commonality and predominance analyses require a court to consider the elements of the plaintiff's class-based claims.").

Since the Supreme Court underscored the need for plaintiffs to provide "significant proof" of a common question in *Wal-Mart*, the Seventh Circuit has had several occasions to evaluate evidence in determining whether the commonality prong of Rule 23(a) has been satisfied, without making a merits determination. *See, e.g.*, *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794 (7th Cir. 2017); *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016); *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015); *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426 (7th Cir. 2015); *Bolden v. Walsh Const. Co.*, 688 F.3d 893 (7th Cir. 2012); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (7th Cir. 2012).  The Seventh Circuit's decision in *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015) is a good example.   In *Bell*, the Seventh Circuit affirmed the district court's certification of a class of non-exempt employees who worked at one of twenty-six branches in Illinois alleging PNC had an unofficial policy or practice of

8

requiring employees to work unpaid overtime. *Bell*, 800 F.3d at 372. In analyzing the related requirements of commonality and predominance, the court of appeals rejected PNC's argument that the named plaintiff "was required to actually prove" the existence of such a policy before a class could be certified. *Id*. at 374-78. "A proposed class of plaintiffs must prove the existence of a common question . . . but it need not prove that the answer to that question will be resolved in its favor." *Id*. at 376. That said, "[t]his does not mean, however, that on issues affecting class certification, a court must simply assume the truth of the matters as asserted by the plaintiff." *Id*. at 377. Rather, "[i]f there are material factual disputes that bear on the requirements for class certification, the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.'" (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). The Seventh Circuit explained that a "court weighing class certification must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Id*. at 377; *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020) (recognizing the "contradiction built into the standard" of requiring the judge to "examine the evidence for its cohesiveness while studiously ignoring its bearing on the merits questions[.]").

In *Bell*, the Seventh Circuit determined that the plaintiff had offered sufficient "evidence that the denial of overtime pay came from a broader company policy." *Bell*, 800 F.3d at 375. As the Seventh Circuit described it, plaintiff's evidence consisted of (1) evidence that plaintiff was told not to record overtime; (2) an affidavit plaintiff's branch manager submitted stating that that PNC regularly required off-the-clock work; (3) evidence that at least one regional manager told branch managers not to record overtime worked by their employees; and (4) "plentiful evidence"

suggesting that many employees worked overtime without proper compensation. *Id.* On this record, the *Bell* court concluded that the question of whether PNC had an unofficial policy or practice requiring employees to work unpaid overtime hours was a common one that was capable of class-wide resolution. *Id.* at 375; *see also Chi. Teachers Union*, 797 F.3d at 431-32, 438-89 (concluding that the commonality requirement was met where evidence demonstrated that a "uniform employment practice (the set of criteria used to evaluate the school) used by the same decision-making body to evaluate the schools" resulted in a disparate impact on African-American teachers).

Without ruling on the merits, the Seventh Circuit has on several other occasions evaluated the extent to which plaintiffs can prove their case with common evidence, but found the plaintiffs' evidence insufficient to establish commonality. For instance, in *Bolden*, twelve African-American plaintiffs alleged that defendant Walsh Construction tolerated racial discrimination in assigning overtime work and in working conditions. *Bolden*, 688 F.3d at 894. The plaintiffs sought to certify two classes of African-American employees (the hostile-work-environment class and the overtime class) covering all of Walsh's 262 projects in the Chicago area going back several years. *Id.* at 895. In support of their overtime claim, the plaintiff submitted statistical evidence that white and Hispanic workers worked more overtime hours than African-American workers. *Id.* at 894. The Seventh Circuit overturned the district court's order certifying two multi-site classes. The court reasoned that the evidence, like the evidence in *Wal-Mart*, showed only that Walsh had a company-wide non-discrimination policy and granted discretion to its superintendents in assigning work and dealing with offensive language and bigoted conduct that occurred on Walsh's Chicago-area sites. *Id.* at 898. The evidence showed that the sites had different superintendents, different policies, materially different working conditions, and ranged in the amount of alleged discriminatory

practices. *Id*. at 896, 898. The court explained that "when multiple managers exercise independent discretion, conditions at different stores (or site) do not present a common question." *Id*. at 896. Furthermore, in analyzing the overtime claim, the court found that plaintiffs' statistical evidence did not satisfy the commonality requirement that would allow a multi-site overtime class. *Id*. at 896-97. The court noted, for example, that plaintiffs' proffered statistical evidence of a disparity in assigning overtime was inadequate to establish commonality because it did not demonstrate the common question of whether all supervisors discriminated in offering overtime. "If Walsh had 25 superintendents, 5 of whom discriminated in awarding overtime, aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality." *Id*. at 896. Accordingly, the evidence the plaintiffs presented failed to meet the commonality requirement. *See also McCaster*, 845 F.3d at 800 (finding plaintiffs' failure to "suppl[y] evidence that could support a finding" that defendant had a statewide practice of withholding payment of accrued earned vacation meant plaintiffs could not demonstrate that class members' claims "depend[ed] on a common contention that is 'capable of classwide resolution.'"); *Phillips*, 828 F.3d at 558 (emphasizing absence of classwide "proof" that a prison was engaging in a systemic practice of indifference to their need for dental care which could tie all the detainees' claims together); *Jamie S.*, 668 F.3d at 498 (vacating a class certification order because there was no "proof" of a common illegal policy that violated the IDEA).

With these precedents in mind, the Court proceeds to analyze commonality in light of the nature of WDES's RICO claims and its theory of the case. WDES's theory under RICO rests on 18 U.S.C. § 1962(c) and (d). The RICO conspiracy statute, 18 U.S.C. § 1962(d), provides that it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or

(c) of this section." 18 U.S.C. § 1962(d).  Under 18 U.S.C. § 1962(c), it is unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id*. § 1962(c).  RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).  Congress defined a "pattern of racketeering activity" to require "at least two acts of racketeering activity" within a ten-year period. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019) (citing 18 U.S.C. § 1961(5)).  Section 1961(1) defines "racketeering activity" to include violations of 18 U.S.C § 1951 (relating to interference with commerce, robbery, or extortion) and 29 U.S.C. § 186 (dealing with restrictions on payments and loans to labor organizations)—the offenses WDES alleges JLL committed.

WDES identifies the common questions of law and fact in this case as whether: (1) JLL enforced the union-only requirement at the class buildings; (2) JLL had an agreement with the Unions to enforce the union requirement at the class buildings; (3) JLL's agreement with the Unions was an illegal hot cargo agreement violating 29 U.S.C. § 158(e); (4) JLL violated 18 U.S.C. § 1951 and 29 U.S.C. § 186; (5) JLL violated 18 U.S.C. §§ 1962(c) and (d) in enforcing this requirement, including common legal questions of whether there is a pattern of racketeering and a RICO enterprise; and (6) the class members were damaged by this requirement/policy in the form of higher labor and moving costs, pursuant to 18 U.S.C. § 1964(c). Doc. 105 at 9.  In its supplemental brief in support of class certification, WDES has identified the common questions of whether "JLL formed an agreement and was part of an enterprise with Local 705 and 399, respectively, to prevent non-union trade workers and movers from performing work at all Loop buildings managed by JLL." Doc. 183 at 11.

Regarding WDES's first common question, the important issue for evaluating commonality is not simply whether JLL enforced a union-only restriction in the Class Buildings, but whether it did so because of an agreement between JLL and either Local 705 or Local 399 (separately, the "Union" and together, the "Unions"). The answer to WDES's first proposed question is not disputed. The Class Buildings have a general requirement that union labor perform work in the buildings. *McCaster*, 845 F.3d at 801 (holding proposed common question of whether defendant's vacation-pay policies were length-of-service policies subject to the IWPAC and its implementing regulation was "really no question at all" where defendant treated them as such and there was no dispute on the issue). As explained in the Court's prior opinion, WDES's first common question is not central to the validity of WDES's RICO claims and its answer will not drive resolution of the litigation because the "key issue with respect to WDES's RICO claims is whether JLL forced tenants to hire union-only contractors and movers 'as a result of an illegal conspiracy/agreement between JLL and the [] labor unions.'" *Wacker Drive*, 337 F.R.D. at 153-54. The Court noted that "[m]ere enforcement of the union-only requirement at class buildings by JLL does not establish that JLL agreed and conspired with the Unions to enforce the union-only rule." *Id*. at 154; *McFields*, 982 F.3d at 517 (holding question of whether paper triage policy exists was not common because it was "relevant to just one small part of the analysis" under *Monell* and *Miranda* and "leaves us far from resolving the litigation on a classwide basis.")

In its prior decision, the Court further found that WDES's second through sixth common questions all rest on its contention that JLL entered into an agreement with each Union to enforce the union-only restriction at the 20 Class Buildings. *Wacker Drive*, 337 F.R.D. at 155. WDES's theory of the case is thus dependent on the existence of agreements between JLL and the Unions to force tenants to use union labor across the Class Buildings. *See* Doc. 131 at 10 ("[t]he core

13

liability question identified by *both* [p]arties [is] whether JLL entered into an illegal 'hot cargo' agreement with the unions."). As the Court explained, proof that the union-only restriction is imposed as a result of an agreement between JLL and the Unions at all 20 buildings could potentially tie all the class claims together. *Id*. Whether JLL entered into such an agreement will "resolve an issue that is central to the validity of each claim" and thus satisfy the commonality requirement. *Chi. Teachers Union, Local No. 1,* 797 F.3d at 434; *Wal-Mart*, 564 U.S. at 359 ("even a single common question" is sufficient for Rule 23(a)(2)). In the current motion, the threshold common question remains whether JLL had an overall hot cargo agreement with each Union to enforce the union-only requirement in all 20 Class Buildings. Sufficient evidence of the necessary agreements must be provided, at the very least, before class certification to ensure that common factual or legal questions potentially exist.

In addition to overall agreements with the Unions to enforce the union-only rule across the 20 Class Buildings, WDES's RICO conspiracy claim (§ 1962(d)) also hinges on an agreement to violate RICO. At its core, a RICO conspiracy is an *agreement* to commit predicate RICO acts. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) ("[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute."); *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 600 (7th Cir. 2001) (emphasis in original) (Section "1962(d)'s target, like that of all provisions prohibiting conspiracies, is the *agreement* to violate RICO's substantive provisions, not the actual violations themselves."). Thus, besides a hot cargo agreement that is necessary to prove that JLL violated 18 U.S.C. §§ 1962(c) and (d), including the wrongful element of a Hobbs Act extortion predicate claim, an agreement is also needed to prove the RICO conspiracy claim.

A second related common question to be resolved in order for the proposed class to recover under its RICO claims is whether there is a RICO enterprise? This issue is also crucial in this case because it will "resolve[] a key element of all of the plaintiffs' claims." *Phillips*, 828 F.3d at 552. Establishing a RICO violation under 18 U.S.C. § 1962(c) and (d) requires, among other things, proof of the existence of an enterprise. *Bobb v. Swartz-Reston P.C.*, 2018 WL 4384292, at *6 (N.D. Ill. Sept. 14, 2018) (although there are substantive differences among the four RICO provisions, "the existence of an 'enterprise' is fundamental to each provision" of 18 U.S.C. §§ 1962(a)-(d)). An association-in-fact enterprise, which WDES alleges existed here, is defined as a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Thus, central to the RICO claims is proof that JLL and the Unions were engaged in an association-in-fact enterprise to enforce the union-only requirement across the Class Buildings. As a result, sufficient evidence of the required agreements and enterprises are necessary for all of WDES's RICO claims in order to show that they are common issues across all Class Buildings.

In evaluating commonality, the *Wal-Mart* Court explained that, "[i]n this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a *pattern or practice* of discrimination. That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision" *Wal-Mart*, 564 U.S. at 352. Similarly, in this case, overlap between the Rule 23 factors and certain issues on the merits "cannot be helped." *Id*. at 351. Given the precise nature of WDES's claims, the crux of the inquiry here is the existence of 20 building-wide: agreements to require union-only labor, conspiracies to violate RICO in enforcing the union-only requirement, and RICO enterprises involving JLL and the Unions to enforce the union-only requirement. Proof of commonality thus

necessarily overlaps with WDES's merits contentions that (1) JLL and the Unions agreed to force tenants to hire union-only contractors and movers across 20 Class Buildings in violation of RICO; (2) JLL and the Unions conspired to violate RICO in enforcing the union-only rule at 20 Class Buildings; and (3) JLL and each Union formed an association-in-fact enterprise for the purpose of enforcing the union-only rule across the 20 Class Buildings. With respect to each Union, WDES must offer "convincing proof" of a common agreement and enterprise along with a conspiracy as to its § 1962(d) claim at certification or "it will be impossible to say that examination of all class members' claims" will produce a common answer to the central question of why tenants at 20 different buildings were forced to use union labor. *Id.* at 352, 359. Stated another way, to certify each sub-class, sub-class members must be able to trace their injury to a single, common agreement/conspiracy/enterprise since August 14, 2014 and covering 20 JLL-managed buildings in the Chicago Loop. Thus, though the Court must consider certain merit-based questions as to each Union concerning the existence of a 20 building-wide agreement to force tenants to hire union-only labor, conspiracy to violate RICO, and RICO enterprise and examine evidence going to the merits of those issues in making its class certification decision, the Court expresses no opinion as to the ultimate likelihood of WDES succeeding on the merits of its RICO claims.

a.      **Existence of an Agreement to Bar Non-Union Labor and Conspiracy to Violate RICO**

As noted in the Court's prior opinion, *Wal-Mart* made clear that the commonality requirement is not satisfied by merely raising a "common contention" among class members. *Wal-Mart*, 564 U.S. at 349-50. Rather, commonality requires the plaintiff to demonstrate that the "common contention" is of "such nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350. In the employment discrimination context, the *Wal-*

*Mart* Court described the "glue" that would have satisfied commonality as "significant" or "convincing" proof that an employer "operated under a general policy of discrimination." *Id.* at 353. In *Wal-Mart*, the crux of each class member's claim was the reason for a particular employment decision. *Id*. at 352, 359. The *Wal-Mart* plaintiffs "sue[d] about literally millions of employment decisions at once." *Id*. at 352. The Supreme Court explained that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id*. The Supreme Court found that proof of such a general policy was "entirely absent" where Wal-Mart gave its local supervisors discretion over employment matters and the plaintiffs did not identify a "common mode of exercising discretion that pervade[d] the entire company" other than their sociological expert's inadequate testimony and insufficient statistical and anecdotal evidence. *Id*. at 353-58.

Relevant to this case, the crucial question in resolving an individual tenant's RICO claims is the reason for the particular union-only decision regarding a construction project or move. There needs to be a common answer to the question of *why* a tenant was forced to use union labor to establish commonality. *See* Doc. 183 at 3. It is not sufficient for WDES to merely assert that tenants were required to hire union-only labor as the result of an illegal conspiracy/agreement between JLL and the Unions across 20 buildings. *Wal-Mart* requires that WDES provide "significant proof" that JLL actually operated under agreements with Local 705 and Local 399 to force tenants at 20 different buildings to hire only union labor. The "glue holding the alleged reasons for [the challenged labor] decisions" relating to tens of thousands of construction projects and moves is JLL's alleged overall agreements with the Unions to impose the union-only rule on tenants in all 20 Class Buildings. *Wal-Mart*, 564 U.S. at 352. In the absence of evidence that JLL

17

enforced an overall agreement requiring union-only labor across 20 Class Buildings, there does not appear to be a question that requires common resolution.

Continuing further with the analysis, *Wal-Mart* suggests that in order to demonstrate commonality, WDES must show, by a preponderance of evidence, that there were (i) explicit agreements between JLL and the Unions to force tenants to hire union-only labor at the 20 Class Buildings it manages in the Chicago Loop or (ii) overall agreements that can be reasonably inferred from the facts and circumstances of the case. *Wal-Mart*, 564 U.S. at 344, 355-58. Similarly, for purposes of its § 1962(d) claim, WDES must offer significant proof of the existence of agreements between JLL and the Unions to violate the substantive RICO provision with respect to the 20 Class Buildings.

As practical matter, plaintiffs can rarely provide evidence of an explicit agreement of a conspiracy. *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015) ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative."); *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir. 1969) ("The formalities of an agreement are . . . usually lacking since the mark of a successfully conspiracy is secrecy."). "Not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support" for an agreement. *United States v. Stephens*, 46 F.3d 587, 593 (7th Cir. 1995). While "the agreement need not be overt, [] the alleged acts must be sufficient to raise the inference of mutual understanding." *Kunik v. Racine County, Wis.* 946 F.2d 1574, 1580 (7th Cir. 1991); *Krakow Business Park v. Locke Lord, LLP, et al.*, 135 F.Supp.3d 770, 793 (N. D. Ill. Sept. 28, 2015) ("A conspiracy is an agreement to inflict injury or harm, which, even if inferred from circumstantial evidence, requires a meeting of the minds."). Likewise, "[t]he agreement necessary to support a

claim of conspiracy [under § 1962(d)] may be inferred from evidence of sufficient concerted action or other surrounding circumstances." *Morgan v. Bank of Waukegan*, 1987 WL 17535, at *5 (N.D. Ill. Sept. 23, 1987).

The record contains no direct evidence of an express agreement between JLL and either Union to force tenants to use union-only labor across 20 Class Buildings. No witness testified that such an agreement exists, and no document indicates that the union-only practice WDES challenges was the result of an understanding between JLL and either Union to require tenants to use union-only labor at all 20 Class Buildings. In fact, the corporate representative of Local 705 (Richard DeVries) testified that no agreement existed between JLL and Local 705 to enforce a union-only rule in Class Buildings.[4] Doc. 190-13 at 56:16-21. The Court of course recognizes that this is to be expected, given that it would be difficult for a union to testify otherwise without admitting fault. Moreover, JLL witnesses testified that JLL enforces the union-only rule pursuant to directions from the various building owners. Doc. 190 at 5-6. The record also contains no direct evidence that JLL entered into an agreement with either Union to violate RICO. Therefore, the Court looks to the circumstantial evidence to see whether WDES has shown an actual agreement and conspiracy exist to enforce a union-only rule across the 20 Class Buildings.

WDES begins by asserting that it is undisputed that JLL maintains a rule excluding non-union laborers from performing work at the Class Buildings it manages in the Chicago Loop and this rule is proof that can be used on a classwide basis. Doc. 183 at 4. This argument misses the point. It is true that each Class Building has a general requirement that union labor perform work in the building, but the mere existence of a union-only rule—without any evidence that its stems

---

[4]     The SEIU Local 1 corporate representative also testified that no JLL/Local 1 agreement existed to enforce a union only rule with respect to movers and contractors. Doc. 190-14 at 52:7-53:4. A corporate representative of Local 399 was not deposed.

from an overall agreement between JLL and either Union—does not constitute significant proof that the class of tenants were subject to an unlawful common practice needed for commonality. WDES does not contend that JLL's union-only practice at these 20 Class Buildings facially violates the NLRA and RICO. *Id.* And the fact that JLL has a general practice of requiring union-only contractors and movers in each of the Class Buildings does not, on its face, raise an inference that all decisions regarding tenant labor use are the result of an overall JLL agreement with either Union to force tenants at the 20 Class Buildings to use only union movers or contractors. *Wal-Mart*, 54 U.S. at 355 (corporate policy of allowing discretion by local supervisors over employment matters did not provide the commonality needed for class action because it did not raise an inference of discriminatory conduct); *McCaster*, 845 F.3d at 800-01 (commonality not established where plaintiffs did not identify any unlawful conduct common to members of the class).

Before considering the remainder of WDES's circumstantial evidence, the Court notes that the parties contest whether the union-only rule originates from the building owners or from JLL itself. JLL's explanation for the union-only requirement in each of the Class Buildings is that it simply enforces the rule for the buildings its manages pursuant to direction from building owners, and thus, there is no single agreement between JLL and either Union regarding the 20 different buildings at issue. JLL has offered evidence that the union-only rules are owner rules, which are not created by JLL, including that each Class Building's owner lease agreement contains some variation of a "labor harmony" clause. Doc. 125 at 9-10; doc. 190 at 5-6. JLL also notes, for example, that management agreements between JLL and owners of two of the Class Buildings make clear that JLL's role as manager is to "implement, or cause to be implemented, the decisions of Owner . . . and [JLL] shall use its best efforts to conform to all policies and programs established

20

from time to time by Owner . . . and the scope of Manager's authority shall be expressly limited in accordance with said policies." Docs. 191-1, 191-2. JLL further cites to its enforcement of a *non-union*-only rule imposed by the owner of the Tribune Tower when it managed the building from November 2013 through September 2016 as evidence that it follows the building owners' directives regarding their preference for union or non-union labor. Doc. 125-1 at ¶ 7; *see also* Doc. 190-5 at 40:18-45:16.[5] As another example, during a window washer strike in July 2018, a building owner decided to hire non-union window washers and JLL arranged for the non-union window washers as the owner directed. Doc. 190-3 (Milenkov Dep.) 84:6-8, 94:2-24, 100:17-101:1; *see also* Doc. 190-5 (Constance McDonagh Dep.) 40:18-46:15 (JLL manager testifying that she requested pricing for both union and non-union labor because "ownership isn't sure how he wants to hire, a union or non-union."). Notably, even the experience of WDES suggests that the owners set the union-only rules for the buildings. In September 2013, WDES negotiated an exception to the building's union-only rule with the owner and the owner amended the lease to allow WDES to use non-union labor.[6] If the union-only rule originates with JLL as opposed to the owners, one would expect WDES to seek JLL's (and the Union's) permission (pursuant to the purported agreement) to use non-union labor. Yet the permission came from the building owner pursuant to the lease terms. All of this evidence provides support for JLL's assertion that each individual building owner sets the union-only rule and JLL enforces them, and not that the union-only rule originates from JLL itself for its own reasons.

---

[5] The Tribune Tower is located at 435 Michigan Avenue and just a half-block outside of WDES's defined "Chicago Loop." WDES has never explained why the alleged conspiracies between JLL and the Unions extend only to high-rises south of the Chicago River, and not to high-rises immediately north of it.

[6] The amendment to the lease allowed WDES, a non-union entity, to act as its own general contractor for any renovation project for the leased space.

On this point, WDES responds that "JLL does not simply enforce a union-only rule created by building owners . . . but rather JLL promulgates and imposes the rule upon tenants." Doc. 183 at 11. WDES contests that the above record evidence shows that the union-only rule is a directive from the building owners, rather than from JLL itself. Doc. 183 at 10-11; *see also* doc. 193 at 2-3 (arguing that doc. 183-7 is evidence that JLL's management promulgated the union-only rule). But at this stage, this dispute does not matter. Even if WDES is right that the union-only rule originated from JLL, WDES still has to provide "significant" or "convincing" proof that JLL entered into agreements with each Union to force tenants at 20 Class Buildings to hire only union contractors and movers, which is the essential question on which its theory of commonality depends. *Wal-Mart*, 564 U.S. at 352, 359. Even if JLL (as opposed to the building owner) is responsible for the union-only rule, but JLL's enforcement of the rule is not the result of an agreement between JLL and the Unions, then there is no RICO violation under WDES's theory.

It likewise does not follow that if the union-only restrictions are a directive from the building owners, a conspiracy between JLL and the Unions to enforce the rule cannot exist. A possible explanation is that even if all of the building owners do impose the union-only rule on JLL, JLL could have conspired with the Unions to enforce the rule. While WDES disputes JLL's proof on whether the union-rule originates from the building owners, it does not dispute that commonality requires significant proof of an agreement between JLL and either Union to enforce the union-only rule across all 20 Class Buildings to provide the necessary glue to potentially tie all the class claims together.

Because WDES presents distinct circumstantial evidence of an alleged overall agreement and conspiracy between JLL and each Union regarding the 20 Class Buildings, the Court will address WDES's evidence regarding each Union separately.

i.    **Local 705**

WDES argues that the behavior of JLL and Local 705 in carrying out and enforcing the union-only rule with respect to movers presents significant circumstantial evidence of an agreement to force tenants at 20 Class Buildings to use only Local 705-signatory movers. Doc. 183 at 6. To demonstrate the existence of an agreement between JLL and Local 705, WDES points to four mains pieces of circumstantial evidence and testimony. *Id*. at 6-8. But this evidence does not demonstrate at the class certification stage, an overall agreement between JLL and Local 705.

*First*, WDES relies on the deposition testimony of Richard DeVries, Local 705's business representative. Doc. 183 at 5, 6. DeVries testified that he occasionally monitors JLL-managed buildings by looking down alleys to see if any non-union moving companies are performing work in the buildings. Doc. 183-2 at 11:2-16, 30:21-31:3, 42:10-43:3, 44:4-10. If non-union movers are found, he considers "tak[ing] some type of action," including picketing and deployment of an inflatable rate outside the building. *Id*. at 60:14-63:22. However, DeVries also stated that the three ways he monitors whether non-union movers are working in a JLL-managed building *do not involve JLL*: (1) his personal observation while being physically present in the Loop; (2) reports from Local 705 members who make personal observations; and (3) occasional reports from various moving companies when they make observations. *Id*. at 11:7-11. The Court fails to understand how this qualifies as evidence of a 20 building-wide JLL/Local 705 agreement. By its terms, DeVries testimony reveals that he monitors the use of non-union movers at JLL-managed buildings independent of and lacking in coordination with JLL. So on its own, DeVries testimony comes nowhere near suggesting that he acts on behalf of Local 705, pursuant to an agreement with JLL to require tenants to use union-only movers.

23

*Second*, WDES points to a February 15, 2020 email the Chief Engineer of 180 N. LaSalle, Frank Falzone, sent to the JLL manager, Julie Welter, regarding a conversation with DeVries. Doc. 183-3. DeVries testified that he had a conversation with Falzone in which DeVries said: "I see you're using a non-union mover in the building" and Falzone responded that he was instructed not to discuss the subject of non-union movers because of this lawsuit. Doc. 190-13 at 16:11-18, 46:2-47:15. Falzone then wrote an email to Welter:

> Julie,
>
> We had the BA from local 705 Teamsters visit our building this morning. He was questioning the union affiliation of the gym equipment personal [sic]. Mister Vries, the union Rep., said union movers should be used to move and transport the gym equipment.
>
> I was able to nicely negotiate him out of inflating a blow-up critter in front of the building. He asked for your business card and maybe contacting you at some point.

Doc. 183-3. WDES claims that DeVries's threat of deploying an inflatable rat because of the presence of non-union movers is not an isolated occurrence, but it does not cite to any other example. Doc. 183 at 7. Regardless, even if DeVries did threaten JLL with an inflatable rat (which is contested), these circumstances do not support the inference that there was an overall agreement between JLL and Local 705 to require tenants to hire union-only movers at all 20 JLL-managed Class Buildings.[7] In the first place, this incident appears to involve the installation of new gym equipment for the building, and WDES does not explain how this incident relates to a JLL/Local 705 agreement to force *tenants* to use union movers, as opposed to vendors for the common area of the building. Doc. 19-6 at 39:3-18; 40:5-41:2. Second, the email reveals that there was no working relationship or connection between DeVries and Welter from which a JLL and Local 705

---

[7] DeVries testified that he did not threaten to inflate the rat in response to seeing non-union workers move exercise equipment. Doc. 190-13 at 15:1-16:23, 45:18-47:1.

agreement to require tenants to hire only union movers could be inferred, despite Welter having been the General Manager at 180 N. LaSalle since 2013. *See* Doc. 190-6 (Welter Dep.) at 14:6-17; 41:23-42:12 (Welter testifying that she does not know DeVries). Nor did DeVries have a prior relationship with Falzone. DeVries testified that to the best of his recollection, April 17, 2020 was the only time he had met Falzone. Doc. 190-13 at 40:11-14. And the evidence shows that DeVries did not take any later action in regard to "contacting [Welter] at some point," which one would also expect if JLL and Local 705 had agreed to implement a union-only mover rule. Doc. 190-6 at 48:18-21. Accordingly, this email does not give rise to a reasonable inference that an agreement between JLL and Local 705 exists.

According to WDES, the first and second pieces of evidence taken together demonstrate that Local 705 "monitors [JLL] buildings for compliance [] and at the first sign of non-compliance, a Local 705 Business Agent will personally show up as a harbinger of consequences to come if that non-compliance is not promptly remedied." Doc. 183 at 8. But WDES ignores that JLL continued to use the non-union mover to complete the gym equipment job and Local 705 took no action with respect to the non-union mover. Doc. 190-13 at 45:3-8, 47:16-48:18. Thus, contrary to WDES's assertion, this example highlights that JLL did not "capitulate to a demand [by Local 705] to impose a union-only rule." Doc. 183 at 7. DeVries's testimony and Falzone's email viewed together do not support a reasonable inference of a JLL/Local 705 agreement regarding 20 different buildings.

*Third*, WDES highlights DeVries's testimony that on two to three occasions in the past four years, he distributed a list of union movers to JLL Managers. Doc. 183-2 at 17:17-18:6, 41:20-24.[8] WDES claims that "JLL, in turn, mandates that tenants use these movers and bars all other

---

[8]      WDES cites Welter's deposition for the proposition that such a union generated list existed as long as she has been at 180 N. LaSalle. Doc. 183 at 7. In fact, Welter testified that she was not aware of any

movers from its Loop buildings," but cites no evidence to support that assertion. Doc. 183 at 5. In any event, DeVries's irregular practice of distributing a list of union moving companies does not give rise to a reasonable inference of an agreement between JLL and Local 705 because this practice is consistent with Local 705's "interest is enhancing the employment for our members." Doc. 190-13 at 21:23-22:3. To raise the inference of a mutual understanding, "the acts performed by members of a conspiracy [must be] unlikely to have been undertaken without an agreement." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (quotation marks and citation omitted); *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017) (court may infer an agreement "when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone[.]"). Because DeVries's behavior is entirely consistent with the interest of the Union in securing jobs for its members, this evidence does not reasonably indicate an agreement. *Domanus*, 847 F.3d at 482 (finding that because lawyer-defendants' actions were "easily explained by their own self-interest," this was not enough to indicate a RICO conspiracy).

Moreover, if there was a mutual understanding between JLL and the Local 705 to enforce the union-only mover rule across 20 Class Buildings, one would expect DeVries to have expected

---

union ever providing JLL with a list of contractors. Doc. 190-6 at 66:17-19. She added that a list of pre-approved union vendors and contractors including movers existed when she originally began working at the 180 North LaSalle building, and her department would add or delete companies from the list based on whether the building or in theory, tenants had a good experience with them. *Id*. at 67:5-72:8. But Welter stated the list was building specific, and she was not aware of the unions themselves contributing to the creation of the list. *Id*. 68:23-69:10, 70:16-71:2. Two other JLL managers testified that they were not aware of JLL having a union generated contractor list to provide tenants. Doc. 190-4 (Noah Gens) at 81:15-82:22; doc. 190-5 (Constance McDonagh) at 77:8-78:17. WDES does cite an email Keelee Leyden, JLL manager at 1 N. Franklin and 175 W. Jackson, sent to DeVries on October 18, 2018 asking for an updated movers list because her last list was dated April 1, 2015. But if Local 705 "regularly updates JLL with a list of its union-member movers," as evidence of an agreement to force tenants to use only union movers as WDES says, then one would not expect there to be a three and half year gap between lists. Doc. 183 at 5. More importantly, an isolated example of one JLL manager requesting a union generated mover list is not circumstantial evidence of an overall JLL/Local 705 agreement to carry out and enforce a union-only mover rule in all 20 Class Buildings.

JLL managers to refer union-movers on the list to tenants and actual referrals of union movers to tenants to follow. But the evidence does not even reflect that Devries understood that JLL managers would make the list available to tenants. DeVries explained that the list of Local 705 signatory movers he occasionally provides to JLL managers is an advertisement and he "hope[s] that the tenants ask for bids from the [] signator employers that [Local 705] have, so there are members potentially working there." Doc. 190-13 at 22:15-20, 38:18-24. He stated that "[i]t's up to [JLL managers] what they do with the list. . . . I don't know what they do with the list once they've received it." *Id*. 38:5-17. The record also does not indicate a *single instance* where JLL actually referred a tenant to a union-mover on the list, much less mandated use of a mover on the list, as WDES claims. Accordingly, JLL's receipt of a list of union movers from DeVries does not reasonably raise an inference of the existence of an overall agreement between JLL and Local 705 to require union movers at all 20 Class Buildings because WDES offers no facts to substantiate its speculation that JLL requires tenants to use these movers and bars all other movers in Class Buildings.[9]

---

[9]      Regarding Local 705's practice of distributing a list of union moving companies to JLL, WDES also cites its answer to JLL's Interrogatory No. 16, which states that "Plaintiff's counsel" spoke to the Senior Director of Asset/Property Management at Tishman Speyer who stated that DeVries "sends out a list of 'approved movers' to major landlords in the Chicago Loop" and threatens picketing if he learns a tenant plans to use a non-union mover, which puts "a lot of pressure on building managers to only allow union contractors into the buildings." Doc. 183 at 7; doc. 183-6 at 20-21. WDES's counsel's statement is not evidence, and WDES proffers no declaration by Mr. Sciascia to this effect. Regardless of whether counsel's statement can be used to establish the requirements for certification under Rule 23, the Court cannot reasonably infer from Sciascia's statement that an single agreement exists between JLL and Local 705 to force tenants to hire union-only movers at the Class Buildings. To the contrary, Tishman Speyer was the prior owner of the 125 S. Wacker Drive building, and JLL did not manage the building for Tishman Speyer. Doc. 105-3 at 32:19-33:5. Moreover, Sciascia described DeVries's practice as sending an approved mover list to *landlords* and calling them to threaten picketing if he learns a tenant plans to use a non-union mover, which results in building managers feeling pressure to only allow union contractors in the buildings. Even assuming that DeVries threatens building owners with picketing and assuming further that building managers then feel pressure to require union contractors, however, these facts do not support the inference that this pressure prompted JLL to coordinate a response with Local 705. There must be evidence of a meeting of the minds between JLL and Local 705, and Sciascia's statement offers no support for that conclusion.

*Finally*, WDES cites a 2015 email between two JLL General Managers, Noah Gens and David Hopwood, concerning the use of non-union movers at 10 South Riverside Plaza, a building outside the Class. Doc. 183 at 8; doc. 183-7. The building owner, Callahan Capital Partners, wanted to use non-union movers to donate chairs to Chicago Public Schools. Gens sought Hopwood's advice regarding the owner's use of a non-union mover for this project. Doc. 183-7 at 2. Gens wrote:

> David,
>
> I know we have corresponded on the union vs. non-union matter in the past. Our client Callahan Capital Partners, has excess furniture they want to donate and they do not want to use a union mover. My understanding is that the use of union labor is not based on intent, no matter how good hearted it may be (i.e. charity), but rather based on trade jurisdiction.
>
> I have never allowed a non-union trade to conduct work in a union building before. I do not want to come across as being an obstructionist but also do not want to carelessly succumb to this request either.
>
> I would appreciate your thoughts on this so I can respond to CPP.
>
> Thank you.
>
> Noah B. Gens

*Id*. WDES believes this email shows that if a building owner wants to use non-union labor at its own building, it must seek JLL's approval and JLL resists the use of non-union labor. Doc. 183 at 10. Even if that is true (and JLL contests the point based on Gens's deposition testimony, *see* doc. 190 at 8), however, this fact does not support the inference that JLL and Local 705 had agreed to force tenants to hire only union movers at all 20 Class Buildings.[10] The email does not concern a

---

[10]     At his deposition, Gens testified that a building owner would *not* need to get permission from JLL to use non-union movers. Doc.190-4 at 40:12-16, 72:1-73:18, 75:13-20. Gens explained that in this instance he was concerned about deviating from the building's practice and he wanted the building owner to understand the parameters of deviating from the building policies that it had put in place or had accepted through collective bargaining agreements. *Id*. at 48:10-23, 52:4-6.

JLL/Local 705 agreement and does not contain any additional facts sufficient to support a mutual understanding or meeting of the minds between JLL and Local 705 to enforce a union-only mover rule. WDES makes much of Gens's deposition testimony that he was concerned that deviating from the building's union practice could result in union repercussions like strikes, picketing, or the inflation of a giant rat outside the building. Doc. 183 at 8; Doc. 183-8 at 52:2-53:6. WDES claims that this fear of a labor disruption explains why JLL "would agree to capitulate to a demand to impose a union-only rule" and "strongly suggests an agreement with Local 705 to carry out the parties' objective." Doc. 183 at 7-8. The fact that building management was concerned about a potential labor disruption if non-union movers were allowed in a union building is not circumstantial evidence of the existence of an overall agreement between JLL and Local 705 as it reflects a reasonable way of managing a building. In addition, and significantly, this email concerns a building *outside of the class* and the building owner ultimately used *non-union* movers for the job. Doc. 190-4 at 48:6-9. Given these facts, this incident is hardly evidence of a common JLL/Local 705 agreement and conspiracy at the 20 Class Buildings.

That is all the evidence of a JLL/Local 705 agreement to stop tenants from using non-union labor at 20 Class Buildings that WDES has provided here. To recap, the sum total of WDES's circumstantial evidence of an overall agreement between JLL and Local 705 to force tenants to hire union movers in all 20 Class Buildings since August 2014 is: (1) Local 705's business representative's testimony that he occasionally and independently monitors JLL-managed buildings for non-union movers; (2) a 2020 conversation between Local 705's business representative and the Chief Engineer at 180 N. LaSalle about non-union workers installing gym equipment for the building; (3) Local 705's occasional distribution of a list of union movers to JLL Managers; and (4) a 2015 JLL email regarding a building owner's use of non-union movers

to donate furniture at a non-class building. The Court easily concludes that these various pieces of evidence, taken together, do not suggest that JLL and Local 705 had a mutual understanding to prevent tenants from hiring non-union movers across all 20 Class Buildings. Nor does this evidence support an inference that some meeting of the minds occurred between JLL and Local 705 to violate RICO in enforcing the union-only requirement. *Cf. Kleen Products LLC v. International Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016) (plaintiffs established that the existence of the conspiracy could be proven by evidence common to the class where they "offered voluminous written materials of various types, which in the aggregate pointed to the existence of both agreement and actions to violate the antitrust laws."). Accordingly, WDES has failed to meet its burden to offer "significant proof" of an agreement or conspiracy between JLL and Local 705 across all 20 JLL-managed buildings to which each tenant was subjected to in order to establish commonality.

### ii. Local 399

For the contractor subclass, WDES contends that JLL and Local 399 agreed to prohibit all non-union trade workers from performing any contracting and subcontracting work in all Class Buildings. To demonstrate this, WDES's supplemental motion points to only two general categories of evidence related to Local 399. This evidence falls short of providing convincing proof that an overall agreement existed between JLL and Local 399 to prevent non-union trade contractors from performing work in 20 Class Buildings that could tie all its thousands of Contracting Subclass claims together.

*First*, WDES relies on the declaration of Patrick J. Kelly, Local 399's President and Business Manager. In his declaration, Kelly states: "If non-union workers seek to perform work at these buildings, it has been our practice, reinforced periodically including at membership

meetings, to tell Chief Engineers to call their business representative (also known as an 'agent'), either directly, through the union office or a 'hot line', to inform them of the non-union workers." Doc. 183-1 at ¶ 3. Kelly explains that "Local 399 has an interest in ensuring that contractors who perform work in these buildings are skilled tradesmen and women who are licensed as may be required and are union." *Id*. "The purpose of having workers in the building advise business agents of the presence of non-union workers is so the business agents can advise the relevant building trades union in case that union wants to try to organize the non-union workers." *Id*. In WDES's view, this demonstrates that JLL's Chief Engineers, who are all members of Local 399, work together with their supervising JLL General Managers to bar non-union trade workers from JLL-managed Class Buildings. Doc. 183 at 9. Kelly says no such thing and this is not an inference that reasonably emerges from Kelly's declaration. Kelly's declaration shows only that at the direction of their Union, Local 399 engineers may monitor for non-union contractor activity in the buildings where they work. Kelly's testimony does not show that Local 399 had actually ever worked together with JLL to prohibit non-union contractors in Class Buildings, as opposed to Local 399 engineers independently working at the direction of their Union to report non-union workers to Union business agents.

*Second*, to demonstrate that Local 399 Engineers "work with" and "regularly interact" with JLL Managers to carry out the union-only rule, WDES cites Falzone's deposition testimony. Doc. 183 at 9; doc. 193 at 6-7. WDES claims that Falzone confirmed that "all JLL Chief Engineers agreed 'not to have non-union contractors in our building.'" *Id*. WDES is correct that Falzone testified that he believed that all Chief Engineers in buildings in the downtown area prefer not to have non-union contractors in their buildings. Doc. 183-10 at 13-14. However, one Chief Engineer's testimony that based on his "prior experience" and "dealing[s] in other buildings that

31

[he] worked," all chief engineers share the same preference not to have non-union contractors in their buildings is not evidence of any broader agreement among JLL and Local 399 or even an agreement among "all JLL Chief Engineers" to keep non-union contractors out of JLL-managed buildings. *Id*. Standing alone, that JLL Chief Engineers had a preference for non-union contractors in their own buildings, does not reasonably lead to an inference that JLL reached an overall agreement with Local 399 that tenants would be forced to hire union only contractors at all 20 Class Buildings. In its supplemental reply brief and on the existence of a JLL/Local 399 agreement, WDES cites to three additional emails which show JLL's knowledge that certain Chief Engineers check for union status of contractors at two Class Buildings. Doc. 193-1 (JLL General Manager at 111 W. Jackson advising tenant that she "want[s] to be sure there are no occurrences with a contractor in the building that we did not approve or is non-union. Plus our amazing engineers are union . . . and they strictly enforce that."); doc. 193-2 (fitness center tenant advising JLL that "unless the Engineer has an issue with it," the tenant "typically do[es] not have issues in existing buildings" with non-union workers installing/assembling fitness equipment because there are no union groups for such work and JLL representative responding that she "spoke with our chief engineer and we are fine with non-union for this" type of work at 224 S. Michigan Avenue); doc. 193-3 (JLL aware that engineers at 111 W. Jackson entered a tenant's space without tenant authorization to check union status).

WDES argues that the implication from Falzone's testimony and the three emails that it cites is that these JLL Chief Engineers are not merely acting in their own personal or Union's interests, but instead that they are carrying out an overall agreement between JLL and Local 399 to institute the union-only rule across the 20 Class Buildings, particularly given JLL's knowledge and consent to this conduct of their agents. Doc. 183 at 9; doc. 193 at 6 (WDES claiming

"[e]ngineers constantly patrol buildings to 'strictly enforce' the union-only rule on JLL's behalf, as JLL well-knows."). But there is no evidence showing that JLL instructs Chief Engineers like Falzone to monitor for non-union contractors. Rather, JLL offers evidence explaining how the process of enforcing the union-only rule varies from building to building and that there is no general policy of Chief Engineers checking the union status of contractors. Doc. 105-3 (Zsigray 30(b)(6) Dep.) at 26:9-24 (process of checking union membership of contractors "varies by property." "There are always multiple trades working in a building. Typically, we get notification, if there was a nonunion contractor in that building, it's coming from a trade who is working in that building and observes it."); *id*. at 38:12-39:8 (there is "no consistent policy" for chief engineers to check union status of contractors and eject those without valid union card and "all of them do not do that."); *id*. at 41:8-43:13 (in larger buildings, loading dock security officers check that contractors are authorized to work in the building based on a list prepared by JLL, which includes union status); *id* at 54:2-19; Doc. 190-5 (JLL Senior General Manager McDonagh's Dep) at 23:14-19 (chief engineer's responsibilities did not include "advis[ing] management of the presence of non-union workers at the building."); 23:20-25:16 (when chief engineer did that, he did so "on his own accord."); *id*. at 60:24-64:22; *id*. at 75:15-18 (he believes union-only rule is "flexible."); Doc. 190-3 (former JLL General Manager Milenkov Dep.) at 28:12-31:23 (monitoring Class Buildings for non-union labor was not one of Milenkov's duties as Vice-President/General Manager; that duty was "handled better by the security personnel"); *see also* Doc. 125-3 (Falzone Dep.) at 44:15-45:20, 47:20-48:15 (checking for union status of contractors is not part of Falzone's responsibility as a JLL employee, rather "[i]t's a responsibility that I take upon myself" to protect the integrity of the building and fellow union members.").

At best, the evidence shows two things. First, JLL was aware that certain Chief Engineers check for union status of contractors in a few of the Class Buildings. However, JLL's relationship with its Chief Engineers absent any additional understanding beyond the mere relationship does not support an inference of a 20 building-wide agreement. Nor is JLL's knowledge of certain Chief Engineers' activities in a small number of the Class Buildings in this regard enough to infer that an understanding had been reached between JLL and Local 399 with respect to denying non-union contractors from working in all 20 Class Buildings. Knowledge and a meeting of the minds are not equivalent. *See e.g.*, *United States v. Pedigo*, 12 F.3d 618, 624 (7th Cir. 1993) ("mere knowledge of the illegal activities of another is not enough to support an inference of an agreement to join a conspiracy."); *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991) (evidence of a defendant's agreement to join a conspiracy is "not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds."). Without some further evidence pointing toward the requisite meeting of the minds to deprive tenants across 20 Class Buildings from hiring non-union contractors, JLL's knowledge falls short of plausibility suggesting an agreement necessary to establish WDES's claims. Thus, this evidence does not satisfy WDES's obligation to offer significant proof of an overall scheme or agreement between JLL and Local 399 to keep non-union contractors out of all 20 Class Buildings managed by JLL. *Walker v. White*, 2021 WL 1058096, at *15 (N.D. Ill. March 19, 2021) ("Even if [defendant] knew about the alleged misconduct, knowledge alone is typically insufficient to support the existence of an agreement absent evidence that [defendant] expressly or tacitly agreed to participate in the scheme."). Nor does this evidence of JLL's knowledge reasonably suggest that JLL and Local 399 agreed to violate RICO under § 1962(d).

Second, the evidence suggests that there are individualized circumstances at the specific buildings—such as whether each Chief Engineer monitors for non-union contractor activity in the buildings where they work. Chief Engineers apparently undertake different tasks at each building, and there is no evidence that Chief Engineers uniformly check the union status of contractors. Thus, there is no evidence of standardized conduct across 20 Class Buildings from which a broader JLL/Local 399 agreement could be inferred. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (common questions rise where defendant engaged in standardized conduct). Determining in this context why a tenant was required to use union labor would necessarily turn on individual inquiries into each building's practices. Individual inquiries like these are akin to the Supreme Court's concern in *Walmart* about the lack of evidence of a company-wide policy not being reasonably susceptible to class adjudication. *Wal-Mart*, 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices.") (emphases omitted).

WDES offers nothing else to support to support the existence of a 20 building-wide JLL/Local 399 agreement. Doc. 183 at 9. At bottom, WDES has offered evidence of Local 399's own practice of advising Chief Engineers to report non-union contractors to Local 399 and has made an unsubstantiated claim detailed above about Chief Engineers "work[ing] with" and "regularly inter[acting]" with their supervising JLL General Managers to bar non-union trade workers, but it has provided nothing to substantiate such joint action at 20 Class Buildings.[11] *Id*.

---

[11]     The email regarding 224 S. Michigan Avenue does show one instance where a JLL Manager contacted the building's engineer to confirm that there was no issue with the use of non-union labor for the delivery and installation of gym equipment because no union groups perform such work, but this single

There is no evidence showing JLL was aware of Local 399's practice, and WDES fails to identify a single action Local 399 took with JLL to prevent tenants from hiring non-union contractors. Although there is evidence of JLL's awareness that certain Chief Engineers monitor for non-union contractors, WDES has provided no evidence that JLL had any role in their activities. Nor can a conspiracy to violate section 1962(c) be inferred from WDES's evidence. *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002) (holding evidence of numerous phone calls between alleged co-conspirators over a nine-month period, standing alone, merely proves the individuals remained in contact and amounts to "simply speculation" of a conspiracy).

**b.     Existence of a RICO Enterprise**

Another key common question identified by WDES related to its RICO claims is whether an enterprise exists to implement the alleged union-only agreement because the "claims of every class member will rise or fall on the resolution of that question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014). Therefore, to meet the commonality requirement with respect to this question, WDES needs to demonstrate with sufficient evidence that the enterprise element of its RICO claims is capable of common proof. However, this common question suffers from the same flaw of insufficient proof. WDES has not offered significant evidence that a RICO enterprise exists to sufficiently tie all the tenant RICO claims together.

WDES's claim now includes two association-in-fact enterprises: JLL and Local 705 (enterprise 1) and JLL and Local 399 (enterprise 2). An enterprise includes a "group of individuals associated in fact," which means, "associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 944. Such an enterprise "is proved by evidence of an

---

experience at one building is insufficient to establish that Local 399 Engineers work with JLL Managers on a uniform basis at the 20 Class Buildings to prevent tenants from hiring non-union labor.

ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945. Association-in-fact enterprises must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose." *Bible v. United Student Aid Funds, Inc.* 799 F.3d 633, 655 (7th Cir. 2015); *see also Boyle*, 556 at 946 ("The concept of association requires both interpersonal relationships and a common interest.") (citations omitted). "As with conspiracy in general, circumstantial evidence that defendants agreed to participate in the enterprise is sufficient." *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014). Moreover, a "truly joint enterprise where each individual entity acts in concert with others to pursue a common interest" is a RICO enterprise; a "run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest" is not. *Id*. at 655-56 (finding that the plaintiff plausibly alleged an enterprise where she "allege[d] a number of facts permitting the reasonable inference that . . . [the defendant and two companies] work[ed] as a single enterprise."); *DeGuelle*, 664 F.3d at 205 (one could infer that three defendants agreed to participate in the affairs of an enterprise where there were sufficient factual allegations indicating that the men "worked in tandem with the tax department and made decisions together.").

WDES asserts that the alleged enterprises had the following common purpose: "to force union-only labor on commercial tenants in buildings managed by JLL in the Chicago Loop." Doc. 75 at ¶ 55. It alleges that the enterprise "has been ongoing for years and depends upon the regular communications among the members to carry out its illegal purpose." *Id*. But WDES has not offered any evidence of "regular communications" between JLL and the Unions concerning forcing tenants to hire non-union labor or any instances where they acted together to force union-only labor on tenants. Moreover, JLL says that the evidence shows nothing more than that JLL

and the Unions were acting in their own business interests by requiring union labor. The Court agrees that WDES has also failed to provide significant proof that JLL and the Unions joined together to create a distinct entity for purposes of enforcing the union-only rule, as opposed to acting "in their individual capacities, to advance their individual self-interests." *Walgreen*, 719 F.3d at 854.

The Court considers the evidence as to the existence of a RICO enterprise separately with respect to each alleged enterprise.

### i. JLL/Local 705 Enterprise

Regarding the first enterprise, WDES states in conclusory fashion that "Local 705 is constantly on the lookout for non-union movers," threatens to picket and/or deploy an inflatable rat outside any offending building, and JLL cooperates by not allowing non-union movers in its buildings and even refusing requests by landlords to use non-union movers. Doc. 183 at 11.[12] However, the only evidence WDES points to in support is one email that supposedly shows "JLL has an admittedly close relationship with Local 705" and DeVries's deposition testimony discussed above. *Id.* Neither is sufficient to reasonably support an inference of an enterprise. *First*, the email WDES cites indicates that in February 2015, JLL donated $2,500 to the Stephen E. Pocztowski Memorial Scholarship Fund, which is affiliated with Local 705. Doc. 183-14 (Tim Casey, on behalf of JLL, states that "JLL very much values its relationship with Local 705 and we are pleased to contribute to such a worthy cause."). While this email does show that JLL and Local 705 had a relationship, a single corporate donation to a union-affiliated scholarship fund is not enough evidence of a close relationship between JLL and Local 705 to by itself support an

---

[12]     WDES has come forward with no evidence that "JLL refus[es] requests by landlords to use non-union movers." Doc. 183 at 11. In fact, as discussed above concerning the email with Gens regarding non-union movers at a building outside the Class, the building owner ultimately used non-union movers for the job. Doc. 190-4 at 48:6-9; Doc. 191-4 at 2.

inference that they formed an enterprise and were operating as a distinct entity with the goal of forcing tenants to use union-only movers at 20 Class Buildings.

*Second*, and as discussed above, DeVries testified that he on his own, without any involvement by JLL, "occasion[ally] monitor[]s whether non-union and union movers are working in that building—in that area" and Local 705 has done "virtually nothing" upon learning of non-union moving work in the last four years, including blowing up an inflatable rat. Doc. 190-13 at 11:1-24, 26:20-30:20, 42:1-43:3, 44:4-45:8. WDES does not offer any other evidence of communications or actions suggesting that JLL and the Local 705 worked together as a separate entity to enforce the union-only mover rule at the Class Buildings. For the same reasons that the testimony by DeVries is not evidence of an overall agreement between JLL and Local 705, his testimony fails to give rise to a reasonable inference that JLL and Local 705 worked together, let alone functioned together as a single entity, to enforce the union-only rule at the Class Buildings. *See also* Doc. 190-13 (DeVries Dep.) at 32:5-18 ("I don't have a relationship sufficient with Jones Lang & LaSalle to be able to know what their actual building policies are concerning the use of movers."); *see id.* at 12:20-24; 17:6-20, 40:11-14 (DeVries does not know Welter and interacted with Falzone once).

### ii. JLL/Local 399 Enterprise

With respect to the alleged JLL and Local 399 enterprise, WDES says that "there is a close working relationship between JLL and Local 399, both as a result of their CBA, and more importantly, the JLL Chief Engineers who wear two hats: as union-members trained to report non-union workers to Local 399; and as JLL employees trained to report non-union workers to JLL." Doc. 183 at 12. However, no evidence supports WDES's assertions of a JLL/Local 399 CBA or that Chief Engineers are "trained to report non-union workers to JLL." Nor does the record evidence suggest that JLL and Local 399 ever functioned collectively as a single "continuing unit"

to implement the union-only rule. *Boyle*, 556 U.S. at 945.  *First*, JLL does not have a CBA with Local 399; only the buildings are signatories to the CBAs with Local 399. Doc. 190 at 23; doc. 191-5.[13]  *Second*, WDES offers no evidence whatsoever of any training by JLL for its Chief Engineers regarding the reporting of non-union contractors to JLL.  Indeed, as discussed above, the evidence shows that: (1) checking for union status of contractors is not part of the job responsibilities of a Chief Engineer; (2) there is no general policy or practice of Chief Engineers checking for union status of contractors; (3) JLL has knowledge that certain Chief Engineers check for union status of contractors; and (4) instances in which Chief Engineers Falzone and Fieldman have done so were done by them on their own accord. Doc. 105-3 (Zsigray 30(b)(6) Dep.) at 26:9-24, 38:12-39:8, 41:8-43:13, 54:2-19; Doc. 190-5 (JLL Senior General Manager McDonagh's Dep) at 23:14-19, 23:20-25:16; Doc. 190-3 (former JLL General Manager Milenkov Dep.) at 28:12-31:23; Doc. 125-3 (Falzone Dep.) at 44:15-45:20, 47:20-48:15; Doc. 193-1; Doc. 193-2; Doc. 193-3.  WDES also offered evidence that (5) "Local 399 has an interest in ensuring that contractors who perform work in these buildings are skilled tradesmen and women who are licensed as may be required and are union" and (6) at the direction of their union, Local 399 engineers may monitor for non-union activity at their buildings. Doc. 183-1 at ¶ 3.  None of this evidence—separately or collectively—permits a reasonable inference that Chief Engineers acted in concert with JLL or together functioned as a single entity to enforce the union-only role across the 20 Class Building. Further, without more, JLL's general awareness that certain Chief Engineers check the union status of contractors does not give rise to a reasonable inference of joint conduct.  WDES offers no

---

[13]     The Court clarifies a factually inaccurate statement it made in its prior class certification ruling. Accepting WDES's allegations as true (doc. 76 at ¶ 12, doc. 105 at 2 n.2), the Court stated that Local 399 has a collective bargaining agreement ("CBA") with JLL governing the terms of employment of building engineers. *Wacker Drive*, 337 F.R.D. at 151.  As noted above, JLL does not have a CBA with Local 399.

evidence that JLL assisted in or encouraged that conduct. Doc. 190-5 at 27:20-24 (Q: Did you encourage [Fieldman] to keep doing it? A: I did not.").

Moreover, the evidence fails to create a reasonable inference that those communications or actions by Falzone, Fieldman, or other Chief Engineers with JLL's knowledge were undertaken on behalf of the enterprise as opposed to actions taken by them in their individual capacities to advance their distinct self-interests in protecting the integrity of the building and fellow union members. *See* Doc. 125-3 (Falzone Dep.) at 44:15-45:20, 47:20-48:15. In other words, the evidence fails to sufficiently tie JLL and the Chief Engineers into a single entity acting as if they were a unit for the purpose of enforcing the union-only rule rather than the Chief Engineers engaging in a series of acts for their own individual benefits and not for that of the whole. WDES claims that Local 399, which represents engineers, should not have any interest—on its own—in ensuring that carpenters, painters, electricians, etc. are hired by tenants, and thus, they must be acting on behalf of a larger enterprise. Doc. 193 at 9. But the evidence confirms that Local 399 does indeed have an interest in ensuring that tenants hire union contractors for non-engineering work. Doc. 183-1 at ¶ 3. Kelly explained, in a declaration advanced by WDES, that "Local 399 has an interest in ensuring that contractors who perform work in these buildings are skilled tradesmen and women who are licensed as may be required and are union" and that "[t]he purpose of having workers in the building advise business agents of the presence of non-union workers is so the business agents can advise the relevant building trades union in case that union wants to try to organize the non-union workers." *Id*. And Falzone testified that on his own accord, he checks contractors for union status because he is in fact "looking out for fellow union members." Doc. 125-3 at 48:13-15. For these reasons, none of the evidence by itself, or even taken all together, provide significant proof of a JLL/Local 399 enterprise that can be proven on a class-wide basis.

41

* * *

In sum, WDES's theory is that JLL entered into two separate hot cargo agreements, each with the object to force tenants at the 20 Class Buildings to hire union-only labor—one agreement between JLL and Local 705, and a second agreement between JLL and Local 399.  In order to show commonality at this juncture, for each subclass, WDES needed to advance "significant proof" on the essential question of the existence of a 20 building-wide agreement to tie the claims of each subclass together.  Stated differently, WDES had to show that the individualized building inquiries for class members—such as whether the decision to require union contractors or movers in each particular building was based on an overall agreement between JLL and Local 705 or Local 399—could be meaningfully resolved through common questions.  As discussed more fully above, even if every single piece of evidence offered by WDES is taken as true, WDES's evidence is too weak to raise a reasonable inference that all tenant contractor or mover labor decisions are the result of two overall agreements.  None of the evidence offered shows that transactions presented by WDES were part of broader agreements between JLL and the Unions to coordinate in different ways and different times the enforcement of the union-only rule in all 20 Class Buildings.  As a result, the Court's assessment is that WDES's evidence is not "significant proof" from which it can be reasonably inferred that JLL was part of an agreement with either Local 705 or Local 339 to force tenants at 20 buildings to hire only union labor sufficient to supply a common, classwide method of proof and establish commonality.  Moreover, WDES's evidence does not raise a reasonable inference that JLL agreed with either Union to violate RICO with respect to the 20 Class Buildings or formed a RICO enterprise to enforce a 20 building-wide agreement to prevent tenants from hiring non-union movers or contractors.  Thus, WDES has not met its burden to produce sufficient proof of these key common questions that will drive resolution of this action.

In conducting the above detailed evaluation of WDES's evidence to determine whether it presented a common question under Rule 23(a)(2), the Court took seriously the cautions by the Seventh Circuit not to expand the analysis into an assessment of the merits of WDES's claim at this stage. And while the "boundary between a class determination and the merits may not always be easily discernible," the Court has carefully stayed below the fine dividing line and has not required WDES to prove the existence of a 20 building-wide hot cargo agreement, conspiracy to violate RICO, and RICO enterprise to obtain class certification. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993); *McFields v. Dart*, 982 F.3d 511, 515-16 (7th Cir. 2020) (rejecting plaintiff's argument that the district court, in analyzing commonality, improperly decided the case on the merits where it did not hold that "surety of prevailing on the merits" was a requirement for class certification). The Court only decides that the RICO claims as framed by WDES do not present common questions of law or fact that could drive resolution of the litigation for all members of the putative class. WDES's individual claims based on its own unique circumstances remain, and the Court expresses no view on whether WDES's individual claims may or may not ultimately have merit.

Alternatively, WDES requests that, if the Court finds there is insufficient common evidence that JLL formed an agreement and was part of an enterprise with Local 705 and Local 399, respectively, regarding the 20 Class Buildings, then the Court should certify a moving subclass and contracting subclass for five buildings: 125 S. Wacker Driver, 180 N. LaSalle, 333 S. Wabash, 71 S. Wacker Drive, and 111 S. Wacker. At oral argument, WDES explained that its request is based on the Noah Gens email concerning an owner's desire to use non-union labor at a building outside of the class. WDES says the five identified buildings are Class Buildings Gens

and Hopwood managed during the Class period.[14]  For all the same reasons set forth above, WDES has not produced significant proof from which the Court can infer the threshold element of a JLL agreement with Local 705 or Local 399 to deny non-union contractors or movers from performing work at these five specific buildings that would satisfy the commonality requirement.  WDES has also failed to point to any evidence which would support the essential common finding that JLL formed an enterprise and acted in concert with either Union to achieve that goal at the five identified buildings.  Nor has WDES offered evidence of a JLL/Local 705 or JLL/Local 399 conspiracy to violate RICO with respect to the five buildings.  Accordingly, the Court denies WDES's alternative request to certify a class of tenants at the five buildings WDES identified.

## 2.  Typicality

Rule 23(a) requires WDES to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members and [is] based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  The typicality requirement "primarily directs the district court to focus on whether named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).  The requirement of typicality "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Id*.  Moreover, "[t]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses [defendant] might have against certain class members." *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir.1996).

---

[14]     333 S. Wabash is not listed as one of the 20 Class Buildings. *See* Doc. 105 at 4.

Regarding typicality, the Court concludes that for the same reasons that WDES has failed to offer significant proof the union-only rule is the result of an overall agreement between JLL and each Union across all 20 Class Buildings, WDES fails to demonstrate that its claims are typical of the claims of other class members, as required by Rule 23(a)(3). WDES still has RICO claims that will remain after the resolution of its motion. But for the reasons stated above, WDES's individual claims about a hot cargo agreement and RICO enterprise/conspiracy are not typical of claims by the tenants at each of the Class Buildings. Stated differently, if WDES cannot establish that it was injured by the same conduct that injured other class members, then its claims cannot be typical of other members of the class. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality requirements of Rules 23(a) tend to merge.").

## B.     Rule 23(b)(3) Factors

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement "builds on commonality; whereas Rule 23(a)(2) requires the existence of a common question, Rule 23(b)(3) requires the common question(s) to 'predominate' over individual ones." *Howard*, 989 F.3d at 607. The predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (internal quotation marks omitted). Put another way, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted). As compared to the commonality requirement of Rule 23(a), "the predominance criterion is far

more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Messner,* 669 F.3d at 814 ("While similar to Rule 23(a)'s requirements for typicality and commonality, 'the predominance criterion is far more demanding.'").

Because WDES has failed to meet the more basic requirement that class members share a common question of law or fact, it necessarily fails the "more demanding" standard for predominance. *Amchem*, 521 U.S. at 624. Without significant proof that would be enough to establish the existence of the alleged agreements/conspiracies or enterprises to unite the tenant mover and contractor labor decisions, these essential aspects of WDES's RICO causes of action do not predominate. *Howard*, 989 F.3d at 598 (the "'same basic defects' doom the class" on commonality, typicality, and predominance); *McCaster*, 845 F.3d at 801 ("The plaintiffs' failure to satisfy the commonality requirement is fatal to their request for class certification. That necessarily means that they have not satisfied Rule 23(a)'s typicality requirement, much less the more strenuous predominance requirement of Rule 23(b)(3).").

Even if WDES had properly shown that there is sufficient proof of a common issue central to liability that would predominate, JLL argues that individual questions about each plaintiff's damages predominate because WDES has not provided a common method of measuring damages for each class member of the Contracting Subclass. Under WDES's theory, tenants would be owed damages for the "increased costs for union labor" paid, as compared to the costs of non-union labor tenants would have paid if not for the union-only restriction. Doc. 105 at 6; doc. 76 at ¶¶ 29, 59. WDES asserts that each class member can rely on the methodology of its expert, Dr. Robert Kaestner, to determine the increased amount it was forced to pay as a result of the union-only requirement. More specifically, the first part of Dr. Kaestner's damages methodology requires isolating the cost of the union labor actually incurred from all other contracting costs charged to a

tenant (*e.g.*, insurance, materials, profit) that are not subject to the union surcharge. *See* Doc. 105-1 at 10 for Kaestner's "General Approach to Estimating Damages to Potential Class Members." JLL argues that there is no way to isolate the amount of cost of labor for Dr. Robert Kaestner to apply his methodology because contractor invoices only set forth the bottom-line costs, which bundle together labor costs with non-labor costs. In other words, his methodology cannot be applied to the bottom-line amount a tenant pays to a union contractor. JLL asserts that the damage calculation for each plaintiff therefore requires an individual inquiry about the specifics of each renovation project and whether the cost for union labor can be broken out from other non-labor items charged to the tenant, like materials, insurance, and the contractor's profit. In response, WDES does not dispute that tenants only have the bottom-line amounts they paid to contractors, not the isolated union labor costs Dr. Kaestner requires. Doc. 131 at 22. According to WDES, "[n]either WDES, nor Dr. Kaestner, nor anyone else (including JLL) is able to isolate the precise amount of the labor costs as a component of the invoices for build-outs. WDES believes it is extremely unlikely that contractor/subcontractor records in JLL's possession for class members will show any such itemization either." *Id.*.

In order to show predominance on the damages question, WDES must offer sufficient evidence that there is a workable way to prove a classwide measure of damages through generalized proof. *Comcast Corp.*, 569 U.S. at 34 (plaintiffs failed to establish predominance where their damages model fell short of "establishing that damages are capable of measurement on a classwide basis."); *Suchanek*, 764 F.3d at 760 (in determining whether to certify a class, the court should conduct a "'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'"). As to the Contracting Subclass, WDES has failed to

offer significant proof that there is an adequate method of estimating damages that applies classwide.

WDES cites numerous cases for the general proposition that expert analysis can be used to calculate a reasonable estimate of damages. Doc. 131 at 23-25. The Court does not disagree, but WDES's position completely ignores the practical reality that expert discovery has closed in this case. Although it had the opportunity to present expert evidence, WDES has presented *no* expert's estimate of labor costs to apply to Dr. Kaestner's methodology. Neither Dr. Kaestner nor any other expert provides an opinion on how labor costs would be estimated in this case. Recognizing that it lacks any expert basis for establishing the cost of labor tenants paid on a classwide basis, WDES claims for the first time in its reply brief that charges incurred by the Contracting Subclass can be discounted by 49% before subjecting them to Dr. Kaestner's damages methodology. *Id*. at 25-26; *see also id*. at 22 (WDES conceding that it "may be true" that Dr. Kaestner's method "will produce overinclusive damages," but claiming that a "49% discount on damages can be applied to account for all conceivable non-itemized costs."). As support for its 51% estimate of the labor cost of a tenant's union contracting costs, WDES relies on three pieces of evidence: (1) WDES's principal's testimony that labor costs account for the "vast majority" or "overwhelming major" of the total contractor/subcontractor invoiced costs; (2) a U.S. Labor Statistics, Monthly Labor Review report it says indicates that "the employee-only labor share (costs) for the construction industry exceeds 59% since 1997, and was 64% in 2014"; and (3) an article published by JLL stating that union labor for "commercial office space construction" costs "up to 20%" more than non-union labor. *Id*. at 21 n. 12, 25, 26 n. 18.

WDES's showing does not persuade the Court that 51% is a reasonable estimate of the labor cost of a tenant's union contracting costs. *Comcast Corp.*, 569 U.S. at 35 (damages

48

calculations need not be exact); *Phoenix Bond & Indem. Co. v. Bridge*, 911 F.Supp.2d 661, 675 (N.D. Ill. Sept. 5, 2012) ("A plaintiff has the burden of proving damages to a reasonable degree of certainty."); 4 *Newberg on Class Actions*, at § 12.4 ("models that 'reasonably' account for the defendant's liability are acceptable."). The main problem is that WDES has not provided sufficient evidence that its principal (Amy Lynn Grossman) is qualified to opine on an estimate of the labor component of a tenant's union contracting costs under Federal Rule of Evidence 701 or 702. Even if Grossman was qualified to give an expert or lay opinion on labor costs, WDES has fallen short of showing that her opinion has an adequate factual foundation. WDES has not offered any supporting factual foundation for the process Grossman used to arrive at her labor costs opinion. The extent of her testimony on this issue is a few lines at her depositions where she could not give the basis for her estimate. Doc. 105-7 at 145:1-9; doc. 125-9 at 167:9-20, 210:20-212:21. In addition, WDES's remaining evidence does not adequately substantiate its claim that 51% is a reasonable estimate of the union labor costs of a tenant's bottom-line costs on a contractor invoice.

Without the critical labor component information, Dr. Kaestner's damages methodology cannot be used. It follows then the process of determining damages for each individual class member would necessarily require individual proof based on whether each contractor for each project can reasonably estimate the specific costs for union labor. Proving damages will therefore result in the "intractable process" of asking every single one of the contractors each tenant used for each renovation project whether the specific cost for that union labor can reasonably be broken out from other non-labor items charged to the tenant. Doc. 125 at 28; *Comcast Corp.*, 569 U.S. at 34 (absent another damages methodology, plaintiff cannot show predominance because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."). Because WDES has not met its burden of offering sufficient proof of a reasonable

approach to estimating the union labor costs Dr. Kaestner's methodology requires, it has not shown that there is a classwide method of proving damages for the Contracting Subclass. *Comcast Corp.*, 569 U.S. at 35 (without a usable common model of measuring damages, plaintiff "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."). Thus, predominance is lacking for the additional reason that WDES failed to offer sufficient proof that any resulting damages for the Contracting Subclass would be established by sufficiently common proof.[15]

## CONCLUSION

For all these reasons, WDES's supplemental request for class certification [183] is denied.

**SO ORDERED.**

Dated: April 7, 2022

Sunil R. Harjani
United States Magistrate Judge

---

[15]    Because WDES has failed to show that common issues predominate, the Court need not consider Rule 23(b)(3)'s superiority requirement. *In re Testosterone Replacement Therapy Products Liability Litigation*, 2018 WL 3586182, at *21 (N.D. Ill. July 26, 2018); *Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 375 (N.D. Ill. 2012).